UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA          :

          -v-                     :          **INDICTMENT**

PAUL M. DAUGERDAS,                :          09 Cr.
ERWIN MAYER,
DONNA GUERIN,                     **09 CRIM      581**
DENIS FIELD,
ROBERT GREISMAN,                  :
RAYMOND CRAIG BRUBAKER, and
DAVID PARSE,                      :
          Defendants.

                                  :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## COUNT ONE
### (Conspiracy – All Defendants)

The Grand Jury charges:

## I.   PERTINENT INDIVIDUALS AND ENTITIES

### A.   The Jenkens & Gilchrist Defendants and Co-Conspirator

1.      Through on or about August 31, 1994, defendant PAUL M.

DAUGERDAS, a lawyer and Certified Public Accountant ("CPA"), was a long-time tax

partner at the accounting firm of Arthur Andersen LLP, in Chicago, Illinois.  From in or

about November 1994 until late December 1998, DAUGERDAS was a tax partner and head

of the tax department at the Chicago law firm of Altheimer & Gray ("A&G").  On or about

December 29, 1998, DAUGERDAS resigned from A&G and, commencing on or about

January 1, 1999, became the managing shareholder of the newly-formed Chicago office of Jenkens & Gilchrist, PC ("J&G"), a law firm headquartered in Dallas, Texas. DAUGERDAS served as the Chicago office's managing shareholder and head of the Chicago tax practice at J&G until in or about April 2004.   At both A&G and J&G, DAUGERDAS's tax practice centered around the design, marketing, and implementation of tax shelters.

2.      At all times relevant to this Indictment, defendant ERWIN MAYER was a lawyer and an accountant, and defendant DONNA GUERIN was a lawyer and a CPA. From at least 1994 through late December 1998, MAYER and GUERIN were tax partners in A&G's Chicago office.   In late December 1998, MAYER and GUERIN moved to the Chicago office of J&G as shareholders with defendant PAUL DAUGERDAS and other A&G lawyers.  From at least 1994 thereafter, MAYER and GUERIN's practices included the design, marketing, and implementation of tax shelters.

3.      Lawyer A, a co-conspirator not named as a defendant herein, was an associate lawyer in J&G's Chicago tax practice from June 1999 to November 2004.  During his tenure at J&G, Lawyer A, who has a Master of Laws degree in Taxation, worked primarily for defendants PAUL DAUGERDAS, DONNA GUERIN, and ERWIN MAYER (collectively hereinafter, "the J&G DEFENDANTS") in J&G's Chicago office in the design, marketing, and implementation of tax shelters.

**B.**    **The BDO Defendants and Co-Conspirators**

4.    At all times relevant to this Indictment, BDO Seidman LLP ("BDO") was a major international accounting firm, which maintained its headquarters in Chicago, Illinois, and offices in various other United States cities, including New York, New York. BDO provided audit services to many corporate clients, and provided tax services to corporate and individual clients, including some of the wealthiest individuals in the United States. Those tax services included preparing tax returns, providing tax advice, and representing clients in audits by the Internal Revenue Service ("IRS") and litigation with the IRS in Tax Court.

5.    At all times relevant to this Indictment, defendant DENIS FIELD was a lawyer with a Master of Laws degree in Taxation and a CPA. FIELD became the head of National Tax at BDO in 1996, and the Chairman and Chief Executive Officer of BDO in 1999, a position he held until October 2003.

6.    In or about early 1998, defendant DENIS FIELD, while BDO's National Tax leader, formed a group devoted to designing, marketing, and implementing high-fee tax strategies for individual clients, often with law firms, investment firms, and financial institutions. Initially called the "Tax Sales Executive Group" and "Tax Products Group," the group's name was changed to the "Tax Solutions Group" or "TSG" (collectively hereinafter "TSG") in or about October 1999. The strategies marketed by the TSG included tax shelters that could be used by wealthy clients to eliminate or reduce taxes on significant income or

gains. The tax shelters generally generated non-economic tax benefits — primarily losses or gain eliminations — that far outweighed the costs to enter into the tax shelters. BDO touted the tax shelters internally as "value-added products" whereby fees far in excess of the normal BDO hourly billing rates would be charged.

7.     From 1984 through in or about October 2004, Charles W. Bee, Jr., a co-conspirator not named as a defendant herein, was a CPA and a partner in BDO's international tax group in its New York office. Bee also served as BDO's National Director for International Taxation. From in or about July 1999 through October 2003, Bee was a member of BDO's Board of Directors. From June 2000 until October 2003, Bee served as a Vice-Chairman of BDO.

8.     From July 1995 through in or about October 2000, Adrian Dicker, a co-conspirator not named as a defendant herein, was a United Kingdom chartered accountant and a partner in BDO's international tax group in its New York office. From in or about early 1999 through October 2000, Dicker was a member of BDO's Board of Directors, and thereafter through in or about October 2003, Dicker served on the Board of Directors as a retired partner director.    From June 2000 until October 2000, Dicker served as a Vice-Chairman of BDO.

9.     From 1998 through October 2003, defendant DENIS FIELD and Charles W. Bee, Jr., and Adrian Dicker, co-conspirators not named as defendants herein, were the leaders of the TSG. They were also members of BDO's Tax Opinion Committee,

which analyzed tax shelter products for their potential use by BDO's clients, and reviewed templates of opinion letters to be utilized in connection with some of those tax shelters.

10.     At all times relevant to this Indictment, defendant ROBERT GREISMAN was a lawyer and CPA, and a partner in BDO's Chicago office. GREISMAN was a member of BDO's TSG and assumed TSG leadership responsibilities upon the retirement of Adrian Dicker, a co-conspirator not named as a defendant herein. GREISMAN was also a member of BDO's Tax Opinion Committee. GREISMAN was the point person within BDO for the preparation of income tax returns related to the reporting of tax results of BDO's clients' tax shelters. GREISMAN also oversaw the provision of information to the IRS in connection with audits of various BDO tax shelter clients' income tax returns.

11.     Between 1998 and 2008, Michael Kerekes, a co-conspirator not named as a defendant herein, was a lawyer and a principal in BDO's Los Angeles office, where he acted as a technical tax expert and advisor to others at BDO. Kerekes was a member of BDO's TSG and Tax Opinion Committee.

12.     In or about late 1998, through the efforts of defendants DENIS FIELD, ROBERT GREISMAN, and others, BDO entered into an alliance with J&G, pursuant to which BDO assisted in the design, marketing, and implementation of certain J&G tax shelters to BDO's clients and potential clients, acted as a referral source for clients to purchase certain J&G tax shelters, and prepared certain of the income tax returns reporting the tax benefits of the tax shelters. In return, J&G paid BDO a portion of the fees J&G collected

-5-

from clients as a result of the sale of the tax shelters. Beginning in or about the Fall of 1999, BDO charged its tax shelter clients its own fee, in addition to the fee it received from J&G on the BDO clients' tax shelter sales.

C.    **The "Bank A" Defendants**

13.    Bank A, a foreign bank with United States headquarters in New York, New York, structured and implemented many of the financial transactions used in the J&G tax shelters, including those involving BDO and others.

14.    From at least 1994 until in or about 1997, Investment Banking Firm A was an investment banking firm with offices nationwide, including Chicago, Illinois, and Dallas, Texas. From 1997 until in or about June 1999, Investment Banking Firm A was an investment banking subsidiary of a national bank. In or about June 1999, Investment Banking Firm A became an investment banking subsidiary of Bank A (Investment Banking Firm A and Bank A sometimes collectively hereinafter "Bank A").

15.    Beginning in or about 1998, defendant RAYMOND CRAIG BRUBAKER (hereinafter "CRAIG BRUBAKER" or "BRUBAKER"), a lawyer and CPA, was an Investment Representative in Investment Banking Firm A's Dallas office. Prior to joining Investment Banking Firm A, BRUBAKER was a partner at the Dallas office of the Arthur Andersen accounting firm, where as a member of the private client practice he assisted high net worth individuals in tax planning and wealth management. Beginning in or about 1998, BRUBAKER participated in the design, marketing, and implementation of

certain tax shelters with the J&G DEFENDANTS and others.  BRUBAKER's primary contact at J&G was defendant ERWIN MAYER.  BRUBAKER received substantial commissions from the implementation of the J&G tax shelters, among others.

16.    Beginning in or about 1996, defendant DAVID PARSE, a CPA, was an Investment Representative in Investment Banking Firm A's Chicago office.  From in or about 1998, PARSE participated in the design, marketing, and implementation of certain tax shelters with the J&G DEFENDANTS, Lawyer A, a co-conspirator not named as a defendant herein, defendants DENIS FIELD and ROBERT GREISMAN and others.  PARSE earned substantial commissions from the implementation of the J&G tax shelters, among others.

17.    From in or about 1998 through in or about 2003, defendants CRAIG BRUBAKER and DAVID PARSE worked with the Investment Banking Firm A's Private Client Fixed Income desk in Baltimore, Maryland, and Bank A's foreign exchange trading desk ("Bank A's FX desk") in New York, New York, to structure and implement the financial products used in certain J&G tax shelters.  J&G and BDO referred tax shelter clients to BRUBAKER and PARSE in order for them to provide additional details to the clients about the options, stock, and foreign currency to be used in the implementation of the J&G tax shelters.

D.    **The HOMER Co-Conspirators and Entities**

18.    At all times relevant to this Indictment, John B. Ohle III ("John Ohle"), a co-conspirator not named as a defendant herein, was a lawyer and a CPA.  From in or about

November 1999 through early 2002, Ohle was employed by a national bank ("Bank B") in its "Innovative Strategies Group" ("ISG"), which maintained its principal office in Chicago, Illinois. The ISG provided estate planning and tax shelter strategies for high net worth clients, including a tax shelter known as "Hedge Option Monetization of Economic Remainder" or "HOMER." Ohle supervised certain activities of the ISG, including the sales of HOMER, and was its lead salesperson.

19.    Individual A, a co-conspirator not named as a defendant herein, was a childhood friend of John Ohle, a co-conspirator not named as a defendant herein. Ohle enlisted Individual A to participate in the HOMER tax shelters as the purported unrelated third-party "buyer" of certain assets in return for substantial compensation.

E.    **Other Pertinent Entities**

20.    At all times relevant to this Indictment, Accounting Firm A was a national accounting firm with an office in Chicago. J&G referred tax shelter clients to Individual B at Accounting Firm A for preparation of income tax returns related to the reporting of the tax results of the tax shelters. Accounting Firm A referred clients to J&G for the purchase and implementation of tax shelters.

21.    At all times relevant to this Indictment, an outside law firm for BDO ("BDO Outside Law Firm A") was a major international law firm, with offices in New York and Washington, among other places.

-8-

## II.   INTRODUCTION

22.   From at least in or about 1994 through at least in or about 2004, PAUL DAUGERDAS, ERWIN MAYER, DONNA GUERIN, DENIS FIELD, ROBERT GREISMAN, CRAIG BRUBAKER, and DAVID PARSE, the defendants, and others known and unknown to the Grand Jury (hereinafter their "co-conspirators") participated in a scheme to defraud the IRS by designing, marketing, implementing and defending tax shelters using means and methods intended to deceive the IRS about the bona fides of those shelters, and about the circumstances under which the tax shelters were marketed and implemented.

23.   Defendants PAUL DAUGERDAS, ERWIN MAYER, DONNA GUERIN, DENIS FIELD, ROBERT GREISMAN, CRAIG BRUBAKER, and DAVID PARSE, and their co-conspirators designed, marketed, and implemented fraudulent tax shelters known as the Short Sale, Short Options Strategy ("SOS"), Swaps, and HOMER tax shelters (collectively hereinafter "the J&G tax shelters") for clients through false and fraudulent means; prepared and caused to be prepared, and filed and caused to be filed by the clients with the IRS, false and fraudulent U.S. individual income tax returns reporting the fraudulent tax shelter losses, resulting in the payment of far lower taxes by the clients; and fraudulently concealed from and misrepresented the true nature of the tax shelters to the IRS, in order to enrich themselves personally through the generation of extraordinary fee and commission income.   Defendants DAUGERDAS, MAYER, FIELD, GREISMAN, BRUBAKER, and PARSE also utilized tax shelters to evade their own taxes on income

received largely through the sale of the fraudulent tax shelters.

24.   Defendants PAUL DAUGERDAS, ERWIN MAYER, DONNA GUERIN, DENIS FIELD, ROBERT GREISMAN, CRAIG BRUBAKER, and DAVID PARSE, and their co-conspirators designed, marketed, and implemented the J&G tax shelters — portrayed to clients as turnkey tax elimination products — as a means for wealthy individuals generally with multi-million dollar taxable income or gains to fraudulently eliminate or reduce the tax paid to the IRS on that income or gains.  Thus, instead of the wealthy clients paying U.S. individual income taxes generally between 20% and 40% of the their taxable income, the clients could choose the amount of tax loss or benefits, and pay certain of the defendants, co-conspirators, and others an "all-in" cost generally equal to 5 to 10% of the desired tax loss or benefit.  This all-in cost included the fees of J&G, BDO, Bank B, third-party referral sources, and/or others, as well as the net premium to Bank A used to execute the purported "investments" that were designed to make it appear that the shelters were legitimate investments rather than tax shelters, from which defendants BRUBAKER and PARSE took their commissions.  The size of the purported investments and the amount of the fees paid to certain defendants, co-conspirators, and others were determined based on the tax loss to be generated.

25.   Defendants PAUL DAUGERDAS, ERWIN MAYER, DONNA GUERIN, DENIS FIELD, ROBERT GREISMAN, CRAIG BRUBAKER, and DAVID PARSE, and their co-conspirators understood that if the IRS were to detect the clients' use

of the respective tax shelters and learn the true facts and circumstances surrounding their design, marketing, and implementation, including their lack of both economic substance and genuine business purpose, the IRS would disallow the claimed tax benefits, and seek to impose substantial penalties, in addition to the tax and interest owed.   Accordingly, defendants DAUGERDAS, MAYER, GUERIN, FIELD, GREISMAN, BRUBAKER, and PARSE and their co-conspirators undertook to prevent the IRS from: (i) detecting their clients' use of these tax shelters; (ii) understanding how the steps of the tax shelters operated to produce the purported tax benefits claimed by the clients; (iii) learning that these tax shelters were marketed as cookie-cutter products that were designed to and did significantly reduce or eliminate the clients' tax obligations; (iv) learning that any potential payout from the financial product used in the tax shelter could never overcome the total fees required to engage in the tax shelter; (v) learning that the clients were not genuinely seeking profit-making investment opportunities, but were, instead, seeking huge tax benefits; and (vi) learning that from the outset the clients intended to complete a preplanned series of steps that had been designed by the defendants and their co-conspirators to lead to the specific tax losses sought by the clients.

## III.  THE TAX SHELTERS

### A.  The Fraudulent Short Sale, SOS, and Swaps Shelters

26.     While at A&G, defendants PAUL DAUGERDAS, ERWIN MAYER, and DONNA GUERIN designed, marketed, and implemented a tax shelter known as the

Short Sale tax shelter, which DAUGERDAS had designed, marketed, and implemented while at Arthur Andersen. DAUGERDAS, MAYER, and GUERIN brought the Short Sale tax shelter with them to J&G, and marketed and implemented it with defendants DENIS FIELD, ROBERT GREISMAN, CRAIG BRUBAKER, and DAVID PARSE, and others.

      27.    The Short Sale tax shelter was typically implemented through three entities set up by J&G — a single-member limited liability company ("LLC"), a partnership, and an S corporation — and typically involved the following preplanned steps. Through the LLC, the client borrowed U.S. Treasury securities ("Treasuries") from Bank A and then sold them, thereby generating cash proceeds for the client (the so-called "short sale" of Treasuries). Subsequently, the client contributed the proceeds to a partnership, together with the obligation to close, or "cover," the short position through the purchase of replacement Treasuries. Although the contribution of the short sale cash proceeds — in an amount that correlated to the tax loss sought by the client — was treated as a partnership asset (thereby increasing the client's tax basis in the partnership), J&G took the position that the obligation to cover the short sale was not a liability for tax purposes because, notwithstanding the obligation to replace the Treasuries, the precise amount required to do so was not yet fixed or determined. Using additional client funds, the client through his or her partnership purchased a small amount of either shares of stock or foreign currency, or the client contributed such assets to the partnership. The short sale would then be closed, usually after just a few days' duration and always before year's end. Following liquidation of the

partnership (typically through transfer of partnership assets to the S corporation), the client's purportedly stepped-up basis in the partnership would carry over to the assets of the partnership -- the stock or the foreign currency.  J&G took the position that the subsequent sale of that stock or foreign currency, executed through Bank A, produced reportable tax losses for the clients.  Those non-economic losses were approximately equivalent to the basis increase that had been purportedly produced through the tax shelter, and were the tax losses that the client sought in the purchase of the tax shelter.  Those tax losses vastly exceeded any actual economic loss suffered by the client.  The reporting of the tax shelter's tax benefits on the client's tax returns substantially reduced or eliminated the amount of taxes owed by the client.

28.  A second and similar tax shelter, known as the "short options strategy" or "SOS" tax shelter, was designed, marketed, and implemented by the J&G DEFENDANTS and Lawyer A, a co-conspirator not named as a defendant herein, with defendants CRAIG BRUBAKER and DAVID PARSE at Bank A, and for certain clients by defendants DENIS FIELD and ROBERT GREISMAN at BDO, and others.  It typically involved the following preplanned steps.  Through an LLC, the client purchased from Bank A a long foreign currency digital option with a stated premium, or cost, equaling the amount of the tax loss the client  sought to generate.  Simultaneously, the client sold to Bank A a short foreign currency digital option with a virtually offsetting premium.  The only money that the client was required to pay to Bank A — which was the only amount that the client was at risk of

loss — was the difference between the premiums paid for the long and received for the sale of the short ("the net premium"), which typically was one percent (1%) of the tax loss sought by the client. Virtually all of the J&G SOS options had an approximate one-third chance of doubling the net premium, two-third chance of losing the net premium and a purported remote possibility of making a much larger multiple of the net premium (the so-called "lottery" or "sweet spot").

29.     The client then contributed the long and short options to a partnership, which resulted in an increase in the client's tax basis in the partnership equal to the long option. J&G took the position that the short option would not be treated as a liability for tax purposes, and thus no adjusting decrease in the client's basis in the partnership would occur. As in the Short Sale tax shelter, using funds supplied by the client, the partnership then purchased a small amount of foreign currency or shares of stock, or the client contributed such assets to the partnership. Thereafter, often after a short duration and always before year's end, the partnership would close the options positions. Following liquidation of the partnership (typically through transfer of partnership assets to the S corporation), the client's purportedly stepped-up basis in the partnership would carry over to the assets of the partnership — the stock or the foreign currency. J&G took the position that the subsequent sale of that stock or foreign currency, executed through Bank A, produced reportable tax losses for the clients. Those non-economic losses were approximately equivalent to the basis increase that had been purportedly produced through the tax shelter, and were the tax losses

that the client sought in the purchase of the tax shelter. Those tax losses vastly exceeded any actual economic loss suffered by the client. The reporting of the tax shelter's tax benefits on the client's tax returns substantially reduced or eliminated the amount of taxes owed by the client.

30.    A third and similar tax shelter, known as the "Swaps" tax shelter, was designed, marketed, and implemented by the J&G DEFENDANTS and Lawyer A, a co-conspirator not named as a defendant herein, with defendants CRAIG BRUBAKER and DAVID PARSE at Bank A and others. It typically involved the following preplanned steps. Through an LLC, the client entered into two swaps (notional principal contracts) positions, requiring an up-front payment ("yield adjustment fee") to acquire one swap (the "long swap"), and resulting in the receipt of a yield adjustment fee with respect to the other swap (the "short swap"). The only money that the client was required to pay to Bank A — which was the only amount that the client was at risk of loss — was the net premium, which in the Swaps tax shelter was typically two-and-a-half percent (2.5%) of the tax loss sought by the client.

31.    As in the SOS tax shelter, the client contributed the two swaps positions to a partnership, which would result in an increase in the client's tax basis in the partnership equal to the long swap. J&G took the position that the short swap would not be treated as a liability for tax purposes, and thus no adjusting decrease in the client's basis in the partnership would occur. As in the short sale and SOS tax shelters, using funds supplied by

the client, the partnership then purchased a small amount of foreign currency or shares of stock, or the client contributed such assets to the partnership. Thereafter, often after a short duration and always before year's end, the partnership would close the swaps positions. Following liquidation of the partnership (typically through transfer of partnership assets to the S corporation), the client's purportedly stepped-up basis in the partnership would carry over to the assets of the partnership — the stock or the foreign currency. J&G took the position that the subsequent sale of that stock or foreign currency, executed through Bank A, produced reportable tax losses for the clients. Those non-economic losses were approximately equivalent to the basis increase that had been purportedly produced through the tax shelter, and were the tax losses that the client sought in the purchase of the tax shelter. Those tax losses vastly exceeded any actual economic loss suffered by the client. The reporting of the tax shelter's tax benefits on the client's tax returns substantially reduced or eliminated the amount of taxes owed by the client.

**B.     The Fraudulent HOMER Tax Shelter**

        32.     A fourth tax shelter, known as the "HOMER" tax shelter, was designed, marketed, and implemented by the J&G DEFENDANTS and Lawyer A, a co-conspirator not named as a defendant herein, with defendant DAVID PARSE at Bank A and John Ohle, a co-conspirator not named as a defendant herein, and others at Bank B. The HOMER tax shelter, which was sold exclusively by J&G and Bank B, typically involved the following preplanned steps. The client purchased from Bank A two pairs of specialized foreign

currency or bond options. By design, two of the options would win and two would lose. Bank A charged a net premium of 1.25% of the desired tax loss for the options. Bank A loaned the client virtually all of the funds necessary to purchase the options, with the client providing the small balance.

33.     The client transferred the options to a grantor retained trust formed by J&G for the client. The client then gifted a small interest in the trust to a chosen beneficiary (the "Unitrust Beneficiaries"), with the client retaining a remainder interest. The client thereafter sold his or her remainder interest to a purportedly unrelated third-party partnership owned by Individual A and his wife, receiving in exchange a promissory note secured by the remainder interest in the trust. At the end of a complex series of steps, usually of a short duration, the client received the tax losses he or she purchased, the Unitrust Beneficiary received a payment from Individual A generally in an amount less than $10,000, and Individual A received .15% of the amount of the client's tax loss and the gains from the options. In one instance, where there were several individuals in a group doing a HOMER tax shelter, the clients each designated one of the others as his Unitrust Beneficiary, resulting in a circular exchange of the Unitrust Beneficiary payments between the clients.

34.     The HOMER tax shelter was carefully constructed so that neither Bank A, the client (except for the net premiums paid for the options), the Unitrust Beneficiaries, nor Individual A were at risk of meaningful loss at any stage of the tax shelter. The tax losses purportedly created by the tax shelter vastly exceeded any actual economic loss

suffered by the client.  The reporting of the tax shelter's tax benefits on the client's tax returns substantially reduced or eliminated the amount of taxes owed by the client. Individual A received over $1,000,000 in income from his participation in the HOMER tax shelters, and, with the assistance of John Ohle, a co-conspirator not named as a defendant herein, used a tax shelter to eliminate taxes on that income.

## IV.    THE TAX SHELTER FRAUD

### A.    Fraud in the Design of the J&G Tax Shelters

35.    The Short Sale, SOS, and Swaps tax shelters were designed to produce tax losses for the clients through a contrived, preplanned, and preordained series of steps that lacked both economic substance and business purpose, and resulted in non-economic losses from the shelter flowing to the clients in order to offset their taxable income and reduce their income tax liabilities.  There was no reasonable possibility for the clients to make a profit, given the duration and structure of the tax shelters and the fees required to be paid to obtain the losses.  Defendants PAUL DAUGERDAS, ERWIN MAYER, DONNA GUERIN, DENIS FIELD, ROBERT GREISMAN, CRAIG BRUBAKER, and DAVID PARSE, Lawyer A, a co-conspirator not named as a defendant herein, and their co-conspirators marketed the Short Sale, SOS, and Swaps tax shelters as a way to eliminate clients' taxes. The use of the entities in the Short Sale, SOS, and Swaps tax shelters — the LLC, partnership, and S corporation — was designed to achieve the desired tax loss in a manner that concealed the true nature of the tax shelters from the IRS.

-18-

36.     In structuring the options to be used in the SOS tax shelter, defendant CRAIG BRUBAKER requested that Bank A's FX desk provide pricing on a pair of a long and short options with a so-called "sweet spot" or lottery feature. Pursuant to BRUBAKER's request, Bank A's FX desk constructed the SOS options whereby the tax shelter client's out-of-pocket cost would be one per cent (1%) of the net of the long and short options premiums. The pricing on these options was set at an inflated price, which the tax shelter clients seeking huge tax losses would pay but which a true investment client would not pay, in order to increase revenues to Bank A.

37.     As the defendants and others well knew, there was in fact no reasonable possibility that the sweet spot would ever be hit by a tax shelter client.  Indeed, because the risk of having to make a payout on the sweet spot was so small — essentially nil — Bank A's FX desk made a decision not to hedge the sweet spot.  Despite the lack of any possibility of a sweet spot payout, defendants PAUL DAUGERDAS, DONNA GUERIN, ROBERT GREISMAN, CRAIG BRUBAKER, DAVID PARSE, and ERWIN MAYER, and others continued to portray the sweet spot as a remote but real possibility to potential tax shelter clients.  They did so in order to enable the tax shelter clients to argue to the IRS that the sweet spot provided profit potential, when the defendants knew there was none because the sweet spot could not be hit and Bank A would not permit it to be hit.  BRUBAKER and PARSE, in conjunction with Bank A's FX desk, offered early termination payments — typically less than double the net premium payout amount — to a number of clients whose

options were close to paying out.

38.     The HOMER tax shelter was a tax shelter designed to produce tax losses for the clients through a contrived, preplanned, and preordained series of steps that lacked economic substance and resulted in losses from the options flowing to the HOMER clients in order to offset their taxable income, and gains from the options being left with a purportedly unrelated third party, Individual A, whose participation in the HOMER tax shelters was funded by John Ohle, a co-conspirator not named as a defendant herein.  There was no reasonable possibility for the HOMER clients to make a profit, given the structure of the HOMER options and the fees required to be paid to obtain the losses.  Moreover, the HOMER clients did not engage in the HOMER tax shelters to make a gift of approximately $10,000 to a beneficiary, much less pay hundreds of thousands or millions of dollars of fees to J&G, Bank A, and Bank B to do so.  Defendants PAUL DAUGERDAS, ERWIN MAYER, DONNA GUERIN, and DAVID PARSE, and Lawyer A and John Ohle, co-conspirators not named as defendants herein, and their co-conspirators, marketed the HOMER tax shelters as a way to eliminate clients' taxes.  The use of the entities in the HOMER tax shelter — the grantor trust, partnerships, and S corporations — was designed to achieve the desired tax loss in a manner that concealed the true nature of the tax shelter from the IRS.

39.     The fees charged to the tax shelter clients were based on the amount and character of the tax losses sought by the clients.  For the Short Sale, SOS, and Swaps shelters, J&G generally charged the clients a fee of three per cent (3%) of the desired tax loss for capital losses, and a fee of four per cent (4%) of the desired tax loss for ordinary losses.  For BDO clients, J&G further agreed to pay BDO 20% of the fee J&G received.  BDO, which marketed the tax shelters to existing and potential clients, also typically charged the client an additional fee of three to five per cent (3%-5%) of the desired tax loss.  Bank A generally received commissions for the Short Sale tax shelters, a 1% net premium on the SOS tax shelters, and a 2.5% net premium on the Swaps tax shelters.  The net premium included Bank A's profit and the costs of implementing the options.  J&G paid other referral sources 20-50% of its fees in payment for the referral of clients.  J&G charged the HOMER clients fees generally totaling 6%, or 600 basis points, of the tax loss they sought, which included the net premium of 1.25% to Bank A.  The remaining 4.75% in fees were divided among J&G (2.6%), Bank B (1.8%), and Individual A (.15%), and Bank B as the trustee of the grantor trust (.2%).

**B.     <u>Fraud in the Marketing of the J&G Tax Shelters</u>**

40.     To obtain tax shelter clients, the J&G DEFENDANTS created a large referral network, soliciting clients from numerous sources including other law firms and accounting firms.  J&G paid the referral sources millions of dollars in fees in exchange for the client referrals.  One of the most significant referral sources for the J&G DEFENDANTS

was BDO, with whom J&G did hundreds of tax shelters.  BDO surveyed its base of tax and audit clients for tax shelter prospects, and developed alliances with other financial firms to provide referrals to the J&G DEFENDANTS for additional tax shelter clients.  Another referral source was Accounting Firm A, which referred clients to the J&G DEFENDANTS for the sale and implementation of J&G tax shelters.  In compensating certain of the referral sources who had used their J&G tax shelters to eliminate their taxes, defendant ERWIN MAYER caused the amount of referral fees owed to the referral sources to be netted against the cost of their individual tax shelters.

41.    Another referral source, and virtually the sole source of referrals on the HOMER tax shelter was Bank B.  Bank B employees, led by John Ohle, a co-conspirator not named as a defendant herein, encouraged high net worth clients of Bank B to purchase the HOMER tax shelter, with Bank B employees, including Ohle, receiving bonuses if their clients implemented a HOMER tax shelter.

42.    Defendant CRAIG BRUBAKER also solicited various law, accounting, and other firms to become referral sources for tax shelter clients in return for a fee.  Defendant DAVID PARSE referred some of his clients to J&G in order for the purchase of a J&G tax shelter.  Both BRUBAKER and PARSE participated in some of the meetings in which tax shelters were pitched to clients.

C.      **Fraud in the Implementation of the J&G Tax Shelters**

(1)      **The false and fraudulent J&G opinion letters**

43.      The law in effect at all times relevant to this Indictment provided that if a taxpayer claimed a tax benefit by using a tax shelter, and that benefit was later disallowed, the IRS could impose substantial penalties upon the taxpayer — ranging from 20% to 40% of the underpayment attributable to the shelter — unless the claimed tax benefit was supported by an independent opinion, reasonably relied upon by the taxpayer in good faith, that the client would "more likely than not" prevail in claiming the tax benefits from the tax shelter if challenged by the IRS. Thus, in order to encourage clients to participate in the tax shelters, J&G provided a cookie-cutter "more likely than not" opinion letter ("the opinion letter") to the tax shelter clients. However, PAUL DAUGERDAS, ERWIN MAYER, DONNA GUERIN, DENIS FIELD, ROBERT GREISMAN, CRAIG BRUBAKER, and DAVID PARSE, the defendants, and their co-conspirators knew the tax shelter opinion letters were based on false and fraudulent statements and omitted material facts. By helping clients obtain the false and fraudulent opinion letters, with the understanding and intent that they would be presented to the IRS in defense of the transaction, if and when the clients were audited, the defendants and their co-conspirators sought not only to undermine the ability of the IRS to ascertain the clients' true tax liabilities, but also to undermine the IRS's ability to determine whether penalties should be imposed.

44.    The J&G SOS opinion letter contained the following false and fraudulent representations, among others:

      a.    The opinion stated:

> You entered into the purchase and sale of the Options for substantial nontax business reasons, including (i) to produce overall economic profits because of your belief that the [foreign currency]/U.S. Dollar exchange rate and the [second foreign currency]/U.S. Dollar exchange rate relationships would change; and (ii) your belief that the most direct way, with the most leverage, to realize gain from expected changes in currency prices was the purchase and sale of the Options.

In truth and fact, the clients entered into the purchase and sale of the options in order to obtain the desired tax benefits, and had no substantial nontax business reasons for entering into them.

      b.    The opinion stated, "You contributed the Options to the Partnership for substantial nontax business reasons, including, but not limited to, potential diversification of the risks of certain investments, the desire to co-invest as partners with the other co-partners and for your convenience." In truth and fact, the clients had no substantial nontax business reasons for that step, and the clients took that step because the conspirators directed them to do so in order to achieve the tax losses or benefits they purchased.

      c.    The opinion stated, "Your contribution of your interest in the Partnership to [the S corporation] was made for substantial nontax business reasons including, but not limited to, consolidation of investment activities, bookkeeping, accounting and tax functions and elimination of duplicate work and expenses in administration." In truth

and fact, the clients made the contribution in order to achieve the tax benefits and for no nontax business reason whatsoever.

        d.     The opinion stated, "Neither you, [the] LLC, the Partnership, nor [the S corporation] were obligated to engage in any transaction to which our opinions herein relate upon the completion of any other of such Transactions." In truth and fact, the defendants marketed to their clients, and the clients had paid fees to obtain, a tax shelter that, while not legally compelling a participant to complete any particular part of the transaction, consisted of a contrived, preplanned, and preordained series of steps designed to result in the predetermined tax benefits, for which the client was paying large fees.

        e.     The opinion stated, "To the best of your knowledge, you have provided to us all the facts and circumstances necessary for us to form our opinion, and the facts stated herein are accurate." In truth and fact, the defendants virtually never spoke with the clients about the facts and circumstances, or any of the representations, contained in the opinion letters, did not receive affirmation about the veracity of the facts and circumstances or the representations from any representative of the clients, and in some instances had no client contact at all.

        45.     The J&G Short Sale and Swaps opinion letters contained false and fraudulent representations virtually identical to those in the SOS opinion letters, all intended to convey to the IRS and federal courts that the clients had substantial nontax business reasons for entering into the various steps of the tax shelters, when in truth and fact the

clients had no nontax business purpose — their purpose was to obtain the tax losses.

      46.    The HOMER opinion letters contained the following false and fraudulent representations, among others:

      a.    The opinion stated, "[T]he Trust was created for the purposes of effectuating a gift to the Unitrust Beneficiary and conserving and protecting the assets of the Trust for the benefit of the Trust's beneficiaries[;]" when, in truth and fact, the clients created the trust at the direction of J&G for the purpose of executing the HOMER tax shelter, and not for genuine estate planning reasons.

      b.    The opinion stated, "You [the client] entered into the Options for substantial nontax business reasons, including (i) to produce overall economic profits because of your belief that the relevant bond prices would change; and (ii) your belief that the most direct way, with the most leverage, to realize gain from expected changes in currency prices was the Options." In truth and fact, the clients purchased the options — which were designed by the joint efforts of the J&G lawyers and employees of Bank B pursuant to predetermined parameters and durations — in order to obtain the desired tax benefits, and thus the clients had no substantial nontax business reasons for entering into the options.

      c.    The opinion stated,

> You [the client] entered into the Transactions, other than the creation of the Trust, for substantial nontax business reasons, including (without limitation) your belief that the potential economic benefits of owning the Note [the promissory note

provided by the third-party buyer] outweighed the potential economic benefits of retaining the Remainder Interest, and a desire to maximize profits and minimize risks with respect to your various investment activities.

In truth and fact, the clients sold the options to the third-party buyer because defendants PAUL DAUGERDAS, DONNA GUERIN, and ERWIN MAYER, Lawyer A and John Ohle, co-conspirators not named as a defendant herein, and others advised the clients that such a sale was a necessary step to achieve the tax benefits. The clients were generally not provided with information about the financial health and credit-worthiness of the third-party buyer in order to be able to assess whether selling the Remainder Interest in exchange for the Note was an economically sound decision.

        d.      The opinion letter stated, "Neither you, the Trust, the Buyer, nor the Unitrust Beneficiary were obligated to engage in any transaction to which our opinion related upon the completion of any other of such transaction," when in truth and fact, J&G and Bank B marketed to their clients, and the clients had paid fees to obtain, a tax shelter that, while not legally compelling a participant to complete any particular part of the tax shelter, consisted of a preplanned series of steps designed to result in the predetermined tax benefit, for which the client was paying large fees.

        e.      The opinion letter stated, "You are not related, directly or indirectly, to the Buyer [Individual A] or any Buyer's successors, and your sale of the Remainder Interest to the Buyer was an arm's length transaction." In truth and fact, the use of Individual A was a preplanned part of the HOMER shelter, whose fees were preset, and

whose receipts of the gains from the HOMER options was assured.

47.     The J&G tax shelter opinions purported to be based upon "all the facts and circumstances necessary" for J&G to form its opinion.  However, the J&G opinions failed to disclose that J&G had designed and marketed the tax shelters, and implemented them on behalf of the clients, and that J&G had collected as its fee a percentage of the loss amount generated.  In addition, the J&G opinions failed to disclosed the following material facts, among others: (i) that the tax shelter clients responded to a promotional pitch that emphasized the respective shelter's tax benefits, and they entered into the transaction primarily or exclusively to obtain those tax benefits; (ii) that the clients knew from the outset that a particular series of steps would be undertaken, for a given fee, leading ultimately to a specific tax result; (iii) that the tax shelters were structured so that each client would probably lose his entire cash contribution plus fees, and had no reasonable possibility of making a profit; and (iv) that the "more likely than not" opinion letters had been offered to the clients as part of J&G's promotion of the tax shelter.

**(2)     Backdating of transactions used to achieve fraudulent tax losses**

48.     In several instances in 2000 and 2001, J&G caused clients' tax shelter transactions to be incorrectly implemented at Bank A, which resulted in the wrong amount and/or type of tax loss to be generated for the clients.  After the close of the tax year but before the respective tax return was to be filed, defendants PAUL DAUGERDAS and DONNA GUERIN, and Lawyer A, a co-conspirator not named as a defendant herein,

discovered or were made aware of the errors and caused new transactions to be effectuated by Bank A through defendant DAVID PARSE and caused them to be backdated to the prior year. Defendants DAUGERDAS and GUERIN and Lawyer A thereafter caused false and fraudulent client tax returns to be prepared and filed using the tax losses created by the post-tax year end, backdated transactions, in violation of fundamental principles of tax accounting that require cash basis taxpayers to report transactions that actually occurred in a given tax year. Defendants DAUGERDAS, GUERIN, and PARSE and Lawyer A failed to advise those clients and their tax return preparers of the true nature and impact of the errors and the fraudulent nature of the fixes, resulting in the preparation and filing of income tax returns that reported the results of the backdated transactions as if they had occurred during the tax year. Defendants DAUGERDAS and GUERIN and Lawyer A caused J&G to issue opinion letters for those clients that omitted any mention of the backdating of some of the transactions described therein, presenting them in the opinion letter as if they had been implemented during the relevant tax year.

### (3)     The creation and use of false and fraudulent transactional documents in the J&G tax shelters

49.     In order to maximize the appearance that each tax shelter was an investment undertaken to generate profits, and to minimize the likelihood that the IRS would learn that the tax shelters were actually designed to create tax losses, defendants PAUL DAUGERDAS, ERWIN MAYER, DONNA GUERIN, DENIS FIELD, ROBERT GREISMAN, CRAIG BRUBAKER, and DAVID PARSE, and their co-conspirators, created,

assisted in creating, and reviewed transactional documents and other materials containing false and fraudulent information, including false and fraudulent descriptions of the clients' motivations for entering into the tax shelters' financial transactions and for taking the various steps that would yield the tax benefits. The defendants intended that the false and fraudulent information ultimately be provided to the IRS to support the shelter losses or benefits claimed on the tax returns and defend against the imposition of penalties. Examples of such documents include letters purporting to document the client's business purpose for the use of the partnership in the transaction and the client's investment purpose in entering into the options transaction. The J&G DEFENDANTS and Lawyer A, a co-conspirator not named as a defendant herein, also frequently drafted and sent to the clients the letters of authorization and other documents utilized to execute the preplanned steps of the J&G tax shelters, with instructions to the clients to sign but not date the documents. The J&G DEFENDANTS, Lawyer A, a co-conspirator not named as a defendant herein, and others at J&G later inserted many of the dates on the documents after the various steps had occurred.

50.    As a result of their awareness that the J&G tax shelters lacked both reasonable profit potential and business purpose, and therefore were likely to be successfully challenged by the IRS, defendants DENIS FIELD and ROBERT GREISMAN, co-conspirators Charlie Bee, Adrian Dicker, and Michael Kerekes, and other BDO TSG members developed and used a template consulting agreement to disguise the fact that the fees clients would be charged by BDO were solely for the tax shelters. The consulting

agreement contained a false and fraudulent description of the nature and scope of the services to be rendered under the agreement, and deliberately omitted any mention of the tax shelter. In truth and fact, as defendants FIELD, GREISMAN, and PAUL DAUGERDAS, co-conspirators Charlie Bee, Adrian Dicker, and Michael Kerekes, and other BDO TSG members knew, the services to be rendered by BDO under the consulting agreement and the fees referenced therein were solely for the sale and implementation of the tax shelter. This was done so that BDO and its clients could falsely tell the IRS that the fees were for services in addition to the tax shelter, and therefore only a portion of BDO's fees should be counted when conducting a profitability analysis of the tax shelter.

**(4)     Preparation of the false and fraudulent income tax returns reporting the tax shelter benefits**

51.     BDO, under the supervision of defendant ROBERT GREISMAN, prepared many false and fraudulent partnership and S corporation returns, and, for some clients, individual income tax returns, that reflected the tax benefits of the tax shelter transactions for BDO/J&G clients. J&G referred tax shelter clients to Accounting Firm A to prepare false and fraudulent partnership and S corporation returns, and for some clients, individual income tax returns that reflected the tax benefits of the tax shelters. In some instances, Accounting Firm A prepared such returns for tax shelter clients whose regular return preparer refused to prepare or sign the tax shelter returns. In other instances, the client's own return preparer prepared the tax returns that reflected the tax shelter benefits. BDO, Accounting Firm A, and many of the clients' own accountants refused to sign income

-31-

tax returns reporting the tax shelter benefits unless and until J&G issued its opinion letter.

**D.**     **Fraud During IRS Audits and Litigation Related to the J&G Tax Shelters**

52.     Beginning in or about 2002, the IRS began examinations, or audits, of certain individuals and entities that had participated in J&G tax shelters.  In connection with those examinations, the IRS sought documents and sworn testimony from individuals knowledgeable about various aspects of the tax shelters.  In order to mislead the IRS about the true nature of the tax shelters, the defendants and their co-conspirators provided and caused to be provided false information to the IRS during audits of tax shelter clients' tax returns, including false responses to IRS Information Document Requests, false sworn testimony to the IRS, and false sworn testimony in federal courts in tax shelter-related litigation.  This included false testimony by defendant CRAIG BRUBAKER, Charles W. Bee, Jr., and Michael Kerekes, co-conspirators not named as defendants herein, and various tax shelter clients.  This also included defendant ROBERT GREISMAN's coaching clients to provide false information and statements to the IRS in IRS audits, and his subornation of perjury in sworn IRS testimony.

53.     On February 18, 2004, defendant CRAIG BRUBAKER appeared before the IRS to answer questions concerning the tax shelters of a group of J&G clients who had implemented SOS tax shelters through BRUBAKER and defendant ERWIN MAYER.  After being placed under oath, BRUBAKER sought to obstruct and impede the IRS by providing false and misleading testimony concerning his involvement in the design, marketing, and

implementation of the tax shelters and the clients motivations for engaging in the fraudulent tax shelters. Among other things, BRUBAKER provided false and misleading testimony with respect to the following topics: the tax ramifications of a tax shelter client's short options transaction; the reason why a client transferred Treasury notes into the client's partnership as part of the tax shelter; the nature and purpose of a tax shelter client's conversation relating to the client's SOS tax shelter at Bank A; the origins and proprietary nature of the tax shelters; whether MAYER gave input with respect to development or implementation of any tax shelter; and the nature of BRUBAKER's relationship with MAYER.

### E.     Tax Harm Caused by the Fraudulent Tax Shelters

54.    Because the tax shelters were executed simply to generate huge tax losses (and lacked economic substance and business purpose), the tax shelters resulted in massive tax evasion caused by the defendants on behalf of their clients.

55.    The Short Sale tax shelter was marketed and sold from at least in or about 1994 through at least in or about 1999 to at least 290 wealthy individuals and generated at least $2.6 billion in false and fraudulent tax losses. Among the individuals who used Short Sale tax shelters to evade their own taxes, largely on income earned from the sale of tax shelters, were defendants PAUL DAUGERDAS, ERWIN MAYER, and CRAIG BRUBAKER.

56.    The SOS tax shelter was marketed and sold from at least in or about

1998 through at least in or about 2000 to at least 550 wealthy individuals, and generated at least $3.9 billion in false and fraudulent tax losses.  Among the individuals who used SOS-type shelters to evade their own taxes, largely on income earned from the sale of tax shelters, were defendants PAUL DAUGERDAS, ERWIN MAYER, DENIS FIELD, ROBERT GREISMAN, CRAIG BRUBAKER, and DAVID PARSE, and Charles Bee, Adrian Dicker, and other co-conspirators not named as defendants herein.

57.   The Swaps tax shelter was marketed and sold in 2001 and 2002 to at least 55 wealthy individuals, and generated more than $420 million in false and fraudulent tax losses.

58.   The HOMER tax shelter was marketed and sold in 2001 to at least 36 wealthy individuals, and generated more than $400 million in false and fraudulent tax losses.

59.   The institutions received the following approximate gross fees/ premiums from the sales of J&G tax shelter: J&G – $230 million; BDO – $44 million; Bank A – $99 million; and Bank B – $5.2 million.

F.   **The Income Received by the Defendants from the Tax Shelters**

60.   As a result of the involvement of defendants PAUL DAUGERDAS, ERWIN MAYER, DONNA GUERIN, DENIS FIELD, ROBERT GREISMAN, CRAIG BRUBAKER, and DAVID PARSE, in the fraudulent tax shelters, they were paid the following approximate aggregate amounts during the tax years 1998 through 2002:

| DEFENDANT | APPROX. INCOME FROM TAX SHELTERS |
|---|---|
| PAUL DAUGERDAS | $95,700,000 |
| ERWIN MAYER | $28,700,000 |
| DONNA GUERIN | $17,500,000 |
| DENIS FIELD | $24,600,000 |
| ROBERT GREISMAN | $4,200,000 |
| CRAIG BRUBAKER | $3,300,000 |
| DAVID PARSE | $6,000,000 |

**G.    The Defendants' Own Use of Fraudulent Tax Shelters**

61.    In addition to designing, marketing, and implementing fraudulent tax shelter for clients and prospective clients of J&G, BDO, and Bank A, defendants PAUL DAUGERDAS, ERWIN MAYER, CRAIG BRUBAKER, DAVID PARSE, DENIS FIELD, and ROBERT GREISMAN developed and utilized tax shelters for themselves in order to evade personal tax liabilities on the substantial income they were receiving from their design, marketing, and implementation of fraudulent tax shelters. J&G provided BRUBAKER and PARSE with free opinion letters for their personal tax shelters, and provided discounted tax shelter opinion letters to other Bank A personnel.

**Statutory Allegations**

62.    From at least in or about 1994 until in or about 2004, in the Southern District of New York and elsewhere, PAUL DAUGERDAS, ERWIN MAYER, DONNA GUERIN, DENIS FIELD, ROBERT GREISMAN, CRAIG BRUBAKER, and DAVID

PARSE, the defendants, together with others known and unknown to the grand jury, unlawfully, willfully, and knowingly did combine, conspire, confederate and agree to defraud the United States and an agency thereof, to wit, the Internal Revenue Service, and to commit offenses against the United States, to wit, violations of Title 26, United States Code, Section 7201.

## Objects of the Conspiracy

63.     It was a part and object of the conspiracy that, from in or about 1996 until in or about 2004, PAUL DAUGERDAS, ERWIN MAYER, DONNA GUERIN, DENIS FIELD, ROBERT GREISMAN, CRAIG BRUBAKER, and DAVID PARSE, the defendants, and others known and unknown to the grand jury, unlawfully, willfully, and knowingly would and did defraud the United States of America and an agency thereof, to wit, the IRS, by impeding, impairing, defeating, and obstructing the lawful governmental functions of the IRS in the ascertainment, evaluation, assessment, and collection of income taxes.

64.     It was a further part and object of the conspiracy that, from in or about 1996 through in or about 2004, PAUL DAUGERDAS, ERWIN MAYER, DONNA GUERIN, DENIS FIELD, ROBERT GREISMAN, and CRAIG BRUBAKER, the defendants, and others known and unknown to the grand jury, unlawfully, willfully, and knowingly would and did attempt to evade and defeat a substantial part of the income taxes due and owing by the tax shelter clients, in violation of Title 26, United States Code, Section 7201.

## Means and Methods of the Conspiracy

65.     Among the means and methods by which PAUL DAUGERDAS, ERWIN MAYER, DONNA GUERIN, DENIS FIELD, ROBERT GREISMAN, CRAIG BRUBAKER, and DAVID PARSE, the defendants, their co-conspirators, and others known and unknown to the grand jury would and did carry out the objectives of the conspiracy were the following:

a.      They would and did design, market, and implement the tax shelters, and create false and fraudulent factual scenarios to support those transactions, so that wealthy individuals could pay a percentage of their income or gain in fees to J&G, BDO, Bank A, Bank B, and the other participants in the transactions, rather than paying a substantially greater amount in taxes to the IRS;

b.      They would and did design, market, and implement the tax shelter transactions in ways that made it difficult for the IRS to detect it and determine the true nature of the transaction;

c.      They would and did design, market and implement the tax shelter transactions in ways that disguised the fact that the tax shelters were tax-motivated, and lacked virtually any nontax business purpose;

d.      They would and did seek to prevent the IRS from learning that they had marketed tax shelters consisting of preplanned steps leading to predetermined tax benefits;

e.      They would and did prepare and assist in preparing, and cause to be prepared, false and fraudulent documents in order to deceive the IRS, including but not limited to, transactional documents and correspondence;

f.      They would and did craft and assist in crafting legal opinions for use by the tax shelter clients in defending the transactions and shielding the clients from penalties, knowing that these opinions contained false, fraudulent, and misleading information and omitted other information, all of which was material to a determination of whether the claimed tax results were allowable;

g.      They would and did prepare and cause to be prepared tax returns for the tax shelter clients that were false and fraudulent because, among other things, they claimed fraudulent tax losses and thereby substantially understated the tax due and owing by the tax shelter clients;

h.      They would and did provide and cause to be provided false information to the IRS during the course of audits of clients' tax shelter returns and make and cause to be made false statements to the IRS and sworn false testimony in tax shelter-related litigation.

i.      They would and did cause backdated financial transactions to be effectuated through Bank A after year end to correct transactions that had been incorrectly implemented by J&G in order to provide the clients with the tax losses they had purchased;

j.      They would and did pay and cause to be paid bonuses to

-38-

employees and referral fees to third-party referral sources, which frequently were not disclosed to the client, as a means of rewarding those who successfully marketed the tax shelter transactions and to provide incentives to others to do so; and

    k.  They would and did provide and receive free legal opinions and payments for the early termination of tax shelter options as benefits to co-defendants and others.

## Overt Acts

   66.  In furtherance of the conspiracy and to effect the illegal objects thereof, PAUL DAUGERDAS, ERWIN MAYER, DONNA GUERIN, DENIS FIELD, ROBERT GREISMAN, CRAIG BRUBAKER, and DAVID PARSE, the defendants, and their co-conspirators, committed and caused to be committed the following overt acts, among others, in the Southern District of New York and elsewhere:

    a.  On or about May 9, 1996, defendant ERWIN MAYER wrote a memorandum to another A&G lawyer, copying defendant PAUL DAUGERDAS, which outlined the steps of a Short Sale tax shelter for a potential client.

    b.  On numerous occasions during 1998 through 2003, defendants DAVID PARSE and CRAIG BRUBAKER implemented SOS, Swaps, and HOMER foreign currency digital option positions for clients of J&G, BDO, and Bank B, through Bank A's FX desk in New York, New York, and the short sales of Treasury Notes for the Short Sale tax shelter through Investment Banking Firm A's Private Client Fixed Income desk in Baltimore,

Maryland.

c.      In or about Fall 1998, defendant DONNA GUERIN hand-wrote a document that outlined the steps of a five-day Short Sale tax shelter that was to be executed by Client L.M., who was anticipating a large gain from the sale of his company.

d.      In or about Fall 1998, defendant DAVID PARSE met with Client L.M. at his home in Florida to discuss the steps of a Short Sale tax shelter, in particular the sale of the treasuries.  Defendant DONNA GUERIN participated in the meeting by phone.

e.      On or about January 12, 1999, defendant ROBERT GREISMAN sent a letter and attached spreadsheet to defendant PAUL DAUGERDAS, and copied defendant DENIS FIELD, which confirmed the tax shelter transactions for short sale clients whom BDO referred to J&G and the estimated fees that J&G owed BDO relating to those clients.

f.      In or about February 1999, defendant DONNA GUERIN, during a tutorial session on the Short Sale tax shelter for certain J&G associates, advised them, in the presence of defendant ERWIN MAYER, among other things, that the use of the single-member LLC in the Short Sale tax shelter was part of a "hide the ball strategy."

g.      On or about March 15, 1999, defendant ROBERT GREISMAN sent to the BDO Tax Opinion Committee members, including defendant DENIS FIELD, a memorandum that discussed the issues surrounding the inclusion of fees as transactions costs in the Short Sale tax shelter.  GREISMAN noted, "As such, it is understood that transaction costs, when set against the expected profit on the short sale trade, would render it impossible