UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------X
                                       :

UNITED STATES OF AMERICA,                         S3 09 Cr. 581 (WHP)
                                       :

        - against -                       MEMORANDUM & ORDER
                                         :

PAUL M. DAUGERDAS, *et al.*,

                Defendants.
-----------------------------------------------------------X

WILLIAM H. PAULEY III, United States District Judge:

                                       USDC SDNY
                                       DOCUMENT
                                       ELECTRONICALLY FILED
                                       DOC #:
                                       DATE FILED: 6/4/12

The right to a jury trial is a bulwark of liberty enshrined in the Constitution. Because "justice must satisfy the appearance of justice," courts need to ensure that tainted jury verdicts—even those reached after long and costly trials—do not stand. But justice also demands that a defendant having reason to suspect juror misconduct not remain silent in order to secure a risk-free trial.

The sanctity of an oath is central to the sound administration of justice. An oath impresses on one's conscience the duty to testify truthfully. And attorneys, as officers of the court, owe an unflagging duty of candor to the tribunal. When these foundational duties are breached, the integrity of the judicial process is undermined and a free society imperiled. This case lays bare the damage that ensues when the obligation to be forthright is cast aside.

The trial of this tax shelter fraud prosecution spanned three months and included 9,200 pages of testimony from forty-one witnesses. The Government produced more than twenty-two million documents during discovery, and the Court received approximately 1,300 exhibits in evidence. No expense was spared. On the ninth day of deliberations, a jury returned a split verdict convicting Paul M. Daugerdas, Donna M. Guerin, Denis M. Field, and David K.

Parse (collectively, "Defendants") of multiple tax-related offenses and acquitting Raymond

Craig Brubaker.  Pursuant to Federal Rule of Criminal Procedure 33(a), Defendants move for a

new trial based on juror misconduct.  For the following reasons, Defendants Daugerdas, Guerin,

and Field's motion for a new trial is granted, but Defendant Parse's motion is denied.

BACKGROUND

The facts underlying this motion are not in dispute, and are gleaned from

transcripts of the trial and related proceedings and the parties' submissions.

I.   Voir Dire

On February 23, 2011, 450 prospective jurors reported to the courthouse and

completed a basic hardship questionnaire.  Catherine M. Conrad ("Conrad") was among them.

The questionnaire posed three questions:  (1) whether "service as a juror on a 3-month trial

[would] cause undue hardship or extreme inconvenience"; (2) whether each prospective juror

had "any difficulty reading or understanding English"; and (3) whether each prospective juror

suffered "any physical ailment or other limitation that would make it difficult to serve as a

juror."  (See Declaration of Theresa Trzaskoma in Support of Defendants' Motion for a New

Trial, dated July 8, 2011 ("Trzaskoma Decl.") Ex. 2, at 2-1 to 2-2.)  Conrad answered each

question "no."  Later that day, the Jury Department provided counsel with a jury roll identifying

the prospective jurors in the venire, and listing a "Catherine M. Conrad" with a Bronxville

residence.  (See Trzaskoma Decl. Ex. 1.)  The following day, copies of the juror questionnaires

were distributed to counsel.  (Trzaskoma Decl. Ex. 2, at 2-1 to 2-2.)  During a final pretrial

conference on February 28, the Court excused a number of prospective jurors who had claimed

hardships on their questionnaires.  (Feb. 28, 2011 Transcript ("2/28 Tr.") 6.)

On March 1, 2011, voir dire commenced, and approximately 175 jurors, including Conrad, swore the following oath: "Do each of you solemnly swear that you will give true answers to all questions as shall be put to you touching upon your qualifications to serve as jurors in this case?" The Court sought to qualify forty-two prospective jurors from whom a twelve-person jury and six alternates would be selected.[1]  Conrad was present in the courtroom throughout the three-day voir dire and was among the first to be seated in the jury box.  After the prospective jurors were sworn, the Court explained, inter alia, the function of voir dire and that it is a French term meaning "to speak the truth." (Trial Transcript dated Mar. 1, 2011 through May 24, 2011 ("Trial Tr.") 10.)  This Court then posed a number of questions to the panel as a whole, including five that are relevant to this motion:

> 1.      "Do any of you know or have you had any association, professional, business, social, direct or indirect, with any member of the staff of the United States Attorney's Office for the Southern District of New York, the United States Department of Justice, or the Internal Revenue Service?  Has anybody had any dealings with the U.S. Attorney's Office, the Department of Justice, or the IRS?" (Trial Tr. 84-85.)
>
> 2.      "Are you or [has] any member of your family ever been a party to [a] lawsuit, that is, a plaintiff or a defendant in a civil case or a criminal case?" (Trial Tr. 105.)
>
> 3.      "Have any of you or a close relative ever been involved or appeared as a witness in any investigation by a federal or state grand jury or any congressional committees or state legislative bodies or licensing authorities or planning boards?" (Trial Tr. 107.)
>
> 4.      "Have any of you ever been a witness or a complainant in any hearing or trial, whether it be in the state or federal courts?" (Trial Tr. 108.)

---

[1] This Court employed the "struck panel method" for selecting jurors. See, e.g., United States v. Rudaj, No. 04 Cr. 1110 (DLC), 2005 WL 2746564, at *1-*3 (S.D.N.Y. Oct. 25, 2005) (detailing the process of jury selection by the struck panel method).  The Government exercised nine peremptory challenges, and Defendants exercised fifteen.  (Trial Tr. 348-51.)

> 5. "[H]ave you or any member of your family or any very close personal friend ever been arrested or charged with a crime?" (Trial Tr. 118.)

Conrad responded affirmatively to only two of these questions. In response to the first question, Conrad offered that her father "works for DOJ across the street" as "an immigration officer." (Trial Tr. 85.) She then assured this Court that his position would not affect her ability to be fair and impartial. (Trial Tr. 85.) In response to the second question, Conrad stated that she "was a plaintiff in a personal injury negligence case . . . pending" in Bronx Supreme Court. (Trial Tr. 105.) Again, she represented that her personal injury action would not interfere with her ability to serve as a juror. (Trial Tr. 106.) Conrad did not provide any additional information or any other affirmative answers to questions posed to the group. This Court informed prospective jurors that "if any of you have an answer to any question that you prefer not to give in public, just let me know, and the lawyers and I will hear you up here at the sidebar of the bench." (Trial Tr. 15-16.) Throughout voir dire, several prospective jurors offered sensitive or potentially embarrassing personal information at sidebar. (See, e.g., Trial Tr. 31, 40, 47, 52, 79, 82, 112.) Conrad did not.

After posing questions generally to the venire, this Court made inquiries of each prospective juror individually. Conrad was present for all of the individual questioning, including each prospective juror's responses and all of the Court's follow-up inquiries. Importantly, Conrad listened to the Court's individual voir dire of two jurors on the first day of jury selection and had the opportunity to reflect overnight on how she would answer the following morning. (Trial Tr. 133-39.) The individual voir dire of Conrad proceeded on March 2 as follows:

> THE COURT: Now I think what I'd like to do is to return to some individual questioning of jurors. I think Ms. Conrad, Juror No. 3, that I

4

was about to begin with you when we suspended yesterday. So first would you tell us what neighborhood you reside in?

CONRAD: Bronx Village [sic] [Bronxville] in Westchester.

THE COURT: How long have you lived at your current address?

CONRAD: My whole life.

THE COURT: Do you own or rent?

CONRAD: We own.

THE COURT: Who are the other members of your household?

CONRAD: I live with my husband. He's retired at this point.

THE COURT: What is he retired from?

CONRAD: He owns some bus companies.

THE COURT: Do you work outside the home?

CONRAD: No. I'm a stay-at-home wife.

THE COURT: Do you have any children?

CONRAD: No.

THE COURT: All right. What is the highest level of education you've attained?

CONRAD: I have a BA in English literature [and] classics, and I studied archeology abroad.

THE COURT: What do you do in your spare time?

CONRAD: I like to read. We travel. I take care of an elderly aunt.

THE COURT: How generally do you get your news?

CONRAD: Periodicals, magazines, newspapers, radio, cable, internet.

THE COURT: Can you identify someone for us who we'd all know who you admire most?

CONRAD: Probably dating myself, but the ex-grid [sic] great Lynn Swann from the Steelers. Unbeknownst to many people, he did study ballet, and I admire him because I think he combined grace and grit under pressure.

THE COURT: All right. Is there anything that you think it would be important for us to know about you in making a decision as to whether you should serve as a juror in this case?

CONRAD: If the trial lasts more than three months, I'm still available.

THE COURT: All right. Thank you very much. Is there any reason that you feel you could not be fair and impartial in this case, Ms. Conrad?

CONRAD: Not at all.

THE COURT: Thank you, ma'am.

(Trial Tr. 203-05.)

During the course of voir dire, this Court excused 117 prospective jurors from the venire. (See, e.g., Trial Tr. 113-15, 293-95.) At the conclusion of voir dire on March 3, this Court asked whether counsel wished that further inquiry be made of any particular juror or the panel as a whole. No counsel requested any further inquiries. (Trial Tr. 354.) Following the exercise of peremptory challenges, this Court empanelled the jury, and Conrad became Juror No. 1. (Trial Tr. 353.) Each empanelled juror swore the following oath: "Do each of you solemnly swear that you shall well and truly try this case now on trial and give a true verdict according to the law and the evidence?" As discussed below, it is now undisputed that Conrad lied extensively during voir dire and concealed important information about her background.

II. The Verdict

On May 24, 2011—after eight days of jury deliberations and forty-six jury notes—the jury returned a split verdict against the five defendants. The jury convicted Daugerdas of one count of conspiracy to defraud the United States and the IRS, to commit tax evasion, and to commit mail and wire fraud in violation of 18 U.S.C. § 371 ("the conspiracy count"); eighteen counts of tax evasion in violation of 26 U.S.C. § 7201 and 18 U.S.C. § 2; three counts of personal income tax evasion in violation of 26 U.S.C. § 7201; one count of corruptly obstructing and impeding the due administration of the Internal Revenue Laws in violation of 26 U.S.C. § 7212(a); and one count of mail fraud in violation of 18 U.S.C. §§ 1341 and 2. The jury convicted Guerin of the conspiracy count; nine counts of tax evasion in violation of 26 U.S.C. § 7201 and 18 U.S.C. § 2; one count of corruptly obstructing and impeding the due administration of the Internal Revenue Laws in violation of 26 U.S.C. § 7212(a); and one count of mail fraud in violation of 18 U.S.C. §§ 1341 and 2. The jury convicted Field of the conspiracy count; four

6

counts of tax evasion in violation of 26 U.S.C. § 7201; one count of corruptly obstructing and

impeding the due administration of the Internal Revenue Laws in violation of 26 U.S.C. §

7212(a); and one count of mail fraud in violation of 18 U.S.C. §§ 1341 and 2.  The jury

convicted Parse of one count of corruptly obstructing and impeding the due administration of the

Internal Revenue Laws in violation of 26 U.S.C. § 7212(a) and one count of mail fraud in

violation of 18 U.S.C. §§ 1341 and 2, but acquitted him of the conspiracy count and three counts

of tax evasion.  The jury acquitted Brubaker of all charges.

III.  Conrad's May Letter and Her True Identity

    Conrad authored a two-page type-written letter dated May 25, 2011 to Assistant

United States Attorney Stanley J. Okula, Jr. ("Okula") praising the Government's prosecution of

the case (the "May Letter").  The May Letter was postmarked May 28.  On June 22, the

Government forwarded the May Letter to the Court and defense counsel.  (ECF No. 458.)  In her

letter, Conrad wrote, "I thought that you [i.e., Okula], Ms. Davis and Mr. Hernandez [other

members of the Government's trial team] did an outstanding job on behalf of Our Government."

In describing the jury's role, she stated that "I did feel that we reached a fair and just verdict

based on the case, facts and evidence presented to us."  She further explained that "we did have

qualms with Mr. David Parse.  I solely held out for two days on the conspiracy charge for him – I

wanted to convict 100%, (not only on that charge) – but on Tuesday, May 24, 2011, we had

asked for the Judge's clarification of 'willfully' and 'knowingly', I believe, and I had to throw in

the towel."  Conrad went on for an additional two paragraphs discussing the strengths and

weaknesses of the Government's case against Parse, the effectiveness of expert witness

testimony, the persuasiveness of certain evidence, and the credibility of fact witnesses.  She

concluded her letter by writing, "I have learned, the saying a 'federal case' is REALLY a

'federal case', and I feel privileged to have had the opportunity to observe la crème de la crème –
KUDOS to you and your team !!!" (All punctuation and emphasis in original.)

According to Defendants, the May Letter caused Parse's trial counsel Brune &
Richard LLP to investigate Conrad's background. That inquiry led to the current motion for a
new trial based on Conrad's numerous lies and omissions during voir dire. This Court now
recounts Conrad's torrent of false and misleading testimony.

## A. Personal Background

Conrad lied about her educational, professional, and personal background. While
she informed the Court that her highest level of education was a bachelor's degree, she in fact
obtained her juris doctorate from Brooklyn Law School in 1997 and was admitted to practice law
in New York in January 2000. (Trzaskoma Decl. Ex. 4; Ex. 27 at 27-2 to 27-3.) Further,
although she informed the Court that she was a "stay-at-home wife," she had practiced law for
some time until the New York Supreme Court Appellate Division, First Department (the
"Appellate Division") suspended her law license. (Trzaskoma Decl. Ex. 27 at 27-3.) And the
day before she was sworn as a prospective juror, she sought to have her law license reinstated.
Conrad answered under oath that she owned a home and lived in Bronxville in Westchester
County "all my life." (Trial Tr. at 203.) That, too, was a lie. In fact, Conrad rented an
apartment and lived on Barker Avenue in the Bronx for years.

## B. Prior Litigation Experience

Conrad also failed to disclose during voir dire the disposition of her personal
injury action and she concealed the fact that she was a witness in that litigation. While Conrad
represented that she was a plaintiff in a "pending" personal injury action, she failed to disclose
that in May 2007, the Bronx Supreme Court dismissed her case for her failure to appear for a

8

compliance conference. (Trzaskoma Decl. Ex. 22, at 22-4.) The Bronx Supreme Court later

reinstated the case because Conrad claimed that her failure to prosecute was the result of a

hospitalization for medical issues "unrelated" to the lawsuit. (Trzaskoma Decl. Ex. 23, at 23-4;

Ex. 24.) After seven days of trial in June and July 2010, a jury returned a verdict against Conrad,

finding that the defendants had not been negligent. (Trzaskoma Decl. Ex. 26, at 26-3.) On

March 24, 2011, the Bronx Supreme Court denied Conrad's motion to set aside the verdict.

(Trzaskoma Decl. Ex. 28, at 28-5.) While this Court asked directly whether any juror had ever

been a trial witness, Conrad never revealed to this Court that she had testified as a witness, both

at trial and deposition or that a jury rejected her person injury claim and the only aspect of the

case still pending was her motion for a new trial and a judgment notwithstanding the verdict.

C. Prior Investigation by State Licensing Authority

Conrad also hid the fact that she was the subject of an investigation and

disciplinary proceedings conducted by the Departmental Disciplinary Committee (the

"Disciplinary Committee") of the Appellate Division. In December 2007, the Appellate Division

suspended Conrad from the practice of law for failing "to cooperate with the [Disciplinary]

Committee's investigation into two complaints alleging professional misconduct which threatens

the public interest." In the Matter of Catherine M. Conrad ("2007 Suspension Order"), 48

A.D.3d 187, 188 (1st Dep't 2007). According to one complaint, Conrad "violated court orders

and failed to appear as directed, ultimately resulting in the dismissal of the action." 2007

Suspension Order, 48 A.D.3d at 188. According to the second complaint, she failed to oppose an

order to show cause, resulting in an adverse ruling against her client. 2007 Suspension Order, 48

A.D.3d at 188. In response to her state bar suspension, on January 4, 2008, Conrad was

suspended from the bar of the United States District Court for the Southern District of New

York. See In re Catherine M. Conrad, No. M-2-238 (JSR) (S.D.N.Y. Jan. 4, 2008); see also Local Civ. Rule 1.5(b)(5) (violations of the New York State Rules of Professional Conduct are grounds for discipline, including suspension). On January 29, 2008, Conrad was suspended from the bar of the United States District Court for the Eastern District of New York. See In re Catherine M. Conrad, No. MC-08-010 (BMC) (E.D.N.Y. Jan. 29, 2008).

Shortly after her December 2007 suspension, Conrad began cooperating with the Disciplinary Committee's investigation and acknowledged an alcohol dependency. In the Matter of Catherine M. Conrad ("2010 Suspension Order"), 80 A.D.3d 168, 169-70 (1st Dep't 2010). Conrad moved to convert her existing suspension to a medical suspension nunc pro tunc and sought an order vacating the suspension and reinstating her to the practice of law due to her year-long sobriety. 2010 Suspension Order, 80 A.D.3d at 169. She attributed her earlier failure to cooperate with the investigation and her underlying professional misconduct to her alcohol dependence. 2010 Suspension Order, 80 A.D.3d at 169-70. As part of the Disciplinary Committee's investigation, Conrad submitted to a psychiatric evaluation in May 2010. The examining psychiatrist determined that Conrad was not yet "fit to re-commence the practice of law." 2010 Suspension Order, 80 A.D.3d at 169. As a result, on December 9, 2010, the Appellate Division modified the 2007 Suspension Order and indefinitely suspended Conrad from the practice of law because she suffered from a "disability by reason of physical or mental infirmity or illness." 2010 Suspension Order, 80 A.D.3d at 170.

On February 28, 2011, just days after she reported for jury service, and the day before voir dire commenced, Conrad filed an application for reinstatement to the bar. (Affirmation of Paul Shechtman, dated Oct. 26, 2011 ("Shechtman Aff'n") Ex. F: Notice of Motion for Reinstatement as Attorney, dated Feb. 26, 2011.) Conrad's application for

reinstatement was riddled with falsehoods. She failed to report that she had not paid a fine

imposed on her by the Eastern District of New York, even though the application required that

disclosure. (See Shechtman Aff'n Ex. A: Letter from Chief Counsel Jorge Dopico of the

Disciplinary Committee, dated Aug. 9, 2011 ("Dopico Letter"), at 3.) She also stated, in

response to a direct question on the application, that she had not used any other names, even

though she had used the name "Catherine Rosa" when arrested in May 2009. (Dopico Letter, at

5). Finally, she stated that she had no arrests or convictions since her suspension in 2007, when

in fact she had pleaded guilty to shoplifting charges in October 2009. (Dopico Letter, at 5.)

Because of this deceitful conduct, in August 2011, the Disciplinary Counsel recommended that

Conrad's application for reinstatement be denied and that she be disbarred nunc pro tunc to

February 28, 2011. (Dopico Letter, at 9.)

D. Criminal History

During voir dire, Conrad also concealed her and her husband's extensive histories

of criminal arrests and convictions. According to New York and Arizona criminal records,

Conrad was arrested and charged with crimes on at least five occasions. Conrad's husband,

Frank J. Rosa ("Rosa"), is a career criminal.

On April 17, 1998, Conrad was arrested in New York and charged with driving

while intoxicated, reckless endangerment, leaving the scene of an accident, assault, resisting

arrest, and harassment. (Trzaskoma Decl. Ex. 11, at 11-1.) On October 21, 1998, she pleaded

guilty to the misdemeanor driving while intoxicated charge. (Trzaskoma Decl. Ex. 11, at 11-1.)

Shortly before that plea, on September 23, 1998, she was arrested again and charged with

criminal contempt and aggravated harassment. She pleaded guilty to these misdemeanors on

May 17, 1999, and was sentenced to three years probation. (Trzaskoma Decl. Ex. 11, at 11-1.)

On August 4, 2007, Conrad was arrested in Arizona for disorderly conduct. (Trzaskoma Decl. Ex. 14.)  At approximately 5:00 a.m., local police responded to a call from Conrad, complaining of a domestic dispute at a motel with Rosa, who she had married six weeks earlier. (Trzaskoma Decl. Ex. 14, at 14-10.)  As the police investigated, she was highly disruptive, disturbed other hotel guests, and ignored the responding officers' requests to quiet down.  Ultimately, the officers placed Conrad under arrest and booked her at the Navajo County Jail on charges of disorderly conduct.  On August 7, 2007, Conrad was released on her own recognizance and ordered to appear for arraignment on August 14.  (Trzaskoma Decl. Ex. 14, at 14-17.)  She failed to appear and an arrest warrant was issued.  (Trzaskoma Decl. Ex. 14, at 14-14 to 14-16.)  It appears that warrant remains outstanding.

In May 2009, Conrad was arrested in New York on two separate occasions for shoplifting.  (Trzaskoma Decl. Ex. 11, at 11-2 to 11-3.)  On May 6, she was arrested for shoplifting $47 worth of groceries from a Yonkers supermarket.  (Trzaskoma Decl. Ex. 15, at 15-2.)  Days later, on May 14, she was arrested again for shoplifting approximately $27 worth of goods from a New Rochelle supermarket.  (Trzaskoma Decl. Ex. 16, at 16-5.)  Both charges were resolved by a plea to a single count of petit larceny.  (Trzaskoma Decl. Ex. 15, at 15-1.)  Under her plea agreement, Conrad was placed on probation for three years.  (Trzaskoma Decl. Ex. 16, at 16-1.)  A July 14 probation report noted that Conrad was in an outpatient treatment program for alcoholism.  (Trzaskoma Decl. Ex. 16, at 16-11.)  An October probation report indicated that the outpatient program expelled her because of her continued use of alcohol and recommended a four-week inpatient program.  (Trzaskoma Decl. Ex. 16, at 16-4.)  While it is unclear whether she participated in that program, Conrad was on probation during voir dire and throughout the entire trial of this case.

Conrad's fabrication that her husband was retired from "own[ing] some bus companies" was designed to conceal his criminal past. According to public records, from 1980 through the late 1990s, Rosa was convicted of at least nine criminal offenses. (Trzaskoma Decl. Ex. 17.) Among other crimes, he was convicted of receiving stolen property, criminal contempt, possession of a controlled substance, forgery, and illegal possession of a firearm. (Trzaskoma Decl. Ex. 17.) He has been incarcerated on numerous occasions and served a seven year sentence in Northern State Prison in New Jersey. (Trzaskoma Decl. Ex. 18, at 18-1.) When sentencing Rosa, the New Jersey Superior Court, Middlesex County, observed that Rosa "had substantial contacts with the justice system," "an extensive history of mental illness," and a "history of domestic violence." (Trzaskoma Decl. Ex. 17, at 17-45.) Like Conrad, he also has a history of alcoholism. (See Trzaskoma Decl. Ex. 17, at 17-40.)

IV.   The December 20 Advice of Rights Hearing

On November 15, 2011, after briefing on Defendants' motion for a new trial was complete, this Court concluded that an evidentiary hearing was necessary. (ECF No. 499.) On November 29, this Court set the hearing for February 15-16 ("Hearing"). (ECF No. 500.) In anticipation of that hearing, this Court directed Conrad to appear in person on December 20, to instruct her regarding her constitutional rights and to appoint counsel for her if she could not afford an attorney. (ECF No. 502.) The Court directed the U.S. Marshals to serve Conrad with a copy of the order to appear. The marshals served Conrad at her apartment in the Bronx, and on receiving the order, she stated, "I think I know what this is about, I failed to disclose that I'm a lawyer, but they never asked, so I didn't lie." Conrad recognized a photograph of herself that the marshals carried and said, "that picture must be from my rap sheet." (GX 3500-2, U.S. Marshals Report dated Dec. 16, 2011.)

13

At the December 20 hearing, this Court delivered its instructions to Conrad on the record, with a deputy clerk, two deputy U.S. marshals, and a Criminal Justice Act attorney present. All counsel and the parties consented to participate by telephone. At the hearing, Conrad's behavior was erratic and her remarks often incoherent. Several times the Court directed her to sit down, and deputy marshals blocked her attempts to leave the courtroom before the proceedings were concluded. (Dec. 20, 2011 Transcript ("12/20 Tr.") 11-12.) Conrad advised the Court that there was no reason for an evidentiary hearing because, in her view "[Defendants are] fricken crooks and they should be in jail and you know that." (12/20 Tr. 17.) She went on to opine: "come on, this is anything in favor of the defendants . . . . And they brought the motion against the prosecution . . . . It's ridiculous." (12/20 Tr. 17.)

## V. February 15-16 Juror Misconduct Hearing

At the Hearing, Conrad admitted that she lied to the Court to make herself more "marketable" as a juror.[2] (Feb. 15 and 16, 2012 Hearing Transcript ("Hr'g Tr.") 153, 160, 208.) She also testified that she believed that if the truth were known, "the defense counsel would be wild to have me" on the jury. (Hr'g Tr. 210.) Conrad reasoned that Defendants would want "crooks" on the jury because they themselves were "crooks." (Hr'g Tr. 210, 229.) Indeed, Conrad admitted that she had used this to rationalize her conduct to herself at the time of voir dire. (Hr'g Tr. 229 ("Q. You told yourself at the time that it was OK from the defendants' perspective because, if anything, somebody who was married to a criminal would tend to favor other criminals, right? A. I guess it can be characterized as that.").) Conrad acknowledged that

---

[2] At the outset of her testimony, Conrad invoked her Fifth Amendment privilege against self-incrimination. On the Government's application pursuant to 18 U.S.C. §§ 6002 and 6003, this Court granted Conrad use immunity. (Hr'g Tr. 102; see also Order dated Feb. 15, 2012, ECF No. 518 ("[N]o testimony or other information compelled under this Order, or any information directly or indirectly derived from such testimony or other information, may be used against Catherine M. Conrad in any criminal case, except a prosecution for perjury, giving a false statement, or otherwise failing to comply with this Order.").)

she made the conscious decision to perjure herself between the first and second day of voir dire. After hearing the questions posed to the first two prospective jurors, she conjured up a personal profile that she thought would be attractive. (Hr'g Tr. 185.) Throughout the trial she thought of the fact that she had lied to get on the jury, and she knew what she had done was wrong. (Hr'g Tr. 168.)

At the Hearing, Conrad opined that "most attorneys" are "career criminals." (Hr'g Tr. 148.) Daugerdas and Guerin are attorneys, and while Parse is licensed to practice law, he is an investment banker. She twice underlined the difference in financial success between herself and Daugerdas. When asked if she had about $14,000 in assets, Conrad retorted: "Correct. Much less than your client." (Hr'g Tr. 134.) When asked whether she was financially successful as a lawyer, Conrad testified: "I don't live an extravagant lifestyle like Mr. Daugerdas." (Hr'g Tr. 136-37.) She also lashed out at defense counsel. When asked whether her behavior at the December 20 hearing was irrational, she shot back, "I'm not University of Chicago trained"—a reference to her cross-examiner's law school alma matter. (Hr'g Tr. 105-06.) Similarly, when asked if failing to tell the Court that she was an attorney was a lie, Conrad responded, "You're the evidence professor"—a reference to defense counsel's adjunct teaching position at DePaul University College of Law. (Hr'g Tr. 143.) These responses, among others, indicate that contrary to the Court's instructions, Conrad may have accessed electronic databases to learn about the professional backgrounds of various trial participants.

When given a chance to explain her declaration that all the Defendants were "crooks" and that their motion for a new trial was "ridiculous," she claimed repeatedly that she did not recall what she meant to convey. She also claimed she did not know why she made those statements because "I'm not a psychologist." (Hr'g Tr. 115.)

Throughout the Hearing, Conrad behaved erratically and responded to questions evasively. She claimed repeatedly that she could neither understand the questions nor remember the facts. For instance:

- Conrad claimed that she did not recall why she told the Court on December 20 that the Defendants' motion was ridiculous because she was not a psychologist. (Hr'g Tr. 115; see also 12/20 Tr. at 17.)

- Conrad claimed that she did not recall telling the deputy clerk on December 20 that her time was being wasted by being ordered to appear and that she was going to leave the courthouse. (Hr'g Tr. 117-18; see also 12/20 Tr. at 21.)

- Conrad said that based on her experience as a lawyer, she did not know whether it was unusual for a lawyer to defy a judge's instructions to appear for a hearing because she was not a psychologist. (Hr'g Tr. 119.)

- When asked what medications she takes, Conrad responded: "Water." (Hr'g Tr. 120.)

- When asked whether her attempt to reject a subpoena served on her in front of the Court on December 20 was irrational, Conrad quipped that it was "irrelevant." (Hr'g Tr. 122.)

- Conrad claimed not to know why she told the Court on December 20, "this is garbage." (Hr'g Tr. 127; see also 12/20 Tr. at 8, 18.)

- Conrad variously claimed that she had no idea whether she was a financial success as a lawyer, that one would need to ask her mother to ascertain the answer, and that she did not know what the question meant. (Hr'g Tr. 134-36.)

- Conrad claimed she did not remember telling the Court on December 20 that her finances were "[n]one of [the Court's] business," and that she would retain "[herself] or [her] husband, the convicted felon," to act as her attorney. (Hr'g Tr. 138-39; see also 12/20 Tr. at 12, 16.)

After lengthy examinations by counsel, this Court asked Conrad directly why she had committed perjury to make herself "marketable for the jury." Conrad replied:

> As I had mentioned, I knew I could be a fair, unbiased juror and substantivelywise [sic] it seemed as if it would be an interesting trial experience. And having been suspended for so long, I guess mentally I would think maybe I'm back in the swing of things now.

> I know misrepresenting myself and the perjury was wrong, and I apologize to the Court and to everybody else who has, I'm sure, devoted immeasurable amount of time, hours. Maybe it just wasn't for the $40. That's basically it. I know a lot of resources were spent because of this and I apologize to everybody. It wasn't a calculated folly, it was just maybe folly. But I know I served and I did my civic duty and I believe I was fair and just in rendering the verdict.
>
> I know my disclosures definitely would not have allowed me to sit as a juror. I also know that I could have requested a side bar to speak with your Honor and the other attorneys during the voir dire and I didn't do that. I apologize to everybody. (Hr'g Tr. 236-37.)

Conrad's attempt to express some degree of contrition reflects a jarring disconnect from reality. This was not mere folly. She made a calculated, criminal decision to get on the jury. Such a stratagem undermines the integrity of the jury system, the fair administration of justice, and is an affront to this Court. The human toll her deliberate lies inflicted on the parties, their counsel, the witnesses, and the jurors, who faithfully served, is inestimable. And there are myriad collateral consequences. For example, the Clerk of Court disbursed $110,569.85 for attendance and mileage fees and jury meals for this trial. (ECF No. 532.) Numerous witnesses face the prospect of having their lives interrupted again to testify at any retrial. And the fates of the cooperating witnesses continue in suspense.

Finally, it appears that Conrad's criminal conduct with respect to jury service began before voir dire. According to the records of the Jury Clerk, on November 2, 2010, Conrad declared under penalty of perjury, on a standard juror qualification questionnaire, that her permanent address was in Bronxville, New York. She also claimed two grounds for requesting to be excused: (1) prior jury service within the last four years and (2) true hardship if required to serve. (ECF No. 533.) Yet, this Court asked during voir dire "[h]ave any of you ever served on a grand jury or a trial jury, whether in federal, state, or local court prior to now?" (Trial Tr. 88.) Conrad said nothing about any prior jury service. She also volunteered that she

was available to serve longer than three months. (Trial Tr. 204.) And because she lied about her permanent residence, she collected an additional $765 in travel expenses based on her use of a Westchester zip code. In fact, Conrad received a total of $3,777 in attendance and travel expenses from the Clerk of the Court as a result of her fraudulent conduct. (ECF Nos. 532, 534.) As these lies demonstrate, Conrad's startling dishonesty began before trial, persisted through the proceeding, and continued well after the verdict.

VI. Brune & Richard's Pre-Verdict Investigation of Conrad

In their memorandum of law in support of their motion for a new trial, filed July 8, 2011 ("Defendants' Brief"), counsel for Defendants[3] represented that "[t]he tone and content of [Conrad's May Letter], which were in sharp contrast to the image Conrad had projected through the trial ('always head down, taking notes!'), caused defendants concern and prompted them to investigate." (Memorandum of Law in Support of Defendants' Motion for a New Trial, dated July 8, 2011 ("Def. Br.") at 9 (emphasis added) (quoting the May Letter).) Defendants also stated they learned of, inter alia, Conrad's status as a suspended lawyer and the pending disciplinary proceedings against her by "conducting public records searches in the wake of Conrad's May 25, 2011 post-verdict letter to the government[.]" (Def. Br. at 3 (emphasis added).) They further stated that "Conrad's voir dire responses did not provide even a hint of bias and she exhibited no outward signs of any mental or emotional instability[.]" (Def. Br. at 8.) And they represented that they "had no basis to inquire whether Conrad was lying in response to each of the Court's questions [during voir dire]." (Def. Br. at 32 n.13.) With no other disclosures by Defendants, the clear implication of these statements was that they had no

_____

[3] Brune & Richard drafted the memorandum of law, which was joined by the other defense counsel. (Hr'g Tr. 301 ("Because the resources were different, [Brune & Richard] took by far the laboring oar with the brief[.]").)

idea of Conrad's true identity and background until their post-verdict investigation following the receipt of Conrad's May Letter.

On July 15, 2011, the Court convened a telephone conference with all parties and counsel to discuss Defendants' motion for a new trial.[4]  (July 15, 2011 Transcript ("7/15 Tr.").)  During the conference, the Government stated that it "was unaware of any of the facts that were brought forth in connection with defendants' motion" and expressed its desire to unearth any potential waiver arguments.  (7/15 Tr. 9.)  In response, this Court announced:  "I fully intend as part of the record on this motion to ascertain from each of the defendants . . . whether any of them were aware of the disturbing things that have been revealed by defense on this motion concerning Juror Number One."  (7/15 Tr. 11.)  This Court added that it was "perfectly prepared to let defendants respond now or to provide a letter[.]"  (7/15 Tr. 11.)  This inquiry was not an invitation for counsel to engage in an iterative process testing the limits of how little could be revealed.  Officers of the court are not adverse witnesses.  Cf. Bronston v. United States, 409 U.S. 352, 362 (1973) (holding that "any special problems arising from the literally true but unresponsive answers are to be remedied through the questioner's acuity[.]" (internal quotation marks omitted)).  The Court's directive called for prompt and complete disclosure.

Without hesitation, Defendant Field's counsel responded, "On behalf of Mr. Field we can say we have no knowledge of the fact that she was an attorney or of the things that came to light now."  (7/15 Tr. 11.)  Then, counsel for Daugerdas chimed in, representing that "I can say the same with regard to defendant Daugerdas[.]"  (7/15 Tr. 11.)  Guerin's counsel did the same:  "I will advise the court that no member of the Guerin defense team . . . [or] the defendant herself were aware of any of the issues that have surfaced with regard to Juror Number One.

---

[4] Defendants' counsel consented to conduct the conference by telephone and waived their clients' right to appear.

Everything I thought I knew about Juror Number One was learned by us in the course of the voir dire proceedings in this case." (7/15 Tr. 11-12.) Lastly, Parse's counsel, Theresa Trzaskoma ("Trzaskoma"), responded, "Your Honor, we were not aware of the facts that have come to light and I think that if your Honor deems it appropriate, we can submit a letter." (7/15 Tr. 12.) This Court invited a submission from Parse's counsel to make certain that no jury consultant had any information about Conrad before the verdict. (7/15 Tr. 12.) The colloquy concluded with a seemingly innocuous feint by Parse's counsel: "The only thing additional that I would offer, your Honor, is – well, we can address this in the letter. I think it's more appropriate." (7/15 Tr. 12.)

After this initial salvo, counsel for Parse—Susan Brune ("Brune"), Trzaskoma, and Laurie Edelstein ("Edelstein"), each partners of the firm Brune & Richard LLP (collectively, "Brune & Richard" or "Parse's attorneys")—began to disclose in stages the full extent of their investigation into Conrad's background. Indeed, they acknowledged candidly that had the Court or the Government not inquired, Brune & Richard would never have disclosed any of their investigation into Conrad. (Hr'g Tr. 79 ("[HERNANDEZ:] Ms. Trzaskoma, if the government had not inquired about your firm's knowledge about certain facts that you had about Catherine Conrad, were you ever going to disclose that information to the Court? [TRZASKOMA:] I don't know I can answer that. . . . It didn't occur to me to disclose it. As I said, I regret that. But I can't say that it wouldn't have come up subsequently."); Hr'g Tr. 317 ("COURT: Ms. Brune, . . . would your firm have disclosed the information in your firm's July 21 letter and the investigation into Juror No. 1 if the Court had not inquired or the government failed to raise the waiver issue? [BRUNE]: I don't think we would have your Honor[.]"); Hr'g Tr. at 357 ("OKULA: [A]re you saying that you would have felt comfortable that you had fulfilled all your

obligations if the Court had decided this motion without learning of the facts concerning what your firm knew prior to receiving the [May Letter]?  Yes or no.  [EDELSTEIN]: Yes.").)

A.  The July 21 Brune & Richard Letter

When Brune & Richard's promised letter did not materialize, the Government prodded them on July 19 to provide their letter by July 21.  (See ECF No. 469.)  On July 21, Brune submitted a letter revealing for the first time that prior to voir dire, Brune & Richard had conducted a Google search of the terms "Catherine Conrad" and "New York" and discovered the 2010 Suspension Order, suspending a Catherine M. Conrad from the practice of law.  (Brune & Richard Letter dated July 21, 2011 ("July 21 Letter"), at 1, ECF No. 464.)  But because Conrad stated during voir dire that her highest level of education was a B.A. in English Literature, the Brune & Richard trial team concluded that Conrad could not be the suspended lawyer.  (July 21 Letter, at 2.)  Despite the exact match of Conrad's name with the middle initial "M." on both the jury roll and the 2010 Suspension Order, Brune & Richard ruled out the possibility that Conrad lied during voir dire, and they did not raise their discovery of the 2010 Suspension Order with the Court.  (July 21 Letter, at 2.)

While ruling out the possibility that Conrad was lying, Brune & Richard, along with other defense counsel, the Government, and the Court, raised far more minor issues during voir dire.  Defense counsel for Daugerdas and Guerin had a juror excused because "he put his head on his fingers."  (Trial Tr. 114.)  Counsel for Field had a postal worker excused because the prospective juror "might be stressed."  (Trial Tr. 126.)  On the third day of voir dire, Brune & Richard challenged a prospective juror's impartiality on the grounds that he had contacts with law enforcement agencies and because he was "wearing an FBI turtleneck today."  (Trial Tr. 337.)  The Government had a juror removed for cause due to his "extreme lack of desire to

serve." (Trial Tr. 175-77.) Based on a prospective juror's apparent ethnicity and residence in Rockland County, the Government asked the Court to investigate whether he used a Spring Valley tax preparer whom the Government prosecuted fifteen years ago, and whose clients were primarily Haitian. (Trial Tr. 245-46.) The Court ruled out that remote possibility in less than one minute with three direct voir dire questions. (Trial Tr. 318.) This Court removed one prospective juror because she supposedly found the subject matter of the case so "boring" that she could not focus on it. (Trial Tr. 29.) Similarly, the parties consented to the removal of other jurors based on their behavior or odd demeanor. (Trial Tr. 114-15, 294.)

       In the July 21 Letter, Brune & Richard also disclosed for the first time that they had conducted additional research about Conrad following her submission of a note to the Court on May 11, 2011 (the "Juror Note"), in the midst of closing arguments. (July 21 Letter, at 2.) The Court shared the contents of the Juror Note with counsel at the end of the day after closing arguments concluded. (Trial Tr. 8832.) In the Juror Note, Conrad asked whether the Court would instruct the jury on the legal doctrine of respondeat superior and posed a question about vicarious liability. (Trial Tr. 8832.) No party had raised either term during trial, and neither term was germane to the questions at issue.

       The Juror Note prompted Trzaskoma to direct a paralegal to conduct further research on Conrad early the next morning. The paralegal conducted a Google search and located the 2007 and 2010 Suspension Orders, which suspended "Catherine M. Conrad" from the practice of law in New York. (July 21 Letter, at 2.) The paralegal also searched Westlaw for information on "Catherine M. Conrad," generated a report (the "Westlaw Report"), and provided it to Trzaskoma. (July 21 Letter, at 2; Ex. 1.) The Westlaw Report—in Brune & Richard's hands just after the start of jury deliberations—was freighted with information revealing Juror

No. 1's hidden identity. The Westlaw Report lists a previous address for Catherine M. Conrad in Bronxville—the same exact name and town listed for Conrad on the jury roll—and also shows that Conrad was a suspended attorney with a Bronx address. It lists Robert J. Conrad [5] as a member of Conrad's household and indicates that Conrad was involved in a civil lawsuit in Bronx Supreme Court. The Westlaw Report links the Bronx civil suit to Conrad—the suspended attorney—with a "Confidence Level" of 99%.

According to the July 21 Letter, after receiving the Westlaw Report, "Trzaskoma had the initial thought that the lawyer and the juror were potentially one and the same, but she reviewed the report and found it confusing, internally inconsistent and not reliable." (July 21 Letter, at 2.) Trzaskoma then conferred with Brune and Edelstein. They believed Conrad's use of legal terms in the Juror Note was consistent with her involvement in a personal injury action and thought that it was "inconceivable" that Conrad lied during voir dire. Thus, they concluded collectively that she could not be the suspended attorney. (July 21 Letter, at 2-3.) After reaching that conclusion, they did not bring any of the underlying information to the attention of the Court or the Government. Nor did they revisit the question between May 12 and May 24, when the jury returned its verdict.

After receiving Conrad's post-verdict May Letter, Parse's attorneys conducted another Google search of Conrad and once again located the 2010 Suspension Order. (July 21 Letter, at 3.) This time, they matched a telephone number Conrad provided in the May Letter with a telephone number associated with Conrad on the New York State Unified Court System's attorney registration website. (July 21 Letter, at 3.) At this point, Parse's trial team purportedly

---

[5] During voir dire, Conrad offered that her father was "an immigration officer" but did not provide his name. Without adequate explanation in the record, it was later revealed that Trzaskoma identified Robert J. Conrad as Conrad's father and an "immigration judge." (See infra, Background, Section VI B; see also Hr'g Tr. 46-48.)

realized, for the first time, that it was no longer "inconceivable" that Conrad was not who she

claimed to be during voir dire. (July 21 Letter, at 3.) Brune & Richard then conducted a two-

week investigation, which unearthed Conrad's personal injury lawsuit filings, her property

records, her criminal records, her husband's criminal records, and their marriage records. (July

21 Letter, at 3-4.) Only then did they apparently conclude that they had the metaphysical

certainty necessary to alert this Court to Conrad's juror misconduct and to seek a new trial for

Parse. (July 21 Letter, at 3-4.)

Upon receiving the July 21 Letter, this Court scheduled another conference call

with the parties and counsel. During that call, this Court questioned Brune about the

discrepancies between the version of events provided in the motion papers and the July 21 Letter.

(See July 22, 2011 Transcript ("7/22 Tr.") 5.) Brune endeavored to explain:

> Your Honor, when we submitted the brief that we did we were submitting
> with the other lawyers and as demonstrated by the statements that
> three of the firms made on the phone on the Friday [July 15th] conference,
> their level of knowledge is apparently non-existent and our situation is
> different and it is for that reason that Ms. Trzaskoma proposed to file the
> letter which we did as opposed to just responding on the call. We did not
> know that this juror was essentially posing as a different person at no point
> during the trial.
>
> We certainly anticipated that the government was going to raise the issue
> of waiver, it features prominently in the Supreme Court case that controls
> here, and we anticipated that when he inquired, which he inevitably was
> going to do, we were going to lay out the facts accurately as we have.
> And my sense of what we are trying to accomplish—but of course your
> Honor will guide me on this—is that Mr. Okula needed the facts so that he
> can make whatever waiver argument he proposes to make in his brief. And
> it is with that in mind, and I of course also responded to the Court, that I
> laid this out.
>
> But, I certainly didn't mean to suggest by our opening brief that we had no
> information about Ms. Conrad. We had the information that I've laid out
> but at no point did we know that she was perpetrating a fraud on this Court
> and unfortunately harming Mr. Parse in the way that she did.

(7/22 Tr. 5-6.)

B. Additional Disclosures by Parse's Attorneys

In response to the revelations in Brune & Richard's July 21 Letter, the Government sought discovery from Defendants to determine precisely what they knew concerning Conrad prior to the jury verdict. Specifically, the Government sought, inter alia, "[a]ny and all documents concerning any and all research performed by the defendants, their counsel, and their counsel's employees, agents, and consultants, including any jury or trial consultant, or by anyone on their behalf, as to Juror #1, Catherine M. Conrad (including but not limited to searches related to 'Catherine Conrad'), prior to the return of the verdict on May 24, 2011." (ECF No. 469.)

In a letter submission to the Court and during an August 8 telephone conference, Parse's attorneys resisted the Government's discovery requests. First, Brune urged this Court to decide the legal question of whether Parse could ever waive his Sixth Amendment right to an impartial jury before reaching any discovery issues. Second, Brune argued that most of the material sought by the Government was protected by the attorney work product doctrine. (Aug. 8, 2011 Transcript ("8/8 Tr.") 10-11.) This Court rejected both arguments during the August 8 teleconference. In ruling that the Government had the right to determine the extent and timing of Parse's attorneys' knowledge of the facts relating to Conrad, this Court ordered Brune & Richard to comply with five out of six of the Government's document requests and directed counsel for Daugerdas, Guerin, Field, and Brubaker to submit affidavits with respect to their pre-verdict knowledge of Conrad.[6] (8/8 Tr. 12-14.) With respect to any claim of attorney work product

---

[6] Counsel for Defendants Daugerdas, Geurin and Field later swore by affidavit that they had no prior knowledge of Conrad's background. (ECF Nos. 481-85.) In their affidavit, counsel for Geurin stated that on a telephone call on or about June 23, 2011, Brune and Edelstein told Geurin's counsel that Conrad's May Letter had prompted Parse's attorneys to make inquiries about Juror No. 1. (ECF No. 484 (emphasis added).) In their affidavit, counsel for Brubaker disclosed that following the parties' summations and the disclosure of Conrad's Juror Note,

privilege, the Court directed Brune & Richard to submit a detailed privilege log and alerted

counsel that the Court would conduct an in camera review of any documents withheld as work

product. (8/8 Tr. 14.) On August 30, Stillman Friedman & Shechtman, P.C.[7] appeared on behalf

of Parse. (ECF No. 486.)

As a result of the Court's August 8 discovery ruling, significant new details

emerged concerning Brune & Richard's knowledge and investigation of Conrad during trial.

(See Brune Affidavit dated Sept. 15, 2011 and Attached Exhibits ("Brune Aff.").) Document

discovery revealed that prior to voir dire, Parse's attorneys created a "juror snapshot" where they

recorded Conrad's middle initial as M. (Brune Aff. ¶ 5, Ex. C.). Thus, they knew Conrad's full

name from the jury roll prior to voir dire, and incorporated that knowledge in their research.

Conrad's full name matched the name on the 2010 Suspension Order, which was in their

possession and should have set off an alarm.

Further, Brune & Richard e-mails reveal that on May 12 when the jury began its

deliberations, Trzaskoma expressed her belief that the suspended attorney Catherine M. Conrad

and Juror No. 1 were the same person. (Brune Aff., Ex. J (E-mails).) The e-mails pinpoint the

precise sequence of exchanges on May 12 among Parse's trial team[8]:

---

Parse's attorneys told them during two brief conversations that Conrad had the same name as a
disbarred New York lawyer but that based on Conrad's voir dire responses, Juror No. 1 and the
lawyer were not the same person. (ECF No. 485.)

[7] On October 24, 2011, Paul L. Shechtman noticed a change of address from the firm Stillman
Friedman & Shechtman, P.C. to Zuckerman Spaeder LLP. (ECF No. 494.)

[8] The time stamps on e-mails produced by Parse's attorneys are inconsistent. E-mail strings were
produced several times and some of the same e-mails bear time stamps three hours apart. This
appears to depend on whether the e-mail was printed from Brune & Richard's New York or
San Francisco offices. In any event, Trzaskoma sent her initial e-mail at 7:25 a.m. and her
epiphanous e-mail at 2:36 p.m.

| | |
|---|---|
| 7:25 a.m.: | Trzaskoma requests that her team "send [her] all of our intelligence on juror #1, including pre-voir dire info we thought we had." |
| 7:54 a.m.: | Paralegal David Benhamou e-mails Trzaskoma a summary of Conrad's answers during voir dire. |
| 8:02 a.m.: | Vivian Stapp, an associate at Brune & Richard, responds to Benhamou's email regarding the lack of information in their files.  She observes: "We don't have Nardello[9] info gathered for her.  She was initially given a 'Z' grade and then it looks like we gave a 'D' at some point, probably because we thought she was that lawyer.[10]  Unfortunately we don't have anything else for her. I'll keep looking but that's what the spreadsheet is showing.  A little more: 'is a plaintiff in a pending personal injury case in South Bronx Division.'" |
| 10:55 a.m.: | Trzaskoma advises Benhamou, "What we found before voir dire was that maybe she was a suspended lawyer." |
| 11:06 a.m.: | Randall Kim, an associate at Brune & Richard, replies to Stapp:  "We (I thought TT [Trzaskoma]) found something more, which more clearly suggested she has been/is and [sic] alcoholic." |
| 11:07 a.m.: | Benhamou sends Kim, Stapp, and Trzaskoma the link to the 2010 Suspension Order. |
| 11:13 a.m.: | Stapp then observes to Kim, "We have Conrad down as a 'Do Not Search.'  I don't think she's that lawyer, unless she blatantly omitted information during voir dire when describing her educational background (or was able to become a lawyer without going to law school.)" |
| 11:15 a.m.: | Benhamou, at Trzaskoma's request, sends Trzaskoma, Kim, and Stapp an excerpt of Conrad's voir dire testimony. |
| 11:17 a.m.: | After reviewing Conrad's voir dire testimony, Trzaskoma instructs Benhamou, Kim, and Stapp to keep a dossier on Conrad, by noting:  "Ok, unless Conrad totally lied about her highest level of education, it can't be the same person as the suspended lawyer.  But let's keep a little dossier on her." |

---

[9] "Nardello" is Nardello & Company, an investigative firm that performed database investigations of certain prospective jurors for Parse prior to the start of voir dire.  (Brune Aff. ¶ 4.)  It was not until Brune's September 15 affidavit that anyone at Brune & Richard disclosed that Nardello & Company had investigated potential members of the jury, albeit not Conrad, prior to the start of voir dire.  (Supplemental Memorandum of Law of United States in Opposition to Defendants' Motion for a New Trial, dated Oct. 7, 2011, Ex. 1:  Affidavit of Daniel Nardello, dated Sept. 28, 2011.)

[10] Parse's attorneys apparently utilized during voir dire an "A" to "F" rating system for prospective jurors, with an "A" assigned to those most likely to be pro-defense and "F" most likely to be pro-Government. A "Z" rating was assigned where there was no meaningful information available to allow assignment of a letter within the A to F range. (Brune Aff. ¶¶ 5-6.) Ultimately, Conrad received a "C" rating. (Brune Aff. ¶ 8.)

| 11:22 a.m.: | Benhamou asks Trzaskoma if she wants him to "do a people search on Westlaw," and she responds less than one minute later, "Sure." |
| --- | --- |
| 2:24 p.m.: | Benhamou sends Trzaskoma the Westlaw Report with the following message: "Attached is a Westlaw report. I picked the Catherine M. Conrad who has an address in Bronxville, which seemed to match her testimony. Westlaw thinks this is the same suspended lawyer from the Bronx, but perhaps it's confusing two people or I picked the wrong one. If you really care about this, I suggest you have Nardello run this down as I'm not too sure what I'm doing here." Benhamou then went on to describe some of the information in the Westlaw Report, including the reference to a "Robert J. Conrad." |
| 2:32 p.m.: | Trzaskoma responds to Benhamou: "I think Robert Conrad is her father — he is an immigration judge." |
| 2:36 p.m.: | Trzaskoma shares with Benhamou: "<u>Jesus, I do think that it's her</u>. Can you please track down that lawsuit?" (Emphasis added). |

Any fair reading of these e-mail exchanges shows that Parse's attorneys had

actionable intelligence that Conrad was an imposter. That knowledge demanded swift action to

bring the matter to the Court's attention. Further investigation would have been easy and

prudent. But Parse's attorneys chose to do neither.

In her September 15 affidavit, Brune asserts that sometime after 2:36 p.m.,

Trzaskoma shared with her and Edelstein the possibility that the suspended lawyer and Juror No.

1 were the same person. (Brune Aff. ¶ 12.) While now armed with the Westlaw Report, Brune,

Trzaskoma, and Edelstein nevertheless adhered to their earlier conclusion during voir dire,

namely that "Ms. Conrad could be a suspended lawyer only if she had lied repeatedly during voir

dire, and it seemed inconceivable that any juror, much less a lawyer, would perjure herself so

brazenly." (Brune Aff. ¶ 12.) Through that rationalization, Parse's attorneys convinced

themselves that "no additional research was warranted, and none was conducted." (Brune Aff. ¶

12.) Missing from the Brune Affidavit are any particulars about Parse's attorneys' thought

processes in the wake of the newly acquired Westlaw Report, Benhamou's professed uncertainty

with his research and, most importantly, Trzaskoma's epiphany just hours earlier that Juror No. 1

was the suspended attorney with alcohol issues ("Jesus, I do think that it's her").  Moreover,

Brune's Affidavit provides no details about whether Parse's attorneys discussed alerting the

Court to their investigation, nor does it explain why they did not ask the Nardello firm to

investigate Juror No. 1 immediately.

After digesting Brune's Affidavit, this Court concluded that an evidentiary

hearing was needed on the Government's argument that Parse had waived his right to challenge

Conrad's misconduct.  By Order dated November 29, 2011, the Court fixed hearing dates of

February 15 and 16, 2012.  (ECF No. 500.)

### C.  Parse's Attorneys' Testimony at the Juror Misconduct Hearing

During the Hearing, Brune & Richard offered another layer of detail about the

events of May 12.  Trzaskoma acknowledged reviewing the Westlaw Report after Benhamou

sent it to her that morning.  (See Hr'g Tr. 49-50 ("It struck me that holy cow, it's possible that

it's the same person, and I was looking at the Westlaw report to try to figure out is there some

way that this tells me one way or the other, that gives me more information.").)  But she testified

that she did not look at the Westlaw Report until after sending the "Jesus" e-mail and she

minimized its significance on her thought process.  (Hr'g Tr. 55-56.)  Citing her inexperience in

reading such reports, Trzaskoma claimed that she questioned the Westlaw Report's accuracy and

whether it had aggregated information about multiple Catherine Conrads.  (Hr'g Tr. 49-55.)

Trzaskoma offered no explanation for her failure to seek assistance from her colleagues.  She

also quibbled over whether Juror No. 1 physically appeared to be a woman in her early forties

(maintaining that she believed Juror No. 1 to be "close to 50").  And even though she was

looking for correlations to Juror No. 1, she "did not focus on the [middle initial] 'M'" and she

"didn't think of it" as a way to help her narrow down the information in the Westlaw Report. (Hr'g Tr. 24, 50).

Trzaskoma also provided more details regarding her May 12 discussion with Brune and Edelstein about Conrad. The conversation was short, lasting "no longer than five minutes" and took place in Foley Square Plaza. (Hr'g Tr. 58.) Notwithstanding her Eureka e-mail a few hours earlier—"Jesus, I do think that it's her"—Trzaskoma claimed that when she met with her partners, she did not think that Conrad and the suspended attorney were the same person, but raised only the "possibility" that there might be a connection. (Hr'g Tr. 58, 92, 280.) Trzaskoma never shared the existence of the Westlaw Report or its contents with Brune or Edelstein. Indeed, all three Brune & Richard partners testified in unison that they never mentioned, let alone discussed, the Westlaw Report in their Foley Square conversation. (Hr'g Tr. at 58-59, 281, 328.) Brune made the point emphatically: "I'm confident that [Trzaskoma made no mention whatsoever of the Westlaw Report], and here is why. Laurie Edelstein is the kind of person who will always kind of say, well, show me the case, show me the document. She is extremely thorough and if [Trzaskoma] had referenced the document in the conversation, that's what Ms. Edelstein would have said. So I know that there was no reference to [the Westlaw Report] in the conversation." (Hr'g Tr. 281.) In exploring the basis for Trzaskoma's rekindled belief that Conrad could be the suspended attorney, Parse's attorneys only considered the Juror Note and the transcript of Conrad's voir dire testimony. (Hr'g Tr. 58-59, 281, 328.) Further, according to Brune's and Edelstein's testimony, Trzaskoma never mentioned the Westlaw Report or the May 12 internal e-mails about Brune & Richard's research of Conrad at any point during the eleven days of jury deliberations. (Hr'g Tr. 59, 281.)

Brune, Edelstein, and Trzaskoma all testified that, after Trzaskoma raised her concern about Conrad during their Foley Square conversation, they discussed Conrad's voir dire answers, and observed that Conrad's odd note about vicarious liability and respondeat superior could be explained as relating to her personal injury lawsuit, which Conrad had mentioned during voir dire. (Hr'g Tr. 38, 60, 280.) On that slender reed, they unilaterally decided that no further investigation was necessary—even though Trzaskoma recalled mentioning that they should have an investigator look at the issue: "what I thought at the time was that we would need to investigate." (Hr'g Tr. 60, 92.) Trzaskoma asked Brune whether they should keep looking at the issue, and Brune told her "no, just leave it." (Hr'g Tr. 60, 283.) According to Brune, she shut down further inquiry because she credited Conrad's voir dire responses. But she also acknowledged that Parse's trial team had not taken any additional steps to rule out that Conrad was the suspended lawyer. (Hr'g Tr. 282.) This Court cannot fathom how lawyers as thorough as Brune, Edelstein, and Trzaskoma would neglect to tie off such a glaring loose end.

Acting on Brune's instruction to "leave it," Trzaskoma directed Benhamou to "stand down" on his efforts to obtain records of the civil lawsuit referenced in the Westlaw Report. (Hr'g Tr. 93.) Edelstein added that she, Brune, and Trzaskoma specifically discussed whether they should bring the issue to the Court's attention, and decided against it because she thought it was "inconceivable" that Conrad had lied. (Hr'g Tr. 354-55.) This was another tragic misjudgment.

Paul Schoeman, Brubaker's counsel, testified that some time after the receipt of the Juror Note on May 11, and likely the Monday thereafter, Trzaskoma told him that there was a suspended attorney named Catherine Conrad, but that Parse's attorneys had concluded that Juror No. 1 was not that person. (Hr'g Tr. 362-65.) Trzaskoma did not mention the Westlaw Report

31

or other information Brune & Richard unearthed. Barry Berke, another attorney for Brubaker, testified to a similar conversation with Brune. (Hr'g Tr. 368-69.)

In sum, prior to the start of voir dire, Parse's attorneys knew that (1) Juror No. 1 lived in Bronxville, was a plaintiff in a pending personal injury lawsuit, and had a father who was an immigration officer; and (2) a woman with the identical name of "Catherine M. Conrad" was a suspended New York attorney with an alcohol dependency.

Before jury deliberations began, Parse's attorneys knew that (1) Juror No. 1 had submitted a note to the Court referencing several legal concepts not mentioned during the trial; (2) the suspended New York attorney by the name of Catherine M. Conrad used a Bronxville address, the same small village given for Juror No. 1 on the jury roll, and (3) that living in the same household was a Robert J. Conrad, whom Trzaskoma believed to be Conrad's father, the immigration judge. And Trzaskoma had concluded that the Catherine M. Conrad in the Westlaw Report was the same person as Juror No. 1.

VII.   The Jury Deliberations

The tragedy inherent in this motion is that there were many opportunities to avert it. Proceedings in the courtroom overlap the Brune & Richard e-mail timeline, and the Court Reporter's time notations on the transcript tell that side of the story. At 9:55 a.m. on May 12, shortly after Trzaskoma directed her paralegal to investigate Conrad, the Court took up various objections regarding redactions in the indictment to be sent into the jury room. (Trial Tr. 8839.) While the Court delivered its instructions on the law to the jury (Trial Tr. 8854-8912), Parse's attorneys were busy exchanging e-mails and information concerning Conrad, including the 2010 Suspension Order, Conrad's voir dire testimony, and an instruction to conduct a Westlaw people search of Conrad. At 12:47 p.m., the jury retired to have lunch and begin deliberations. (Trial

Tr. 8922.)  Thereafter, the Court ruled on contested redactions in the indictment and proceedings

were adjourned until 2:40 p.m.  (Trial Tr. 8936.)  During that luncheon recess, Benhamou sent

Trzaskoma the Westlaw Report.  At the very time Trzaskoma e-mailed Benhamou her epiphany

"Jesus, I do think that it's her," the Court sent its jury charge, a list of trial exhibits, and a

redacted indictment into the jury room.  (Trial Tr. 8937.)  At 5:00 p.m., the jury returned to the

courtroom, and the Court instructed them for the evening and sent them home.  (Trial Tr. 8945-

46.)  On Friday, May 13, the jury deliberated until 1:30 p.m. and recessed so that a juror could

keep an important medical appointment. (Trial Tr. 8957-58.)

On Monday, May 16, at the beginning of the third day of deliberations, the Court

learned that Juror No. 11 required an emergency surgical procedure that would delay

deliberations for at least one day.  The Government opposed replacing Juror No. 11 with an

alternate.  (Trial Tr. 8974.)  At that time, Brune argued persuasively that the risks of further

delay from complications with the surgical procedure were too great, especially when "[w]e have

plenty of alternates left.  They have been very diligent about coming on time and all the rest."

(Trial Tr. 8974-75.)  The Court agreed with Defendants and excused Juror No. 11 from service

over the Government's objection.  (Trial Tr. 8975.)

This Court instructed the remaining jurors to suspend deliberations while

Alternate No. 1 travelled to the courthouse.  (Trial Tr. 8983-84.)  At 2:00 p.m. on May 16, the

jury reconvened with Alternate No. 1 seated as Juror No. 11.  (Trial Tr. 8995.)  The Court

instructed the jury to disregard all earlier deliberations and begin anew.  At 2:15 p.m., the newly

constituted jury commenced deliberations.  (Trial Tr. 8999.)  The displacement of Juror No. 11

in the third day of deliberations was seamless, and the new jury reached a unanimous verdict

after six days of deliberation.  Even after the displacement of Juror No. 11, there were at least

two qualified alternate jurors available.

       At the end of the first day of jury deliberations, Parse's attorneys discussed

Trzaskoma's reawakened unease that Conrad was not who she claimed to be during voir dire.

But their discussion was superficial and never addressed any of the information accumulated

over the last twelve hours, including the Westlaw Report and the intense exchange of e-mails

among some members of the trial team.  In a fateful decision, uncharacteristic of their conduct

throughout the case, Parse's attorneys decided to call off any further investigation of Conrad.

And worse, they withheld this information and precluded the Court from taking any ameliorative

countermeasures.  Through this unfortunate concatenation of events, Parse's attorneys permitted

Conrad's egregious conduct to infect the largest tax fraud prosecution in U.S. history.

DISCUSSION

I.   <u>Defendants' Motion For a New Trial</u>

   A.   <u>Legal Standard</u>

       The Sixth Amendment guarantees a criminal defendant the right to a trial by an

impartial jury.  <u>See</u> U.S. Const. amend. VI.  In <u>McDonough Power Equipment, Inc. v.</u>

<u>Greenwood</u>, 464 U.S. 548 (1984), the Supreme Court addressed juror dishonesty during voir dire

and emphasized that "[o]ne touchstone of a fair trial is an impartial trier of fact—'a jury capable

and willing to decide the case solely on the evidence before it.'"  <u>McDonough</u>, 464 U.S. at 554

(quoting <u>Smith v. Phillips</u>, 455 U.S. 209, 217 (1982)).  Voir dire plays an essential role in

protecting the right to trial by an impartial jury.  Defendants deserve "a full and fair opportunity

to expose bias or prejudice on the part of veniremen," and "there must be sufficient information

elicited on voir dire to permit a defendant to intelligently exercise not only his challenges for

34

cause, but also his peremptory challenges." United States v. Barnes, 604 F.2d 121, 139 (2d Cir. 1979) (internal quotations and citations omitted).

A juror's dishonesty during voir dire undermines a defendant's right to a fair trial. Writing for a unanimous Supreme Court, Justice Cardozo concluded:  "If the answers to the questions [during voir dire] are willfully evasive or knowingly untrue, the talesman, when accepted, is a juror in name only. . . . His relation to the court and to the parties is tainted in its origin; it is a mere pretense and sham." Clark v. United States, 289 U.S. 1, 11 (1933); see also McDonough, 464 U.S. at 554 ("The necessity of truthful answers by prospective jurors if [voir dire] is to serve its purpose is obvious.").   Thus, a juror who lies her way onto a jury is not really a juror at all; she is an interloper akin "to a stranger who sneaks into the jury room." Dyer v. Calderon, 151 F.3d 970, 983 (9th Cir. 1998) (en banc).  "Justice must satisfy the appearance of justice." Offutt v. United States, 348 U.S. 11, 14 (1954).  Accordingly, "courts cannot administer justice in circumstances in which a juror can commit a federal crime in order to serve as a juror in a criminal case and do so with no fear of sanction so long as a conviction results." United States v. Colombo, 869 F.2d 149, 152 (2d Cir. 1989).

In McDonough, the Supreme Court held that to obtain a new trial where, as here, a juror lied during voir dire, "a party must first demonstrate that a juror failed to answer honestly a material question on voir dire, and then further show that a correct response would have provided a valid basis for a challenge for cause.  The motives for concealing information may vary, but only those reasons that affect a juror's impartiality can truly be said to affect the fairness of a trial." McDonough, 464 U.S. at 556.  In Colombo, the Second Circuit held that where a juror deliberately conceals information that, if revealed, "might thwart her desire to sit" on the jury, any resulting conviction "cannot stand" because such conduct "obstruct[s] the voir

dire and indicate[s] an impermissible partiality on the juror's part." Colombo, 869 F.2d at 151.

While the Second Circuit "has never found reason to overturn a verdict on the basis of juror

nondisclosure under McDonough," United States v. Stewart, 433 F.3d 273, 303 (2d Cir. 2006),

the exceptional circumstances—deliberate lies engineered to create a fictitious, "marketable"

juror—presented by this case warrant such extraordinary relief.

### B. Conrad Failed to Answer Truthfully the Court's Questions on Voir Dire

Conrad's lies are breathtaking.  In response to direct and unambiguous questions,

she intentionally provided numerous false and misleading answers and omitted material

information.  Conrad's lies were calculated to prevent the Court and the parties from learning her

true identity, which would have prevented her from serving on the jury.  This is not a case where

the relevant voir dire questions were somehow vague or ambiguous, particularly given Conrad's

status as an attorney.  Cf. McDonough, 464 U.S. at 555 (because jurors are called "from all

walks of life, many may be uncertain as to the meaning of terms which are relatively easily

understood by lawyers and judges"); see also Stewart, 433 F.3d at 304 (noting the district court's

finding that ambiguities in the voir dire questions drafted by the parties "made it unclear that [the

juror's] responses deliberately concealed the truth").  The Court's questions to Conrad were

clear, simple, and direct.

The events she lied about were recent, personally significant, and directly affected

her qualifications to serve as a juror.  Her arrests and suspensions from the practice of law were

not the result of youthful indiscretions or errors on the part of police or courts.  Cf. United States

v. McConnel, 464 F.3d 1152, 1156 (10th Cir. 2006) (juror failed to respond to voir dire question

regarding involvement in criminal matter because prior indictment had been dismissed at a

preliminary hearing); cf. also United States v. Bishop, 264 F.3d 535, 554-57 (5th Cir. 2001)

(juror failed to disclose prior felony conviction because she was told by her lawyer that she did not have to reveal it); Brown v. Fisher, No. 06 Civ. 2771 (RJS) (JCF), 2010 WL 3452372, at *3 (S.D.N.Y. Apr. 29, 2010) (juror did not respond to question about being a victim of a crime because he did not believe a minor stab wound received during a teenage fight thirty years earlier in the Ukraine made him a "victim"). There is no dispute that Conrad was aware of her prior convictions, her attorney disciplinary problems, and her personal injury suit at the time she answered the Court's questions under oath. There is also no question that she made a conscious decision to hide them from the Court.

Conrad's concealment of these material facts is not attributable to personal embarrassment or shame. As Conrad herself acknowledged, "I know my disclosures definitely would not have allowed me to sit as a juror. I also know that I could have requested a side bar to speak with your Honor and the other attorneys during the voir dire and I didn't do that." (Hr'g Tr. 236-37.) Cf. United States v. Langford, 990 F.2d 65, 67 (2d Cir. 1993) (juror failed to disclose two arrests for prostitution fifteen years earlier because of "substantial embarrassment" it would cause her in her current job). Conrad's misrepresentations were not "mistaken, though honest" answers. McDonough, 464 U.S. at 555; see also Langford, 990 F.2d at 67 (juror failed to disclose an arrest because she believed it did not result in a record of arrest or conviction.) They were deliberate and intentional lies. Conrad confessed that she purposefully lied and omitted material information in her voir dire testimony to make herself more "marketable" as a juror. She yearned for professional redemption or some psychic satisfaction: "And having been suspended for so long, I guess mentally I would think maybe I'm back in the swing of things now." (Hr'g Tr. 236.) It is evident that Conrad's untruthful responses to the Court's voir dire questions were premeditated and deliberate. There is no innocent explanation.

37

C.  Conrad Would Have Been Excused for Cause

McDonough's second prong requires a party moving for a new trial to show that the truthful answer to a question at voir dire would have provided a valid basis for a challenge for cause.  McDonough, 464 U.S. at 556; see also United States v. Greer, 285 F.3d 158, 171 (2d Cir. 2002).  The Government urges this Court to adopt a narrow reading of McDonough unsupported by law.  But contrary to the Government's contention, the test is not whether the true facts would compel the Court to remove a juror for cause, but rather whether a truthful response "would have provided a valid basis for a challenge for cause."  McDonough, 464 U.S. at 556.  This means that "the district court must determine if it would have granted the hypothetical challenge" if it had known the true facts.  Stewart, 433 F.3d at 304; Greer, 285 F.3d at 171; cf. also United States v. Shaoul, 41 F.3d 811, 816 (2d Cir. 1994) (noting that under the second prong of McDonough, a defendant must have a basis for arguing that the district court is required to sustain his challenge for cause).  Under any reading of McDonough, Conrad's misconduct demonstrates that she was incapable of being an impartial juror and this Court would have struck her for cause.

An impartial jury is one in which every juror is "'capable and willing to decide the case solely on the evidence before [her].'"  McDonough, 464 U.S. at 554 (quoting Smith, 455 U.S. at 217).  Jurors are instructed that they are to decide the question of a defendant's guilt based solely on the evidence presented.  See United States v. Thomas, 116 F.3d  606, 616-17 n.10 (2d Cir. 1997).  A juror is biased—i.e., not impartial—if her experiences "would 'prevent or substantially impair the performance of [her] duties as a juror in accordance with [her] instructions and [her] oath.'"  Wainwright v. Witt, 469 U.S. 412, 424 (1985) (quoting Adams v. Texas, 448 U.S. 38, 45 (1980)); see also United States v. Torres, 128 F.3d 38, 43 (2d Cir. 1997)

(juror properly excused for cause who had structured financial transactions, in case involving structuring of cash deposits). Challenges for cause can be based on actual bias, implied bias, or inferable bias. See Torres, 128 F.3d at 43; see also United States v. Sampson, 820 F. Supp. 2d 151, 162-67 (D. Mass. 2011) (discussing at length each type of bias). Conrad exhibited all three types of bias. Had Conrad revealed her history as a lawyer suspended on account of alcoholism, her criminal convictions, current probation, outstanding warrant, and the other salient facts—not to mention the perjurious application for reinstatement she filed the day before voir dire—this Court would have dismissed her.

### 1. Actual Bias

"Actual bias is 'bias in fact.'" Torres, 128 F.3d at 43 (quoting United States v. Wood, 299 U.S. 123, 133 (1936)); see also Greer, 285 F.3d at 171. Whether a juror is actually biased is a question of fact determined by the trial judge. See Dyer, 151 F.3d at 973 (citing Patton v. Yount, 467 U.S. 1025, 1038 (1984)); see also Torres, 128 F.3d at 43 (citing Wood, 299 U.S. at 133). "A juror is found by the judge to be partial either because the juror admits partiality . . . or the judge finds actual partiality based upon the juror's voir dire answers." Torres, 128 F.3d at 43; see also Hughes v. United States, 258 F.3d 453, 456 (6th Cir. 2001) (requiring a new trial after seated juror expressed during voir dire her bias against defense based on her relationships with law enforcement officers).

While Conrad claimed that she was a "fair and unbiased" juror (see, e.g., Hr'g Tr. 236), this Court cannot credit that assertion. Conrad is a pathological liar and utterly untrustworthy. See Gray v. Hutto, 648 F.2d 210, 211 (4th Cir. 1981) ("With the manifestly strong pressures on the juror to exculpate herself from a quite untenable position, her self-serving statements should not count for much.") Further, Conrad's own statements and demeanor belie

her claim of impartiality. Her animus toward lawyers—like Defendants here—was evident not only in her comment that most attorneys are criminals but also in her attitude at the evidentiary hearing. Her comment that all attorneys are "crooks" was a direct statement of bias against the Defendants. Conrad's statement can only be understood as reflecting a pre-existing bias against lawyers.

Conrad's hostility toward lawyers is perhaps attributable to her own professional failures. Attorneys reported Conrad to the Disciplinary Committee, and the Appellate Division suspended her. Given her disciplinary problems, Conrad was plainly biased against the Defendant-lawyers in this case. As Conrad herself highlighted repeatedly and bitterly, the Defendant-lawyers in this case enjoyed far more professional success than she did. Her comment that she did not "live a lavish lifestyle like Mr. Daugerdas" demonstrates that she personalized the case and compared her success as a lawyer to that of Daugerdas, a consideration that is inherently improper. Because there was no evidence at trial about Daugerdas's "lifestyle," it is clear that Conrad simply concocted facts and did not limit her consideration of the case to the evidence presented. Moreover, Conrad knew from the very beginning of voir dire that this case involved illegal tax shelters used by clients of the law firm of Jenkins & Gilchrist P.C., the accounting firm BDO Seidman, LLP, and other law and accounting firms. (Trial Tr. 11-12.)

Conrad's May Letter to Okula buttresses the conclusion that she was actually biased. Written the day after the trial concluded, the May Letter indicates that Conrad identified with the Government. She expressed that bias in her emphasis on "Our Government" —a phrase she could not explain. (Hr'g Tr. at 202.) Her bias also bled through when she wrote that she "did fight the good fight" against acquitting Parse on any counts but eventually had to "throw in the towel." Her choice of words shows that Conrad saw herself not as a fact-finder, but as a

partisan for "Our Government." In addition, Conrad included her cell phone number in the

return address of the May Letter, and she testified that she was "very anxious" to talk to the

prosecutors after the verdict. (Hr'g Tr. at 194.) By contrast, she testified that there was "no

reason" for her to talk to the defense lawyers. (Hr'g Tr. at 195.) Whether conscious or

subliminal, the entire tone of Conrad's May Letter reveals that Conrad ignored this Court's jury

instructions, including its final instruction: "Remember at all times you are not partisans, you

are judges, judges of the facts. Your sole interests are to seek the truth from the evidence in the

case and to determine whether the government has proved or failed to prove beyond a reasonable

doubt that the defendants in this case committed the crimes alleged against them in the

indictment." (Trial Tr. 8911-12.) Accordingly, this Court finds that Conrad was actually biased

against Defendants.

2. Implied Bias

Because actual bias is often difficult to detect, courts imply bias when "certain

circumstances create too great a risk of affecting a juror's decision making process, even if the

juror is not, consciously, fully aware of the impact." Fields v. Brown, 503 F.3d 755, 806 (9th

Cir. 2007) (Berzon, J., dissenting). As explained long ago by the Supreme Court:

> Bias or prejudice is such an elusive condition of the mind that it is most
> difficult, if not impossible, to always recognize its existence, and it might
> exist in the mind of one (on account of his relations with one of the
> parties) who was quite positive that he had no bias, and said that he was
> perfectly able to decide the question wholly uninfluenced by anything but
> the evidence. The law therefore most wisely says that, with regard to some
> of the relations which may exist between the juror and one of the parties,
> bias is implied, and evidence of its actual existence need not be given.

Crawford v. United States, 212 U.S. 183, 196 (1909); see also McDonough, 464 U.S. at 556

(Blackmun, J., concurring) (recognizing implied bias as a basis for relief); Smith, 455 U.S. at

221-22 (O'Connor, J., concurring) (same).

Implied bias is determined as a matter of law and "attributed to a prospective juror regardless of actual partiality." Torres, 128 F.3d at 45 (citing Wood, 299 U.S. at 133); see also United States v. Tucker, 243 F.3d 499, 509 (8th Cir. 2001) (implied bias determined "without regard to [the juror's] subjective state of mind"). Where a juror is impliedly biased, disqualification of that juror is mandatory. See United States v. Rhodes, 177 F.3d 963, 965 (11th Cir. 1999). Therefore, if a juror who participated in rendering a verdict was impliedly biased, the moving party is entitled to a new trial. See, e.g., Hunley v. Gonzalez, 975 F.2d 316, 319-20 (7th Cir. 1992).

Courts imply bias in "extreme situations where the relationship between a prospective juror and some aspect of the litigation is such that it is highly unlikely that the average person could remain impartial in his deliberations under the circumstances." Person v. Miller, 854 F.2d 656, 664 (4th Cir. 1988); see also Fields, 503 F.3d at 770; Sanders v. Norris, 529 F.3d 787, 792 (8th Cir. 2008). "Some examples might include a revelation that the juror is an actual employee of the prosecuting agency, that the juror is a close relative of one of the participants in the trial or the criminal transaction, or that the juror was a witness or somehow involved in the criminal transaction." Smith, 455 U.S. at 222 (O'Connor, J., concurring); see also United States v. Brazelton, 557 F.3d 750, 753-54 (7th Cir. 2009) (explaining that courts must imply bias if the juror is related to one of the principals in the case, regardless of whether the juror is objective in fact). Courts imply bias "when there are similarities between the personal experiences of the juror and the issues being litigated." See Sampson, 820 F. Supp. 2d at 163-64 (quoting Skaggs v. Otis Elevator Co., 164 F.3d 511, 517 (10th Cir. 1998) and collecting cases where bias was implied based on the juror's experiences (internal quotation marks omitted)).

Significantly, courts imply bias "where repeated lies in voir dire imply that the

juror concealed material facts in order to secure a spot on the particular jury." Fields, 503 F.3d

at 770 (citing Dyer, 151 F.3d at 982). "A juror . . . who lies materially and repeatedly in

response to legitimate inquiries about her background introduces destructive uncertainties into

the process." Dyer, 151 F.3d at 983. As Judge Kozinski explained in Dyer:

> Jury service is a civic duty that citizens are expected to perform willingly
> when called upon to do so. But there is a fine line between being willing
> to serve and being anxious, between accepting the grave responsibility for
> passing judgment on a human life and being so eager to serve that you
> court perjury to avoid being struck. The individual who lies in order to
> improve his chances of serving has too much of a stake in the matter to be
> considered indifferent. Whether the desire to serve is motivated by an
> overactive sense of civic duty, by a desire to avenge past wrongs, by the
> hope of writing a memoir or by some other unknown motive, this excess
> of zeal introduces the kind of unpredictable factor into the jury room that
> the doctrine of implied bias is meant to keep out.
>
> If a juror treats with contempt the court's admonition to answer voir dire
> questions truthfully, she can be expected to treat her responsibilities as a
> juror—to listen to the evidence, not to consider extrinsic facts, to follow
> the judge's instructions—with equal scorn. Moreover, a juror who tells
> major lies creates a serious conundrum for the fact-finding process. How
> can someone who herself does not comply with the duty to tell the truth
> stand in judgment of other people's veracity? Having committed perjury,
> she may believe that the witnesses also feel no obligation to tell the truth
> and decide the case based on her prejudices rather than the testimony.

Dyer, 151 F.3d at 983; see also Green v. White, 232 F.3d 671, 676-78 (9th Cir. 2000) (finding

implied bias where a juror's "pattern of lies, inappropriate behavior, and attempts to cover up his

behavior introduced 'destructive uncertainties' into the fact-finding process").

The nature, scope and extent of the lies a juror tells may, in and of themselves,

demonstrate an undue partiality or bias. See, e.g., Colombo, 869 F.2d at 151. Even when a

prospective juror is dishonest for reasons other than a desire to serve on the jury, dishonest

answers to voir dire questions indicate that a juror is unwilling or unable "to apply the law as

instructed by the court to the evidence presented by the parties" and, therefore, suggest partiality.

Thomas, 116 F.3d at 617 & n.10.  Therefore, dishonest answers are a factor that can contribute to

a finding of implied bias.  See Skaggs, 164 F.3d at 517.

The principle of implied bias applies with particular force here.  Not only did

Conrad lie, she created a totally fictitious persona in her drive to get on the jury.  Few, if any,

prospective jurors would willfully violate their oath, and knowingly subject themselves to

prosecution for perjury, without a strong personal interest in the outcome of the case.  See

Colombo, 869 F.2d at 151.  Conrad did not tell a discrete lie or two.  Rather, she presented

herself as an entirely different person and lied about virtually every detail of her life, including

mundane subjects like her travel habits.  As Conrad herself acknowledged, her deceit during voir

dire was on her mind throughout the trial.  (Hr'g Tr. 168.)  And as a lawyer, she had to

appreciate the consequences of lying under oath.  Indeed, as a suspended lawyer seeking

readmission, she undoubtedly wanted to show that she could be attentive for prolonged periods

in court.  Anyone so anxious to serve on a jury that she would misrepresent who she is, and risk

criminal prosecution by doing so, see 18 U.S.C. § 1621, cannot be considered impartial.

Someone who commits fraud to get on a jury cannot evaluate the credibility of witnesses, much

less sit in judgment of others who are accused of fraud.

Conrad's sweeping dishonesty demonstrates that she is incapable of weighing

evidence, measuring credibility, and applying the law as instructed by this Court.  Her inability

to differentiate between truthful and untruthful statements was revealed on cross examination

when counsel asked whether she could appreciate the fact that telling this Court her husband had

"own[ed] some bus companies" was a lie.

> Q.  Did you think you were misleading the Court when the judge said,
> "What is he retired from?" and you said, "He owned some bus
> companies"?
>
> A.  No, of course not.

44

Q. That wasn't misleading at all?

A. No.

Q. Did you apply that same standard of what is or is not misleading in acquitting your function as a juror?

A. I don't really know what your question means.

Q. My question means you have an idea of what is misleading and what is not misleading, right?

A. Of course.

Q. You think that what you said here about the bus companies is not misleading, correct?

A. Not at all. Maybe it's a transcription, "own" or "owned." That's it.

Q. In fact, did you apply that same standard in your mind of what is or is not misleading in evaluating the evidence in this case?

A. Of course we had to, and I had to, and I did.

(Hr'g Tr. at 163-64.)

The brazenness of Conrad's deliberate lies and her demonstrated inability to

distinguish truth from falsehood added "destructive uncertainty" to the fact-finding process.

Dyer, 151 F.3d at 983. Accordingly, this Court concludes that Conrad was impliedly biased.

3. Inferable Bias

"Inferable" or "inferred" bias exists "'when a juror discloses a fact that bespeaks a

risk of partiality sufficiently significant to warrant granting the trial judge discretion to excuse

the juror for cause, but not so great as to make mandatory a presumption of bias.'" Greer, 285

F.3d at 171 (quoting Torres, 128 F.3d at 47). As the Second Circuit reasoned:

> There is no *actual* bias because there is no finding of partiality based upon
> either the juror's own admission or the judge's evaluation of the juror's
> demeanor and credibility following voir dire questioning as to bias. And
> there is no *implied* bias because the disclosed fact does not establish the
> kind of relationship between the juror and the parties or issues in the case
> that mandates the juror's excusal for cause.
>
> Nonetheless, inferable bias is closely linked to both of these traditional
> categories. Just as the trial court's finding of actual bias must derive from
> voir dire questioning, so the court is allowed to dismiss a juror on the
> ground of inferable bias only after having received responses from the

> juror that permit an inference that the juror in question would not be able
> to decide the matter objectively. In other words, the judge's determination
> must be grounded in facts developed at voir dire. And this is so even
> though the juror need not be asked the specific question of whether he or
> she could decide the case impartially. Moreover, once facts are elicited
> that permit a finding of inferable bias, then, just as in the situation of
> implied bias, the juror's statements as to his or her ability to be impartial
> become irrelevant.

Torres, 128 F.3d at 47; see also Greer, 285 F.3d at 171; United States v. Quinones, 511 F.3d 289,

301 (2d Cir. 2007).

Although declining to define the "precise scope of a trial judge's discretion to

infer bias," Judge Calabresi further explained:

> It is enough for the present to note that cases in which a juror has engaged
> in activities that closely approximate those of the defendant on trial are
> particularly apt. The exercise of the trial judge's discretion to grant
> challenges for cause on the basis of inferred bias is especially appropriate
> in such situations. "Because [in such cases] the bias of a juror will rarely
> be admitted by the juror himself, partly because the juror may have an
> interest in concealing his own bias and partly because the juror may be
> unaware of it, [partiality] necessarily must be inferred from surrounding
> facts and circumstances." McDonough, 464 U.S. at 558 (Brennan, J.,
> concurring) (internal quotation marks and citation omitted).

Torres, 128 F.3d at 47. Therefore, the doctrine of inferable bias, which courts have long

"implicitly assumed to exist," Torres, 128 F.3d at 43, permits a court in its discretion to dismiss a

juror because of an inference that the juror will not be able to decide the case based solely on the

evidence.

Had this Court known the facts, Conrad would have been subject to a valid

challenge for cause. She was manifestly incapable of performing the central functions of a

juror—evaluating witness credibility and making a fair assessment of the evidence. Solely on

the basis of her false voir dire testimony, the Court could easily infer that she is inherently unable

to perform the crucial function of ascertaining the truth. The fact is, however, that there is a

mountain of other evidence showing that not only did she lie to this Court on voir dire, but that

she is a pathological liar who does not know the difference between truth and lie. The presence of such a tainted juror, who cannot appreciate the meaning of an oath is simply intolerable.

Conrad's actions in this case, as well as in other lawsuits in which she has participated, "evinces a shocking disregard for the judicial system[.]" 2007 Suspension Order, 48 A.D.3d at 188. In addition to her serial perjury, Conrad's direct defiance of the Court and its orders, as well as her statements at the December 20 and February 15 hearings, betray a fundamental contempt for the judicial process. She advised the Court at the December 20 hearing that there was no point in holding a hearing because the Defendants are "fricken crooks and they should be in jail." (12/20 Tr. at 17.) Conrad also repeatedly gave her unsolicited view at the Hearing that there was no point in inquiring into her erratic conduct or perjury because she and the jury had convicted the defendants. (See, e.g., Hr'g Tr. 132, 134, 137, 148.) As she pointedly put it: "These are semantics, sir. Your client is still guilty as charged with our verdict, and that's it." (Hr'g Tr. 149.)

Conrad's erratic behavior at the December 20 and February 15 hearings indicates significant mental instability that would have disqualified her from service had it been known at the time of the trial. For instance, on December 20, when the Court asked her to sit down, she bizarrely responded, "Then I get a free hamburger?" (12/20 Tr. at 12.) When told that she should retain an attorney, she replied, "I'll retain myself or my husband, the convicted felon." (12/20 Tr. at 16.) None of this made the slightest bit of sense. Conrad had no explanation for this erratic behavior, and she did not know why she made those statements. (Hr'g Tr. 108, 112.) But she specifically denied that she was intoxicated at the time of the December 20 hearing. (Hr'g Tr. at 109-10.)

Her conduct on February 15 was just as bizarre. She refused to come to court as ordered, and she could not explain that conduct. (Hr'g Tr. 104-08.) Indeed, she was not even sure if she had a reason for telling this Court's deputy clerk that she would not come. (Hr'g Tr. 108.) Her defiance caused this Court to issue a warrant for her immediate arrest and direct the U.S. Marshals to take her into custody. She was arrested and transported to the courtroom. When asked if she had lied about not being a lawyer because no one specifically asked her about whether she was admitted to practice, Conrad responded, "Sir, that's posing the quantum theory, if the tree doesn't fall and nobody sees it. No, of course, the answer is no." (Hr'g Tr. 170-71.) She repeatedly refused to answer questions about whether her behavior at the earlier hearing was irrational and whether there was a logical connection between her actions and what was being discussed on December 20. Her testimony that she was not a psychologist is a non sequitur. (Hr'g Tr. 112-13.) Similarly, she testified that she did not know why she had said the Defendants' motion for a new trial was "ridiculous" because, "I'm not a psychologist." (Hr'g Tr. 115.) But of course, it does not take a psychologist to answer such questions, nor does it take a psychologist to know that someone whose behavior is so erratic, and who cannot explain her behavior, has a serious mental problem. No doubt these problems have been exacerbated by many years of alcohol abuse. Such a person has no business sitting on a jury in judgment of others. Accordingly, had this Court known the full extent of Conrad's character at voir dire, it would have exercised its discretion and inferred that she was biased.

Because Conrad lied during voir dire, and her honest answers would have caused this Court to strike her for cause, Daugerdas, Guerin, and Field are entitled to a new trial.

II. Waiver

Parse waived his claim for a new trial based on Conrad's alleged misconduct. Prior to the verdict, Parse's attorneys knew—or with a modicum of diligence would have known—that Conrad's voir dire testimony was false and misleading.

A. Legal Standard

Like all constitutional rights, the right to challenge the partiality of a jury verdict based on a juror's alleged misconduct during voir dire may be waived. See McDonough, 464 U.S. at 551 n.2 ("It is not clear from the opinion of the Court of Appeals whether the information stated in Greenwood's affidavit [about the juror] was known to respondents or their counsel at the time of the voir dire examination. If it were, of course, respondents would be barred from later challenging the composition of the jury when they had chosen not to interrogate [the] juror . . . further upon receiving an answer which they thought to be factually incorrect." (citing Johnson v. Hill, 274 F.2d 110, 115-16 (8th Cir. 1960))); see also City of Richmond v. Madison Mgmt. Grp., Inc., 918 F.2d 438, 459 (4th Cir. 1990) (counsel "could have discovered that [the juror's] answer was false before trial because they were given a list of the jurors' addresses. We cannot find that the district court abused its discretion by not excusing the Pipe Defendants' failure to act earlier on the information available to them." If 'the right to challenge a juror is waived by failure to object at the time the jury is empanelled if the bases for objection might have been discovered during voir dire,' such a right surely is waived if the basis could have been discovered before voir dire." (citation omitted)); accord United States v. Steele, 390 F. App'x 6, 13-14 (2d Cir. 2010) (summary order) (defendant not deprived of due process where judge did not excuse juror caught sleeping at various times; judge carefully observed and monitored juror and "[n]either party objected to district court's actions"). The Government bears the burden of

proving a defendant's waiver by a preponderance of the evidence. See United States v. Mastrangelo, 693 F.2d 269, 273-74 (2d Cir. 1982).

It bears noting at the outset that a defendant can waive certain rights through the actions of his attorneys, even if the defendant himself was unaware of the circumstances and actions giving rise to the waiver. See Gonzalez v. United States, 553 U.S. 242, 248 (2008) ("As to many decisions pertaining to the conduct of the trial, the defendant is deemed bound by the acts of his lawyer-agent and is considered to have notice of all facts, notice of which can be charged upon the attorney." (internal quotation marks and citations omitted)). As the Supreme Court stated in Gonzalez, "[g]iving the attorney control of trial management matters is a practical necessity." 553 U.S. at 249. "The adversary process could not function effectively if every tactical decision required client approval." Taylor v. Illinois, 484 U.S. 400, 418 (1988). Indeed, Parse does not dispute this basic legal principle, and he is bound by Brune & Richard's actions and decisions at trial. Moreover, this is not a case of total abandonment, where the consequences of lawyer neglect are not imputed to the client. Cf. Maples v. Thomas, 132 S. Ct. 912, 922 (2012). Brune & Richard represented Parse zealously throughout trial and the attorney-client relationship was continuous.

The Supreme Court recently reiterated that constitutional rights can be waived, even in complex cases:

> We have recognized "the value of waiver and forfeiture rules" in "complex" cases, Exxon Shipping Co. v. Baker, 554 U.S. 471, 487-488, n.6 (2008), and this case is no exception. In such cases, as here, the consequences of "a litigant . . . 'sandbagging' the court—remaining silent about his objection and belatedly raising the error only if the case does not conclude in his favor," Puckett v. United States, 556 U.S. 129, ___ (2009) (some internal quotation marks omitted)—can be particularly severe. If Pierce believed that the Bankruptcy Court lacked the authority to decide his claim for defamation, then he should have said so—and said so promptly. See United States v. Olano, 507 U.S. 725, 731 (1993) ("No

> procedural principle is more familiar to this Court than that a constitutional right,' or a right of any other sort, 'may be forfeited . . . by the failure to make timely assertion of the right before a tribunal having jurisdiction to determine it'" (quoting <u>Yakus v. United States</u>, 321 U.S. 414, 444 (1944)). Instead, Pierce repeatedly stated to the Bankruptcy Court that he was happy to litigate there. We will not consider his claim to the contrary, now that he is sad.

<u>Stern v. Marshall</u>, 131 S. Ct. 2594, 2608 (2011).

The waiver doctrine as explicated in <u>McDonough</u> and <u>Stern</u> reflects courts' disfavor of litigants who fail to act on information in their possession only to claim later that such information resulted in a violation of their rights. For example, in <u>Brazelton</u>, 557 F.3d at 755, counsel for the defendant did not challenge for cause a juror who was the second cousin to the victim of a shooting by the defendant, which led to the defendant's arrest on the drug and weapons charges for which he was on trial. On appeal, the defendant argued that he was denied his right to an impartial jury, which he claimed was not waivable. The Seventh Circuit disagreed:

> In this circuit, there is no ambiguity on the question whether the right to an impartial jury can be waived. We have held that "[t]he Sixth Amendment right to an impartial jury, like any constitutional right, may be waived." <u>United States v. Zarnes</u>, 33 F.3d 1454, 1472 (7th Cir. 1994); <u>accord</u> <u>United States v. Joshi</u>, 896 F.2d 1303, 1307 (11th Cir. 1990). Brazelton's on-the- record decision to pass up not one, but two opportunities to ask that Juror Number Four be struck for cause was a waiver. If a defendant is allowed to twice forego challenges for-cause to a biased juror and then allowed to have the conviction reversed on appeal because of that juror's service, that would be equivalent to allowing the defendant to "plant an error and grow a risk-free trial." <u>United States v. Boyd</u>, 86 F.3d 719, 722-23 (7th Cir. 1996).

<u>Brazelton</u>, 557 F.3d at 755.

The discussion in <u>United States v. Bolinger</u>, 837 F.2d 436, 438-39 (11th Cir. 1988), is similarly instructive. In <u>Bolinger</u>, on a weekend break in the middle of jury deliberations, an attorney for the defense learned from a relative of a juror's neighbor that the

juror had purportedly formed a view of the defendant's guilt prior to the close of evidence. The jury did not return a verdict until three days later. Rather than inform the court of what he had learned, defense counsel filed a post-verdict motion for a new trial based on the juror's bias and purported misconduct.

The Eleventh Circuit upheld the district court's denial of the new trial motion, explaining:

> Our cases teach that "a defendant cannot learn of juror misconduct during the trial, gamble on a favorable verdict by remaining silent, and then complain in a post-verdict motion that the verdict was prejudicially influenced by that misconduct." United States v. Jones, 597 F.2d 485, 588 n.3 (5th Cir. 1979). In Jones, the court explained that a motion for new trial based on juror misconduct is a form of new trial motion for newly discovered evidence. Id. at 488. As such, the motion must be supported by proof that the evidence of misconduct was not discovered until after the verdict was returned. In the particular context of juror misconduct, this rule serves to ensure that the trial court is given every available opportunity to attempt to salvage the trial by ridding the jury of prejudicial influences. Thus, where the defendant or defense counsel knows of juror misconduct or bias before the verdict is returned but fails to share this knowledge with the court until after the verdict is announced, the misconduct may not be raised as a ground for a new trial. Id.; see also United States v. Edwards, 696 F.2d 1277, 1282 (11th Cir. 1983) (no abuse of discretion in refusing to interrogate jury about alleged juror misconduct where defendant waited to hear the verdict before contesting jury's impartiality); United States v. Dean, 667 F.2d 729, 732-34 (8th Cir. 1982) (en banc) (untimely notification of juror misconduct waives right to new trial even where actual prejudice can be shown).

Bolinger, 837 F.2d at 438-39 (footnote and subsequent history omitted).

Importantly, the Bolinger court also found that defense counsel's ignorance of the full truth did not preclude a finding of waiver:

> Although the June 10 telephone call did not disclose the full extent of [the juror's] misconduct, enough information was relayed that counsel should have contacted the district court for instructions while counsel continued his investigation. It is up to the court, and not the parties, to determine the appropriate response when evidence of juror misconduct is discovered. See United States v. Caldwell, 776 F.2d 989, 997 (11th Cir. 1985); United States v. Carrodeguas, 747 F.2d 1390, 1395 (11th Cir. 1984). [The

defendant's] decision to gamble on the jury rather than inform the court of the problem in time to allow the court to determine if corrective action was possible prior to verdict is fatal to his claims regarding juror Hunter.

Bolinger, 837 F.2d at 439.

Other courts agree that defense counsel may not remain silent at trial about known or suspected juror misconduct. See United States v. Breit, 712 F.2d 81, 83 (4th Cir. 1983) ("A defendant who remains silent about known juror misconduct—who, in effect, takes out an insurance policy against an unfavorable verdict—is toying with the court. To hold the government to an exacting burden of proof of the defendant's knowledge—a matter by definition best known to the defendant and his acquaintances rather than the government—is effectively to invite that policy to be cashed in at high value and little risk to the defendant, but at great cost to the finality of verdicts and the integrity of the trial process." (citing Gray, 648 F.2d at 212)); see also Edwards, 696 F.2d at 1282 ("The appropriate time to alert the court of the problem clearly would have been before the return of the verdict. At that point the judge could have investigated the charge, if necessary, and taken curative action as might be appropriate under the circumstances. The defendant learned of the problem at a stage in the proceedings when some corrective action might have been suitable.").

Ultimately, a defendant waives his right to an impartial jury if defense counsel were aware of the evidence giving rise to the motion for a new trial or failed to exercise reasonable diligence in discovering that evidence. To be sure, actual knowledge of facts disqualifying a juror is an absolute bar to any challenge to that juror after a verdict. McDonough, 464 U.S. at 551 n.2 (party who had knowledge "would be barred from later challenging the composition of the jury when they had chosen not to interrogate [the suspected juror] further upon receiving an answer which they thought to be factually incorrect"). But a defendant cannot consciously avoid learning the truth in the hope the jury verdict will be in his

53

favor. See Johnson, 274 F.2d at 115-16. In Johnson, a decision on which the Supreme Court

relied in McDonough, the Eighth Circuit explained:

> The right to challenge the panel or to challenge a particular juror may be
> waived, and in fact is waived by failure to seasonably object. It is
> established that failure to object at the time the jury is empanelled operates
> as a conclusive waiver if the basis of the objection is known <u>or might have</u>
> <u>been known or discovered through the exercise of reasonable diligence</u>, or
> if the party is otherwise chargeable with knowledge of the ground of the
> objection.

274 F.2d at 115-16 (quoting Batsell v. United States, 217 F.2d 257, 260 (8th Cir. 1954)

(emphasis added, internal citations omitted); see also Gray, 648 F.2d at 212 ("In short, however

strong Gray's case for a mistrial might have been had the court been immediately notified,

counsel's deliberate inaction amounted to a conscious decision to find out what the jury was

going to do."); Burden v. CSX Transp., Inc., No. 08-cv-04-DRH, 2011 WL 3793664, at *8-9

(S.D. Ill. Aug. 30, 2011) ("The Court agrees because all the information about Juror Nos. 2 and 9

submitted by defendant was found in public documents, primarily by internet searches.

Consistent with McDonough, Johnson, and Stanczak[v. Penn. RR Co., 174 F.2d 43, 48-49 (7th

Cir. 1949)] the Court finds that defendant waived its present objections because the basis of the

objections might have been known or discovered through the exercise of reasonable diligence.

Defendant gambled with the possibility of a verdict and now raises questions it might have raised

earlier.")

        In Johnson, a personal injury case arising from a multi-car accident, prospective

jurors were asked whether they or their family members were involved in accidents of any kind.

Juror Harry Strege answered "no" to those questions, when in fact his son had been in a car

accident, and Strege had acted as a guardian ad litem in a property damage claim arising from the

accident. In affirming the district court's rejection of the motion for a new trial, the Eighth

Circuit noted that defense counsel, having "information from two sources that an individual by

54

the name of 'Harry' or 'Harris' Strege had been involved in a property damage suit in Richland County . . . was possessed of information which was sufficient to put him on notice as to the prior Strege incident." Johnson, 274 F.2d at 116.  Defense counsel "made no request of the court for a further interrogation." Johnson, 274 F.2d at 116.  The Johnson court further noted that the trial spanned a week, "which certainly afforded counsel ample time and opportunity to apprise the court of his knowledge with respect to juror Strege." Johnson, 274 F.2d at 116.

As Johnson and subsequent cases make clear, litigants and their counsel must act with reasonable diligence based on information about juror misconduct in their possession, or they will be deemed to have waived their right to an impartial jury based on the challenged juror misconduct.

B. Knowledge

Here, the facts adduced at the Hearing and from Brune & Richard's serial disclosures show that counsel for Parse believed that Juror No. 1 was the suspended New York attorney named Catherine M. Conrad.  First, Trzaskoma, the Brune & Richard partner who oversaw and coordinated juror research, demonstrated her knowledge through the simple, declarative language of her e-mail on May 12, 2011:  "Jesus, I do think that it's her."  Trzaskoma based her declaration on a considerable body of evidence:  (1) the Appellate Division's 2010 Suspension Order suspending attorney "Catherine M. Conrad" for alcohol-related issues; and (2) the Westlaw Report describing a "Catherine M. Conrad" who (i) resided in Bronxville, among other places; (ii) was forty-one years of age; (iii) participated in a lawsuit involving "Saranta Foods Ltd., Unity Coffee," pending in Bronx Supreme Court; (iv) was associated with a Robert J. Conrad, whom Trzaskoma identified in an email as "an immigration judge" (Hr'g Tr. 46-47); and (v) was a suspended New York attorney.  This information—which Trzaskoma reviewed in

a sustained back-and-forth with her colleagues at Brune & Richard—amply supports her vivid declaration that Juror No. 1 was suspended attorney Catherine M. Conrad.

Other Brune & Richard lawyers acknowledged that Trzaskoma had drawn a strong link between the Catherine M. Conrad described in the 2010 Suspension Order and the Catherine M. Conrad seated as Juror No. 1. In particular, Brune & Richard attorney Randy Kim noted in a May 12 e-mail that Trzaskoma had previously reviewed data that "clearly suggested" that Conrad was an alcoholic, which reflects Trzaskoma's pre-voir dire review of the 2010 Suspension Order. (See Brune Aff. Ex. J at 86: May 12, 2011 E-mail from Randy Kim to Vivian Stapp ("We (I thought TT [Theresa Trzaskoma]) found something more; which more clearly suggested she has been/is and [sic] alcoholic.").) And in yet another May 12 e-mail, Trzaskoma herself acknowledged the pre-voir dire connection she had drawn between Conrad and the person depicted in the 2010 Suspension Order. (See Brune Aff. Ex. J at 86: E-mail from Trzaskoma to paralegal David Benhamou ("What we found before voir dire was that maybe she was a suspended lawyer.").)

The actions of Parse's attorneys in connection with the new trial motion further support the conclusion that they knew that Conrad was the subject of the 2010 Suspension Order. First, Trzaskoma's statement to the Court on July 15, 2011 that "we were not aware of the facts that have come to light" was not entirely candid. One of the facts that purportedly "came to light" was the 2010 Suspension Order, which Defendants identified as one basis for their new trial motion. Parse's attorneys possessed those facts prior to voir dire, and, indeed, Trzaskoma admitted that she had reviewed the 2010 Suspension Order, and discussed it with Brune and their jury consultant, prior to Conrad's individual voir dire. What is more, Trzaskoma's purported

ignorance cannot be reconciled with the additional evidence that Parse's defense team uncovered and reviewed at Trzaskoma's behest.

Similarly, Defendants' Brief, which Trzaskoma drafted and Brune and Edelstein edited, contained two significant factual misstatements pertaining to their knowledge about Conrad. First, in its description of how the Defendants learned of Conrad's true identity, Defendants' Brief suggests that they began to collect and review documents and information pertaining to Conrad's background only after receiving Conrad's May Letter. (See Def. Br. at 9 ("The tone and content of [Conrad's May Letter], . . . caused defendants concern and prompted them to investigate[.]").) Second, Defendants represented they "had no basis to inquire whether Conrad was lying in response to each of the Court's questions [during voir dire]." (Def. Br. at 32 n.13.) But those statements are at odds with the facts that emerged after this Court inquired and the Government pursued discovery. At a minimum, Trzaskoma had reviewed the 2010 Suspension Order prior to voir dire and thus possessed information indicating that a "Catherine M. Conrad" was a suspended attorney. That alone was a basis to inquire whether Conrad was lying during voir dire.

In addition, Parse's attorneys resisted the Court's and the Government's attempt to discover the full extent of their research into Conrad. In resisting that discovery, Brune raised a legal argument that directly contradicted her earlier representations to the Court. During the August 8, 2011 conference, Brune argued against well-settled law that "there is a split in the federal circuits about whether the fundamental right to an impartial jury can ever be waived," and asked the Court to address that legal issue before allowing any discovery. (8/8 Tr. 11.) Yet, in attempting to explain why Brune & Richard omitted their extensive pre-verdict investigation of Conrad from Defendants' Brief, Brune stated that "we certainly anticipated that the

government was going to raise the issue of waiver, it features prominently in the Supreme Court case that controls here[.]" (7/15 Tr. 6.) Such cognitive dissonance is unsettling. It also belies Brune's characterization of their decision not to disclose their pre-verdict investigation in their brief. This Court declines to credit Brune's dismissive claims that her law firm "kind of missed it" and that she "never imagined that . . . [it] was going to assume the debate level prominence that it has here. I missed the issue and I really regret that." (Hr'g Tr. 292-93.)

Only after this Court directed Parse's attorneys to comply with the Government's discovery requests and after this Court advised counsel that it would conduct an in camera review of their assertions of the attorney work product privilege, did Brune & Richard produce documents relating to their research of Conrad, including Trzaskoma's May 12 "Jesus" e-mail. The import of Parse's attorneys' conduct is that they attempted to foreclose an inquiry into their pre-verdict knowledge of Conrad and ward off any anticipated "due diligence" argument by the Government. Ultimately, their post-hoc explanations suggest an acute concern about the implications to their client's legal position if the Court were to learn the true facts.

Finally, Trzaskoma's attempt during the Hearing to distance herself from the language of her own May 12 e-mail was unpersuasive. There is simply no convincing way to morph her vivid affirmation of belief—"Jesus, I do think that it's her"—into a statement of "possibility," "remote possibility," or "potential[ity]." (Hr'g Tr. 43, 59, 62.) Trzaskoma's knowledge of Conrad's identity was far deeper than a mere "possibility," as shown by her review of the 2007 and 2010 Suspension Orders and the Westlaw Report. That report, as noted above, contained a number of connections to Juror No. 1, including a Bronxville address, Conrad's age, the pendency of a lawsuit in Bronx Supreme Court, and a reference to a person Trzaskoma recognized as Conrad's father.

Moreover, Benhamou presented Trzaskoma with the information from the Westlaw Report just four minutes before she declared, "Jesus, I do think that it's her." Her immediate, unvarnished reaction is tantamount to an excited utterance. While usually employed as an exception to the hearsay rule, the well-recognized reliability of excited utterances applies equally in this context. See United States v. Tocco, 135 F.3d 116, 127 (2d Cir. 1998) ("The rationale for this hearsay exception is that the excitement of the event limits the declarant's capacity to fabricate a statement and thereby offers some guarantee of its reliability."). Trzaskoma made her statement in reaction to the explosive information contained in the Westlaw Report and without the benefit of time to deliberate and reflect on the consequences of her statement. Thus, her spontaneous declaration is a reliable indication of her state of mind precisely when the Court was sending its instructions, a list of exhibits, and a redacted copy of the indictment into the jury room so that Conrad, and her fellow jurors, could begin their deliberations.[11]

In sum, the facts fully support that Trzaskoma, on behalf of Parse, was aware during trial that Juror No. 1 was the suspended New York attorney Catherine M. Conrad. That knowledge, possessed by Parse's attorney who acted as the point person in Brune & Richard's jury research process, waives Parse's claim of juror misconduct.

---

[11] Parse argues that to adopt this interpretation of Trzaskoma's state of mind would be to engage in what psychologists call "hindsight bias." (Parse's Post-Hearing Brief on the Issue of Waiver, dated Apr. 6, 2012 ("Waiver Br.") at 11 (citing Daniel Khaneman, Thinking, Fast and Slow 202 (2011) and Jeffrey J. Rachlinski, A Positive Psychological Theory of Judging in Hindsight, 65 U. Chi. L. Rev. 571, 572 (1998) ("In hindsight, people consistently exaggerate what could have been anticipated in foresight[.]")).) Of course, this argument presumes that even given what Trzaskoma had learned by May 12, it was "unimaginable" that Conrad had lied during voir dire. (Waiver Br. at 11.) But not only was that eventuality imaginable on May 12, there is clear and convincing evidence that Trzaskoma believed it to be so.

C. <u>Lack of Reasonable Diligence</u>

Even if this Court were to conclude that Parse's counsel did not know that Juror No. 1 was the suspended New York attorney Catherine M. Conrad, this Court would still find waiver appropriate because the facts overwhelmingly paint a picture of a glaring lack of reasonable diligence by Parse's attorneys.

As an initial matter, Parse's contention that a lack of reasonable diligence cannot constitute a waiver is wrong as a matter of law, and does not comport with basic principles of a fairly functioning judicial process. The waiver doctrine exists to ensure that the Court receives information in time to make inquiries, remedy potential prejudices, and save all concerned the time, expense, and efforts of a retrial. A waiver standard predicated solely on actual knowledge, to a 100% certainty, would result in retrials where defense attorneys had substantial information of juror misconduct that put them on reasonable notice that the Court should be notified and additional inquiry undertaken. Parse's position is inconsistent with the institutional imperative of ensuring that "the trial court is given every available opportunity to attempt to salvage the trial by ridding the jury of prejudicial influences." <u>Bolinger</u>, 837 F.2d at 439. Stated simply, to avoid waiver, Parse's attorneys were required to act with reasonable diligence both after they learned about the 2010 Suspension Order prior to voir dire and after they obtained the Westlaw Report on May 12, 2011—the day jury deliberations started. But they did not. Parse's attorneys were on sufficient notice and they should have raised their concerns with the Court at voir dire and then again at the beginning of jury deliberations. At the very least, they should have taken additional steps to acquire sufficient information to make an informed decision. Their failure to do so constitutes a waiver.

Parse's attorneys argue that they reasonably relied on Conrad's voir dire answers, but this excuse is unpersuasive. First, with the 2010 Suspension Order in hand during voir dire, they could have asked the Court to pose a direct question to Juror No. 1 about whether she was the "Catherine M. Conrad" referenced in the order. Indeed, Brune acknowledged that if the person in the suspension opinion were the same person as Juror No. 1, that would be "very significant information" and "it was certainly going to be significant to Judge Pauley if it was the same person." (Hr'g Tr. 265). But Parse's attorneys chose not to ask the Court to inquire of Juror No. 1 about the 2010 Suspension Order. That decision flies in the face of Brune's argument at a pretrial conference about the need for an extensive juror questionnaire: "What's the harm in asking additional questions?" (Dec. 8, 2010 Transcript 35.) That Parse's attorneys failed to heed their own advice when it mattered most speaks volumes.

Second, on May 12, Parse's attorneys failed to exercise reasonable diligence by deciding not to do any additional research or investigation and deciding not to notify the Court when faced with mounting evidence that Juror No. 1 was a suspended New York attorney. Brune claims that, at that point in time, she did not know one way or the other whether Juror No. 1 was the suspended attorney. (Hr'g Tr. 283-84). But, at a minimum, Parse's attorneys possessed information that could not be reconciled without additional investigation. Trzaskoma recognized this on May 12 when she exclaimed, "Jesus, I do think that it's her," and she reasonably concluded that additional investigation was needed. (Hr'g Tr. 62, 92.) Specifically, she instructed Benhamou to gather information about the civil lawsuit referenced in the Westlaw Report.

Unfortunately, before Benhamou located information about the lawsuit, Brune, Edelstein, and Trzaskoma decided not to pursue it. During their May 12 conversation in Foley

Square Plaza, they discussed at least two of the options available to them that could have reconciled the conflicting information in their possession—further investigation or alerting the Court.  Together they rejected both options without first learning from Trzaskoma, much less discussing, the factual basis behind Trzaskoma's earlier conviction.  Rather, they chose a course that was guaranteed to leave the issue unresolved.  By choosing to do nothing, Parse's attorneys failed to exercise reasonable diligence in view of the information they possessed before the jury began deliberations.

There were, of course, some simple steps that could easily have shed light on whether Juror No.1 was the suspended attorney.  Parse's attorneys could have compared Conrad's name on the jury selection panel report with the name listed in the Suspension Orders, which showed that Juror No. 1 shared the same middle initial as the suspended attorney.  They could have visited the New York State Bar's website and located Catherine Conrad's listing, which would have shown that she had the same address as one of the addresses listed in the Westlaw Report.  They could have consulted with the Government, whom Brune acknowledged had "pretty good investigators and . . . access to more information than I do[.]"  (Hr'g Tr. 320-21.)  They could have requested that Nardello, their private investigator, make further inquiry.  See United States v. Rodriguez, 182 F.3d 902 (2d Cir. 1999) (table) (rejecting Rule 33 motion where defense counsel failed to investigate); see also United States v. Slutsky, 514 F.2d 1222, 1225 (2d Cir. 1975) (denying motion for a new trial where defendants "knew, or at the very least with the exercise of due diligence should have known, of the existence of . . . exculpatory evidence and its ramifications").

Most important, they could have sought guidance from the Court.  As in Bolinger, "enough information was relayed that counsel should have contacted the district court for

instructions while counsel continued his investigation." 837 F.2d at 439. Instead, Parse's attorneys usurped the judicial prerogative by substituting their judgment for the Court's. Their stated reason—"we relied on voir dire answers"—is wholly inadequate in view of their awareness of information casting strong doubt on those answers. And it is especially deficient when much of the information relating to Conrad was reflected in public records that Parse's attorneys possessed prior to the jury verdict. In sum, Parse's attorneys' knowledge of Conrad's deception and their lack of reasonable diligence in acting on that knowledge warrants finding a waiver.

CONCLUSION

Oaths are sacred and their origins ancient. They acted as a self-curse, and those who swore to one believed dire consequences flowed from its violation. That belief undergirded the oath's effectiveness and validated its purpose. See Helen Silving, The Oath: I (The Historical Evolution of the Judicial Oath in Various Legal Systems), 68 Yale L. J. 1329, 1335 (1959). Today, the need to punish perjurers—through contempt proceedings, criminal prosecutions, or both—is no less acute. While the decision to prosecute Conrad for perjury is not this Court's, the Government should have a strong incentive to punish such conduct and deter others. The prospect of preserving a tainted jury verdict should not temper the Government's resolve to call Conrad to account for her egregious conduct.

Jury selection is integral to the organization of a trial. As officers of the court, attorneys share responsibility with a judge to ensure the integrity of the proceedings. In this respect, counsel and the court are joint venturers. An attorney's duty to inform the court about suspected juror misconduct trumps all other professional obligations, including those owed a

client. Any reluctance to disclose this information—even if it might jeopardize a client's position—cannot be squared with the duty of candor owed to the tribunal.

At a minimum, Parse's attorneys had a suspicion that Juror No. 1 was not the person she represented herself to be during voir dire. That suspicion leavened into tangible evidence that Conrad was a monstrous liar. And Parse's attorneys knew—or with a modicum of diligence would have known—of Conrad's misconduct before the jury rendered its verdict. But they gambled on the jury they had. Accordingly, Parse's attorneys' failure to bring Conrad's misconduct to the attention of the Court leads to the anomalous, but entirely just, result that Daugerdas, Guerin, and Field's motion for a new trial is granted, while Parse's is denied.

For the foregoing reasons, Paul M. Daugerdas, Donna M. Guerin, and Denis M. Field's motion for a new trial is granted. David K. Parse's motion for a new trial is denied. The Clerk of the Court is directed to terminate the motion pending at ECF No. 459.

Dated: June 4, 2012
       New York, New York

                              SO ORDERED:


                              WILLIAM H. PAULEY III
                              U.S.D.J.


*All Counsel of Record.*

64