UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA       :

    -v-            :

                                **S3 09 Cr. 581 (WHP)**

PAUL M. DAUGERDAS,       :
DONNA GUERIN, and
DENIS FIELD,          :

        Defendants.     :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


GOVERNMENT'S MEMORANDUM OF LAW IN OPPOSITION
TO DEFENDANT PAUL M. DAUGERDAS'S MOTION SEEKING TO
VACATE THE POST-INDICTMENT RESTRAINT ON CERTAIN PROCEEDS


PREET BHARARA
United States Attorney for the Southern
District of New York


NANETTE L. DAVIS,
STANLEY J. OKULA, JR.,
Assistant United States Attorneys

     — Of Counsel —

## TABLE OF CONTENTS

PRELIMINARY STATEMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

BACKGROUND. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    A.   The Indictments, Seizure Orders, and Post-Indictment
           Restraining Order. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    B.   Daugerdas's Initial Monsanto Motion and Settlement Agreement
           With the Government. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

   DAUGERDAS'S MOTION TO DISMISS IS MERITLESS. . . . . . . . . . . . . . . . . . . . 7

    A.   Forfeiture, the Sixth Amendment Right to Counsel,
           and United States v. Monsanto. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

        1.   Forfeiture. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

        2.   The Sixth Amendment and Monsanto. . . . . . . . . . . . . . . . . . . . . . . . . 10

    B.   Daugerdas's Request for a Monsanto Hearing Should Be Denied
           Because He has Failed to Demonstrate Entitlement to Such a Hearing. . . . . . . . . 12

        1.   Daugerdas Has Significant Unrestrained Funds and Assets. . . . . . . . . . . . . 13

        2.   Daugerdas Has Failed to Pointed to Any Evidence, Much Less Substantial
           Evidence, that the Restrained Funds Are Not Forfeitable. . . . . . . . . . . . . . . 15

Conclusion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA            :

          -v-            :

                              **S3 09 Cr. 581 (WHP)**

PAUL M. DAUGERDAS,            :
DONNA GUERIN, and
DENIS FIELD,            :

              **Defendants.**            :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## GOVERNMENT'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT PAUL M. DAUGERDAS'S MOTION SEEKING TO VACATE THE POST-INDICTMENT RESTRAINT ON CERTAIN PROCEEDS

The United States respectfully submits this Memorandum of Law, together with the Declaration of Assistant United States Attorney Stanley J. Okula, Jr. (the "Okula Decl.") in opposition to the motion of defendant Paul M. Daugerdas ("Daugerdas" or the "Defendant") seeking to vacate the Court-ordered post-indictment restraint of millions of dollars of fraud proceeds obtained by Daugerdas as a result of his commission of the wire fraud conspiracy and mail fraud offenses charged in the Third Superseding Indictment (the "S3 Indictment").

## PRELIMINARY STATEMENT

Neither a criminal defendant nor anyone else is entitled to use forfeitable funds — i.e., crime proceeds or funds used to commit a crime — to finance a criminal defense. A criminal defendant does, however, have a qualified Sixth Amendment right to counsel of choice. As a result, the Second Circuit has recognized that the accused has a right to a "post-restraint, pretrial hearing" to test the Government's forfeiture case, United States v. Monsanto, 924 F.2d 1186, 1203 (2d Cir.

1991) (en banc) ("<u>Monsanto</u>"), but only if he can satisfy two threshold requirements.  <u>First</u>, he must demonstrate the restrained funds are necessary to pay for counsel of choice — that is, that the Government has restrained all of his other money or assets.  <u>Second</u>, he must raise a substantial evidentiary question about the forfeitability of funds restrained by the Government.  Only then does his qualified Sixth Amendment right outweigh the Government's interests in preventing a hearing.

Paul Daugerdas — a defendant whose trial demonstrated that he was the leader of a decade-long tax fraud scheme that resulted in his receipt of over $95,000,000 in proceeds of that scheme — seeks a <u>Monsanto</u> hearing, but has made neither requisite showing.  To begin, it is not in dispute that Daugerdas has access to hundreds of thousands of dollars of pension and other funds and is the co-owner of a lien-free home in Wilmette, Illinois that is worth in excess of $750,000.  Notably, neither Daugerdas nor his wife (to whom Daugerdas transferred millions of dollars of assets during the course of his fraud) has submitted an affidavit regarding their respective financial conditions.

Nor has Daugerdas persuasively tendered any legitimate question about the merits of the Government's forfeiture.  His primary argument is that the Government has failed to prove that the money restrained in accounts he controls can be traced directly to a Jenkens & Gilchrist account that received the tax shelter fees directly from his tax shelter clients.  But Daugerdas's argument ignores the fact that the restraint of proceeds is appropriate if the Government can establish that the ill-gotten fees would not have been paid to him "but for" the forfeiture offenses with which Daugerdas is charged.  Here, the trial proof established just that — "but for" the tax shelter fraud, Daugerdas would not have received the $95,000,000 in proceeds.

Moreover, Daugerdas is simply wrong on the facts relating to tracing.  The tax shelter fees were not paid to some general account maintained in Texas by the Texas-based J&G firm and then filtered thereafter to Daugerdas.  Rather, the tax shelter fees paid by the clients were paid to a

2

separate Chicago-based account maintained for J&G's Chicago office headed by Daugerdas. Only after the salaries, partner fee income, and other expenses of the Chicago office were paid were remaining amounts remitted to the main J&G office in Texas.   Thus, the proceeds Daugerdas received were indeed directly traceable to the tax shelter client payments. Daugerdas's secondary argument — that the restraint of his accounts should be limited to the fees paid by those tax shelter clients who testified at trial — ignores well-settled forfeiture law that allows for forfeiture (and thus pretrial restraint) of the full range of proceeds garnered through an ongoing conspiracy or scheme, such as the wire fraud conspiracy and mail fraud scheme proved at trial.

Finally, Daugerdas's attack on the forfeiture should be rejected because he has already made a binding agreement with the Government and the law firm of Jenner & Block that permitted him to use certain proceeds in exchange for the Government's agreement to refrain from seeking forfeiture of certain of his assets. That agreement was made when the Government and Daugerdas stipulated in March 2010 that a significant amount of proceeds could be used to fund the $3 million amount that his lawyers at Jenner & Block argued was essential to the defense of his case.  Having received the benefit of that agreement — which provided for the use of proceeds that the Government was not legally obligated to release under Monsanto, and the Government's agreement not to seek forfeiture of other assets —  Daugerdas should not be allowed to walk away from the agreement in order to obtain access to additional proceeds of his crimes.

In sum, Daugerdas's motion fails both factually and as a matter of law.

## BACKGROUND

### A.    The Indictments, Seizure Orders, and Post-Indictment Restraining Order

The original Indictment was returned by the grand jury on June 6, 2009, in 27 counts.  The Count One conspiracy charged that, between 1994 and 2004, Daugerdas and various co-defendants

3

engaged in a massive scheme to defraud the Government out of billions of dollars of tax revenue by causing hundreds of United States taxpayers to engage in four types of fraudulent tax shelter transactions — which Daugerdas helped create, sell, and implement — and thereafter causing those taxpayers to file income tax returns with the IRS that fraudulently reported the results of those shelters. Indictment, ¶¶ 62-66.  As a result of his central involvement in that fraud scheme, Daugerdas received — through an S-Corporation he controlled called PMD Chartered — approximately $95,000,000 for the 1998-2002 time period alone.  Id., ¶ 60.

The first superseding indictment (the "S1 Indictment") was returned by the grand jury on June 23, 2009, adding, among other allegations, the wire fraud object of the Count One conspiracy and attendant forfeiture allegations.  See S1 Indictment, ¶ 65.  The second and third superseding indictments, returned by the grand jury on November 19, 2009 and March 4, 2010, respectively, similarly contained wire fraud and attendant forfeiture allegations.  In particular, the S3 Indictment, like the S1 Indictment, contained a wire fraud object in the Count One conspiracy charge, see S3 Indictment, ¶ 65, and sought forfeiture based on that conspiracy charge.  Id. ¶ 119.  The forfeiture allegation specifically sought forfeiture from Daugerdas and co-defendants of "all property, real and personal, that constitutes or is derived from proceeds traceable to the commission of the offenses." Id.; see also S1 Indictment, ¶ 117 (seeking forfeiture of "all property, real and personal, that constitutes or is derived from proceeds traceable to the commission of the offense").[1]

---

[1]  The forfeiture allegations contained in the S3 Indictment used the plural "offenses" at the end of the forfeiture allegation in paragraph 119 because the S3 Indictment also predicated the forfeiture on a substantive mail fraud charge (Count Thirty-One) that was brought in S3.  In addition, the S3 Indictment added a citation to 982(a)(2)(A) — the criminal forfeiture statute — as an additional basis for forfeiture, because the mail and wire fraud "offenses" affected a financial institution.  Both the S1 and S3 Indictments cited to § 981(a)(1)(C) as a basis for forfeiture. See S1 Indictment, ¶ 117; S3 Indictment, ¶ 119.

After specifically identifying certain of the "proceeds" obtained by Daugerdas from the offenses, see S3 Ind. ¶ 119(b)-(hh); S1 Ind. ¶ 119(b)-(t), the S1 and S3 Indictments also alleged that Daugerdas and each of the co-defendants are liable for a personal money judgment of at least $180 million, representing the total proceeds obtained during the charged conspiracy and mail fraud offense. See S3 Ind. ¶ 119(a). The Indictments also contain a substitute assets provision. See S3 Ind. ¶ 120; S1 Ind. ¶ 118.

Following the return of the initial Indictment, the Government applied ex parte for seizure warrants pursuant to 18 U.S.C. § 981. That application specifically identified financial accounts owned or controlled by Daugerdas, into which proceeds of the tax fraud scheme charged in the initial Indictment were alleged to have been deposited or were otherwise contained. See Affidavit of Christine Mazzella, dated June 18, 2009 (the "Mazzella Affidavit"), attached to the Okula Decl. at Exh.1. As a result of the allegations contained in the initial Indictment and the Mazzella Affidavit, this Court authorized the restraint of certain proceeds of the fraud offenses committed by Daugerdas, which proceeds were contained in numerous financial accounts at Goldman Sachs, Putnam Investments, and Credit Suisse, among other places. In addition, following the return of the S1 Indictment, the Government applied for and obtained a post-indictment restraining order pursuant to 21 U.S.C. § 853(e)(1)(A) (the "PIRO"). See PIRO, attached to the Okula Decl. as Exh. 2. Based on the allegations contained in the S1 Indictment and the Mazzella Affidavit, the PIRO effectuated restraints on various additional "proceeds" obtained by Daugerdas, including a luxury weekend home in Williams Bay, Wisconsin, and financial accounts at JP Morgan Chase, Fidelity, and Smith Barney, among others. Id. Finally, the S2 Indictment identified additional "proceeds" obtained by Daugerdas during the scheme, which, through their listing in the S2 Indictment, the Government indicated an intention to forfeit.

5

**B.      Daugerdas's Initial <u>Monsanto</u> Motion and the Settlement Agreement With the Government**

Through motion papers filed on or about January 10, 2009, Daugerdas requested a <u>Monsanto</u> hearing and sought to vacate the court-authorized restraints on his proceeds.  After the filing of the Government's response, counsel for the Government and Daugerdas exchanged various correspondence and information relating to Daugerdas's finances in order to resolve the <u>Monsanto</u> issue without Court intervention.   In particular, the Government provided counsel for Daugerdas a chart containing an updated "tracing" analysis with respect to Daugerdas's proceeds of the charged offenses, <u>see</u> Okula Decl. Exh. 3, while counsel for Daugerdas provided various information relating to Daugerdas's finances, including information about an Individual Retirement Account ("IRA"), a Defined Benefit Plan, and certain other assets, including his home in Wilmette, Illinois.  Following this exchange of information, the parties agreed to a settlement of the <u>Monsanto</u> issues that would give Daugerdas access to over $3 million of otherwise potentially forfeitable assets? — which was more than the $2.5-3 million that Daugerdas claimed was necessary to fund his defense through Jenner & Block.

The agreement provided as follows: (i) the Government agreed that it would not seek to forfeit certain accounts controlled by Daugerdas that contained approximately $1.463 million, which accounts were identified on a schedule prepared by Daugerdas's counsel (so-called "Exhibit A," attached to the Okula Decl. as Exh.4); (ii) even though Daugerdas purchased his Wisconsin house with $3 million of proceeds of the offenses and therefore stood to forfeit the home and any appreciation, the Government agreed that Jenner & Block would be given a $1.6 million interest in that home through a second mortgage on the property, which would be paid to the firm upon

Daugerdas's sale of the property;[2] and (iii) the Government agreed not to seek the forfeiture of Daugerdas's IRA and Defined Benefit Plan, which had a combined value of over $2.3 million. See Okula Decl. Exh. 5 (attaching e-mail exchange between Charles Sklarsky and Stanley Okula, dated March 22, 2010). As a result of the foregoing agreement, Daugerdas was permitted to keep his principal residence in Wilmette, Illinois, which he co-owns with his wife and is believed to be worth approximately $750,000.[3]

## ARGUMENT

## DAUGERDAS'S MOTION TO VACATE IS MERITLESS

Despite the fact that defendant Daugerdas has failed to establish that he lacks access to assets or funds to pay for his legal defense, he insists he is entitled to a Monsanto hearing and levels a multi-pronged attack on the restraining orders. First, Daugerdas maintains that because he was convicted only of a limited number of tax evasion counts, the tax shelter fee income he received from non-testifying taxpayers — representing a majority of the fees he received — should not be subject to restraint. Second, he argues that restraining orders should be vacated because the Government has failed to establish the direct tracing of the client tax shelter fees into a specific Jenkens & Gilchrist bank account and then, prior to a diminution of the balance of that account, into accounts of Daugerdas. Finally, Daugerdas broadly claims that the pretrial restraint of his funds violates his constitutional rights because he is a defendant in a complex fraud case and the

---

[2] The property, which was unencumbered, was believed to be worth between $6 million and $8 million. It is nominally owned by an entity, WBLG Walworth LLC, of which Eleanor Daugerdas — Paul Daugerdas's wife — is the nominal owner.

[3] During the course of the negotiations of the settlement of the initial Monsanto motion, the Government offered to release $750,000 in proceeds to allow Daugerdas to monetize his interest in his home, to be secured by a mortgage in the same amount by Daugerdas to the Government. Daugerdas would not agree to do so.

Government should not deprive him of his economic wherewithal prior to conviction.

Each of Daugerdas's arguments is meritless.

## A.   Forfeiture, the Sixth Amendment Right to Counsel, and United States v. Monsanto

### 1.   Forfeiture

The criminal forfeiture proceedings in this case are governed by 18 U.S.C. § 982(a)(2)(A), which provides that criminal defendants convicted of mail or wire fraud charges affecting a financial institution "shall forfeit to the United States any property constituting, or derived from, any proceeds the person obtained, directly or indirectly, as the result of such violation."  See also § 982(b)(1) (providing that forfeiture and seizures under section 982 are governed by 21 U.S.C. § 853); 21 U.S.C. § 853 (mandating forfeiture of "any property constituting, or derived from, any proceeds the person obtained, directly or indirectly, as the result of such violation").[4]  "Proceeds" are "property that a person would not have but for the criminal offense . . . ."  United States v. Grant, No. S4 05 CR 1192, 2008 WL 4376365, at *2 n.1 (S.D.N.Y. Sept. 25, 2008); see also United States v. Porcelli, 865 F.2d 1352, 1363-65 (2d Cir. 1989); United States v. Dupree, No. 10–CR–627 (KAM), 2011 WL 3235637, at *8 (E.D.N.Y. July 27, 2011) ("That the 'but for' test can be used post-trial under the more rigorous standard of preponderance of the evidence persuades this court that the Second Circuit also would approve its application in the pre-trial phase under the less rigorous probable cause standard, and the court so holds that the 'but for' test may be applied to the instant case"); United States v. Nicolo, 597 F. Supp. 2d 342, 346 (W.D.N.Y. 2009) (quoting Grant).

---

[4]   Although, as noted above, the forfeiture proceedings are governed by 18 U.S.C. § 982(a)(2)(A) because of the allegations that the wire and mail fraud schemes "affected a financial institution," the forfeiture is alternatively based on the civil forfeiture statute, 18 U.S.C. § 981(a)(1)(C), which is implicated for wire fraud charges that do not "affect a financial institution". Section 981(a)(1)(C) provides for the forfeiture of "[a]ny property, real or personal, which constitutes or is derived from proceeds traceable to [the] violation."

A criminal defendant is jointly and severally liable for any and all reasonably foreseeable gross proceeds of the offense.  See United States v. Awad, 598 F.3d 76, 78-79 (2d Cir. 2010); see also United States v. Coleman Commercial Carrier, Inc., 232 F. Supp. 2d 201, 204 (S.D.N.Y. 2002) ("co-conspirators are liable jointly and severally to forfeit the reasonably foreseeable proceeds of their criminal activity"); United States v. Fruchter, 411 F.3d 377, 383-84 (2d Cir. 2005) (affirming imposition of joint and several liability for all proceeds reasonably foreseeable to defendant in RICO case, including proceeds derived from acquitted conduct); United States v. Benevento, 836 F.2d 129, 130 (2d Cir. 1988) (affirming imposition of joint and several liability on defendant under 21 U.S.C. § 853(a)(1) rather than limiting forfeiture to property acquired solely or wholly by defendant).

In fraud cases involving a continuing scheme (such as mail fraud or wire fraud), this means that the defendant is liable for the full amount derived from the scheme, even if he is charged with and convicted of only a few substantive counts.  See United States v. Boesen, 473 F. Supp. 2d 932, 952 (S.D. Iowa 2007) (in fraud case, forfeiture is imposed because the defendant has been convicted of perpetrating a scheme; it does not matter how many executions of that scheme were alleged in the indictment; hence a defendant convicted of 82 substantive counts of health care fraud must forfeit the proceeds of the entire scheme, not just the proceeds involved in the 82 counts on which he was convicted); United States v. Capoccia, 503 F.3d 103, 117 (2d Cir. 2007) (citing Boesen and noting that if a defendant is convicted of mail or wire fraud, or any other offense of which a scheme is an element, he is liable for the proceeds of entire scheme).

In either the civil or the criminal context, federal law authorizes the Government to take steps to preserve forfeitable assets pending adjudication of the merits of its forfeiture claims.  In the criminal context, the Government may obtain a restraining order by showing probable cause, pursuant to 21 U.S.C. § 853(e)(1)-(2).  These provisions — which are available to the Government

9

at any time pending adjudication of its forfeiture claims — help ensure that forfeiture will be an effective remedy and deterrent to crime, as wrongdoers otherwise could dissipate their property during the pendency of the forfeiture proceedings.  See generally Stefan D. Cassella, Asset Forfeiture in the United States, § 1-1 (2007).

2.      **The Sixth Amendment and Monsanto**

The Sixth Amendment provides that, "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence." U.S. Const. amend. VI.  Although this provision guarantees to a criminal defendant the right of access to counsel, the "Sixth Amendment right to choose one's own counsel is circumscribed in several important respects." Wheat v. United States, 486 U.S. 153, 159 (1988); see also United States v. Perez, 325 F.3d 115, 124-25 (2d Cir. 2003) (setting forth limitations on right to counsel of one's choice).  Among other things, the Supreme Court has held, "[w]hatever the full extent of the Sixth Amendment's protection of one's right to retain counsel of his choosing, that protection does not go beyond the individual's right to spend his own money to obtain . . . counsel."  Caplin & Drysdale, Chartered v. United States, 491 U.S. 617, 626 (1989) (internal quotation marks omitted).  That is, there is

> no Sixth Amendment right to spend another person's money for services rendered by an attorney, even if those funds are the only way that that defendant will be able to retain the attorney of his choice.  A robbery suspect, for example, has no Sixth Amendment right to use funds he has stolen from a bank to retain an attorney to defend him if he is apprehended.  The money, though in his possession, is not rightfully his . . . .

Id.

Applying that basic principle, the Supreme Court has unequivocally held that "neither the Fifth nor the Sixth Amendment to the Constitution requires Congress to permit a defendant to use assets adjudged to be forfeitable to pay that defendant's legal fees." United States v. Monsanto, 491

10

U.S. 600, 614 (1989) (citing <u>Caplin & Drysdale</u>, 491 U.S. 617 (1989)).  For similar reasons, freezing the assets in question pending adjudication of the forfeiture claims — to ensure that such assets are not dissipated over the course of the proceedings — raises no Fifth or Sixth Amendment concerns so long as there has been a finding of probable cause to believe the assets are forfeitable.  <u>See id.</u> at 615.  "[I]f the Government may, post-trial, forbid the use of forfeited assets to pay an attorney," the Supreme Court has explained, "then surely no constitutional violation occurs when, after probable cause is adequately established, the Government obtains an order barring a defendant from frustrating that end by dissipating his assets prior to trial."  <u>Id.</u> at 616.

Following the Supreme Court's decision in <u>Monsanto</u>, the Second Circuit held that, although the Government may obtain an <u>ex parte</u> pretrial order restraining potentially forfeitable assets, a criminal defendant may be entitled to "an adversary, post-restraint, pretrial hearing" to test the finding of probable cause.  <u>United States v. Monsanto</u>, 924 F.2d 1186, 1203 (2d Cir. 1991) (en banc).  Specifically, the Second Circuit held that

> the fifth and sixth amendments, considered in combination, require an adversary, post-restraint, pretrial hearing as to probable cause that (a) the defendant committed crimes that provide a basis for forfeiture, and (b) the properties specified as forfeitable in the indictment are properly forfeitable, to continue a restraint of assets (i) needed to retain counsel of choice and (ii) ordered ex parte. . . .

<u>Id.</u>  To warrant a <u>Monsanto</u> hearing, a defendant must make at least a threshold showing that the Government has improperly restrained assets that he or she needs to pay for counsel of choice.  <u>See id.</u>; <u>see also</u> <u>United States v. Jones</u>, 160 F.3d 641, 647 (10th Cir. 1998); <u>United States v. Farmer</u>, 274 F.3d 800, 804-05 (4th Cir. 2001); <u>United States v. All Funds On Deposit in Various Accounts</u>, 11 CV. 4858 (BSJ), 2012 WL 2900487, at *1 (S.D.N.Y. July 6, 2012) (most courts in Second Circuit have held that defendant is entitled to <u>Monsanto</u> hearing only after demonstrating that defendant lacks assets to pay counsel and living expenses and that there is a bona fide reason to believe that

prior determination of probable cause as to forfeitability was "erroneous"); United States v. Martinez, 11 Cr. 445 (NRB), 2011 WL 4949873, at *8 (S.D.N.Y. Oct. 11, 2011) ("the balance of authority developed since Monsanto IV [the Second Circuit's decision after remand from the Supreme Court] suggests that the requirement of a pretrial hearing is not absolute. Under the so-called 'Jones–Farmer Rule,' a pretrial hearing on a defendant's motion to release assets is required only if the defendant (1) demonstrates to the court's satisfaction that he has no assets, other than those restrained, with which to retain private counsel; and (2) makes a prima facie showing that the assets are not forfeitable"); United States v. Dupree, 781 F. Supp. 2d 115, 141-42 (E.D.N.Y. 2011) (same).

If — and only if — a defendant satisfies both of the foregoing requirements and a hearing is held, the burden is on the Government at the hearing to demonstrate probable cause that the restrained assets are properly forfeitable.  See Monsanto, 924 F.2d at 1195-96.[5]  If the Government succeeds in making that showing, there is no constitutional limitation on continuing the pretrial restraint — even if it effectively precludes the defendant from retaining counsel of his or her choice. See id. at 1196.

**B.      Daugerdas's Motion for a Monsanto Hearing Should Be Denied Because He Has Failed to Demonstrate His Entitlement to Such a Hearing**

As noted, before a defendant is entitled to a Monsanto hearing, he must make a two-step preliminary showing that, first, there is some substantial evidence that the restrained assets are not

---

[5]    At a Monsanto hearing, the Government may not rely on the indictment as per se proof of probable cause, but the Court has considerable discretion in the form of the hearing — for example, the Federal Rules of Evidence do not apply, and the Government may offer hearsay evidence otherwise inadmissible at trial.  See Monsanto, 924 F.2d at 1203; accord United States v. 15 Black Ledge Drive, 897 F.2d 97 (2d Cir. 1990).  The Court, of course, can also consider the evidence presented at trial.

forfeitable and, <u>second</u>, that the Government is "restrain[ing] . . . assets . . . needed to retain counsel of choice." <u>Monsanto</u>, 924 F.2d at 1203. <u>See also</u> <u>United States v. Jones</u>, 160 F.3d at 647; <u>United States v. Farmer</u>, 274 F.3d at 804-05; <u>United States v. Egan</u>, No. 10 Cr. 191 (JFK), 2010 WL 3000000 (S.D.N.Y. July 29, 2010); <u>United States v. Kramer</u>, No. 06 Cr. 200, 2006 WL 3545026 (E.D.N.Y. Dec. 8, 2006); <u>United States v. Vogel</u>, No. 08 Cr. 224, 2010 WL 547344 (E.D. Tex. Feb. 11, 2010); <u>United States v. St. George</u>, 241 F. Supp. 2d 875, 878-80 (E.D. Tenn. 2003); <u>United States v. Ziadeh</u>, 230 F. Supp. 2d 702, 703-04 (E.D. Va. 2002).

### 1.    Daugerdas Has Significant Unrestrained Funds and Assets

Daugerdas has failed to make either showing. Taking the second prong first, Daugerdas has in no way demonstrated that he needs access to restrained funds to pay his counsel of choice, let alone that he has "no other assets" to pay for counsel. <u>Egan</u>, 2010 WL 3000000, at *5 (citing cases and agreeing that, to satisfy this prong of the <u>Monsanto</u> inquiry, defendant must make "an initial showing that the defendant has no other assets with which to retain private counsel as a pre-requisite to a pre-trial hearing to challenge a restraining order" (internal quotation marks and brackets omitted)); <u>see also</u> <u>United States v. All Funds On Deposit in Various Accounts</u>, No. 11 CV. 4858 (BSJ), 2012 WL 2900487, at *1 (S.D.N.Y. July 6, 2012) (Bernard Madoff co-conspirator "Bonventre has provided the Court with insufficient information for it to make any determination as to his ability to fund his own defense with unrestrained funds, and his conclusory assertions to the contrary do not change this result"). Without doing so, he simply cannot demonstrate that due process requires a hearing. <u>See</u>, <u>e.g.</u>, <u>Farmer</u>, 274 F.3d at 804 (holding that defendant's "private interest [under the balancing test set out in <u>Mathews v. Eldridge</u>, 424 U.S. 319 (1976),] would be absent if [defendant] possessed the means to hire an attorney independently of assets that were seized.").

13

The only factual support offered by Daugerdas for this prong of the <u>Monsanto</u> showing is his own unsworn assertion, on the last page of his memo, that the restraint of funds would result in the denial of effective assistance of counsel at trial. Daugerdas Memorandum ("Mem") at 14. That conclusory statement is insufficient to justify a hearing. <u>See</u> <u>United States v. Varner</u>, No. 505 Cr. 00025, 2005 WL 2206083, at *2 (W.D. Va. Sept. 9, 2005) (defendant's affidavit was "insufficient to discharge his burden to make a threshold showing that" he lacked other assets to hire counsel where his affidavit did "not detail his assets and liabilities or provide a meaningful basis for the court to independently judge his assertion that he lacks the ability to retain counsel").

On the contrary, Daugerdas has significant unrestrained assets available to him. Those assets include hundreds of thousands of dollars in Daugerdas's retirement-related accounts, as well as his substantial financial interest in his home. Given those current unrestrained assets worth, conservatively, a half a million dollars, Daugerdas cannot hope to show that he must have access to restrained funds to afford counsel of choice. <u>See</u> <u>Egan</u>, 2010 WL 3000000, at *5 ("The presence of unrestrained assets fundamentally changes the due process balancing. When a defendant has sufficient unrestrained resources to retain the counsel of his choice, the private interest of protecting his Sixth Amendment right to counsel of choice is removed from the due process calculus. It is then the Government's interests against a pre-trial hearing — including preserving forfeitable assets, conserving prosecutorial resources, and avoiding the premature disclosure of its trial strategy — that tip the balance towards waiting until trial to provide the defendant his opportunity to be heard." (citation omitted)); <u>see also</u> <u>Vogel</u>, 2010 WL 547344, at *2 ("defendant must demonstrate that there are <u>no assets</u>, other than those subject to the forfeiture order, with which to exercise defendant's Sixth Amendment right to counsel") (emphasis supplied).

14

    **2.**       **Daugerdas Has Failed to Pointed to Any Evidence, Much Less Substantial Evidence, that the Restrained Funds Are Not Forfeitable**

Even if Daugerdas could demonstrate that he needed access to restrained funds to pay his lawyers — for example, by providing sworn financial affidavits for himself and his wife — he would still not be entitled to a <u>Monsanto</u> hearing because he is unable to make even a preliminary showing that the restrained funds are not forfeitable.  <u>Cf.</u> <u>Vogel</u>, 2010 WL 547344, at *2 ("there must be a bona fide reason to believe that the grand jury erred in finding probable cause to believe that the restrained property would be subject to the forfeiture").

On this prong, Daugerdas offers precious little to challenge the probable cause finding of this Court (through the seizure orders and PIRO), as well as the grand jury, much less the massive amount of evidence introduced at the first trial.  Indeed, Daugerdas does not dispute that he received in excess of $95 million in fee income from the four tax shelters proven at trial, or that he was part of a massive fraud scheme executed in connection with those tax shelter transactions.  Instead, he advances the myopic argument that because only a relative handful of tax shelter clients testified at trial, the restrained "proceeds" of the criminal activity cannot extend beyond the fees paid by those clients — purportedly because the Government has not shown that Daugerdas also attempted to evade those clients' taxes by proving the subjective component of the "economic substance" test.

What this argument ignores, however, is that the test for determining fraud under the forfeiture predicates alleged in the S3 Indictment — that is, the mail and wire fraud charges — is not dependent on the "economic substance" test derived from the substantive tax evasion charges.  Instead, a determination of forfeitability is dependent on a determination that the elements of mail and wire fraud rather than the tax evasion statute are established.  This Court essentially found that a rational jury could make such a finding — beyond a reasonable doubt — when it allowed the jury

to consider in its deliberations whether the mail fraud and conspiracy to commit wire fraud counts were proven by the Government.[6]

Relatedly, Daugerdas's argument also ignores the basic forfeiture principle that in fraud cases involving a continuing conspiracy or scheme (like that alleged in the S3 Indictment), the defendant is liable for the full amount derived from the scheme, even if he is charged with and convicted of only a few substantive counts.  United States v. Capoccia, 503 F.3d at 117; United States v. Boesen, 473 F. Supp. 2d at 952.  Thus, it is entirely irrelevant that Daugerdas was convicted of "just" a dozen or so substantive tax evasion charges.  The proof at trial overwhelmingly established a massive, ongoing mail and wire fraud scheme to defraud the IRS of tax revenues through, among other things, the use of cookie-cutter false opinion letters and other false representations.  That proof was not limited to Daugerdas's individual tax shelter clients; instead, it included testimony from witnesses like Erwin Mayer, who testified about the hundreds of clients involved in his fraudulent tax shelters, and expert David Derosa, who testified about dozens of tax shelter transactions that had no chance of making a profit.  That proof abundantly supported the inference that all of the tax shelter fee income was the product of a massive scheme to defraud the IRS. Accordingly, there is ample support for the proposition that all of the fees derived from the scheme by Daugerdas and his co-conspirators are subject to forfeiture and thus pretrial restraint.

Daugerdas's argument based on the purported lack of direct "tracing" of the proceeds into

---

[6]  We recognize, of course, that the Court has granted a new trial to Daugerdas and certain other defendants based on juror bias in the first trial.  That determination, however, does nothing to undercut the compelling force of the proof that allowed the Government's case to survive the defendant's Rule 29 motion at the end of the Government's case — an implicit recognition that a rational jury could finds all of the elements of the wire fraud conspiracy and mail fraud charges beyond a reasonable doubt.  The standard for a forfeiture determination, of course, is preponderance of the evidence.

his accounts fares no better than his other arguments. As noted above, this argument is meritless because it is based on the flawed premise that direct tracing of proceeds from taxpayer to J&G account and then to Daugerdas must be established before any of Daugerdas's proceeds can be restrained. In fact, because the word "proceeds" means the property that a person would not have obtained or retained "but for" the commission of the offense, see Asset Forfeiture, § 25-4,[7] "proceeds" include not only those funds or assets directly traceable via an unbroken money trail into the defendant's possession, but, in addition, those funds or assets obtained or retained as a result of the commission of the criminal offenses. See United States v. Porcelli, 865 F.2d 1352, 1365 (2d Cir. 1989) (otherwise legitimate or untainted assets may nonetheless be seized by the government if a criminal defendant "would not have acquired or maintained [them] but for his fraudulent scheme").

This "but for" definition of proceeds stems from the wording of the governing forfeiture statute itself, which mandate forfeiture of "any property constituting, or derived from, any proceeds the person obtained, directly or indirectly, as the result of such violation." 21 U.S.C. § 853 (emphasis supplied). See also 18 U.S.C. § 982(a)(2)(A) (criminal defendants convicted of mail or wire fraud charges affecting a financial institution "shall forfeit to the United States any property constituting, or derived from, any proceeds the person obtained, directly or indirectly, as the result of such violation") (emphasis supplied). The Second Circuit's opinion in Porcelli is directly on point. In Porcelli, the Second Circuit reviewed an appeal of a criminal conviction that involved the forfeiture of several pieces of real property purchased with the proceeds of a RICO enterprise. Id. at 1364-65. Even though the Government had shown that the RICO enterprise proceeds helped to

---

[7]    Most cases define "proceeds" in the negative, using the "but for" language. Stated positively, Cassella notes, "proceeds" are defined as "property that a person obtained or retained as a consequence of the commission of an offense." Asset Forfeiture, § 25-4

purchase these properties, the Second Circuit remanded the matter so that the district court could "determine the extent of Porcelli's interest in these properties that he would not have acquired or maintained but for his fraudulent scheme." Id. at 1365. Specifically, the Second Circuit found that since the properties were purchased only in part with illicit proceeds and then improved as a result of the defendant's "hard work and business acumen," the district court was required to determine how much of the value of the real properties were subject to forfeiture because they would not have existed but for the criminal activity. Id.

On remand, the district court applied the "but for" test to the defendant's real property. United States v. Porcelli, No. CR-85-00756 (CPS), 1990 WL 172676 (Aug. 15, 1990 E.D.N.Y.). As a result, Judge Sifton found two properties forfeitable in full and one property forfeitable to the extent of 1/10 of the sales price. The difference in Judge Sifton's application arose from the different ways by which the defendant purchased the three properties; the defendant bought the first property only in part with funds from corporations dependent on his illicit activities, but the other two properties were bought by the defendant entirely with funds from such corporations.

Regarding the first property, Judge Sifton found that because ten per cent of the purchase price was funded with money from offending corporations, ten per cent percent of the gross receipts from the sale of that property were forfeitable. The fact that the sale price of $1.7 million exceeded the original purchase price of $1 million was irrelevant. Judge Sifton did not conclude that the exact dollar amount that the offending corporations invested in the property (i.e., $100,000) determined the amount of forfeiture. Instead, the court pegged forfeiture to the percentage that the offending corporations invested in the property, leaving the government with 10% of $1.7 million, or $170,000.

Turning to the other properties, Judge Sifton held that they were forfeitable in full because

18

"[t]he [purchase] money came from enterprise corporations which were dependent upon defendant's fraud." Id. at *3. Notably, Judge Sifton did not state that those corporations were entirely dependent upon the defendant's fraud, and more importantly, his decision necessarily assumed the Second Circuit's conclusion that there was "evidence that Porcelli's [gas station] business expanded and prospered as a result of his hard work and business acumen." Porcelli, 865 F. 3d at 1365. The defendant sold gas to the general public and his fraud did not victimize them – he just cheated New York out of tax revenue. Id. at 1355-57. Porcelli's sales were legitimate. Nevertheless, because the government established that the property at issue had been purchased by corporations that would not have existed but for the defendant's illicit activities, the court concluded that the property was forfeitable in full.

Other cases examining otherwise legitimate activities also interpret the "but for" test to require forfeiture of far more than the particular dollar amount of illicit proceeds invested in a business or property. For example, in United States v. Grant, where the property at issue was not real estate but income from legitimate securities activities, Judge Buchwald held that but for the defendant's fraud, he would have been forced into bankruptcy and lost his trading privileges as a securities dealer. No. 05 CR 1192 (NRB), 2008 WL 4376365 (S.D.N.Y. Sept. 25, 2008). Therefore, Judge Buchwald found, all income that the defendant Grant derived from his business after the fraud was forfeitable as the gross proceeds of the fraud:

> There can be no serious dispute that had Grant and his co-conspirators forthrightly acknowledged the existence of the Niederhoffer loans in 1997, Refco would have been forced into bankruptcy. Obviously, had Refco filed for bankruptcy and consequently lost its exchange trading rights, no monies would have been earned by Grant subsequent thereto. Thus, all monies received by Grant thereafter were the proceeds of the fraud.

Id. at *1 (emphasis added).  Accordingly, because all of the defendant's income was the indirect result of fraud, Judge Buchwald approved the government's proposed preliminary order of forfeiture pursuant to 18 U.S.C. § 981(a)(1)(c) and 29 U.S.C. § 2461.

Similarly, in United States v. Warshak, the Sixth Circuit applied the "but for" test and held that even if a part of the business was legitimate, the proceeds of that part are nevertheless forfeitable if the legitimate side of the business "result[ed] indirectly" from fraudulent activity:

> Any money generated through these potentially legitimate sales is nonetheless subject to forfeiture, as the sales all resulted "directly or indirectly" from a conspiracy to commit fraud.  See 18 U.S.C. § 982(a)(2).  The same can be said for any sales that occurred at retail because those sales were the outgrowth of Berkeley's fraudulent beginnings.  Furthermore, it could be argued that any sales post-dating the bank-fraud counts were proceeds resulting indirectly from fraud, as Berkeley would have been unable to conduct credit-card transactions if the chargeback-manipulation scheme had never been implemented.  As a consequence, forfeiture of Berkeley's revenues, including money generated through supposedly legitimate transactions, was appropriate.

631 F.3d 266, 332-33 (6th Cir. 2010).  For that reason, the Sixth Circuit affirmed the district court's forfeiture judgment regarding proceeds.

The Seventh Circuit reached a similar conclusion in United States v. Hodge, 558 F.3d 630 (7th Cir. 2009).  Hodge was an appeal by two defendants who had been convicted of conspiring to operate a racketeering enterprise, among other charges.  The racketeering enterprise that the defendants operated was a business that functioned both as a brothel and as a health spa.  The Seventh Circuit vacated the forfeiture award and remanded the case so that the court could determine whether there was a lawful portion of the defendant's business that was not forfeitable. In so doing, the Seventh Circuit made clear that revenue from the lawful part of the business could be forfeited if that lawful part would not have existed "but for" the illicit part:

> If the business as a whole would have closed its doors but for the prostitution component, then it makes sense to say that all of its revenues derive (if indirectly) from prostitution; but if it could have operated as a legitimate massage parlor, then the revenues of the legal part of the business are not forfeitable.

Hodge, 558 F.3d at 635 (emphasis added).  In other words, the circuit court directed that all of the legitimate massage parlor revenues would be subject to forfeiture if the district court found that the lack of the illicit revenue would have caused the business as a whole to fold.  See also United States v. Dupree, No. 10–CR–627 (KAM), 2011 WL 3235637, at *8 (E.D.N.Y. July 27, 2011) (adopting "but for" test in upholding bank account and other restraints).

Here, the proof adduced at trial overwhelmingly demonstrated that the tax shelter fees obtained by the entire Chicago office of J&G — generated through the work of conspirators Daugerdas, Mayer and Guerin — would not have been obtained "but for" the massive tax shelter (fraud) business those conspirators brought to the J&G firm.  Given that proof, the restraint and ultimate forfeiture of all of Daugerdas's fees is entirely appropriate.

Even if this Court were to require strict tracing of the tax shelter fees into Daugerdas's accounts, such a tracing is fully supported.  Contrary to Daugerdas's suggestion,[8] the tax shelter fees paid to J&G by the various tax shelter clients were not transferred into a general account maintained for the whole J&G firm, and thus commingled with J&G's general firm revenues.  Instead, pursuant to an Administrative Services Agreement ("the Agreement") entered into by the J&G firm and the separate Illinois corporate entity that constituted the J&G Chicago office, a special bank account was opened and maintained for the J&G office in Chicago, into which all of the revenues of the Chicago

---

[8]   Daugerdas in his papers does not identify which J&G account he is talking about when he describes the transfer of tax shelter fee income to the J&G firm.  For this reason alone, his claim should be rejected, as the burden is on Daugerdas to introduce proof significantly calling into question the previous findings of probable cause.

office were deposited — separate and apart from the rest of the firm.  See Agreement, § 2b, attached to Okula Decl. Exh. 6 (requiring deposit of all "Gross Business Revenues" of Chicago office into account for Chicago office).[9]  That account thus served to collect the tax shelter fees paid by Daugerdas's tax shelter clients, and thereafter served as the bank that transferred to Daugerdas the massive bonuses that constituted over 95% of the fee income Daugerdas and the others in the Chicago office were paid.  See Okula Decl. Exh. 7 ($15,473,001 wire transfer to Daugerdas account on Dec. 31, 1999, and $46,357,902 wire transfer to Daugerdas account on Dec. 29, 2000, paid by "J&G, an Illinois Professional Corporation").  Given the foregoing, Daugerdas's contention that the tax shelter fee income was commingled with the firm's general (legitimate) revenues is simply not supported by the facts.

Finally, Daugerdas's Monsanto claim should be denied as a result of the previous agreement he reached with the Government regarding access to proceeds, pursuant to which Daugerdas abandoned his request for a Monsanto hearing.  As noted above, that agreement allowed Daugerdas to fund his defense at trial and secured for him the promise that the Government would not seek to forfeit certain assets that were potentially subject to forfeiture — such as pension and retirement accounts containing over $2 million.  Having secured these benefits, and no doubt expended a substantial portion of those assets, Daugerdas should not be permitted simply to disregard an agreement that was made for his benefit by his attorneys, and with Daugerdas's explicit agreement. Stated simply, an agreement is an agreement, and, having received the benefit of his bargain with the Government, Daugerdas should be required to abide by it.

---

[9]   The Agreement, signed by defendants Paul Daugerdas and Donna Guerin on behalf of J&G Illinois, became "effective as of December 30, 1998."

## <u>CONCLUSION</u>

For the foregoing reasons, Daugerdas's motion should be denied.

Dated:  New York, New York
        August 24, 2012

                                          Respectfully submitted,

                                          PREET BHARARA
                                          United States Attorney
                                          Southern District of New York

                        By:     <u>   s/Stanley J. Okula, Jr.        </u>
                                            Stanley J. Okula, Jr.
                                          Assistant United States Attorney
                                          (212) 637-1585
                                          stan.okula@usdoj.gov
                                          Nanette L. Davis
                                          Assistant United States Attorney
                                          (212) 637-1117
                                          nanette.l.davis@usdoj.gov

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that this document, filed through ECF system will be sent electronically to

the registered participants as identified on the Notice of Electronic Filing and that paper copies will

be sent to those indicated as non-registered participants on the above date, and that an electronic

copy will be sent via e-mail to defendant Paul Daugerdas.

<div style="margin-left: 40%;">

By:    <u>   s/Stanley J. Okula, Jr.      </u>
      STANLEY J. OKULA, JR.
      Assistant United States Attorney
      (212) 637-1585
      stan.okula@usdoj.gov
      NANETTE L. DAVIS
      Special Assistant United States Attorney
      (212) 637-1117
      nanette.l.davis@usdoj.gov

</div>