UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                                    :

UNITED STATES OF AMERICA
                                                    :

         -v-                                         :         **INDICTMENT**

PAUL DAUGERDAS, and                                 :         **S5 09 Cr. 581 (WHP)**
DENIS FIELD,
                  **Defendants.**                    :

                                                    :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

ORIGINAL

## COUNT ONE
### (Conspiracy – DAUGERDAS and FIELD)

The Grand Jury charges:

## I.   PERTINENT INDIVIDUALS AND ENTITIES

### A.   <u>The Jenkens & Gilchrist Defendant and Co-Conspirators</u>

1.      Through on or about August 31, 1994, defendant PAUL DAUGERDAS, a

lawyer and Certified Public Accountant ("CPA"), was a long-time tax partner at the accounting firm

of Arthur Andersen LLP, in Chicago, Illinois. From in or about November 1994 until late December

1998, DAUGERDAS was a tax partner and head of the tax department at the Chicago law firm of

Altheimer & Gray ("A&G"). On or about December 29, 1998, DAUGERDAS resigned from A&G

and, commencing on or about January 1, 1999, became the managing shareholder of the newly-

formed Chicago office of Jenkens & Gilchrist, PC ("J&G"), a law firm headquartered in Dallas,

Texas.   DAUGERDAS served as the Chicago office's managing shareholder and head of the

Chicago tax practice at J&G until in or about April 2004. At both A&G and J&G, DAUGERDAS's

tax practice centered around the design, marketing, and implementation of tax shelters.

2.      At all times relevant to this Indictment, Erwin Mayer was a lawyer and an

accountant, and Donna Guerin was a lawyer and a CPA. From at least 1994 through late December 1998, Mayer and Guerin, co-conspirators not named as defendants herein, were tax partners in A&G's Chicago office. In late December 1998, Mayer and Guerin moved to the Chicago office of J&G as shareholders with defendant PAUL DAUGERDAS and other A&G lawyers. From at least 1994 thereafter, Mayer and Guerin's practices included the marketing and implementation of tax shelters.

       3.     John Beery, a co-conspirator not named as a defendant herein, was an associate lawyer in J&G's Chicago tax practice from June 1999 to November 2004. During his tenure at J&G, John Beery, who has a Master of Laws degree in Taxation, worked primarily for defendant PAUL DAUGERDAS, Donna Guerin, and Erwin Mayer (collectively hereinafter, "the J&G Tax Partners"), in J&G's Chicago office in the design, marketing, and implementation of tax shelters.

**B.**     <u>**The BDO Defendant and Co-Conspirators**</u>

       4.     At all times relevant to this Indictment, BDO Seidman LLP ("BDO") was a major international accounting firm, which maintained its headquarters in Chicago, Illinois, and offices in various other United States cities, including New York, New York. BDO provided audit services to many corporate clients, and provided tax services to corporate and individual clients, including some of the wealthiest individuals in the United States. Those tax services included preparing tax returns, providing tax advice, and representing clients in audits by the Internal Revenue Service ("IRS") and litigation with the IRS in Tax Court.

       5.     At all times relevant to this Indictment, defendant DENIS FIELD was a lawyer with a Master of Laws degree in Taxation and a CPA. FIELD became the head of National Tax at

BDO in 1996, and the Chairman and Chief Executive Officer of BDO in 1999, a position he held until October 2003.

6.      In or about early 1998, defendant DENIS FIELD, while BDO's National Tax leader, formed a group devoted to designing, marketing, and implementing high-fee tax strategies for individual clients, often with law firms, investment firms, and financial institutions.  Initially called the "Tax Sales Executive Group" and "Tax Products Group," the group's name was changed to the "Tax Solutions Group" or "TSG" (collectively hereinafter "TSG") in or about October 1999. The strategies marketed by the TSG included tax shelters that could be used by wealthy clients to eliminate or reduce taxes on significant income or gains.  The tax shelters generally generated non-economic tax benefits — primarily losses or gain eliminations — that far outweighed the costs to enter into the tax shelters. BDO touted the tax shelters internally as "value-added products" whereby fees far in excess of the normal BDO hourly billing rates would be charged.

7.      From 1984 through in or about October 2004, Charles W. Bee, Jr., a co-conspirator not named as a defendant herein, was a CPA and a partner in BDO's international tax group in its New York office.  Bee also served as BDO's National Director for International Taxation.  From in or about July 1999 through October 2003, Bee was a member of BDO's Board of Directors.  From June 2000 until October 2003, Bee served as a Vice-Chairman of BDO.

8.      From July 1995 through in or about October 2000, Adrian Dicker, a co-conspirator not named as a defendant herein, was a United Kingdom chartered accountant and a partner in BDO's international tax group in its New York office.  From in or about early 1999 through October 2000, Dicker was a member of BDO's Board of Directors, and thereafter through in or about October 2003, Dicker served on the Board of Directors as a retired partner director.  From

June 2000 until October 2000, Dicker served as a Vice-Chairman of BDO.

9.     From 1998 through October 2003, defendant DENIS FIELD and Charles W. Bee, Jr., and Adrian Dicker, co-conspirators not named as defendants herein, were the leaders of the TSG.  They were also members of BDO's Tax Opinion Committee, which analyzed tax shelter products for their potential use by BDO's clients, and reviewed templates of opinion letters to be utilized in connection with some of those tax shelters.

10.     At all times relevant to this Indictment, Robert Greisman, a co-conspirator not named as a defendant herein, was a lawyer and CPA, and a partner in BDO's Chicago office. Greisman was a member of BDO's TSG and assumed TSG leadership responsibilities upon the retirement of Adrian Dicker.  Greisman was also a member of BDO's Tax Opinion Committee. Greisman was the point person within BDO for the preparation of income tax returns related to the reporting of tax results of BDO's clients' tax shelters.  Greisman also oversaw the provision of information to the IRS in connection with audits of various BDO tax shelter clients' income tax returns.

11.     Between 1998 and 2008, Michael Kerekes, a co-conspirator not named as a defendant herein, was a lawyer and a principal in BDO's Los Angeles office, where he acted as a technical tax expert and advisor to others at BDO.  Kerekes was a member of BDO's TSG and Tax Opinion Committee.

12.     In or about late 1998, through the efforts of defendant DENIS FIELD, co-conspirators Robert Greisman, Charles Bee, Adrian Dicker, and others, BDO entered into an alliance with J&G, pursuant to which BDO assisted in the design, marketing, and implementation of certain J&G tax shelters to BDO's clients and potential clients, acted as a referral source for clients to

purchase certain J&G tax shelters, and prepared certain of the income tax returns reporting the tax benefits of the tax shelters.  In return, J&G paid BDO a portion of the fees J&G collected from clients as a result of the sale of the tax shelters.  Beginning in or about the Fall of 1999, BDO charged its tax shelter clients its own fee, in addition to the fee it received from J&G on the BDO clients' tax shelter sales.

### C.   The "Deutsche Bank" Co-Conspirators

13.     Deutsche Bank, a foreign bank with United States headquarters in New York, New York, structured and implemented many of the financial transactions used in the J&G tax shelters, including those involving BDO and others.

14.     From at least 1994 until in or about 1997, Alex Brown was an investment banking firm with offices nationwide, including Chicago, Illinois, and Dallas, Texas.  From 1997 until in or about June 1999, Alex Brown was an investment banking subsidiary of a national bank. In or about June 1999, Alex Brown became an investment banking subsidiary of Deutsche Bank (Alex Brown and Deutsche Bank sometimes collectively hereinafter "Deutsche Bank").

15.     Beginning in or about 1998, Raymond Craig Brubaker (hereinafter "Craig Brubaker" or "Brubaker"), a lawyer, CPA, and co-conspirator not named as a defendant herein, was an Investment Representative in Alex Brown's Dallas office.  Prior to joining Alex Brown, Brubaker was a partner at the Dallas office of the Arthur Andersen accounting firm, where as a member of the private client practice he assisted high net worth individuals in tax planning and wealth management. Beginning in or about 1998, Brubaker participated in the design, marketing, and implementation of certain tax shelters with the J&G Tax Partners and others.  Brubaker's primary contact at J&G was Erwin Mayer.  Brubaker received substantial commissions from the implementation of the J&G tax

shelters, among others.

16.     Beginning in or about 1996, David Parse, a CPA and co-conspirator not named as a defendant herein, was an Investment Representative in Alex Brown's Chicago office. From in or about 1998, Parse participated in the design, marketing, and implementation of certain tax shelters with the J&G Tax Partners, John Beery, defendant DENIS FIELD, and others.  Parse earned substantial commissions from the implementation of the J&G tax shelters, among others.

17.     From in or about 1998 through in or about 2003, Craig Brubaker and David Parse worked with the Alex Brown's Private Client Fixed Income desk in Baltimore, Maryland, and Deutsche Bank's foreign exchange trading desk ("Deutsche Bank's FX desk") in New York, New York, to structure and implement the financial products used in certain J&G tax shelters.  J&G and BDO referred tax shelter clients to Brubaker and Parse in order for them to provide additional details to the clients about the options, stock, and foreign currency to be used in the implementation of the J&G tax shelters.

D.     **The HOMER Co-Conspirators and Entities**

18.     At all times relevant to this Indictment, John B. Ohle III ("John Ohle"), a co-conspirator not named as a defendant herein, was a lawyer and CPA.  From in or about November 1999 through early 2002, Ohle was employed by Bank One in its "Innovative Strategies Group" ("ISG"), which maintained its principal office in Chicago, Illinois.  The ISG provided estate planning and tax shelter strategies for high net worth clients, including a tax shelter known as "Hedge Option Monetization of Economic Remainder" or "HOMER."  Ohle supervised certain activities of the ISG, including the sales of HOMER, and was its lead salesperson.

19.     Kenneth Brown, a co-conspirator not named as a defendant herein, was a

childhood friend of John Ohle.  Ohle enlisted Kenneth Brown to participate in the HOMER tax shelters as the purported unrelated third-party "buyer" of certain assets in return for substantial compensation.

### E.      Other Pertinent Entities

20.      At all times relevant to this Indictment, American Express Tax and Business Services was a national accounting firm with an office in Chicago.  J&G referred tax shelter clients to Robert Goldstein at American Express Tax and Business Services for preparation of income tax returns related to the reporting of the tax results of the tax shelters.  American Express Tax and Business Services referred clients to J&G for the purchase and implementation of tax shelters.

21.      At all times relevant to this Indictment, an outside law firm for BDO ("Skadden Arps") was a major international law firm, with offices in New York and Washington, among other places.

## II.      INTRODUCTION

22.      From at least in or about 1994 through at least in or about October 2005, defendants PAUL DAUGERDAS and DENIS FIELD, together with Erwin Mayer, Donna Guerin, Craig Brubaker, and David Parse, and others known and unknown to the Grand Jury (hereinafter their "co-conspirators") participated in a scheme to defraud the IRS by designing, marketing, implementing and defending tax shelters using means and methods intended to deceive the IRS about the bona fides of those shelters, and about the circumstances under which the tax shelters were marketed and implemented.

23.      Defendants PAUL DAUGERDAS and DENIS FIELD and their co-conspirators designed, marketed, and/or implemented some or all of the fraudulent tax shelters

known as the Short Sale, Short Options Strategy ("SOS"), Swaps, and HOMER tax shelters (collectively hereinafter "the J&G tax shelters") for clients through false and fraudulent means; prepared and caused to be prepared, and filed and caused to be filed by the clients with the IRS, false and fraudulent U.S. individual income tax returns reporting the fraudulent tax shelter losses, resulting in the payment of far lower taxes by the clients; and fraudulently concealed from and misrepresented the true nature of the tax shelters to the IRS, in order to enrich themselves personally through the generation of extraordinary fee and commission income.  Defendants DAUGERDAS and FIELD and certain other co-conspirators also utilized tax shelters to evade their own taxes on income received largely through the sale of the fraudulent tax shelters.

24.     Defendants PAUL DAUGERDAS and DENIS FIELD and their co-conspirators designed, marketed, and implemented the J&G tax shelters -– portrayed to clients as turnkey tax elimination products — as a means for wealthy individuals generally with multi-million dollar taxable income or gains to fraudulently eliminate or reduce the tax paid to the IRS on that income or gains.  Thus, instead of the wealthy clients paying U.S. individual income taxes generally between 20% and 40% of the their taxable income, the clients could choose the amount of tax loss or benefits, and pay certain of the defendants, co-conspirators, and others an "all-in" cost generally equal to 5 to 10% of the desired tax loss or benefit.  This all-in cost included the fees of J&G, BDO, Bank One, third-party referral sources, and/or others, as well as the net premium to Deutsche Bank used to execute the purported "investments" that were designed to make it appear that the shelters were legitimate investments rather than tax shelters, from which co-conspirators Brubaker and Parse took their commissions.  The size of the purported investments and the amount of the fees paid to certain defendants, co-conspirators, and others were determined based on the tax loss to be

generated.

25.     Defendants PAUL DAUGERDAS and DENIS FIELD and their co-conspirators understood that if the IRS were to detect the clients' use of the respective tax shelters and learn the true facts and circumstances surrounding their design, marketing, and implementation, including their lack of both economic substance and genuine business purpose, the IRS would disallow the claimed tax benefits, and seek to impose substantial penalties, in addition to the tax and interest owed.   Accordingly, defendants DAUGERDAS and FIELD and their co-conspirators undertook to prevent the IRS from: (i) detecting their clients' use of these tax shelters; (ii) understanding how the steps of the tax shelters operated to produce the purported tax benefits claimed by the clients; (iii) learning that these tax shelters were marketed as cookie-cutter products that were designed to and did significantly reduce or eliminate the clients' tax obligations; (iv) learning that any potential payout from the financial product used in the tax shelter could never overcome the total fees required to engage in the tax shelter; (v) learning that the clients were not genuinely seeking profit-making investment opportunities, but were, instead, seeking huge tax benefits; and (vi) learning that from the outset the clients intended to complete a preplanned series of steps that had been designed by the defendants and their co-conspirators to lead to the specific tax losses sought by the clients.

## III.   THE TAX SHELTERS

### A.   The Fraudulent Short Sale, SOS, and Swaps Shelters

26.     While at A&G, defendant PAUL DAUGERDAS with Donna Guerin and Erwin Mayer marketed, and implemented a tax shelter known as the Short Sale tax shelter, which DAUGERDAS had designed, marketed, and implemented while at Arthur Andersen.

DAUGERDAS, Guerin, and Mayer brought the Short Sale tax shelter with them to J&G, and marketed and implemented it with defendant DENIS FIELD and their co-conspirators, including co-conspirator Robert Greisman.

27.    The Short Sale tax shelter was typically implemented through three entities set up by J&G — a single-member limited liability company ("LLC"), a partnership, and an S corporation — and typically involved the following preplanned steps.  Through the LLC, the client borrowed U.S. Treasury securities ("Treasuries") from Deutsche Bank and then sold them, thereby generating cash proceeds for the client (the so-called "short sale" of Treasuries).  Subsequently, the client contributed the proceeds to a partnership, together with the obligation to close, or "cover," the short position through the purchase of replacement Treasuries.  Although the contribution of the short sale cash proceeds — in an amount that correlated to the tax loss sought by the client — was treated as a partnership asset (thereby increasing the client's tax basis in the partnership), J&G took the position that the obligation to cover the short sale was not a liability for tax purposes because, notwithstanding the obligation to replace the Treasuries, the precise amount required to do so was not yet fixed or determined.  Using additional client funds, the client through his or her partnership purchased a small amount of either shares of stock or foreign currency, or the client contributed such assets to the partnership. The short sale would then be closed, usually after just a few days' duration and always before year's end.  Following liquidation of the partnership (typically through transfer of partnership assets to the S corporation), the client's purportedly stepped-up basis in the partnership would carry over to the assets of the partnership — the stock or the foreign currency. J&G took the position that the subsequent sale of that stock or foreign currency, executed through Deutsche Bank, produced reportable tax losses for the clients.  Those non-economic losses were

approximately equivalent to the basis increase that had been purportedly produced through the tax shelter, and were the tax losses that the client sought in the purchase of the tax shelter. Those tax losses vastly exceeded any actual economic loss suffered by the client. The reporting of the tax shelter's tax benefits on the client's tax returns substantially reduced or eliminated the amount of taxes owed by the client.

28.     A second and similar tax shelter, known as the "short options strategy" or "SOS" tax shelter, was designed, marketed, and implemented by defendants PAUL DAUGERDAS and DENIS FIELD and their co-conspirators and others. The SOS tax shelter typically involved the following preplanned steps. Through an LLC, the client purchased from Deutsche Bank a long foreign currency digital option with a stated premium, or cost, equaling the amount of the tax loss the client  sought to generate. Simultaneously, the client sold to Deutsche Bank a short foreign currency digital option with a virtually offsetting premium. The only money that the client was required to pay to Deutsche Bank — which was the only amount that the client was at risk of loss — was the difference between the premiums paid for the long and received for the sale of the short ("the net premium"), which typically was one percent (1%) of the tax loss sought by the client. Virtually all of the J&G SOS options had an approximate one-third chance of doubling the net premium, two-third chance of losing the net premium and a purported remote possibility of making a much larger multiple of the net premium (the so-called "lottery" or "sweet spot").

29.     The client then contributed the long and short options to a partnership, which resulted in an increase in the client's tax basis in the partnership equal to the long option. J&G took the position that the short option would not be treated as a liability for tax purposes, and thus no adjusting decrease in the client's basis in the partnership would occur. As in the Short Sale tax

shelter, using funds supplied by the client, the partnership then purchased a small amount of foreign currency or shares of stock, or the client contributed such assets to the partnership. Thereafter, often after a short duration and always before year's end, the partnership would close the options positions. Following liquidation of the partnership (typically through transfer of partnership assets to the S corporation), the client's purportedly stepped-up basis in the partnership would carry over to the assets of the partnership — the stock or the foreign currency. J&G took the position that the subsequent sale of that stock or foreign currency, executed through Deutsche Bank, produced reportable tax losses for the clients. Those non-economic losses were approximately equivalent to the basis increase that had been purportedly produced through the tax shelter, and were the tax losses that the client sought in the purchase of the tax shelter. Those tax losses vastly exceeded any actual economic loss suffered by the client. The reporting of the tax shelter's tax benefits on the client's tax returns substantially reduced or eliminated the amount of taxes owed by the client.

30.    A third and similar tax shelter, known as the "Swaps" tax shelter, was designed, marketed, and implemented by defendant PAUL DAUGERDAS, Erwin Mayer, Donna Guerin, and John Beery, with Craig Brubaker and David Parse at Deutsche Bank, and others. It typically involved the following preplanned steps. Through an LLC, the client entered into two swaps (notional principal contracts) positions, requiring an up-front payment ("yield adjustment fee") to acquire one swap (the "long swap"), and resulting in the receipt of a yield adjustment fee with respect to the other swap (the "short swap"). The only money that the client was required to pay to Deutsche Bank — which was the only amount that the client was at risk of loss — was the net premium, which in the Swaps tax shelter was typically two-and-a-half percent (2.5%) of the tax loss sought by the client.

-12-

31.     As in the SOS tax shelter, the client contributed the two swaps positions to a partnership, which would result in an increase in the client's tax basis in the partnership equal to the long swap.  J&G took the position that the short swap would not be treated as a liability for tax purposes, and thus no adjusting decrease in the client's basis in the partnership would occur.  As in the short sale and SOS tax shelters, using funds supplied by the client, the partnership then purchased a small amount of foreign currency or shares of stock, or the client contributed such assets to the partnership.  Thereafter, often after a short duration and always before year's end, the partnership would close the swaps positions.  Following liquidation of the partnership (typically through transfer of partnership assets to the S corporation), the client's purportedly stepped-up basis in the partnership would carry over to the assets of the partnership — the stock or the foreign currency. J&G took the position that the subsequent sale of that stock or foreign currency, executed through Deutsche Bank, produced reportable tax losses for the clients.  Those non-economic losses were approximately equivalent to the basis increase that had been purportedly produced through the tax shelter, and were the tax losses that the client sought in the purchase of the tax shelter.  Those tax losses vastly exceeded any actual economic loss suffered by the client.  The reporting of the tax shelter's tax benefits on the client's tax returns substantially reduced or eliminated the amount of taxes owed by the client.

**B.     The Fraudulent HOMER Tax Shelter**

32.     A fourth tax shelter, known as the "HOMER" tax shelter, was designed, marketed, and implemented by defendant PAUL DAUGERDAS, Erwin Mayer, Donna Guerin, and John Beery, with David Parse at Deutsche Bank and John Ohle at Bank One and others.  The HOMER tax shelter, which was sold primarily by J&G and Bank One, typically involved the

following preplanned steps.  The client purchased from Deutsche Bank two pairs of specialized

foreign currency or bond options.  By design, two of the options would win and two would lose.

Deutsche Bank charged a net premium of 1.25% of the desired tax loss for the options.  Deutsche

Bank loaned the client virtually all of the funds necessary to purchase the options, with the client

providing the small balance.

33.     The client transferred the options to a grantor retained trust formed by J&G

for the client.  The client then gifted a small interest in the trust to a chosen beneficiary (the "Unitrust

Beneficiaries"), with the client retaining a remainder interest.  The client thereafter sold his or her

remainder interest to a purportedly unrelated third-party partnership owned by Kenneth Brown and

his wife, receiving in exchange a promissory note secured by the remainder interest in the trust.  At

the end of a complex series of steps, usually of a short duration, the client received the tax losses he

or she purchased, the Unitrust Beneficiary received a payment from Kenneth Brown generally in an

amount less than $10,000, and Kenneth Brown received .15% of the amount of the client's tax loss

and the gains from the options.  In one instance, where there were several individuals in a group

doing a HOMER tax shelter, the clients each designated one of the others as his Unitrust Beneficiary,

resulting in a circular exchange of the Unitrust Beneficiary payments between the clients.

34.     The HOMER tax shelter was carefully constructed so that neither Deutsche

Bank, the client (except for the net premiums paid for the options), the Unitrust Beneficiaries, nor

Kenneth Brown were at risk of meaningful loss at any stage of the tax shelter.  The tax losses

purportedly created by the tax shelter vastly exceeded any actual economic loss suffered by the

client.  The reporting of the tax shelter's tax benefits on the client's tax returns substantially reduced

or eliminated the amount of taxes owed by the client.  Kenneth Brown received over $1,000,000 in

income from his participation in the HOMER tax shelters, and, with the assistance of John Ohle, used a tax shelter to eliminate taxes on that income.

## IV.    THE TAX SHELTER FRAUD

### A.    Fraud in the Design of the J&G Tax Shelters

35.    The Short Sale, SOS, and Swaps tax shelters were designed to produce tax losses for the clients through a contrived, preplanned, and preordained series of steps that lacked both economic substance and business purpose, and resulted in non-economic losses from the shelter flowing to the clients in order to offset their taxable income and reduce their income tax liabilities. There was no reasonable possibility for the clients to make a profit, given the duration and structure of the tax shelters and the fees required to be paid to obtain the losses.  Defendants PAUL DAUGERDAS and DENIS FIELD and their co-conspirators marketed the Short Sale and SOS tax shelters as a way to eliminate clients' taxes.  Defendant DAUGERDAS and his co-conspirators marketed the Swaps tax shelter as a way to eliminate clients' taxes.  The use of the entities in the Short Sale, SOS, and Swaps tax shelters — the LLC, partnership, and S corporation — was designed to achieve the desired tax loss in a manner that concealed the true nature of the tax shelters from the IRS.

36.    In structuring the options to be used in the SOS tax shelter, Craig Brubaker requested that Deutsche Bank's FX desk provide pricing on a pair of a long and short options with a so-called "sweet spot" or lottery feature.  Pursuant to Brubaker's request, Deutsche Bank's FX desk constructed the SOS options whereby the tax shelter client's out-of-pocket cost would be one per cent (1%) of the net of the long and short options premiums.  The pricing on these options was set at an inflated price, which the tax shelter clients seeking huge tax losses would pay but which a true

investment client would not pay, in order to increase revenues to Deutsche Bank.

37.     The HOMER tax shelter was a tax shelter designed to produce tax losses for the clients through a contrived, preplanned, and preordained series of steps that lacked economic substance and resulted in losses from the options flowing to the HOMER clients in order to offset their taxable income, and gains from the options being left with a purportedly unrelated third party, Kenneth Brown, whose participation in the HOMER tax shelters was funded by John Ohle. There was no reasonable possibility for the HOMER clients to make a profit, given the structure of the HOMER options and the fees required to be paid to obtain the losses. Moreover, the HOMER clients did not engage in the HOMER tax shelters to make a gift of approximately $10,000 to a beneficiary, much less pay hundreds of thousands cr millions of dollars of fees to J&G, Deutsche Bank, and Bank One to do so. Defendant PAUL DAUGERDAS and co-conspirators Donna Guerin, David Parse, Erwin Mayer, John Beery, and John Ohle and others marketed the HOMER tax shelters as a way to eliminate clients' taxes. The use of the entities in the HOMER tax shelter — the grantor trust, partnerships, and C corporations — was designed to achieve the desired tax loss in a manner that concealed the true nature of the tax shelter from the IRS.

38.     The fees charged to the tax shelter clients were based on the amount and character of the tax losses sought by the clients. For the Short Sale, SOS, and Swaps shelters, J&G generally charged the clients a fee of three per cent (3%) of the desired tax loss for capital losses, and a fee of four per cent (4%) of the desired tax loss for ordinary losses. For BDO clients, J&G further agreed to pay BDO 20% of the fee J&G received. BDO, which marketed the tax shelters to existing and potential clients, also typically charged the client an additional fee of three to five per cent (3%-5%) of the desired tax loss. Deutsche Bank generally received commissions for the Short Sale

tax shelters, a 1% net premium on the SOS tax shelters, and a 2.5% net premium on the Swaps tax shelters. The net premium included Deutsche Bank's profit and the costs of implementing the options. J&G paid other referral sources 20-50% of its fees in payment for the referral of clients. J&G charged the HOMER clients fees generally totaling 6%, or 600 basis points, of the tax loss they sought, which included the net premium of 1.25% to Deutsche Bank. The remaining 4.75% in fees were divided among J&G (2.6%), Bank One (1.8%), and Kenneth Brown (.15%), and Bank One as the trustee of the grantor trust (.2%).

**B.      Fraud in the Marketing of the J&G Tax Shelters**

39.      To obtain tax shelter clients, defendant PAUL DAUGERDAS and co-conspirators Erwin Mayer and Donna Guerin created a large referral network, soliciting clients from numerous sources including other law firms and accounting firms. J&G paid the referral sources millions of dollars in fees in exchange for the client referrals. One of the most significant referral sources for defendant PAUL DAUGERDAS and co-conspirator Donna Guerin was BDO, with whom J&G did hundreds of tax shelters. At the behest of defendant DENIS FIELD, BDO surveyed its base of tax and audit clients for tax shelter prospects, and developed alliances with other financial firms to provide referrals to the J&G Tax Partners for additional tax shelter clients. Another referral source was American Express Tax and Business Services, which referred clients to the J&G Tax Partners for the sale and implementation of J&G tax shelters. In compensating certain of the referral sources who had used their J&G tax shelters to eliminate their taxes, Erwin Mayer caused the amount of referral fees owed to the referral sources to be netted against the cost of their individual tax shelters.

40.      Another referral source, and virtually the sole source of referrals on the

-17-

HOMER tax shelter, was Bank One.  Bank One employees, led by co-conspirator John Ohle, encouraged high net worth clients of Bank One to purchase the HOMER tax shelter, with Bank One employees, including Ohle, receiving bonuses if their clients implemented a HOMER tax shelter.

41.     Co-conspirator Craig Brubaker also solicited various law, accounting, and other firms to become referral sources for tax shelter clients in return for a fee.  Co-conspirator David Parse referred some of his clients to J&G in order for the purchase of a J&G tax shelter.  Both Brubaker and Parse participated in some of the meetings in which tax shelters were pitched to clients.

C.     **Fraud in the Implementation of the J&G Tax Shelters**

(1)     **The false and fraudulent J&G opinion letters**

42.     The law in effect at all times relevant to this Indictment provided that if a taxpayer claimed a tax benefit by using a tax shelter, and that benefit was later disallowed, the IRS could impose substantial penalties upon the taxpayer — ranging from 20% to 40% of the underpayment attributable to the shelter — unless the claimed tax benefit was supported by an independent opinion, reasonably relied upon by the taxpayer in good faith, that the client would "more likely than not" prevail  in claiming the tax benefits from the tax shelter if challenged by the IRS.  Thus, in order to encourage clients to participate in the tax shelters, J&G provided a cookie-cutter "more likely than not" opinion letter ("the opinion letter") to the tax shelter clients.  However, defendants PAUL DAUGERDAS and DENIS FIELD and their co-conspirators knew the tax shelter opinion letters were based on false and fraudulent statements and omitted material facts.  By helping clients obtain the false and fraudulent opinion letters, with the understanding and intent that they would be presented to the IRS in defense of the transaction, if and when the clients were audited, the

defendants and their co-conspirators sought not only to undermine the ability of the IRS to ascertain the clients' true tax liabilities, but also to undermine the IRS's ability to determine whether penalties should be imposed.

43.    The J&G SOS opinion letter contained the following false and fraudulent representations, among others:

a.    The opinion stated:

> You entered into the purchase and sale of the Options for substantial nontax business reasons, including (i) to produce overall economic profits because of your belief that the [foreign currency]/U.S. Dollar exchange rate and the [second foreign currency]/U.S. Dollar exchange rate relationships would change; and (ii) your belief that the most direct way, with the most leverage. to realize gain from expected changes in currency prices was the purchase and sale of the Options.

In truth and fact, the clients entered into the purchase and sale of the options in order to obtain the desired tax benefits, and had no substantial nontax business reasons for entering into them.

b.    The opinion stated, "You contributed the Options to the Partnership for substantial nontax business reasons, including, but not limited to, potential diversification of the risks of certain investments, the desire to co-invest as partners with the other co-partners and for your convenience." In truth and fact, the clients had no substantial nontax business reasons for that step, and the clients took that step because the conspirators directed them to do so in order to achieve the tax losses or benefits they purchased.

c.    The opinion stated, "Your contribution of your interest in the Partnership to [the S corporation] was made for substantial nontax business reasons including, but not limited to, consolidation of investment activities, bookkeeping, accounting and tax functions and elimination of duplicate work and expenses in administration." In truth and fact, the clients made

the contribution in order to achieve the tax benefits and for no nontax business reason whatsoever.

        d.      The opinion stated, "Neither you, [the] LLC, the Partnership, nor [the S corporation] were obligated to engage in any transaction to which our opinions herein relate upon the completion of any other of such Transactions." In truth and fact, the defendants marketed to their clients, and the clients had paid fees to obtain, a tax shelter that, while not legally compelling a participant to complete any particular part of the transaction, consisted of a contrived, preplanned, and preordained series of steps designed to result in the predetermined tax benefits, for which the client was paying large fees.

        e.      The opinion stated, "To the best of your knowledge, you have provided to us all the facts and circumstances necessary for us to form our opinion, and the facts stated herein are accurate." In truth and fact, the defendants virtually never spoke with the clients about the facts and circumstances, or any of the representations, contained in the opinion letters, did not receive affirmation about the veracity of the facts and circumstances or the representations from any representative of the clients, and in some instances had no client contact at all.

        44.      The J&G Short Sale and Swaps opinion letters contained false and fraudulent representations virtually identical to those in the SOS opinion letters, all intended to convey to the IRS and federal courts that the clients had substantial nontax business reasons for entering into the various steps of the tax shelters, when in truth and fact the clients had no nontax business purpose — their purpose was to obtain the tax losses.

        45.      The HOMER opinion letters contained the following false and fraudulent representations, among others:

        a.      The opinion stated, "[T]he Trust was created for the purposes of

effectuating a gift to the Unitrust Beneficiary and conserving and protecting the assets of the Trust

for the benefit of the Trust's beneficiaries[;]" when, in truth and fact, the clients created the trust at

the direction of J&G for the purpose of executing the HOMER tax shelter, and not for genuine estate

planning reasons.

        b.     The opinion stated, "You [the client] entered into the Options for

substantial nontax business reasons, including (i) to produce overall economic profits because of

your belief that the relevant bond prices would change; and (ii) your belief that the most direct way,

with the most leverage, to realize gain from expected changes in currency prices was the Options."

In truth and fact, the clients purchased the options — which were designed by the joint efforts of

defendant PAUL DAUGERDAS, co-conspirator John Beery, and employees of Bank One and

Deutsche Bank pursuant to predetermined parameters and durations — in order to obtain the desired

tax benefits, and thus the clients had no substantial nontax business reasons for entering into the

options.

        c.     The opinion stated,

> You [the client] entered into the Transactions, other than the creation
> of the Trust, for substantial nontax business reasons, including
> (without limitation) your belief that the potential economic benefits
> of owning the Note [the promissory note provided by the third-party
> buyer] outweighed the potential economic benefits of retaining the
> Remainder Interest, and a desire to maximize profits and minimize
> risks with respect to your various investment activities.

In truth and fact, the clients sold the options to the third-party buyer because defendant PAUL

DAUGERDAS, co-conspirators Donna Guerin, Erwin Mayer, John Beery, and John Ohle, and others

advised the clients that such a sale was a necessary step to achieve the tax benefits. The clients were

generally not provided with information about the financial health and credit-worthiness of the

third-party buyer in order to be able to assess whether selling the Remainder Interest in exchange for the Note was an economically sound decision.

        d.     The opinion letter stated, "Neither you, the Trust, the Buyer, nor the Unitrust Beneficiary were obligated to engage in any transaction to which our opinion related upon the completion of any other of such transaction," when in truth and fact, J&G and Bank One marketed to their clients, and the clients had paid fees to obtain, a tax shelter that, while not legally compelling a participant to complete any particular part of the tax shelter, consisted of a preplanned series of steps designed to result in the predetermined tax benefit, for which the client was paying large fees.

        e.     The opinion letter stated, "You are not related, directly or indirectly, to the Buyer [Kenneth Brown] or any Buyer's successors, and your sale of the Remainder Interest to the Buyer was an arm's length transaction." In truth and fact, the use of Kenneth Brown was a preplanned part of the HOMER shelter, whose fees were preset, and whose receipts of the gains from the HOMER options were assured. Moreover, the actions of Kenneth Brown were controlled by defendant PAUL DAUGERDAS, co-conspirators John Ohle, John Beery, and others.

        46.     The J&G tax shelter opinions purported to be based upon "all the facts and circumstances necessary" for J&G to form its opinion. However, the J&G opinions failed to disclose that J&G had designed and marketed the tax shelters, and implemented them on behalf of the clients, and that J&G had collected as its fee a percentage of the loss amount generated. In addition, the J&G opinions failed to disclosed the following material facts, among others: (i) that the tax shelter clients responded to a promotional pitch that emphasized the respective shelter's tax benefits, and they entered into the transaction primarily or exclusively to obtain those tax benefits; (ii) that the clients

knew from the outset that a particular series of steps would be undertaken, for a given fee, leading

ultimately to a specific tax result; (iii) that the tax shelters were structured so that each client would

probably lose his entire cash contribution plus fees, and had no reasonable possibility of making a

profit; and (iv) that the "more likely than not" opinion letters had been offered to the clients as part

of J&G's promotion of the tax shelter.

(2)     **Backdating of transactions used to achieve fraudulent tax losses**

47.     In several instances in 2000 and 2001, J&G caused clients' tax shelter

transactions to be incorrectly implemented at Deutsche Bank, which resulted in the wrong amount

and/or type of tax loss to be generated for the clients.  After the close of the tax year but before the

respective tax return was to be filed, defendant PAUL DAUGERDAS and co-conspirators Donna

Guerin and John Beery discovered or were made aware of the errors and caused new transactions

to be effectuated by Deutsche Bank through David Parse and caused them to be backdated to the

prior year.  Defendant DAUGERDAS and co-conspirators Guerin and Beery thereafter caused false

and fraudulent client tax returns to be prepared and filed using the tax losses created by the post-tax

year end, backdated transactions, in violation of fundamental principles of tax accounting that

require cash basis taxpayers to report transactions that actually occurred in a given tax year.

Defendant DAUGERDAS and co-conspirators Guerin, Beery, and Parse failed to advise those clients

and their tax return preparers of the true nature and impact of the errors and the fraudulent nature of

the fixes, resulting in the preparation and filing of income tax returns that reported the results of the

backdated transactions as if they had occurred during the tax year.  Defendant DAUGERDAS and

co-conspirators Guerin and Beery caused J&G to issue opinion letters for those clients that omitted

any mention of the backdating of some of the transactions described therein, presenting them in the

opinion letter as if they had been implemented during the relevant tax year.

       **(3)**     **The creation and use of false and fraudulent transactional documents in the J&G tax shelters**

      48.     In order to maximize the appearance that each tax shelter was an investment undertaken to generate profits, and to minimize the likelihood that the IRS would learn that the tax shelters were actually designed to create tax losses, defendants PAUL DAUGERDAS and DENIS FIELD and their co-conspirators created, assisted in creating, and reviewed transactional documents and other materials containing false and fraudulent information, including false and fraudulent descriptions of the clients' motivations for entering into the tax shelters' financial transactions and for taking the various steps that would yield the tax benefits. The defendants intended that the false and fraudulent information ultimately be provided to the IRS to support the shelter losses or benefits claimed on the tax returns and defend against the imposition of penalties. Examples of such documents include letters purporting to document the client's business purpose for the use of the partnership in the transaction and the client's investment purpose in entering into the options transaction. The J&G Tax Partners and co-conspirator John Beery also frequently drafted and sent to the clients the letters of authorization and other documents utilized to execute the preplanned steps of the J&G tax shelters, frequently with instructions to the clients to sign but not date the documents.

      49.     As a result of their awareness that the J&G tax shelters lacked both reasonable profit potential and business purpose, and therefore were likely to be successfully challenged by the IRS, defendant DENIS FIELD, co-conspirators Robert Greisman, Charlie Bee, Adrian Dicker, and Michael Kerekes, and other BDO TSG members developed and used a template consulting agreement to disguise the fact that the fees clients would be charged by BDO were solely for the tax

shelters.  The consulting agreement contained a false and fraudulent description of the nature and scope of the services to be rendered under the agreement, and deliberately omitted any mention of the tax shelter.  In truth and fact, as defendants FIELD and PAUL DAUGERDAS, co-conspirators Robert Greisman, Charlie Bee, Adrian Dicker, and Michael Kerekes, and other BDO TSG members knew, the services to be rendered by BDO under the consulting agreement and the fees referenced therein were solely for the sale and implementation of the tax shelter.  This was done so that BDO and its clients could falsely tell the IRS that the fees were for services in addition to the tax shelter, and therefore only a portion of BDO's fees should be counted when conducting a profitability analysis of the tax shelter.

      (4)      **Preparation of the false and fraudulent income tax returns reporting the tax shelter benefits**

      50.      BDO, under the supervision of co-conspirator Robert Greisman, prepared many false and fraudulent partnership and S corporation returns, and, for some clients, individual income tax returns, that reflected the tax benefits of the tax shelter transactions for BDO/J&G clients.  J&G referred tax shelter clients to American Express Tax and Business Services to prepare false and fraudulent partnership and S corporation returns, and for some clients, individual income tax returns that reflected the tax benefits of the tax shelters.  In some instances, American Express Tax and Business Services prepared such returns for tax shelter clients whose regular return preparer refused to prepare or sign the tax shelter returns.  In other instances, the client's own return preparer prepared the tax returns that reflected the tax shelter benefits.  BDO, American Express Tax and Business Services, and many of the clients' own accountants refused to sign income tax returns reporting the tax shelter benefits unless and until J&G issued its opinion letter.

D.      **Fraud During IRS Audits and Litigation Related to the J&G Tax Shelters**

51.      Beginning in or about 2002, the IRS began examinations, or audits, of certain individuals and entities that had participated in J&G tax shelters.   In connection with those examinations, the IRS sought documents and sworn testimony from individuals knowledgeable about various aspects of the tax shelters.   In order to mislead the IRS about the true nature of the tax shelters, the defendants and their co-conspirators provided and caused to be provided false information to the IRS during audits of tax shelter clients' tax returns, including false responses to IRS Information Document Requests, false sworn testimony to the IRS, and false sworn testimony in federal courts in tax shelter-related litigation.   This included false testimony by co-conspirators Craig Brubaker and Charles W. Bee, Jr., and various tax shelter clients.   This also included co-conspirator Robert Greisman's coaching of clients to provide false information and statements to the IRS in connection with IRS audits, and his subornation of perjury in sworn IRS testimony.

52.      On February 18, 2004, co-conspirator Craig Brubaker appeared before the IRS to answer questions concerning the tax shelters of a group of J&G clients who had implemented SOS tax shelters through Brubaker and Erwin Mayer.   After being placed under oath, Brubaker sought to obstruct and impede the IRS by providing false and misleading testimony concerning his involvement in the design, marketing, and implementation of the tax shelters and the clients' motivations for engaging in the fraudulent tax shelters.   Among other things, Brubaker provided false and misleading testimony with respect to the following topics: the tax ramifications of a tax shelter client's short options transaction; the reason why a client transferred Treasury notes into the client's partnership as part of the tax shelter; the nature and purpose of a tax shelter client's conversation relating to the client's SOS tax shelter at Deutsche Bank; the origins and proprietary nature of the

-26-

tax shelters; whether Mayer gave input with respect to development or implementation of any tax shelter; and the nature of Brubaker's relationship with Mayer.

E.    **Tax Harm Caused by the Fraudulent Tax Shelters**

53.    Because the tax shelters were executed simply to generate huge tax losses (and lacked economic substance and business purpose), the tax shelters resulted in massive tax evasion caused by the defendants on behalf of their clients.

54.    The Short Sale tax shelter was marketed and sold from at least in or about 1994 through at least in or about 1999 to at least 290 wealthy individuals and generated at least $2.3 billion in false and fraudulent tax losses.  Among the individuals who used Short Sale tax shelters to evade their own taxes, largely on income earned from the sale of tax shelters, were defendant PAUL DAUGERDAS and co-conspirators Erwin Mayer and Craig Brubaker.

55.    The SOS tax shelter was marketed and sold from at least in or about 1998 through at least in or about 2000 to at least 550 wealthy individuals and generated at least $3.8 billion in false and fraudulent tax losses.  Among the individuals who used SOS-type shelters to evade their own taxes, largely on income earned from the sale of tax shelters, were defendants PAUL DAUGERDAS and DENIS FIELD, co-conspirators Craig Brubaker, David Parse, Erwin Mayer, Robert Greisman, Charles Bee, and Adrian Dicker, and other co-conspirators not named as defendants herein. J&G provided Brubaker and Parse with free opinion letters for their personal tax shelter, and provided discounted tax shelter opinion letters to other Deutsche Bank personnel.

56.    The Swaps tax shelter was marketed and sold in 2001 and 2002 to at least 55 wealthy individuals, and generated at least $400 million in false and fraudulent tax losses.

57.     The HOMER tax shelter was marketed and sold in 2001 to at least 36 wealthy individuals, and generated at least $429 million in false and fraudulent tax losses.

## G.      The Defendants' Own Use of Fraudulent Tax Shelters

58.     In addition to designing, marketing, and implementing fraudulent tax shelter for clients and prospective clients of J&G, BDO, and Deutsche Bank, defendants PAUL DAUGERDAS and DENIS FIELD utilized tax shelters for themselves in order to evade personal tax liabilities on the substantial income they were receiving from the sales of the of fraudulent tax shelters.

## Statutory Allegations

59.     From at least in or about 1994 until in or about October 2005, in the Southern District of New York and elsewhere, PAUL DAUGERDAS and DENIS FIELD, the defendants, together with others known and unknown to the grand jury, willfully and knowingly did combine, conspire, confederate and agree to defraud the United States and an agency thereof, to wit, the Internal Revenue Service, and to commit offenses against the United States, to wit, violations of Title 26, United States Code, Section 7201, and Title 18, United States Code, Section 1343.

## Objects of the Conspiracy

60.     It was a part and object of the conspiracy that, from in or about 1994 until in or about October 2005, PAUL DAUGERDAS and DENIS FIELD, the defendants, and others known and unknown to the grand jury, willfully and knowingly would and did defraud the United States of America and an agency thereof, to wit, the IRS, by impeding, impairing, defeating, and obstructing the lawful governmental functions of the IRS in the ascertainment, evaluation, assessment, and

collection of income taxes.

61.    It was a further part and object of the conspiracy that, from in or about 1994 through in or about October 2005, PAUL DAUGERDAS and DENIS FIELD, the defendants, and others known and unknown to the grand jury, willfully and knowingly would and did attempt to evade and defeat a substantial part of the income taxes due and owing by the tax shelter clients, in violation of Title 26, United States Code, Section 7201.

62.    It was a further part and object of the conspiracy that, from in or about 1994 through in or about October 2005, PAUL DAUGERDAS and DENIS FIELD, the defendants, and others known and unknown to the grand jury, willfully and knowingly having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, to wit, a scheme to defraud the IRS through the design, marketing, and implementation of the fraudulent tax shelter transactions, and for the purpose of executing such scheme and artifice and attempting so to do, would and did (i) cause matters and things to be deposited in the mail and with private and commercial interstate carriers in order to be sent and delivered by same, and cause matters and things to be delivered by mail and private and commercial interstate carriers according to the directions thereon, to wit, opinion letters, tax returns and related information, and bank-related documents for tax shelter clients who had executed Short Sale, SOS, Swaps, and HOMER tax shelters, in violation of Title 18, United States Code, Section 1341; and (ii) transmit and cause to be transmitted by means of wire and radio communications in interstate and foreign commerce, writings, signs, signals, pictures, and sounds, to wit, interstate telephone calls, faxes, and e-mails related to the design, marketing, and implementation of the Short Sale, SOS, Swaps, and HOMER tax shelters, in violation of Title 18,

United States Code, Section 1343.

**<u>Means and Methods of the Conspiracy</u>**

63.     Among the means and methods by which defendants PAUL DAUGERDAS and DENIS FIELD, their co-conspirators, and others known and unknown to the grand jury would and did carry out the objectives of the conspiracy were the following:

a.     They would and did design, market, and implement the tax shelters, and create false and fraudulent factual scenarios to support those transactions, so that wealthy individuals could pay a percentage of their income or gain in fees to J&G, BDO, Deutsche Bank, Bank One, and the other participants in the transactions, rather than paying a substantially greater amount in taxes to the IRS;

b.     They would and did design, market, and implement the tax shelter transactions in ways that made it difficult for the IRS to detect it and determine the true nature of the transaction;

c.     They would and did design, market and implement the tax shelter transactions in ways that disguised the fact that the tax shelters were tax-motivated and not motivated by profit, and lacked virtually any nontax business purpose;

d.     They would and did seek to prevent the IRS from learning that they had marketed tax shelters consisting of preplanned steps leading to predetermined tax benefits;

e.     They would and did prepare and assist in preparing, and cause to be prepared, false and fraudulent documents in order to deceive the IRS, including but not limited to, transactional documents and correspondence;

-30-

   f.  They would and did craft and assist in crafting legal opinions for use by the tax shelter clients in defending the transactions and shielding the clients from penalties, knowing that these opinions contained false, fraudulent, and misleading information and omitted other information, all of which was material to a determination of whether the claimed tax results were allowable;

   g.  They would and did prepare and cause to be prepared tax returns for the tax shelter clients that were false and fraudulent because, among other things, they claimed fraudulent tax losses and thereby substantially understated the tax due and owing by the tax shelter clients;

   h.  They would and did provide and cause to be provided false information to the IRS during the course of audits of clients' tax shelter returns and make and cause to be made false statements to the IRS and sworn false testimony in tax shelter-related litigation;

   i.  They would and did cause backdated financial transactions to be effectuated through Deutsche Bank after year end to correct transactions that had been incorrectly implemented by J&G in order to provide the clients with the tax losses they had purchased;

   j.  They would and did pay and cause to be paid bonuses to employees and referral fees to third-party referral sources, which frequently were not disclosed to the client, as a means of rewarding those who successfully marketed the tax shelter transactions and to provide incentives to others to do so; and

   k.  They would and did provide and receive free legal opinions and payments for the early termination of tax shelter options as benefits to co-defendants and others.

## Overt Acts

64.    In furtherance of the conspiracy and to effect the illegal objects thereof, PAUL DAUGERDAS and DENIS FIELD, the defendants, and their co-conspirators, committed and caused to be committed the following overt acts, among others, in the Southern District of New York and elsewhere:

a.    On or about May 9, 1996, co-conspirator Erwin Mayer wrote a memorandum to another A&G lawyer, copying defendant PAUL DAUGERDAS, which outlined the steps of a Short Sale tax shelter for a potential client.

b.    In or about Fall 1998, co-conspirator Donna Guerin hand-wrote a document that outlined the steps of a five-day Short Sale tax shelter that was to be executed by Client Larry Morgan, who was anticipating a large gain from the sale of his company.

c.    In or about Fall 1998, co-conspirator David Parse met with Client Larry Morgan at his home in Florida to discuss the steps of a Short Sale tax shelter, in particular the sale of the treasuries.

d.    On or about January 12, 1999, co-conspirator Robert Greisman sent a letter and attached spreadsheet to defendant PAUL DAUGERDAS, and copied defendant DENIS FIELD, which confirmed the tax shelter transactions for Short Sale clients whom BDO referred to J&G and the estimated fees that J&G owed BDO relating to those clients.

e.    In or about February 1999, co-conspirator Donna Guerin, during a tutorial session on the Short Sale tax shelter for certain J&G associates, advised them, in the presence of Erwin Mayer, among other things, that the use of the single-member LLC in the Short Sale tax

shelter was part of a "hide the ball strategy."

f.        On or about March 15, 1999, co-conspirator Robert Greisman sent to the BDO Tax Opinion Committee members, including defendant DENIS FIELD, a memorandum that discussed the issues surrounding the inclusion of fees as transactions costs in the Short Sale tax shelter. Greisman noted, "As such, it is understood that transaction costs, when set against the expected profit on the short sale trade, would render it impossible to earn a profit on the trade. If it's impossible to earn a profit, presumably a taxpayer's reliance on a tax opinion would be unreasonable for purposes of avoiding penalties." Greisman further discussed as a possible solution the "re-engineering" of the fee of defendant PAUL DAUGERDAS "so as to separate out the fees for the tax opinion from other tax and legal consulting they provide in connection with a transaction that gives rise to capital gain, such as the sale of the business." Greisman further noted DAUGERDAS's willingness to consider such a proposal provided that his overall fee not be reduced.

g.        In or about September 1999, co-conspirator Adrian Dicker, after speaking to another accountant involved in the design, marketing, and implementation of tax shelters, introduced to and discussed with defendant DENIS FIELD, co-conspirator Robert Greisman, and other TSG members a way to attempt to conceal the reporting of the losses generated by the tax shelters through the netting of gains and losses on a grantor trust tax return, instead of reporting the gains and the losses separately on the clients' individual income tax return.

h.        On or about October 1, 1999, defendant DENIS FIELD presented a Power Point slide show at a BDO partnership meeting, emphasizing the profits already generated by and to be generated by the sale of BDO's tax shelter products.

i.      On or about November 4, 1999, co-conspirator Robert Greisman sent an e-mail to co-conspirator Donna Guerin containing the comments of BDO's TSG members with respect to the J&G tax opinion letter for the SOS tax shelter.

j.      On or about November 15, 1999, co-conspirator Robert Greisman drafted a template letter to be sent to clients and placed in client files in order to provide false and fraudulent business purpose for BDO's tax shelters.  The letter provided:  "Dear [blank,]  Just a short note to confirm that I've thought about the business and tax issues we've been discussing and concluded that you should contribute the investments to the partnership.  Best regards, Robert Greisman."

k.      On or about December 8, 1999, co-conspirator Robert Greisman sent via e-mail to co-conspirator Donna Guerin a memorandum that detailed each step that still needed to occur in the ongoing SOS transactions and who — as between BDO, J&G, and Deutsche Bank — would be responsible for the completion of each particular step.

l.      On or about December 18, 1999, co-conspirator Craig Brubaker sent an e-mail from Dallas, Texas to the head of Deutsche Bank's FX desk in New York, New York, directing that a $30,000 early termination payment on co-conspirator Erwin Mayer's short options be paid to MBCR Trading Partners account at Deutsche Bank.

m.      In or about late 1999 or early 2000, during a discussion about profit potential in the tax shelter transactions in light of the fees charged by J&G and BDO, co-conspirator Charles W. Bee, Jr., discussed with defendant PAUL DAUGERDAS the disguising of BDO's tax shelter fees through the use of a consulting agreement or engagement letter that falsely portrayed the nature and scope of the services to be rendered, and that deliberately omitted any mention of the tax shelter.

n.      On or about January 7, 2000, defendant PAUL DAUGERDAS paid, from his entity PMD Chartered, co-conspirator Donna Guerin the first of three bonus payments in 2000, which totaled $8,950,000.

o.      On or about February 14, 2000, defendant PAUL DAUGERDAS met with Client Michael McDermott and presented to him an SOS tax shelter that, according to DAUGERDAS, could shelter capital gains taxes that McDermott expected from his sale of stock.

p.      On or about March 14, 2000, co-conspirator Adrian Dicker sent an e-mail to co-conspirator Robert Greisman that contained Dicker's comments on a J&G draft template SOS opinion letter.

q.      On or about May 16, 2000, co-conspirator Craig Brubaker sent an e-mail to co-conspirator Erwin Mayer in which Brubaker stated,

> I spoke to [a Deutsche Bank employee] regarding an equity version of the fx option today.  They are still examining it with great interest. Question for you, is it imperative that the long and short options have different strikes, which generates the lotto payout alternative?  The fx markets are much less regulated, trade 24 hours, etc., and it is much easier for those guys to move the market off those strikes.  That can't be done on the equity market side with its regulation, therefore, there is real exposure to the possibility, albeit small, of having to pay out the lottery.  If we could eliminate that possibility without destroying the integrity of your transaction, that would help.  We still haven't gotten to the pricing question yet, but we are getting there.

r.      On or about June 5, 2000, defendant DENIS FIELD and co-conspirators Charles W. Bee, Jr., and Adrian Dicker signed a compensation agreement with BDO, retroactive to July 1, 1999, that entitled them to 30% of the net profits of the TSG, which they were to share equally.

s.      On or about October 20, 2000, co-conspirator Erwin Mayer signed and filed with the IRS a Form 1040, U.S. Individual Income Tax Return, for the 1999 tax year, for himself and his spouse, on which he claimed $3,971,160 in fraudulent losses derived from J&G Short Sale and SOS tax shelters and which substantially reduced the income taxes he and his spouse would otherwise have owed.

t.      On or about November 18, 2000, co-conspirator Craig Brubaker sent an e-mail to co-conspirator Erwin Mayer in which Brubaker stated the following:

> I had a conf call with [Clients Eunice Sullivan and Corey Todd] this am to go over transaction. He's the option trader. He is concerned about risking $30,000 w/ a 30% probability. We talked about lowering the payout, which I said would require your approval, or he suggested a different trade that has a long and short option, but also has a short stock position. I didn't get into the details with him, I suggested since it's your tax opinion, you would have to make the call on a different trade.
>
> I tried to be as blunt as possible what the result was irrespective of the win/lose on the option, but as an option trader, he's focused on the forest not the trees.
>
> I'll ask [the Deutsche Bank FX desk salesman] Monday am if he can give me a range of reduced payouts and higher probabilities. He also asked about lowering the premium, I said no.
>
> Just wanted to brighten up your Sunday.
>
> Craig

u.      On or about November 19, 2000, co-conspirator Erwin Mayer responded to co-conspirator Craig Brubaker's e-mail of the previous day stating, "No F"ING way."

v.      In or about February 2001, co-conspirator Donna Guerin sent to co-conspirator David Parse's sales assistant two different tax shelter client authorization letters — one used in the original, incorrectly implemented transaction in 2000, with a handwritten note saying "was sent to you," and a second one to be used in implementing the corrected, backdated transaction in 2001, with a handwritten note saying, "The next page is the liquidation letter that should have been sent to you."

w.      In or about mid 2001, defendant PAUL DAUGERDAS and co-conspirators Donna Guerin and John Beery drafted and assisted in drafting a legal opinion for the HOMER tax shelter.

x.      On or about July 27, 2001, defendant PAUL DAUGERDAS sent a reply e-mail to a CPA who had sent DAUGERDAS questions regarding the HOMER tax shelter, and copied co-conspirators Donna Guerin and John Beery, in which DAUGERDAS stated the following, among other things, in response to the CPA's questions:

> Preferable [HOMER deal] size minimum is $10 million, exceptions may be made in special circumstances. . . .
>
> By design, the value of the remainder interest will always be greater than the note by at least 15 basis points, a cost which is included in the overall transaction cost structure. The loan may also be greater than the note by an additional 125 basis points, depending on option performance, a potential cost which is also included in the overall transaction cost structure. There should be no additional risks. . . .
>
> As indicated above, the option proceeds will always be sufficient to pay the note. Corporate or partnership entities can deal directly with the financial institutions; for individuals, we will create single member limited liability companies owned by the individuals to act as counterparties.

The overall maximum investment at risk and potential cost is 600 basis points, consisting of approximately 460 basis points of tax legal fees and costs, 125 basis points of equity investment in the option positions, and 15 basis points of discount on sale. The cost is the same for capital and ordinary situations. While the option duration is 45 days or less, with set up time and data gathering the total time frame is more typically 60 days.

y.      On or about August 20, 2001, an advisor for a group of potential HOMER clients sent an e-mail to co-conspirator John Beery, copying defendant PAUL DAUGERDAS, stating with respect to a proposed HOMER tax shelter:

I don't think your spreadsheet reflects the economics of this deal. The investment needs to be the 600 bps [basis points]. (For purposes of assessing whether or not there is an economic profit potential all the marginal costs of the transaction must be consider.) When I re-run your numbers on this basis there is NO POTENTIAL FOR PROFIT. [One of the members of the client group] show a best case loss of $172K and the other [members of the client group] show $235K each. See my revised spreadsheet. I think you need to change the terms of the option (premium amount, volatility and strike price) so that the "best case" numbers show a true profit opportunity.

z.      In or about September 2001, defendant PAUL DAUGERDAS and co-conspirators John Ohle and Kenneth Brown met in Chicago to discuss Kenneth Brown's role as the third-party buyer in the HOMER tax shelter.

aa.      On or about October 17, 2001, co-conspirator Erwin Mayer filed a Form 1040, U.S. Individual Income Tax Return, for himself and his spouse, with the IRS for the 2000 tax year, on which he claimed $22,286,596 in fraudulent losses derived from an SOS tax shelter and which substantially reduced the income taxes he and his spouse would otherwise have owed.

bb.      On or about November 14, 2001, J&G established eight different partnerships

-38-

and two different corporations for co-conspirator Kenneth Brown for his use as the third-party buyer in the HOMER tax shelters to create the appearance that a number of unrelated third-party buyers were participating in the HOMER shelters;

      cc.    On or about November 30, 2001, defendant PAUL DAUGERDAS sent a confidentiality agreement to co-conspirator Kenneth Brown, requiring his signature, which affirmed that Kenneth Brown would use "confidential proprietary information" involving "certain financing structures [ ] developed by J&G and/or its clients, consultants or co-counsel, that provide economic, financial, business and tax advantages for Kenneth Brown's companies through the use of the Structures" only to evaluate "the Structures" and a potential relationship with J&G.

      dd.    On or about March 13, 2002, co-conspirator John Beery sent an e-mail to co-conspirator Donna Guerin regarding the discovery by John Beery of errors in the implementation of a J&G Swaps tax shelter for Client Michael Toporek. In that e-mail, John Beery stated, in part:

> I received Michael Toporek's returns from Judi Gagnon. They were right and wrong, all at once. Mr. Toporek had a split cap/ord transaction, with a 1.3M ord piece, and a 0.7M capital piece. We billed him $93,000 (1.3M x 5% + 0.7Mx4% = $93,000), and all of the notes in the file reflect these as the correct amounts. He only wanted to recognize part of the losses last year, and the math on how much of each piece to sell is based on these same numbers. The problem is that the Lucent stock held at liquidation was worth roughly $19,500, while the currency held at liquidation was worth roughly $10,500. This results in a basis boost to the LUC of $1.3M, and to the CAD of $700K -- not the other way around. I found this because the capital loss was greater than the $700K maximum noted in the file, and looked harder at the rest of the numbers. I didn't see anything correcting these numbers on subsequent statements (though I'm not sure we have a complete set, but that's probably because nothing happened in the accounts later).
>
> Paul and I can certainly take care of this if it is a problem. My

question is: Did Mr. Toporek change his mind on the numbers at same point, or was the deal done backwards??

ee.　　On or about January 13, 2003, Swaps Client Michael Toporek filed with the IRS a false and fraudulent 2001 U.S. Individual Income Tax Return, Form 1040, on which he claimed fraudulent losses derived from a J&G Swaps tax shelter and which substantially reduced the income taxes he would otherwise have owed.

ff.　　On or about April 7, 2003, co-conspirator Robert Greisman faxed a letter to co-conspirator John Beery, identifying tax shelter clients who needed "follow up" tax opinions in 2003 relating to tax shelters executed in earlier tax years that generated losses in 2002.

gg.　　On or about June 4, 2003, defendant PAUL DAUGERDAS and co-conspirator Donna Guerin sent a HOMER client a "more likely than not" opinion letter for a HOMER tax shelter.

hh.　　On or about October 18, 2003, BDO Client Wayne Harter filed with the IRS a false and fraudulent 2002 U.S. Individual Income Tax Return, Form 1040, on which he claimed fraudulent losses derived from a J&G SOS tax shelter and which substantially reduced the taxes he would otherwise have owed.

ii.　　On or about October 15, 2000, October 15, 2001, and October 15, 2002, defendant PAUL DAUGERDAS filed with the IRS false and fraudulent U.S. Individual Income Tax Returns, Forms 1040, for himself for the tax years 1999 through 2001, on which he claimed fraudulent tax losses from DAUGERDAS's tax shelters and which substantially reduced the income taxes he would otherwise have owed.

-40-

jj.     On or about January 12, 2004, defendant PAUL DAUGERDAS filed with the IRS a false and fraudulent amended U.S. Individual Income Tax Return, Form 1040X, for himself for the 2002 tax year, on which he claimed in excess of $3,500,000 in fraudulent tax shelter losses, and claimed a false refund of $967,915 in taxes paid with the original 2002 Form 1040 return.

kk.     On or about February 18, 2004, co-conspirator Craig Brubaker testified falsely under oath in a deposition taken during an IRS audit of a group of related SOS clients of co-conspirators Brubaker and Erwin Mayer.

ll.     On or about August 15, 2004, HOMER client Robert Platt filed with the IRS a false and fraudulent U.S. Individual Income Tax Return, Form 1040, on which he claimed approximately $2,686,399 in fraudulent carry-forward capital losses derived from a HOMER tax shelter and which substantially reduced the taxes he would otherwise have owed.

mm.     On or about September 15, 2004, New York-based HOMER client Knoedler Archivum filed with the IRS a false and fraudulent U.S. Corporation Income Tax Return, Form 1120, that claimed approximately $480,294 in fraudulent carry-forward losses derived from a HOMER tax shelter.

nn.     On or about September 19, 2005, New York-based HOMER client Knoedler Archivum filed with the IRS a false and fraudulent U.S. Corporation Income Tax Return, Form 1120, that claimed approximately $371,815 in fraudulent carry-forward losses derived from a HOMER tax shelter.

(Title 18, United States Code, Section 371.)

## COUNTS TWO THROUGH SEVENTEEN
### (Tax Evasion — Tax Shelter Clients)

The Grand Jury further charges:

65.     The allegations set forth in paragraphs 1 through 58, 63a through 63k, and 64a through 64nn, are repeated and realleged as if fully set forth herein.

### Statutory Allegations

66.     From in or about the beginning of the year prior to the filing of the income tax returns listed below through at least in or about October 2005, in the Southern District of New York and elsewhere, the defendants listed below willfully and knowingly did attempt to evade and defeat a substantial part of the income tax due and owing by tax shelter clients below to the United States of America for the calendar years set forth below by various means, including among others:

a)     designing and implementing tax shelters that the defendants knew lacked economic substance and genuine business purpose, and were not engaged in for profit;

b)     using those tax shelters to generate millions in tax losses that the defendants knew could not properly be deducted on the returns of the tax shelter clients;

c)     creating and utilizing entities, including limited liability companies, partnerships, and S corporations, that served no legitimate business purpose, but were used merely to obtain tax benefits for tax shelter clients, as well as fees for the defendants, J&G, BDO, Deutsche Bank, and others;

d)     providing and causing to be provided false and fraudulent "more likely than not" legal opinion letters from J&G;

-42-

e)      causing to be prepared, and causing to be signed and filed with the IRS, false and fraudulent U.S. Individual Income Tax Returns, Forms 1040, for the calendar years set forth below, which understated various tax shelter clients' taxable income and the tax due and owing thereon; and

f)      taking various steps to conceal from the IRS the existence of the tax shelters, their true nature, and certain conspirators' role in designing, marketing, and implementing the tax shelters, including, but not limited to, providing false and misleading testimony and information in response to IRS investigations and inquiries, and preparing, executing, and causing the execution of false, misleading, and fraudulent documents intended to deceive the IRS.

| COUNT | DEFENDANTS | CLIENT AND SHELTER TYPE | TAX RETURN | APPROX. FILING DATE OF RETURN | APPROX. AMOUNT OF FRAUDULENT TAX SHELTER LOSSES |
|---|---|---|---|---|---|
| 2 | PAUL DAUGERDAS | CLIENT GERALD RISCH SOS | 1999 1040 | 4/15/00 | $15,559,855 |
| 3 | PAUL DAUGERDAS | CLIENT KEVIN RISCH SOS | 1999 1040 | 4/15/00 | $2,065,035 |
| 4 | PAUL DAUGERDAS | CLIENT BRIAN RISCH SOS | 1999 1040 | 4/15/00 | $2,065,035 |

| COUNT | DEFENDANTS | CLIENT AND SHELTER TYPE | TAX RETURN | APPROX. FILING DATE OF RETURN | APPROX. AMOUNT OF FRAUDULENT TAX SHELTER LOSSES |
|---|---|---|---|---|---|
| 5 | PAUL DAUGERDAS | CLIENT JEFFREY RISCH SOS | 1999 1040 | 4/15/00 | $2,065,035 |
| 6 | PAUL DAUGERDAS | CLIENT DAVID RISCH SOS | 1999 1040 | 4/15/00 | $2,065,035 |
| 7 | PAUL DAUGERDAS DENIS FIELD | CLIENT LARRY MOORE SOS | 2000 1040 | 04/15/01 | $8,127,687 |
| 8 | PAUL DAUGERDAS | CLIENTS ROBERT SHACKLETON/ DENISE SHACKLETON SOS | 2000 1040 | 08/20/01 | $31,513,783 |
| 9 | PAUL DAUGERDAS DENIS FIELD | CLIENT WAYNE HARTER SOS | 2002 1040 | 10/18/03 | $424, 371 |
| 10 | PAUL DAUGERDAS | CLIENT CLYDE GIBB SWAPS | 2001 1040 | 10/11/02 | $2,089,564 |
| 11 | PAUL DAUGERDAS | CLIENT MATTHEW COLEMAN SWAPS | 2001 1040 | 10/11/02 | $6,715,176 |
| 12 | PAUL DAUGERDAS | CLIENT ROBERT GREGORY BLAIR SWAPS | 2001 1040 | 11/04/02 | $1,185,031 |

| COUNT | DEFENDANTS | CLIENT AND SHELTER TYPE | TAX RETURN | APPROX. FILING DATE OF RETURN | APPROX. AMOUNT OF FRAUDULENT TAX SHELTER LOSSES |
|---|---|---|---|---|---|
| 13 | PAUL DAUGERDAS | CLIENT MICHAEL TOPOREK SWAPS | 2001 1040 | 01/13/03 | $1,098,400 |
| 14 | PAUL DAUGERDAS | CLIENT SUZETTE DUCOTE HOMER | 2001 1040 | 10/17/02 | $1,498,501 |
| 15 | PAUL DAUGERDAS DENIS FIELD | CLIENTS JOHN OLMSTED/ MARY ANNE OLMSTED SOS | 2000 1040 | 04/15/01 | $1,543,732 |
| 16 | PAUL DAUGERDAS DENIS FIELD | CLIENT WILLIAM SAUNDERS SOS | 2000 1040 | 04/15/01 | $9,116,849 |
| 17 | PAUL DAUGERDAS | CLIENT MICHAEL TOPOREK SWAPS | 2002 1040 | 12/22/03 | $951,532 |

(Title 26, United States Code, Section 7201, and

Title 18, United States Code, Section 2.)

## **COUNT EIGHTEEN**

(Corrupt Endeavor To Obstruct and Impede the Internal Revenue Laws — FIELD)

The Grand Jury further charges:

67.    The allegations set forth in paragraphs 1 through 58, 63a through 63k, and 64a

through 64nn, are repeated and realleged as if fully set forth herein.

68.     From in or about 1998 through in or about October 2005, in the Southern District of New York and elsewhere, DENIS FIELD, the defendant, did corruptly obstruct and impede, and endeavor to obstruct and impede, as set forth above, the due administration of the Internal Revenue Laws.

(Title 26, United States Code, Section 7212(a).)

**COUNT NINETEEN**

(Corrupt Endeavor To Obstruct and Impede the Internal Revenue Laws
— DAUGERDAS)

The Grand Jury further charges:

69.     The allegations set forth in paragraphs 1 through 58, 63a through 63k, and 64a through 64nn, are repeated and realleged as if fully set forth herein.

I.     **OVERVIEW OF DEFENDANT PAUL DAUGERDAS'S PERSONAL TAX SHELTERS**

70.     In or about 1993 and 1994, defendant PAUL DAUGERDAS engaged in a series of Short Sale tax shelters using partnership and other entities he controlled, including a partnership named DP Investors, in order to generate fraudulently inflated basis totaling over $7,800,000. Between in or about December 1993 and August 1995, DAUGERDAS transferred that basis, which was attached to foreign currency, to Treasurex Financial Limited ("Treasurex"), an S corporation DAUGERDAS created in August 1993 and of which he was the president, sole officer, and 100% shareholder. For the tax years 1994 through 1999, DAUGERDAS used Treasurex to generate false and fraudulent tax losses through sales of inflated basis currency. DAUGERDAS

-46-

thereafter used those fraudulent losses to eliminate or substantially reduce his tax liabilities on the partnership income he received from A&G and the fee income he received through Treasurex.

71.   Between 1998 and 2001, defendant PAUL DAUGERDAS engaged in a series of additional Short Sale tax shelters, as well as SOS tax shelters, using partnership and other entities he controlled, in order to generate fraudulently inflated basis totaling over $95,000,000. DAUGERDAS transferred that basis, which he caused to be attached to foreign currency, to PMD Chartered, an S corporation DAUGERDAS caused to be incorporated in December 1997, of which DAUGERDAS was president, sole officer, and 100% shareholder.   DAUGERDAS thereafter used that fraudulent basis to generate losses, again through the sale of foreign currency, to eliminate or substantially reduce his tax liabilities on the partnership income he received from A&G and fee income received from J&G through PMD Chartered.

72.   In effectuating his personal Short Sale and SOS tax shelters between 1993 and 2001, creating the fraudulently inflated basis, purchasing and selling the foreign currency to which the inflated basis attached, and reporting the resulting "losses" on various tax returns, defendant PAUL DAUGERDAS engaged in numerous acts designed to obstruct and impede the due administration of the IRS by concealing the nature and extent of DAUGERDAS's income and the tax shelters utilized to eliminate or reduce the tax liabilities on that income.   Those obstructive acts including: that J&G pay over $90,000,000 of DAUGERDAS's fee income not directly to DAUGERDAS but instead to his S corporations — Treasurex and PMD Chartered; causing PMD Chartered to pay DAUGERDAS a small wage income each year; setting up numerous entities to utilize in his tax shelters; making transfers involving his partnership and other tax shelter entities that had no purpose other than the production of tax losses; engaging in false and misleading tax

reporting, including the omission of tens of millions of dollars of fee income from the gross receipts line of PMD Chartered's tax returns and millions from the gross receipts line of Treasurex's returns; omitting from the first page of the tax returns for PMD Chartered and Treasurex tens of millions of dollars of the false and fraudulent tax shelter losses DAUGERDAS produced through his personal tax shelters; and netting those losses against fee income on handwritten schedules attached to the tax returns for PMD Chartered and Treasurex.

## II.   THE 1994 TAX YEAR

73.     In or about 1994, in addition to the income he received from Arthur Andersen, defendant PAUL DAUGERDAS received approximately $1,050,000 in income.

74.     In addition, in reporting the $1,050,000 in income on Treasurex's 1994 Form 1120S, defendant PAUL DAUGERDAS falsely and fraudulently failed to report that income on Line 1a, the gross receipts line.   Instead, DAUGERDAS netted that income against approximately $1,599,918 in false and fraudulent losses DAUGERDAS created through the sale of foreign currency with the fraudulently inflated basis.   As a result, DAUGERDAS caused Treasurex to report a false and fraudulent loss of $547,963 for the 1994 tax year, which loss flowed through to DAUGERDAS's U.S. Individual Income Tax Return, Form 1040, thereby falsely and fraudulently reducing DAUGERDAS's individual income tax liabilities.   More particularly, although DAUGERDAS earned and was paid a total of approximately $1,700.000 in income for the 1994 tax year (including the $1,050,000 in side income), he reported on his Form 1040 taxable income of approximately $1,156 and paid approximately just $25,246 in taxes for that tax year.

### III.    THE 1995 TAX YEAR

75.    In or about late 1995, defendant PAUL DAUGERDAS created approximately $409,000 in fraudulent losses in Treasurex through the sale of additional amounts of Treasurex's foreign currency. Those Treasurex losses flowed through to DAUGERDAS's 1995 U.S. Individual Income Tax Return, Form 1040, thereby falsely and fraudulently reducing DAUGERDAS's individual income tax liabilities. More particularly, although DAUGERDAS received approximately $427,000 in income for the 1995 tax year, he reported on his Form 1040 taxable income of $0 and paid approximately $17,002 in taxes.

### IV.    THE 1996 TAX YEAR

76.    In or about late 1996, defendant PAUL DAUGERDAS created approximately $204,807 in fraudulent losses in Treasurex through the sale of additional amounts of Treasurex's foreign currency. Those Treasurex losses, together with additional losses from DP Investors, flowed through to DAUGERDAS's 1996 U.S. Individual Income Tax Return, Form 1040, thereby falsely and fraudulently reducing DAUGERDAS's individual income tax liabilities. More particularly, although DAUGERDAS received approximately $497,000 in income for the 1996 tax year, he reported on his Form 1040 taxable income of $0 and paid approximately $16,708 in taxes.

### V.    THE 1997 TAX YEAR

77.    In or about late 1997, defendant PAUL DAUGERDAS created approximately $737,449 in fraudulent losses in Treasurex through the sale of additional amounts of Treasurex's foreign currency. Those Treasurex losses, which resulted from the netting of approximately $730,000 in fraudulent losses and $250,000 in fee income that DAUGERDAS reported on the 1997 S corporation tax return of Treasurex, flowed through to DAUGERDAS's 1997 U.S. Individual

Income Tax Return, Form 1040, thereby falsely and fraudulently reducing DAUGERDAS's individual income tax liabilities. More particularly, although DAUGERDAS received approximately $693,790 in income for the 1997 tax year, he reported on his Form 1040 a taxable income of negative $20,695 (-$20,695) and paid approximately $25,442 in taxes.

## VI.   THE 1998 TAX YEAR

### A.   The J&G Employment Contract

78.     In or about mid-1998, defendant PAUL DAUGERDAS, and four other A&G lawyers, including co-conspirators Donna Guerin and Erwin Mayer (the "DAUGERDAS Group"), approached representatives of J&G's Dallas office and commenced discussions aimed at having the DAUGERDAS Group join J&G and operate a newly-formed J&G office in Chicago.

79.     As a result of the discussions with defendant PAUL DAUGERDAS, J&G extended offers of employment to DAUGERDAS and other members of the DAUGERDAS Group. The offer to DAUGERDAS was made in the form of a December 22, 1998 letter addressed to DAUGERDAS and PMD Chartered, which provided that PMD Chartered would be paid the following amounts: a base salary of $480,000; a general bonus of $120,000; 50% of any tax shelter fee attributable to DAUGERDAS between $1,000,000 and $5,000,000; and 70% of any tax shelter fee collections attributable to DAUGERDAS above $5,000,000.

80.     On or about December 29, 1998, defendant PAUL DAUGERDAS and co-conspirators Donna Guerin and Erwin Mayer submitted letters of resignation to a senior partner of A&G. In an attempt to have the fee income from his 1998 A&G tax shelters governed by his 1999 J&G employment contract, DAUGERDAS approached the aforementioned senior partner of A&G