

305 Madison Avenue
New York, NY 10165
T: 212-922-1080
F: 212-949-8255

Henry E. Mazurek
Brian D. Linder
mazurek@clayro.com
linder@clayro.com

September 8, 2013

By ECF and Email

The Honorable William H. Pauley III
United States District Judge
United States District Court
500 Pearl Street
New York, New York 10007

  Re: *United States v. Daugerdas, et ano.*, S6 09 Cr. 581 (WHP)

Dear Judge Pauley:

  On behalf of Mr. Daugerdas, we write to oppose the government's requested "supplemental" jury charges. On the very eve of trial, the government once again seeks to change course from the essence of the Indictment and the basis for every criminal "tax shelter" case decided by the Second Circuit – the common law economic substance doctrine. It hopes to lessen its burden of proof by adding an entirely separate and internally inconsistent theory of criminal tax evasion: that losses deducted from taxpayers' returns were willful violations of Section 165(c)(2) of the Internal Revenue Code. This second theory is independent of the economic substance doctrine and relies on a single Code section for its validity. In short, the government seeks by its supplemental charge to undermine the crux of its 67-page S6 Indictment in favor of what it believes to be a more lax standard to obtain tax evasion convictions. The Court should once again reject the government's attempts to infuse reversible error in this prosecution.

  The Section 165(c)(2) theory of criminal tax evasion is not new to the Court because the government fought extremely hard to introduce it during the first trial. The Court denied the government's repeated requests to inject this alternate theory of guilt on several grounds, including that the Indictment did not give adequate notice to the Defendants that the grand jury indicted under this theory, and also because the legal standard espoused by the government under Section 165(c)(2) could not be reconciled

Hon. William H. Pauley III
September 8, 2013
Page 2 of 13

with the economic substance test that framed all the evidence introduced in the case. Now, the government maddeningly tries again.

What is most frustrating and blatantly dismissive of concepts of constitutional due process and fundamental fairness is the fact that the government did not have the simple respect for the law and trial process to announce its intent to the parties and the Court in advance of the Friday night before jury selection. Indeed, the government deliberately avoided revealing its true intentions. When the government decided to supersede its Indictment, with the fifth superseding Indictment in this case, the Court specifically inquired – almost four months ago – on the date of the S-5 arraignment on May 17, 2013:

> Q: Briefly, for the benefit of the Court and the defendants, can you describe the essential changes in the S5 Indictment as opposed to the S3 Indictment on which the defendants were tried two years ago?
>
> A: Yes, Your Honor. There were – first, let me say that the conspiracy charge remained in effect the same. We dropped certain overt acts from the conspiracy that correspond with certain witnesses that we intend not to call at the second trial, so, therefore, we wouldn't prove those overt acts.
>
> We dropped certain substantive tax evasion counts relating to the witnesses whom we don't intend to call at the second trial, one of whom, for instance, is Claude Penn who immediately comes to mind. The rest of the indictment, your Honor, was altered to make it essentially Paul Daugerdas and Denis Field centric; that is, to take out the emphasis or the capitalization that related to Ms. Guerin and Mr. Parse and Mr. Brubaker in the first trial.
>
> **There were also slight alteration[s] of some of the language relating to profit potential on both the conspiracy and the tax evasion charges.**
>
> Other than that, your Honor, it remains essentially the same.

Tr. 9, 5/17/2013, attached at Exhibit A (emphasis added).

In the best light, one might interpret the government's response as gamesmanship. Why reveal at that early stage of the retrial litigation the fact the government intends to seek once again to alter the essential theory of tax evasion charged in the Indictment when it could lie in wait and spring this change on defendants on the eve of trial instead? By raising this issue now perhaps the government seeks to take advantage of the defendants' lack of time to properly brief and address this substantial issue of law and force the Court to make a quick decision in its favor on the subject. In the worst light, the government evidences a complete disregard for concepts of due process and fairness in a criminal justice system that should be more about getting the law right rather than simply winning.

Hon. William H. Pauley III
September 8, 2013
Page 3 of 13

In any case, motives aside (ironically in a case where the motives of taxpayers play center stage), the reality is that the government intentionally decided not to raise its **known** belief that it altered the S5 Indictment (and subsequently S6, which kept the S5 changes in this regard) to include (at least in its mind) specific language that would add the Section 165(c)(2) loss deduction theory for the criminal tax evasion counts, Counts 2-11 and 14-16, at the retrial. How could the government possibly believe that when the Court asked what "the essential changes [were] in the S5 Indictment as opposed to the S3 Indictment on which the defendants were tried two years ago," that changing the theory of culpability on all of the criminal tax evasion counts – in a tax shelter criminal case – was **not** an "essential" change from the earlier indictment? Did it think it was being clear and transparent when it stated: "There were also slight alteration[s] of some of the language relating to profit potential on both the conspiracy and the tax evasion charges." *Id.* And add to this sleight of hand the fact that, while undersigned counsel are new to the case, at the first trial as gleaned from the cold record, there were hours of argument between the parties and the Court about how Section 165(c)(2) was not properly charged in the S3 Indictment. If the government knew it was infusing this additional theory of tax evasion in the retrial after all of that debate during the first trial, why did it not tell the Court and the parties when directly asked about the "essential" changes in the new Indictment?

Now, we are forced hastily to prepare a response to the government's shiftiness on the eve of trial. We are also forced to ask for the Court's immediate ruling on this issue before opening statements because we have prepared a defense that confronts head-on the issue of mixed motives in the taxpayers' minds as a centerpiece to Mr. Daugerdas's defense. In effect, the government seeks to take this defense away from Mr. Daugerdas with absolutely no warning beforehand (unless you believe that the government gave a transparent answer to the Court of its intention at the S-5 arraignment).

We believe that the Court's jury instructions at the first trial reflect the current state of the law in criminal tax shelter cases in the Second Circuit and that adding this second – and directly contradictory – theory to economic substance jurisprudence infuses prejudicial error into these proceedings. This is not the eleventh hour of this seemingly endless litigation, it is well past the thirteenth. The government's efforts here are remarkable in their brazenness.

Defendant Daugerdas objects to the government's attempts to change its theory of tax evasion charged in the S6 Indictment on the following procedural, substantive and constitutional grounds:

1. The government's addition of several general and vague words in two paragraphs of a 67-page S6 Indictment failed to give Mr. Daugerdas adequate notice of the charges under the Fifth Amendment's Due Process Clause. It also violates due process guarantees of fundamental fairness.

Hon. William H. Pauley III
September 8, 2013
Page 4 of 13

2. The government's alternate theory under Section 165(c)(2) constructively amends the latest S6 Indictment and its exclusive focus on economic substance and business purpose.  The additions of the phrases "were not engaged in for profit," at paragraph 63(c), and "were not entered into by Daugerdas with the requisite profit motive," at paragraph 105(a), are insufficient to alter the S6 Indictment's actual theory of culpability -- criminal tax evasion and fraud based on the lack of economic substance or business purpose in the various financial tax shelters.  In fact, these two recently added phrases to the Indictment are also consistent with a theory of lack of business purpose under the traditional common law test.  If the Court is at all uncertain whether the grand jury actually intended to add this new theory of tax evasion to the current Indictment, given the language's ambiguity and underwhelming reference to a judicially created theory of Section 165(c)(2) loss deductions, even after substantial debate in the first trial over the lack of clarity in the S3 Indictment,  the Court should order production of the grand jury minutes and seek the government's proof that this was in fact a theory actually presented to the grand jury and on which it voted to indict.  This is especially needed now after the government's earlier dissembling on this issue.

3. The government's proposed instruction on Section 165(c)(2) eviscerates the economic substance instructions, *in toto*, rendering them meaningless.  The government will spend weeks of evidence arguing the more stringent economic substance standards and at the end of trial tell the jury that it can ignore all of that evidence because all it would need to find to convict under the tax evasion counts, and similarly under the conspiracy and obstruction counts, was that the defendants did not believe that the taxpayers had a "primarily for profit" motive in the tax shelters.[1]  Such a result would make a farce of almost the entire trial presentation in this case.  It also, as argued at length during the first trial, would result in hopeless confusion of the jury to the great detriment and prejudice to the defendants.

4. The government is not presenting *any* evidence that Mr. Daugerdas set out to willfully violate Section 165(c)(2), and instead will present at least four cooperating witnesses to testify hours and days at a time about the economic substance test.  Thus, the government's request for this "supplemental" charge is without factual support.

---

[1] Even the government in its charge to gain an advantage toward conviction stated: "But I realize that your Honor is worried about the issue of confusion with respect to seemingly inconsistent tests or the tests have some tension between them.  And we concede that between the primarily for profit in 165(c)(2) and the common law economic substance doctrine, there is some tension.  The bar plainly and simply is a lot lower with respect to 165(c)(2)."  (Trial Tr. 8327) (attached at Ex. C).

Hon. William H. Pauley III
September 8, 2013
Page 5 of 13

5. The standard proposed by the government in its supplemental Section 165(c)(2) charge is not supported by clear and accepted case law *as it existed at the time of the charged transactions.* Thus, the government's proposal violates the Ex Post Facto Clause of the Constitution. Federal courts were not uniformly applying a "primarily for profit" standard. Indeed, this was a judicially created standard to begin with. The statute only states that deductions may be taken for "losses incurred in any transaction entered into for profit." 26 U.S.C. § 165(c)(2). The Supreme Court never ruled on the "primarily for profit" standard (at most the government can point to is a footnote in dicta in *Helvering v. Northern Grocery Co.*, 304 U.S. 282, 289 n. 5 (1938), that raised the possibility that this standard might apply to a predecessor statute to Section 165(c)(2)), and there was substantial case law from federal Tax Court and Court of Claims decisions which were valid precedent in the late 1990s and early 2000s (the time of the transactions in this Indictment), that disagreed with this view. Under the rule of lenity and the doctrine of constitutional vagueness, the Court would be in error in instructing the jury under the government's proposed civil standard in a criminal case. *See Skilling v. United States*, 130 S.Ct. 2896, 2927-28 (2010) ("a penal law statute [must] define the criminal offense [1] with sufficient definiteness that ordinary people can understand what conduct is prohibited and [2] in a manner that does not encourage arbitrary and discriminatory enforcement") (quoting *Kolender v. Lawson*, 461 U.S. 352, 357 (1983)).

6. The government's proposed instruction is contrary to the evidence in the case and constitutes an entirely new theory of culpability in criminal tax shelter cases in the Second Circuit. *See United States v. Coplan*, 703 F.3d 46 (2d Cir. 2012); *United States v. Stein,* No. 05 Cr. 0888 (LAK); *United States v. Atkins*, 869 F.2d 135, 139-40 (2d Cir. 1989); *United States v. Ingredient Technology Corp.*, 698 F.2d 88, 98 (2d Cir. 1983); *United States v. Regan*, 937 F.2d 823, 828 (2d Cir. 1991) (all cases involving complex "tax shelters" such as these, and all applying for criminal tax evasion offenses the two-pronged test for determining whether or not a transaction has economic substance).[2] The government's theory rests on the extraordinary assertion that one can be convicted of criminal tax evasion for endorsing the position on a tax return that a loss could be taken *even if the taxpayer had an actual mixed motive in*

---

[2] The government cites to a single case, *United States v. Ohle*, 08 Cr. 1109 (JSR), in support of its position here. However, in that case the issuance of an instruction under Section 165(c)(2) was not litigated at all. There was no defense objection to the government's requested charge under this Code section. Also, the tax shelter at issue in the tax evasion count in *Ohle* differed from those at issue in this case. The particular contested transaction in *Ohle's* substantive tax evasion count utilized a certain section of the Code involving option straddle transactions. *See* 26 U.S.C. § 1256. It is unclear from the transcript in that case whether the government relied upon an economic substance theory of criminal culpability in the tax evasion count at all.

> *proceeding with the shelter.* In other words, a tax planner could be convicted of aiding and abetting felony tax evasion even where the taxpayer had a genuine motive to make the investment for profit reasons and the investment had real possibility for profit, only because the taxpayer was more interested in obtaining the substantial tax benefits that accompanied the investments. Thus, a conviction under this standard would be valid even if the defendant passes both the economic substance and business purpose tests. In an extraordinary shift of existing case law, the government suggests criminal liability may attach to complicated tax shelters on the single premise that the taxpayer did not have and never achieved a "primary" profit motive when it sought the advice of a tax planner. This theory of criminal culpability could extend to almost any tax planning advice that involved structured financial investments as it is based on an amorphous subjective standard of what constitutes "primary" in another person's mind. This theory would substantially weaken a generation of Supreme Court precedent under *Cheek v. United States,* 498 U.S. 192 (1991), by supplanting the strict mental state requirement with an uncertain scope of culpable conduct.

Mr. Daugerdas relies on the earlier submissions of former counsel (*see* attached Exhibit D) in support of the following arguments: (i) the latest S6 Indictment does not sufficiently charge a criminal tax evasion theory under 26 U.S.C. § 165(c)(2) and constructively amends the Indictment in violation of the Due Process Clause of the Fifth Amendment; *see United States v. Milstein*, 401 F.3d 53, 65 (2d Cir. 2005) ("When the trial evidence or the jury charge operates to 'broaden [ ] the possible bases for conviction from that which appeared in the indictment,' the indictment has been constructively amended. Constructive amendment is a *per se* violation of the Fifth Amendment.") (quoting *United States v. Miller*, 471 U.S. 130, 138 (1985)); (ii) the government's trial evidence at the first trial, likely to be repeated in the retrial, does not include evidence to rebut the fact that the Jenkens & Gilchrist's ("J&G") opinion letters set forth a non-frivolous legal argument in support of the fact that federal courts had not uniformly adopted a "primarily for profit" test under Section 165(c)(2) (*see* relevant portion of J&G opinion letter, at Exhibit B), including reference to cases that had taken a contrary position. The government will present *no* evidence to show that this candid presentation of the law was done in bad faith[3]; (iii) an instruction on the "primarily for profit" test would eviscerate the instructions on economic substance and business purpose, thereby amending the Indictment, confusing and misleading the jury, and infusing reversible error into the trial record.

---

[3] The tax opinion letters in the *Stein* and *Coplan* cases also discussed Section 165(c)(2) and reached similar conclusions to the J&G letters. *See e.g., Stein*: GX 7001, GX 8003; *Coplan*: GX 2004-33; GX 2002-17. Notably, the prosecutors in those similar cases did not try to use the opinion letters as a basis for arguing that the court should instruct the jury on Section 165(c)(2) and the government's "primarily for profit" reading of the statute.

Hon. William H. Pauley III
September 8, 2013
Page 7 of 13

If the government decides to proceed under this new theory, it should be compelled to elect which of the theories it intends to rely upon – economic substance or Section 165(c)(2). It makes no sense to instruct the jury on both, since they are inconsistent with each other. If the government proceeds under the Section 165(c)(2) theory of tax evasion under Counts 2-11 and 14-16, Mr. Daugerdas moves to sever these counts from the remainder of the S6 Indictment, which presumably would continue to charge violations of the higher standard of economic substance and business purpose. Under Fed. R. Crim. P. 14(a), "[i]f the joinder of offenses . . . in an indictment . . . appears to prejudice a defendant . . . , the court may order separate trials of counts."[4] Asking the jury to understand why similar charges in the Indictment, under the same facts, would be charged under one theory of liability while many others are charged under a completely separate and less stringent theory of liability would be highly confusing to the jury and would likely lead to prejudicial results against these defendants. (*See* Trial Tr. 8357-58, giving the reasons of the Court for denying the government's motion for reconsideration of Section 165(c)(2) instructions on counts related to Mr. Daugerdas's personal tax returns) (attached at Exhibit C).

Mr. Daugerdas also relies on the law of the case doctrine as grounds to deny the government's renewed attempt to infuse a Section 165(c)(2) theory into this criminal indictment. Based on the Second Circuit's application of the law of the case doctrine, a court may change its prior ruling in the same case only if any of the following conditions exists: "(1) an intervening change in controlling law, (2) new evidence, or (3) the need to correct a clear error of law or to prevent manifest injustice." *United States v. Carr*, 557 F.3d 93, 102 (2d Cir. 2009) ("when a court has ruled on an issue, that decision should generally be adhered to by that court in subsequent stages in the same case") (internal quotation marks omitted); *see also United States v. Pugh,* 648 F.3d 118, 123-24 (2d Cir. 2011). The government has failed to argue that any of the above circumstances have arisen since the first trial.

Lastly, we present below the relevant case law that existed at the time of the

---

[4] Mr. Daugerdas also moves pursuant to Fed. R. Crim. P. 8(a) to sever his personal counts of tax evasion (Counts 14 through 16) on grounds that the government's new claims under Section 165(c)(2) are based upon an entirely different theory of prosecution than the "tax promoter" counts. Based on prior argument (Trial Tr. 8319-8337; Ex. C), and the government's renewed request, the government has conceded that "if the Court were to apply only the common law economic substance test, it would be[,] is there [sic] a reasonable possibility for a profit. I think there is some argument that there is a reasonable opportunity for a profit simply because Mr. Daugerdas, as the promoter himself, paid no fees." (Trial Tr. 8320; Ex. C). Thus, the government seeks to proceed under a completely different theory under Section 165(c)(2) for these counts that does not constitute a "common scheme or plan" with the other taxpayer counts charged in the Indictment. This is the same kind of conflict that led to the reversal of multiple convictions in *United States v. Shellef*, 507 F.3d 82, 88 (2d Cir. 2007), under Fed. R. Crim. P. 8.

Hon. William H. Pauley III
September 8, 2013
Page 8 of 13

transactions at issue in this case to show that there was no uniform application of a "primarily for profit" standard that can now be transposed as the basis for a criminal conviction. *Skilling*, 130 S.Ct. at 2927-28 (holding that a criminal law must provide the public with fair notice as to what is prohibited and limit the potential for arbitrary enforcement); *see also City of Chicago v. Morales*, 527 U.S. 41, 56 (1999) (the critical question is whether the law is reasonably clear at the relevant time that the defendant's conduct was criminal).

### At the Relevant Time in the Indictment, Federal Courts Did Not Uniformly Establish a "Primarily for Profit" Test Under Section 165(c)(2)

Section 165(c)(2) limits an individual's deduction of losses not arising from a business, casualty or theft to those "incurred in any transaction entered into for profit." 26 U.S.C. § 165(c)(2). Neither the statute nor the regulations require that the transaction have been entered into "primarily for profit." Some courts, however, in certain situations have required that under Section 165(c)(2), the taxpayer's profit motive be the "primary" motive for entering into the transaction. This "primary" addition to the statute is derived from footnote 5 in *Helvering v. National Grocery Co.*, 304 U.S. at 289 n. 5. In that footnote, the Court, in providing examples of where the taxpayer's state of mind determined the incidence of income tax, stated that under Section 23(e) of the 1939 Internal Revenue Code, the predecessor statute of Section 165, the deductibility of losses may depend on whether the taxpayer's motive in entering the transaction was "primarily" for profit. That case involved the constitutionality of the accumulated earnings tax. The statement in footnote 5 was mere dictum that had nothing to do with the holding or analysis of the accumulated earnings tax. It was made in passing by the Court without reference to other authorities.

For the next 45 years following the *National Grocery* footnote, cases applied this gloss to bar deduction of losses, but only in a **non-commercial setting** such as a hobby, the purchase of a personal residence, or another transaction entered into for personal purposes. *See Ewing v. Commissioner*, 20 T.C. 216 (1953), *aff'd,* 213 F.2d 438 (2d Cir. 1954); *Austin v. Commissioner*, 298 F.2d 583 (2d Cir. 1962). In *Austin*, the court explained that the judicially added "primary" qualifier is a consequence of the apparent conflict between Section 165(c)(2), which permitted the deduction of losses from a for-profit transaction, and Section 262, which bars a deduction for "personal, living, or family expenses." *Id.* at 584. According to the *Austin* court, in a personal transaction that a taxpayer enters with mixed motives, one must determine which motive predominates – *i.e.,* between for-profit or personal, living, or family expense – to determine which Code section applies. Thus, the "primary" motive inserted by some courts is based on an analysis of for-profit versus personal expense – not whether a for-profit motive is predominant over other non-profit motives.

By contrast, a loss from a partially tax-motivated transaction is not a personal expense, being wholly unlike any of the examples of "personal, living, and family expenses" set forth in Treas. Reg. § 1.262-1(b). The court in *Weir v. Commissioner*, 109

F.2d 996 (3d Cir. 1940), made this very point, rejecting the IRS's attempt to disallow the deduction of a loss on a sale of housing cooperative stock.

While the taxpayer testified in *Weir* that he had bought the stock in order to have a voice in management and because he intended to live in the building, the court inferred an intention to receive profits (dividends or accretion in value), "unless the purchaser knows at the time of purchase that such profits are an impossibility," which was not the case. *Id.* at 998 (citing, *inter alia, National Grocery Co.*, 304 U.S. at 289 n. 5). The Third Circuit reasoned that the taxpayer's intention to influence the corporation through his stock ownership did not negate a profit motive; they could co-exist as separate motives:

> This last, it will be noted, serves to distinguish the decisions dealing with non-income producing property. If, for instance, the taxpayer has purchased a yacht, his cruising about in it presupposes a state of mind inconsistent with making a profit out of it by chartering. Hence that inconsistency must be resolved by ***ascertaining whether the intention or motive of pleasure or that of profit is the 'prime thing'*** . . .

*Id.* (emphasis added).

The *Weir* court concluded:

> The public coffers are weighted with the same amount from taxes on [the stock] dividends, whether the stock is held with the motive of voting or with the motive of profit. That portion of petitioner's capital was 'used to produce taxable income.' That being so, petitioner is entitled to his deduction. We need hardly add that a contrary position would only serve to embroil the administrators of the taxing statute in a hectic and ridiculous search for non-profit motives.

*Id.*

In the late 1990s, the case law still countenanced deductions for losses under Section 165(c)(2) that did not require a motive beyond ***any*** genuine profit motive, without regard to its primacy among other motives. In *Smith v. Commissioner*, 78 T.C. 350, 391 (1982), the Tax Court stated that in a tax-motivated transaction, any non-tax

business motive would suffice to sustain a deduction, although it failed to find that any existed in *Smith's* case:

> The mere fact that petitioners may have had a strong tax-avoidance purpose in entering into their commodity tax straddles does not in itself result in the disallowance of petitioners' losses under section 165(c)(2), ***provided petitioners also had a non-tax motive for their investments at the time*** . . . ***Such hope of deriving an economic profit aside from the tax benefits need not be reasonable so long as it is bona fide*** . . . However, the existence of a non-tax profit objective is a question of fact on which the petitioners bear the burden of proof . . .

*Id.* (citations omitted) (emphasis added).

The federal appellate Court of Claims also had established a test under Section 165(c)(2) that did not require a "primary" motive and it also was valid precedent at the time of the defendants' transactions in this case. In *Knetsch v. United States*, 348 Ct. Cl. 1965, *cert. denied,* 383 U.S. 957 (1966), the appellate Court of Claims, while again reciting that "the determinative question is whether the taxpayer's purpose in entering into the transaction was primarily for profit," *id.* at 936, citing *National Grocery Co.,* proceeded to indicate that it thought the test required much less:

> There are two crucial words contained in this test: purpose and profit. . . . Thus, you can have a profit intention side-by-side with a non-profit motive. However, the statutory requirement "for profit" can be satisfied by either. . . . By the same token, you can have a prohibited profit motive or intent [e.g., tax-motivated] side-by-side with a legitimate profit motive or intent and meet the statutory requirement.

*Id.* (citing *Weir v. Commissioner,* 109 F.2d at 998).

The court then noted that two possible motives or intents could be ascribed to the taxpayers when they purchased annuity contracts on a leveraged basis. The "dominant intent or motive" was to deduct the purported interest. A "secondary purpose" would be to provide for retirement income. The court held that although the first purpose would produce a "profit" of sorts, that was not the sort of profit intended to be covered by Section 165(c)(2). That is, the "statutory word 'profit' cannot embrace profit-seeking activity in which the only economic gain derived therefrom results from a tax reduction . . . [*i.e.,* where] the transaction which gave rise to the loss has been determined to have been 'without economic substance' or a 'sham.'" *Id.* at 938. It follows then, that if the "primary" tax motive were treated the same as a "primary personal" motive, and because the court had stated previously that the taxpayer's non-tax motive was "secondary," the

court should have stopped there under the government's view. But it did not. It also did not engage in any balancing of the taxpayers' tax and non-tax motives. Rather, the court concluded:

> [I]n order for the realized loss to be recognized under section 165(c)(2), the permissive profit motive previously discussed is required. Thus, taxpayers here are required to show that they intended, when they pursued their annuity contract, to realize a profit through the increase in the cash value of the annuity contract apart from the tax savings.
>
> It appears that the taxpayers' *only* motivating factor was the tax deduction.

*Id.* at 939 (emphasis added).

*Knetsch* is read by *Johnson v. United States,* 11 Ct. Cl. 17, 29 (1986), a subsequent Court of Claims case as indicating that "some, arguably even a slight, profit motive, in addition to tax motives will sustain tax deductions" under Section 165(c)(2). Another federal Circuit court, the Sixth Circuit, also affirmed a holding by the Tax Court, which found that the required profit motive under Section 165(c)(2) was something below a "primary" threshold. In *Illes v. Commissioner*, 62 T.C.M. (CCH) 728 (1991), *aff'd*, 976 F.2d 733 (6th Cir. 1992), the Tax Court simply stated that an "actual and honest profit motive" was sufficient to meet the standards of Section 165(c)(2)."[5] In another case, affirmed by the Second Circuit, the Tax Court held that hope of deriving an economic profit aside from tax benefits **need not even be reasonable so long as it is bona fide.** *Bessenyey v. Commissioner*, 45 T.C. 261, 274 (1965), *aff'd*, 379 F.2d 252 (1967) (emphasis added). As commentators Bittker and Lokken describe it, "if there is also a reasonable prospect of economic gain, a transaction qualifies even though the taxpayer was motivated in part by knowledge that a loss, if incurred, would be deductible from income otherwise subject to high marginal tax rates." Bittker & Lokken, *Federal Taxation of Income, Estates and Gifts*, at ¶ 25.3, at text accompanying n. 11 (Thomson Reuters 2007).

Finally, in a case relied upon by the government, *Yosha v. Commissioner*, 861

---

[5]  Commentators, even as late as 2007, were also indicating that something less than a "primary" motive for investments could result in deductions under Section 165(c)(2). *See generally* Bittker & Lokken, *Federal Taxation of Income, Estates and Gifts*, at ¶ 25.3, at text accompanying nn. 15 and 16 (Thomson Reuters 2007). Bittker and Lokken suggest that the "entered into for profit" language in Code Section 165(c)(2) should be interpreted consistent with Code Section 212's application to "other activities [*i.e.,* not constituting a trade or business] for the production or collection of income or for the management, conservation or maintenance of property held for the production of income" (collectively, investment activities). *Id.*

F.2d 494, 499 (7th Cir. 1988), Judge Posner, speaking for the Seventh Circuit, stated that the court need not decide whether the standard "for profit" or "primarily for profit" should be utilized in a loss case that invoked Section 165(c)(2) (thus leaving open the question of what standard actually applied), because:

> By either standard – "no non-tax motive or consequences," the test under the judge-made doctrine of substance over form, applicable to all deductions, or "not predominant non-tax motive," the statutory test applicable to the deduction of losses – this is an easy case. There was no non-tax profit motive and the transactions did not impinge on the world . . . Forget the [judicially-imposed] gloss: the effort here to turn paper losses into tax benefits was contrary to the original, unembellished purpose of section 165(c)(2). . .

*Id.* (internal citations omitted).

Indeed, later in the *Yosha* decision, Judge Posner decried the use at all of a subjective test in interpreting Congress's directives in Sections 165(c)(2) and Section 1092, which both use the identical language of "a transaction entered into for profit." He wrote for the *Yosha* court:

> Despite this growing phalanx of authority [supporting a predominant-motive test], the objective test, strongly urged by the taxpayers in this case, has much to recommend it. Judges can't peer into people's minds or "weigh" motives, and as Professor Blum has observed, "Although in these tax avoidance controversies the conclusion often is framed in what appear to be state of mind terms – that is, we say that in taking a particular action a person did or did not have a non-tax purpose or a tax avoidance motive – the battle is rarely fought on state of minds grounds. Rather, the usual approach is to focus the analysis on whether any non-tax goals or functions were or plausibly could have been served by the action." *Motive, Intent, and Purpose in Federal Income Taxation*, 34 U. Chi. L. Rev. 485, 523 (1967) (footnote omitted).

*Yosha,* 861 F.2d at 502. Judge Posner then conducted an analysis of the investments at issue in *Yosha* under an objective test as well, for purposes of Section 165(c)(2) and economic substance purposes. The court concluded that the taxpayers in that case "flunked" the objective test as well. But the court left open the possibility that the Seventh Circuit could be convinced under different facts to impose an objective test in evaluating investment losses under Section 165(c)(2).

Hon. William H. Pauley III
September 8, 2013
Page 13 of 13

In sum, the government cannot possibly meet its burden of showing that a particular common law interpretation of Section 165(c)(2) was so uniformly applied *in the civil context* during the time of the transactions in this case to merit rising to a standard of criminal culpability in this tax evasion prosecution. As described above, the applicable standard in Section 165(c)(2) loss cases involving investment activity was far from clear at all. Significantly, tax commentators as late as 2007 were still debating what standard should apply. To base a criminal conviction on such feeble foundation would certainly violate notions of constitutional due process. *See Skilling*, 130 S.Ct. at 2931 (acknowledging that "[r]eading the statute to proscribe a wider range of offensive conduct . . . would raise the due process concerns underlying the vagueness doctrine.").

The government's motion to supplement the charges with a theory under Section 165(c)(2) should once again be rejected.

Finally, the defendants also object to a *Pinkerton* charge and rely on the Court's previous findings (Trial Tr. 8134-35; Ex. C), and on the law of the case doctrine. We can submit a separate letter brief on this issue if the Court deems it helpful or if there is a particular issue the Court would like us to address.

                    Respectfully yours,

                By: /S// Henry E. Mazurek

                Henry E. Mazurek
                Brian D. Linder
                *Attorneys for Paul Daugerdas*

cc:     Counsel to All Parties (by ECF)