

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

---

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York  10007*

October 1, 2013

The Honorable William H. Pauley III
United States District Judge
Southern District of New York
500 Pearl Street, Room 2210
New York, New York 10007

      Re:    United States v. Paul Daugerdas, et ano.
                S6 09 Cr. 581 (WHP)

Dear Judge Pauley:

      We write to highlight for the Court certain aspects of the cross-examination of Erwin Mayer, during which counsel for Daugerdas inaccurately suggested that Mayer had never, during the period 1997-2009, discussed with *anyone* his belief and conclusions that he had engaged in tax evasion activities. That suggestion was inaccurate and improper because Mayer had, in fact, discussed his tax evasion activities and related misconduct with Paul Daugerdas during the period in which they had a joint defense arrangement, which was in place between in or about 2003-2007. Given the factually inaccurate impression that Daugerdas created through his cross-examination, the Government should be allowed on re-direct examination to explore the conversations between Mayer and Daugerdas during the period of joint defense, during which they discussed Mayer's tax misconduct and the criminal activities of Daugerdas.

      **1.**    **The Cross-Examination**

      Daugerdas's counsel created the inaccurate impression with respect to Mayer during the following exchanges, among others:

      Q.    From this point in time, from 1996 to 2009, sir, for the 13 years that you had been living with the work that you had done and the work that you had defended, you continued to tell everyone around you, everyone around you who would listen that the work that you did in the tax strategies was defensible and completely legitimate, didn't you?

A.  Yes, sir.

Q.  And anybody that worked with you and listened to you would have every reason to believe that they were working with someone who believed that he was just doing what lawyers do, correct?

MR. OKULA:   Objection.
THE COURT:   Sustained as to form.

Q.  Well, you told anyone that you worked with and anyone who listened to you that you believed that what you were doing during the course of all of those years, those 13 years, Mr. Mayer, that you were just doing what lawyers do, correct?

A.  I don't remember making specific statements like that, but certainly that could be inferred, sir.

Q.  Well, you did testify at this prior proceeding back in March 2011, correct?

A.  Yes, sir.

Q.  And you gave sworn testimony then on March 24, 2011, correct?

A.  Yes, sir.

Q.  And I refer counsel to page 3642 of the transcript, lines 2 through 5.  And you were asked this question just two years Ago: "Q. And anybody that worked with you and listened to you would have every reason to believe that they were working with someone who believed that he was just doing what lawyers do?"
And your answer, sir, was:   "Yes, sir."
That's still your answer today?

A.  I believe that could be inferred, yes, sir.
(Tr. 2994-2996)

Q.  And you also tell these civil lawyers who interview you in 2004 regarding the strategy that the economic substance test was met in all three strategies that you advised clients on?

A.  Most likely, sir.

Q.  And you told these civil lawyers who asked you -- and these interviews took place over a number of days; I think these were two different days of interviews that you agreed to give, correct?

A.  I believe so.

2

Q. And these were not under oath testimony, but it is -- the lawyers were expecting you to be truthful to them, correct?

A. Yes, sir.

Q. And you told them that in the course of these two days of voluntary interviews that you believed that the advice that you gave to your hundreds of clients on the three strategies was that the tax opinions were lawful, correct?

A. Yes, sir.

Q. If we can add that to the timeline. And now where we are on the timeline, from the day of your first advice to a client on one of these tax strategies -- it was in 1996 and 2004 -- this is eight years advising or defending the tax strategies at this point, correct?

A. Yes, sir.

Q. And at this point in time you haven't told anyone that you believed that what you were doing was assisting clients in committing tax evasion, correct?

A. Yes, sir.

Q. Or that you yourself believed you had committed tax evasion on your personal returns, correct?

A. Yes, sir.
(Tr. 2985-2986, portions of transcript attached).

## 2. Discussion

The foregoing questioning makes clear that Daugerdas's counsel inaccurately and unfairly suggested that, for the entire period 1997-2009, Erwin Mayer had never discussed his belief that his conduct was illegal. In order to permit the Government to correct that factually inaccurate impression, the Government should be permitted to question Mayer about Mayer's discussions with Daugerdas between 2004-2009, including discussions that occurred while both

were parties to a joint defense agreement.   See <u>In re Grand Jury Subpoena Duces Tecum</u>, 112 F.3d 912, 922 (8th Cir. 1997) (party to common defense agreement can waive protections; in addition, "a party always remains free to disclose his own communications").

                                             Respectfully submitted,

                                             PREET BHARARA
                                             United States Attorney

                                          By: <u>//s// Stanley J. Okula, Jr.</u>
                                               Stanley J. Okula Jr.
                                               Nanette L. Davis
                                               Niketh Velamoor
                                               Assistant United States Attorneys
                                               (212) 637-1585/1117/1076

cc:     All Defense Counsel

```
                                                                    2994
     D9undau6                  Mayer - cross
 1   that you were doing anything wrong in making and advising
 2   clients with respect to any of these strategies, correct?
 3   A.  In essence, yes, sir.
 4   Q.  And your attorneys went in and followed your instruction to
 5   tell the prosecutors what it was that you were telling them,
 6   correct?
 7   A.  Yes, sir.
 8   Q.  In May of 2009, and this was at a point in time where you
 9   expected that you were going to be prosecuted, correct?
10   A.  I'm sorry, sir, when did you say?
11   Q.  May of 2009.
12   A.  Yes, sir.
13   Q.  Again, your attorneys are telling the prosecutors that it
14   is an impossible stretch to find something for you to plead
15   too, is that correct?
16   A.  They may have said that, sir.
17           MR. MAZUREK:  Can we add that to the time line.
18   Q.  In May of 2009, your lawyers are telling the prosecutors
19   that they could not find anything for you to plead to because
20   you were innocent of the allegations, correct?
21   A.  Yes, sir.
22   Q.  From this point in time, from 1996 to 2009, sir, for the 13
23   years that you had been living with the work that you had done
24   and the work that you had defended, you continued to tell
25   everyone around you, everyone around you who would listen that
                     SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300
```

```
                                                                   2995
     D9undau6                         Mayer - cross
 1   the work that you did in the tax strategies was defensible and
 2   completely legitimate, didn't you?
 3   A.   Yes, sir.
 4   Q.   And anybody that worked with you and listened to you would
 5   have every reason to believe that they were working with
 6   someone who believed that he was just doing what lawyers do,
 7   correct?
 8            MR. OKULA:   Objection.
 9            THE COURT:   Sustained as to form.
10   Q.   Well, you told anyone that you worked with and anyone who
11   listened to you that you believed that what you were doing
12   during the course of all of those years, those 13 years,
13   Mr. Mayer, that you were just doing what lawyers do, correct?
14   A.   I don't remember making specific statements like that, but
15   certainly that could be inferred, sir.
16   Q.   Well, you did testify at this prior proceeding back in
17   March 2011, correct?
18   A.   Yes, sir.
19   Q.   And you gave sworn testimony then on March 24, 2011,
20   correct?
21   A.   Yes, sir.
22   Q.   And I refer counsel to page 3642 of the transcript, lines 2
23   through 5.   And you were asked this question just two years
24   ago:
25   "Q.   And anybody that worked with you and listened to you would
                    SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300
```

2

```
                                                                2996
     D9undau6                    Mayer - cross
 1   have every reason to believe that they were working with
 2   someone who believed that he was just doing what lawyers do?"
 3            And your answer, sir, was:  "Yes, sir."
 4            That's still your answer today?
 5   A.  I believe that could be inferred, yes, sir.
 6   Q.  Now, in June of 2009, you were indicted, correct?
 7   A.  Yes, sir.
 8   Q.  And in that same month, the government seized most of, if
 9   not all of, your family assets, correct?
10   A.  No, sir, not all.
11   Q.  A substantial portion?
12   A.  A substantial portion, yes, sir.
13   Q.  Most of your assets, correct?
14   A.  There was significant assets left available to us, sir.
15   Q.  In June of 2009, when your assets were frozen by court
16   order after your indictment?
17   A.  Yes, sir.
18   Q.  Enough assets that would enable you to pay for legal fees
19   to defend yourself?
20   A.  Yes, sir.
21   Q.  And leave enough left over for you to be able to sustain
22   your family?
23   A.  Yes, sir.
24   Q.  Where were these assets from?
25   A.  They were in various accounts, sir, that had not been
                      SOUTHERN DISTRICT REPORTERS, P.C.
                                (212) 805-0300
```

```
                                                                    2997
      D9undau6                      Mayer - cross
 1    identified by the government or traced by the government, sir.
 2    Q.  But these were accounts and monies that were the result of
 3    proceeds that you received as a result of the tax strategies,
 4    correct?
 5    A.  Some of them, sir, yes, sir.
 6    Q.  Well, I would say that most of them would be an accurate
 7    statement, correct?
 8    A.  Some of them, sir.
 9    Q.  What other income were you receiving during these years
10    other than income that you were receiving as a result of your
11    work on the tax strategies?
12    A.  My wife worked for a portion of the period of time under
13    consideration here.  I did other work at Altheimer & Gray
14    besides tax shelter work as well, sir.
15    Q.  Well, at the time -- this is June of 2009, correct?
16    A.  Yes, sir.
17    Q.  Your wife hadn't worked for ten years at that point in
18    time, correct?
19    A.  Yes, sir.
20    Q.  That's correct?
21    A.  Yes, sir.
22    Q.  So she was not making any income during the period from
23    about 1997 or 1998 and 2009, correct?
24    A.  I believe it was sometime around 1999 or so that she
25    stopped working.  I forget the exact date.
                      SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300
```

```
                                                            2985
     D9uedau5                    Mayer - cross
 1   you agreed to be interviewed by civil lawyers in connection
 2   with questions relating to these tax strategies, correct?
 3   A.  Yes, sir.
 4   Q.  And again, you voluntarily agreed to be interviewed at that
 5   time, correct?
 6   A.  Yes, sir.
 7   Q.  And you were trying to be truthful when you gave that
 8   interview to lawyers who were asking you questions about your
 9   clients' tax strategies, correct?
10   A.  Defending the transaction, sir.
11   Q.  And again, you told these civil lawyers in 2004, when you
12   were questioned, that you always explained to your clients the
13   need for a business purpose of making money, is that right?
14   A.  Wouldn't be surprised, sir.
15   Q.  But is that your recollection, that in talking to these
16   civil lawyers in 2004 --
17   A.  As best as I can recall, sir.
18   Q.  And you also tell these civil lawyers who interview you in
19   2004 regarding the strategy that the economic substance test
20   was met in all three strategies that you advised clients on?
21   A.  Most likely, sir.
22   Q.  And you told these civil lawyers who asked you -- and these
23   interviews took place over a number of days; I think these were
24   two different days of interviews that you agreed to give,
25   correct?
                    SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300
```

```
                                                              2986
   D9uedau5                      Mayer - cross
1   A.   I believe so.
2   Q.   And these were not under oath testimony, but it is -- the
3   lawyers were expecting you to be truthful to them, correct?
4   A.   Yes, sir.
5   Q.   And you told them that in the course of these two days of
6   voluntary interviews that you believed that the advice that you
7   gave to your hundreds of clients on the three strategies was
8   that the tax opinions were lawful, correct?
9   A.   Yes, sir.
10  Q.   If we can add that to the timeline.
11           And now where we are on the timeline, from the day of
12  your first advice to a client on one of these tax strategies --
13  it was in 1996 and 2004 -- this is eight years advising or
14  defending the tax strategies at this point, correct?
15  A.   Yes, sir.
16  Q.   And at this point in time you haven't told anyone that you
17  believed that what you were doing was assisting clients in
18  committing tax evasion, correct?
19  A.   Yes, sir.
20  Q.   Or that you yourself believed you had committed tax evasion
21  on your personal returns, correct?
22  A.   Yes, sir.
```

2

```
                                                              2987
     D9uedau5                      Mayer - cross
 1   correct?
 2   A.  I think that's right, sir.
 3   Q.  And as part of that you retained the services of lawyers to
 4   represent you, correct?
 5   A.  Yes, sir.
 6   Q.  And Mr. Okula asked you some questions about meetings that
 7   took place in the year 2005.  Do you recall that?
 8   A.  Vaguely, sir.  Yes, sir.
 9   Q.  Well, when you say "vaguely," 2005 you were being
10   investigated criminally, correct?
11   A.  I'm not sure that it centered on me at that point in time,
12   but there were criminal investigations going on, sir.
13   Q.  Well, you weren't sure it centered on you, but you knew
14   enough to retain counsel for yourself, correct?
15   A.  Yes, sir.
16   Q.  And this was a pretty significant moment in your life,
17   wouldn't you agree?
18   A.  Yes, sir, it was.
19   Q.  By the way, had you ever committed a crime before you
20   filled out your tax return in 1997?
21   A.  You mean other than traffic violations or things of that
22   nature, sir?
23   Q.  Yes.
24   A.  Nothing significant, no, sir.
25   Q.  So when you completed your tax return for the year 1997, I
                    SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300
```

2

                                                                2988
     D9uedau5                    Mayer - cross
1    guess you did it in 1998, and you made a conscious decision at
2    that point in time to file a return that you believed was not
3    truthful, is that right?
4    A.  Yes, sir.
5    Q.  That was a significant moment for you, I would imagine,
6    correct?
7    A.  Yes, sir.
8    Q.  And you decided to do that, again, because you didn't want
9    to pay about $40,000 in taxes; is that your testimony?
10   A.  That's the amount involved, sir.  Yes, sir.
11   Q.  Well, that's the reason why you did it, correct?
12   A.  Yes, sir, to generate the tax losses.
13   Q.  Not to pay those $40,000 in taxes, correct?
14   A.  Yes, sir.
15   Q.  And in 2005, now you are some years removed from when you
16   filled out your tax returns for the year 1997, and you're
17   retaining counsel on your behalf, correct?
18   A.  Yes, sir.
19   Q.  And at that point in time, after you did your first tax
20   shelter in 1997, you had advised literally hundreds of clients,
21   correct?
22   A.  Yes, sir.
23   Q.  And at that point in time you instructed your attorneys in
24   2005 to make a presentation to the federal prosecutors,
25   correct?
                    SOUTHERN DISTRICT REPORTERS, P.C.
                             (212) 805-0300

                                    3

```
                                                                    2989
     D9uedau5                        Mayer - cross
 1   A.  Yes, sir.
 2   Q.  And that presentation that you instructed your lawyers to
 3   make was to explain to them -- well, to explain to the
 4   prosecutors who were investigating the case that you believed
 5   whenever you gave legal advice to your clients on these
 6   transactions, that you were acting lawfully, correct?
 7   A.  Yes, sir, in essence.
 8   Q.  And you told them that -- to tell the prosecutors that you
 9   were a true believer in those transactions, correct?
10   A.  I don't know word for word, but in essence, yes, sir.
11            (Continued on next page)
12
13
14
15
16
17
18
19
20
21
22
23
24
25
                      SOUTHERN DISTRICT REPORTERS, P.C.
                               (212) 805-0300
```