

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York   10007*

October 17, 2013

VIA E-MAIL

The Honorable William H. Pauley
United States District Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

         Re:    United States v. Paul Daugerdas, *et ano*
                     S6 09 Cr. 581 (WHP)

Dear Judge Pauley:

      The United States respectfully submits this letter (1) in opposition to defendant Paul M. Daugerdas's ("Daugerdas") motion to preclude the testimony of witness Robert Coplan; and (2) in further support of the Government's request to admit GX 500-3 – an email in which co-conspirator Robert Coplan recounted advice that he gave to Daugerdas and others at J&G that the short options-based tax shelter being devised by Ernst & Young ("E&Y") and Jenkens & Gilchrist "had to be potentially profitable after ALL fees."   (GX 500-3) (emphasis in original). For the reasons set forth below, the motion to preclude should be denied, as none of the reasons articulated by Daugerdas justify the preclusion of the highly-relevant testimony Coplan can provide.   Moreover, as we demonstrate below, the Government has established that a conspiracy involving Coplan and Daugerdas existed at the time GX 500-3 was sent, and that GX 500-3 was a statement by a coconspirator during and in furtherance of that conspiracy. Therefore, GX 500-3 should be admitted pursuant to Rule 801(d)(2)(E).

      A.  Coplan's Testimony

      Coplan, a Georgetown Law graduate with an LLM in taxation and a former lawyer at the IRS Office of Chief Counsel, was a partner at E&Y who spearheaded that firm's development, sale, and defense of four tax shelters between 1999 and 2003.   Those tax shelters were COBRA, PICO, Contingent Deferred Swap ("CDS"), and CDS Add-On.   As pertinent here, COBRA was similar to the J&G short options tax shelter except for the enhanced economics that E&Y insisted be included with respect to the potential returns from the clients' options transaction.   In

particular, during the development of COBRA in the Fall of 1999, Coplan and others at E&Y participated in conversations with Daugerdas during which Coplan and his colleagues reported to Daugerdas that E&Y did not accept Daugerdas's purported position that the J&G fees could be disregarded when conducting a profitability analysis of the COBRA tax shelter.   As a result of E&Y's unalterable position on this point, which was imparted to Coplan by Ron Friedman, a top technical partner at E&Y, J&G agreed to co-promote, implement, and serve as one of the opinion letter writers for COBRA, whose economics that were far superior to those of J&G's short options transaction --- i.e., the potential return on the COBRA options had the ability to surpass all the fees.

        In addition to implementing over a dozen COBRA transactions with J&G in late 1999, Coplan participated in the design of CDS Add-On.   That tax shelter was designed by appending a COBRA tax shelter (which, like J&G's short options shelter, eliminated all taxes), to a CDS tax shelter, which was designed as a deferral, rather than an elimination, strategy.   In essence, Coplan and others decided to make available to those CDS clients who had deferred taxes through CDS in earlier years an "add-on" product --- viz., COBRA --- that could then eliminate all the taxes that had been deferred.   Thus viewed (and contrary to the suggestion of Daugerdas), CDS Add-On was just like J&G's short options transaction in that it was based on the identical tax play and same type of European-style digital currency options.

        Although Coplan and his partners set out to design CDS Add-On with economics, like COBRA, that could result in options returns that could overcome all the fees paid to the promoters (including those paid to an opinion letter writer), Coplan learned after the implementation of those Add-On transactions that the options returns could not, in fact, overcome all the fees.   Despite learning this crucial fact, Coplan continued to falsely defend the economic substance of those transactions in IRS audits and was convicted of tax evasion as a result.   Coplan was also convicted of conspiring to defraud the IRS by engaging in a massive scheme to impede and obstruct the IRS by, among other things, lying to the IRS about the reasons why the E&Y clients pursued the four above-mentioned tax shelters, and urging colleagues at E&Y to purge their files of documents pertaining to the marketing of the shelters.

        B.   Daugerdas's Challenge to Coplan's Testimony

        Daugerdas opposes the Coplan testimony on two principal grounds.   First, Daugerdas maintains that the Government is calling Daugerdas for the improper purpose of impeaching him with his own convictions.   Second, invoking Rule 403, Daugerdas maintains that Coplan's testimony regarding his advice to Daugerdas --- to the effect that all costs and fees need to be considered when judging the profitability of a tax shelter transaction --- is unduly prejudicial and needlessly cumulative of the Blanchard memo.   Daugerdas also seeks a proffer of the proposed Coplan testimony or pre-testimony voir dire in order to determine the potential relevance of any testimony from Coplan.   None of Daugerdas's arguments has any merit.

        Coplan's first argument requires little discussion because the Government does not intend to call Coplan for the sole purpose of impeaching his testimony.   On the contrary, the

Government intends to elicit from Coplan testimony highly relevant to its case.   More particularly, the Government would elicit from Coplan the fact that he and others at E&Y told Daugerdas that E&Y (collectively as a firm) did not and would not accept Daugerdas's unprecedented view that J&G's fees could be disregarded in any economic substance "profitability" analysis.   Consequently, the COBRA economics (as designed and implemented in part through Daugerdas's own efforts) were such that the clients' potential return could overcome all the fees.   Given this core, corroborating aspect of Coplan's proposed testimony, there is simply no legal bar to his testimony.   United States v. Eisen, 974 F.2d 246, 262-63 (2d Cir. 1992) ("where the Government has called a witness whose corroborating testimony is instrumental to constructing the Government's case, the Government has the right to question the witness, and to attempt to impeach him, about those aspects of his testimony that conflict with the Government's account of the same events").   Finally, Coplan's proposed testimony is not unfairly or improperly cumulative.   Unlike the Blanchard Memo, the proposed testimony of Coplan constitutes a direct communication to Daugerdas that his legal position had been rejected by E&Y and could not form the basis of any collaborative tax shelter.   This proof constitutes devastating and direct notice to Daugerdas that his legal position was untenable.   This proof thereby supports the inference that Daugerdas knew his so-called position was unlawful.

The fact that the Government may elicit an acknowledgment from Coplan that he was convicted based on his tax shelter conduct does not change the analysis.   Indeed, the Federal Rules of Evidence specifically allow a party to impeach its own witness.   Moreover, if the Government were not allowed to impeach Coplan regarding his undisputed fraud activities, the jury would be left with a factually inaccurate or skewed view of Coplan, who, after all, has been brought from his BOP facility involuntarily to testify as a sentenced federal prisoner and who, through his CDS Add-On activities, violated the very economic substance rules that guided his construction of the potentially profitable COBRA economics.   Finally, the fact of Coplan's conviction is directly relevant to rebut Daugerdas's opening statement in which he argued that the case against Daugerdas is tantamount to an IRS effort to single out Daugerdas for prosecution.   Tr. 56 ("[T]hey brought this case against the tax lawyer for aggressively pursuing his profession.   It's easier to shoot the messenger. . . . The IRS objective is to crush Paul and send a message that you can't beat the IRS at its own game.").   Stated simply, the Government's efforts to prosecute tax cheats is not, as Daugerdas inaccurately suggested in his opening, a singular effort to focus on Paul Daugerdas.   In sum, because Coplan can provide testimony directly relevant to issues in the case, there is no reason to bar that testimony, or any impeachment of Coplan regarding his convictions.   Nor is there any need for voir dire, given the outline of Coplan's testimony noted above.

C.   Government Exhibit 500-3

By motion dated August 2, 2013, the Government moved for admission of GX 500-3. The Government argued that GX 500-3 was a co-conspirator statement made in furtherance of a conspiracy involving, among others, Coplan and Daugerdas.   The defendant opposed the Government's motion on August 9, 2013.   The defendant argued, inter alia, that any conspiracy

involving Coplan and Daugerdas had ended by the time GX 500-3 was sent and that, in any event, the email is inadmissible pursuant to Federal Rule of Evidence 403.

At the close of the pre-trial argument on August 29. 2013 concerning the admissibility of GX 500-3, the Court decided to reserve decision on the issue, but informed the parties that its "inclination is that the Government needs to demonstrate the existence of an ongoing conspiracy at the time the e-mail is sent in order to overcome the defendants' hearsay objection."   (Aug. 29, 2013 Oral Arg. Tr. 21-22.).

Rule 801(d)(2)(E) states that out-of-court statements are not hearsay if they were made "by a coconspirator of a party during the course and in furtherance of the conspiracy."   To admit a statement under Rule 801(d)(2)(E), the Court must find by a preponderance of the evidence "(a) that there was a conspiracy, (b) that its members included the declarant and the party against whom the statement is offered, and (c) that the statement was made during the course of and in furtherance of the conspiracy."   United States v. Farhane, 634 F.3d 127, 161 (2d Cir. 2011) (internal quotation marks omitted); see also Bourjaily v. United States, 483 U.S. 171, 175-76 (1987).

A district court "may properly find the existence of a criminal conspiracy where the evidence is sufficient to establish, by a preponderance of the evidence, that 'the . . . alleged coconspirators entered into a joint enterprise with consciousness of its general nature and extent.'" In re Terrorist Bombings of U.S. Embassies in E. Africa, 552 F.3d 93, 137-38 (2d Cir. 2008). Although Rule 801(d)(2)(E) "'requires that both the declarant and the party against whom the statement is offered be members of the conspiracy, there is no requirement that the person to whom the statement is made also be a member.'" In re Terrorist Bombings, 552 F. 3d at 139 (quoting United States v. Beech-Nut Nutrition Corp., 871 F.2d 1181, 1199 (2d Cir. 1989)).

Daugerdas is simply wrong in contending that there was no existing conspiracy at Ernst & Young, or between E&Y and Jenkens & Gilchrist with respect to ongoing tax shelter activities.   In fact, the communications between E&Y and J&G show a steady stream of communications between 2000-2002 relating to the winding down of the COBRA transactions and the defense of those transactions with respect to the IRS.   Moreover, the communications show that in mid-2001 --- at the very time that Coplan communicates to Richard Joyner, another E&Y tax partner, about his prior conversations with Daugerdas (as evidenced by GX 500-3) --- E&Y had signed a new confidentiality agreement sent by Daugerdas to Coplan, in connection with Coplan's consideration on behalf of E&Y whether to participate in the BART transaction, which was the predecessor to HOMER.

D. The COBRA Communications

Although the E&Y/J&G COBRA transactions were implemented at the very end of 1999, the tax reporting and defense of those transactions, as well as the winding down of the entities utilized in the transactions, continued for a number of years and were the subject of ongoing communications between E&Y and J&G.   For instance, in response to an internal E&Y request

- 4 -

for guidance on how to terminate the LLCs that had been used to carry out the COBRA transactions, Coplan wrote to Donna Guerin and Paul Daugerdas on November 13, 2000 seeking instruction from J&G on this topic.   On November 17, 2000, Guerin wrote to Coplan and explained how to "dissolve" the LLCs and S-Corporations that were set up by J&G and E&Y and used by their joint clients in the COBRA transactions.   See Exh. A, attached hereto. Similarly, in July 2001, Coplan wrote to Daugerdas concerning the audit of a mutual COBRA client in which the IRS had requested copies of the opinion letters issued by J&G to the clients and their entities, as well as any "contracts and invoices" between the tax shelter entities and J&G.   Upon receiving Coplan's request, Daugerdas forwarded Coplan's e-mail to Guerin and Erwin Mayer and asked whether they had "any suggestions." See Exh. B, attached hereto.   As late as April 2002, Coplan requested from Daugerdas an electronic version of the J&G opinion letter issued in "our transactions" in order that E&Y could employ the facts section of that opinion in creating a "template" amnesty disclosure to be submitted to the IRS.   See Exh. C, attached hereto.   (It bears mention that Coplan was convicted at trial based on false statements he made to the IRS in 2001 and 2002 concerning the defense of E&Y's tax shelter transactions.)

      E.    The Communications Concerning BART

      The proof at trial has shown that J&G was meeting with Bank One officials in mid-2001 concerning the creation of the BART tax shelter, which eventually morphed into HOMER. Communications between J&G and E&Y demonstrate that J&G was seeking to involve E&Y in the BART transaction in May and June 2001.   Indeed, Daugerdas drafted and sent to Coplan a new confidentiality agreement dated May 14, 2001, which Coplan executed on May 21, 2001 and faxed back to Daugerdas on the same day.   See Exh. D, attached hereto.   Two days later, on May 23, 2001, Belle Six (a co-conspirator in the E&Y trial who helped market and sell E&Y tax shelters) corresponded with Paul Daugerdas, Jeff Conrad at Bank One, and others in an e-mail entitled "BART E&Y Update."   In the e-mail, Six reported that she had had a telephone call with E&Y concerning BART and that she had "confidence that this [BART] has a fair shot at going forward" for E&Y clients who had participated in an E&Y tax shelter named "Add On." Six added that she had "sent Bob Coplan" and another E&Y official the BART tax shelter opinion.   After receiving this e-mail, Daugerdas forwarded it to Guerin and John Beery the following day, May 24, 2001. See Exh. E, attached hereto.

      Finally, on June 5, 2001, Belle Six sent a follow-up e-mail to Daugerdas, Conrad, and others concerning further communications with Coplan and E&Y in order to enlist E&Y to participate in BART.   In particular, Six stated that: (1) Jeff Conrad and Six had participated in a telephone call with Coplan regarding BART the same morning; (2) Six had an additional call with Coplan in the afternoon for "next steps" in the process; (3) Coplan was "extremely positive" after the calls, and wanted to see the transaction go forward with certain E&Y clients; and (4) it would be "beneficial to Bob [Coplan]" if he could see the revised opinion letter for the transaction.   Six then thanked Daugerdas for "turning that [the opinion letter] around," and also thanked Conrad for "participating," presumably in the opinion letter revisions.   Six ended by noting that she planned to have a follow-up call with E&Y the following week, declaring "We are still alive!"   The day after receiving the aforementioned e-mail, Daugerdas forwarded it to

Guerin and Beery --- the two J&G attorneys who worked most with Daugerdas on HOMER --- with a short note: "FYI."   See Exh. F, attached hereto.

      F.    GX 500-3 Was a Statement in Furtherance of an Ongoing Conspiracy

      To be in furtherance of a conspiracy, the statement must in some way have been designed to promote or facilitate achievement of goals of the ongoing conspiracy.   Thus, statements are in furtherance of a conspiracy if they, among other things, (1) inform or provide an update as to the status or progress of the conspiracy, see United States v. Desena, 260 F.3d 150, 158 (2d Cir. 2001); United States v. Rastelli, 870 F.2d 822, 837 (2d Cir. 1989); United States v. Diaz, 176 F.3d 52, 88 (2d Cir. 1998); (2) "prompt the listener . . . to respond in a way that promotes or facilitates the carrying out of a criminal activity," United States v. Maldonado-Rivera, 922 F.2d 934, 958 (2d Cir. 1990); (3) "seek to induce a co-conspirator's assistance," Desena, 260 F.3d at 158; (4) "provide reassurance," id.; (5) "serve to foster trust and cohesiveness," id.; (6) "facilitate and protect" the conspiratorial activities, United States v. Diaz, 176 F.3d at 88; or (7) inform a co-conspirator of "the identity and activities of his coconspirators," Rastelli, 870 F.2d at 837.   A statement must be more than "idle chatter," United States v. Lieberman, 637 F.2d 95, 102-03 (2d Cir. 1980), or "a merely narrative description by one co-conspirator of the acts of another."   Desena, 260 F.3d at 158.   But a narrative description of a past event is admissible as long as it serves "some current purpose in the conspiracy."   United States v. Thai, 29 F.3d 785, 813 (2d Cir. 1994) (tape-recorded conversations about past events served current purpose of giving another co-conspirator confidence to carry out his assignment); see also Farhane, 634 F.3d at 162 (rejecting defendant's claim that statements were "idle chatter;" seeking to persuade an undercover agent that declarant and co-conspirator were trustworthy furthered conspiracy).

      Here, because Coplan's statement satisfies the aforementioned criteria, GX 500-3 should be admitted.   Coplan's e-mail is a classic co-conspirator statement ─ a statement by a member of the conspiracy (Coplan) to another (Joyner) as part of an e-mail chain reciting past dealings with Daugerdas and J&G, and discussing the conditions under which E&Y will proceed with the signing of tax returns for tax shelter participants in certain situations.   The e-mail also discusses the structure of tax shelter transactions that Coplan would find acceptable.   GX 500-3, at 1 ("I would sign off on the right decision last year and this year . . . ."). Coplan specifically advised Daugerdas that Daugerdas's position on the exclusion of fees was untenable, leading to a change in the economics of the COBRA transaction.   Those conversations are plainly admissible under Rule 801.

      Finally, the admissibility of GX 500-3 does not depend on whether Coplan is called as a witness in this trial. Stated simply, because the e-mail satisfies the criteria of Rule 801(d)(2)(E), Coplan's availability is irrelevant to the issue of admissibility.   Thus, the Court should allow the admission of GX 500-3, even if the Court were to deem Coplan's testimony violative of Rule 403 or otherwise inadmissible.

4c

G.   Conclusion

Daugerdas's motion seeking to preclude the testimony of Coplan should be denied.    In addition, the Government respectfully requests that the Court permit the admission of GX 500-3 as a statement in furtherance of a conspiracy pursuant to Rule 801(d)(2)(E).

Respectfully submitted,

PREET BHARARA
United States Attorney
Southern District of New York


By: __/s/Stanley J. Okula, Jr._____
Stanley J. Okula, Jr.
Nanette L. Davis
Niketh Velamoor
Assistant United States Attorneys
Tel.: (212) 637-0054 (during trial)

cc: Defense Counsel of Record
        By email