D9jndau1

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   UNITED STATES OF AMERICA,

 4              v.                          09 CR 581 (WHP)

 5   PAUL M. DAUGERDAS and
     DENIS M. FIELD,
 6

 7              Defendants.

 8   ------------------------------x
                                          New York, N.Y.
 9                                        September 19, 2013
                                          10:00 a.m.
10   Before:

11                  HON. WILLIAM H. PAULEY III

12                                        District Judge

13                        APPEARANCES

14   PREET BHARARA
          United States Attorney for the
15        Southern District of New York
     BY:  STANLEY J. OKULA, ESQ.
16        NANETTE DAVIS, ESQ.
          NIKETH VELAMOOR, ESQ.
17        Assistant United States Attorneys

18   CLAYMAN & ROSENBERG
          Attorneys for Defendant Daugerdas
19   BY:  HENRY MAZUREK, ESQ.
          BRIAN D. LINDER, ESQ.
20
     KOSTELANETZ & FINK, LLP
21        Attorneys for Defendant Field
     BY:  SHARON McCARTHY, ESQ.
22             and
     THE LAW FIRM OF CÉSAR de CASTRO, P.C.
23        Attorneys for Defendant Field
     BY:  CÉSAR de CASTRO, ESQ.
24
     Also Present:  Christine Mazzella,
25                  Special Agent Internal Revenue Service
```

D9jndau1

```
 1                 (Trial resumed)

 2                 (In open court; jury not present)

 3     ROBERT GREISMAN, resumed.

 4                 THE COURT:  Any issues?

 5                 MS. DAVIS:  No, your Honor.

 6                 MR. MAZUREK:  Judge, I wanted to put one thing on the

 7     record in response to the Rule 806 issue.  If you want to do

 8     that at lunch and you are anxious to get the jury started, I

 9     can do it then.

10                 THE COURT:  Why don't we do it at the break.

11                 MR. MAZUREK:  OK.

12                 THE COURT:  OK.  Great.  The jury is all here.  Let's

13     bring in the jury.

14                 (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25
```

D9jndau1

```
 1              (Jury present)
 2              THE COURT:  Everyone may be seated.  Good morning,
 3    members of the jury.
 4              JURORS:  Good morning, your Honor.
 5              THE COURT:  Members of the jury, thanks again for your
 6    punctuality.  It is another bright morning in New York.  We are
 7    going to continue now with the trial and resume where we left
 8    off yesterday afternoon with Ms. Davis' continued direct
 9    examination of Mr. Greisman.
10              Mr. Greisman, do you understand, sir, that you
11    continue to be sworn as a witness under oath in this proceeding
12    now on trial?
13              THE WITNESS:  I do, your Honor.
14              THE COURT:  Very well you may proceed.
15              MS. DAVIS:  Thank you, your Honor.
16    DIRECT EXAMINATION
17    BY MS. DAVIS:
18    Q.  Mr. Greisman, if you would take Government Exhibit 200-146
19    contained in your file.
20              Do you have that in front of you?
21    A.  I do.
22    Q.  Do you recognize that document?
23    A.  I do.
24    Q.  What is it?
25    A.  An e-mail to Donna Guerin from Paul Shanbrom, copy to me
```

D9jndau1                       Griesman - direct

1    and to Paul Daugerdas, dated February 25, 1999, with the

2    subject, Follow-up items, please respond.

3    Q.   Did those items relate to the implementation of the Jenkens

4    & Gilchrist tax shelters that BDO was selling?

5    A.   Yes, they did?

6             MS. DAVIS:   The government offers 200-146.

7             MR. LINDER:   No objection.

8             MR. DE CASTRO:   No objection.

9             THE COURT:   Government Exhibit 200-146 is received in

10   evidence.

11            (Government's Exhibit 200-146 received in evidence)

12            MS. DAVIS:   May I publish it.

13            THE COURT:   You may.

14            MS. DAVIS:   If you would, Ms. Torres, enlarge down

15   through the first two numbered paragraphs.

16   BY MS. DAVIS:

17   Q.   In February of '99, what essentially is the stage that BDO

18   was at in terms of the implementation of the 1998 short sale

19   tax shelters?

20   A.   The 1998 short sale tax shelters, the eight or so that BDO

21   had, had all been completed by the end of the year in terms of

22   the steps that had to be done before the end of the year.  At

23   this point it was tax return preparation, opinion preparation

24   by Jenkens, and the filing, ultimate filing of the tax returns

25   by April 15 of '99.

D9jndau1                         Griesman - direct

1    Q.   If you would, just read the paragraphs out loud, please.

2    A.   One and two?

3    Q.   Starting with the beginning, Donna.

4    A.   Donna, I had left you a voice mail message a couple days

5    ago, but haven't heard back from you, so I thought I would try

6    the e-mail route since I will be out of town through 2/28.

7    Some of these items need an immediate response due to filing

8    deadlines approaching for corporate returns.

9            When we spoke approximately four weeks ago, you had

10   indicated that you would be putting together an information

11   package on each of the clients I referred to you for 1998

12   transactions, including information such as entities set up, ID

13   numbers, etc.  I still have not received any information from

14   you, and I am getting concerned since corporate returns are due

15   in just over two weeks.  Although at this point we will

16   probably be extending the returns, I would like to get this

17   information as soon as possible so we are not pressing up

18   against the deadline.  Please forward as soon as possible.

19           Please let me know when you expect to have the

20   opinions completed for the clients I referred to you for 1998

21   transactions.  Some have gotten us their information, and we

22   would like to have a better idea for internal scheduling

23   purposes as to when the remaining information will be

24   forthcoming.  Although your opinion will not directly affect

25   the tax return, I do not want to issue the returns until the

D9jndau1                        Griesman - direct

1    opinions are issued.

2    Q.   The reference to the filing deadline for corporate tax

3    returns, what is that deadline?

4    A.   That deadline is March 15, 1999.

5    Q.   How did that relate to the tax returns that were being

6    prepared for the 1998 short sale tax shelter clients?

7    A.   You will remember that I testified that an S corporation

8    was one of the entities that was used in the transaction, and

9    the S corporation requires an S corporation return, which is a

10   corporate tax return that is due at March 15.

11   Q.   In this period in early 1999, what was the return

12   preparation process at BDO with respect to the tax shelter

13   clients?

14   A.   The tax returns would be prepared by whoever would normally

15   prepare returns for that client.  So if it was a BDO client,

16   whichever person was assigned to that client would be

17   responsible for preparing returns.  Some of the shelter clients

18   were not BDO clients, so whoever normally handled their tax

19   returns would handle return preparation.

20   Q.   So, as an example, I think we saw on the chart yesterday

21   that for one of your short sale clients, Steve Ferrara, was the

22   relationship partner?

23   A.   Correct.

24   Q.   Is that right?

25   A.   Yes.

D9jndau1                    Griesman - direct

1  Q.  So would he be the one to have oversaw the tax return

2  preparation if that was a pre-existing client?

3  A.  Generally, if that person -- Steve Ferrara happened not to

4  be a tax person, he was a relationship person.  He was an audit

5  person.  So I was a tax person, I oversaw it.  But in general,

6  if he had been a tax person, he would have been the one

7  handling the tax return preparation.

8  Q.  Just so the record is clear, when BDO had rolled out the

9  short sale tax shelter product, were the sales of that limited

10  to just tax partners at BDO?

11  A.  No.

12  Q.  In other words, was it possible for a BDO audit partner to

13  refer a client for a Jenkens tax shelter?

14  A.  Not just possible, but highly encouraged.

15  Q.  Just to clarify, the tax return preparation, the final

16  signing of the return by BDO that was predicated on the receipt

17  of what document from Jenkens & Gilchrist?

18  A.  The tax opinion.

19        MS. DAVIS:  If you would, Ms. Torres, enlarge

20  paragraph No. 3, please.

21  Q.  Could you just read that paragraph, please.

22  A.  Please give me an update on the Asher situation.  For

23  example, when will you be writing that opinion, is it still

24  being issued from A & G with the fees being paid to A & G and

25  when BDO should reasonably expect our portion of the fees, and

D9jndau1                        Griesman - direct

1   will you assist us in facilitating the payment of our fee.  As

2   we have discussed before, my referral source on this

3   transaction is very anxious to get resolution to this matter,

4   and has been quizzing me quite a bit on these questions.  I

5   understand that you still probably have issues that you are

6   still working out with your severance; however, I still have I

7   still have my referral source to answer to since he will be

8   getting a chunk of the BDO fee and I'm trying to get more

9   referrals from him.  So please try to help me out with these

10  questions.

11  Q.  What is the issue that is back raised another with regard

12  to the reference to A & G?

13  A.  A & G is Altheimer & Gray.  And if you recall I testified

14  yesterday that either Donna Guerin or Paul Daugerdas informed

15  me right after the first of 1999 that they were switching firms

16  from Altheimer & Gray to Jenkens & Gilchrist.

17  Q.  So that was an issue related to that switchover in terms of

18  which entity would be issuing the opinion for the Asher client?

19  A.  That's correct.

20  Q.  Do you see Mr. Shanbrom's reference to a referral source?

21      Was BDO paying other people or entities referral fees

22  for the purpose of referring Jenkens & Gilchrist tax shelter

23  clients?

24  A.  Yes, it was.

25  Q.  Was there some sort of set fee for those what I'll call

D9jndau1                          Griesman - direct

1   third-party referral sources?

2   A.   Yes.

3   Q.   Do you recall what that was?

4   A.   I believe it was 20 percent of what BDO received.

5           MS. DAVIS:   If we could enlarge the last paragraph,

6   No. 5, on this.

7           Could you read that, please.

8   A.   As I mentioned in my phone mail, the CTA deal is still not

9   closed, which is why I haven't gotten back to you regarding the

10  fees.  At this point the capital gain appears to be between $30

11  and 31 million.  As we previously discussed, you will not have

12  to pay BDO an advisory fee on this one.  I am still trying to

13  work that fee out with them, and it still appears that you will

14  get your fee up front.  My question is, would you be willing to

15  go as low as 2.75 percent of the gain if necessary, since you

16  will not be having to pay BDO, or do I have to try to stick to

17  three percent?

18  Q.   With regard to this, what did you understand Mr. Shanbrom

19  to mean when he said that you will not have to pay BDO an

20  advisory fee on this one?  Did that mean BDO was not getting a

21  fee?

22  A.   No.  What he's referring to is, and what he's referring to

23  as the advisory fee in quotes is the referral fee that Jenkens

24  would pay to BDO.  And what he's suggesting here is that,

25  instead of the normal arrangement, where Jenkens charges the

D9jndau1                          Griesman - direct

1    client 3 percent and gives BDO .8 percent and keeps 2.4, 2

2    percent, whatever the number was, in this case, Jenkens would

3    just charge their net fee and let BDO charge the client

4    directly for the fee.

5    Q.  Was that practice actually implemented at BDO with regard

6    to Jenkens & Gilchrist tax shelter clients, to your knowledge?

7    A.  It became implemented, yes.

8              MS. DAVIS:  And if we could republish, your Honor,

9    Government Exhibit 301-216 already in evidence.

10             THE COURT:  You may.

11   BY MS. DAVIS:

12   Q.  You might recall when we ended yesterday, Mr. Greisman we

13   were looking at paragraph 2 on this.

14             MS. DAVIS:  Could I have that enlarged, Ms. Torres.

15   Q.  Now, you talked about some research that you did with

16   regard to the issue of whether the Jenkens & Gilchrist fee

17   could be characterized as a transaction cost.

18             Do you recall that?

19   A.  Yes.

20   Q.  Did you actually go and read cases on it?

21   A.  I did some research.

22   Q.  What did that research entail?

23   A.  I think it was looking for cases, I guess reading cases

24   that I found and looking for articles and other sources.

25   Q.  Was this a definitively decided issue based on your

D9jndau1                          Griesman - direct

1   research?

2   A.  I think it was a little bit of a fuzzy issue, you know,

3   there was an indication, but I wouldn't say it was a clearly

4   conclusive answer.

5           MS. DAVIS:  And if you would go down to the next

6   paragraph, Ms. Torres, in the document?

7   Q.  Could you read that to the jury, please.

8   A.  Internal Revenue Code Section 6662(d)(2)(C) provides that

9   the accuracy related penalty does not apply to noncorporate

10  taxpayers involved in tax shelters if the taxpayer reasonably

11  believed that the tax treatment of such items was more likely

12  than not proper.  It is generally accepted that a tax opinion

13  will provide a basis for a taxpayer to have such a reasonable

14  belief.  Jenkens & Gilchrist charges a fee for their opinion

15  that is based upon a percentage of the tax saved.  In addition,

16  they do the legal work, which is minimal, associated with

17  forming and dissolving entities, and they manage the process of

18  the short sale transaction, which also appears to involve

19  minimal time.  Ryan & Sudan, who issues a tax opinion that is

20  essentially identical with the J & G opinion, charge a flat

21  fee, $100,000, and do not provide any other legal fees

22  associated with the transaction.

23  Q.  So when you were testifying yesterday about the reasonable

24  reliance of the tax --

25          THE COURT:  I think he misread the last line.  He said

1    do not provide any other legal fees associated with the

2    transaction.

3    Q.  Could I just have you read the last line again,

4    Mr. Greisman?

5    A.  And to not provide any other legal services associated with

6    the transaction.

7         MS. DAVIS:  Thank you, your Honor.

8    Q.  When you were testifying yesterday about the reliance of

9    the taxpayer on the opinion letter, is this sort of the legal

10   underpinning of that reliance?

11   A.  Yes.

12   Q.  And Ryan & Sudan, did you have a familiarity with that law

13   firm?

14   A.  Not really, no.

15   Q.  How did you come to learn of Ryan & Sudan?

16   A.  I started to describe yesterday the telephone call from

17   Mr. Bee where he said, you know, giving me a heads-up, we might

18   have to terminate the relationship with Jenkens.  In a shortly

19   thereafter, subsequent call he indicated that -- this is

20   Mr. Bee indicated to me that he was aware of this firm, Ryan &

21   Sudan, and that they prepared the same tax opinions on a flat

22   fee basis and asked me to consult with them to see if they

23   would do it for us.

24   Q.  Did you, in fact, consult with them?

25   A.  I did.

D9jndau1                          Griesman - direct

1   Q.  Did you take any action with regard to using Ryan & Sudan

2   for Jenkens & Gilchrist tax shelters?

3   A.  We did not, no.

4   Q.  Why not?

5   A.  It just -- there was some back and forth.  Ryan & Sudan

6   didn't seem that interested, and just Charlie Bee instructed me

7   to just keep things the way they are, and so that's how it

8   went.

9           MS. DAVIS:  Can you go do down not next paragraph,

10  Ms. Torres, which is actually just one line on this page and

11  then we will have to move to the next page.

12  Q.  If you can go ahead and read that paragraph.

13  A.  Based on our prior experiences, the type of situations we

14  expect to encounter are as follows.

15  Q.  And then if you could just read those numbered paragraphs,

16  please?

17  A.  Ongoing clients of the firm where we regularly render tax

18  and other consulting advise to both the individual and entity

19  taxpayers, and where we have the opportunity to provide

20  meaningful tax advice that would justify a substantial fee,

21  equivalent perhaps to 1 percent to 3 percent of the gain, in

22  connection with a transaction that gives rise to a capital

23  gain.  Examples of these situations are the sale of assets by

24  an S corporation where both the shareholders and the

25  corporation are our clients, or the sale of the stock of a C

D9jndau1                        Griesman - direct

corporation where there is planning in connection with that
transaction and where both the C corporation and the
shareholders are our clients.

Q.  Let me stop you there and just have you explain what a C
corporation is.

A.  A C corporation is a regular company, a regular
incorporated entity which is taxed.  It provides legal
liability to the shareholders.  It's considered a person or
entity unto itself.  For legal purposes for tax purposes, it is
a taxpayer.

Q.  And an S corporation is it a taxpayer?

A.  It is not a taxpayer.  It files a return, but the
shareholders or the owners of the S corporation pay the taxes.

Q.  Going down to paragraph 2.

A.  Individuals, both ongoing clients and nonclients, that are
generating a capital gain that does not involve a transaction,
such as the sale of a public company stock on the open market.

Q.  And just when you say they are generating a capital gain
that does not involve a transaction, what do you mean by that?

A.  You know, the transactions are referring to somebody who
perhaps owns a business that might or my not be our client and
they sell the business.  The reference here is to if somebody
owns a stock that, maybe it's been in the family for
generations and has gone up in value greatly and they just call
their stockbroker and sell the stock.

D9jndau1                         Griesman - direct

1    Q.  And paragraph 3.

2    A.  Individuals, both ongoing clients and non-clients, that are

3    generating large ordinary income that does not involve a

4    transaction, such as the exercise of a stock option.

5    Q.  And I think you testified yesterday that ordinary income

6    might be something like salaries or wages, is that correct?

7    A.  Yes.

8            MS. DAVIS:  Could you go down to the next paragraph,

9    Ms. Torres.

10   Q.  If you could read that, Mr. Greisman.

11   A.  Going forward, we have the opportunity to minimize clients

12   of exposure to penalties in one of two ways.

13           First, we can execute the short-sale transaction and

14   retain appropriate legal counsel for the entity formation and

15   dissolution and retain R & S to issue the tax opinion.

16   Assuming that we are able to charge for tax planning and other

17   consulting services in connection with the transaction giving

18   rise to the gain, such as might occur in facts similar to those

19   in situation 1 above, we have the opportunity to avoid any

20   transaction costs for the short sale to be charged against the

21   profit.  The fee paid for the tax opinion is not a cost of the

22   transaction, and at the level of $100,000, where the law firm

23   provides no additional tax services, is presumed not to be in

24   danger a recharacterization as a transaction cost.  In facts

25   like those in situations 2 and 3 above where we have no

D9jndau1                          Griesman - direct

reasonable opportunity to provide meaningful tax consulting or

planning with respect to the gain-generating transaction, we

will be limited as to the amount of transaction consulting fees

we can charge.  Hence, we may either decline sales in those

situations, or we may charge a fee that is one that, when set

against the expected profit from the short sale trade, would

not diminish the expectation/possibility of a profit.

Q.  And if you could, just focusing on the phrase, that is

presumed not to be in danger of a recharacterization as a

transaction cost, what do you mean there?  In the sentence with

the reference to the $100,000.

A.  That tax opinion would be pure legal advice and would not

be considered under the law as we understood it at the time as

a transaction cost.

Q.  Did you have any impediments to your knowledge,

Mr. Greisman, in doing the short-sale transaction on your own

with Ryan & Sudan as counsel rather than through Jenkens &

Gilchrist?

A.  Well, the issue at the time, the issue in my mind was

the -- and this would be an impediment -- the ability to manage

the trade process part of this, that BDO was not an investment

firm, didn't give investment advice, and perhaps couldn't

manage the steps all that well in terms of that aspect of it.

Q.  In the latter part of the paragraph, you present two

alternatives, one being to decline the sales, not go forward;

D9jndau1                          Griesman - direct

1    the other would be to charge a smaller fee.  Am I reading that

2    correctly?

3    A.  Yes, you are.

4    Q.  Did BDO adopt either of those alternatives?

5    A.  No, it did not.

6    Q.  Who was in a position -- withdrawn.

7             Who was in the position, Mr. Greisman, to adopt one of

8    those two alternatives?

9    A.  The BDO tax leadership solutions leadership group, Denis

10   Field, Charlie Bee and Adrian Dicker.

11   Q.  Were you in a position to make that decision?

12   A.  No, I was not.

13   Q.  And did BDO's fees on the Jenkens & Gilchrist tax shelter

14   clients ever decrease, to your knowledge?

15   A.  No, they did not.

16   Q.  Did they go the other way?

17   A.  They -- yes, they did.

18   Q.  They increased from the original fee structure?

19   A.  Well, by this point in time they had already increased from

20   the original 3 percent to as high as 8 percent.

21   Q.  Looking down at the next paragraph that starts, The second

22   opportunity, could you read that, please.

23   A.  The second opportunity to minimize exposure to penalties is

24   to work with J & G to reengineer their fee structure so as to

25   separate out the fees for the tax opinion from other tax and

1    legal consulting they provide in connection with a transaction

2    that gives rise to a capital gain, such as the sale of a

3    business.  Further, our payment for services would have to come

4    directly from the client rather than from J & G for consulting

5    services rendered.  In this fashion we would attempt to avoid

6    any potential recharacterization of fees as fees that would be

7    profit-reducing transaction costs.  As with the first approach,

8    described in the previous paragraph, this would necessitate

9    avoidance of factual situations like those in points 2 and 3

10   above, where there is no realistic opportunity for tax or legal

11   consulting on the gain transaction.  Further, it would require

12   J & G willingness to reengineer fees.  As discussed more fully

13   below, based on a preliminary conversation I had with Paul

14   Daugerdas of that firm, they are willing to work on other fee

15   structures so long as the total compensation they would earn is

16   not reduced.

17   Q.  If you could continue reading.

18   A.  Issues discussed, but not resolved, relative to the first

19   approach above, our execution of the transaction with a tax

20   opinion from R & S, include the following.

21        Our exposure to claims of violation of the

22   confidentiality agreement signed with Daugerdas' prior firm,

23   Altheimer & Gray.  Even apart from legal issues, there are

24   goodwill issues, at least in the Chicago marketplace,

25   associated with our competing with him on this product.

D9jndau1                        Griesman - direct

1    Q.  Let me stop you there and ask you, Mr. Greisman, what do

2    you mean when you say claims of violation of the

3    confidentiality agreement?

4    A.  Well, you recall the confidentiality agreement that I

5    described and read yesterday indicated that this product idea

6    was a proprietary idea to Altheimer & Gray.

7    Q.  So was there a concern that there might be some sort of --

8    this is my term -- theft of intellectual property?

9    A.  Yeah.  We didn't characterize it as theft, but we certainly

10   saw that confidentiality agreement as a potential obstacle to

11   proceeding with our own transaction.

12   Q.  Why was that?

13   A.  Because, again, by its terms it seemed to preclude taking

14   that idea.

15   Q.  You used the term goodwill in this phrase in quotes.  What

16   do you mean by that?

17   A.  Even if there were some -- and I guess if you look at the

18   precise language of the consulting, of that confidentiality

19   agreement, it wasn't clear that we were barred from using this

20   idea, but even if there was no legal issue, just the

21   relationship issue of the fact that Jenkens provided us or

22   Altheimer provided us with idea and we proceeded with it.

23   Q.  In other words, people might not look favorably upon that

24   in the marketplace?

25   A.  Correct.

D9jndau1                              Griesman - direct

1   Q.   If you could go ahead and continue reading there.

2   A.   Whether our execution of the transaction, as opposed to our

3   merely consulting with the client on a transaction that J & G

4   executes, puts us in greater proximity to exposure should a

5   transaction result in a lawsuit by a client, being in the

6   direct line of fire versus only being a secondary target.

7   Q.   Can you explain what you mean by this paragraph.

8   A.   There was probably from the very inception of the tax

9   solution business at BDO always an overriding concern about the

10   exposure of lawsuits from clients if the transactions failed to

11   work and the clients were unhappy.  And the concept here was

12   that if it's overall Jenkens, and BDO is not receiving its fee

13   directly the client and BDO is not as involved in the direct

14   execution of the transaction and things go badly, that maybe

15   the client wouldn't be thinking of suing BDO.  Whereas if BDO

16   is directly handling the transaction and collecting the fee,

17   BDO is directly in the line of fire.

18   Q.   Were the concerns about lawsuits from clients discussed in

19   the tax solutions group meetings?

20   A.   Perpetually.

21   Q.   Was Denis Field a participant in those discussions?

22   A.   Yes, he was.

23   Q.   Was there a weighing of the risk of lawsuits versus the

24   benefit?

25             MR. DE CASTRO:   Judge, I am going to object, time

D9jndau1                          Griesman – direct

1   frame.

2            THE COURT:  Can you fix a time frame for this?

3   BY MS. DAVIS:

4   Q.  At or about the date of the memo, March 15 of 1999, was

5   this issue of risk of lawsuit being discussed in the tax

6   solutions group?

7   A.  Yes, it was.

8   Q.  And was it discussed before the March 15, '99, date, to

9   your knowledge?

10  A.  I believe that it was.  I'm sorry.  I believe it was

11  discussed as early as the time that BDO began selling the tax

12  shelter.

13  Q.  To your knowledge, was there discussion in the tax

14  solutions group in relation to the issue that you raise here

15  about the weighing of the risk of lawsuits versus the benefits

16  from the transactions?

17  A.  I don't remember specific discussion of that.  I know -- I

18  mean, I know generally that that was a topic that was always

19  discussed, but I don't remember the specifics of the

20  discussion.

21  Q.  Did there ever come a point while you were selling the

22  Jenkens & Gilchrist -- withdrawn.

23            Could you go on and read the third paragraph there,

24  the third bullet point?

25  A.  Our expertise and capability to execute and advise on the

D9jndau1                          Griesman - direct

transactions, particularly those that are not plain vanilla.

Q.  Does that relate to the concern you had expressed about

your firm not being financial advisers?

A.  Yes.

Q.  And if you could continue to read.

          MS. DAVIS:  If we could have that paragraph -- thank

you, Ms. Torres.

A.  Finally, there was some discussion of exactly which

standards apply with respect to the reasonable reliance issue.

For example, it is not entirely clear whether or not the IRS

could or would recharacterize a portion of a fee paid for a tax

opinion as a transaction cost in a transaction that essentially

has no costs.  There was also some discussion of the Journal of

Taxation article by Dick Lipton, and the view that the *Cottage

Savings* case sought to be relied upon -- ought to be relied

upon to allow recognition of losses when there is an exchange,

even if there is no real change in economic position.  However,

it was noted, subsequent to the conference call, that the real

point of Lipton's article is the focus on the time period or

duration.  Thus, very possible the real issue is the length of

the transaction and not the size of the transaction costs.

Further, with possible -- with proper structuring, it may be

possible to build a strong case to be governed by *Cottage

Savings*.

Q.  And *Cottage Savings* was a tax case that was in existence at

D9jndau1                         Griesman – direct

1   that time, Mr. Greisman, is that the reference?

2   A.   Yes, it was.

3   Q.   Is it customary when lawyers are citing case citations that

4   it's either italicized or underlined?

5   A.   Yes, it is.

6   Q.   What do you mean when you are talking about the -- you say

7   very possibly the real issue is the length of the transaction.

8   A.   The *Cottage Savings* case, which is a Supreme Court case,

9   was a tax shelter case that was favorable to the taxpayer.  But

10  upon analysis of that case, you see that the assets that were

11  involved were held for a very long period of time, and there

12  was an exchange of assets and they were held long periods of

13  time before the exchange as well as after.

14          And the issue here is, in the Jenkens transaction they

15  were very short duration trades, so the suggestion was that the

16  real turning point of the transaction is not as much the

17  transaction cost -- that's what the point of this discussion

18  is -- but rather the duration of the assets of the *Cottage*

19  *Savings* was successful.  They had very long duration.  The

20  Jenkens cases had very short duration.

21  Q.   By the Jenkens & Gilchrist assets, what are you referring

22  to there?

23  A.   The treasury note short sale.

24  Q.   In other words, the treasury note short sale would be in

25  place only for a short period of time?

D9jndau1                        Griesman - direct

1   A.  It would be in place a short period of time, and some of

2   the other activities that happened in connection that were also

3   in place only for a short period of time.

4   Q.  As we saw yesterday when you were talking about the Harris

5   transaction, Mr. Harris' transaction would be able to be in

6   existence only for how many weeks?

7   A.  Probably less than three weeks.

8   Q.  Can you continue reading, please.

9   A.  As indicated above, in a brief telephone conversation with

10  Daugerdas, he indicated that he is agreeable to reengineering

11  the way his fee is billed.  However, he firmly believes the

12  better position is to have it all billed as tax opinion fee

13  because there is no basis or support in his opinion for the IRS

14  to recharacterize the tax opinion fee as something else,

15  particularly where there are no costs a-- I'm sorry -- no other

16  costs associated with the transaction.  He made the point that

17  where there is much at stake a tax opinion fee could be greater

18  than where there is less at stake.  As a fee for a tax opinion,

19  his entire fee comes off the table when determining profit

20  potential.  This is an argument that may warrant further

21  consideration.

22  Q.  Did you have the conversation with Mr. Daugerdas that is

23  referenced in this paragraph?

24  A.  Yes, I did.

25  Q.  Approximately when was that in relation to the March 11,

D9jndau1                          Griesman - direct

1    conference call about which you are writing on March 15?

2    A.  Sometime within the prior few weeks.

3    Q.  And for the 1998 short sale transactions, how was BDO

4    getting paid its fee?

5    A.  It was getting paid a fee directly from Jenkens &

6    Gilchrist, and for several of the eight transactions that BDO

7    did, it charged a fee in addition to that -- no, strike that.

8    It was getting a fee from Jenkens & Gilchrist on all those

9    transactions.

10   Q.  And that fee, how did that fee relate to the fee that was

11   actually invoiced to the clients?  I think we saw the Stewart

12   Harris invoice yesterday for $400,000.

13   A.  So it was split based on a predetermined percentage in

14   terms of predetermined by agreement between BDO and Jenkens.

15        So in some of the transaction the total fee was 3

16   percent and the split was 3.2 to Jenkens and .8 to BDO.  In

17   other transactions, as you saw from the little computation we

18   discussed yesterday, the fee was 8 percent and half of that was

19   split 3.2/.8, and the other half was split 50/50.

20   Q.  And the fee that Mr. Daugerdas' firm was charging the tax

21   shelter clients that you were aware of covered what?

22   A.  It essentially covered everything that was involved in the

23   transaction, the preparation of the packet of documents that

24   were required in terms of setting up entities and transferring

25   assets and liquidating assents, overseeing of the steps of the

D9jndau1                          Griesman - direct

1    transaction, that people did the right things in term of moving

2    assets and trades got executed and all those kinds of steps,

3    and then the preparation of the tax opinion.

4    Q.   Was any part of BDO's portion of the fee for a tax opinion?

5    A.   No, it was not.

6    Q.   Was that your role in this transaction?

7    A.   No, it was not.

8    Q.   If we could continue reading starting at, The items to do.

9    A.   The items to do at this point are as follows:

10             Conduct further analysis and research to solidify a

11   position on how best to structure these transactions going

12   forward, to assure that transactions can withstand challenges

13   based on both business purpose, profit possibility, and time

14   duration.  It is recognized that as a result, we may do fewer

15   of these transactions, limiting ourselves to better facts, such

16   as situation 1 but not 2 or 3 described above, regardless of

17   which law firm issues the tax opinion.  In the alternative we

18   may charge a substantially reduced fee to avoid transaction

19   costs that would render the profit possibility to be nil.

20   Q.   Did that happen, Mr. Greisman?

21   A.   No, it did not.

22   Q.   Was there any restructuring of these transactions on this

23   basis by BDO, to your knowledge?

24   A.   Any restructuring to conform to what I just read?

25   Q.   Yes.

D9jndau1                          Griesman - direct

1  A.  No, there was not.

2  Q.  Whose decision was it to continue as things were currently

3  structured?

4  A.  The BDO tax solution leadership group, Denis Field, Charlie

5  Bee and Adrian Dicker.

6  Q.  If you could continue reading the next point, please.

7  A.  Related to the point above, we may want to layer in as much

8  planning and --

9  Q.  Could you just start from the beginning and reread that,

10  Mr. Greisman?

11  A.  The second bullet point?

12  Q.  Yes, please.

13  A.  Related to the point above, we want to layer in as much

14  planning and consulting, particularly to build as much business

15  purpose as possible in each transaction.

16  Q.  Continue reading to the end of the memo.

17  A.  We will form a working group consisting of DiMuzio,

18  Greisman, Kerekes and Shanbrom to oversee, structure, and

19  facilitate any of these transactions on a firmwide basis.

20  Moreover, this group will work on developing our internal

21  capability to execute these transactions and on developing the

22  outside contacts, law firms and broker/dealers, needed to

23  complete the team.

24          We will advise Bob Gaida of the need to modify our

25  selling efforts to shift away from transactions where we do not

D9jndau1                          Griesman - direct

1      have the opportunity to provide significant tax planning and

2      consulting on the underlying gain transaction, situations 2 and

3      3, in favor of those where we do.  Further, we will advise Bob

4      that the tax sales executives should funnel all of these

5      transactions to the working group.

6      Q.  Was that working group formed?

7      A.  I don't -- the work -- to my knowledge the working group

8      never actually did working group work.

9      Q.  Did BDO modify its selling efforts to shift away from

10     transactions where it did not have the opportunity to provide

11     significant tax planning?

12     A.  No, it did not.

13     Q.  And was Mr. Shanbrom included in the March 11 conference

14     call?

15     A.  No, he was not.

16     Q.  Did you have a subsequent conversation with him about his

17     discomfort, or any discomfort about not being included in the

18     call?

19     A.  Yes, I did.

20     Q.  When was that discussion?

21     A.  Sometime shortly after this conference call on March 11, of

22     '99 Paul Shanbrom called me in a little bit of a state of

23     anxiety, you know, saying he knew there was a call, and how

24     come he wasn't included on it.  He indicated he was doing so

25     much work on the selling of the Jenkens transactions.  In

D9jndau1                          Griesman - direct

1  effect, he was saying to me, or in substance he said to me, you

2  know, gee, I'm worried why didn't -- is Denis mad at me?  Did I

3  do something wrong?  Why wasn't I on the call?

4  Q.  What did you say in response?

5  A.  I basically told him that I didn't think he had done

6  anything wrong, and I couldn't see a reason why he wouldn't

7  have been there and he should talk to Mr. Field directly

8  himself.

9  Q.  Did you have a subsequent call with Mr. Shanbrom in which

10 he mentioned whether or not he had spoken --

11             MR. DE CASTRO:  Objection.  Sorry.  Leading.

12             THE COURT:  Sustained.

13 Q.  Was there a second conversation with Mr. Shanbrom about

14 this topic?

15 A.  Yes, there was.

16 Q.  When was that conversation?

17 A.  Sometime not too long after the first conversation.

18 Q.  And what did Mr. Shanbrom say to you?

19 A.  That he had spoken with Denis and that Denis assured him

20 that, you know, he hadn't done anything wrong and that he

21 should really focus on selling the Jenkens transactions and

22 really putting his foot to the pedal and putting it to floor to

23 really get them going.  And, again, I don't know if these were

24 his exact words, but the substance was that this could be his

25 meal ticket.

1  Q.  Did you have knowledge of what Mr. Shanbrom's technical tax

2  specialty was at that point in time?

3  A.  At that point his, the specialty he had was in local

4  property and real estate taxes.

5  Q.  Did the Jenkens & Gilchrist tax shelters have anything to

6  do with his specialty?

7  A.  No, they did not.

8  Q.  In 1999 -- so how was it left at the end of this call with

9  the group that was on the call?

10  A.  Pretty much as indicated in the memo, that this working

11  group would be formed, which I was part of, to evaluate these,

12  that at that point in time we would hit the brake on the

13  Jenkens transaction pending further analysis.  And, again, just

14  as the memo sets out, that's how the call was left.

15  Q.  Going forward, did BDO take the foot off brake so to speak?

16  A.  BDO took the foot off the brake and jammed the accelerator.

17  Q.  Was there a particular size of client transactions that the

18  Jenkens & Gilchrist tax shelters were being -- withdrawn.

19        Was BDO marketing the Jenkens & Gilchrist tax shelters

20  to a particular size client, if you will, with respect to the

21  size of gain?

22  A.  Yes, it was.

23  Q.  What was that?

24  A.  Again, remember, the minimum was $3 million.  And on the

25  upper end, BDO tended to limit it to somewhere, I believe it

D9jndau1                          Griesman - direct

1   was around 10 or 20 million.

2   Q.  Why was that?

3   A.  Shortly after this time frame of this memo, you know,

4   approximately late May, early June, BDO unveiled its own tax

5   shelter product which I will refer to as the Sentinel tax

6   shelter.  And it was -- it had a minimum also, but it's minimum

7   was something like 20 or 30 million dollars.  So the notion was

8   that for a client that had incomes or gains over that 20 or 30

9   million dollars, BDO would sell them the Sentinel transaction;

10  for those that were under that minimum, sell them the Jenkens

11  transaction.

12  Q.  Was there any other issue with regard to the sale of the

13  Jenkens & Gilchrist tax product versus the Sentinel product

14  that permitted sales of Jenkens?

15  A.  Well, the structure of the Sentinel transaction, because of

16  the steps that had be to done and the timing of the steps,

17  similar to the Jenkens transaction, it had a cutoff date or an

18  end date of approximately September 30, in this case September

19  30, 1999.

20          So as the year moved forward, there came a time that

21  BDO was no longer selling the Sentinel transaction, namely,

22  after September 30, but there were clients that were still --

23  that BDO was still finding who would be tax shelter potential

24  clients, so then they became candidates as well for the Jenkens

25  transaction.

D9jndau1                           Griesman – direct

1    Q.  In the spring of 1999, did you have a meeting with Denis

2    Field and another tax shelter promoter?

3    A.  I did.

4    Q.  Who was that other promoter?

5    A.  A gentleman named James Haber.

6    Q.  Where was the meeting?

7    A.  In Denis' office in Chicago.

8    Q.  How did you come to participate in that meeting?

9    A.  Denis called me and said that there was a tax shelter

10   promoter who was making a presentation to him and he wanted me

11   to come over and join him and hear it.

12   Q.  Did you, in fact, listen to the presentation with

13   Mr. Field?

14   A.  I did.

15   Q.  The product that Mr. Haber was presenting, was it somewhat

16   similar to the Jenkens & Gilchrist product?

17   A.  It was.

18   Q.  What was Mr. Field's reaction to using or the potential to

19   sell Mr. Haber's product?

20   A.  It was fairly negative, principally because Mr. Haber had

21   suggested a fee arrangement that was a fairly low fee

22   percentage, and then a referral sharing similar to the Jenkens

23   transaction.  I believe the fee percentage was something like 1

24   and a half or 2 percent, and then sharing 20 percent of that

25   with BDO.  And Mr. Haber indicated that the fee was low so that

D9jndau1                          Griesman - direct

1   profit potential could be maintained and economic substance

2   could be maintained, and Mr. Field objected that the fee was

3   too low.

4   Q.  Are you familiar with BDO's use of a consulting agreement

5   with respect to the Jenkens & Gilchrist tax shelter clients?

6   A.  Yes, I am.

7   Q.  How did that come about?

8   A.  As a general proposition at BDO and probably at all

9   accounting firms, when clients, when there's work done for a

10  client, it's done under the terms of an -- what is either

11  referred to as an engagement letter or a consulting agreement,

12  and those terms are used interchangeably.

13          So when the time came, as it did in 1999, where BDO

14  started charging clients directly for the fees that it was

15  charging, it started using consulting agreements.

16  Q.  Are you familiar with a BDO client by the name of Melvin

17  Gale?

18  A.  Yes I am.

19  Q.  I would ask that you take out Government's Exhibits 301-309

20  and 301-310.

21          Do you recognize those exhibits?

22  A.  I do.

23  Q.  Looking at 301-309, what is that document?

24  A.  It is a letter to Mel Gale from Eric Hananel dated October

25  7, 1999.

D9jndau1                          Griesman - direct

1   Q.  This is in relation to what topic?

2   A.  It is in relationship to a consulting agreement.

3   Q.  For what product or services?

4   A.  The Jenkens transaction.

5          MS. DAVIS:  Your Honor, the government offers

6   Government Exhibit 301-309.

7          MR. LINDER:  No objection.  Contact.

8          MR. DE CASTRO:  No objection.

9          THE COURT:  Government Exhibit 301-309 is received.

10         (Government's Exhibit 301-309 received in evidence)

11         THE COURT:  You may publish it.

12  BY MS. DAVIS:

13  Q.  Before we publish it, I would just like to have you look at

14  301-310.  Do you recognize that document?

15  A.  Yes.

16  Q.  What is that document?

17  A.  It is the consulting agreement between BDO and Mel Gale.

18         MS. DAVIS:  Your Honor, the government offers 301-310.

19         MR. LINDER:  No objection.

20         MR. DE CASTRO:  No objection.

21         THE COURT:  Government Exhibit 301-310 is received.

22         (Government's Exhibit 301-310 received in evidence)

23         MS. DAVIS:  Ms. Torres, if I could publish 301-309,

24  please.  If you could enlarge the body of the letter.

25  BY MS. DAVIS:

D9jndau1                          Griesman - direct

1   Q.  The date on the letter is what?

2   A.  October 7, 1999.

3   Q.  Could you just read the first paragraph?

4   A.  As we discussed, enclosed in duplicate is our consulting

5   agreement covering the next 12 months services.  If the

6   agreement meets with your approval, please execute one copy and

7   send it back to my attention in the enclosed envelope.  The

8   second copy is for your files.

9          Have a great vacation and speak to you soon.

10  Sincerely, Eric Hananel.

11  Q.  Mr. Hananel was whom?

12  A.  He was BDO tax partner in the New York office.

13  Q.  Is this letter written on his New York office letterhead?

14  A.  Yes, it is.

15  Q.  What is the street address?

16  A.  330 Madison Avenue.

17  Q.  How did you come to know Mr. Gale?

18  A.  He was introduced to me by Mr. Hananel.

19  Q.  Nor what purpose?

20  A.  For participating in the Jenkens tax shelter transaction.

21  Q.  Mr. Hananel did what sort of work in the New York office,

22  to your knowledge?

23  A.  Tax work.

24  Q.  Did he make a referral to you as a member of the tax

25  solutions group?

D9jndau1                        Griesman - direct

1    A.  He did.

2    Q.  That was consistent with the directions that had been given

3    by Adrian Dicker in the November 1998 meeting?

4    A.  Yes, it was.

5    Q.  Did you actually meet with Mr. Gale?  Do you recall?

6    A.  I had several telephone conversations with him.  I don't

7    recall meeting with him.

8    Q.  Looking at the consulting agreement itself, does this look

9    like the consulting agreement that was generally used for the

10   Jenkens & Gilchrist tax shelter clients by BDO when it started

11   to use a consulting agreement?

12   A.  Yes, it does.

13   Q.  Did you see versions of this used for other BDO tax shelter

14   clients?

15   A.  Yes.

16   Q.  Similar versions?

17   A.  At a later point in time, yes.

18           MS. DAVIS:  If you would, could we publish 301-310.

19           It is up.

20           THE COURT:  You may.

21           MS. DAVIS:  Thank you.

22   Q.  Do you see the first whereas clause --

23           MS. DAVIS:  If you would, thank you, Ms. Torres.

24   Q.  Could you just read that.

25   A.  Whereas the client is interested in selling various

 1   investments and in making certain other investments

 2   parenthetically and in quotes the Transactions.

 3   Q.  Going down to the services paragraph, could you just read

 4   that paragraph?

 5   A.  Services.  During the term, BDO agrees to provide the

 6   following consulting services to the client (the Services),

 7   consulting services in conjunction with present and future

 8   business transactions, including assistance in determination of

 9   purchase or sale prices, assistance in structuring the

10   transactions, assisting the client and/or his advisers in

11   structuring the transactions to obtain the most beneficial tax

12   results, and assisting the client and/or his representatives in

13   its discussions and or negotiations with potential purchasers

14   or sellers on a specifically requested basis, as well as in

15   estate planning and other personal financial planning.

16   Q.  To your knowledge, what was the actual purpose of the

17   consulting agreement based on your conversations with

18   Mr. Hananel and Mr. Gale?

19   A.  To sell the Jenkens & Gilchrist tax shelter.

20   Q.  Is there any mention of a tax shelter in this services

21   agreement?

22   A.  There was not.

23   Q.  Why not?

24   A.  Because Adrian Dicker when he wrote this consulting

25   agreement out to the tax solutions group instructed us to

D9jndau1                          Griesman – direct

1    complete the services section trying to describe the

2    transaction as best we could without using the words tax

3    shelter.

4    Q.   And was Mr. Field present when Mr. Dicker gave those

5    instructions?

6    A.   I believe that he was on one of the conference calls.

7    Q.   Was that, in fact, what you were doing in the tax shelter,

8    Jenkens & Gilchrist tax shelter sales that you were doing,

9    attempting to make sure that consulting agreements did not

10   reference the tax shelter?

11   A.   Yes.

12   Q.   What was the harm in referencing the tax shelter in these

13   consulting agreements?

14   A.   Adrian said we don't want to advertise that we're selling

15   tax shelters.  If the term tax shelter had been there, it would

16   have impaired the argument that the transaction had economic

17   substance or business purpose.

18   Q.   Was BDO using this type of consulting agreement for the

19   1998 short sale tax shelter clients that you have spoken of?

20   A.   No, it did not.

21   Q.   Why not?

22   A.   Because the fees in those transactions are not coming from

23   the client.  It was only if the point in time the fees were

24   coming directly from the client the consulting agreement was

25   required.

D9jndau1                          Griesman - direct

1   Q.  Did you give any advice to any BDO partners who were not

2   members of the tax solutions group about what they were to do

3   with the consulting agreements?

4   A.  I believe that I did.

5   Q.  What were those instructions?

6   A.  Similar instructions in terms of the preparation of the

7   consulting agreement, to fill out the services section as best

8   they could without using the term tax shelter.

9            MS. DAVIS:  I would like to look at Government Exhibit

10   200-81A.

11           Your Honor, it is my understanding that the parties

12   will be stipulating to its admission based on our

13   conversations.

14           MR. LINDER:  That's correct, your Honor.

15           MR. DE CASTRO:  That's correct.

16           THE COURT:  All right.

17           MS. DAVIS:  So I would offer Government Exhibit

18   200-81A.

19           THE COURT:  All right.  Government Exhibit 200-81A is

20   received in evidence.

21           (Government's Exhibit 200-81A received in evidence)

22           THE COURT:  Members of the jury, a stipulation is just

23   an agreement among counsel about something.  That is all a

24   stipulation is.  You can consider this exhibit as evidence in

25   the case.

D9jndau1                        Griesman – direct

1          MS. DAVIS:  Your Honor, may I publish 200-81A?

2          THE COURT:  You may.

3          MS. DAVIS:  If we could just enlarge the portion at

4   the bottom.  What's called the original message.

5   BY MS. DAVIS:

6   Q.  Who is this e-mail from and who is it to?

7   A.  It's from Donna Guerin to John Beery.

8   Q.  Sent on what date?

9   A.  May 13, 2002.

10  Q.  The subject line is what?

11  A.  Mittens 2.

12  Q.  Could you just read that e-mail, please.

13  A.  Donna, I just spoke to David Ayoub and Michael D'Avirra.

14  They don't have much to talk about, but the two big issues are

15  as follows:

16          The 9/30/00 corporate return doesn't have a deal on

17  it.  They didn't do one.  However, as part of the IDR, the

18  Service requested the individual returns from 1999 and 2000 and

19  the corporate return from the year ending 9/30/2001.  These

20  other returns have $37 million of deductions from the various

21  deals, T-note and Gramercy, so they're hoping to avoid notice

22  on the other returns.

23          One question on the IDR asks for substantiation of the

24  professional fees paid from the corporation which includes the

25  BDO fees from at least one deal, including invoices and

D9jndau1                         Griesman - direct

contracts detailing the services performed.  Greisman told them
to hand over the engagement letter consulting agreement, but
they think it has some language they'd prefer not to use and
might raise eyebrows.  However, there is no invoice from BDO.
They'd like one generated to reflect the fees paid.  My fear is
that turning over the consulting agreement might waive some of
the accountant/client privileges they might want later.

          Any thoughts?

          Thanks.  John.

Q.  Can you just give us the context of what's going on with
regard to an IDR request?

A.  So the IRS audits taxpayer tax returns to determine the
correctness the return.  And as part of the process of an
IRS exam, the auditors issue something called information
document requests.  For short they call them IDRs.  And so
these would be a series of requests for documents and
information.

Q.  In this paragraph, the second paragraph, it says, Greisman
told them to hand over the engagement letter/consulting
agreement.  Would that be a similar one to the kind we just
looked at?

A.  Yes, it would.

Q.  That is similarly not mention or not reference specifically
a tax shelter?

A.  That's correct.

D9jndau1                          Griesman - direct

1    Q.  Although the consulting agreement is not called an invoice,

2    did the consulting agreements actually list the fees that the

3    clients were to paid for the tax shelter in it?

4    A.  Yes, it did.

5    Q.  And it did on the Mel Gale one that we just looked at,

6    correct?

7    A.  Correct.

8    Q.  For $150,000?

9    A.  I believe that's correct, yes.

10   Q.  Do you want to look at it and just confirm.

11   A.  $150,000.

12   Q.  John Beery, to your knowledge, was whom?

13   A.  He was an associate at Jenkens & Gilchrist.

14   Q.  What was Ms. Guerin's response to Mr. Beery to his May 13

15   e-mail?

16   A.  Do you want me to read it.

17   Q.  Yes.  If you would just start at, An IDR.

18   A.  An --

19          THE COURT:  Before he reads it, members of the jury,

20   you see that there is a notation in bold in portions that says

21   redacted.  All right.  Don't give any consideration to that.

22   Any material that is redacted has been removed from the

23   document because it's not legally admissible as evidence in

24   this case.

25          MS. DAVIS:  Thank you, your Honor.

D9jndau1                          Griesman - direct

1    BY MS. DAVIS:

2    Q.  We had read in the prior paragraph the reference to IDR.

3    What specifically does that stand for?

4    A.  IDR, information document request.

5    Q.  And the reference to T-note in the second paragraph?

6    A.  That's the treasury note sort sale.

7    Q.  And the reference to Gramercy was what?

8    A.  There was a BDO tax shelter that BDO sold later, in 2000

9    and 2001, and Gramercy was the investment adviser, so that was

10   none as the Gramercy transaction.

11   Q.  Did that transaction have anything do with Jenkens &

12   Gilchrist?

13   A.  No, it did not.

14   Q.  Could you read starting at, An IDR.

15   A.  An IDR, and for that matter, a summons to produce

16   documents, can only request third-party documents you have in

17   your possession.  As far as BDO's engagement letter/consulting

18   agreement goes, my recollection is that it was pretty vanilla,

19   describing a whole bunch of services in very generic terms, for

20   example, tax planning.  If Greisman, who is very cognizant of

21   privilege issues, suggested turning it over, then I'd probably

22   defer -- though I wouldn't want to offer any suggestion without

23   seeing how it reads.  Thanks for talking with him.

24        Donna.

25   Q.  The reference to your being very cognizant of privilege

1    issues, what did that mean?  What did you understand that to

2    mean?

3    A.  Well, I didn't see this at the time.  What I understand it

4    to mean now?

5    Q.  Yes.

6    A.  I mean, privilege -- communications between an attorney and

7    a client are privileged and don't have to be shared under

8    certain circumstances with the government or others.  In some

9    very limited cases there was an accountant privilege.

10           So, when it's referring to privilege, it's referring

11   to those kinds of issues in terms of determining when documents

12   might be able to be withheld from being turned over to the

13   government in an examination.

14   Q.  Who holds the privilege?

15   A.  The client holds the privilege.

16           (Continued on next page)

17

18

19

20

21

22

23

24

25

D9jedau2                          Greisman - direct

1   BY MS. DAVIS:

2   Q.  Can a client waive the privilege and decide to turn over

3   documents that might otherwise be privileged?

4   A.  Yes.

5   Q.  Did there come a point, Mr. Greisman, where you learned

6   that Jenkens & Gilchrist was switching from the short sale tax

7   shelter to a different kind of tax shelter?

8   A.  Yes.

9   Q.  Or different version?  When did you learn that?

10  A.  I believe sometime in October of '99, probably slightly

11  sooner.

12  Q.  And from whom did you learn that?

13  A.  Either Donna Guerin or Paul Daugerdas.

14  Q.  And what did you learn from either Mr. Daugerdas or

15  Ms. Guerin was the reason for the switch?

16  A.  There was legislation pending in Congress that principally

17  had nothing to do with tax shelters, but there was language in

18  the proposed legislation that, if it passed, would close the

19  loophole that the treasury note short sale shelter was built

20  upon.

21  Q.  So what was the proposed replacement?

22  A.  So the proposal was to not take the chance that that

23  loophole might get closed and to switch over to a different

24  structure from the tax shelter.  And the structure was

25  essentially the same as for the treasury note short sale, but

1    it used a different financial instrument.  Instead of treasury

2    note short sales, it used foreign currency options.

3    Q.  At that point in time were you familiar with foreign

4    currency options of the kind that was proposed for the new

5    version?

6    A.  Yes, I was.

7    Q.  And how were you familiar with it?

8    A.  You recall a little while ago I said that in May or June of

9    '99 BDO rolled out its own transaction, which was called the

10   Sentinel transaction.  And the Sentinel transaction used the

11   foreign currency options.  And I had at least between June of

12   '99 and October '99 gained familiarity with them.

13   Q.  Were those options identical to the ones that the Jenkens &

14   Gilchrist firm was proposing to use?

15   A.  If not identical, very similar.

16   Q.  Was there a financial institution that was -- Ms. Guerin or

17   Mr. Daugerdas proposed to use for these financial currency,

18   foreign currency options?

19   A.  Yes.

20   Q.  Which one, which institution?

21   A.  Deutsche Bank.

22   Q.  In the conversation that you had with either Mr. Daugerdas

23   or Ms. Guerin about the switchover, was there any discussion

24   about the state of the treasury note market at that time?

25   A.  Not that I recall, no.

D9jedau2                        Greisman - direct

1   Q.   Was there any discussion about the state of the foreign

2   currency markets at that time?

3   A.   Not that I recall, no.

4   Q.   Specifically at Deutsche Bank, who was proposed to be used

5   for the option, foreign currency options transactions?

6   A.   David Parse.

7   Q.   Was that the same broker that was being used for the short

8   sale of treasury notes?

9   A.   Yes.

10  Q.   And did you learn what the economic risks and rewards of

11  the options transactions were in the Jenkens & Gilchrist short

12  options tax shelter?

13  A.   Yes.

14  Q.   Who did you learn that from?

15  A.   Either Paul Daugerdas, Donna Guerin or David Parse.

16  Q.   And what did you learn to be the economic risks and

17  rewards?

18  A.   The option was -- it was sort of very black and white.  It

19  would either be if -- you invest a certain amount of money, and

20  either you would double your money or you would lose it all.

21  And the percentage odds were there would be a one-third chance

22  that you would double your money.  If you put $10,000 in, there

23  was a one in three chance you'd walk out with $20,000, and

24  there was a two-thirds chance you'd lose it all.  So you put

25  10,000 in and you could walk away with nothing.

D9jedau2                        Greisman - direct

1   Q.  Was there an additional aspect of it as well?

2   A.  There was.

3   Q.  What was that?

4   A.  The Jenkens transaction built in something that came to be

5   known as the lottery feature, and that was a feature where if

6   certain things aligned a certain way, so if at a certain exact

7   moment in time the pricing -- and just for that moment, the

8   pricing on the foreign currencies hit an exact certain spot,

9   then there could be a payoff that would be lottery style.  It

10  would be multiples of the amount that was invested in it.

11  Q.  Were you given any percentage likelihood that that lottery

12  feature would actually succeed or hit?

13  A.  I don't remember a percentage, but if -- the clearer

14  expectation was that it was a very -- you know, very

15  lottery-like minimal likelihood that it would hit.

16  Q.  And just to clarify, the one-third chance that you had to

17  double your money, what would be your net result?  In other

18  words, how much would be in your pocket after you paid for the

19  options and if you won on the option bet?

20  A.  Just looking at the option in isolation from everything

21  else?

22  Q.  Yes.

23  A.  If you would -- basically made 100 percent profit.  You put

24  $10,000 in and walk away, if it was successful, with $20,000,

25  you'd double your money.

D9jedau2                        Greisman - direct

1   Q.  But the net win being $10,000, correct?

2   A.  Correct.

3   Q.  Because you had to pay for the options in the first place?

4   A.  Correct.

5   Q.  Do you recall what the amount was that the clients had to

6   transfer to Deutsche Bank to purchase these options?

7   A.  Not the precise amount, but general amount, yes.  It was --

8   in order -- because these were -- the way the options were

9   structured for technical trading reasons, there was a very

10  small net amount to buy a very large dollar amount.  So as a

11  percentage of the amount of the loss that was being generated,

12  it was something like 1 percent.

13  Q.  And did BDO, in fact, consider selling this new version of

14  Jenkens & Gilchrist tax shelter?

15  A.  Yes, it did.

16  Q.  And who participated in the consideration of whether or not

17  BDO should sell this product?

18  A.  The BDO tax opinion committee.

19  Q.  And was there a decision to go forward on the sales of

20  the -- what I'll call the short options tax shelter?

21  A.  Yes, there was.

22  Q.  To your knowledge who made that decision?

23  A.  The tax opinion committee.

24  Q.  Was Denis Field a part of that committee at that time?

25  A.  Yes, he was.

D9jedau2                         Greisman - direct

1   Q.  And approximately when was the BDO -- did BDO approve the

2   Jenkens & Gilchrist short options tax shelter?

3   A.  I believe sometime around October of '99.

4   Q.  And did BDO add a certain aspect to this short options tax

5   shelter?

6   A.  Yes, it did.

7   Q.  What did it add?

8   A.  It added the requirement that in addition to the 1 percent

9   the client had to put into it to buy the options, it would add

10  a -- the claim would add an additional 1 percent, which is

11  referred to as the add-on to be used generally for additional

12  investing, and in some cases, to execute part of the

13  transaction.

14  Q.  Whose idea was that?

15  A.  BDO's idea.

16  Q.  Was there anyone in particular within BDO whose idea it was

17  that you can recall?

18  A.  Not that I recall.

19  Q.  And what was the -- why have the clients had that

20  additional 1 or 2 percent?

21  A.  For ordinary transactions, there was a very narrow

22  technical reason, but more generally, it was there to allow the

23  clients to do some additional trading that would give the

24  transaction the appearance of economic substance.

25  Q.  And was the add-on investing sufficient in your mind to

D9jedau2                              Greisman - direct

1   actually provide economic substance?

2   A.  I -- there came a point that I came to the determination

3   that it was not.

4   Q.  What point was that?

5   A.  Sometime in the latter -- in the last quarter of 1999.

6   Q.  And why did you come to that conclusion?

7   A.  In just looking at the transaction and knowing the size of

8   the transaction fees, it was a question of measuring profit

9   potential from this investing that the client would do against

10  the transaction fees.  And if the client was investing

11  1 percent and had a chance of doubling their money, that was

12  part of it.  And if the client was investing another 1 percent

13  in doing some minimal trading on their own without professional

14  investment advice for a limited period of time, it just became

15  patently clear that there was no way that they would ever be

16  able to generate enough profits to come anywhere enough to

17  cover the transaction cost and the fees that were being

18  charged.

19  Q.  And we had seen in the -- with regard to the 1998 short

20  sale transactions that BDO was charging clients -- BDO and

21  Jenkens were charging clients an 8 percent fee?

22  A.  In some cases, yes.

23  Q.  And with regard to the short options sales by BDO, was

24  that -- were there similarly large fees being charged to the

25  client?

D9jedau2                         Greisman - direct

1   A.  Yes, there were.

2   Q.  Were there even larger fees than 8 percent that you were

3   aware of?

4   A.  I'm not aware.  There could have been.  There were smaller

5   fees, too, but there was fees the size of 8 percent.

6   Q.  Did you have this add-on investing topic, was that

7   specifically discussed in a tax solutions group?

8   A.  Yes, it was.

9   Q.  Was Denis Field a part of that?

10  A.  Yes, he was.

11  Q.  Was the purpose or the reason for the add-on investment

12  discussed within the tax solutions group?

13  A.  Yes, it was.

14          MR. DE CASTRO:  Can we set a time frame here?  This is

15  just generally.

16  Q.  What time frame are we speaking of, Mr. Greisman?

17  A.  The same time frame in which the transition happened from

18  the short, treasury note short sale to the options trading; and

19  actually, even before in connection with the other BDO

20  transaction involved options.

21  Q.  So this would be in or around October of 1999 or earlier?

22  A.  Yes.

23  Q.  Did you also have a discussion with David Parse about this

24  additional add-on investing BDO was requiring?

25  A.  I did.

D9jedau2                        Greisman - direct

1    Q.  When did you have that conversation?

2    A.  Also in October or so time frame.

3    Q.  Was this in person or on the phone?

4    A.  On the phone.

5    Q.  Who initiated the conversation?

6    A.  I don't recall.  Probably me, though.

7    Q.  What did you say to Mr. Parse?

8    A.  I told him about the decision to have this additional

9    investing.  The clients would be putting additional funds into

10   the transaction to do additional trades, which he would then

11   have it be held to manage, recommend, execute, oversee.

12   Q.  What was Mr. Parse's reaction?

13   A.  He was not too happy.

14   Q.  Did he say why?

15   A.  Yes.

16   Q.  What did he say?

17   A.  That this was -- having these limited amount of sort of

18   one-off trades was not really the kind of work he wanted to do.

19   He was looking to manage much larger portfolios on a

20   longer-term basis, rather than doing a few occasional trades on

21   a short-term basis.

22   Q.  You used the term one-off.  What do you mean by one-off?

23   A.  From somebody in his position as an investment manager,

24   people, wealthy clients, would typically give him whatever

25   large amount of money to handle over a period of time on an

D9jedau2                    Greisman - direct

1   ongoing relationship.  These were going to be trades that would

2   just be a handful of trades that would be put on and taken off

3   quickly.  And so that's what I'm referring to when I say

4   one-off.

5   Q.  Was there an intent as to how long these add-on investment

6   trades would stay in place?

7   A.  Yes.

8   Q.  What was that intent?

9   A.  Fairly short term.

10  Q.  Why was that?

11  A.  Because the clients, they weren't really putting -- being

12  put there as real investments or real trading activity.  They

13  were being put there to give the appearance of investing and

14  trading, and the clients didn't want to take a lot of risk with

15  them.  So they were tending to be short term in nature.

16  Q.  Did you talk to anyone at Jenkens & Gilchrist about the

17  add-on investing requirement that BDO wanted to implement?

18  A.  Yes, I did.

19  Q.  Who did you speak with?

20  A.  Donna Guerin.

21  Q.  When was that?

22  A.  Again, in this time period, October '99.

23  Q.  Was this conversation in person or on the phone?

24  A.  I believe on the phone.

25  Q.  In words or substance, what was the conversation that you

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

D9jedau2                         Greisman - direct

1    had with Ms. Guerin?

2    A.  I explained what was going to happen in terms of the

3    1 percent, and that because Jenkens was providing all of the

4    paperwork instructions to clients in terms of what they needed

5    to do, money that he had to transfer and where they had to put

6    it, this additional 1 percent had to be incorporated into her

7    instructions.

8    Q.  Did you attend a partners meetings, BDO's partners meeting

9    in the fall of 1999?

10   A.  I did.

11   Q.  Where was it?

12   A.  In Phoenix, Arizona.

13   Q.  And did Mr. Field speak at this meeting?

14   A.  He did.

15   Q.  What was the context of his presentation or speech?

16   A.  It was a presentation to a general partners meeting, all of

17   the partners in attendance.  And as the head of the tax

18   business line, he was giving, in effect, I'll refer to it as a

19   state of the union address on how the tax business line was

20   doing.

21   Q.  In September of 1999 what was Denis Field's position at

22   BDO?

23   A.  He was a member of the board of directors and head of the

24   tax business line.

25   Q.  For the entire firm?

D9jedau2                          Greisman - direct

1   A.  For BDO's tax practice nationwide, yes.

2   Q.  And at the time that he spoke was there also a simultaneous

3   PowerPoint presentation?

4   A.  Yes, there was.

5   Q.  I'd like you to look at Government Exhibit 301-269.  Do you

6   have that document?

7   A.  I do.

8   Q.  Were you present at that meeting, Mr. Greisman?

9   A.  I was.

10  Q.  And did you see Mr. Field give his speech?

11  A.  I did.

12  Q.  Do you recognize Government Exhibit 301-269?

13  A.  I do.

14  Q.  What is it?

15  A.  It's the copies of the PowerPoint slides he presented and

16  then the narrative of the presentation that he made.

17          MS. DAVIS:  Your Honor, the government offers 301-269.

18          MR. LINDER:  No objection.

19          MR. DE CASTRO:  No objection.

20          THE COURT:  Government Exhibit 301-269 is received.

21          (Government's Exhibit 301-269 received in evidence)

22          MS. DAVIS:  May I publish, your Honor.

23          THE COURT:  You may.

24  BY MS. DAVIS:

25  Q.  Before we get to the specifics of this document,

D9jedau2                          Greisman - direct

1   Mr. Greisman, what was Denis Field's management style at BDO?

2   A.  He was very aggressive, very energetic, very directive and

3   also somewhat manipulative.

4   Q.  When you say "directive," what do you mean?

5   A.  Some manager styles, bosses are, you know, a little bit

6   weak, I guess, or looking to build consensus.  Denis was very

7   direct in terms of the direction he wanted to go and what he

8   wanted people to do.

9   Q.  You used the term manipulative.  What do you mean by that?

10  A.  I mean that not -- in the sense that there are leaders,

11  good and bad, who use people to get things done.  Examples in

12  history are people like Lyndon Johnson and FDR.  So using

13  people, telling some people some things other people other

14  things, you know, kind of playing people off against each other

15  and move things forward.

16  Q.  And did those same traits carry over to his management of

17  the tax solutions group?

18  A.  I believe it did, yes.

19  Q.  And in his presentation that he gave in the November '99

20  partners meeting, did he articulate generally a vision of the

21  firm's future as he saw it?

22  A.  Yes.

23  Q.  What was that vision?

24  A.  A vision of making great profits going forward by selling

25  value-added products and principally tax solutions.

D9jedau2                          Greisman - direct

1   Q.  And did that vision include the sale of Jenkens & Gilchrist

2   tax shelter products?

3   A.  Yes, it did.

4   Q.  Looking at this document, do you see the -- in the box at

5   the top it says, wolves, always friendly but never tame?

6   A.  Yes.

7   Q.  What was the reference to wolves?

8   A.  Denis was developing as subject of a cultural identity the

9   wolf pack; the idea that wolves have certain characteristics,

10  they can be very effective in hunting or killing and also very

11  effective in working together and watching out for each other.

12  And he was trying to create this cultural image of BDO as a

13  wolf pack.

14  Q.  And how did he use this wolf imagery or logo or reference

15  as a motivation technique?

16  A.  It was used in the -- obviously oral discussion and

17  presentations, but also even in visual ways in terms of having

18  a wolf become a logo on certain materials, and eventually I

19  think on letterhead and in distributing little -- in some cases

20  not so little wolf statutes.  All the partners received a lot

21  at home by Fed Ex, or probably this high statute of a wolf.

22  And other employees in the office received little desk size

23  statutes of wolves.  So it was just -- it became a cultural

24  thing, like an emblem or mascot.

25  Q.  And from your perspective who was the alpha wolf?

D9jedau2                         Greisman - direct

1   A.   Denis Field.

2   Q.   Were you ever asked in a group meeting setting to howl like

3   a wolf by Denis Field?

4   A.   At a partners meeting, all of the partners were like to

5   howl like wolves, yes.

6   Q.   Did you howl?

7   A.   I did.

8   Q.   Why?

9   A.   Because I was asked to by Denis Field, and everyone else

10  did.

11  Q.   Going down to the bottom part of the front page of the

12  document.

13  A.   I'm sorry, fourth page?

14  Q.   I'm sorry, the front page.  Can you just read from some

15  history down to the bottom of the page.

16          You can scroll down just a little bit more,

17  Ms. Torres, so we can get the full part of the part.  Thank

18  you.

19  A.   Some history.  When I was in my youth in 1984, Seidman and

20  Seidman sent me away from the Grand Rapids office to the

21  New York office to learn how to be logical, analytical and

22  practical.  I came back 13 years later to Chicago clinically

23  eccentric, in the best case, and in the worse case, mad.  I

24  would just like to state I possibly might be completely sane

25  and intellectually logical in my radical thinking.

D9jedau2                         Greisman - direct

1          We can turn the grayest sky to green.  June 30, 1998,

2     2.2 million actual profit.

3          We can make it rain whenever we want it to.  June 30,

4     1999, 4.8 million actual profit.

5          THE COURT:  I think you misread that.

6     Q.  Can you reread the amount there.

7     A.  14.8 million actual profit.

8          We can turn a raging fire into a green river.

9     June 30, 2000.  75 million plus -- 75-plus million profit goal.

10    Q.  Continue reading to the bottom of the page.

11    A.  With all the power we possess, we can change BDO into a

12    green ocean.

13    Q.  If we can go to the third page, PDF page three, Bates

14    number 4975.  And do you see in the box it says tax business

15    line strategy, business -- tax business line was led by

16    Mr. Field, correct?

17    A.  Correct.

18    Q.  And if you could just read the words at the bottom

19    underneath the box.

20    A.  One word sums the strategy of the tax business line.

21    Money.

22    Q.  Keep going.

23    A.  All of us in the firm need to focus on money.  Think green.

24    Green is good.  There's nothing wrong with trying to make more

25    money.  And I'm not talking only about the firm's

D9jedau2                              Greisman - direct

1   profitability.  I'm also talking about individual

2   profitability.

3   Q.  And just so we get a better sense of the -- of what was

4   actually going on at the meeting, the box pictures that we're

5   seeing at the top, was that the PowerPoint slide that was being

6   projected?

7   A.  Yes, it was.

8   Q.  And the words that we see on the bottom, are these

9   basically the words that Mr. Field was stating to the audience?

10  A.  Yes.

11  Q.  Did Mr. Field explain to the partners what the impact on

12  any particular partner's finances would be if they sold the

13  Jenkens tax shelter at this meeting?

14  A.  Yes.

15  Q.  What was that, did he say?

16  A.  It could be very substantial.  The firm had a very unique

17  and radical commission compensation program that essentially

18  gave partners, in essence, a commission and bonus on the sale

19  of these shelters.

20  Q.  Was this a shift from the traditional way that BDO had

21  compensated its partners?

22  A.  It was a radical shift from the way BDO, and actually all

23  other firms, compensated partners.

24  Q.  And the traditional way that BDO had compensated partners

25  was what?

D9jedau2                        Greisman - direct

1   A.   Basically, as with all other accounting firms, partners

2   typically had what were referred to as units, or basically a

3   percentage of the pie.  So at the end of the year the profits

4   were determined and partners received compensation based on

5   their ownership of the firm.  And then sometimes there would be

6   a little bit paid out as bonuses, but typically 90 percent of

7   the firm's earnings were distributed through this unit program,

8   and maybe 10 percent as bonuses.

9   Q.   What was the largest bonus that you had received in your

10  entire career prior to the start of the selling of the

11  Jenkens & Gilchrist tax shelters?

12  A.   25 to $30,000.

13  Q.   And did those figures significantly go up?

14  A.   Yes, they did.

15  Q.   I'd like you to look for a moment, and we'll get back to

16  this 301-269, but I'd like you to look for a moment at

17  Government Exhibit 301-255.  Do you recognize that document?

18  A.   Yes.

19  Q.   What is it?

20  A.   It's a schedule that shows the bonus payments that I

21  received over a period of time from BDO.

22  Q.   From what period of time?

23  A.   Fiscal year 1998 through calendar 2003.

24  Q.   And did those bonuses include bonuses for the Jenkens &

25  Gilchrist tax shelters?

D9jedau2                          Greisman - direct

1  A.  Yes, they did.

2            MS. DAVIS:  Your Honor, the government offers 301-255.

3            MR. LINDER:  No objection.

4            MR. DE CASTRO:  No objection.

5            THE COURT:  Government Exhibit 301-255 is received.

6            (Government's Exhibit 301-255 received in evidence)

7            MS. DAVIS:  May I publish, your Honor.

8            THE COURT:  You may, Ms. Davis.

9            MS. DAVIS:  Ms. Torres, if we could have just the

10 fiscal 1999 box.  It's the small one -- yes, there you go.

11 Perfect.

12 BY MS. DAVIS:

13 Q.  Can you just explain to the jury what the fiscal 1999

14 reference is?

15 A.  So BDO was on a fiscal year -- wasn't a calendar year.  For

16 financial planning purposes, the fiscal year ended June 30th.

17 So fiscal year '99 is actually the year that ended June 30,

18 1999.

19 Q.  And starting on what date?

20 A.  Starting July 1, 1998.

21 Q.  And is there a bonus reflected here for your sale of the

22 Art Frigo tax shelter transaction?

23 A.  Yes, there is.

24 Q.  How much did you receive?

25 A.  $84,750.

D9jedau2                        Greisman - direct

1    Q.  And also for the Stewart Harris transaction that we've been

2    speaking about?

3    A.  Yes.

4    Q.  How much did you receive for that?

5    A.  $2,535.

6    Q.  Is there also a bonus for the Desmet/CTA transaction that

7    we saw on the chart before?

8    A.  Yes.

9    Q.  How much did you get from that?

10   A.  6,175.

11   Q.  Was that your client referral to Jenkens & Gilchrist,

12   Mr. Greisman?

13   A.  No, it was not.

14   Q.  Do you know why you received a bonus on that transaction?

15   A.  I never came to fully understand that.  I had the

16   appreciation that Denis arbitrarily allocated some bonuses to

17   me for reasons that weren't entirely clear, but that was not a

18   transaction I actually worked on.

19   Q.  SSW, was that a transaction that you worked on?

20   A.  No.

21   Q.  How much did you receive for that?

22   A.  10,000.

23   Q.  And I won't do it, but there are many other transactions

24   that are listed on this document, correct?

25   A.  There are.

D9jedau2                          Greisman - direct

1    Q.  And if you would, Ms. Torres, go all the way down to the

2    bottom of the last three lines.  What do those references

3    relate to?

4    A.  Bottom of the first page?

5    Q.  Yes, please.

6    A.  So there's a listing of three tax sales group, general.  So

7    these were general bonuses that were awarded on a more or less

8    discretionary basis out of the tax solutions profits.

9    Q.  Who made the decision to award you those bonuses?

10   A.  Denis Field.

11   Q.  The tax sales group refers to what?

12   A.  The tax solution group.

13   Q.  So you got one -- earliest one listed there is on what

14   date?

15   A.  December 13, 1999.

16   Q.  And so that would put us in which fiscal year?

17   A.  It would put us in the 2000 fiscal year.

18   Q.  And then you got a bonus on March 10th of 2000 of how much?

19   A.  $6,085.

20   Q.  And a bonus a week later of how much?

21   A.  $76,404.

22   Q.  And if you could go to the next page at the very top,

23   Ms. Torres, there are two entries there.  If you could capture

24   all the way down to the fiscal year 2001 heading.  Are there

25   additional bonuses for the fiscal year 2000 listed there?

D9jedau2                        Greisman - direct

1   A.  There are.

2   Q.  Is there one on May 3rd of 2000?

3   A.  Yes.

4   Q.  For how much?

5   A.  35,206.

6   Q.  And on July 31, 2000, how much?

7   A.  49,075.

8   Q.  And what was the total of the bonuses that you received in

9   the fiscal year 2000?

10  A.  I believe it was 834,647.  One second.  There were some

11  other bonuses unrelated to tax solutions.  The total tax

12  solution -- the total tax bonuses that commission type in

13  general was 687,647, and total overall bonus is 834,647.

14  Q.  Do you see the reference on the right-hand side, there's a

15  column that reads total K1 taxable income.  Please explain what

16  that means.

17  A.  That was the amount that -- because of the complicated

18  accounting rules that applied to the way we earned our income,

19  there was a difference, sometimes very significant, between how

20  much we actually took in cash and how much we had to pay tax

21  on.  So in that year, for example, my actual cash bonuses were

22  834,647, but what got reported to the government for tax

23  purposes was 1,077,099.

24  Q.  Do we see similar bonuses for the fiscal year 2001 further

25  down on this page?

D9jedau2                    Greisman - direct

1   A.  Yes.

2   Q.  Ms. Torres, if you could scroll down there are -- there is

3   an entry of three -- yes, you have it.  Three bonuses in 2001

4   that are labeled tax sales, discretionary.  What does that

5   label mean?

6   A.  Again, these were bonuses that came out of the tax solution

7   group or tax solution profits but that were discretionary on

8   the part of Denis in terms that they weren't associated with a

9   specific client transaction.

10  Q.  And for every -- if someone is looking at this document for

11  every label that we see, tax sales discretionary, would that

12  relate to a bonus that Denis Field had given you out of the

13  discretionary pool of funds?

14  A.  Yes.

15  Q.  And how much in discretionary bonuses did you get from

16  Denis Field in the fiscal year 2001?

17  A.  525,000.

18  Q.  Did you get a similar discretionary tax sales bonus in

19  2002?

20  A.  I did.

21  Q.  I should be more clear.  The fiscal year 2002, correct?

22  A.  Yes.

23  Q.  And how much was that?

24  A.  300,000.

25  Q.  So your total bonuses for the fiscal year 2001 was how

D9jedau2                          Greisman – direct

1    much?

2    A.  1,412,854.

3    Q.  And in fiscal year 2002?

4    A.  636,946.

5    Q.  And do the bonuses significantly taper off after 2002?

6    A.  They did.

7    Q.  Why was that?

8    A.  The tax -- primarily tax solution business dried up, and we

9    weren't selling these anymore.

10   Q.  And did you observe Denis Field exercising his discretion

11   to award bonuses to nontax solutions group partners?

12   A.  I did.

13              MR. DE CASTRO:  Objection.

14              THE COURT:  Sustained.  Don't lead the witness.  The

15   answer is stricken.

16   Q.  What did you observe, if anything, Denis Field do with

17   regard to bonuses for nontax solutions group members?

18              MR. DE CASTRO:  Objection.

19              THE COURT:  Overruled.

20   A.  Denis -- in general Denis used the compensation as a either

21   as a carrot or a stick.  And specifically I recall an instance

22   of being at a meeting with Denis where sort of out of the blue

23   and unrelated to the topic being discussed, he decided that a

24   tax solution bonus should be given to a particular partner who

25   was not part of the tax solutions group.  And he told one of

D9jedau2                          Greisman - direct

1    his assistants make a note and give this guy $25,000.

2    Q.  Who was that person?

3    A.  A partner named Lee Graul.

4    Q.  To your knowledge was Lee Graul selling any of the tax

5    shelters?

6    A.  No, he was not.

7    Q.  Was there a process in place for a BDO employee to try to

8    get one of these discretionary bonuses?

9    A.  Well, there came a point in 2001 or '2 that the partner

10   evaluation process -- thanks to a partner evaluation process in

11   place, that it was supposedly being used to help determine what

12   bonuses partners would be awarded.

13   Q.  Did that process include a requirement of any submission of

14   any particular document by the BDO employee?

15   A.  Yes.  In this case it was partners specifically, not

16   employees.

17   Q.  What did the partner have to do?

18   A.  Denis developed something referred to as the good guy/good

19   gal memo, where a partner -- was essentially a one- or two-page

20   questionnaire that was essentially answering the question, tell

21   me why I should give you money.  And the partner would have to

22   fill out their accomplishments or their justifications for

23   receiving a bonus for the year.

24   Q.  Did you submit your own good guy memos?

25   A.  I did.

D9jedau2                    Greisman - direct

1   Q.  Was the -- do you know what the source of the pool of funds

2   was for these discretionary bonuses?

3   A.  Yes.

4   Q.  How do you know that?

5   A.  Charlie Bee informed me.  Others did, too, but Charlie Bee

6   specifically that I remember.

7   Q.  What did he inform you?

8   A.  Basically at this point in time -- we're talking about

9   fiscal year 2000, 2001, that most of the profits of the firm

10  were being generated from the tax solution business, and then

11  it was funding all of the bonus pool.

12  Q.  And at the time that the -- these bonuses were being handed

13  out in the fiscal year '99 to 2001 time period, what was

14  happening to the unit value of the partner's compensation?

15  A.  It was going down radically.

16  Q.  Meaning what was the impact of the bonus structure then on

17  the overall finances for a particular partner?

18  A.  You have to think of the firm's earnings as a pie, and so

19  that pie gets allocated.  Traditionally it had mostly been

20  allocated to unit income and a little bit to bonuses.  When

21  Denis changed the structure to allocate most of the pie based

22  on bonuses, there was very little left to go buy units.  So if

23  a partner was only relying on unit income and it was not

24  receiving a bonus, their income went down substantially.

25  Q.  And in 1998 what was your approximate unit income?

D9jedau2                      Greisman - direct

1    A.   300,000.

2    Q.   And in 2003 what was your approximate unit income?

3    A.   I think it was approximately the same.  I don't --

4    Q.   In 2003?

5    A.   My unit income -- I don't recall.  It was somewhere between

6    300,000 and 500,000.

7    Q.   Were you aware of other partners' unit income decreasing?

8    A.   Yes.

9    Q.   If we could look -- go back to Government Exhibit 301-269

10   on page five, Ms. Torres.  It's Bates number 4977.

11            What's the title of the slide there?

12   A.   Why are we here?

13   Q.   And starting at the name of the game, could you just read

14   to the bottom of that page.

15   A.   The name of the game is profitability.  And we can be much

16   more profitable.  We have to move our focus away from

17   compliance.  The truth is compliance provides low margin -- I'm

18   sorry, low profit margins, high risk and fixed costs.  We need

19   to reduce costs and increase efficiency.  We can't devote

20   limited resources to serving unprofitable accounts.  So we'll

21   continue to use compliance as a great source for cross-selling

22   our value-added services.  But we need to charge appropriately

23   for those services, based on the value we bring to the client's

24   business, and not as an adjunct for compliance.  Look at it

25   this way:  Home run fees of 1 million equals time-based fees of

D9jedau2                           Greisman - direct

 1   5 million.  We need to increase our clients' appreciation of

 2   value and focus on our most profitable areas.

 3   Q.  The reference to compliance means what?

 4   A.  Compliance work is work like preparing tax returns or doing

 5   audits for a company's financial statements.  It's kind of

 6   routine bread and butter work of an accounting firm.

 7   Q.  When it references value-added services, explain what that

 8   means.

 9   A.  Value-added service is our services other than those bread

10   and butter services an accounting firm might do, where much

11   larger fees can be charged doing, for example, specialty

12   consulting in a bankruptcy case or selling tax shelters.

13   Q.  And cross selling, do you see there's a reference to

14   compliance being a great source for cross-selling?

15   A.  Yes.

16   Q.  Our value-added services, what did you understand

17   cross-selling to mean?

18   A.  Cross-selling is that if you offer a client one type of

19   service, like auditing financial statements, you can also sell

20   them other services you offer, like tax services.

21   Q.  If you would turn to the next page, Mr. Greisman.  Do you

22   see a reference to Lincoln Alliance?

23   A.  Yes.

24   Q.  What was the Lincoln Alliance?

25   A.  The Lincoln Alliance is something that Denis had created in

D9jedau2                          Greisman - direct

1    1998.  Lincoln was a large life insurance company, and Denis

2    struck a deal on behalf of BDO and Lincoln where Lincoln paid

3    BDO millions of dollars for access to BDO's clients for them to

4    sell life insurance.

5    Q.  Was Lincoln also viewed as a potential source of clients

6    for BDO?

7    A.  Potentially, yes.

8    Q.  And did you -- do you know whether, in fact, there were

9    Lincoln clients who were sold Jenkens & Gilchrist tax shelters?

10   A.  I don't know of a specific name, but I understand that

11   there were, yes.

12   Q.  And if you would turn to page seven, which is the next

13   page.  Ms. Torres, if you could enlarge the box for a moment.

14        The profit figures we saw in the actual profit column,

15   is that similar to the profit figures that had been referenced

16   by Mr. Field earlier in the presentation?

17   A.  Yes.

18   Q.  Do you see the column that's marked profit budget?

19   A.  Yes.

20   Q.  What does that mean?

21   A.  Every year BDO, like all other accounting firms, would

22   establish a budget for the year going forward.  It would be in

23   the business plan how much revenue is expected and how much

24   expenses were expected and what categories and then how much

25   the budgeted profit was.

D9jedau2                        Greisman – direct

1  Q.  And then those numbers go from what to what from '98 to

2  2000?

3  A.  In '98 it was a budgeted profit of $1 million, and in 2000

4  a budgeted profit of 25 million.

5  Q.  And these are specifically profits from what part of the

6  firm?

7  A.  The tax solutions group.

8  Q.  Do you see the work in process column on the right-hand

9  side?

10  A.  Yes.

11  Q.  What did you understand that to mean?

12  A.  I understood that work in process was potential work that

13  was in the pipeline that wasn't actual dollars in the bank yet

14  or clients who had committed to do things but that could

15  potentially translate into profits.

16  Q.  And those work in process figures went from what in 1998 to

17  what in 2000?

18  A.  1.1 million to 100 million.

19  Q.  And if you go down, scroll down, Ms. Torres, to the

20  paragraph that start out, but we are setting our sights.

21       Could you read that paragraph, Mr. Greisman.

22  A.  But we're setting our sights even higher than that.  Right

23  now we're expecting actual profits of 75 million.  And then in

24  parenthetical, original goal was 50 million in profits.  Denis

25  increased profits to 75 million following the annual partner

D9jedau2                          Greisman - direct

1   meeting.

2   Q.  Going to the next page, Mr. Greisman.  If you can

3   enlarge -- thank you.

4           What does that read?

5   A.  The text or the slide?

6   Q.  You can read the slide there.

7   A.  Provide -- under the heading, how do we increase

8   profitability, provide top producers with sizeable bonuses;

9   goal for fiscal year 2000, 10.125 million in general bonuses;

10  goal for fiscal year 2000, 7.13 million in tax solution bonus;

11  oh, and make sure our expenses do not exceed our revenue.

12  Q.  And what did you understand that last reference to expenses

13  not exceeding revenue?

14  A.  It was a general theme that Denis always had for

15  controlling expenses.

16  Q.  If you go to the last page of the document, which is PDF

17  page 15, Bates page 4987.  Underneath the wolf pack logo, if

18  you could, Ms. Torres.  Thank you.

19          Could you read the sentence starting out, you can?

20  A.  You can all get in on this sea of green at BDO.  With the

21  power, talent and knowledge we possess in our wolf pack, we can

22  turn BDO into a green, green ocean.

23  Q.  And does he acknowledge a specific person from the tax

24  solutions group?

25  A.  Yes, Charlie Bee.

D9jedau2                    Greisman - direct

1   Q.  That's the same Charlie Bee about which we've been

2   speaking?

3   A.  Yes.

4   Q.  During the last quarter of 1999, in terms of the activity

5   related to the Jenkens & Gilchrist now short options tax

6   shelter being sold at BDO, what was going on?

7   A.  It was very intense at the time.  At the end by the last

8   quarter of '99, there were a great many clients who had

9   surfaced who were potential clients for the tax shelter.  There

10  was a lot of selling and implementing the shelters going on.

11  Q.  Were you personally selling at that point in time?

12  A.  Yes, I was.

13          THE COURT:  Is this an appropriate time to take a

14  recess?

15          MS. DAVIS:  It is, your Honor.

16          THE COURT:  All right.  Members of the jury, we're

17  going to take a short midmorning recess.

18          Keep an open mind.  Come to no conclusions and don't

19  discuss the case.

20          Please recess the jury.

21          (Continued on next page)

22

23

24

25

D9jedau2                          Greisman - direct

 1              (In open court; jury not present)

 2              THE COURT:  Mr. Greisman, you may step down, sir, for

 3      a few minutes.

 4              Everyone may be seated.  Any issues that counsel want

 5      to raise?  Do you want to put your point on the record now or

 6      right at the luncheon recess?

 7              MR. MAZUREK:  Whatever you prefer.

 8              THE COURT:  If your remarks are a minute or two, we'll

 9      do it now.  If it's a little longer, we'll do it at lunch.

10              MR. MAZUREK:  Let's do it at lunch.

11              THE COURT:  Okay.  Fair enough.

12              One other thing.  When counsel has an objection, just

13      do me a favor:  Stand and say you have an objection, all right?

14      That way I'll hear it and know that there's an objection.

15              Thank you.

16              MR. MAZUREK:  And are we allowed to say strike that or

17      just --

18              THE COURT:  No.  The next time the witness -- nothing

19      gets stricken unless I tell the court reporter to strike it.

20      Lawyers should only be withdrawing a question, not striking it.

21      All right?

22              Let's take a few minutes.

23              (Recess)

24              THE COURT:  Let's bring in the jury.

25              MS. DAVIS:  I'd like to alert the Court and deputy

D9jedau2                              Greisman – direct

1    that Mr. Dan Grescher, of the law firm whose name is on the

2    envelope, had hand delivered in the courtroom a courtesy copy

3    of a filing.  And rather than have him wait, we just took it

4    from him and left it.

5              THE COURT:  Fine.

6              MS. DAVIS:  Other duties as assigned.

7              (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1               (Jury present)

2               THE COURT:  All right.  Everyone may be seated.  We

3    will continue with the direct examination of Mr. Greisman by

4    Ms. Davis.  You may proceed.

5               MS. DAVIS:  Thank you, your Honor.

6    BY MS. DAVIS:

7    Q.  Mr. Greisman, could you take out Government Exhibit

8    300-165.

9               Do you have that document?

10   A.  I do.

11   Q.  Do you recognize that document?

12   A.  Yes.

13   Q.  What is it?

14   A.  It is a chain of e-mails, two e-mails dated April 3 and

15   April 5 of '99 from -- between Bob Gaida and myself and Paul

16   Shanbrom and Denis Field.

17   Q.  Does this relate to the tracking of the 1998 short sale

18   transactions?

19   A.  Yes, it does.

20              MS. DAVIS:  The government offers 300-165.

21              MR. LINDER:  No objection.

22              MR. DE CASTRO:  No objection.

23              THE COURT:  Government Exhibit 300-165 is received.

24              (Government's Exhibit 300-165 received in evidence)

25              MS. DAVIS:  May I publish?

D9jndau3                        Greisman - direct

1              THE COURT:  You may.

2    BY MS. DAVIS:

3    Q.  Could you just read the -- just for the record, is the

4    bottom e-mail the first in time followed by the top e-mail?

5    A.  It is.

6    Q.  So could you please read the bottom e-mail and tell us who

7    it's from and who it's to?

8    A.  It's to Bob Gaida from me.

9              Bob,

10             Attached is an updated tracking sheet on the BEST

11   sales.  Note that I have changed the format to show estimated

12   fee, billed fee, and collected fee.  The changes since the last

13   time I sent you the tracking sheet are:  Collection of $175,000

14   as downpayment on the transaction for Hi Ball, issuance of

15   invoice for $140,000 to Harris, issuance of invoice for

16   $178,000 to Holton, and revision of fee estimate on Desmet to

17   $1,310,000 from $210,000.  Please call if you have any

18   questions.  CC Denis Field.

19   Q.  Then Mr. Shanbrom's response up top is what?

20   A.  Holton fee of $179,000 instead of $178,000 collected on

21   4/2/99.  I delivered the Desmet bill of $1,310,000 to client on

22   4/22/99, agreed to wire payment to us on 4/8/99.  I will let

23   you know when it is in the bank.

24   Q.  Do you know why the Desmet fee increased from $210,000 to

25   $1,310,000?

D9jndau3                          Greisman - direct

1  A.  I recollect that it was a change in size of the client's

2  income generated or gain generated.

3  Q.  Did you come to a realization, Mr. Greisman, specifically

4  about the economic substance in the Jenkens & Gilchrist tax

5  shelters that you were selling?

6  A.  I did.

7  Q.  When was that?

8  A.  Sometime in the last quarter of 1999.

9  Q.  What was that realization?

10 A.  That there was no way that the transactions would have

11 economic substance, that the profit potential would never

12 overcome the transaction cost.

13 Q.  What led you to that realization?

14 A.  Just stepping back and taking a moment and looking at the

15 numbers and realizing, particularly in connection with the

16 add-on trading, that there was no way that there was ever going

17 to be enough trading and there was enough invested to be able

18 to produce the required profit.

19 Q.  Why was economic substance important in these tax shelters?

20 A.  In order for the tax shelter to be upheld by the IRS both

21 the loophole in the law had to work and the transaction had to

22 have economic substance.

23 Q.  So why was this a concern for you?

24 A.  Because, the concern was that we were selling tax shelters

25 that wouldn't work.

D9jndau3                              Greisman - direct

1    Q.   Was there a risk to BDO if those tax shelters did not work?

2    A.   There would be -- yes, there was.

3    Q.   What was the risk?

4    A.   There was the obvious economic risk that if the shelters

5    didn't work and the clients ultimately paid taxes and interest

6    and penalties they would come after BDO and sue for refunds of

7    their fees and the penalties.

8    Q.   Did you share those concerns with anyone, Mr. Greisman?

9    A.   I did not.

10   Q.   Were you preparing tax returns that reported the results of

11   these tax shelters for which you concluded there was no

12   economic substance?

13   A.   Regrettably I was.

14   Q.   Why was that?

15   A.   Because at this point we were -- we didn't -- to have

16   pulled the plug on these would have been to have pulled the

17   plug on a major portion of the BDO profits.  And also, on a

18   personal level, to have lost the bonuses that were coming and

19   would have caused great embarrassment and risk.

20   Q.   Were there any other risks to BDO besides just the client

21   risks?

22   A.   There were also risks that BDO faced in terms of

23   examination itself by the IRS, and there was something called

24   tax shelter promoter rules; that BDO could be subject to

25   penalties by the government in that connection as well.

D9jndau3                        Greisman - direct

1    Q.  I ask you to look at Government Exhibit 301-13.

2            Do you recognize that document?

3    A.  I do.

4    Q.  What is it?

5    A.  It is a presentation made by Michael Kerekes of the BDO LA

6    office on November 6, '99, to a tax solution group meeting

7    entitled Creating a Record of Business Purpose.

8    Q.  What was the context of this memo being handed out by

9    Mr. Kerekes at the tax solutions group meeting?

10   A.  It was either in connection with the general meeting of the

11   tax solution group or a training session for the tax solution

12   group.

13   Q.  Was Denis Field present --

14   A.  Yes.

15   Q.  -- at this meeting?

16   A.  Yes, he was.

17           MS. DAVIS:  Your Honor, the government offers

18   Government Exhibit 301-13.

19           MR. LINDER:  No objection.

20           MR. DE CASTRO:  No objection.

21           THE COURT:  Government Exhibit 301-13 is received in

22   evidence.

23           (Government's Exhibit 301-13 received in evidence)

24           MS. DAVIS:  May I publish?

25           THE COURT:  You may, Ms. Davis.

D9jndau3                          Greisman - direct

1    BY MS. DAVIS:

2    Q.  How was it, to your knowledge, that it came about that

3    there was a document called Creating a Record of Business

4    Purpose?

5    A.  As was common at tax solution group meetings, there were

6    presentations on different topics.  And this particular topic

7    was that, creating records of business purpose, because it was

8    one of the elements of a tax shelter transaction.

9    Q.  Looking at the first section that is entitled, Business

10   Purpose in General.

11           Could you just read that section, please.

12   A.  It is understood that profit potential and economic

13   substance are critical to preserving the tax benefits of a

14   transaction.

15           Over time Congress and the IRS and the courts have

16   evolved a series of criteria for economic substance in addition

17   to the direct analysis of cash-on-cash returns.

18           We need to work to meet those criteria to the greatest

19   extent possible in order to add support to the basic argument

20   that there is adequate cash-on-cash economic substance.

21   Q.  What did you understand cash-on-cash economic substance to

22   mean?

23   A.  Cash-on-cash is basically describing, if you put $10,000

24   into a transaction and you get back $20,000, you have doubled

25   your money or you've made 100 percent return.  So it's the

D9jndau3                          Greisman - direct

1    analysis of how much direct return you are getting out of an

2    investment.

3    Q.   Did you also have to include all the fees when you were

4    looking at a cash-on-cash return?

5    A.   If you are just looking narrowly at the investment, no.

6    But if you are determining economic substance, you have to look

7    at all of the fees, yes.

8    Q.   Because why?

9    A.   Because the rules of economic substance are essentially

10   defined as the ability to earn a profit or have economic

11   consequence in excess of the costs for the tax shelter

12   transaction.

13   Q.   The cost for the BDO tax shelter transaction was what?

14   A.   Well, it absolutely was the cost of the BDO fee that

15   clients were paying and arguably was also the cost of the tax

16   opinion fee.

17   Q.   You used the phrase tax opinion fee.  What are you

18   referring to when you say tax opinion fee?

19   A.   The Jenkens & Gilchrist fee.

20   Q.   Did that cover more than just the tax opinion?

21   A.   It did.

22          MR. DE CASTRO:  Objection.  Leading.

23          MR. LINDER:  Objection, your Honor.

24          THE COURT:  Overruled.

25   A.   Yes.

D9jndau3                          Greisman - direct

1   Q.  Was there ever an instance to your knowledge, Mr. Greisman,

2   where a BDO tax client who was sold a Jenkens & Gilchrist tax

3   shelter did not pay a fee to Jenkens & Gilchrist?

4            MR. LINDER:  Objection.  Foundation.

5            THE COURT:  You can answer that yes or no.

6            The objection is overruled.

7   A.  No.

8   Q.  Looking at the second page of this document, do you see the

9   section that is entitled How to Approach Economic Substance.

10           If you could read the section A there.

11  A.  Section A.  Settings in which issue may arise.

12           1.  Audit.

13           2.  Appeals division negotiation, possibility of

14  compromise based on the hazards of litigation.

15           3.  Litigation negotiation, an additional opportunity

16  to compromise normally with renewed participation by appeals

17  division.

18           4.  Court, recent cases unfavorable to taxpayer.

19  Q.  Can you just explain to the jury what exactly is meant by

20  this series of steps that are listed?

21  A.  This is describing the context in which the issue of

22  economic substance will arise.  So, in the first instance, it

23  could arise in an audit by the IRS, where the IRS's auditing or

24  examining the tax return to determine the correctness of the

25  tax return.

D9jndau3                        Greisman - direct

1           After the IRS conducts an audit and makes a

2      determination, if the determination is that additional taxes

3      are due, the taxpayer has a right to go to the appeals division

4      to have a negotiation and possibly a settlement of the dispute

5      with the IRS.

6           If the issue is not resolved at that level, it can go

7      on to litigation, which might involve more negotiation and the

8      possibility of settlement.

9           And if it isn't resolved by settlement, then it goes

10     to court and to a trial.

11     Q.   Litigation means what?

12     A.   A lawsuit.

13     Q.   In the tax shelter sales that you were doing of Jenkens &

14     Gilchrist tax shelters, did you tell the clients anything about

15     having to go to court to have these tax benefits upheld?

16     A.   Yes.

17     Q.   What did you tell them?

18     A.   That if they were examined by the IRS they could be

19     challenged and likely the IRS could disallow the losses and

20     that they would have to go through the process, in effect

21     explaining these steps they would have to go through, the audit

22     process and appeals process ultimately possibly having to go to

23     court.

24     Q.   Did you tell that to each and every BDO tax shelter client

25     who bought a Jenkens & Gilchrist tax shelter?

D9jndau3                          Greisman - direct

1   A.  I personally told it to the best of my knowledge to most of

2   the clients I sold the shelter to.

3   Q.  The BDO fee that we saw, for example, on the Mel Gale

4   consulting agreement, that $150,000, would that cover BDO's

5   representation of a client through the audit process and

6   beyond?

7   A.  No, it would not.

8   Q.  If you could turn to the next page, Ms. Torres and

9   Mr. Greisman.  Could you just read the heading and below.

10  A.  The heading is Indicators of Economic Substance.

11            Approach:  It is impossible to predict which

12  indicators will be found most relevant in any given case.

13  Sometimes it seems that simply amassing a large number of

14  favorable indicators may be persuasive.  Each indicator should

15  be examined to determine whether it applies or can be made to

16  apply to the taxpayer.

17  Q.  Under Soft Indicators of Business Purpose -- well, let me,

18  do you see the heading Soft Indicators of Business Purpose?

19  A.  I do.

20  Q.  What does the reference to soft indicator mean?

21  A.  Soft indicator means that these are things that are not

22  absolutely going to establish business purpose, but might help

23  support an argument for business purpose.

24  Q.  What's listed there?

25  A.  Due diligence in entering into an activity.

D9jndau3                         Greisman - direct

```
 1              Understanding of profit potential of activity.
 2              Maintaining good books and records.
 3              Carrying on activity in a manner similar to that in
 4   which other profitable activities are carried on.
 5              No element of personal enjoyment.
 6              Existence of business benefits other than direct
 7   profit, administrative simplicity, etc.
 8              A documented reason, preferably external, for each
 9   action.
10   Q.  If we could go to the next page, please.  What's the
11   heading in subsection B?
12   A.  Flexible Indicators of Business Purpose.
13   Q.  Are there approximately 15 or 20 factors that are listed
14   there?
15   A.  There are.
16   Q.  If you could just read the first four transactions.
17   A.  Duration.
18   Q.  Withdrawn.  If you could just read the first four flexible
19   indicators?
20   A.  Duration of activity, short may indicate lack of business
21   purpose.
22              Tailoring of results of activity to taxpayer's tax
23   needs.
24              Year-end transaction, without other justification may
25   indicate lack of business purpose.
```

D9jndau3                        Greisman - direct

1          Transaction is unusual or isolated for taxpayer.

2  Q.  Down at the bottom do you see the reference to hard

3  indicators of business purpose?

4  A.  Yes.

5  Q.  What is a hard indicator of business purpose?

6  A.  I think a hard indicator would be something that would be

7  more definitive in establishing the existence or lack of

8  business purpose.

9  Q.  Can you give an example.

10 A.  This would be like the profit potential on a transaction as

11 measured against the transaction cost.

12 Q.  What is listed underneath the heading Hard Indicator of

13 Business Purpose?

14 A.  It says, Discussion omitted, discussed in previous

15 presentation.

16 Q.  Was that a presentation that Mr. Kerekes had made to the

17 tax solutions group?

18 A.  I don't recall.

19 Q.  Looking at subsection 4 on the last page, what does it say

20 under subsection 4?

21 A.  It says, Examples and Practices.

22          A client file should include:

23          Memoranda analyzing transactions and documents,

24 prepared and reviewed before the fact; see samples.

25          Economic analysis documents, prepared and reviewed

D9jndau3                          Greisman - direct

1    before the fact.

2             Records of telephone conversations, indicating content

3    of discussions and decisions made.

4             Related information, such as news items relevant to

5    client's activity.

6             Records of any other facts relevant to the indicators

7    discussed above.

8    Q.  Did you personally, Mr. Greisman, create and send documents

9    that would fall into or would purport to fall into one of these

10   categories?

11   A.  I did.

12   Q.  And were any of those documents anything other than fully

13   truthful?

14   A.  Yes.

15   Q.  Looking at Government Exhibit 300-131, do you have it in

16   front of you?

17   A.  Yes.

18   Q.  What is that document?

19   A.  It is a memo from Michael Kerekes with the subject line,

20   Your Investment Plans.  It is essentially a template document,

21   and it's several pages long.

22   Q.  Did this document relate to the implementation of the

23   Jenkens & Gilchrist tax shelters, among others?

24   A.  Yes, it did.

25   Q.  Were you provided a copy of this by Mr. Kerekes in the

1    course of the tax solutions group business?

2    A.  Yes, I was.

3            MS. DAVIS:  Your Honor, the government offers 300-131.

4            MR. LINDER:  No objection.

5            MR. DE CASTRO:  No objection.

6            THE COURT:  Government Exhibit 300-131 is received.

7            (Government's Exhibit 300-131 received in evidence)

8            MS. DAVIS:  May I publish?

9            THE COURT:  You may.

10           MS. DAVIS:  If we can enlarge from the confidential on

11   down to the bottom of the page.

12           Let's try just the header at first so we can see it

13   better.

14   BY MS. DAVIS:

15   Q.  The author of this memo is whom?

16   A.  Michael Kerekes.

17   Q.  Do you see the entries for the to, file, cc, and date are

18   blank?

19   A.  They are.

20   Q.  Why was that?

21   A.  This was just a template that was handed out.

22   Q.  And by template you mean what?

23   A.  Just like a form essentially not intended to be given to

24   some specific person but intended to be used in a number of

25   cases.

D9jndau3                          Greisman – direct

1   Q.  And what was the understanding about what you were to do

2   with this template?

3   A.  To use this to develop documents to place in the client

4   files.

5   Q.  For what purpose?

6   A.  To show economic substance.

7   Q.  Accurately or inaccurately?

8   A.  Inaccurately.

9   Q.  The subject matter line says what?

10  A.  Your Investment Plans.

11  Q.  To your knowledge, was Mr. Field aware that Mr. Kerekes was

12  handing out such a document?

13  A.  Yes.

14  Q.  How was that?

15  A.  This document was discussed in a tax solution group call.

16  Q.  That Mr. Field participated in?

17  A.  Yes.

18          MS. DAVIS:  If you could scroll down, Ms. Torres, and

19  if we can enlarge the paragraphs.  Try one more time and see if

20  we can get them a little bit bigger.

21          Thank you.

22  BY MS. DAVIS:

23  Q.  If you could just read the first two paragraphs there.

24  A.  As we have previously discussed, this memorandum addresses

25  some of my preliminary thoughts regarding the investment

D9jndau3                              Greisman - direct

1   program you are considering entering.  As we have discussed,

2   while I am not an investment professional and do not give

3   investment advice, I have worked in the past together with

4   blank personnel in reviewing the general structure of

5   investment arrangements to determine whether they appear to

6   make sense from a tax and financial standpoint.

7   Q.  You can continue reading.

8   A.  As I understand it, you are planning to pursue a series of

9   investments in various derivative securities, particularly

10  securities of types that are sensitive to interest rates.  You

11  have noted that you expect volatility in that area and expect

12  to have opportunities to achieve speculative profits.  As we

13  have discussed, you are not planning to take extremely large

14  exposure on any one position; rather, you will attempt to make

15  repeated and frequent small profits while holding risks to a

16  reasonable level.  My general reaction to that strategy is that

17  it should help you limit your risks, but that to be extremely

18  successful you will have to make a large number of correct

19  guesses.  However, if you have a nose for interest rate

20  changes, you may be able to do very well over a course of

21  trading involving numerous trades.  Over the long term your

22  potential profits appear essentially unlimited.

23  Q.  What time period was this document provided to the tax

24  solutions group?

25  A.  I believe in the October -- September, October, November

D9jndau3                        Greisman - direct

1    '99 time frame.

2    Q.  Did you in fact use this document as a template for your

3    own clients?

4    A.  I used portions of this document as a template for my

5    clients, yes.

6    Q.  The investment program that is referenced in the first

7    paragraph, what does that refer to?

8    A.  That refers both to the options trade and the tax shelter

9    transaction as well as the additional cash being invested.

10   Q.  Were you pitching this to the clients that you sold your

11   Jenkens & Gilchrist tax shelters to as an investment program?

12            MR. DE CASTRO:  Objection.

13            THE COURT:  Sustained.

14   Q.  Did you make pitches to BDO tax shelter clients?

15   A.  Yes.

16   Q.  What did you say to them about investment programs?

17   A.  That they would have to engage in an investment program in

18   order to get the tax shelter.

19   Q.  In looking down at the second paragraph, do you see where

20   it says, you will attempt to make repeated and frequent smaller

21   profits while holding risks to a reasonable level?

22   A.  Yes.

23   Q.  Let me just -- that whole sentence reads, As we have

24   discussed, you are not planning to take extremely large

25   exposure on any one position; rather, you will attempt to make

D9jndau3                    Greisman - direct

1   repeated and frequent smaller profits while holding risks to a

2   reasonable level.

3          How many times, to your knowledge, did the client

4   enter into a foreign currency transaction for the short options

5   tax shelter?

6   A.   Generally only once or twice.

7   Q.   Was that the intent?

8   A.   Yes.

9   Q.   Was that the planned aspect of the investment part of the

10  short options tax shelter?

11  A.   Yes, to enter into one or two or no more than three option

12  trades, yes.

13  Q.   Do you see the reference to, However, if you have a nose

14  for interest rate changes?

15         What did interest rate changes have to do with the

16  foreign currency options transaction in the short options tax

17  shelter?

18  A.   They did not.

19  Q.   If you look at the third page of the document, does it have

20  an additional memo attached?

21  A.   Yes.

22  Q.   What's the date on that memo?

23  A.   October 6, '99.

24  Q.   What is the subject matter line?

25  A.   Investment planning -- I'm sorry, investment plan, timing

D9jndau3                          Greisman - direct

1    of commencement and comments on documents.

2    Q.  Do you see here it has a first section called Timing?

3    A.  Yes.

4    Q.  Can you just read the first paragraph.

5    A.  As we have discussed by telephone, the initial set of

6    documents prepared by -- it's got the letter J and blank --

7    with respect to your investment plan did not accurately reflect

8    your wishes.  I have spoken with -- and then D and blank -- and

9    the documents are being revised.  I have made clear to -- D and

10   blank -- that you believe the most favorable market conditions

11   for pursuing your plan exist now, and you need to move forward

12   quickly.  She has said she will prepare the revised documents

13   as quickly as possible.

14   Q.  Are there comments listed in the rest of the memo about

15   particular aspects of the documents that were being prepared in

16   relation to the tax shelter program?

17   A.  There are.

18   Q.  If you would go to, I believe Bates page 1155.  It's about

19   three more pages in.  Do you see the entry for 6.1(i) in the

20   middle?

21   A.  Yes.

22   Q.  What does it say there?

23   A.  The partnership is scheduled to end after 30 years.  The

24   partners have the option of extending it should they choose to

25   do so.

1   Q.  In the Jenkens & Gilchrist that you were selling, that BDO

2   was selling, when was the partnership scheduled to end?

3   A.  By the end of the calendar year.

4   Q.  Why was that?

5   A.  Because of the way the loophole in the tax law worked, if

6   the partnership didn't end by the end of the year, the tax

7   shelter would not be available.

8   Q.  Was this step a necessity in order to achieve the tax

9   benefits from the tax shelter?

10  A.  Yes, it was.

11  Q.  Could you achieve the tax benefits from the Jenkens &

12  Gilchrist tax shelter without the end of the partnership by the

13  end of the tax year?

14  A.  Not in that year, no.

15  Q.  If you would look at the title of the last document

16  attached to the memo.  It says, Your Investment Plans, LLC

17  documents.  It starts on Bates page 1157.

18  A.  Yes.

19  Q.  LLC references what?

20  A.  Limited liability company.

21  Q.  Was that one of the entities that was used to implement a

22  BDO Jenkens tax shelter?

23  A.  Yes.

24          MS. DAVIS:  If you would scroll down, Ms. Torres, to

25  the second paragraph.

D9jndau3                           Greisman - direct

1   Q.   Could you just read that, please.

2   A.   As I understand it, you are pursuing a series of

3   investments in various derivative securities.  You have told me

4   of your ex--- you have told me of your history of excellent

5   financial success with similar investments, options, and I can

6   understand why, based on the past success, you would wish to

7   continue making similar investments.  I also consider it a

8   highly prudent decision to pursue the investment program

9   through an LLC managed by competent investment professionals;

10  while you have done well in the past, derivatives have become a

11  very fast moving and computer-based area of investment, and as

12  an individual without professional assistance, you could be at

13  a disadvantage.  Thus, I think you are doing the right thing in

14  joining an investment LLC.  I further think it is a good idea

15  to join an LLC without too many other partners, so that your

16  voice will be heard clearly when decisions have to be made.

17  Q.   Generally, who were the partners of the LLCs for the

18  Jenkens & Gilchrist tax shelters?

19  A.   The client who was seeking the tax shelter and others who

20  were related to them.

21  Q.   In an instance where it was just a single individual with

22  no other co-participants who would be the members of the, who

23  was related to the LLC?

24  A.   The taxpayer would either have or create an S corporation

25  and have that S corporation that the client owned be the other

D9jndau3                        Greisman - direct

1    member of the LLC.

2    Q.  Looking at Government Exhibit 301-34, do you recognize that

3    document?

4    A.  Yes.

5    Q.  What is it?

6    A.  It's memo from me to Melvin Gale dated September 28, 1999,

7    and the caption, Your Investment Plans.

8    Q.  Was this the same Melvin Gale about which you testified

9    earlier?

10   A.  Yes.

11   Q.  Was this sent in connection with his Jenkens & Gilchrist

12   tax shelter?

13   A.  Yes.

14            MS. DAVIS:  Your Honor, the government offers 301-34?

15            MR. LINDER:  No objection.

16            MR. DE CASTRO:  No objection.

17            THE COURT:  Government Exhibit 301-34 is received in

18   evidence.

19            (Government's Exhibit 301-34 received in evidence)

20            MS. DAVIS:  Might I publish?

21            THE COURT:  You may.

22            MS. DAVIS:  If we can just have the caption below

23   memorandum through the first two paragraphs.

24   BY MS. DAVIS:

25   Q.  Does this language that we see here, Mr. Greisman,

1    essentially mirror the language that we saw in the template

2    that was sent out by Mr. Kerekes?

3    A.  It does.

4    Q.  Did you discuss with Mr. Gale expected volatility,

5    potentially related to Y2K concerns?

6    A.  No.

7    Q.  Why does it say in paragraph 2 that you have noted that

8    you, Mr. Gale, expect volatility potentially related to Y2K

9    concerns?

10   A.  To make it appear that it has economic substance.

11   Q.  Was that an accurate depiction there?

12   A.  No.

13   Q.  If you would, read the sentence out loud that says, As we

14   have discussed in the middle of the paragraph there.

15   A.  As we have discussed, you are not planning to take

16   extremely large exposure on any one position; rather, you will

17   attempt to make repeated and frequent smaller profits while

18   holding risks to a reasonable level.  My general reaction is

19   that strategy -- my general reaction to that strategy is that

20   it should help you limit your risks, but that to be extremely

21   successful you will have to make a large number of correct

22   guesses.  However, if you have a nose for interest rate changes

23   or know someone who does, you may be able to do very well over

24   a course of trading involving numerous trades.  Over the long

25   term, your potential profit appears essentially unlimited.

D9jndau3                          Greisman - direct

1   Q.  Did you have such a discussion with Mr. Gale?

2   A.  I did not.

3   Q.  Is this a true statement as put in this memo, Mr. Greisman?

4   A.  It is not.

5   Q.  Did you use similar types of memos with other Jenkens &

6   Gilchrist tax shelter clients?

7   A.  Yes.

8   Q.  Why did you use such documents.

9   A.  To make it appear that there was economic substance when

10  there was not.

11  Q.  To what end?

12  A.  To be able to help the taxpayer prevail in the event of an

13  IRS audit.

14  Q.  What would be the effect of such a document -- withdrawn.

15          With the intent of producing what benefit at the end

16  of the road?

17  A.  Potentially being used to convince the IRS the transaction

18  had economic substance.

19  Q.  Looking at Government Exhibit 301-158, do you recognize

20  that document?

21  A.  I do.

22  Q.  What is it?

23  A.  A letter from me to Mel Gale dated November 19, 1999.

24  Q.  Does this relate to similar documentation that you were

25  sending to Mr. Gale related to his tax shelter?

1  A.  Yes.

2            MS. DAVIS:  The government offers 301-158.

3            MR. LINDER:  No objection.

4            MR. DE CASTRO:  No objection.

5            THE COURT:  Government Exhibit 301-158 is received.

6            (Government's Exhibit 301-158 received in evidence)

7            MS. DAVIS:  May I publish, your Honor.

8            THE COURT:  Yes.

9            MS. DAVIS:  If we could enlarge the body of the letter

10  with the date.

11            Thank you.

12  BY MS. DAVIS:

13  Q.  What is the date on this letter?

14  A.  November 19, 1999.

15  Q.  Was this in the course of Mr. Gale's implementation of his

16  Jenkens & Gilchrist tax shelter?

17  A.  Yes.

18  Q.  Could you just read the body of the letter there.

19  A.  Dear Mel.

20            For your information, below are some websites that I

21  came across that may be of interest to you in light of your

22  recent interest in foreign exchange investing.

23            It lists four websites.

24  Q.  Why did you send this letter to Mr. Gale?

25  A.  To make it appear that he had an interest in foreign

D9jndau3                         Greisman – direct

1  currency investing.

2  Q.  Had he expressed an interest in foreign currency investing

3  to you?

4  A.  Not that I recall.

5  Q.  Looking at Government Exhibit 301-155, do you recognize

6  that document?

7  A.  Yes.

8  Q.  What is it?

9  A.  It's a letter from me to Mel Gale dated November 11, 1999.

10 Q.  Is this a document that you sent in connection with the

11 implementation of Mr. Gale's tax shelter?

12 A.  Yes.

13          MS. DAVIS:  Your Honor, the government offers 301-155.

14          MR. LINDER:  No objection.

15          MR. DE CASTRO:  No objection.

16          THE COURT:  Government Exhibit 301-155 is received in

17 evidence.

18          And you may publish it.

19          MS. DAVIS:  Thank you, your Honor.

20          (Government's Exhibit 301-155 received in evidence)

21 BY MS. DAVIS:

22 Q.  If we could just focus on the fax banner for a second.

23          What is the date on the fax banner?

24 A.  November 11, 1999.

25 Q.  Does it appear to be a fax banner from BDO Seidman?

D9jndau3                              Greisman - direct

1   A.  Yes.

2   Q.  Going down to the body of the letter, can we just have, if

3   we can -- well, do you see it has a reference to how this

4   document was sent to Mr. Gale?

5   A.  Yes.

6   Q.  In what manner was it sent to Mr. Gale?

7   A.  By fax and regular mail.

8   Q.  To Mr. Gale in what location?

9   A.  At his home in Boca Raton, Florida.

10          MS. DAVIS:  If you could scroll down a bit, or enlarge

11  starting at this letter going down to the end of the body of

12  the letter, Ms. Torres.

13  BY MS. DAVIS:

14  Q.  Could you read the body of the letter?

15  A.  Dear Mel.

16          This letter is a follow-up to the telephone conference

17  call you invited me to sit in on between you, David Parse of

18  Alex Brown, and me today.

19  Q.  Actually, I am going to stop you there, Mr. Greisman, to

20  ask you, did Mr. Gale invite you to sit in on the meeting or

21  the conference call with David Parse?

22  A.  No.

23  Q.  How did that actually work?

24  A.  I initiated the call.

25  Q.  For what purpose?

D9jndau3                         Greisman - direct

1    A.  For the purpose of having Mr. Parse explain the option to

2    Mr. Gale.

3    Q.  So why in this letter did you state that you were the --

4    you, Mr. Gale -- Mr. Gale was the one who had invited you?

5    A.  I don't recall.

6    Q.  Looking down at the prior-to-the-call paragraph, could you

7    read that?

8    A.  Prior to the call, you expressed on Eric Hananel and me an

9    interest in investment opportunities that had hedging

10   potential, particularly in light of potential Y2K problems.  In

11   this connection, I had communicated to you that I have heard

12   and read that various people I consider knowledgeable are

13   expecting a significant rise in the value of the euro versus

14   the dollar beginning in late November and early December.  Of

15   course, BDO does not give investment advice, but I thought I

16   would pass along what I heard in case you wanted to explore the

17   matter with your investment advisers.

18   Q.  Did you have such a call with Mr. Gale in which he

19   expressed to you and Mr. Hananel an interest in investment

20   opportunities that had hedging potential particularly in light

21   of potential Y2K problems?

22   A.  No.

23   Q.  Why did you include that here?

24   A.  To make it appear that there was economic substance.

25   Q.  Could you read the next paragraph, please.

D9jndau3                         Greisman - direct

1   A.   Today you had a conference call with David Parse of Alex

2   Brown which you invited me to be part of.  David outlined

3   various strategies and theories relative to foreign currency

4   options and discussed the role that volatility and supply and

5   demand have in making a profit in these transactions.  David

6   also described for you the risks related to these transactions

7   as well as the profit potential.  In answer to your question

8   about the best currency to trade now, he indicated that his

9   firm would look for volatility, which is generally favorable in

10  option trades, at the cheapest price in a currency that has

11  deep liquidity, such as the euro or the yen.  You indicated you

12  had some experience with stock options and puts and calls, and

13  because speed was of the essence, you were prepared to proceed

14  with a trade.

15  Q.   Do you recall having a conversation or conference call at

16  all with David Parse and Mel Gale?

17  A.   Yes, I do.

18  Q.   Do you recall whether Mr. Parse outlined or discussed the

19  role of volatility and supply and demand in making a profit in

20  the options transactions?

21  A.   He did.

22  Q.   And did Mr. Gale indicate to him that or question him about

23  the best currency to trade?

24  A.   He did.

25  Q.   What was Mr. Parse's recommendation?

1    A.   That he would make a determination at some point in the

2    future, in the near future.

3    Q.   Did he say what that would be based on?

4    A.   The things that he indicated here, that he would be looking

5    for liquidity and a cheap price.

6    Q.   Did Mr. Gale indicate in that call that he had experience

7    with stock options and puts and calls?

8    A.   He did.

9    Q.   Did he also indicate that speed was of the essence?

10   A.   Not that I recall.

11   Q.   Was speed of the essence at that point in time?

12   A.   It was relative to the tax shelter, yes.

13   Q.   Why was speed of the essence?

14   A.   Because, as you will recall, there was a series of steps

15   that have to happen and be done by the end of the calendar year

16   in order for the tax shelter to work.

17   Q.   And this letter is copied to whom?

18   A.   Eric Hananel.

19   Q.   In what office?

20   A.   The BDO New York office.

21   Q.   I would ask you to look at Government Exhibit 301-51.  Do

22   you have it in front of you?

23   A.   I do.

24   Q.   What is this document?

25   A.   A letter dated November 19, 1999 from me to Andrew Wright

1    and Mark Heaney of the Addus Healthcare Company.

2    Q.   Were they Jenkens & Gilchrist tax shelter clients at BDO?

3    A.   They were.

4    Q.   Did you have involvement with them?

5    A.   Yes.

6    Q.   Were they your pre-existing clients?

7    A.   They were BDO pre-existing clients.  I had some involvement

8    with them.

9    Q.   Was this document sent in connection with the

10   implementation of their Jenkens & Gilchrist tax shelter?

11   A.   Yes, it was.

12             MS. DAVIS:  Your Honor, the government offers 301-51?

13             MR. LINDER:  No objection.

14             MR. DE CASTRO:  No objection.

15             THE COURT:  Government Exhibit 301-51 is received.

16             (Government's Exhibit 301-51 received in evidence)

17             MS. DAVIS:  May I publish?

18             THE COURT:  You may.

19   BY MS. DAVIS:

20   Q.   What is the date on this letter, Mr. Greisman.

21   A.   November 19, 1997.

22   Q.   How was it sent on Mr. Wright and Mr. Heaney?

23   A.   By fax and regular mail.

24   Q.   Could you read the body of the note there.

25   A.   Dear Andy and Mark.

D9jndau3                          Greisman - direct

```
 1              Just a short note to confirm that I've thought about
 2      the business and tax issues we've been discussing and concluded
 3      that you should contribute the investment to the partnership.
 4      Q.  Why are you sending such a note to Mr. Wright and
 5      Mr. Heaney?
 6      A.  To make it appear that there was a business reason for
 7      making the contribution of the investment to the partnership.
 8      Q.  Were you on November 17, 1999, giving any actual
 9      consideration to the thought of whether or not the investment
10      should be contributed to the partnership?
11      A.  No.
12      Q.  Why are you saying there that you are concluding on
13      November 17, 1999 after consideration that you should
14      contribute the investment to the partnership?
15      A.  To make it falsely appear that there was a business reason
16      for doing that.
17      Q.  Was there any question about whether the investment by
18      Mr. Wright and Mr. Heaney had to be contributed to the
19      partnership?
20      A.  No.  That was one of the steps that was required to make
21      the tax shelter work.
22      Q.  When did you first learn of that step in relation to any
23      Jenkens & Gilchrist tax shelter structure?
24      A.  Very early in learning the process of the tax shelters.  I
25      am not sure, we were -- in late 1998.
```

D9jndau3                          Greisman - direct

1  Q.  There is a copy or a cc to Sherwin Gilbert and Steve

2  Ferrara.

3          Can you identify who those people are, please.

4  A.  Sherwin Gilbert was a tax partner in the BDO Chicago

5  office, and he was the primary partner taking care of tax

6  matters for this client, and Steve Ferrara was the audit

7  partner in Chicago.

8  Q.  Looking at Government Exhibit 301-265, do you recognize

9  that document, or that set of documents?

10  A.  I do.

11  Q.  Do they relate to two Jenkens & Gilchrist tax shelter

12  clients of BDO?

13  A.  Yes.

14  Q.  Which clients?

15  A.  Stanley Sher and John Illinghorn.

16  Q.  Were these clients related to each other at all?

17  A.  No.

18  Q.  And the date on the first document is what?

19  A.  December 15, 1999.

20  Q.  And the date on the second document is what?

21  A.  December 5, 2000.

22          MS. DAVIS:  Your Honor, the government offers 301-265.

23          MR. LINDER:  No objection.

24          MR. DE CASTRO:  No objection.

25          THE COURT:  Government Exhibit 301-265 is received in

D9jndau3                        Greisman - direct

1    evidence.

2              (Government's Exhibit 301-265 received in evidence)

3              MS. DAVIS:  May I publish?

4              THE COURT:  You may.

5              MS. DAVIS:  If you could enlarge the front, actually

6    the -- there you go.  Down from Stanley Sher down to the

7    bottom.

8    BY MS. DAVIS:

9    Q.  Who was Stanley Sher?

10   A.  He was a BDO client of the Milwaukee office who was based

11   in Washington, D.C.

12   Q.  Was he your client at all prior to your involvement with

13   him with the tax shelter?

14   A.  No, he was not.

15   Q.  How did you learn about Mr. Sher?

16   A.  David Weinberg, who was a member of the tax department in

17   the BDO Milwaukee office, was aware that Mr. Sher had large

18   income or gain and brought him to my attention.

19   Q.  Did you have an opportunity to learn Mr. Sher's background?

20   A.  I did.

21   Q.  What was it?

22   A.  He was the senior partner in a maritime law firm in

23   Washington, D.C.

24   Q.  And just for the -- withdrawn.

25              What is maritime law?

D9jndau3                                    Greisman - direct

1   A.   International shipping and commerce.

2   Q.   Was Mr. Sher part of a larger family group that had a large

3   gain that year?

4   A.   Yes, he was.

5   Q.   Do you recall what the source of the gain was?

6   A.   His family owned -- his family which consisted of he and

7   his wife and his sister and her mother had real estate he had

8   inherited and sold at a large gain.

9   Q.   Did you have an opportunity to meet with Mr. Sher in

10  person?

11  A.   I did.

12  Q.   When was that?

13  A.   In early December of 1999.

14  Q.   Where was the meeting?

15  A.   In Mr. Sher's office in Washington.

16  Q.   Who attended the meeting?

17  A.   Mr. Sher and myself and Denis Field.

18  Q.   How was it that you came to meet Mr. Sher with Mr. Field at

19  Mr. Sher's office in December '99?

20  A.   Mr. Field had asked me to accompany him on a business trip

21  to Washington to meet with another gentleman, and it turned out

22  Mr. Sher's office was just about a block away.  Since I had

23  been dealing with Mr. Sher extensively over the telephone at

24  this point, I wanted to meet him, so I arranged the meeting and

25  took Mr. Field along with me.

D9jndau3                         Greisman – direct

Q.   Now, this other meeting of which you spoke, what was that

meeting?

A.   That was a meeting that Denis Field arranged with a

gentleman named L. William Seidman.  And L. William Seidman at

that time was a CNN, or he was a CNBC news commentator and was

very prominent in the financial community.  He had previously

served in the Reagan Administration, but he was the son and

nephew of the bounder of BDO Seidman and had for many years run

the firm.

Q.   What did Mr. Field say to Mr. Seidman in the meeting?

A.   He made him aware in general terms of our tax solution

practice and in effect was looking to Mr. Seidman to be a

potential source for clients.

Q.   How old was Mr. Seidman at that point in time?

A.   In his early 80s.

Q.   To your knowledge, did Mr. Seidman refer any clients to BDO

for its tax shelters?

A.   No, he did not.

Q.   Where was that meeting with Mr. Seidman?

A.   At the TV studio, I think it was CNBC, whatever the news

station was that Mr. Seidman was a commentator at.

Q.   Then at some point during the day you also met with

Mr. Sher at his offices?

A.   Yes, either immediately before or immediately afterwards.

The offices were just about a block apart.

1  Q.  At the meeting with Mr. Sher, what did you say to Mr. Sher?

2  A.  By this point in time, Mr. Sher was already engaged in the

3  implementing of the transaction, so some part of the meeting

4  was just general social.  We had talked on the phone a lot and

5  hadn't met before.  And some part of it was, How is it going

6  with the transaction, all the steps that had have been done.

7          But we did discuss the fact that there was

8  documentation that BDO was preparing for the files, and

9  actually Mr. Sher, either I asked him to or he volunteered that

10 he would send an acknowledgement letter back to me.

11 Q.  Was Denis Field present with that conversation with

12 Mr. Sher?

13 A.  Yes, he was.

14         MS. DAVIS:  Looking at Government Exhibit 301-2 -- I'm

15 sorry.  Can we have 201-265, in evidence already I believe.  If

16 I might republish it, your Honor.

17         THE COURT:  You may.

18 BY MS. DAVIS:

19 Q.  So, could you just read the body of the letter here to

20 Mr. Sher on December 15, 1999.

21 A.  Dear Stan,

22         This confirms our recent discussion regarding your

23 plans relative to the hedging, currency, and related derivative

24 investment strategies you are pursuing.  I agree with your

25 conclusions as well as with your decision to continue the

1    investment activities in the S corporation.  As time goes by,
2    we will have to reevaluate the relationship with Alex Brown.
3    While the short option trade ended up apparently as a loser,
4    you understood, as we've discussed, the speculative nature of
5    the investment, and the need to be -- to both be persistent and
6    to minimize risks by taking several small positions rather than
7    a few large ones.
8            While we will continue to evaluate the tax aspects of
9    your activities, please feel free to call me if you have any
10   questions or additional thoughts.
11   Q.  And your statement there where, I agree with your
12   conclusions as well as with your decision to continue the
13   investment activities in the S corporation, what do you mean by
14   that?
15   A.  It was predetermined that he would continue a limited
16   amount of investing in the S corporation for a period of time,
17   and this is documenting that as part of the preplanned step.
18   Q.  That continued investment, did that have any relationship
19   to the requirement that BDO was requiring add-on investing?
20   A.  Yes, it did.
21   Q.  Was there any question as to whether or not Mr. Sher would
22   be engaging in those investment activities in the S
23   corporation?
24   A.  No, there were not.
25   Q.  Why not?

D9jndau3                          Greisman - direct

1   A.  Because this was a required element of the transaction.

2   Q.  So is this a true statement here, or does this portray an

3   accurate picture of the discussions?

4   A.  It does not portray an accurate picture of the discussions.

5   Q.  Turning to the next page of this document, which you said

6   was dated December 5, of 2000, who is this addressed to?

7   A.  John Illingworth.

8   Q.  Who was Mr. Illingworth?

9   A.  We BDO client of the Milwaukee office.

10  Q.  How did you get to know Mr. Illingworth?

11  A.  One of the BDO partners in Milwaukee a gentleman named Jim

12  Blinka brought him to the table.

13  Q.  Is the body of this letter that is sent a year later

14  identical to the one that you sent to Stanley Sher?

15  A.  It is.

16  Q.  Why are you sending this sort of letter to Mr. Illingworth?

17  A.  For the same reason, to make it appear as if there, the

18  step is documented for his economic substance.

19  Q.  After you had sent this letter to the client, would you

20  maintain a copy of this in the client file at BDO?

21  A.  Yes.

22  Q.  For what purpose?

23  A.  For the purpose of having it in the file in the event that

24  it was needed later in an IRS exam.

25  Q.  Do you recall whether any of these letters actually ended

1    up in the hands of the IRS, these or similar letters?

2    A.  Yes.

3    Q.  At what point in time?

4    A.  There came a point in time that BDO eventually turned over

5    the names and contact information for essentially all of the

6    clients and all of them came under IRS audit.

7    Q.  What was the purpose of providing these letters to the IRS?

8    A.  It was in response to IRS requests for all documents, and

9    this was part of the file and had been put in the file for the

10   purpose of attempting to make it appear there was economic

11   substance.

12   Q.  If you would look at Government Exhibit 300-79.

13           Mr. Greisman, why could you not have included just a

14   true depiction of the facts as they were occurring as these

15   clients were implementing their Jenkens & Gilchrist tax

16   shelters?

17   A.  Because a true reflection would have shown that the

18   transaction lacked economic substance.

19   Q.  At that time did you know that it was wrong to make false

20   statements to the IRS?

21   A.  Yes.

22   Q.  Why do that?

23   A.  Why?  To deceive the IRS.

24   Q.  Looking at Government Exhibit 300-79, do you recognize that

25   document?

D9jndau3                          Greisman - direct

1    A.  I do.

2    Q.  What is it?

3    A.  It is a chain of e-mails between myself, Paul Shanbrom, and

4    Donna Guerin in November of 1999.

5    Q.  Does this relate to the BDO tax shelters that you were

6    selling with Jenkens & Gilchrist?

7    A.  Yes.

8            MS. DAVIS:  Your Honor, the government offers 300-79.

9            MR. LINDER:  No objection.

10           MR. DE CASTRO:  No objection.

11           THE COURT:  Government Exhibit 300-79 is received in

12   evidence.

13           (Government's Exhibit 300-79 received in evidence)

14           MS. DAVIS:  May I publish?

15           THE COURT:  You may.

16   BY MS. DAVIS:

17   Q.  Is this one be of those e-mails where the first e-mail's at

18   the bottom and the response is at the top?

19   A.  Yes.

20   Q.  Who is the bottom e-mail to?

21   A.  Donna Guerin.

22   Q.  And on what date?

23   A.  November 11.

24   Q.  Of what year?

25   A.  '99.

D9jndau3                          Greisman - direct

1   Q.  Could you read the e-mail that you sent to Donna Guerin?

2   A.  Donna.

3       Attached is my most recent bed check list.  Please

4   look it over and be sure everyone is snugly tucked in.  I

5   assume, as I heard nothing yesterday, that you resolved issues

6   with Michael and Allen and Jemmet and that Clementi wire

7   transfer instructions were sent.  I'm still waiting to hear

8   from you on Kel.  Did you speak with him?  Where does that one

9   stand.  Finally note that it is possible that Kuykindall and

10  Engage could still fall out of bed, but Paul may have another

11  one or two that he's discussed with you.  We will know today.

12       Bob.

13  Q.  What is generally the bed check list?

14  A.  It was just a checklist of keeping track of all of these

15  transactions, it was coming close to the end of the year, to

16  make sure they were all on track to have the steps done.

17  Q.  Were you having a back and forth with Donna Guerin and

18  perhaps others at Jenkens & Gilchrist to make sure of this

19  during the November 1999 period?

20  A.  Yes.

21  Q.  What was Mr. Shanbrom's response at the top?

22  A.  Do you wish me to read it?

23  Q.  Sure.

24  A.  Bob.

25       FYI, I sent information to Donna regarding two more

D9jndau3                        Greisman - direct

1   transactions today, after speaking to her.  Dresner, Friedman,

2   30 million total capital gain, although I only sent her $10

3   million today since the other $20 million will trigger in 2000

4   and we thought best to start that trade in 12/99.  I spoke to

5   her late this afternoon and she was already working on these

6   documents.

7           Adler/Roth, 7.5 million total, 1.7 million ordinary

8   5.8 million capital.

9           I should find on the $200 million transaction tomorrow

10  and should be it.

11          Also FYI, I talked to her again regarding the

12  confusion between her and David Parse regarding whether each

13  individual needed to sign the term sheet after the trade took

14  place.  She said that Paul D. was adamant that they did not

15  need to sign.

16  Q.  The reference to Paul D. was whom?

17  A.  Paul Daugerdas.

18  Q.  And the reference to term sheet was what?

19  A.  I think it was the term sheet for the trade, the actual

20  options trade.

21  Q.  Term sheet from what entity?

22  A.  Deutsche Bank.

23  Q.  Looking at Government Exhibit 300-24, do you see that

24  document?

25  A.  Yes.

D9jndau3                          Greisman - direct

1   Q.  What is it?

2   A.  An e-mail from me dated November 15, '99 to various members

3   of the tax solution group.  Subject, Follow-up, with an

4   attachment -- with actually two attachments.

5   Q.  Did you, in fact, send this e-mail in connection with the

6   tax solution group activities?

7   A.  Yes.

8             MS. DAVIS:  Your Honor, the government offers 300-24.

9             MR. LINDER:  No objection.

10            MR. DE CASTRO:  No objection.

11            THE COURT:  Government Exhibit 300-24 is received.

12            (Government's Exhibit 300-24 received in evidence)

13            MS. DAVIS:  May I publish.

14            THE COURT:  You may.

15  BY MS. DAVIS:

16  Q.  What is the date on this e-mail, Mr. Greisman?

17  A.  November 15, '99.

18  Q.  Who generally are listed here in the to and the cc?

19  A.  Members of the tax solutions group.

20  Q.  Is Dennis filed copied on this?

21  A.  Unless I'm missing it, I don't see that he is.

22  Q.  And can you read the body of the e-mail.

23            MS. DAVIS:  If we could get that enlarged, Ms. Torres.

24  Q.  What does that say?

25  A.  As we approach the close of business on the 15th of day of

1   the 11th month, a few things to keep in mind.

2           1.  You should keep in touch with your friends on a

3   daily basis at this point.  Except for the handful of

4   last-minute details, everyone should have wired in their money

5   by now.

6   Q.  I'm going to stop you because I think you might have

7   misread.  If you could read that sentence again?

8   A.  Under No. 1?

9   Q.  The sentence starting, Except for?

10  A.  Except for the handful of last-minute deals, everyone

11  should have wired in their money by now.  Let me know who has

12  not done so.  I want to assure the wire transfer instructions

13  are out to everyone.

14          2.  The traders are finishing up calls to all who have

15  wired money into the account.  Where possible, you should be

16  part of those calls.  We've discussed letters that can be used

17  even where you are not part of the call.  Letters can also

18  confirm subsequent considerations.  See the two with names

19  deleted attached.

20          3.  In some cases a contribution of some long-term

21  asset is required.  This is an easy detail to forget.  The

22  timing of this can be before or after the contribution to the

23  partnership of the currency position, but it must happen.  We

24  need to be sure this critical step is not missed.

25          In -- I think it says in many cases the client will

D9jndau3                        Greisman - direct

1  have to get wire transfer instructions to wire the stock, if

2  it's held now in street name, to the LLC or to the partnership

3  account.  Please follow up on this step to be sure it's

4  happening.

5           Please call me if you have questions or comments.

6           Bob.

7  Q.  In the initial part of the e-mail you say, As we approach

8  the close of business on the 15th of the 11th.

9           What was significant about that day?

10 A.  It's significant that we're getting very close to the end

11 of the calendar year when all of the transactions have to be

12 complete.

13 Q.  To your knowledge, how long was the duration of the foreign

14 currency option trade that had to be put on as part of the

15 Jenkens & Gilchrist tax shelter?

16 A.  There was a 30-day trade.

17 Q.  This talked about the fact that people should wire in their

18 money or are in the process of wiring in their money.  What was

19 that for?

20 A.  The money had to be wired into the account so that there

21 was money in the account to make the trade.

22 Q.  The account being which account generally?

23 A.  Generally I believe it was the account that clients set up

24 to be able to buy the trade before, to purchase the options so

25 they could contribute it to the partnership.

D9jndau3                         Greisman - direct

1   Q.  Do you see the first sentence, the second paragraph, reads,

2   The traders are finishing up calls to all who have wired money

3   into the account.

4         So which step was coming first?  The wiring or the

5   calls about the investment?

6   A.  The wiring generally.

7   Q.  Did the wiring occur before or after the client had decided

8   to go forward?

9   A.  The client decided to go forward first and then the wiring

10  happened.

11  Q.  And then the trader called?

12  A.  Yes.

13  Q.  You also referenced the contribution or the need for a

14  contribution of a long-term asset to the partnership.

15  A.  Yes.

16  Q.  What was that all about?

17  A.  It's part of the way the technical loophole worked.  In

18  many of the cases that asset had to be there for the loss to be

19  able to be June rated.

20  Q.  Can you give just a little more detail as to why that was?

21  A.  The loss -- the enhanced basis we talked about yesterday

22  got triggered by the contribution of the option to the

23  partnership.  But then the option closed after 30 days or less,

24  and that basis had to transfer to another asset.  So the client

25  put in something more vanilla, like stock that they owned in

D9jndau3                           Greisman - direct

1   Microsoft, to be able to take that basis and trigger the loss.

2   Q.  Was there significance to the asset being a lock-term asset

3   as you describe it here?

4   A.  In some cases there was a preference for a long-term asset.

5   It wasn't an absolute necessity.

6        If the client was generating a long-term capital gain

7   that they were trying to shelter, using a long-term asset would

8   perhaps help, let's say disguise the loss on the tax return.

9   That is not totally clear that it would, but there was a

10  possibility it might.

11  Q.  By long-term capital gain, how do you generate a long-term

12  capital gain?

13  A.  A long-term capital gain is a sale of asset that you own

14  for more than 12 months.  If you own it for less than 12

15  months, it's short term.

16  Q.  An asset such as what?

17  A.  Again, stock or real estate.

18            THE COURT:  Is this an appropriate time to suspend?

19            MS. DAVIS:  It is, your Honor.

20            THE COURT:  Members of the jury, we are going to take

21  our luncheon recess now.

22            Keep an open mind, come to no conclusions and don't

23  discuss the case.  Have a great lunch.  We'll see you all at 2

24  o'clock.

25            Please recess the jury.

D9jndau3                          Greisman – direct

1                THE DEPUTY CLERK:  All rise, jury exiting.

2                THE COURT:  Mr. Greisman, you may step down, sir.  You

3    are excused until 2 o'clock.

4           (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

D9jndau3                          Greisman - direct

1                (Jury not present)

2                THE COURT:  All right.  Everyone may be seated.

3                Mr. Mazurek, would you like to be heard further at

4       this time on the Rule 806 question.

5                MR. MAZUREK:  Yes, your Honor.

6                We are in receipt of the government's reply letter

7       that was filed last evening.  I just wanted to address the

8       Court and respond with a couple of authorities on the record

9       relating to the Court's inquiry at the end of Court yesterday

10      relating to the Rule 609 issue.

11               Because it was not originally addressed in our letter

12      and your question did create questions in my own mind, I did

13      some research last night, and there is another issue that I

14      didn't address in response to the Court's original inquiry.

15               That is, in this case obviously the government is

16      seeking to introduce the plea agreement of Mr. Ivsan, which we

17      still contend obviously that it would be testimonial, in

18      violation of the rules stated by the Supreme Court in <u>Crawford</u>.

19               The Court raised an interesting inquiry as to whether

20      Rule 609 should apply, which is just the fact of conviction.

21               The issue that I think, and maybe the reason that the

22      government has failed to raise 609 on its own and seek instead

23      the fact of the conviction as opposed to the plea agreement, is

24      because I think, based on my research last evening, that there

25      is still an open issue in the Second Circuit as to how

D9jndau3                        Greisman - direct

conviction is defined in the Rule 609 for purposes of that

rule.

         In this case Mr. Ivsan to my understanding has pled

guilty to pursuant to a written cooperation agreement with the

government and has yet to be sentenced.  The question is

whether a final conviction under federal law is required by

Rule 609 in order to be admissible under that particular

theory.

         My research shows that the Second Circuit has decided

the issue of whether after a trial verdict, but before

sentencing, the fact of conviction or of a guilty verdict can

be admitted.  And they answered that in the affirmative.  The

case is United States v. Vanderbosch.  The citation is 610 F.2d

95 (1979).

         I have not found a case, the Second Circuit has not

apparently ruled on the issue of whether a guilty plea by

itself is sufficient.

         I note, however, in the Vanderbosch decision the

reason that the Court decided that a trial verdict is, is

because of the finality of a verdict as opposed to a guilty

plea.  It has the imprimatur of finality more than simply a

guilty plea.

         This has, I think, been enhanced by the Supreme Court

in a subsequent decision called Mitchell v. United States.  If

I may just have a moment I will give you the cite to that

D9jndau3                        Greisman - direct

1    particular case.

2              Mitchell v. United States, your Honor, was in a

3    different context.  That was a determination whether the Fifth

4    Amendment existed all the way through sentencing or terminated

5    upon a plea allocution under Rule 11.

6              But it is instructive, because in that decision the

7    Supreme Court explains the fact that there is a lack of

8    permanence after just a Rule 11 proceeding, since Congress

9    itself provided within Rule 11 the possibility that that plea

10   may be withdrawn prior to sentencing.

11             The combination of those decisions I would urge the

12   Court to consider on the fact of whether the plea by itself

13   would satisfy Rule 609's requirement that it be a conviction

14   for entry under that particular theory.

15             I will put on the record the Mitchell citation, again,

16   if I could just have a moment.

17             The Mitchell cite is 526 U.S. 314.  That was a 1999

18   Supreme Court decision.

19             That is all.

20             THE COURT:  Thank you.

21             MR. OKULA:  Just very, very briefly, your Honor.

22             I would just make the observation that the finality of

23   guilty pleas, if you look at those compared to jury verdicts,

24   where defendants almost invariably challenge on appeal their

25   verdicts, if the Court found that, notwithstanding the pendency

D9jndau3                         Greisman - direct

1    and the endurance of someone's Fifth Amendment privilege, which

2    they still have -- after you are found guilty you have your

3    Fifth Amendment privilege until the Supreme Court denies cert.

4             If the Second Circuit said that a conviction becomes

5    final after a jury verdict, I think that a plea agreement,

6    which I think is less frequently overturned and less subject to

7    attack, the same reasoning applies there.

8             That's my only observation, your Honor.

9             THE COURT:  All right.

10            Thanks for your supplementation of the record.  It

11   will give me something more to think about over the luncheon

12   recess.

13            I will see you all at 2 o'clock.

14            MR. OKULA:  Thank you, your Honor.

15            MS. DAVIS:  Thank you, your Honor.

16            (Luncheon recess)

17

18

19

20

21

22

23

24

25

D9jndau3                        Greisman - direct

1                          AFTERNOON SESSION

2                               2:05 p.m.

3              (In open court; jury not present)

4              THE COURT:  Let's bring in the witness and the jury.

5              I'm going to tell the jury that tomorrow we'll only

6       work until 1:00 instead of 1:30, the reason being that I have

7       other matters on at 2:00.  And it's a parallel universe in

8       which I don't -- from arising in the Bronx, in which I don't

9       think that there should be collisions.  And there may be a

10      significant number of people from the community here.

11             MR. OKULA:  You have other cases?

12             THE COURT:  Believe it or not.

13             (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

D9jndau3                    Greisman - direct

 1              (In open court; jury present)

 2              THE COURT:  Good afternoon, members of the jury.

 3     Thanks again for your punctuality, especially on an afternoon

 4     like this.  I, too, got outside for a few minutes.  It's hard

 5     to come back into a building, but we're all here.  We've got

 6     important work to do.  And we're going to get right back to it.

 7              At this time we're going to continue with

 8     Mr. Greisman's direct examination.

 9              You may proceed, Ms. Davis.

10              MS. DAVIS:  Thank you, your Honor.

11              May I briefly republish Government Exhibit 301-34.

12              THE COURT:  You may.

13     BY MS. DAVIS:

14     Q.  Do you recognize this as the document we looked at before

15     the lunch break that was a memo to Mr. Gale entitled your

16     investment plans?

17     A.  Yes.

18              MS. DAVIS:  Might I republish, your Honor, Government

19     Exhibit 301-162 already in evidence?

20              THE COURT:  You may.

21              MS. DAVIS:  Is there any way to tile those side by

22     side, Ms. Torres?  301-34 is the other one.

23     Q.  If you could just take a look at the screen, Mr. Greisman.

24     Do you see that on the left-hand side we have a memo from Brian

25     Allen to Michael Kerekes that's also entitled your investment

D9jndau3                        Greisman - direct

1    plans?

2    A.  Yes.

3    Q.  If you could just look it over and tell me if those

4    documents seem to have virtually identical language in them.

5    A.  They do.

6    Q.  Looking at Government Exhibit 300-31, if you would.

7              MS. DAVIS:  You can take those down, Ms. Torres.

8              I'm sorry.  Your Honor, might I republish 300-24?

9              THE COURT:  You may.

10             MS. DAVIS:  If you could highlight just the top part

11   of the e-mail there, or enlarge that.

12   Q.  We were looking at this just prior to the lunch break,

13   Mr. Greisman.  Do you see the attachments that are listed to

14   this e-mail that you had sent to the tax solutions group

15   members?

16   A.  I do.

17   Q.  And just could you just identify the names, the file names

18   of the attachments there.

19   A.  One is broker call letter.doc, and the other is partnership

20   distribution letter.doc.

21   Q.  You understand that that .doc is a reference to a word

22   processing program extension?

23   A.  Yes.

24   Q.  Looking at Government Exhibit now 300-31.

25             You can take that down, Ms. Torres.

D9jndau3                         Greisman - direct

1      Do you recognize that document?  You should have it in

2  front of you, 300-31.

3  A.  I don't.  Just give me a moment.

4  Q.  It's not what we were going through before.

5  A.  I have 300 --

6  Q.  Here you go.  Do you recognize that document?

7  A.  I do.

8  Q.  What is it?

9  A.  It's an e-mail from me to Donna Guerin, November 16, 1999,

10  with two pages of attachments.

11  Q.  Was it then sent to Donna Guerin in connection with the

12  implementation of the Jenkens & Gilchrist tax shelters?

13  A.  Yes, it was.

14      MS. DAVIS:  Your Honor, the government offers

15  Government Exhibit 300-31.

16      MR. LINDER:  No objection.

17      MR. DE CASTRO:  No objection.

18      THE COURT:  Government Exhibit 300-31 is received in

19  evidence.

20      (Government's Exhibit 300-31 received in evidence)

21      MS. DAVIS:  May I publish, your Honor.

22      THE COURT:  You may, Ms. Davis.

23  BY MS. DAVIS:

24  Q.  Could you read the body of the e-mail to Ms. Guerin that

25  you sent.

1   A.  Donna, for your information, attached are a couple of

2   letters we sent to various clients.  Bob.

3   Q.  And if you look at the attachments that are listed in the

4   e-mail heading, do you see the names of the attachments that

5   are listed in the e-mail heading?

6   A.  Yes.

7   Q.  What are they?

8   A.  One is broker call letter doc and the other is partnership

9   letter doc.

10  Q.  And do you see the attachments?  If we could have up the

11  second page, please.  And if you could just enlarge the body of

12  the letter there.

13          Does that appear to be identical to some of the

14  documents that we had just looked at?

15  A.  Yes, it does.

16  Q.  And does this letter contain the identical statements as

17  the prior letters that we looked at?

18  A.  It does.

19  Q.  Going to the next letter that's attached.  Is this

20  identical to a letter that you sent out to a tax shelter client

21  that we just looked at?

22  A.  Yes, it is.

23  Q.  And why were you sending Donna Guerin these documents?

24  A.  Just for her information.

25  Q.  If you could take Government Exhibit 301-133.

D9jndau3                         Greisman - direct

```
 1   A.  Yes.

 2   Q.  Let me ask you, with regard to talking to Donna Guerin

 3   about -- or letting her know about these documents, why would

 4   you even care that she knew about these documents?

 5   A.  I don't -- I don't recall a precise reason, other than the

 6   fact that, you know, I wanted her to see what we were doing in

 7   terms of building the story for economic substance.

 8   Q.  Looking at 301-133.

 9   A.  Yes.

10   Q.  What is this document?

11   A.  A letter dated October 29, 1999, from me to Donna Guerin.

12   Q.  And is this sent in connection with the Jenkens & Gilchrist

13   tax shelters?

14   A.  Yes.

15            MS. DAVIS:  Your Honor, the government offers 301-133.

16            MR. LINDER:  No objection.

17            MR. DE CASTRO:  No objection.

18            THE COURT:  Government Exhibit 301-133 is received in

19   evidence.

20            (Government's Exhibit 301-133 received in evidence)

21            MS. DAVIS:  May I publish, your Honor?

22            THE COURT:  Yes, you may.

23            MS. DAVIS:  If you could enlarge the paragraph down

24   through the one entitled Stanley Sher, et al.

25                              - - - - -
```

D9jndau3                     Greisman - direct

1    BY MS. DAVIS:

2    Q.  Could you read that first paragraph for us, please.

3    A.  Under Stanley Sher, et al.?

4    Q.  No.  The first one starting, a question.  Top.

5    A.  I'm sorry.  A question on our new transaction, and then

6    some client specific information.  The question is, should we

7    be having clients wiring cash equal to 2 percent of the

8    transaction amount, i.e. double the amount needed for the

9    purchase of a short option, so that there will be cash in

10   partnership to either purchase foreign currency and/or conduct

11   future additional trades?  If so, is that instruction one that

12   can come from you at the time the wire transfers are sent?

13   When you can, call me so we can discuss this.

14   Q.  Let me stop you there and ask you, what are you referring

15   to when you say new transaction in quotation marks?

16   A.  You'll recall we talked a little while ago about the

17   switchover from the treasury note short sell to the option,

18   currency option shelter, the option, currency option

19   transactions, the new transaction.

20   Q.  And the question that you're asking her about whether the

21   client should wire in the cash equal to 2 percent of the

22   transaction amount, why were you asking her that question?

23   A.  Well, I'm not exactly sure because I recall that the

24   decision had been made that it would be 2 percent, but I think

25   I was getting at the point she needed to be telling the clients

D9jndau3                        Greisman - direct

1    that they needed to wire in the 2 percent.

2    Q.  And the 2 percent was related to what?

3    A.  That -- and, again, the -- as I described before, the cost

4    of the option was essentially 1 percent of the transaction, and

5    then we had the add-on investing with the additional 1 percent.

6    So that gets you to 2 percent.

7    Q.  Did you have any conversation with any tax solutions group

8    member about your concerns regarding the add-on investing?

9    A.  Regarding the specifically the add-on investing?  Not that

10   I recall.

11   Q.  Looking at the bottom, the paragraph Stanley Sher, et al.

12   A.  Yes.

13   Q.  Can you read that.

14   A.  The desire to proceed with the short option transaction,

15   although the exact size of the transaction is not yet certain,

16   that will be finalized shortly.  Stanley says he has returned

17   all his documents to you, and hopefully the same has happened

18   for the other side of the family.  He is ready to talk to

19   someone from the investment firm to learn about the investment

20   from them, and is ready to wire transfer funds into the account

21   to purchase the short option.  However --

22   Q.  You can just stop there.  So at this point in time,

23   October 29th of 1999, when you're saying to Donna Guerin,

24   Stanley says he has returned all his documents to you, what

25   documents are you referring to there?

D9jndau3                        Greisman - direct

1   A.  These are the documents that Jenkens & Gilchrist prepared

2   to initiate the transaction and that required the client

3   signature, things like formation of entities and authorizations

4   to transfer things as the transaction progressed.

5   Q.  To your knowledge as of October 29, 1999, had Mr. Sher and

6   his related group made a decision to go forward with the short

7   options tax shelter?

8   A.  They had.

9   Q.  Had they yet talked to anyone from Deutsche Bank?

10  A.  They had not.

11  Q.  How is it that they could make a decision about the short

12  options transaction without having first talked to anyone from

13  Deutsche Bank?

14  A.  Because the decision to do the short options transaction

15  was based on their desire to get the tax shelter and was really

16  independent of what the investment would be.

17  Q.  Looking at Government Exhibit 301-178.  Do you recognize

18  that document?

19  A.  301-87?

20  Q.  Yes, I'm sorry.  301-87.

21  A.  Yes, I do.  I have it.

22  Q.  What is that document?

23  A.  It's a letter to Stanley Sher from me dated November 11,

24  1999.

25  Q.  Sent to him with respect to what?

D9jndau3                    Greisman - direct

1  A.  The -- in connection with the Jenkens tax shelters, and

2  specifically in connection with the conference call with David

3  Parse.

4              MS. DAVIS:  Your Honor, the government offers 301-87.

5              MR. LINDER:  No objection.

6              MR. DE CASTRO:  No objection.

7              THE COURT:  Government Exhibit 301-87 is received in

8  evidence.

9              (Government's Exhibit 301-87 received in evidence)

10             THE COURT:  And you may publish it.

11 BY MS. DAVIS:

12 Q.  Mr. Greisman, is this document similar to the ones that you

13 sent to Donna Guerin?

14 A.  Yes.

15 Q.  And does it reference hedging potential in light of

16 potential Y2K problems?

17 A.  Yes, it does.

18 Q.  That's a reference that was present in several of the

19 letters that we've looked at so far, correct?

20 A.  Correct.

21 Q.  And prior to the call, had Mr. Sher expressed an interest

22 in investment opportunities that had hedging potential,

23 particularly in light of potential Y2K problems?

24 A.  No, he did not.

25 Q.  Why did you send this letter?

D9jndau3                              Greisman - direct

1    A.   To make it appear that there was economic substance.

2    Q.   Appear to whom?

3    A.   To the IRS.

4    Q.   For what reason?

5    A.   For the purpose of being able to convince them that there

6    was economic substance.

7    Q.   And what would be the result if you or the client were able

8    to convince them there was economic substance?

9    A.   That the -- then they would likely allow the tax shelter.

10   Q.   To what benefit at the end of the day for the client?

11   A.   For the client to be able to get the tax savings.

12   Q.   Looking at Government Exhibit 300-74.  Do you see that?

13   A.   Yes.

14   Q.   What is that document?

15   A.   It's an e-mail from me to Donna Guerin dated October 29,

16   '99.

17   Q.   In relation to the Jenkens tax shelters?

18   A.   Yes.

19            MS. DAVIS:  The government offers 300-74.

20            MR. LINDER:  No objection.

21            MR. DE CASTRO:  No objection.

22            THE COURT:  Government Exhibit 300-74 is received in

23   evidence.

24            (Government's Exhibit 300-74 received in evidence)

25            MS. DAVIS:  May I publish, your Honor.

D9jndau3                          Greisman - direct

 1              THE COURT:  Yes.

 2   BY MS. DAVIS:

 3   Q.  Can you just read the body of the e-mail to us, please.

 4   A.  Donna, Joe Goldman will not be going ahead with the

 5   transaction.  At the last minute the sale of his business fell

 6   through, thus no gain.  Bob.

 7   Q.  And to your knowledge was Joe Goldman having any

 8   consideration of the investment market at the time that he was

 9   making the decision not to go through with the tax shelter?

10   A.  He was not.

11   Q.  It was related to what instead?

12   A.  He had anticipated the sale of the business, and it didn't

13   happen.

14   Q.  Looking at Government Exhibit 300-9.  Do you recognize that

15   document?

16   A.  Yes.

17   Q.  What is it?

18   A.  An e-mail from me to members of the tax solution group

19   dated November 9, 1999, with the caption wire transfer

20   instructions.

21              MS. DAVIS:  Your Honor, the government offers 300-9.

22              MR. LINDER:  No objection.

23              MR. DE CASTRO:  No objection.

24              THE COURT:  Government Exhibit 300-9 is received in

25   evidence.

1           (Government's Exhibit 300-9 received in evidence)

2           THE COURT:  And you may publish it.

3           MS. DAVIS:  Thank you, your Honor.

4   BY MS. DAVIS:

5   Q.  Do you see, Mr. Greisman, at the to line, it has the dot

6   dot dots?

7   A.  Yes.

8   Q.  What does that represent?

9   A.  That there were others who received the e-mail whose names

10  didn't print out.

11  Q.  And were those others members of the tax solutions group?

12  A.  Yes, they were.

13  Q.  Was Denis Field a member of the tax solutions group?

14  A.  Yes.

15  Q.  Can you read the body of the e-mail, please.

16  A.  Guys, I've been told that all wire transfer instructions

17  will be out today, except for the most recent transactions,

18  where documents are still being prepared.  We should be

19  following up with each client to be sure that they, in fact,

20  have received the instructions.  We've been told that the calls

21  from the investment people to clients, where the funds have

22  been received, will start today to begin explaining the trades

23  and taking orders.

24          Note that about 48 hours after the short option has

25  been purchased the lawyers will be faxing the documents to

1    authorize the transfer.  Clients need to be alert to this so

2    they can return.  Also, keep in mind that some client activity

3    will be required at the end of December.  We may schedule a

4    call next week to be sure we're covering all process/procedure

5    issues.  Please call me with any questions or if you have any

6    problems.  Bob.

7    Q.  Who is the reference to investment people in the first

8    paragraph?

9    A.  Deutsche Bank.

10   Q.  And the reference to the lawyers in the second paragraph?

11   A.  Jenkens & Gilchrist.

12   Q.  And when you say, also keep in mind that some client

13   activity will be required at the end of December, what do you

14   mean by that?

15   A.  That there would be documents to be signed and things to be

16   authorized.

17   Q.  Was it a logistical task to keep track of all the steps in

18   the transactions that needed to be done?

19   A.  Yes, it was.

20   Q.  What was your role specifically with regard to that?

21   A.  To help coordinate that and play air traffic control.

22   Q.  And the reference to scheduling a call next week, who would

23   that call be among?

24   A.  The tax solution group.

25   Q.  Looking at 300-133.  What is that document?

D9jndau3                          Greisman - direct

1    A.  An e-mail from me to Michael Kerekes dated November 9,

2    1999.  Subject, conversation with Donna.

3    Q.  Was it sent in connection with the tax shelter sales?

4    A.  Yes, it was.

5              MS. DAVIS:  Your Honor, the government offers 300-133.

6              MR. LINDER:  No objection.

7              MR. DE CASTRO:  No objection.

8              THE COURT:  Government Exhibit 300-133 is received in

9    evidence.

10             (Government's Exhibit 300-133 received in evidence)

11             THE COURT:  And you may publish it.

12             MS. DAVIS:  Thank you, your Honor.

13   BY MS. DAVIS:

14   Q.  Is the date on this e-mail the same date as the e-mail that

15   we just looked at?

16   A.  Yes, it is.

17   Q.  Can you read the body of the e-mail, please.

18   A.  Michael, Donna should be calling you.  Call her if you

19   don't hear from her soon.  She's got some questions on Jemmett,

20   which is why they don't have docs yet.  Why she didn't call

21   sooner is probably a good question, but one I didn't answer --

22   I'm sorry, one I didn't ask.  Allen, she has some issues.  She

23   wants to wait a few days to see what Senate Finance does before

24   deciding to undo transactions or use new entities.  You need to

25   discuss this with her, but that may be the best thing.  All

clients should receive wire transfer instructions by the end of

the day today.  Although not the way I'd like to see it, we

need to be finding out from the client if and when they get the

wire transfer instructions.  Call if questions.  Bob.

Q.  The Donna that you reference in this e-mail is whom?

A.  Donna Guerin.

Q.  And why are you sending this e-mail to Michael Kerekes?

A.  He was having trouble getting a response back from Donna

and asked me to get in touch with her and see if I could poke

her a little bit to respond.

Q.  And the reference to Allen, do you know who that refers to?

A.  Yes, I do.

Q.  Who is that?

A.  That was a client of Michael Kerekes's in California named

Brian Allen.

Q.  And there's a reference to waiting a few days to see what

Senate Finance does.  What does that refer to?

A.  That refers to pending legislation that in some way might

have affected these transactions.

Q.  And if you would look at 300-92.  Do you have that

document?

A.  I do.

Q.  Just for the record, if we could go back to 300-133.  And

tell us what the time of the e-mail was.

A.  11:12 a.m.

D9jndau3                          Greisman - direct

1   Q.  And what's the date and time of this e-mail?

2   A.  It's November 9, 1999, 7:45 p.m.

3   Q.  Same day, later time, is that correct?

4   A.  Correct.

5   Q.  From who to who?

6   A.  From Michael Kerekes to Donna, Allen -- I'm sorry, Donna

7   Guerin.  Subject, Brian Allen.

8           MS. DAVIS:  Your Honor, the government offers 300-92.

9           MR. LINDER:  No objection.

10          MR. DE CASTRO:  No objection.

11          THE COURT:  Government Exhibit 300-92 is received in

12   evidence.

13          (Government's Exhibit 300-92 received in evidence)

14          MS. DAVIS:  May I publish.

15          THE COURT:  You may.

16   BY MS. DAVIS:

17   Q.  Could you read the body of the e-mail, please.

18   A.  Bob Greisman has told me that you suggest waiting for

19   further senate action before deciding how to resolve

20   Mr. Allen's situation.  He funded a short sale on 20 October.

21   I don't think we have time to wait, considering our 15 November

22   deadline.  I propose that we undo the initial transaction by

23   having Mr. Allen's partnership distribute property

24   approximately identical to that which was originally

25   contributed, then have Mr. Allen proceed with the spread

D9jndau3                          Greisman - direct

1    transaction.  Please let me know of your thoughts.  If you

2    consider the proposal acceptable, I will immediately coordinate

3    with David Parse and Mr. Allen to make the necessary transfers.

4    Thank you for your attention.  Michael.

5    Q.  Are you copied on the e-mail?

6    A.  I am.

7    Q.  Now, the reference to having Mr. Allen's partnership

8    distribute property approximately identical to that which was

9    originally contributed, why was that necessary?

10   A.  So you'll recall we talked before about the transfer or the

11   switchover from the old tax shelter, the treasury note short

12   sale, to the new one, the option transaction, because of

13   pending legislation.  Mr. Allen had already begun the process

14   of the old shelter and contributed property in.  And now with

15   the switchover, what Michael Kerekes was proposing was to

16   basically undo the transaction he had started by distributing

17   out the property identical to what he had put in.

18   Q.  And then starting over?

19   A.  Correct.

20   Q.  Do you know whether that was done?

21   A.  I believe that it was.

22   Q.  Looking at 301-65.

23   A.  Yes.

24   Q.  What is that document?  Do you recognize it?

25   A.  I do recognize it.

D9jndau3                          Greisman - direct

1    Q.  What is it?

2    A.  It's a fax cover sheet from me to Donna Guerin with a

3    memorandum attached dated December 7, 1999.  And the to and the

4    subject lines are left blank.

5    Q.  Was this sent in connection with the implementation of the

6    Jenkens tax shelters?

7    A.  Yes, it was.

8              MS. DAVIS:  Your Honor, the government offers 301-65.

9              MR. LINDER:  No objection.

10             MR. DE CASTRO:  No objection.

11             THE COURT:  Government Exhibit 301-65 is received.

12             (Government's Exhibit 301-65 received in evidence)

13   BY MS. DAVIS:

14   Q.  What's the date on the fax banner on the front?

15   A.  December 8, 1999.

16   Q.  And is the front just basically the cover sheet?

17   A.  Yes, it is.

18             MS. DAVIS:  May I publish, your Honor.

19             THE COURT:  You may.

20   Q.  Can you just generally explain what you're attempting to do

21   with this memo that you're sending to Donna Guerin?

22   A.  This was a memo that I had prepared to members of the tax

23   solution group with a lot of the detailed steps of things that

24   needed to get done of the transactions for their clients for

25   the Jenkens shelters as the end of the year was coming near.

D9jndau3                         Greisman - direct

1    And I had had a telephone conversation with Donna Guerin where

2    I was -- I told her what -- that instructions had been provided

3    to the BDO tax solutions people.  And I was sending her a copy

4    of those instructions so that she could see what we were doing

5    and things would stay coordinated.

6    Q.  Could you read the paragraph, first paragraph that starts,

7    the following.

8            If we can have the second page, Ms. Torres.

9    A.  The following is provided to assist you with the final

10   execution of your transactions.  By now you should have

11   received e-mail communications containing the most recent

12   version of our tracking form, with spaces provided to check off

13   certain benchmark events and a sheet from Alex Brown with

14   account names, numbers, trade and settlement dates, trade

15   amounts and cash balances.  Please review these items carefully

16   and let me know of any problems immediately.  Those sheets

17   should be used in conjunction with the instructions below.

18   Q.  And what's the first step there?

19   A.  To have clients contribute options to the partnership.

20   Q.  And it reads, the first sentence?

21   A.  By now all but a handful of clients have contributed the

22   options to the partnership.  On an individual basis we will

23   deal with those exceptions to resolve the specific problems.

24   Q.  And was that a necessary step to get the tax benefit from a

25   tax shelter?

D9jndau3                           Greisman - direct

1    A.  Yes, it was.

2    Q.  Looking at paragraph 2, could you just read the first

3    sentence of the second paragraph.

4    A.  We need to push the other long-term capital asset, the

5    stock, to ultimately be sold at a loss, into the LLC account,

6    not the partnership account, in those cases where the asset has

7    not yet been put there, which is the majority of the cases.

8    Q.  What do you mean when you say you need to push the other

9    long-term capital asset into the LLC account?

10   A.  I explained before that another capital asset was

11   ultimately needed to take the enhanced basis.  In terms of the

12   technicalities of it, it had to step through the LLC to get

13   into the partnership.

14   Q.  And physically or logistically how would you do that

15   pushing?

16   A.  It would be done by execution of transfer documents.

17   Q.  To be sent to whom?

18   A.  To be executed by the client and sent to Deutsche Bank.

19   Q.  And then paragraph 3, if you could read the first two

20   sentences, please.

21   A.  As stated above, it's our job to push the other asset into

22   the LLC.  Once that is done, J & G will pull it down into the

23   partnership by preparing the legal documents to contribute the

24   asset from the LLC to the S corporation, 1 percent, and to the

25   partnership, 99 percent.

1   Q.  If you could read the next sentence.

2   A.  It would speed that process if your client would fax a copy

3   of the above wire transfer instructions to Donna Guerin at

4   J & G, phone number -- with a fax number, so she does not have

5   to wait for word from Alex Brown.

6   Q.  And then continue reading.

7   A.  Clients should be told that shortly, 24 to 48 hours, after

8   the asset goes into the LLC, J & G will fax the client

9   documents requiring signature to authorize the contribution to

10  the S and partnership.

11  Q.  And the very last sentence is what of that paragraph?

12  A.  They need to be available to sign and return by fax.  And

13  if they plan on being unavailable, alternative arrangements

14  should be made with Donna Guerin, and her phone number.  Your

15  attention is important to this detail, can help assure us with

16  the process.

17  Q.  Why was interest an important detail?

18  A.  It was an important detail to assure that the transaction

19  was completed before the end of the year to be able to get the

20  tax shelter loss, and year end of the year, a lot of clients

21  were travelling and away.

22  Q.  The 1 percent and 99 percent contributions that you list

23  there, what does that mean?

24  A.  The -- in some of the case -- the partnership that was

25  formed, and it was necessary to be used to take advantage of

1    the loophole, in some of the cases where the partnership

2    between the client, the taxpayer, and the S corporation that

3    they had set up for this purpose was older than -- that was

4    owned in the 99/1 percent relationship.

5    Q.  And then paragraph four.

6    A.  As discussed last week, clients should be making

7    appropriate currency related investment/trades in the

8    partnership accounts.  Your guidance is required to assure that

9    this happens and that the trades are documented in ways that

10   tie them to the overall strategy the client has selected and to

11   external events, such as the market activities reported in

12   recent Wall Street Journal articles.  Please drive this

13   process.  And it is an important part of the execution.

14   Q.  Why was this an important part of the execution?

15   A.  Because it gave the transaction the appearance of business

16   purpose and economic substance.

17   Q.  Was this -- did this have any relationship to the add-on

18   investing that you had described earlier?

19   A.  Yes.  This related to the add-on investing.

20   Q.  And why would you want to tie the trades to external

21   events?

22   A.  To make the trades look more business related than, in

23   fact, they were.

24   Q.  For what reason?

25   A.  To give the transaction the appearance of economic

D9jndau3                      Greisman - direct

1   substance.

2   Q.  And why was that important?

3   A.  To be able to attempt to prevail on a controversy with the

4   IRS and to keep the tax savings.

5   Q.  Looking at paragraph five on the second page.

6          Ms. Torres, if you could put it up.

7          Can you just read that paragraph.

8   A.  Where foreign currency is required for ordinary loss, J & G

9   and Alex Brown will see that the partnership purchases it.

10  Nothing is required on this by us, except where there is both

11  ordinary and capital losses desired.  In those cases we will

12  look to the -- look at the value of the capital asset so we can

13  advise J & G and Alex Brown as to the correct amount of foreign

14  currency to purchase.  They will be looking to us for this

15  determination.  As you know, if we want a $4 million capital

16  loss and a 2 million ordinary loss, and if the fair market

17  value of the capital asset in the partnership is $4,000, $2,000

18  of foreign currency needs to be purchased.

19  Q.  And Alex Brown as referred to there you understood to be

20  what financial institution?

21  A.  Deutsche Bank.

22  Q.  And at some point had Deutsche Bank acquired Alex Brown?

23  A.  Yes.

24  Q.  Could you read step six, please.

25  A.  Late this week or early next, depending on how quickly you

D9jndau3                           Greisman - direct

1    guide the clients through the steps above, J & G will be

2    sending a Federal Express package to each client.  The package

3    will contain a number of authorizations that need to be signed

4    and returned by Federal Express to J & G.  They will provide

5    return Federal Express envelopes.  Included in these documents

6    will be the authorizations for the transfer of the partnership

7    interests to the S corporation and for the sale of assets

8    and/or foreign currency by the S corporation.  Note that dates

9    will be left blank, and you need to tell the clients that they

10   are to leave those dates blank.  No written instructions to

11   that effect will be provided.  It is important that clients

12   know this package is coming and are available to receive it

13   and -- if you anticipate problems with this, please coordinate

14   with J & G.  Also, we need to assure that the results of all

15   trading activity described at item four above is undone before

16   the partnership is contributed to the S, or we will cause the

17   wrong asset to receive basis step-up.  Again, this is a key

18   step for which we are responsible.

19   Q.  There is a sentence that appears to be bolded in this

20   paragraph.

21   A.  Yes.

22   Q.  Which sentence is that?

23   A.  Note that dates will be left blank and you need to tell the

24   clients they are to leave those dates blank.  No written

25   instructions to that effect will be provided.

D9jndau3                         Greisman - direct

1   Q.   Why did the clients have to leave the dates blank?

2   A.   Those were the instructions from Jenkens & Gilchrist.

3   Q.   And there's also a reference to, it says, or we will cause

4   the wrong asset to receive basis step-up.  What did you mean by

5   that?

6   A.   And again, it goes to that concept of at the end of the

7   transaction this enhanced basis would be allocated to an asset.

8   And if we were triggering both ordinary loss and capital loss,

9   there was a danger that the wrong asset would get the enhanced

10  basis.

11  Q.   Why was this a key step, as you indicate in the last

12  sentence of this paragraph?

13  A.   Because if this didn't get done correctly, then the client

14  would not be getting the tax shelter that they had purchased;

15  they'd be getting something they couldn't use or didn't want.

16  Q.   Look at number 7, if you would.  What does that say?

17  A.   Except in the case where everything is to be sold this

18  year, we need to determine how much is to be sold and to

19  coordinate communication between the client and Alex Brown and

20  J & G.  Even where all assets are to be sold, we should be

21  taking steps to assure that this happens.

22  Q.   And then the eighth paragraph?

23  A.   In mid to late January J & G will send out a complete set

24  of all executed documents to all clients with a copy to us.

25  Although later than we'd like, these documents can be used to

D9jndau3                          Greisman - direct

1   allow us to finalize our files.

2   Q.  And finally, the last sentence?

3   A.  As you can see, execution is a detailed matter and requires

4   careful attention.  I hope the foregoing helps, but please feel

5   free to call me if any of this is unclear.

6   Q.  And you had faxed this to Donna Guerin on December 8th of

7   1999, is that right?

8   A.  Yes.

9   Q.  Did she -- did you have any communication from Donna Guerin

10  that any of the information in this memorandum was incorrect?

11  A.  No.

12  Q.  Looking at Government Exhibit 200-149.

13  A.  Yes.

14  Q.  What is this document?

15  A.  An e-mail from Paul Shanbrom to Donna Guerin dated

16  December 17, 1999.  Subject, current transactions.

17  Q.  And what current transactions are the subject of the

18  e-mail?

19  A.  The currently pending Jenkens shelter transactions.

20  Q.  And is there a chart attached of short options clients?

21  A.  There is.

22            MS. DAVIS:  Your Honor, the government offers 200-149.

23            MR. LINDER:  No objection.

24            MR. DE CASTRO:  No objection.

25            THE COURT:  Government Exhibit 200-149 is received in

D9jndau3                          Greisman - direct

1    evidence.

2            (Government's Exhibit 200-149 received in evidence)

3            MS. DAVIS:  May I publish, your Honor.

4            THE COURT:  You may.

5    BY MS. DAVIS:

6    Q.  Do you see the little icon there?

7    A.  Yes.

8    Q.  What does that indicate to you?

9    A.  That there's an attached Excel spreadsheet.

10   Q.  The Excel spreadsheet name is what, if you can read it?

11   It's right underneath it.

12   A.  It's JG spread 99.XL.

13   Q.  And Excel refers to what?

14   A.  It's a spreadsheet program.

15   Q.  Could you read the body of the e-mail, please.

16   A.  Donna, in order to help answer some of the questions you

17   have asked recently and to make sure we are on the same page, I

18   have attached an Excel spreadsheet with -- of the short option

19   transactions that I have referred to you.  You will see that I

20   have listed the breakdown between ordinary and capital and

21   whether 100 percent of the loss should be taken in 1999 or if

22   some will be held for future years.  For the clients that I

23   have answered no to that question, I will need to get back to

24   you to let you know how much to take in 1999 versus future

25   years.  The only one I know offhand is Al Pasquaze, who wants

D9jndau3                          Greisman - direct

1   20 percent in 1999, i.e. 330 ordinary loss, 700 capital loss in

2   1999.  I could not recall if Jordan Zimmerman transferred in a

3   long-term asset, which is why I put a question mark in that

4   column for him.  Let me know if you have any questions.  Paul.

5   Q.  And if you would just read out Al 's last name there.  I

6   think you might have misread it.

7   A.  I thought it was Pasquale.

8   Q.  Okay.  Now, this discussion about taking loss in '99 or

9   holding some for future years, what does that refer to?

10  A.  The way the shelter worked, it was possible to -- it was

11  possible to generate a loss that could be used in future years.

12  Didn't literally generate a loss.  If you recall the basis of

13  the shelter was to create enhanced basis.  So if, for example,

14  attached there was expecting gain this year and next year, they

15  could do a transaction.  Now that would create enough basis

16  that could be triggered to offset the gain that they needed

17  this year and then carried over a hold on to it and then sell

18  it and trigger the loss the next year.

19  Q.  So as a practical matter, the asset that they needed to

20  sell, be it stock or the currency, they would sell part of it

21  in one year and part of it in the next year to be able to take

22  losses in both years?

23  A.  Correct.

24  Q.  And could we just look at the second page of this, please.

25  And just looking at Al Pasquale's entry about the fifth line

1    down.

2    A.  Yes.

3    Q.  Can you just identify what the columns are as we're going

4    from left to right.

5    A.  The first column is the total transaction, which was the

6    size of the whole shelter.  The second column was ordinary

7    income, so how much of it would be ordinary income.  The third

8    column is capital gain, how much would be capital gain.  And

9    the next column is all in 1999, yes or no, and then the last is

10   for capital gain, the transferring of long-term asset, meaning

11   whether that had happened or not.

12   Q.  And, Ms. Torres, if we could have the whole -- there.

13           And so there are entries for approximately 20 clients?

14   A.  I think so.

15   Q.  And the total transaction, what do you understand those

16   numbers to reference?

17   A.  The total amount of loss that we had generated.

18   Q.  So, for example, if you look at Shahid Khan, what was the

19   total amount of the transaction that he was trying to generate?

20   A.  Thirty-five million.

21   Q.  And that was of what character?

22   A.  All ordinary.

23   Q.  And the reference to ordinary gain signifies that Mr. Khan

24   had what type of gain that year?

25   A.  He had ordinary income kind of gain.  He earned gain from

1    salary or gain from the profits of an operating business.

2    Q.  If you would take out Government Exhibit 301-213 and

3    301-217.

4    A.  Yes.

5    Q.  I think you had made a statement earlier, Mr. Greisman,

6    that you were sort of an air traffic controller with regard to

7    these transactions.  Did you make an attempt to track these

8    transactions on various spreadsheets?

9    A.  I did.

10   Q.  Looking first at Government Exhibit 301-217.  Do you

11   recognize that document?

12   A.  Yes.

13   Q.  What is that?

14   A.  It's an -- it's a memo from me to Denis Field dated

15   December 15, 1999.  Subject, short options, Jenkens & Gilchrist

16   transaction.

17   Q.  And Government Exhibit 301-213, could you identify that.

18   A.  Yes.  That's a spreadsheet under the -- which is titled BDO

19   short option transactions in process.  And it's a spreadsheet

20   that tracks transactions.

21            MS. DAVIS:  Your Honor, the government offers 301-217

22   and 301-213.

23            MR. LINDER:  No objection.

24            MR. DE CASTRO:  No objection.

25            THE COURT:  Government Exhibits 301-217 and 301-213

1    are received.

2              (Government's Exhibits 301-217 and 301-213 received)

3              MS. DAVIS:  May I publish, your Honor.

4              THE COURT:  You may.

5    BY MS. DAVIS:

6    Q.   Looking first at 301-217.  Who is copied on the e-mail that

7    you sent to Denis Field?

8    A.   Bob Jones, Adrian Dicker and Charlie Bee.

9    Q.   Mr. Jones was who?

10   A.   He was a BDO internal financial person who handled

11   accounting and finance matters for the tax solution group.

12   Q.   Why would you send this type of spreadsheet to him?

13   A.   Because he was the -- in fact, the financial officer for

14   the group, and so this was a financial related matter.

15   Q.   Can you read the body of this e-mail, please.

16   A.   Attached is a summary of the transactions we are executing

17   with Jenkens & Gilchrist and Deutsche Bank Alex Brown.  Note

18   that all fees are shown net of any amounts due to others for

19   their services rendered.  Also, fees collected to date are

20   current as of December 13.  Please let me know if you have any

21   questions.

22   Q.   The reference to fees shown net of any amount due to others

23   for their services rendered, what does that refer to?

24   A.   You'll recall that before we talked about the fact that BDO

25   would pay referral fees to others if they sent a transaction to

D9jndau3                          Greisman - direct

1    BDO.  It's referring to those referral fees.

2                   MS. DAVIS:  Might I publish 301-213, your Honor?

3                   THE COURT:  You may.

4    Q.  What's the caption on this spreadsheet?

5    A.  BDO short option transactions in process.

6    Q.  And is that your handwriting at the bottom?

7    A.  Yes, it is.

8    Q.  What does it say?

9    A.  Adrian, this is an update from what I sent this morning.

10   Michael confirmed his numbers.  Only thing really uncertain at

11   this point is Jordan -- I'm sorry, Jordan transaction.

12   Q.  And Adrian is a reference to who?

13   A.  Adrian Dicker.

14   Q.  And Michael is a reference to whom?

15   A.  Michael Kerekes.

16   Q.  And if you could, Ms. Torres, if we can just see if we

17   can -- and I don't know if we can do this in one fell swoop,

18   but maybe it's best if we do it by column.  So on the left-hand

19   side, if you could just enlarge the first three columns.

20                   Who is the top client there that's listed?

21   A.  Stanley Sher.

22   Q.  And the next two clients?

23   A.  Andy Wright-Addus and Mel Gale.

24   Q.  And are those the individuals that we were previously

25   discussing?

D9jndau3                          Greisman - direct

1   A.  They are.

2   Q.  The next column shows what?

3   A.  It lists the BDO contact person who is primarily

4   responsible for that transaction.

5   Q.  There's a reference to a Dudzinsky.  Do you know who that

6   person was?

7   A.  Yes.

8   Q.  Who was that?

9   A.  Bob Dudzinsky was a member of the tax solution group from

10  the BDO Philadelphia office.

11  Q.  I think you previously identified DiMuzio as David DiMuzio

12  in the Grand Rapids office, correct?

13  A.  Yes.

14  Q.  And the Huntzinger, is that Kurt Huntzinger that you

15  identified previously?

16  A.  Yes, it is.

17  Q.  What's the next column say?

18  A.  It's the fee for consulting agreement.

19  Q.  And do you recall that we had looked at the Mel Gale

20  consulting agreement?

21  A.  Yes.

22  Q.  And does that, the amount on the consulting agreement that

23  we saw, is that reflected in this column here?

24  A.  Yes, it is.

25  Q.  What's that amount?

D9jndau3                        Greisman - direct

1  A.  $150,000.

2  Q.  What's the grand total of the fees that were listed on the

3  consulting agreements for these clients?

4  A.  $18,378,394.

5  Q.  And if we could move over to the next column to the right.

6  Actually, if you could move all the way over, Ms. Torres, so

7  that the fee per consulting agreement is on the far left.

8  Okay.

9         So what's the next column to the right?

10 A.  Fee from Jenkens & Gilchrist.

11 Q.  What does that refer to?

12 A.  That refers to the percent -- the referral fee portion that

13 Jenkens was going to pay BDO out of the fee they collected.

14 Q.  Was that in addition to the fee per consulting agreement?

15 A.  Yes.

16 Q.  How much is listed in that column in total?

17 A.  $1,107,000.

18 Q.  Do you see that in a number of instances in that column

19 zero is listed?

20 A.  Yes.

21 Q.  Under what circumstances would there be a zero?

22 A.  Those were the cases where -- and it was principally, I

23 believe, Paul Shanbrom had negotiated with Jenkens that they

24 would only take the net fee.  So the example we've talked about

25 previously where Jenkens fee was 3 percent and they were going

D9jndau3                          Greisman - direct

1    to keep 2.4 --

2    Q.  What was the advantage to BDO of having zero in that

3    column?

4    A.  Well, all -- the advantage was that all of -- well, there

5    were a couple of advantages.  One -- one advantage was that the

6    way -- the timing of the payment was such that BDO did not

7    collect a referral fee from Jenkens until Jenkens collected

8    their fee from the client.  And Jenkens did not collect their

9    fee from the client until they issued the tax opinion.  When

10   BDO charged the client directly, they collected the

11   consulting -- they collected the fee at the time the consulting

12   agreement was signed, which was the very beginning of the

13   transaction.  So the fee got accelerated substantially.

14   Q.  So just so it's clear, you said that the -- when BDO was

15   being paid by Jenkens & Gilchrist, it would be paid after the

16   fee was paid to Jenkens just before the opinion letter issued,

17   is that right?

18   A.  Yes.

19   Q.  And timing wise when was that?

20   A.  That would usually be in February or March of the year

21   following the year of the tax shelter was done.

22   Q.  And these consulting agreements were signed at what point

23   in the transaction with the client?

24   A.  At the very beginning.

25   Q.  Looking to the right of the fee from Jenkens & Gilchrist,

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

D9jndau3                      Greisman - direct

1   do you see a column called total fee, BDO?

2   A.   Yes.

3   Q.   What's that fee?

4   A.   That's the total of the fees that BDO was collecting from

5   the client directly under the consulting agreement, and the

6   referral fees from Jenkens, if any.

7   Q.   Just curious, if you look at the map -- I don't know if you

8   have any insight into this, but if you add the fee per the

9   consulting agreement and the fee from Jenkens & Gilchrist, does

10  that appear to equal the total BDO fee?

11  A.   Well, that's what -- it's supposed to do that, yes.

12  Q.   Does it appear to, in fact, in this case?

13  A.   Well, the print is very small, but I think the total -- if

14  you look at individual lines, it does.  I don't think that the

15  actual total does.  It must have been an error in the Excel,

16  meaning if you look at the grand total, the bottom line, the

17  fee per consulting agreement was 18 million 300-something, and

18  the fee from Jenkens was over 1 million.  So you would expect

19  the grand total to be 19 million, but it's not.  But if you

20  look at individual lines, they total correctly --

21  Q.   In looking at the collected to date column, what does that

22  reflect?

23  A.   That's how much was actually collected up to that point in

24  some cases, some of the clients had negotiated some portion of

25  the fee to be deferred until later.  But, of course, the

D9jndau3                         Greisman - direct

1    Jenkens fees were not being collected until a later point.

2    Q.  And then do we see basically a schedule out of the timing

3    of various payments and the rest of the columns?

4    A.  Yes, we do.

5    Q.  Looking at Government Exhibit 300-125.

6    A.  Yes.

7    Q.  What is that document?

8    A.  That's an e-mail from Denis Field to BDO, everyone, dated

9    November 11, 1999, under the caption tax sells.

10   Q.  And if you could also pick up 300-117, 300-118 and 300-119.

11   A.  Yes.

12   Q.  Do you have all those?

13   A.  I do.

14   Q.  Are these all e-mails from Denis Field to BDO?

15   A.  They are.

16   Q.  And do they all reference tax shelter sales?

17   A.  They do.

18          MS. DAVIS:  Your Honor, the government offers 300-125,

19   300-117, 300-118 and 300-119.

20          MR. LINDER:  No objection.

21          MR. DE CASTRO:  No objection.

22          THE COURT:  Government Exhibits 300-117, 118, 119 and

23   125 are received in evidence.

24          (Government's Exhibits 300-117, -118, -119 and -125

25   received in evidence)

D9jndau3                        Greisman - direct

1            MS. DAVIS:  May I publish, your Honor.

2            THE COURT:  You may.

3            MS. DAVIS:  If I could have 300-125.

4   BY MS. DAVIS:

5   Q.  Can you read the body -- well, the subject matter says

6   what?

7   A.  Tax sells.

8   Q.  And the S's in the tax sells are replaced with what?

9   A.  Dollar signs.

10  Q.  Had you seen this prior to this particular e-mail?

11  A.  Yes.

12  Q.  In what instance would you see this sort of formulation?

13  A.  There were, again, in the -- similar to the use of the

14  wolf, tax sells caption with the S's replaced by dollar signs

15  was used frequently by Denis and others in BDO internal

16  marketing, internal marketing materials.

17  Q.  What does the body of the e-mail say?

18  A.  Congratulations to Bob Greisman of the Chicago office who

19  closed a tax solution transaction resulting in a profit of

20  $1,008,000 to the firm.  Tax sells.

21  Q.  And similarly, is 300-117 a similar e-mail?

22  A.  It is.

23  Q.  Dated on what date?

24  A.  July 21, 2000.

25  Q.  Who is it congratulating in this e-mail?

D9jndau3                              Greisman - direct

1  A.  Paul Shanbrom.

2          MS. DAVIS:  May I publish 300-117.

3          THE COURT:  You may.

4  Q.  What is he being congratulated for?

5  A.  For closing a tax solution transaction resulting in gross

6  revenues of $1.9 million.

7  Q.  And looking at 300-118.

8          MS. DAVIS:  Might I publish, your Honor?

9          THE COURT:  You may.

10 Q.  Do you see that the e-mail, the to address line is

11 BDO-everyone.  Am I correct in believing that that means it's

12 addressed to the entire firm?

13 A.  Yes, that's correct.

14 Q.  The date on this one was what date?

15 A.  July 20, 2000.

16 Q.  And who's being congratulated?

17 A.  Walter Koziol and Paul Shanbrom of the Detroit office.

18 Q.  For what?

19 A.  Closing a tax solution transaction, producing a profit of

20 $1,125,000.

21 Q.  And looking at 300-119.

22          MS. DAVIS:  May I publish that one, your Honor?

23          THE COURT:  You may.

24 Q.  Do you see the address line there?

25 A.  Yes.

1    Q.  What is that?

2    A.  BDO partner.

3    Q.  And who would receive e-mails when it was addressed to BDO

4    partner?

5    A.  All BDO partners.

6    Q.  Would that include tax and audit and consulting partners?

7    A.  Yes, it would.

8    Q.  What's the date on this e-mail?

9    A.  July 16, 2000.

10   Q.  And at this point in time in July 16th -- on July 16th of

11   2000, what was Denis Field's position within the firm?

12   A.  He was the chief executive -- he was the chairman of the

13   board and chief executive officer of the firm.

14   Q.  Was there anyone higher than him at the firm at this point

15   in time?

16   A.  No.

17   Q.  What does the subject matter say?

18   A.  Tax solution goal.

19   Q.  And what does he say there?

20   A.  Our goal this year will be 250 million in gross revenue.  I

21   am convinced now that tax sells.

22   Q.  Looking at Government Exhibit 300-67.  Do you see that?

23   A.  I do.

24   Q.  During the course of being a member of the tax solutions

25   group, did you review any drafts of the Jenkens & Gilchrist

D9jndau3                          Greisman - direct

1   opinion letters?

2   A.   Yes.

3   Q.   For what years did you review drafts?

4   A.   I know that I saw a draft for 19 -- for the year --

5   reviewed a draft for the calendar year 1998, for the year 1999,

6   for the year 2000.

7   Q.   And who else in BDO were reviewing the Jenkens & Gilchrist

8   tax shelter draft opinion letters?

9   A.   The members of the tax opinion committee, and at least --

10  and possibly other partners who were asked to do so.

11  Q.   Was Denis Field a member of the tax opinion committee in

12  the years 1998, 1999 and 2000?

13  A.   Yes, he was.

14  Q.   Specifically looking at 300-67.  What is that document?

15  A.   It's an e-mail from Paul Shanbrom to Paul Daugerdas with a

16  copy to Donna Guerin dated October 28, 1999, and the subject

17  being option strategy.

18  Q.   Did this relate to the tax shelter sales between BDO --

19  that BDO was doing of the Jenkens product?

20  A.   Yes, it did.

21          MS. DAVIS:  Your Honor, the government offers 300-67.

22          MR. LINDER:  No objection.

23          MR. DE CASTRO:  No objection.

24          THE COURT:  Government Exhibit 300-67 is received.

25          (Government's Exhibit 300-67 received in evidence)

D9jndau3                         Greisman - direct

1              MS. DAVIS:  May I publish.

2              THE COURT:  You may.

3    BY MS. DAVIS:

4    Q.  Could you read the body of the e-mail, please.

5    A.  Paul, thank you for participating on our conference call

6    Tuesday afternoon.  As discussed, please e-mail to me and Bob

7    Greisman a copy of your opinion on this transaction.  On

8    another note, I have spoken to most of the clients that I have

9    in process with Donna currently, and most, if not all, are

10   anxious to get started with the new strategy.  Donna, since I

11   have been out of the country the past two weeks, I just wanted

12   to recap the clients that I have sent to you that I understand

13   would need to be converted to this new strategy are as follows:

14   Q.  And then there's a list of clients?

15   A.  Yes.  Most of them I can't pronounce.  Please let me know

16   if I missed anyone.  Thanks.  Paul.

17   Q.  The new strategy that's being referenced here was what?

18   A.  This was the transfer over from the treasury note short

19   sale to the option strategy.

20   Q.  Looking at Government Exhibit 300-32.

21   A.  Yes.

22   Q.  Do you recognize this document?

23   A.  I do.

24   Q.  What is it?

25   A.  It's an e-mail from me to Donna Guerin dated November 4,

1    1999, with the caption Jenkens draft opinion.

2              MS. DAVIS:  Your Honor, the government offers 300-32.

3              MR. LINDER:  No objection.

4              MR. DE CASTRO:  No objection.

5              THE COURT:  Government Exhibit 300-32 is received.

6              (Government's Exhibit 300-32 received in evidence)

7    BY MS. DAVIS:

8    Q.  And is this e-mail just a week or so after the e-mail that

9    Paul Shanbrom sent to Paul Daugerdas and Donna Guerin asking

10   for a copy of the draft opinion?

11   A.  Yes.

12             MS. DAVIS:  And may I publish this, your Honor?

13             THE COURT:  You may.

14   Q.  Do you see the little envelope icon that's -- that appears

15   on the front of this document?

16   A.  Yes.

17   Q.  What does that signify to you?

18   A.  Jenkens draft opinion that there's an attachment, the

19   Jenkens draft opinion attachment.

20   Q.  Can you read the body of the e-mail?

21   A.  Donna, attached is Larry Cohen's comments on the draft

22   opinion.  Larry is in our New York office.  Not included is the

23   comment from Charlie Bee regarding the need for some discussion

24   on the fact that the purchased and sold call options are

25   separate property.  I may be able to show you some language to

1    that effect from another opinion.  Bob.

2    Q.  And if we turn the page, what is this document?

3    A.  It's an e-mail from Larry Cohen to members of the BDO tax

4    opinion committee.  The subject, Jenkens draft opinion.  Date,

5    November 4, 1999.

6    Q.  And can you identify, please, the people who are listed in

7    the to section of the address.

8    A.  Adrian Dicker, myself, Charlie Bee, Denis Field, Lorin

9    Luchs, Michael Kerekes and Paul Shanbrom.

10   Q.  And is this e-mail sent approximately 40 minutes before you

11   forward it to Donna Guerin?

12   A.  Yes.

13   Q.  And does Mr. Cohen raise various particular issues that he

14   thinks need to be addressed?

15   A.  He does.

16   Q.  And upon sending this type of e-mail, would you have any

17   follow-up conversations with Ms. Guerin or anyone else from

18   Jenkens & Gilchrist?

19   A.  That I either do follow-up conversations or follow-up

20   e-mails, yes.

21   Q.  Looking at Government Exhibit 301-180A.

22   A.  Yes.

23   Q.  Do you recognize that document?

24   A.  I do.

25   Q.  What is it?

D9jndau3                        Greisman - direct

1  A.   It's a fax cover sheet from me to Donna Guerin dated

2  March 14, 2000, with an attached -- with attachments to it.

3           (Continued on next page)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

D9jndau5                          Greisman - direct

1   Q.  Regarding what?

2   A.  Comments on the draft tax opinion.

3          MS. DAVIS:  Your Honor, the government offers

4   301-180A?

5          MR. LINDER:  No objection.

6          MR. DE CASTRO:  No objection.

7          THE COURT:  Government Exhibit 301-180A is received in

8   evidence.

9          (Government's Exhibit 301-180A received in evidence)

10         MS. DAVIS:  Your Honor, may I publish?

11         THE COURT:  You may.

12         MS. DAVIS:  If you could, Ms. Torres enlarge just the

13  handwritten note at the bottom there.

14  BY MS. DAVIS:

15  Q.  Is that your handwriting, Mr. Greisman?

16  A.  Yes, it is.

17  Q.  Could you read what you wrote to Donna Guerin?

18  A.  Donna.

19         Attached are three e-mails I received containing

20  comments on most recent draft of opinion.  Bottom line is we

21  are OK with opinion, but you may want to look over the

22  comments.  At this point, dare I ask, so where are they?

23  Q.  What do you mean when you say, Dare I ask where are they?

24  A.  As you might recall from my prior testimony, the opinions

25  needed to be issued before tax returns could be released.  This

D9jndau5                        Greisman - direct

1   was sent on March 14, the due date for the S corporation

2   returns was March 15, and the due date for the individual

3   returns was April 15.  So I am essentially asking if they can

4   point the way where the opinions are because we needed them.

5   Q.  The prior e-mail that we had looked at was dated November

6   4, 1999.  Were drafts being exchanged during the period

7   November of '99 to March 14 of 2000 between BDO and Jenkens?

8   A.  Yes.  BDO would provide comments and Jenkens would make

9   periodic revisions either in response to BDO's comments or

10  separately.  So, yes, various drafts were provided.

11  Q.  And attached to this, if you would go to the second page,

12  please, what's the first attachment?  Who is it from?

13  A.  From Larry Cohen of the tax opinion committee, dated March

14  10, 2000.

15  Q.  If you would just read the section -- I'm sorry, the first

16  comment that is actually circled there.

17  A.  The one that says page 3?

18  Q.  Yes.

19  A.  Page 3, footnote 1, I would delete the reference to bet

20  option from the definition.  It is unnecessary and conveys the

21  impression that this was not an investment.

22  Q.  What did you understand the reference to bet option to

23  mean?

24  A.  I understood that to be in reference to the lottery feature

25  that I previously described.

D9jndau5                         Greisman - direct

1    Q.   And looking at comment 5, if you could.  Just read
2    Mr. Cohen's comment to the tax opinion committee.
3    A.   Section M, particularly page M-18, is a recitation of many
4    economic substance cases but no real discussion why the cases
5    are distinguishable.
6    Q.   Can you explain what it means for a case to be
7    distinguishable?
8    A.   In tax law you look at cases to provide guidance as to what
9    the answer to a question is.  A case is an application of the
10   law to specific facts and circumstances.  If the facts and
11   circumstances are the same or similar to yours, then that case
12   may govern and determine the answer in your case.  If it's
13   different or distinguishable, then it is largely irrelevant.
14   Q.   The address line on Larry Cohen's e-mail says, To tax
15   opinion committee.
16        Who do you understand would be receiving an e-mail
17   addressed to the "tax opinion committee"?
18   A.   The specific people?
19   Q.   Yes?
20   A.   At that time, the opinion committee included Denis Field,
21   Charlie Bee, Adrian Dicker, myself, Larry Cohen, Michael
22   Kerekes, Paul Shanbrom, Lorin Luchs, and perhaps a couple of
23   others who I don't recall.
24   Q.   I think you had stated that initially you were not a member
25   of the tax opinion committee but later became one.  Do I have

D9jndau5                          Greisman - direct

1   that right?

2   A.  That's correct.  In approximately June of 1999 I became a

3   member.

4   Q.  How did that happen?

5   A.  Denis Field asked me to join, I think at the same time he

6   asked Paul Shanbrom to come to the committee.

7   Q.  Did he say why he wanted you to join?

8   A.  Not that I recall.

9   Q.  Looking at the next page of this, what is this next page?

10          MS. DAVIS:  Ms. Torres.

11  A.  An e-mail from Michael Kerekes to me dated March 8,

12  subject, J & G opinions where he has his additional comments.

13  Q.  If you could just read the first paragraph.

14  A.  At this point, while I don't agree with everything J & G

15  are doing in their opinions, I believe I understand the reasons

16  for their unwillingness to conform to our wishes on some

17  points.  For example, while I wish they would include

18  discussion of the 1 percent safe harbor for respecting a

19  partner as a real partner, I suspect they don't want to do so

20  because I suspect they have clients not falling within the safe

21  harbor.  Thus I think, one, we are as close as we are going to

22  get to exactly what we want and, two, this is close enough to

23  allow us to go forward.

24  Q.  The 1 percent safe harbor reference, what does that refer

25  to?

1  A.  We talked about before about a partnership that was owned

2  99 percent/1 percent, 99 percent by a taxpayer and 1 percent by

3  a corporation the taxpayer controlled.  The tax rules had a

4  rule that said as long as the corporation was at least owned at

5  least 1 percent of the partnership it would be recognized as

6  being independent of the taxpayer, even though it was owned by

7  the taxpayer.

8  Q.  Is there a cc at the bottom of this e-mail?

9  A.  There is.

10 Q.  Who is listed?

11 A.  Charlie Bee, Larry Cohen, Adrian Dicker and three little

12 dots.

13 Q.  Do these appear to be names of the tax opinion committee in

14 alphabetical order?

15 A.  Yes, they do.

16 Q.  Again, in March of 2000, was Denis Field a part of the tax

17 opinion committee?

18 A.  Yes, he was.

19 Q.  Then looking at the last page, who was this e-mail from and

20 to?

21 A.  From Adrian Dicker to me on March 14, also comments on the

22 J & G opinion.

23 Q.  What does he say in the very first paragraph there?

24 A.  I would prefer the options to be referred to throughout

25 as -- throughout just as options rather than as digital options

1    and certainly not as bet options.

2    Q.  Now, Mr. Greisman, these draft opinion letters that

3    originated at Jenkens & Gilchrist and were being bounced back

4    and forth between Jenkens and BDO Seidman, did those contain

5    client representations?

6    A.  I believe that they did, yes.

7    Q.  At any point did you or any other member of the tax opinion

8    committee suggest that those representations be changed?

9    A.  No.

10   Q.  Why not?

11   A.  Because it was just understood that those representations

12   needed to be that way for the transaction to go forward.

13   Q.  To go forward in what way?

14   A.  To be completed.

15   Q.  Why was that?

16   A.  Because the representations were the basis upon which the

17   opinion was, it was really the foundation on which the opinion

18   was centered and without the opinion the tax -- the client

19   would not do the transaction.

20   Q.  Looking at Government Exhibit 300-48.

21   A.  Yes.

22   Q.  With respect to the representations in the opinion letters,

23   did you know that they were false based on your dealings with

24   your various BDO Jenkens & Gilchrist clients?

25   A.  Yes.

D9jndau5                          Greisman - direct

1    Q.  Why did you let the opinion letters go forward with false

2    representations?

3    A.  I greatly regret that I did at this point, and at the point

4    I got, I had a full understanding of that, the transactions

5    were far under progress.  If BDO had backed away from these it

6    would have been refunding a great deal of fees and there was

7    great pressure from the tax leadership group, including Charlie

8    and Denis, to push these transactions forward.  It was just a

9    terrible situation to be caught in.

10   Q.  And would it have impacted your personal finances?

11   A.  It would have.

12   Q.  In what way?

13   A.  If the transactions were unwound, there wouldn't have been

14   bonuses to pay.

15   Q.  Those bonuses that we saw earlier in your testimony?

16   A.  Right.

17   Q.  Looking at Government Exhibit 300-48.

18   A.  Yes.

19   Q.  What is that document?

20   A.  It is an e-mail from me dated March 25, 2000 to various tax

21   solution group members on the subject of J & G tax opinions and

22   invoices.

23   Q.  Is Denis Field copied on this particular e-mail that you

24   see?

25   A.  I do not see that he is.

D9jndau5                          Greisman - direct

1    Q.  And why did you not copy Mr. Field?

2    A.  I don't recall.

3    Q.  The date of this March 25, 2000, is it shortly after the

4    e-mails that you were sending back and forth with Jenkens on

5    the draft e-mails for the '99 tax year?

6    A.  Yes, it was.

7    Q.  Could you read the --

8              MS. DAVIS:  I'm sorry, your Honor.  I am offering

9    300-48.

10             MR. LINDER:  No objection.

11             MR. DE CASTRO:  No objection.

12             THE COURT:  Government Exhibit 300-48 is received in

13   evidence.

14             (Government's Exhibit 300-48 received in evidence)

15             MS. DAVIS:  Thank you, your Honor.  May I publish it?

16             THE COURT:  Yes.

17             MS. DAVIS:  If we can have the body of the e-mail

18   enlarged, Ms. Torres.

19             Thank you.

20   BY MS. DAVIS:

21   Q.  If you could read that, please.

22   A.  J & G is now sending out invoices to clients for the tax

23   opinion along with, in many cases, some corporate resolutions

24   to be executed.  They are beginning to send me draft copies of

25   the opinion.  And as soon as I receive them I will FedEx them

D9jndau5                          Greisman - direct

to you for your review.  In some cases you may need to pass

them on to the client and/or other advisers for review as the

client desires.  I am told that all drafts will be in my hands

by the middle to end of next week, and some have already

arrived and been shipped out.  From a review standpoint,

understand that our tax opinion committee has already signed

off on the substantive aspects of the model opinion.  The

opinions that will be in your hands reflects changes made at

our suggestion.  In particular, your review should focus on the

specific facts of -- of -- I think it's misstated -- but of

your transaction.  Jenkens will issue the opinion in final form

only after payment has been made.  Thus, you should alert your

clients to the invoices being sent.  In all cases, wire

transfer instructions have been provided.  We know many clients

wish to file without extension, so it would be well that

clients are ready to pay the Jenkens fee as they tell me they

will not issue a signed opinion without payment first.  Call if

you have any questions.

         Bob.

Q.  And the reference at the very end to many clients wishing

to file without extension, what does that refer to?

A.  Tax returns are due at April 15 of any given year for the

prior year.  They are also allowed on request to get an

extension until as late as October 15.  Taxes have to be paid,

but the actual filing of the return can be extended.

D9jndau5                        Greisman - direct

1    Q.   So this e-mail appears to be dealing with sort of the
2    end-of-the line nitty gritty with getting the opinions
3    finalized and the payments made, am I correct?
4    A.   Yes.
5    Q.   Was it your habit to copy Denis Field on nitty gritty
6    logistical e-mails in every instance?
7    A.   Not at this point in time, no.
8    Q.   Why not?
9    A.   At this point in time he was the CEO of the firm, so it
10   would be my habit to include him on copies of things that were
11   more of a substantive nature, but not the nitty gritty of
12   things like invoicing.
13   Q.   The fact that he was the CEO, did you have an opportunity
14   to observe his involvement in the tax solutions group while he
15   was the chief executive officer of BDO?
16   A.   Yes.
17   Q.   How would you characterize the level of involvement at that
18   point in time?
19   A.   Very active.
20   Q.   Can you give an explanation as to why you think that?
21   A.   Well, again, attendance and participation at tax solution
22   calls or -- and meetings, maybe not a hundred percent, but
23   frequently and actively.  And, again, consistent with a speech
24   he gave that we talked about before the lunch break at the
25   partners meeting in 1999.  Tax solutions was the major push

D9jndau5                         Greisman - direct

1   that he was expressing as the vision of the firm.

2   Q.  At any point in time did Denis Field express to you that he

3   was not concerned with the tax solutions group business?

4   A.  No.

5   Q.  Did he express to you that he in fact did have an interest

6   in the tax sluices business?

7             MR. DE CASTRO:  Objection to form.

8             THE COURT:  Sustained.

9   Q.  What did Denis Field tell you about his desire to keep

10  informed about the tax solutions business after he became the

11  CEO?

12            MR. DE CASTRO:  Objection.

13            THE COURT:  Overruled.

14  A.  I understood from the context of, the substance of the

15  message Denis was conveying both to me individually and to the

16  partner group as a whole, that he remained very interested in

17  the activities of the tax solution group.

18  Q.  Looking at Government Exhibit 301-154.

19  A.  Yes.

20  Q.  Do you recognize this document?

21  A.  Yes.

22  Q.  What is it?

23  A.  It is a fax from me to Donna Guerin dated August 25, 2000,

24  subject, Illingworth.

25  Q.  And Illingworth, is that the same Illingworth that we had

D9jndau5                          Greisman - direct

1    seen on one of the prior letters that had been sent both the

2    identical letter sent both to Stanley Sher and John

3    Illingworth?

4    A.  Yes.

5    Q.  This relates to the implementation of the Jenkens &

6    Gilchrist tax shelter transactions?

7    A.  Yes.

8            MS. DAVIS:  Your Honor, the government offers 301-154.

9            MR. LINDER:  No objection.

10           MR. DE CASTRO:  No objection.

11           THE COURT:  Government Exhibit 301-154 is received in

12   evidence)

13           (Government's Exhibit 301-154 received in evidence)

14           MS. DAVIS:  May I publish, your Honor?

15           THE COURT:  You may different.

16           MS. DAVIS:  If we could, Ms. Torres, just have the

17   body of the e-mail enlarged.

18   BY MS. DAVIS:

19   Q.  Would you please read that.

20   A.  Donna.

21           We are going to be doing even more business purpose

22   documentation than before.  Thus, ahead of the book that gets

23   put together later, I need a copy of the partnership agreement

24   and the documents for the assignment and transfer of the

25   options to the partnership.  As I may have mentioned, they have

D9jndau5                          Greisman – direct

1   no stock to contribute to the partnership, thus the partnership

2   needs to acquire some stock before the S corporation transfer.

3           Finally, as we set up grantor trusts here, do we want

4   to terminate them or simply use them but provide the grantor

5   trust letter?

6           Any thoughts?

7           MS. DAVIS:  Your Honor, I'm sorry.  I would like to

8   move to strike everything after "before the S corporation

9   transfer."

10          THE COURT:  Come on up to the sidebar for a moment.

11          Take the exhibit down.

12      (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

D9jndau5                        Greisman - direct

1           (At sidebar)

2           MS. DAVIS:  Your Honor, this exhibit had been redacted

3     at the prior trial and apparently in the system the old version

4     was admitted.

5           I will say that I am happy to leave this redacted at

6     this point in time, your Honor.  I will say and just alert the

7     Court that we do intend to elicit testimony about the grantor

8     trust issue which is alleged in the indictment.

9           We already had provided notice back in July to both

10    sides that the grantor trust issue would be elicited on the BDO

11    transactions.  I'm happy not to do it here because of the lack

12    of provision of the unredacted version as part of this

13    particular set of government exhibits, although I would note

14    that both parties have previously been given the unredacted

15    version.  But for our purposes right now, I'm happy to use a

16    redacted version.

17          THE COURT:  Could I see the --

18          MR. LINDER:  This is the version we were provided,

19    Judge, which is the redacted version.  In fact, I wasn't even

20    aware of the fact that it was redacted.

21          I am sure Ms. Davis is correct that it was provided in

22    unredacted form in connection with the first trial.  But since

23    it doesn't indicate that it's redacted, I didn't realize that

24    it was.

25          MS. DAVIS:  That is entirely our fault, your Honor,

1    and I apologize for that.

2               THE COURT:  What do you want to do at this particular

3    moment?

4               MS. DAVIS:  I would just like to finish with it.  I

5    don't need it anymore.  I don't wish to publish it.  I want it

6    in.  I ask that it be admitted in its current form.

7               He's already read the pertinent portions, your Honor,

8    I would just ask that it be admitted at this time in its

9    current form.  And, as I requested, that the testimony anything

10   after this final word be stricken.

11              THE COURT:  After "S corporation transfer"?

12              MS. DAVIS:  Yes, your Honor.

13              MR. LINDER:  Correct.

14              THE COURT:  All right.

15              The application to strike that portion of the

16   testimony that he read is granted.  I am not going to go back

17   and tell the jury that I'm striking a particular portion of the

18   testimony now because it is just going to highlight the issue.

19              MR. LINDER:  Right.

20              MS. DAVIS:  That is fine.

21              THE COURT:  But it's stricken.

22              Your application is granted.  Let's move on.

23              MR. LINDER:  OK.

24              MR. OKULA:  Thank you, Judge.

25              MS. DAVIS:  Thank you.

D9jndau5                        Greisman - direct

1                   (In open court)

2                   THE COURT:  You may proceed.

3                   MS. DAVIS:  Thank you, your Honor.

4    BY MS. DAVIS:

5    Q.  Did there come a point in time, Mr. Greisman, that the

6    Internal Revenue Service issued a notice with regard to certain

7    transactions that they were concerned with?

8    A.  Yes.

9    Q.  When was that?

10   A.  In August of 2000.

11   Q.  What was the name of the notice?

12   A.  It was called Notice 2000-44.

13   Q.  And did you have any discussions with Donna Guerin or Paul

14   Daugerdas about Notice 2000-44?

15   A.  Yes.

16   Q.  Who did you speak with?

17   A.  I think Donna Guerin, possibly Paul Daugerdas.

18   Q.  Just generally, what did Notice 2000-44 do?

19   A.  Notice 2000-44 was effectively a statement by the IRS that

20   described in general terms the tax shelter transaction that we

21   were doing with Jenkens and others, and it described other

22   transactions that were similar and essentially said that we are

23   aware these transactions are being done.  If we come across

24   them in audit examination, our intent is to disallow all of the

25   deductions associated with them because of lack of economic

D9jndau5                          Greisman - direct

1  substance.

2  Q.  What was the reaction of the person that you spoke with at

3  Jenkens & Gilchrist?

4  A.  I don't recall.

5  Q.  Do you know what Jenkens & Gilchrist's position was with

6  respect to notice 2000-44.

7          MR. LINDER:  Objection.

8          THE COURT:  Sustained.

9  Q.  Did you speak with anyone within the tax solutions group

10 about the issuance of Notice 2000-44?

11 A.  Yes.

12 Q.  Who did you speak with?

13 A.  Basically with everyone in the tax solution group.  When

14 the notice first came out, it -- basically Adrian Dicker or

15 Charlie Bee communicated that there would be kind of a

16 ceasefire in everything until the notice could be understood

17 and it could be evaluated, all tax solution selling of these

18 transactions will be stopped.

19          Eventually, in time, the tax solutions group,

20 primarily the tax leadership group, Denis Field, Adrian Dicker

21 and Charlie Bee, evaluated this and came to a conclusion that

22 we would no longer be selling new options shelters, but under

23 certain circumstances the ones that were in process would

24 continue.

25 Q.  What were the certain circumstances under which certain

1  transactions could continue?

2  A.   That if the transaction had started, meaning the consulting

3  agreement had been signed before the date of the issuance of

4  the regulations, and if the client had been advised that this

5  was now a riskier transaction and if they still wanted to

6  proceed that it would go forward.

7  Q.   What legal force is there to IRS notices like notice

8  2000-44?

9  A.   They don't have legal force.  They're basically statements

10 of position.  So they have influence, because the notice tells

11 you what the IRS is thinking and planning on doing, but it does

12 not have legal effect.

13 Q.   Did the notice have any effect on the practical realities

14 for your clients who were engaging in the Jenkens & Gilchrist

15 tax shelter?

16          MR. DE CASTRO:  Objection.

17          THE COURT:  Sustained.

18 Q.   Did BDO make any attempts to notify its clients of the

19 Notice 2000-44?

20 A.   Yes.

21 Q.   What attempts did BDO make?

22 A.   Well, first, when the notice itself was issued, whatever

23 day in early August it was, it was issued with a lot of

24 publicity, a front page Wall Street Journal story, the New York

25 Times.  There was a great deal of publicity associated with it.

D9jndau5                        Greisman - direct

1              BDO within a short period of time wrote to clients and

2       I believe there were a series of telephone calls to clients

3       telling them about the notice, these would be both

4       communicating with clients who had previously done the

5       transaction as well as clients that were in the process of

6       doing the transaction, and explaining the significance of the

7       notice, discussing it with them; and also advising them of a

8       development that was related to the notice, which was now, as

9       of that date, BDO and all other tax shelter promoters were

10      required to keep lists of the clients and provide those lists

11      to the IRS upon request.

12      Q.  Did BDO make an offer to the clients about what they could

13      do in response to this information they were receiving?

14      A.  Yes.

15      Q.  What did they offer?

16      A.  For the clients who had committed to do the transaction in

17      2000 but obviously it hadn't been done yet, they had the

18      opportunity to back out of the transaction and receive a refund

19      of their fees.

20      Q.  Did certain clients choose to do so?

21      A.  Yes.

22      Q.  At some point in the fall of 2000 did you learn that Adrian

23      Dicker was leaving the firm?

24      A.  Yes.

25      Q.  What did you learn and from whom?

D9jndau5                        Greisman - direct

A.  I learned from Denis Field, and as well as through, from on

the grapevine, but Denis Field took me to lunch, told me that

Adrian was feeling a lot of pressure and had some health issues

or family issues and decided to take early retirement.  He was

retiring from the firm although he would still remain in some

more distant capacity as an adviser to the board of directors.

Q.  Did you ever have a conversation with Adrian Dicker about

the reasons for his retirement?

A.  No, I did not.

Q.  Did Mr. Dicker, in fact, leave the firm --

A.  Yes.

Q.  -- other than his board capacity?

A.  Yes, he did.

Q.  After that occurred, did your position or duties change

within the tax solutions group?

A.  Yes, they did.

Q.  What did they change to?

A.  Again Denis asked me at this luncheon where he told me

about Adrian's leaving that -- the function that Adrian had

heavily provided in the tax solution group was organization and

management and keeping things on track.  He indicated to me he

was, that he wanted me to step up and take on some of those

administrative responsibilities, helping Charlie Bee and he,

Denis Field, run the tax solution practice.  He was not asking

me to be one of the people running it but he was asking me to

D9jndau5                          Greisman - direct

1    help with the administrative tasks.

2    Q.   Administrative tasks such as?

3    A.   Well, maybe, I showed you before, the air traffic control

4    on the Jenkens transactions at the end of '99, things like

5    that; organizing meetings, facilitating transmission of

6    information to the tax solution group members, administrative

7    things like that.

8    Q.   Did BDO receive any correspondence from the IRS related to

9    the tax shelters in December of 2000?

10   A.   Yes, it did.

11   Q.   Where were you when you learned about that correspondence?

12   A.   At a previously scheduled meeting of the tax opinion

13   committee or the tax solution leadership group at O'Hare

14   Airport in Chicago.

15   Q.   How did you learn about the letter?

16   A.   There was a letter that was sent to a tax partner in the

17   Chicago office who was unrelated to tax solutions that

18   basically said I'm just giving you my recollection of it.  It

19   was a very short letter that said, dear BDO, we, the IRS, know

20   that you have been selling transactions that were described in

21   the Notice 2000-44.  We would like you to provide us with the

22   list of the names and the contact information for the clients

23   who did it.

24   Q.   Why, to your knowledge, did Nancy Hannafin call you?

25   A.   Because she knew that I was a member of the tax solution

D9jndau5                          Greisman - direct

1   group, and so I would be the person to address this letter.

2   Q.  Who was at the meeting at the Chicago O'Hare Hilton?

3   A.  Denis Field, Charlie Bee, myself, Michael Kerekes, Larry

4   Cohen and Paul Shanbrom.

5   Q.  Did you advise those people about what Nancy Hannafin told

6   you?

7   A.  Yes.  It happened that she -- first thing in the morning,

8   as I was driving to the meeting, she called me and caught me as

9   I was heading to the meeting.

10  Q.  Did you receive a fax copy of the letter while you were at

11  the hotel?

12  A.  Yes.

13  Q.  Who amongst that group read the letter?

14  A.  All of the members of the group.

15  Q.  And did that include Denis Field?

16  A.  Yes, it did.

17  Q.  Did you observe Denis Field's reaction to the letter?

18  A.  Yes.

19  Q.  What was it?

20  A.  Certainly it was agitation and concern and I guess, you

21  know, distress, but certainly a high level of concern.

22  Q.  Was there somebody who was copied on the letter to Nancy

23  Hannafin from the IRS?

24  A.  There was a cc on the letter of somebody's name who was

25  very similar to the name of a partner in the Chicago office, I

D9jndau5                          Greisman - direct

1    don't remember know the exact name, but it wasn't exactly that

2    person's name, but it was very similar to it.

3    Q.  That person's name that Chicago employee was named what?

4    A.  It was a Chicago partner who was a part of the consulting

5    group, not the tax consulting group, the general business

6    consulting group whose name was, I believe his name was

7    Christopher Leisner.

8    Q.  And did Denis Field ask you to do anything in response to

9    reading the letter?

10   A.  Yes.

11   Q.  What did he ask you to do?

12   A.  Denis and Charlie Bee expressed concern that this

13   Mr. Leisner was a quote-unquote whistleblower and that they

14   wanted to have him come out to O'Hare Airport to find out

15   whether he in fact was the one who had contacted the IRS about

16   this.

17   Q.  And by whistleblower, what was your understanding of that

18   term?

19   A.  That the term would be that somebody from the inside who

20   reported to the government things that somebody would be doing

21   that would be wrong.

22   Q.  Did you in fact call reach out to Mr. Leisner as Mr. Field

23   asked you to do?

24   A.  I did.

25   Q.  What did you say to Mr. Leisner?

1    A.  I essentially told him that there was a meeting at the

2    airport and that the head of the firm, Denis Field, commanded

3    that he come out as quickly as he could come out from our

4    office to the airport?

5    Q.  Did he come out to the airport, Mr. Leisner?

6    A.  He did.

7    Q.  What happened while you were waiting -- how long did it

8    take Mr. Leisner to arrive from --

9    A.  Not that long.  Within an hour.

10   Q.  What was going on while you were waiting for Mr. Leisner to

11   arrive?

12   A.  I -- Denis and Charlie got a gentleman named Larry Hill who

13   was BDO, BDO counsel on the outside on the phone and began

14   having discussions with him.

15   Q.  Do you know from your work within the Chicago office what

16   Chris Leisner's and Denis Field's relationship was at that

17   time?

18   A.  Yes.

19   Q.  What was that?

20   A.  Chris Leisner was a very vocal critic of Denis', and I'm

21   not totally sure what relationship Denis had with Chris, but I

22   know that Chris was a very outspoken critic of Denis'.

23   Q.  What happened when Mr. Leisner arrived at the meeting?

24   A.  For a period of, I don't know, a half our so he was grilled

25   with questions by Charlie Bee and to some degree Denis as to

D9jndau5                         Greisman - direct

1    whether he was responsible for that letter being sent.

2    Q.  What happens next after Mr. Leisner is questioned?

3    A.  After it appeared that it was either coincidental or a

4    mistake or unrelated to Mr. Leisner that cc was on the bottom

5    of the letter, most of the rest of the day involved a series of

6    conference calls with Larry Hill in determining next steps that

7    BDO would take in terms of response to the letter.

8    Q.  Was there any particular concern with regard to the BDO

9    clients who had engaged in Jenkens & Gilchrist tax shelters?

10   A.  Yes.

11   Q.  What was the concern?

12   A.  The concern was that if all of their names were handed over

13   to the IRS, then they would all be audited.  And then, because

14   of the notice, we knew that the IRS would disallow all the

15   losses and deductions because the IRS already said they would

16   do so.  And then all of those clients would have taxes and

17   interest to pay and possibly penalties, and that they would be

18   coming after BDO to get refunds of their fees.

19   Q.  Did the BDO tax solutions group advise the Jenkens &

20   Gilchrist tax shelters about the receipt of the letter by Nancy

21   Hannafin?

22   A.  I'm sorry?

23   Q.  Did BDO, the tax solutions group members or otherwise,

24   notify your clients who were doing the tax shelters about the

25   letter that you got from the IRS?

D9jndau5                        Greisman - direct

1    A.  Not to my knowledge.

2    Q.  Why not?

3    A.  I don't recall.  I know there were a series of steps, there

4    was a series of advice that BDO received, and there was a point

5    prior to that that BDO had advised the client in writing that

6    list keeping could be required.  I don't recall what the

7    conclusions were, but I don't believe the clients were notified

8    of that letter.

9    Q.  Did you personally have discussions with anyone at Jenkens

10   & Gilchrist about that letter.

11   A.  Not that I recall, no.

12   Q.  Just so that the roared is clear, Nancy Hannafin, what was

13   her role with the tax solutions group, if any?

14   A.  She did not have a role at the tax solutions group.  She

15   was a tax partner in the Chicago office, but not part of the

16   tax solutions group.

17   Q.  Had she referred any clients to the tax solutions group for

18   the sale of tax shelters?

19   A.  I believe she may have referred one or two clients.  I am

20   not sure that their shelters were went through.

21   Q.  We talked a lot about the return, the fact that these

22   clients were filing tax returns.

23       Did you have a specific role with regard to the

24   preparation of tax returns that reported the results of Jenkens

25   & Gilchrist tax shelters?

D9jndau5                          Greisman - direct

1    A.   Yes.

2    Q.   What was your role?

3    A.   In early 2000, before returns were being prepared in

4    connection with the '99 tax shelters, I and others suggested

5    that the return, the partnership returns and the S corp.

6    returns, which while short and simple returns, had some

7    complexity to them.

8         You'll recall that I had to meet with Donna Guerin the

9    year before to insure that I was collecting the information off

10   the brokerage statement correctly.

11        So we decided to have a group that would be

12   concentrated on preparing those returns centrally in Chicago

13   under my supervision.

14   Q.   Who decided that?

15   A.   I think ultimately it was proposed by some combination of

16   Paul Shanbrom and myself to Adrian.  He consulted with Denis

17   and Charlie, and they said it was a good idea.

18        MR. DE CASTRO:  Objection, Judge.  Move to strike the

19   last portion of that answer.

20        THE COURT:  Application granted.

21        That portion of the witness' testimony that said it

22   was a good idea is stricken.

23   Q.   Do you recall specifically whether Denis Field was aware of

24   this group being formed under your supervision?

25        MR. DE CASTRO:  Objection.

D9jndau5                        Greisman - direct

1            THE COURT:  Overruled.  Answer yes or no.

2   A.  Yes.

3   Q.  How do you know that?

4   A.  From my conversation or e-mail with Adrian, he told me

5   he -- there was a conversation with Denis about it.

6   Q.  So logistically, how did it work with this group in the

7   preparation of the partnership and the S corporation returns.

8   A.  So a small group of low-level staff accountant, four or

9   five of them, were trained on how to read the brokerage

10  statements, and, you know, what item to take from one line on

11  the brokerage statement and put it where on the tax return.

12  And then all of that information was collected centrally in

13  Chicago for the clients around the country so those returns

14  could be prepared.

15  Q.  Do you remember the names of any of those young accountants

16  who worked on the returns under your supervision?

17  A.  Some of them, yes.

18  Q.  What names do you remember?

19  A.  Ed Gall, Nicole Bencik, Gina Sherman, Chris Leisney.  There

20  might have been others.

21  Q.  You used the phrase low-level staff accountants.  What

22  generally, in terms of number of years, the position, their

23  placement in their career, would be a low-level staff

24  accountant?

25  A.  Zero to three years out of school.

D9jndau5                         Greisman - direct

1   Q.  Is staff accountant their actual title?

2   A.  I believe that it was at the time, yes.

3   Q.  When you get promoted from staff accountant, what position

4   do you get promoted into?

5   A.  There why various gradation levels that changed from time

6   to time, but the first significant one was manager.

7   Q.  And then above manager would be what.

8   A.  Partner, sometimes senior manager, and then partner.

9   Q.  I would like you to look at Government Exhibit 300-54.

10  A.  Yes.

11  Q.  Do you recognize that document?

12  A.  I do.

13  Q.  Does this relate to the formation of this tax return

14  preparation group that you just discussed?

15  A.  It does.

16        MS. DAVIS:  Your Honor, the government offers

17  Government Exhibit 300-54.

18        MR. LINDER:  No objection.

19        MR. DE CASTRO:  No objection.

20        THE COURT:  Government Exhibit 300-54 is received in

21  efforts.

22        (Government's Exhibit 300-54 received in evidence)

23        MS. DAVIS:  May I publish?

24        THE COURT:  Yes.

25  BY MS. DAVIS:

D9jndau5                          Greisman - direct

1    Q.  Who is this e-mail from and to?

2    A.  It's a chain of two e-mails, the first one from me to

3    Adrian and then his response.

4    Q.  And your e-mail is sent on what date?

5    A.  On January 26, 2000.

6    Q.  Could you read the first two paragraphs of the e-mail to

7    Adrian from you at the bottom.

8    A.  Adrian.

9            In connection with the 40-plus J & G digital option

10   transactions we did, in a great many cases we offered, as part

11   of the sale, to prepare, or help the client's preparer with,

12   the tax returns for the transaction entity returns, namely, the

13   partnership and S corporation.  The same was the case last

14   year, with the short sale transactions.  Apart from the comfort

15   factor for the clients of having us do the returns, we feel

16   better being sure these easy, but sensitive, returns are done

17   correctly and not in a way that raises red flags.

18           Paul and I have discussed this and feel it makes sense

19   to train a staff accountant on the ins and outs of the broker

20   statements and on the presentation aspects we want, then have

21   that staff do all the returns we're doing.  From experience, we

22   know that once someone knows what they're doing it may be only

23   an hour or two per return.  Remember, these are not client

24   1040s but the 1060s and the 1120s for the entities used for the

25   transactions.

1   Q.  What do you say at the end there?

2   A.  If you agree, you can assign someone and let them charge,

3   the -- it's a charge code number -- for the training time,

4   minimal, and return prep time.  If you don't agree, can we

5   discuss it.

6          Thanks, Bob.

7   Q.  What was Adrian's response to your e-mail?

8   A.  In my view we should be doing the work to insure the

9   entities are dealt with properly.  We don't want any slips on

10  this stage of execution.  I like the idea of concentrating

11  these returns in one person.  I e-mailed Denis and Charlie to

12  get their views.

13  Q.  The group that was working under you, how would they get

14  the information to know what to put on the partnership and the

15  S corporation returns?

16  A.  There was a process in place -- information came from two

17  sources, there was a process in place from the tax solutions

18  people who handled the client to funnel things that were client

19  specific, like broker statements and that kind of information,

20  to this group.  And then there was the collection of what I

21  referred to as the book, the transactional documents that

22  Jenkens & Gilchrist prepared which Jenkens sent us and then we

23  had to give to this group.

24  Q.  The group that included Nicole Bencik that you mentioned,

25  they were located physically where?

D9jndau5                          Greisman - direct

1    A.  In the Chicago office, the same office I was in.

2    Q.  They would prepare a draft return based on the book and the

3    other information that would be sent to them, is that right?

4    A.  Yes.

5    Q.  And then what would happen with the draft return?

6    A.  The return would go through the normal tax return

7    preparation process, someone would review it, it would be

8    finalized.

9           I think it generally was then sent to the tax solution

10   group member who was responsible for the client, and they sent

11   it on to the client or in some cases it may have gone directly

12   from Chicago to the client.

13   Q.  What level of supervision were you giving to this process?

14   A.  That I personally was giving?

15   Q.  Yes.

16   A.  I think after the initial training, high-level guidance and

17   helping resolve questions.  And I think there were some perhaps

18   other senior people in the normal review process who would

19   review returns.

20   Q.  And then from there the returns would get finalized?

21   A.  Yes.

22   Q.  Would you have any role in the finalizing of the returns,

23   specifically you?

24   A.  Typically -- frequently, I would be the one who would sign

25   the return.

D9jndau5                        Greisman - direct

1   Q.   Why was that?

2   A.   Typically the final reviewer, if you will, the person

3   responsible, would sign the return.  The tax return preparer

4   would sign the return, and this didn't literally mean that the

5   low-level staff person who pulled the numbers and put it on the

6   return, but the person who was ultimately responsible for the

7   return would sign the return.  That would be the case for all

8   tax returns.

9   Q.   So this group I think you said was implemented in 2000,

10  correct?

11  A.   Yes.

12  Q.   Did it stay in place for the next filing season in 2001 for

13  the 2000 returns?

14  A.   Yes, it did.

15  Q.   Was BDO selling Jenkens & Gilchrist tax shelters in 2000?

16  A.   Yes, it was.

17  Q.   And which shelter?

18  A.   The options, the same options transaction we have been

19  talking about.

20  Q.   If you would, I would like you to look the Government

21  Exhibit 300-179.

22              THE COURT:  Perhaps before you take the witness to

23  another exhibit, we can take a short recess.

24              MS. DAVIS:  Yes, your Honor.

25              THE COURT:  All right.

D9jndau5                          Greisman – direct

1            Members of the jury, we'll take a short midafternoon

2    recess.  Don't discuss the case.  Please recess the jury.

3            THE DEPUTY CLERK:  All rise.  Jury exiting.

4        (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

D9jndau5                         Greisman - direct

 1              (Jury not present)

 2              THE COURT:  Mr. Greisman, you may step down, sir.

 3              THE WITNESS:  Thank you.

 4              THE COURT:  Everyone may be seated.  Any issues that

 5     counsel want to raise?

 6              MS. DAVIS:  No, your Honor.

 7              MR. LINDER:  No, your Honor.

 8              THE COURT:  All right.  We will take, emphasis on

 9     short, recess this time.

10              (Recess)

11              THE COURT:  All right.  Let's bring in Mr. Greisman

12     and the jury.

13              MS. DAVIS:  Your timing was impeccable, your Honor.  I

14     said I'm going to sit and rest for a second, and one second

15     later you entered the courtroom.

16              THE COURT:  How much more do you have?

17              MS. DAVIS:  I'm certainly reaching the end.  I don't

18     expect to finish today, but I think it would be an hour or less

19     tomorrow.

20              THE COURT:  All right.

21              MS. DAVIS:  Hopefully an hour or less, your Honor.

22              MR. LINDER:  Just so that Court knows, we are going to

23     go out of order on the cross-examination, Your Honor.

24              Mr. DeCastro.

25              THE COURT:  That's fine.

D9jndau5                              Greisman - direct

1                    (Jury present)

2                    THE COURT:  All right.  Everyone may be seated.

3                    Members the jury, we'll continue with Mr. Greisman's

4     direct examination by Ms. Davis.  You may proceed.

5                    MS. DAVIS:  Thank you, your Honor.

6     BY MS. DAVIS:

7     Q.  Mr. Greisman, to review the chronology of the 2000 year,

8     the return preparation group was formed in early 2000.

9                    Do I have that correct?

10    A.  Yes, to prepare the tax returns for the 1999 year, correct.

11    Q.  Were those returns, in fact, prepared in the process that

12    you had just described?

13    A.  They were.

14    Q.  To your knowledge, were BDO clients filing returns that you

15    were sending to them?

16    A.  Yes.

17    Q.  Those returns reported the tax shelter losses or benefits

18    that were generated by the Jenkens & Gilchrist tax shelter?

19    A.  Yes.

20    Q.  It was in what month that notice 2000-44 issued?

21    A.  In August of 2000.

22    Q.  Between April of 2000 and August 2000 what was happening

23    with regard to the tax solutions group, just generally?

24    A.  Generally continuing to try and sell transactions and

25    identify clients.

D9jndau5                          Greisman - direct

1  Q.  And those sales continued into the fall of 2000, is that

2  right?

3  A.  Again, when the notice came out, that put a halt to things.

4           So at that point no new Jenkens & Gilchrist

5  transactions were being sold after the notice.  The ones that

6  had been sold earlier in 2000, if the clients chose to go

7  forward with them, the execution on those was completed.  If

8  the client chose to back out, they got their refund.  But

9  essentially, that was the end of continuing to sell Jenkens

10  transactions.

11          One important note is we talked about the fact that

12  people could generate a loss that would carry over, a basis

13  that could generate a loss that could be carried over.  Those

14  continued to be used as people had them.

15  Q.  In future years, correct?

16  A.  In future years.

17  Q.  When relative to the issuance and discussions of notice

18  2000-44 did Adrian Dicker retire?

19  A.  Shortly after the issuance of the notice, August 2000,

20  Adrian Dicker retired, I believe at the end of October of 2000.

21  Q.  That's when your responsibilities at least administratively

22  increased, am I correct in that?

23  A.  Yes.

24  Q.  And then in December of 2000, was the telephone call that

25  you got while you were driving to the meeting at O'Hare,

D9jndau5                          Greisman - direct

1  correct?

2  A.  Yes.  The letter that BDO received.

3  Q.  The telephone calling specifically was from whom?

4  A.  Nancy Hannafin.

5  Q.  Was she the recipient of the letter from the IRS?

6  A.  Yes, she was.

7  Q.  Did she otherwise have a role in the tax solutions group?

8  A.  No, she did not.

9  Q.  Did she subsequently participate in any of the discussions

10 that were held about the potential response to the letter?

11 A.  No, she did not.

12          MS. DAVIS:  If I could just have republish, your

13 Honor, Government Exhibit 300-54.  I have a few questions.

14          THE COURT:  You may.

15          MS. DAVIS:  Thank you, your Honor.

16          If we could enlarge the e-mail, yes, the bottom part

17 of the e-mail.

18 BY MS. DAVIS:

19 Q.  Do you see in that top paragraph you state to Mr. Dicker,

20 Apart from the comfort factor for the client of having us do

21 the returns, we feel better being sure that these easy, but

22 sensitive, returns are done correctly and not in a way that

23 raises red flags.

24          What do you mean when you said easy but sensitive

25 returns?

D9jndau5                              Greisman - direct

1     A.   Easy in the sense that these returns had very few numbers

2     on them.   There wasn't much to report.   But the numbers were

3     coming off of brokerage statements that were very complex, so

4     it would be easy to make mathematical mistakes that could

5     trigger an audit, and the returns were sensitive because they

6     were returns that were reporting losses from these tax

7     shelters.

8     Q.   When you say, and not in a way that raises red flags, what

9     did you mean by that?

10    A.   Mostly, again, just not making a mistake on a return that

11    could cause it to trigger an audit, just because the brokerage

12    statements were so unusual.

13    Q.   What sort of a mistake could trigger an audit?

14    A.   A mathematical mistake, getting something clearly on the

15    wrong line.

16    Q.   If the client was audited, then would the IRS be looking

17    more closely at those particular returns?

18    A.   Yes.

19    Q.   To your knowledge, did the audit generally also include the

20    person's individual income tax return?

21    A.   Yes.   As a normal, routine matter in an audit, an audit

22    might be of a particular return, but auditors would then look

23    at related returns, absolutely, yes.

24    Q.   So the implementation of the Jenkens & Gilchrist tax

25    shelters that were sold by BDO in the 2000 year, was that

D9jndau5                        Greisman - direct

1   essentially similar to the process that we had looked at for

2   the 1999 year in terms of the logistics of getting it done?

3   A.  Generally, yes.

4   Q.  Were there any differences that were significant in your

5   mind?

6   A.  Only from the standpoint -- only two things.  One is that

7   now it was more familiar, so people knew the drill, and so it

8   wasn't new and different.

9           And there was just I believe a much smaller number of

10  them because of the notice, less quantity.

11  Q.  Into 2001, was BDO still involved with Jenkens & Gilchrist

12  tax shelter clients?

13  A.  Only in an ongoing sense of those that had carry over

14  losses, and some of them still maintained some of the entities,

15  like the S returns, so those returns still needed to be filed.

16  Again, some would have been clients that were ongoing clients

17  anyway, so, yes.

18  Q.  If I could have you look at Government Exhibit 300-175.

19  A.  I have a 300-179.

20  Q.  The next document should be 300-175.  Do you see that?

21  A.  Yes.

22  Q.  Do you recognize that document?

23  A.  I do.

24  Q.  What is it?

25  A.  An e-mail from Paul Shanbrom to tax opinion committee

1  members dated January 12, 2001, under the caption J & G opinion

2  comments.

3  Q.  For the 2000 returns for which there were the tax returns

4  that would need to be filed in 2001, did the tax opinion

5  committee review a draft opinion letter from Jenkens &

6  Gilchrist as it had done in previous years?

7  A.  Yes, they had.

8          (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

D9jedau6                         Greisman - direct

1   BY MS. DAVIS:

2   Q.  And does this e-mail relate to that review?

3   A.  It does.

4            MS. DAVIS:  Your Honor, the government offers 300-175.

5            MR. LINDER:  No objection.

6            MR. DE CASTRO:  No objection.

7            THE COURT:  Government Exhibit 300-175 is received in

8   evidence.

9            (Government's Exhibit 300-175 received in evidence)

10           MS. DAVIS:  May I publish, your Honor.

11           THE COURT:  You may, Ms. Davis.

12  BY MS. DAVIS:

13  Q.  And is this one of those e-mails where it's in reverse

14  chronological order?

15  A.  Yes.

16  Q.  So could you just read the comment or the body of the

17  bottom e-mail, which is the first in time.

18  A.  My comments on the J & G opinion are:  They need to add

19  something about tax penalty.  I think they do that by way of a

20  separate letter but, we should see it.  The summary of opinions

21  should include an opinion on notice 2000-44.  At page seven

22  they indicate that the opinion cannot be shown to anyone

23  without permission of J & G.  I don't like this, and at least

24  the IRS should be expected -- excepted, rather, from any such

25  limitation.  At page I think it's eight, they say that this

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1   transaction is subject to list.  We need to have them take that

2   out for our transactions entered into before 8/11, which I

3   think is all of them.  Please send me your comments and I will

4   collect them and discuss with Paul and Donna.

5   Q.  Was that your practice to discuss the comments that you had

6   on the Jenkens draft opinions with Paul Daugerdas and Donna

7   Guerin?

8   A.  Either discuss or communicate with them by e-mail, yes.

9   Q.  And the 8/11 date that you referred to in comment number

10  four, what was the significance of that date?

11  A.  That's the date that notice 2000-44 was issued and the same

12  date that the IRS issued rules saying transactions entered into

13  after that date were subject to list keeping.

14  Q.  And why are you commenting that, quote, we need to have

15  them, being Jenkens & Gilchrist, take that out of -- for our

16  transactions entered into before 8/11?

17  A.  So the rule was that for transactions entered into after

18  that date were subject to list keeping, our clients all had

19  entered into the transaction before that date.  So that portion

20  of the opinion was irrelevant.

21  Q.  Were you aware of any clients' tax shelters that were

22  permitted by Denis Field to go forward, even though the

23  consulting agreement was not signed at that -- as of that

24  August 11, 2000, date?

25             MR. DE CASTRO:  Objection.

D9jedau6                          Greisman - direct

1            THE COURT:  Sustained.

2   Q.  The August 11, 2000, date had what impact on transactions

3   that were in progress?

4   A.  If the -- the way the rule was written on August 11th was

5   that transactions entered on -- into -- and they defined

6   entered into meaning the earlier of a contribution of a

7   partnership or the signing of a partner -- or a consulting

8   agreement.  So whatever event happened first, that was the

9   trigger that the transaction had started -- that if the

10  transaction started on or after August 11th, that was subject

11  to the list keeping rules.  If it started before, it was not

12  subject to those rules.

13  Q.  Did you have any discussions with anyone in the tax

14  solutions group about essentially grandfathering in --

15  withdrawn.

16           Did you have any discussions with anyone within the

17  tax solutions group about particular clients and whether or not

18  they fell inside or outside of the line?

19  A.  Yes.

20  Q.  Who did you have those discussions with?

21  A.  Michael Kerekes.

22  Q.  And what was the discussion between the two of you?

23  A.  At some point in 2001, I believe it was early 2001, he --

24  and I don't -- this was in connection with something, some list

25  or something I was doing administratively, collecting

D9jedau6                          Greisman - direct

information on transactions.  He mentioned to me that -- he
told me specifically then, because I asked, that there were
transactions that were -- had not begun on August 11th, where
there were three or four of them where Paul Shanbrom had sold
them, the client indicated they wanted to go forward but had
not yet signed the consulting agreement or had not yet made the
partnership contribution or done any of the things that would
have exempted them from the list keeping under regulations.
And Paul got an exemption from Denis Field to in effect
grandfather them in or waive the rule on not doing any
transactions after that date.  After BDO got that letter in
December 2000 that we were talking about a few minutes ago, the
response that BDO ultimately provided to that letter is that
they did not have to give the IRS a list because they had not
done any transactions after that date.  And in order to make it
true, those planned transactions had to be unwound.  And so it
was in connection with that unwinding sometime in early 2001
that I found out about having done transactions and treated
them as if they had been entered into.
Q.   Looking at 300-175, the top part of the e-mail, or the top
e-mail, I should say.  That e-mail is from whom and to whom?
A.   It is from Paul Shanbrom to Charlie Bee, Larry Cohen, Denis
Field and others -- and presumably and others.
Q.   You presume why?
A.   Because there's a GR and three dots.

D9jedau6                          Greisman - direct

1    Q.  Were you the only member of the tax opinion committee whose

2    last name began with GR?

3    A.  Yes.

4    Q.  Was this e-mail in response to your e-mail about your

5    comments on the Jenkens & Gilchrist opinion letter?

6    A.  Yes.

7    Q.  Can you read what Mr. Shanbrom says?

8    A.  I agree with your comments and would also prefer if they

9    took out completely the list keeping language on page eight.

10   I'm sure they have that in there for their own protection, but

11   I don't think it is necessary.  This -- I think he's saying may

12   be -- a better route than trying to distinguish pre8/11, since

13   I don't think they have spent any time on that issue since they

14   have felt throughout that they could use attorney-client

15   privilege.  Also, do they have a draft yet of the

16   Bricolage/Gramercy type opinions?

17   Q.  The reference to -- since they have felt throughout that

18   they could use attorney-client privilege, what did you

19   understand that to reference?

20   A.  I understood that to reference that they felt that they did

21   not have to provide --

22   Q.  I'm going to stop you there and ask you to just identify

23   who the "they" are, rather than using pronouns.

24   A.  That Jenkens -- my understanding was that Jenkens believed

25   they did not have to comply with the list keeping requirement

1    because they had attorney-client privilege with those clients.

2    Q.  Who at Jenkens did you hear that from?

3    A.  Either Donna Guerin or Paul Daugerdas.

4    Q.  The reference to Bricolage, what was Bricolage?

5    A.  Bricolage was an investment firm that BDO was doing other

6    tax shelters with.

7    Q.  And Gramercy?

8    A.  Was also a different investment firm that BDO was doing

9    other tax shelters with.

10   Q.  Was Jenkens & Gilchrist writing opinion letters on those

11   transactions as well?

12   A.  There were a few situations where even though it wasn't a

13   Jenkens transaction, they were hired to write opinion letters.

14   Q.  And to your knowledge did the opinion letters that were

15   issued by Jenkens & Gilchrist in 2001 for the 2000 tax returns,

16   did they also contain client representations that were Paul's?

17   A.  Yes.

18   Q.  And did you prepare tax returns for clients who reported

19   tax benefits in part based on the receipt of the Jenkens &

20   Gilchrist opinion letter that contained false representations?

21   A.  Yes.

22   Q.  Why did you do that?

23   A.  Again, at this point we were so far into it there was no

24   turning back.

25   Q.  Would turning back have had an impact on your personal

D9jedau6                          Greisman - direct

1   finances?

2   A.   Yes.

3   Q.   What impact was that?

4   A.   Loss of bonuses, maybe loss of job.

5   Q.   Why do you say loss of job?

6   A.   I -- I'm not sure -- either I would have had to have left

7   the firm or, you know, I perceived that if I spoke out, my

8   views would not be favored and I'd be asked to leave.

9   Q.   Not be favored by whom?

10  A.   The tax leadership group, at that point Denis Field and

11  Charlie Bee.

12  Q.   Did anyone step into Adrian Dicker's leadership position in

13  the tax solutions group after he left?

14  A.   No.

15  Q.   So at that point it was just whom leading the tax solutions

16  group?

17  A.   Denis Field and Charlie Bee.

18  Q.   Looking at Government Exhibit 300-179.

19  A.   Yes.

20  Q.   Do you recognize that document?

21  A.   Yes.

22  Q.   What is it?

23  A.   It's an e-mail from Joseph Klausner to Denis Field dated

24  March 9, 2001, regarding pricing Quality King.

25  Q.   Were the owners of Quality King clients of the Jenkens &

D9jedau6                        Greisman - direct

1    Gilchrist tax shelter that BDO sold, to your knowledge?

2    A.  I'm not certain.

3    Q.  Joseph Klausner was whom?

4    A.  He was a partner of the BDO New York office.

5    Q.  And was he a member of the tax solutions group?

6    A.  He may have been at one point.  I don't know if he was at

7    that point.

8              MS. DAVIS:  Your Honor, the government offers 300-179.

9              MR. LINDER:  No objection.

10             MR. DE CASTRO:  No objection.

11             THE COURT:  Government Exhibit 300-179 is received in

12   evidence.

13             (Government's Exhibit 300-179 received in evidence)

14             MS. DAVIS:  May I publish, your Honor.

15             THE COURT:  You may.

16   BY MS. DAVIS:

17   Q.  The date on these two e-mails -- again, we have a reverse

18   chronology e-mail -- is what date?

19   A.  The first e-mail is March 9th -- I can't -- and the second

20   e-mail, they're both March 9th -- I'm sorry.  They're both

21   March 9th.

22   Q.  Of what year?

23   A.  2001.

24   Q.  And if you could, Ms. Torres, enlarge the bottom e-mail so

25   you can read it better.  Could you just read that out loud.

D9jedau6                          Greisman - direct

1   A.   In 1999/2000 the owners of Quality King entered into a

2   $80 million solution.  This related to ordinary income and was

3   handled through Sentinel.  The total fees, excluding legal

4   fees, were 6 percent.

5              I am planning a presentation to the key advisers,

6   including Garfinkle, on distressed debt for 65 million ordinary

7   income for 2001.  Last year E&Y made a presentation to them, so

8   I am assuming that the next transaction will be competitive.

9   Can I have any flexibility re the fees?  Joe.

10  Q.   E&Y refers to what?

11  A.   Another accounting firm named Ernst & Young.

12  Q.   And the distressed debt refers to what?

13  A.   A tax shelter that BDO did subsequent to the Jenkens

14  transactions.

15  Q.   And if you could give the 25-word version of what

16  distressed debt is.

17  A.   It involved a different loophole in the tax law so it was

18  totally different.  There was an element of foreign currency

19  options involved in it, and it was a way of creating a loss and

20  then shifting the loss from one entity to another.

21  Q.   What does the phrase distressed debt signify?

22  A.   They were assets, usually foreign assets, that were -- I

23  don't want to use the word distressed.  They were very

24  devalued, so foreign currency or a debt of a foreign country

25  that was in bad trouble -- or debt would be a better example.

D9jedau6                          Greisman - direct

1   Debt of a foreign company that was close to bankruptcy, where

2   the face value of the debt was $100, now people were buying it

3   for pennies on the dollar.  That was -- that's what the term

4   distressed debt meant.

5   Q.  What was Denis Field's response to Joseph Klausner?

6   A.  Yes, get 8 percent, but you can go down to 6 percent.

7   Q.  And by, yes, get 8 percent, and going down to 6 percent,

8   what do you understand that to be referring to?

9   A.  I understand Mr. Klausner basically saying he'd like to

10  have some flexibility in offering the pricing.  And what Denis

11  is telling him is try to get the 8 percent, but if you can't,

12  get the 6 percent.

13  Q.  So in early 2001 was your -- the tax return preparation

14  group in Chicago early 2001 starting to prepare returns for BDO

15  clients?

16  A.  Yes.

17  Q.  I'd like you to look at Government Exhibit 301-131.

18  A.  Yes.

19  Q.  What is that document?

20  A.  It's a cover letter for a tax return and a copy of a tax

21  return, calendar year 2000, partnership tax return for BDO

22  client named Wayne Harter.

23  Q.  And did Wayne Harter engage in a Jenkens & Gilchrist tax

24  shelter?

25  A.  Yes, he did.

D9jedau6                              Greisman - direct

1    Q.   And is your letter -- is your signature on this letter?

2    A.   Yes, it is.

3    Q.   What's attached to the letter?

4    A.   A copy of a tax return.

5              MS. DAVIS:   Your Honor, the government offers 301-131.

6              MR. LINDER:   No objection.

7              MR. DE CASTRO:   No objection.

8              THE COURT:   Government Exhibit 301-131 is received.

9              (Government's Exhibit 301-131 received in evidence)

10             THE COURT:   And you may publish it.

11             MS. DAVIS:   Thank you, your Honor.

12             If we could have just the body of the letter there,

13   please, Ms. Torres.

14   BY MS. DAVIS:

15   Q.   Can you just read the body of the letter.

16   A.   Enclosed are the original and one copy of your 2000

17   partnership tax returns as follows:   2000 federal return, 2000

18   California return.   Each original return should be dated,

19   signed and filed in accordance with the filing instructions.

20   Copies of each return should be retained for your files.

21   Q.   Are instructions like these fairly standard for your -- for

22   BDO when they were sending out returns to clients that they had

23   prepared?

24   A.   Yes.

25   Q.   And looking at the next page, what do we see here?

D9jedau6                          Greisman - direct

1    A.   It's a set of filing instructions.

2    Q.   Wait for our slow computer.

3    A.   It's a set of filing instructions for the client.

4    Q.   And what does it instruct the client to do?

5    A.   Where they should send the return and by when they should

6    send it.

7    Q.   And this was -- there's a date by which the return needed

8    to be filed, is that correct?

9    A.   Yes.

10   Q.   Do you see the date there?  What is that?

11   A.   April 16, 2001.

12   Q.   Now, I think you had identified earlier in your testimony

13   that tax day was April 15, 2000 -- or April 15th of a

14   particular year.  Why are we seeing an April 16, 2001, date

15   here?

16   A.   If the 15th falls on a Saturday or Sunday or a legal

17   holiday, then the date -- they get extended by one day to the

18   next business day.

19   Q.   Turning to the next page of the document.  It's the first

20   page of the tax return.

21        This is a return for which entity?

22   A.   For the partnership entity.

23   Q.   And in this particular case Mr. Harter's partnership was

24   named what?

25   A.   Chardonnay Partners.

D9jedau6                          Greisman - direct

1   Q.  And he has an address in what city?

2   A.  In Livermore, California.

3   Q.  And the form number that's generally referred to or that's

4   on this that refers to a partnership return is what?

5   A.  It's 1065.

6   Q.  Looking at the bottom of the return -- and I would ask if,

7   Ms. Torres, I don't know if there's any way to enlarge the very

8   small type that's above the black arrow on the top set of black

9   arrows.

10          That's not particularly helpful.  So, Mr. Greisman, if

11  you would just read that out loud.

12  A.  The print on my copy is very small but I'll try.  Under

13  penalties --

14  Q.  Withdrawn.  Let me ask you, are you familiar with language

15  from your preparation, experience, at the bottom of generally

16  the first or second page of tax returns that require an

17  affirmation by the client and/or the return preparer?

18  A.  Yes.

19  Q.  What in your experience does that affirmation require?

20  A.  The return preparer is basically affirming that the return

21  is truthful and accurate.

22  Q.  And is it your custom to sign as return preparer when

23  you've prepared an income tax return of any sort?

24  A.  Yes.

25  Q.  Do you, in fact, sign this copy?

D9jedau6                          Greisman - direct

1  A.  Yes.  You sign -- it was policy to sign the copy that the

2  client would get that they would file with the IRS and to

3  file -- sign one copy that remained in our files.

4  Q.  So this is -- return is unsigned why?

5  A.  It's unsigned by the client -- well, the client -- there

6  would be a copy for the client to be retained that would be

7  signed by the return preparer, in this case, me.  There would

8  be a copy in BDO's files, because it's BDO's client, and there

9  would be a copy that the client would sign and file with the

10 IRS.  This was a copy of the client's copy, so it's unsigned by

11 them.  It's their retention copy, but it's signed by me.

12 Q.  And do the obligations to be truthful on -- with regard to

13 the numbers on a tax return extend both to the client and the

14 return preparer?

15 A.  Yes.

16 Q.  And to your knowledge was Mr. Harter's form 1065

17 partnership return for the year 2000 fully truthful and

18 accurate?

19 A.  No, it was not.

20 Q.  In what way was it not?

21 A.  It was not in it reported a loss that was not supported by

22 economic substance.

23 Q.  If you would turn to what's Bates -- the last four digits

24 Bates number of 7070.  It's PDF page 7.

25 A.  Yes.

D9jedau6                        Greisman - direct

1   Q.  And do you see a reference to Chardonnay Partners -- this

2   is a 4797 form?

3   A.  Yes.

4   Q.  What generally does a 4797 form report?

5   A.  It reports -- we talked before about capital gains and

6   losses.  There's also ordinary gains and losses.  This reports

7   ordinary gains and losses.

8   Q.  And do you see down -- if we could scroll down, Ms. Torres

9   to part two, ordinary gains and losses.  You can probably

10  enlarge that portion.

11          Is there an entry listed under ordinary gains and

12  losses?

13  A.  Yes, there is.

14  Q.  On the left-hand side, what does it read, the entry part --

15  well, just read, if you would, the title of line 10.  What does

16  that report there?

17  A.  Ordinary gains and losses, not included in lines 11 through

18  17, include property held one year or less.

19  Q.  And is there anything listed in this particular return on

20  lines 11 through 17?

21  A.  No, there is not.

22  Q.  And on the left-hand side, what's the description read?

23  A.  Statement to.

24  Q.  And under the column D, gross sales price, what is listed

25  there?  What's the amount?

D9jedau6                        Greisman - direct

1   A.  8,955,000 -- 8,955,000.

2   Q.  And is there a cost or basis amount that's listed under

3   column F?

4   A.  Yes.

5   Q.  What's that amount?

6   A.  8,955,000.

7   Q.  And what's the effect on income if you have these types of

8   entries that we see here, identical entries under the first

9   sales price and the cost.

10  A.  In this case it came out to be no gain or loss.

11  Q.  So if you would turn to two pages in, Bates number 7072.

12  Do you see a reference on that page to statement to -- one more

13  page, Ms. Torres.  Do you see a reference to statement to on

14  that page?

15  A.  Yes.

16  Q.  If we could -- thank you, Ms. Torres.

17          What does this statement to, which was referred to on

18  the page that we had just seen, describe?

19  A.  It's describing the gain or loss from the sale of various

20  foreign currency option positions.

21  Q.  And to your knowledge, did those foreign currency options

22  positions relate to the options that were related to the

23  Jenkens & Gilchrist tax shelter?

24  A.  Yes.

25  Q.  So we see these two figures here, the sales price or cost

D9jedau6                         Greisman - direct

```
 1   and basis, and I think you said that results in a zero amount.
 2   How does this zero amount end up flowing through to the
 3   client's individual tax return?
 4   A.   There's a form, there's a summary form called a form --
 5   well, if there were an amount, there's a summary form called a
 6   form K-1.  And the numbers from the K-1, in this case zero,
 7   would flow through to the individual's tax return.
 8   Q.   And the -- a schedule K-1, does that issue for every
 9   partner of a partnership?
10   A.   Yes, it does.
11   Q.   And the results of the K-1 have to be reported on which
12   return?
13   A.   On the individual's personal tax return, which is form
14   1040.
15   Q.   Does a K-1 issue if there is actually zero net income from
16   this type of reporting that we see here?
17   A.   Probably still should, yes.
18   Q.   If I could have you look at Government Exhibit 1001-86.
19   A.   Yes.
20   Q.   Now, do you recognize that document?
21   A.   I do.
22   Q.   What is it?
23   A.   It's a tax return form 1120-S tax return for an S
24   corporation for the year 2002.
25   Q.   For which entity?
```

D9jedau6                          Greisman - direct

1    A.  Chardonnay Investors, Inc.

2    Q.  And is Chardonnay Investors, Inc. related at all to the

3    Chardonnay Partners that we saw or Wayne Harter in the prior

4    year?

5    A.  Yes, it was.

6    Q.  How is it related?

7    A.  You recall the Jenkens transaction, there was a partnership

8    involved and that was the last return we looked at and there's

9    an S corporation, that's this return.

10              MS. DAVIS:  Your Honor, the government offers

11   Government Exhibit 1001-86.

12              MR. LINDER:  No objection.

13              MR. DE CASTRO:  No objection.

14              THE COURT:  Government Exhibit 1001-86 is received in

15   evidence.

16              (Government's Exhibit 1001-86 received in evidence)

17              MS. DAVIS:  May I publish, your Honor.

18              THE COURT:  You may.

19   BY MS. DAVIS:

20   Q.  So we had seen before the partnership return, which had a

21   form number 1065.  What's the form number for an S corporation?

22   A.  1120S.

23   Q.  And does the address on this 1120S match the address

24   that -- on the prior return that we looked at, the 301-131?

25   A.  It does.

D9jedau6                        Greisman - direct

Q.  Ms. Torres, if you could scroll down to the bottom, please,

highlight the bottom.

        Do you see that there's a signature there that reads

for the preparer RR Brown.  Are you familiar with that name?

A.  Yes.

Q.  Who was RR Brown?

A.  Rich Brown, who was a tax partner in the BDO Chicago

office.

Q.  What role did Mr. Brown play with regard to the preparation

of returns such as the one we had here.

A.  I think that in -- at this time period he was the one who

was overseeing the group that was preparing those tax returns.

Q.  So this was in October of 2003, is that right?

A.  Yes.

Q.  And why was he doing this as opposed to you?

A.  My best recollection is that at some point he was assigned

a role of overseeing these.  I don't recall the reason.  And he

largely became involved in handling this at this point in time.

Q.  Was he ever actually a member of the tax solutions group to

your knowledge?

A.  He -- not -- I don't believe that he was.  No.

Q.  If you would, if you could turn to -- it's PDF page 10,

Bates number with the last four digits 5142.  Do you see that?

A.  Yes.

Q.  Can you explain to the jury what this represents.

1    A.   It represents the gain/loss that was generated inside the

2    S corporation that would be passed out to the shareholders to

3    be reported on their personal tax return.  And it's similar to

4    the schedule we looked on the partnership, where it compares

5    the sales price to the tax basis to determine gain or loss.

6    Q.   And in this instance the description of a property was

7    what?

8    A.   Euros.

9    Q.   And what relation did Euros have to Mr. Harter's tax

10   shelter?

11   A.   Euros were the foreign currency or the asset that was in

12   the partnership.  You'll recall earlier we talked about

13   sometimes having to pull an asset in to get the enhanced basis.

14   In this case the asset, though, that was used for the enhanced

15   basis were the Euros.

16   Q.   And those Euros, were some of those Euros with the enhanced

17   basis were still remaining in 2002?

18   A.   Yes.

19   Q.   And the sale date, the acquisition date is listed as what?

20   A.   November 16, 2000.

21   Q.   Was that the time at which Mr. Harter initially entered

22   into the Jenkens & Gilchrist tax shelter?

23   A.   Yes, or shortly before that he would have entered in.

24   Q.   And then the sale date was what?

25   A.   December 30, 2002.

1   Q.  The sales price is listed as what?

2   A.  $3,821.

3   Q.  And the cost or basis was listed as what?

4   A.  379,235.

5   Q.  The net gain and loss was what?

6   A.  Loss of 375,414.

7   Q.  And so how does this loss get reflected, if at all, on

8   Mr. Harter's 2002 individual income tax return?

9   A.  So from this schedule it goes on to a schedule K-1, that

10  that is given to Mr. Harter for use in preparation of his

11  personal tax return.  And that loss number goes on his personal

12  tax return to be used to offset income that's otherwise

13  generated on that return.

14  Q.  Looking at Government Exhibit 301-66.

15  A.  Yes.

16  Q.  What is this document?  Do you recognize it?

17  A.  I do.

18  Q.  What is it?

19  A.  It's a series of fax cover sheets from me to Donna Guerin

20  and Paul Daugerdas in -- on April 7, 2003, and a letter from me

21  to Donna Guerin April 7, 2003, as well as a copy of the letter

22  to me from an attorney at Jenkens & Gilchrist.

23  Q.  And did this letter in terms of documents relate to the

24  continued preparation of tax returns in receipt of opinion

25  letters for BDO and Jenkens tax shelter clients?

D9jedau6                           Greisman - direct

1    A.  Yes.

2              MS. DAVIS:  Your Honor, the government offers 301-66.

3              MR. LINDER:  No objection.

4              MR. DE CASTRO:  No objection.

5              THE COURT:  Government Exhibit 301-66 is received.

6              (Government's Exhibit 301-66 received in evidence)

7              MS. DAVIS:  May I publish, your Honor.

8              THE COURT:  You may.

9    BY MS. DAVIS:

10   Q.  If we could look at the very last page, it's Bates number

11   2272.  It's about -- I think it's seven pages in, Ms. Torres.

12   Last page.

13             Can you identify the date on this document?

14   A.  March 24, 2003.

15   Q.  And what is this document?

16   A.  It's a copy of a letter I wrote to John Beery at Jenkens &

17   Gilchrist with copies to Donna Guerin, Larry Cohen and Lisa

18   Hurley at BDO.

19   Q.  Lisa Hurley was whom?

20   A.  She was a tax professional in BDO's Detroit office.

21   Q.  What role or why were you sending or copying her on this

22   letter to John Beery?

23   A.  She worked on a number of tax returns for the clients that

24   are listed.

25   Q.  And if you would just read the body of the letter down

D9jedau6                         Greisman - direct

1   through the first paragraph after the list of names.

2   A.   Below are the BDO clients who need follow-up opinions.   I

3   want to be sure nothing falls through the cracks, especially as

4   April 15th is coming fast upon us.

5            Do you want me to read these names?

6   Q.   Yes, please.

7   A.   Pat Gordon, Kelley Coffey, Ross Suave, Alfred Maskill,

8   whose name is crossed out, John Olmsted, Dick Neil, Mara

9   Meyers, Jack Thorwegen, Wayne Harter and Nick Clemente, whose

10  name is also scratched off.

11  Q.   Would you continue to read the next paragraph.

12  A.   In addition to the foregoing, I am unsure as to whether

13  Larry Moore and Al Snyder need opinions.   We never received

14  confirmation of any dispositions.   Perhaps you have a way of

15  checking on these.

16  Q.   Do you recognize any of the handwriting on this page?

17  A.   Possibly -- well, other than my signature, possibly

18  Shanbrom, where Paul's name is circled, is mine.   I wouldn't be

19  certain the rest of it is mine.   It does not look like mine.

20  Q.   If you would turn to just the previous page, 2271 Bates

21  number.

22  A.   Yes.

23  Q.   Did you receive a reply from Mr. Beery to your letter

24  requesting the follow-up opinions?

25  A.   I did.

```
 1   Q.  When you say follow-up opinions, what did you mean by
 2   follow-up opinions?
 3   A.  Well, again, we had talked before the about the fact that
 4   enhanced basis could be used at subsequent -- years subsequent
 5   to the time it was generated to trigger losses in later years.
 6   Each of the years in which those losses were triggered, a tax
 7   opinion was needed.  Those were the follow-up opinions.
 8   Q.  And what was Mr. Beery's response to you in his letter?
 9   A.  Do you want me to read it?
10   Q.  Sure, please.
11   A.  Dear Bob, I appreciate your desire to ensure that nothing
12   gets missed at this time of year.  Naturally I share your
13   concerns.  Unfortunately, I am not in a position to confirm our
14   ability or intention to issue opinions to any of the persons
15   mentioned in your letter of March 24, 2003.  This must be done
16   by either Paul Daugerdas or Donna Guerin.  I have forwarded
17   your letter to both Paul and Donna for their attention.  If I
18   may be of any further assistance, please feel free to contact
19   me.
20   Q.  Was there a particular reason why you had addressed your
21   letter to John Beery rather than Donna Guerin or Paul
22   Daugerdas?
23   A.  Yes.
24   Q.  Why was that?
25   A.  I wasn't getting any response from Paul or Donna, and I
```

D9jedau6                          Greisman - direct

1    just -- he was the only other person I knew there.

2    Q.  How were you attempting to contact Ms. Guerin and

3    Mr. Daugerdas at this point in time in 2003?

4    A.  I believe by telephone call.

5    Q.  And turning one more page while we're at Bates 2270, what's

6    the date on this letter?

7    A.  April 7, 2003.

8    Q.  It's a letter you wrote to whom?

9    A.  To Donna Guerin.

10   Q.  Who's copied on the letter?

11   A.  Paul Daugerdas.

12   Q.  Please read the letter.

13   A.  Enclosed is a copy of my letter of March 24th to John Beery

14   along with his reply.  I scratched Maskill's name out on the

15   letter as we learned he did not sell anything in 2002.  I know

16   Lisa Hurley has called and left messages, as have I.

17           Perhaps you've -- previously you've indicated that

18   opinions would be issued.  Your collective lack of response

19   causes me concern, especially as we get closer to April 15th.

20   Please call me as soon as possible so we may discuss this.

21   Q.  And the initial attachments are just the fax cover sheet

22   and fax confirmation sheets, is that correct?

23   A.  Yes, it is.

24   Q.  So April 7th is just a week or so ahead of the April 15th

25   day, is that correct?

D9jedau6                          Greisman - direct

1    A.   Yes.

2    Q.   At this point in time in April of 2003, was BDO's policy

3    that it required an opinion letter from Jenkens before it would

4    sign a tax return still in place?

5    A.   Yes, it was.

6    Q.   What response did you get from anyone at Jenkens &

7    Gilchrist?

8    A.   Ultimately I believe they issued these opinions.

9    Q.   At some point in time, Mr. Greisman, did you learn that

10   Jenkens & Gilchrist tax shelter client was being audited by the

11   Internal Revenue Service?

12   A.   Yes.

13   Q.   Approximately when was that?

14   A.   Well, audits began sometime in the 2001 time frame.

15   Q.   How did you first learn of an audit of any Jenkens &

16   Gilchrist tax shelter client?

17   A.   I don't recall precisely who the first client was, but

18   generally the client would contact us or advise us they were

19   being audited.

20   Q.   What's the -- what sort of notification does -- do clients

21   get when the IRS is starting an audit, if you know?

22   A.   They usually get a letter advising them that they're under

23   audit, and usually we would prefer before the IDCRs,

24   information document requests, so still things they need to

25   collect for the audit.

D9jedau6                          Greisman - direct

1  Q.  I'd like you to look at Government Exhibit 300-76.

2  A.  Yes.

3  Q.  Do you recognize that document?

4  A.  I do.

5  Q.  What is it?

6  A.  It's an e-mail from me to Paul Daugerdas with a copy to

7  Donna Guerin dated November 8, 2001, with -- the subject is a

8  client named Pall, P-A-L-L.

9  Q.  And does this relate to an examination by the IRS of

10 Mr. Pall's tax returns?

11 A.  Yes, it does.

12         MS. DAVIS:  Your Honor, the government offers 300-76.

13         MR. LINDER:  No objection.

14         MR. DE CASTRO:  No objection.

15         THE COURT:  Government Exhibit 300-76 is received in

16 evidence.

17         (Government's Exhibit 300-76 received in evidence)

18         MS. DAVIS:  May I publish, your Honor.

19         THE COURT:  You may, Ms. Davis.

20         MS. DAVIS:  If we could have, Ms. Torres, just

21 starting at the to confirm paragraph down to the signature

22 block enlarged.

23 BY MS. DAVIS:

24 Q.  If you would just go ahead and read that, the body of that

25 e-mail, please.

D9jedau6                          Greisman - direct

A.   To confirm our discussion today, I understand that you will

draft a letter to Mark Pendery conveying, among other things,

the following thoughts:  After consultation with BDO, you

understand that we did not agree to anything.  In connection

with the IRS examination of his clients' tax returns, there is

no basis for J & G to pay anything, as the IRS exam has not

concluded, and the tax treatment of items you advised on has

not been fully defended.  Fees in connection with an IRS audit

are a taxpayer's cost of doing business, and interest that may

ultimately be due to the IRS are for use of money.  There

should be no penalties if the clients reasonable relied upon

your tax opinion.  Thus, there is no basis for any payments

being made.  The tax treatment in connection with the

investment is defendable and should be defended against IRS

challenge.  For the client to be in the best possible position,

the privilege on the tax opinion should be maintained for as

long as possible.  The letter is inaccurate in that it states

that a tax shelter was sold and implies that there is something

wrong with that, whereas, in fact, the client made an

investment and received tax advice in connection with that

investment.  The client was advised about possible risks

related to the investment and is aware that certain business

associates decided not to make the same investment because of

the perceived risks.  Before you send the letter, which will

say all of the above much better than I said it, you will give

D9jedau6                         Greisman - direct

1   us a chance to comment on it.  Any questions, please call.

2   Q.  Who was Mark Pendery?

3   A.  He was an attorney representing the client Pall.

4   Q.  And was the Pall, Mr. Pall, part of a larger group of

5   clients that engaged in a Jenkens & Gilchrist tax shelter?

6   A.  I believe that he was, yes.

7   Q.  Now, did you, in fact, receive a letter from Mr. Pendery

8   about the IRS' examination of his clients' tax returns?

9   A.  Yes.  Somebody at BDO received it and it was sent to me.

10  Q.  And as a result of that letter, did you, in fact, have a

11  conversation with Mr. Daugerdas as is reflected in this e-mail?

12  A.  Yes.

13  Q.  And does this, the contents of this e-mail, basically

14  reflect the substance of the conversation that you had with

15  Mr. Daugerdas in response to Mr. Pendery's letter?

16  A.  Yes.

17  Q.  So if we could just go by one to explain what's going on

18  here, in paragraph, subparagraph one, you're saying that -- and

19  just so I'm clear, this is what you intend to be saying to

20  Mr. Pendery in response to his letter?

21  A.  Yes.  This is what Mr. Daugerdas and I agreed that

22  Mr. Daugerdas would be saying to Mr. Pendery in response to his

23  letter.

24  Q.  And when you say we did not agree to anything, what are you

25  referring to there?

D9jedau6                          Greisman - direct

1   A.  Mr. Pendery's letter, he made a statement to the effect

2   that BDO agreed to pay his client, Mr. Pall, some compensation

3   for my representation fees because of his IRS audit.

4   Q.  Was that, in fact, true?

5   A.  No, BDO did not.  That's why I'm trying to be -- BDO did

6   not agree to do that.

7   Q.  Did the consulting agreements that were in use when

8   Mr. Pall entered into his transaction have any sort of

9   provision that BDO would pay expenses related to audits?

10  A.  I don't -- he may have been a client that did the

11  transaction before the consulting agreements, but the

12  consulting -- if he had signed a consulting agreement, it would

13  not have said that BDO would have paid for representation.

14  Q.  And do you make clear that the fees in connection with the

15  IRS audit are Mr. Pall's responsibility?

16  A.  Yes.

17  Q.  When you say there should be no penalties if the clients

18  reasonable -- and I think it should be reasonably -- relied

19  upon your tax opinion, what do you mean by that?

20  A.  The idea that if they had a tax opinion and they had

21  reasonably relied upon it, they should be protected from any

22  penalties that might be asserted.

23  Q.  And you also say earlier in that paragraph in connection

24  with the IRS examination of his clients' tax returns, there is

25  no basis for J & G to pay anything as the IRS exam has not

D9jedau6                          Greisman - direct

1   concluded.  What does that refer to?

2   A.   This was a -- Mr. Pendery sent this letter to BDO on behalf

3   of his client, Mr. Pall, at a fairly early stage of the IRS

4   exam.  So at this point the letter basically stated my client's

5   under exam and he's expecting you, meaning BDO and Jenkens, to

6   be paying some of his costs of the exam.  And he's also looking

7   for compensation for taxes and penalty he might pay.  And so

8   we're -- Mr. Daugerdas and I agreed it was premature to agree

9   to any of this, since there's not yet been a final outcome with

10  the IRS exam.

11  Q.   But in order for Mr. Pall to defend the transaction, would

12  he have to, in fact, engage in discussions or other contacts

13  with the Internal Revenue Service?

14  A.   Yes.

15  Q.   In paragraph three the reference to should be defended

16  against IRS challenge, meaning that tax treatment should be

17  defended against IRS challenge, what does that refer to?

18  A.   It means that he shouldn't throw in the towel and he should

19  be defending the transaction through audit.

20  Q.   At his cost or at BDO and Jenkens & Gilchrist cost.

21  A.   At his cost.

22  Q.   And then you say, and four, that the privilege on the tax

23  opinion should be maintained for as long as possible.  What do

24  you mean by that?

25  A.   One of the things that the IRS requests in an information

D9jedau6                        Greisman - direct

1    document request is a copy of the tax opinion, and it was

2    not -- it became BDO's position and Jenkens' position to not

3    turn the opinion over at an early stage of the exam under

4    attorney-client privilege principles.

5    Q.  Did you have that discussion with Paul Daugerdas?

6    A.  In connection with this transaction, yes.

7    Q.  And why was it advisable for the privilege on the tax

8    opinion to be maintained for as long as possible?

9    A.  In the event that the transaction ended up in litigation,

10   if the privilege was lost on the tax opinion, it would also

11   potentially waive all attorney-client privilege on anything

12   else that was potentially privileged.

13   Q.  And why would that be a problem?

14   A.  It could potentially cause difficulties to the client in

15   defending a transaction or in litigation.

16   Q.  In what way?

17   A.  The discussions the client would have had with their

18   attorney would not have been subject to attorney-client

19   privilege.  Conversations they would have had with Jenkens &

20   Gilchrist would have been discoverable by the IRS.

21   Q.  Now, I think you had testified earlier today or perhaps

22   yesterday that -- well, withdrawn.

23         What was the purpose of the opinion letter as you

24   understood it from your conversations with Paul Daugerdas?

25   A.  To provide --

D9jedau6                           Greisman - direct

 1          MR. LINDER:  Your Honor, can we have a time frame as

 2   to when these conversations took place.

 3          THE COURT:  Could you endeavor to fix one.

 4   Q.  Do you recall testifying that you had had an initial set of

 5   conversations with Paul Daugerdas prior to BDO ever selling any

 6   Jenkens & Gilchrist tax shelter in October of 1998?

 7   A.  Yes.

 8   Q.  And I think you had recounted the meeting that you had with

 9   Mr. Daugerdas was Trattoria No. Ten.  Do you recall that?

10   A.  Yes.

11   Q.  In the discussions that you had with Mr. Daugerdas in that

12   early time period before BDO was selling tax shelters, what did

13   he say to you about the purpose of the opinion letter?

14   A.  He explained that the purpose of the opinion was that if

15   the IRS ultimately was successful in disallowing the losses,

16   the client would be protected from penalty because they had a

17   more likely than not tax opinion.

18   Q.  If what protection would the client get if it did not

19   provide that opinion to the Internal Revenue Service?

20   A.  None.

21   Q.  So how is Mr. Pall, Mr. Pendery's client, to be in the best

22   possible position if the privilege on the letter is to be

23   maintained?

24   A.  Well, it's to be maintained for as long as possible.  So at

25   this stage of the IRS examination of Mr. Paul, it was fairly

early in the exam.  So the idea of waiving privilege early in

the exam was just the notion that it might -- it would be to

his -- potentially be to his disadvantage, but ultimately, if

push came to shove and the penalty had to be defended, the

privilege -- the privilege would have to be waived and the

opinion would have to be turned over.

Q.  And what is the disadvantage, if any, to the client of just

going ahead and giving the opinion letter right away to the

Internal Revenue Service?

A.  Two potential disadvantages.  One, if the Internal Revenue

Service or that particular agent wasn't familiar with the

transaction, it would be providing a road map to the IRS agent

of the transaction; and the other disadvantage, again,

potential disadvantage, is that privilege would be waived.  And

if later there was litigation, that would put the client at a

disadvantageous position.

Q.  The road map of the transaction that you just referred to,

what do you mean by that?

A.  Well, the opinion very clearly lays out what the

transaction is and the different steps and how things work.  So

if an IRS agent -- it would make it easier, although all those

other -- all those steps are evident from the other transaction

documents that are not privileged, but it's just another way of

saying the transaction from beginning to end in terms of all

the steps.

D9jedau6                         Greisman - direct

1  Q.  Do you see in the fifth paragraph, it says the letter is

2  inaccurate in that it states -- and this is referring to

3  Mr. Pendery's letter, is that correct?

4  A.  Yes.

5  Q.  It states that a tax shelter was sold and implies that

6  there is something wrong with that, whereas, in fact, the

7  client made an investment and received tax advice in connection

8  with that investment.

9              Did BDO and Jenkens & Gilchrist sell Mr. Pall a tax

10  shelter?

11  A.  Yes.

12  Q.  Did you have a specific discussion with Mr. Daugerdas about

13  mischaracterizing this as an investment?

14  A.  Yes.

15  Q.  What was the purpose of that?

16  A.  To better defend BDO's position and Jenkens position

17  against the client.

18  Q.  How does that help the client?

19  A.  It wasn't to help the client.  It was to help BDO and

20  Jenkens.

21  Q.  Why, then, are you making this statement to Mr. -- or

22  discussing with Mr. Daugerdas this statement to be made to

23  Mr. Pendery?

24  A.  Because Mr. Daugerdas was the one who was going to be

25  conveying it to Mr. Pendery.

D9jedau6                          Greisman - direct

```
 1   Q.  I understand that, but what -- if this does not help the
 2   client, why do it?  Why say this, make a statement, make this
 3   false statement to Mr. Pendery?
 4   A.  Mr. Pendery was asserting -- in effect, he was asserting in
 5   the letter that he sent that, oh, this is not a defendable
 6   transaction.  You just sold us a bogus -- he didn't use the
 7   word bogus, but a tax shelter, and in effect Mr. Daugerdas and
 8   I agreed we should rebut that at least in terms of putting it
 9   in writing in the letter.
10   Q.  Rebut that with what, though?
11   A.  With the letter that Mr. Daugerdas was going to send with
12   the assertion that it was undertaken for investment purposes.
13   Q.  Did you and Mr. Daugerdas specifically discuss the term tax
14   shelter that was used by Mr. Pendery in the letter when
15   you're -- withdrawn.
16           These paragraphs, the one through five, you start out
17   by saying, confirming our discussion today.  Am I correct in
18   understanding that this is a reflection of what you and he
19   discussed?
20   A.  Yes.
21   Q.  And, in fact, did you discuss the fact that you wanted to
22   assert to Mr. Pendery that he, in fact -- his client was not
23   sold a tax shelter?
24   A.  Yes.
25   Q.  Was that accurate in any way?
```

1    A.  No.

2    Q.  Do you recall what the outcome of this e-mail exchange was

3    with regard to Mr. Pall or Mr. Pendery?

4    A.  Yes.

5    Q.  What was the outcome?

6    A.  The outcome was ultimately Mr. Daugerdas agreed to provide

7    some limited amount of compensation to Mr. Pall to offset some

8    of his costs, and I don't know if that actually happened or

9    not, but that was the outcome I recall.

10   Q.  Did you personally have a role with regard to BDO's

11   response to other clients' audits by the IRS related to

12   Jenkens & Gilchrist tax shelter clients?

13   A.  Yes.

14   Q.  What was that role?

15   A.  In some number of cases I was handling the IRS audit for

16   clients, particularly clients who did the transaction through

17   me.  And in some other cases I assisted others at BDO in the

18   IRS representation of their clients who were being audited.

19   Q.  How did it come about that you were the person, at least

20   one of the people that handled or helped to handle a response

21   to IRS audits?

22   A.  At some point I was asked to do that by people in

23   leadership at BDO.

24   Q.  Who was that?

25   A.  Specifically I remember Barbara Taylor asking me to do

1   that.  I also think Pam Packard, who was the national tax

2   director at that time.

3   Q.  Barbara Taylor was whom?

4   A.  BDO's general counsel inside lawyer.

5   Q.  And Pam Packard, you said she was the national tax director

6   at that time?

7   A.  Yes.

8   Q.  Had she replaced Mr. Field when he got elevated to the

9   chief executive officer as the national tax director?

10  A.  Yes.

11  Q.  Where was she located?

12  A.  In New York.

13  Q.  What was her background?

14  A.  She was a tax partner in the New York office.

15  Q.  If you would look at Government Exhibit 300-176.  Do you

16  recognize that document?

17  A.  Yes.

18  Q.  What is it?

19  A.  It's also one of these bottom-to-top chain of e-mails

20  between myself and others.

21  Q.  Others within the tax --

22  A.  Other BDO tax solution people dated November -- dated in

23  November 2001.

24  Q.  So this is dated shortly after the e-mail exchange that you

25  had with Paul Daugerdas and Donna Guerin about the Mark Pendery

D9jedau6                        Greisman - direct

1    letter?

2    A.  Yes.

3    Q.  And does this relate to clients' audits by the IRS?

4    A.  Yes.

5           MS. DAVIS:  Your Honor, the government offers 300-176.

6           MR. LINDER:  No objection.

7           MR. DE CASTRO:  No objection.

8           THE COURT:  Government Exhibit 300-176 is received in

9    evidence.

10          (Government's Exhibit 300-176 received in evidence)

11   BY MS. DAVIS:

12   Q.  If we could, since it's in reverse order, look at the

13   bottom e-mail from you to the tax opinion committee.

14          MS. DAVIS:  Oh, may I publish, your Honor.

15          THE COURT:  You may.

16   Q.  And again, so in 2001 to your knowledge who were the

17   members of the tax opinion committee?

18   A.  Denis Field, Charlie Bee, myself, Michael Kerekes, Lorin

19   Luchs, Paul Shanbrom, Larry Cohen.  I believe Pam Packard was

20   on it at this point.

21   Q.  What do you say in this e-mail?

22   A.  Attached is the draft of the IRS representation agreement

23   to be used along with our consulting agreement in those cases

24   where we agree to provide some IRS audit help to close a deal.

25   Well, we agreed to provide some IRS audit help to close a deal

D9jedau6                        Greisman - direct

1    as revised by Laura LoBianco in legal.  It incorporates the

2    standard terms and conditions into the body of the agreement.

3    If you're all okay with it, I'll distribute it to the NTCG so

4    that in the future we are all using the same agreement -- this

5    same agreement.

6    Q.  The representation agreement, what was the purpose of that

7    agreement?

8    A.  So this is basically an engagement letter or a consulting

9    agreement to -- between BDO and the clients for BDO to be

10   handling IRS examinations.

11   Q.  And at this point you're trying to work out the draft of

12   it, is that right?

13   A.  Correct.

14   Q.  The initials NTCG, what did that stand for?

15   A.  National tax consulting group.

16   Q.  How did the national tax consulting group come into being?

17   A.  At some point the tax solution agreement name was changed

18   to NTCG.

19   Q.  Why was the tax solutions group name changed to the

20   national tax consulting group?

21   A.  I don't know.

22   Q.  Looking at the next e-mail response.  Who was that from?

23   Do you see an e-mail from Pam --

24   A.  Yes, Pam Packard.

25   Q.  What does she say in response to your e-mail about the

1   draft representation agreement?

2   A.   How do we control the economics?  Paragraph 1A refers to us

3   handling all audit matters.  The fee section seems to only

4   allow for expenses and expert fees in addition to the retainer.

5   What happens in the retainer is $25,000, for example, and

6   handing the audit costs us $100,000.  Otherwise, it seems fine.

7   Q.   The reference to $25,000, is that a fairly standard type of

8   retainer fee for audit representation?

9   A.   I'm not sure if it was or if she was just uses that as an

10  example.

11  Q.   What was your response to Ms. Packard?

12  A.   Good point.  The intent is that if the retainer is 25,000

13  and it costs 100, we bill them the additional 75.  I'll see

14  what we can do to be sure this is clear.  Note that Charlie

15  found a few small but significant glitches and typos that will

16  also be corrected before this is finalized.

17  Q.   The reference to Charlie is whom?

18  A.   Charlie Bee.

19  Q.   And the response to your e-mail there from Michael Kerekes

20  was what?

21  A.   In addition to the other people's comments, I would point

22  out that the agreement provides that if the client refuses to

23  accept a settlement that we recommend accepting, would you not

24  have to continue representing the client and the agreement

25  shall be of no further force and effect.  See section -- I

D9jedau6                          Greisman - direct

1   think it's 6E.  I believe that the agreement needs to remain in
2   force, especially as to ADR, etc., and the only change is that
3   we don't have to represent the client anymore.
4   Q.  The reference to ADR refers to what?
5   A.  Alternative dispute resolution.
6   Q.  Can you explain what alternative dispute resolution means
7   and what it meant in the context specifically of this?
8   A.  Basically means arbitration, and if the client and BDO got
9   into a dispute, it would -- in terms of the way we handle
10  something or didn't like what we were doing, it was a way to
11  resolve the differences without going to court.
12  Q.  And arbitration is what?
13  A.  It's basically a noncourt litigation.  It's a method of
14  resolving a dispute without going to court.
15  Q.  And do arbitrations generally have arbitrators who are the
16  decisionmakers?
17  A.  Yes, they do.
18  Q.  What was the response -- well, the top e-mail is from whom?
19  A.  The top e-mail is from Denis Field.
20  Q.  To whom?
21  A.  To the people who were members of the tax opinion committee
22  at that time.
23  Q.  And do you see the reference to a Mark Bloom?
24  A.  Yes.
25  Q.  Who was Mark Bloom?

D9jedau6                          Greisman - direct

```
 1   A.  Mark Bloom was a BDO partner in the New York office who
 2   joined the firm shortly before this in July of 2001.
 3   Q.  Had he previously worked at BDO to your knowledge?
 4   A.  My understanding was he had worked there about ten years
 5   before before joining.
 6   Q.  And do you know how it was that he came to come to BDO in
 7   2001?
 8   A.  Yes.
 9   Q.  How was that?
10   A.  Denis invited him back or whatever -- whatever position he
11   had immediately prior to joining BDO was over, when he left
12   that company.  And he, according to what Denis told me, had a
13   very good contact list for potential clients.  And at this
14   point in time BDO was selling the distressed debt transaction,
15   and the notion was that Mark could help find prospects for that
16   tax shelter.
17   Q.  Do you know where Mr. Bloom was geographically located?
18   A.  Yes.
19   Q.  Where was that?
20   A.  In New York.
21   Q.  What was Mr. Field's response to this e-mail string, or
22   specifically, I think to Mr. Kerekes' comment?
23   A.  Good point.
24   Q.  Did BDO, in fact, implement the usage of those -- that type
25   of retainer agreement for BDO clients during the audit?
```

D9jedau6                        Greisman - direct

A.  For certain audit clients, yes.  Not universally, but for
some of them.

          MS. DAVIS:  Your Honor, I'm about to launch into
another document.  I don't know if this might be a good point.

          THE COURT:  I think it's a good time to suspend for
the day, Ms. Davis.

          Members of the jury, we're going to conclude for
today.  Tomorrow we're going to work from 10:00 until 1:00, not
until 1:30 tomorrow because I have other matters on in the
afternoon that are pressing and around us.  So we will work
tomorrow from 10:00 a.m. until 1:00 p.m., and then you'll be
free to enjoy the afternoon or return to your offices, where
I'm sure work is piling up.

          So in the meantime keep an open mind.  Come to no
conclusions and don't discuss the case.

          We'll see you tomorrow morning bright and early.  Have
a safe trip home.  And if we can start a few minutes early
tomorrow, that, too, would be a good thing.  We are making
progress in this case and I appreciate that there's been a lot
been put before you over the last couple of days.

          But clear your mind this evening.  Watch a little
football.  Relax.  And we'll see you at 10:00 a.m.

          Please recess the jury.

          (Continued on next page)

D9jedau6                          Greisman – direct

1              (In open court; jury not present)

2              THE COURT:  Mr. Greisman, you're excused.  You may

3    step down until tomorrow morning.

4              All right.  Everyone may be seated.  Are there any

5    issues that counsel wish to raise?

6              MS. DAVIS:  No, your Honor.

7              MR. LINDER:  No, your Honor.

8              MR. DE CASTRO:  No, your Honor.

9              THE COURT:  All right.  I will try to deliver a ruling

10   to you on the Ivsan matter tomorrow morning before we bring the

11   jury out, all right?  As you can see, I've got other matters

12   on.  So the quicker you can get out, the happier everybody will

13   be.  Have a great evening.

14             MS. DAVIS:  Thank you, your Honor.

15             (Adjourned to September 20, 2013, at 9:30 a.m.)

16

17

18

19

20

21

22

23

24

25

```
 1                        INDEX OF EXAMINATION

 2    Examination of:                          Page

 3    ROBERT GREISMAN

 4    Direct By Ms. Davis  . . . . . . . . . . . . .1362

 5                       GOVERNMENT EXHIBITS

 6    Exhibit No.                              Received

 7     200-146  . . . . . . . . . . . . . . . . .1363

 8     301-309  . . . . . . . . . . . . . . . . .1393

 9     301-310  . . . . . . . . . . . . . . . . .1393

10     200-81A  . . . . . . . . . . . . . . . . .1398

11     301-269  . . . . . . . . . . . . . . . . .1415

12     301-255  . . . . . . . . . . . . . . . . .1422

13     300-165  . . . . . . . . . . . . . . . . .1438

14     301-13   . . . . . . . . . . . . . . . . .1442

15     300-131  . . . . . . . . . . . . . . . . .1451

16     301-34   . . . . . . . . . . . . . . . . .1459

17     301-158  . . . . . . . . . . . . . . . . .1462

18     301-155  . . . . . . . . . . . . . . . . .1463

19     301-51   . . . . . . . . . . . . . . . . .1468

20     301-265  . . . . . . . . . . . . . . . . .1471

21     300-79   . . . . . . . . . . . . . . . . .1478

22     300-24   . . . . . . . . . . . . . . . . .1481

23     300-31   . . . . . . . . . . . . . . . . .1494

24     301-133  . . . . . . . . . . . . . . . . .1496

25     301-87   . . . . . . . . . . . . . . . . .1500
```

1   300-74     . . . . . . . . . . . . . . . .1501

2   300-9   . . . . . . . . . . . . . . . . .1503

3   300-133   . . . . . . . . . . . . . . . .1505

4   300-92     . . . . . . . . . . . . . . . .1507

5   301-65     . . . . . . . . . . . . . . . .1509

6   200-149   . . . . . . . . . . . . . . . .1518

7   301-217 and 301-213   . . . . . . . . . . .1522

8   300-117, -118, -119 and -125   . . . . . . .1528

9   300-67     . . . . . . . . . . . . . . . .1532

10   300-32     . . . . . . . . . . . . . . . .1534

11   301-180A   . . . . . . . . . . . . . . . .1537

12   300-48     . . . . . . . . . . . . . . . .1544

13   301-154   . . . . . . . . . . . . . . . .1548

14   300-54     . . . . . . . . . . . . . . . .1565

15   300-175   . . . . . . . . . . . . . . . .1578

16   300-179   . . . . . . . . . . . . . . . .1585

17   301-131   . . . . . . . . . . . . . . . .1588

18   1001-86   . . . . . . . . . . . . . . . .1595

19   301-66     . . . . . . . . . . . . . . . .1599

20   300-76     . . . . . . . . . . . . . . . .1604

21   300-176   . . . . . . . . . . . . . . . .1616

22

23

24

25