Damndau1

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    UNITED STATES OF AMERICA,

4              v.                              09 CR 581 (WHP)

5    PAUL M. DAUGERDAS and
     DENIS M. FIELD,
6

7                   Defendants.

8    ------------------------------x
                                              New York, N.Y.
9                                             October 22, 2013
                                              9:55 a.m.
10   Before:

11                 HON. WILLIAM H. PAULEY III

12                                            District Judge

13                      APPEARANCES

14   PREET BHARARA
          United States Attorney for the
15        Southern District of New York
     BY:  STANLEY J. OKULA, ESQ.
16        NANETTE DAVIS, ESQ.
          NIKETH VELAMOOR, ESQ.
17        Assistant United States Attorneys

18   CLAYMAN & ROSENBERG
          Attorneys for Defendant Daugerdas
19   BY:  HENRY MAZUREK, ESQ.
          BRIAN D. LINDER, ESQ.
20

21   KOSTELANETZ & FINK, LLP
          Attorneys for Defendant Field
21   BY:  SHARON McCARTHY, ESQ.
22            and
     THE LAW FIRM OF CÉSAR de CASTRO, P.C.
23        Attorneys for Defendant Field
     BY:  CÉSAR de CASTRO, ESQ.
24
     Also Present:  Christine Mazzella,
25                  Special Agent Internal Revenue Service

                 SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

Damndau1

```
 1              (In open court)

 2              THE COURT:  Good morning, everyone.

 3              The jury is all here.  Let's bring in Mr. Dicker and

 4     the jury.

 5      ADRIAN DICKER, resumed.

 6          (Continued on next page)

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Damndau1

```
 1              (Jury present)
 2              THE COURT:  All right.  Everyone may be seated.  Good
 3    morning members of the jury.
 4              JURORS:  Good morning.
 5              THE COURT:  Members of the jury, thanks for being here
 6    early so we can start a little early.  Lo and behold, the
 7    Giants actually won one before this trial concluded.  I am
 8    losing a wager with someone over it, but so be it.
 9              We are going to continue where we left off yesterday
10    with Ms. McCarthy's cross-examination of Mr. Dicker.
11              You may proceed, Ms. McCarthy.
12              MS. McCARTHY:  Thank you.
13    CROSS EXAMINATION (Continued)
14    BY MS. McCARTHY:
15    Q.  Good morning, Mr. Dicker.
16              THE COURT:  Mr. Dicker, do you understand, sir, that
17    you continue to be sworn as a witness under oath in this
18    proceeding now on trial?
19              THE WITNESS:  Yes, your Honor.
20              THE COURT:  All right.
21    BY MS. McCARTHY:
22    Q.  Mr. Dicker, you will recall that we finished up the day
23    yesterday with an e-mail from Kurt Huntzinger on June 7 of 2000
24    announcing that the first transaction with RSM McGladrey had
25    closed.  Do you remember that?
```

Damndau1                    Dicker – cross

1   A.  I am afraid I don't remember that.

2   Q.  Would you like to see that exhibit again?

3   A.  Yes, please, yes.

4            MS. McCARTHY:  It's in evidence, your Honor.  May we

5   republish Defense Exhibit 57.

6            THE COURT:  You may.

7   Q.  Take a look at that, Mr. Dicker.  Do you remember now that

8   is what we were talking about when we finished the day

9   yesterday?

10  A.  Yes.

11  Q.  So this has to do with the joint venture that BDO entered

12  into with RSM McGladrey, right?

13  A.  Correct.

14  Q.  And RSM McGladrey you have testified was a competitor of

15  BDO's, correct?

16  A.  Correct.

17  Q.  Yet BDO entered into this agreement with RSM so that RSM

18  could sell the tax products that BDO had available to its

19  clients, correct?

20  A.  Correct.

21  Q.  So here we are on June 7 of 2000, the first RSM McGladrey

22  transaction has closed, correct?

23  A.  Yes.

24  Q.  You are going to be assisting on the accounting for that

25  transaction, right?

Damndau1                         Dicker - cross

1    A.  Correct.

2    Q.  In fact, Mr. Dicker, you received bonuses from the Red

3    Wagon transaction, isn't that right?

4    A.  Correct.

5    Q.  In fact, you received almost $260,000 worth of bonuses for

6    those transactions, right?

7    A.  I don't know the exact number.

8    Q.  I'm going to show you Government Exhibit 301-248.  Do you

9    recognize this document?

10   A.  It looks familiar.

11   Q.  Do you see your name on top?

12   A.  Yes.

13   Q.  Does it appear to be a BDO document reflecting bonuses paid

14   to you as well as the tax solutions profit sharing?

15   A.  It appears to show bonuses paid to me and profit sharing,

16   yes.

17           MS. McCARTHY:  We offer Government Exhibit 301-248.

18           MS. DAVIS:  No objection.

19           THE COURT:  Government Exhibit 301-248 is received in

20   evidence and you may publish it, Ms. McCarthy.

21           MS. McCARTHY:  Thank you, your Honor.

22           (Government's Exhibit 301-248 received in evidence)

23   BY MS. McCARTHY:

24   Q.  So, Mr. Dicker, if we just look at the very top of this

25   document, it shows your name, correct?

Damndau1                         Dicker - cross

1    A.   Correct.

2    Q.   It shows partner date.  Apparently you were named a partner

3    on July 1 of 1995, is that accurate?

4    A.   That's right.

5    Q.   If we could go down to the bottom, first of all, the very

6    top part shows your bonuses for fiscal 1998, right?

7    A.   Yes.

8    Q.   Then below that is fiscal 1999?

9    A.   Yes.

10   Q.   It looks like you got a general bonus in 1998 and then in

11   1999 it's unclear what you got to bonuses for, but there are

12   two particular clients that are named PHC and Millan Mandaric,

13   correct?

14   A.   That's what it says, yes.

15   Q.   Do you remember those clients?

16   A.   No.

17          MS. McCARTHY:  If we can go down to fiscal 2000.

18   Q.   Again, this fiscal year for 2000 would be starting July 1

19   of 1999, going through June 30 of 2000, is that right?

20   A.   Correct.

21   Q.   All right.  You were receiving bonuses in fiscal year 2000

22   for some particular tax clients, Gordon Foods being one of

23   them, correct?

24   A.   Correct.

25   Q.   Do you remember the other three that are listed there?

1   A.  I recognize the names.  I don't remember --

2   Q.  But for those four clients you received $84,375 in bonuses,

3   right?

4   A.  Yes.

5   Q.  Then we see your tax solution profit sharing which was over

6   $5 million, 5.4 million?

7   A.  Correct.

8          MS. McCARTHY:  If we could go down to fiscal year

9   2001.

10  Q.  We see a number of still -- I'm sorry, OK.  So we have the

11  Mandaric clients and Gordon Foods again, right?

12  A.  Yes.

13  Q.  Then you will see below those two a number of entries that

14  indicate that these are Red Wagon clients, right?

15  A.  Yes.

16  Q.  I believe that those actually go over one more on the next

17  page.

18  A.  Yes.

19  Q.  So the total for the Red Wagon clients is $255,652,

20  correct?

21  A.  I see that, yes.

22          MS. McCARTHY:  We can take that down for now.

23  Q.  Now, Mr. Dicker, is it correct that in a very short time

24  RSM and BDO generated over $13 million in fees from the Red

25  Wagon joint venture?

Damndau1                          Dicker - cross

```
 1   A.  I don't know the number.  I don't recall it.
 2   Q.  Is it a fact that Red Wagon ultimately breached its
 3   agreement with BDO and started selling the transactions without
 4   sharing the profits with BDO?
 5   A.  I am not sure what they did to breach the agreement.
 6   Q.  Do you recall that they did in fact, though, breach the
 7   agreement?
 8   A.  BDO felt that they had breached the agreement.  I know that
 9   happened.
10   Q.  Do you recall that BDO instituted an arbitration action
11   against RSM McGladrey?
12   A.  I don't recall the form of the action, but it was an action
13   against McGladrey.
14          MS. McCARTHY:  All right.  Mr. Dicker, I'm going to
15   approach with what's marked as Defense Exhibit 79.
16          Mr. Dicker, these appear to be board of directors
17   minutes from a meeting and executive session on May 15 to 17,
18   2001?
19   A.  Yes.
20   Q.  Are you present for that meeting?
21   A.  Yes.
22          MS. McCARTHY:  We offer Defendants' Exhibit 79.
23          THE COURT:  Any objection?
24          MS. DAVIS:  No, your Honor.  Sorry.
25          THE COURT:  Defense Exhibit 79 is received in
```

1    evidence.

2            MS. McCARTHY:  We may publish.

3            THE COURT:  You may, Ms. McCarthy.

4            (Defendants' Exhibit 79 received in evidence)

5    Q.  You will see again it's May 15 to 17, 2001.  If we can go

6    down to the last entry on the first page, it says Red Wagon.

7    It says, Denis Field reported that we will go to arbitration on

8    the Red Wagon situation, which we interpret as a violation of

9    our trust.  Discussions will proceed with the company, but the

10   outcome of the arbitration could affect any deal.

11           Do you see that?

12   A.  Yes.

13   Q.  So is it correct that arbitration was then instituted

14   against RSM McGladrey?

15   A.  I know that action was to be instituted against McGladrey

16   and this states that it was in the form of arbitration.

17           MS. McCARTHY:  I just want to jump to a different

18   topic while we have this document up there.  If we could go to

19   the second page, and if we could highlight the top portion that

20   says Project Z.

21   BY MS. McCARTHY:

22   Q.  Do you recall what Project Z was, sir?

23   A.  I think that was the code name for the concept of selling

24   BDO.

25   Q.  So in May of 2001 there are discussions at the board of

Damndau1                          Dicker - cross

1   directors about selling the company, correct?

2   A.  Yes.

3          MS. McCARTHY:  We can take that down.

4   Q.  Mr. Greisman -- I'm sorry.  I am looking at a document.

5   Mr. Dicker, I'm going to approach with what's marked as Defense

6   Exhibit 64.

7          I'm going to ask if this document refreshes your

8   recollection about the amount of fees earned between RSM and

9   BDO.  I just want you to look at the document and make sure you

10  understand what it is and not read it out loud.  Then just go

11  to the red tab.  Don't read it out loud.  Just tell me if that

12  refreshes your recollection about the amount of money earned in

13  the RSM McGladrey joint venture with BDO?

14  A.  No.

15  Q.  Do you remember, sir, that the amount of fees was in at

16  least several million dollars that was generated with the RSM

17  McGladrey joint venture?

18  A.  I don't remember the number.

19  Q.  But you were at board meetings, right, in this time period?

20  A.  Yes.

21  Q.  This would have been discussed in front of you at board

22  meetings, correct?

23  A.  Topics such as this were discussed, yes.

24  Q.  Sir, you were earning bonuses, you earned over $250,000

25  worth of bonuses from the Red Wagon venture, right?  We just

Damndau1                     Dicker - cross

1    established that.  Do you remember the document that we had on

2    the screen just a minute ago?

3    A.   Yes.

4    Q.   This was a matter of some importance to you, was it not?

5    A.   Yes.

6    Q.   That the joint venture be successful, correct?

7    A.   Yes.

8    Q.   But it was not because there was a perception by BDO that

9    RSM had breached the agreement, correct?

10   A.   Correct.

11   Q.   It's fair to say that you are not engendering a business

12   relationship by starting an arbitration action against

13   somebody, correct?

14          MS. DAVIS:  Objection.

15          THE COURT:  Sustained.

16   Q.   Mr. Dicker, when BDO started the arbitration action, is it

17   fair to say that then the joint venture was done?

18   A.   I don't recall.

19   Q.   Mr. Dicker, do you know that RSM McGladrey was owned by H &

20   R Block at that time?

21   A.   You're referring to 2001?

22   Q.   Correct.

23   A.   Yes.

24   Q.   In fact, wasn't H & R Block in discussions with BDO about

25   purchasing BDO?

Damndau1                          Dicker - cross

1    A.   There were discussions about that, yes.

2    Q.   And so H & R Block was an owner of RSM McGladrey, correct?

3    A.   Yes.

4    Q.   BDO had shared all of its information about the tax

5    products that it was offering to clients with RSM McGladrey,

6    correct?

7    A.   It had shared its information, yes.

8    Q.   It is fair to say that a potential buyer, H & R Block, then

9    had this information about BDO's tax products, correct?

10   A.   I can't tell you exactly what H & R Block knew from the

11   information we provided to RSM McGladrey.

12   Q.   H & R Block owned RSM McGladrey, right?

13   A.   Yes.

14   Q.   So, Mr. Dicker, it was no secret, was it, that BDO was in

15   the tax shelter business?

16          MS. DAVIS:  Objection.

17          THE COURT:  Sustained as to form.

18   Q.   Mr. Dicker, BDO shared information with a competitor about

19   its tax products, right?

20   A.   Yes.

21   Q.   We've established that you understood that the clients of

22   BDO had their own advisers, correct?

23   A.   Yes.

24   Q.   So information about BDO's tax shelters was being shared

25   not only with the client, but also with their advisers,

Damndau1                        Dicker – cross

1    correct?

2    A.   Correct.

3    Q.   In addition to H & R Block considering buying BDO, BDO was

4    talking to other potential purchasers, correct?

5    A.   Correct.

6    Q.   Yesterday we looked at a document, and it's in evidence,

7    Government Exhibit 301-293, which is a document that was

8    prepared by W.L. Ross & Company.  Do you remember that?

9    A.   Yes.

10   Q.   That was a document that we looked at to establish

11   Mr. Field's date of birth, right?  Withdrawn.  We don't need to

12   figure that out.

13           I'm going to give you another copy of this, sir.  It's

14   Government Exhibit 301-293.  Does that appear to be the

15   document that W.L. Ross & Company prepared in May 2000?

16   A.   Yes.

17   Q.   Do you know that Wilbur Ross is an investment banker?

18   A.   Correct.

19   Q.   BDO hired Wilbur Ross to help BDO make itself marketable to

20   potential buyers, correct?

21   A.   Correct.

22   Q.   In order for Ross to do that, Ross had to get to know BDO's

23   business, correct?

24   A.   They had to understand elements of the business to be able

25   to prepare this document.

Damndau1                          Dicker - cross

1  Q.  Right.  This document summarizes BDO's business, does it

2  not?  It is a very short summary of the BDO's business.  There

3  is something in there called, the second page is executive

4  summary of business, right?

5  A.  Yes, it seems to describe the overall business.

6          MS. McCARTHY:  If we could publish this, your Honor.

7          THE COURT:  You may.

8          MS. McCARTHY:  If we can go to the second page in the

9  executive summary.

10  Q.  Going down to the paragraph that begins, During the last

11  five years.

12          This paragraph discusses the tax practice, right, the

13  tax shelter practice?  It indicates in the middle that the

14  financial solutions practice combines complex corporate finance

15  structuring techniques with highly sophisticated tax strategies

16  to create a practice which has grown from a nominal amount to

17  more than 19 percent of revenues during the same period, right?

18  A.  That's what it says, yes.

19  Q.  It also indicates that BDO in the last year created a

20  strategic alliance with Lincoln Financial Group, right?

21  A.  Right.

22  Q.  So we can take that down.  So is it fair to say then any

23  potential buyer of BDO would be given information about the tax

24  solutions practice?

25          MS. DAVIS:  Objection.

Damndau1                          Dicker - cross

1           THE COURT:  Sustained.

2   Q.  Sir, you understood that this particular document was

3   created so that potential buyers could get a sense of BDO's

4   business, right?

5   A.  Correct.

6   Q.  In fact, sir, do you recall that Mr. Ross attended a

7   meeting of BDO board of directors August 21st to 23rd 2000

8   where the issue of selling BDO was discussed?

9   A.  I don't recall that.

10           MS. McCARTHY:  May I approach with what's marked as

11  Defense Exhibit 74?

12           THE COURT:  You may.

13  BY MS. McCARTHY:

14  Q.  Sir, do you remember when Notice 2000-44 was released by

15  the IRS?

16  A.  That was in August 2000.

17  Q.  Do you recall that it was August 11 of 2000?

18  A.  Around then.  I don't recall the exact date.

19  Q.  It was the middle of August, correct?

20  A.  Around then, yes.

21  Q.  So is it fair to say that this meeting on August 21,

22  occurred after Notice 2000-44 issued?

23  A.  I think so, yes.

24  Q.  Are you present at this meeting on August 21st to 23rd?

25  A.  Yes.

Damndau1                         Dicker - cross

1              MS. McCARTHY:  Your Honor, we offer Defendants'

2       Exhibit 74.

3              MS. DAVIS:  No objection.

4              THE COURT:  Defense Exhibit 74 is received in

5       evidence.

6              (Defendant's Exhibit 74 received in evidence)

7              MS. McCARTHY:  If we could publish, your Honor.

8              THE COURT:  You may.

9              MS. McCARTHY:  If you could just go under Project Z,

10      please.

11      Q.  It indicates that Jack Weisbaum introduced Wilbur Ross who

12      with Mr. Weisbaum reported on Project Z, correct?

13      A.  That's what it says, yes.

14      Q.  So Mr. Ross attended this meeting after Notice 2000-44

15      issued, right?

16      A.  Correct.

17      Q.  That was to discuss selling the business, right?

18      A.  Project Z was selling the business, yes.

19      Q.  Did you tell anyone at that meeting that you were concerned

20      about criminal liability as a result of Notice 2000-44?

21      A.  I did not.

22      Q.  You didn't tell Mr. Ross that he maybe shouldn't try to

23      sell the business because there was criminal liability at

24      issue?

25      A.  I did not.

Damndau1                        Dicker - cross

1   Q.  Again, there was another meeting with Mr. Ross on January

2   16th to 18th of 2001.  Do you remember that?

3   A.  I don't recall.

4           MS. McCARTHY:  If we could just put up on the screen

5   for the witness Defense Exhibit 76, please.

6           THE COURT:  You may.

7           MS. McCARTHY:  Just for the witness, please.

8   Q.  Do you see that document?

9   A.  Yes.

10           MS. McCARTHY:  It's in?

11           Your Honor, I am told this is in evidence.  May we

12   republish?

13           THE COURT:  You may.

14           MS. McCARTHY:  If we could just go under Project Z.

15   BY MS. McCARTHY:

16   Q.  Do you see that Jack Weisbaum reported on the status of

17   Project Z and Wilbur Ross joined the discussion by telephone?

18   A.  I see that, yes.

19   Q.  There are meetings with various parties scheduled at the

20   end of January, beginning of February, right?

21   A.  Correct.

22   Q.  Again, you did not say anything at that meeting to try to

23   stop the business from being sold because of criminal concerns,

24   correct?

25   A.  Correct.

Damndau1                    Dicker - cross

1    Q.  In fact, a potential buyer was later found for the firm,

2    right?  Do you remember that, the firm called Clark/Bardes?

3    A.  I remember the name.

4    Q.  And do you remember that in April of 2001, Mr. Weisbaum

5    report on the possibility of affiliation with Clark/Bardes?

6    A.  I don't recall the exact report that was made.

7    Q.  I'm going to show you what's been marked as Defense Exhibit

8    78.  Are those board minutes from an executive session on April

9    13, 2001?

10   A.  Yes.

11   Q.  Were you present at that meeting?

12   A.  Yes.

13           MS. McCARTHY:  Your Honor, I'm told that this is also

14   in evidence.

15           May we republish?

16           THE COURT:  You may.

17           MS. McCARTHY:  If we could go under Clark/Bardes.

18   BY MS. McCARTHY:

19   Q.  It says, Jack Weisbaum reported on the possibility of an

20   affiliation with Clark/Bardes, right?

21   A.  Yes.

22   Q.  It also says, Members of their board, Clark/Bardes' board,

23   including Bill Seidman, would meet with the BDO team,

24   consisting of Dave Jensen, Charlie Bee, and Bob Greisman on

25   April 30 to explore terms.  BDO would require control of any

Damndau1                        Dicker - cross

1    new entity.  Right?

2    A.   That's what it says, yes.

3    Q.   Did you know who Bill Seidman was?

4    A.   Yes.

5    Q.   His family had started BDO Seidman, right?

6    A.   I don't recall if they started it, but they were very

7    important in the genesis of Seidman & Seidman.

8    Q.   Right.  It used to be called Seidman & Seidman, right?

9    A.   Correct.

10   Q.   Same family?

11   A.   Yes.

12   Q.   You knew that Mr. Seidman was very prominent in the world

13   of accounting, correct?

14   A.   Yes.

15   Q.   He had a very high public profile as well, correct?

16   A.   Yes.

17   Q.   So in April of 2001, Charlie Bee and Bob Greisman and

18   others were going to sit down with Mr. Seidman to tell him

19   about BDO's business so that there can be a potential

20   affiliation with Clark/Bardes, correct?

21   A.   That's what was proposed, yes.

22   Q.   Do you have any memory of that?

23   A.   No.

24   Q.   No memory?

25   A.   No.

Damndau1                    Dicker - cross

1    Q.  Do you remember who Bill Seidman was?

2    A.  I remember Bill Seidman.  As you say, he was a notable

3    person in the accounting world.

4    Q.  You don't remember that Charlie Bee was going to have a

5    meeting with Bill Seidman?

6    A.  No.

7         MS. McCARTHY:  You can take that down.

8    Q.  This potential sale or potential merger of BDO was

9    happening, as we've seen, starting in 2000 into 2001, correct?

10   A.  Into 2001, yes.

11   Q.  Right.  And Mr. Field was the CEO of the company throughout

12   that time, correct?

13   A.  Correct.

14   Q.  So that was a very major issue for the board of directors

15   and for the company generally, whether or not it was going to

16   sell the entire partnership or pieces of it, correct?

17   A.  It was a very major portion.

18   Q.  Denis Field, again, was at the very top of the pyramid here

19   on this decision making along with the board of directors,

20   right?

21   A.  Correct.

22   Q.  Are you aware also that in 2001 there was an issue that

23   arose in the office in St. Louis concerning a client who had

24   committed some misconduct with a trust fund?

25   A.  I recall that there was a problem in the office.  I don't

Damndau1                     Dicker - cross

1   recall the nature of it.

2   Q.  But do you recall that the U.S. Attorney's Office in

3   St. Louis was investigating BDO because of that misconduct of a

4   client?

5   A.  Yes.

6   Q.  Do you recall that in 2001, in fact, November of 2001, BDO

7   was informed that it was facing indictment?

8   A.  I don't recall the date.

9            MS. McCARTHY:  I'm going to approach with what's

10  marked as Defense Exhibit 70.

11  Q.  Are those board minutes from an executive session on

12  November 29, 2001?

13  A.  Yes.

14  Q.  Were you present for that meeting?

15  A.  Yes.

16           MS. McCARTHY:  We offer Defendants' Exhibit 70?

17           THE COURT:  Any objection?

18           MS. DAVIS:  No objection.

19           THE COURT:  Defense Exhibit 70 is received in

20  evidence.

21           (Defendants' Exhibit 70 received in evidence)

22           MS. McCARTHY:  May we publish, your Honor?

23           THE COURT:  You may.

24           MS. McCARTHY:  If we could highlight the bottom, the

25  only entry here, which is the James Gibson case.

Damndau1                    Dicker - cross

BY MS. McCARTHY:

Q.  In that entry it says, In a conference call Steve Hill and
Marty McLaughlin -- do you know who they were?

A.  I don't recall Steve hill.  I remember the name Marty
McLaughlin.

Q.  Do you know what their role was, if any, with BDO?

A.  I don't know Steve hill, and I don't recall Marty's
McLaughlin's role either.

Q.  They joined the board of directors for discussion of the
matter of the James Gibson case in St. Louis, right?

A.  That's what it says.

Q.  It says, Mr. Gibson is under investigation by the federal
government, and although two years ago the firm was told that
we were not a target of the investigation, five weeks ago this
was reversed, right?

A.  Yes.

Q.  A meeting is scheduled for next Monday morning in which we
will attempt to avoid indictment, right?

A.  That's what it says, yes.

Q.  So that was in November of 2001, right?

A.  Yes.

Q.  That was a pretty serious matter for BDO, correct?

A.  Very serious, yes.

Q.  In fact, that could put the entire business at risk if the
firm were indicted, correct?

Damndau1                         Dicker - cross

1   A.   Correct.

2   Q.   That issue in the St. Louis office had nothing whatsoever

3   to do with what we're here for today, correct?

4   A.   That's correct.

5   Q.   It had to do with a client named James Gibson who committed

6   misconduct and the issue was whether or not the partners in the

7   St. Louis office were aware of that, right?

8   A.   It had to do with the actions of the St. Louis partners.

9   Q.   Right.  So Mr. Field was the CEO at the time this was going

10  on, correct?

11  A.   Yes.

12  Q.   Would you say that Mr. Field was very involved in trying to

13  make this issue go away for BDO?

14         MS. DAVIS:  Objection.

15         THE COURT:  Sustained as to form.

16  Q.   Mr. Dicker, is it your understanding that Mr. Field was

17  involved in BDO's response to the U.S. Attorney's Office?

18  A.   Yes.

19  Q.   In fact, the company was able to avoid indictment, correct?

20  A.   I believe that is right, yes.

21  Q.   The company entered into a deferred prosecution agreement

22  with the St. Louis office and paid a fine, correct?

23  A.   That's what I recall, yes.

24  Q.   That was under Mr. Field's leadership, correct?

25  A.   Yes.

Damndau1                    Dicker - cross

1   Q.  You are also aware, are you not, that in the 2001 time

2   period Mr. Field's marriage broke up?

3   A.  I don't know the date, but I know that his marriage broke

4   up.

5   Q.  He had two small children at the time, isn't that right?

6   A.  Correct.

7   Q.  Is it fair to say that that was a difficult time for him

8   based upon your observations of him?

9   A.  Yes.

10  Q.  Mr. Dicker, you have testified a little bit about a person

11  named Paul Shanbrom, right?

12  A.  Yes.

13  Q.  You had to pause there, is there a reason?

14  A.  I've tried to recall what I had said in the prior

15  testimony.

16  Q.  I see.  Well, you remember that you testified that

17  Mr. Shanbrom had been a member of the tax sales executive

18  group, right?

19  A.  That's my recollection.  Yes.

20  Q.  He had also been a member of the tax solutions group,

21  right?

22  A.  Correct.

23  Q.  He had also been a member of the tax opinion committee,

24  correct?

25  A.  Correct.

Damndau1                    Dicker - cross

1              MS. McCARTHY:  I would ask that we put up on the

2      screen for the witness Defense Exhibit 331, just for the

3      witness.

4              Sorry, your Honor.

5      BY MS. McCARTHY:

6      Q.  Do you recognize the person in that photograph?

7      A.  He reminds me of Paul Shanbrom, yes.  I think that probably

8      is Paul Shanbrom.

9      Q.  You believe that's Paul Shanbrom?

10     A.  It looks like my memory of him.

11             MS. McCARTHY:  Your Honor, we offer Defense Exhibit

12     331.

13             MS. DAVIS:  No objection.

14             THE COURT:  Defense Exhibit 331 is received in

15     evidence, and you may publish it to the jury.

16             MS. McCARTHY:  Thank you, your Honor.

17             (Defendants' Exhibit 331 received in evidence)

18     BY MS. McCARTHY:

19     Q.  This is Paul Shanbrom, correct?

20     A.  It looks like my memory of Paul Shanbrom.

21     Q.  You testified that Mr. Shanbrom sold more of the Jenkens &

22     Gilchrist tax shelters than anybody else at BDO, isn't that

23     right?

24     A.  That's my recollection, yes.

25     Q.  You never accompanied Mr. Shanbrom on a meeting with a

Damndau1                              Dicker - cross

1    client, did you?

2    A.  I don't recall now.

3    Q.  Do you believe you may have?

4    A.  I just don't recall.

5    Q.  All right.  Well, did you ever ask Mr. Shanbrom what he was

6    telling clients at those meetings?

7    A.  I don't recall what I asked him.

8    Q.  Mr. Dicker, you are aware that the Jenkens & Gilchrist tax

9    opinions for both the short sale and the spread option were

10   more-likely-than-not opinions, right?

11   A.  Could you explain what that means.

12   Q.  You are not familiar with the term more likely than not?

13   A.  I recall the term, but I don't recall exactly what it means

14   now.

15   Q.  Well, are you aware that there are different levels of an

16   opinion that one can get from an attorney, starting at the

17   highest being a will opinion?

18   A.  I remember that.

19   Q.  The will opinion is that the attorney is saying with

20   certainty that, if you do what you are doing on your tax

21   return, it's our opinion that the IRS, the Court will uphold it

22   if the IRS challenges, right?

23   A.  Right.

24   Q.  So a more-likely-than-not opinion is saying that we think

25   it's more likely than not, a 51 percent chance, that if the IRS

Damndau1                    Dicker - cross

1   challenges this that the Court may uphold it?  Do you

2   understand that?

3   A.  I understand that concept, yes.

4   Q.  Is it fair to say that a more-likely-than-not opinion

5   should not be described as bulletproof?

6           MS. DAVIS:  Objection.

7           THE COURT:  Sustained as to form.

8   Q.  Did you ever instruct Mr. Shanbrom to describe the Jenkens

9   opinion as bulletproof?

10  A.  I don't believe I did, no.

11  Q.  Did you ever authorize him to tell clients that the opinion

12  was bulletproof?

13  A.  I don't believe I did, no.

14  Q.  Indeed, it was discussed within the tax solutions group,

15  was it not, that there was no guarantee that the IRS would

16  agree with the position taken on tax returns, correct?

17  A.  Correct.

18  Q.  You also discussed within the tax solutions group that

19  there was a strong possibility that clients would in fact be

20  audited, right?

21  A.  That it is possible that they would be audited, yes.

22  Q.  You also discussed the fact that if the taxpayer took the

23  issue to court there was legal support for the position taken

24  on the returns, correct?

25  A.  There was some legal support, yes.

Damndau1                          Dicker - cross

1   Q.  You discussed that within the tax solutions group, that it

2   was important to make sure that the clients understood that

3   these transactions, these Jenkens transactions were aggressive

4   and risky, right?

5   A.  Can you repeat that question.

6   Q.  Sure.  The Jenkens tax transactions were aggressive, were

7   they not?

8   A.  They were.

9   Q.  It was therefore important that the members of the tax

10  solutions group were clear with clients about the risk they

11  were taking, correct?

12  A.  It was important that the clients understood what they were

13  getting into.

14  Q.  That was discussed on those tax solutions phone calls,

15  right?

16  A.  I don't recall specific discussions as I sit here.

17  Q.  Do you have any doubt that was something that would have

18  been discussed on the tax solutions calls?

19          MS. DAVIS:  Objection.

20          THE COURT:  Overruled.

21  A.  I believe that is a topic that would be discussed in those

22  conversations.

23  Q.  Do you know how much money Mr. Shanbrom earned from the tax

24  solutions?

25  A.  I don't know the exact number.

Damndau1                          Dicker - cross

1   Q.  Would it help you if I were to show you a record of his

2   bonuses?

3   A.  Yes.

4           MS. McCARTHY:  May I approach with what's been marked

5   as Defense Exhibit 260.

6           THE COURT:  You may.

7           MS. DAVIS:  Ms. McCarthy, I think you misdescribed the

8   exhibit number.  It's Government Exhibit 301-260.

9           MS. McCARTHY:  I did misdescribe it.  Sorry.

10  Government Exhibit 301-260.  Thank you, Ms. Davis.

11  BY MS. McCARTHY:

12  Q.  Do you recognize the form that document is in, sir?

13          THE COURT:  I'm confused.  What's the exhibit number

14  that you are looking at?

15          MS. McCARTHY:  Government Exhibit 301 --

16          THE COURT:  301-260.

17          MS. McCARTHY:  Thank you.  I apologize.

18          THE COURT:  It is all right.

19  BY MS. McCARTHY:

20  Q.  Does that appear to be in the same format of the document I

21  showed you concerning your own bonuses.

22  A.  Yes.

23  Q.  Does this appear to be a BDO document reflecting Paul

24  Shanbrom's bonuses while he was at BDO?

25  A.  It appears to be a document showing his BDO bonuses, yes.

Damndau1                    Dicker - cross

1              MS. McCARTHY:  We offer Government Exhibit 301-260.

2              MS. DAVIS:  No objection.

3              THE COURT:  Government Exhibit 301-260 is received in

4    evidence.

5              MS. McCARTHY:  May we publish.

6              THE COURT:  You may.

7              (Government's Exhibit 301-260 received in evidence)

8    BY MS. McCARTHY:

9    Q.  Again, this is Paul Shanbrom's bonus record.  And if we go

10   into fiscal year 1998, he earned $136,345, correct, in bonuses?

11   Or it's hard to tell whether that was for a bonus, correct?

12   A.  Correct.

13   Q.  If we go down to fiscal year 1999, it appears that he

14   earned $636,329 on tax matters, correct?

15   A.  I see that number.

16   Q.  If we can go down to fiscal year 2000, that is a very long

17   list, right?

18   A.  Yes.

19   Q.  Is it fair to say that this is the fiscal year in which

20   BDO's tax solutions group was the most active with the Jenkens

21   & Gilchrist shelters, from July 1 of 1999 through June 30 of

22   2000?

23   A.  It was very active in that year.

24   Q.  That's certainly as compared to fiscal year 1999, correct?

25   A.  I don't recall the exact number of transactions in each

Damndau1                          Dicker - cross

 1    period.

 2    Q.  Right.  But do you recall generally that 2000 was a very

 3    good year for you personally for tax solutions profits?

 4    A.  Yes.

 5              MS. McCARTHY:  If we can go to the next page, then.

 6    Just highlight the top portion.

 7    Q.  Do you see that the total bonuses for Mr. Shanbrom just for

 8    fiscal year 2000 was $3.8 million?

 9    A.  I see that number, yes.

10    Q.  Then again for fiscal year 2001, there is another very long

11    list.

12              MS. McCARTHY:  If we could go to the next page.

13    Sorry, Mr. DeCastro.

14    Q.  You will see there is a number there, $3.4 million,

15    correct?

16    A.  I see that, yes.

17    Q.  That's Mr. Shanbrom's earnings from bonuses, correct?  Yes?

18    A.  3.4 was his total K-1 taxable income.

19    Q.  Right.  Do you see, though, the names of all of those

20    clients next to where it says tax?

21    A.  Yes.

22    Q.  Is it fair to say that those are tax solutions clients?

23    A.  Yes.

24    Q.  This goes on and on.  We don't have to go through every

25    page, but is it fair to say, then, sir, that Mr. Shanbrom made

Damndau1                        Dicker - cross

```
 1   a significant amount of money by selling the tax solutions

 2   products?

 3   A.  Yes.

 4   Q.  Do you know, sir, where Mr. Shanbrom is right now?

 5   A.  No.

 6   Q.  Do you know that, in fact, he is still out selling captive

 7   insurance products?

 8            MS. DAVIS:  Objection.

 9            THE COURT:  Sustained.

10   Q.  You have no knowledge of what happened to Mr. Shanbrom?

11   A.  Correct.

12   Q.  I'm going to show you something, Defense Exhibit 282.  Are

13   you saying that you have no knowledge -- you have never had any

14   knowledge of what happened to Mr. Shanbrom after he left -- do

15   you know if he's still at BDO?

16   A.  No, I don't.

17   Q.  So you he could very well still be there, you just don't

18   know?

19   A.  I just don't know.

20   Q.  Do you have any knowledge that he's currently selling

21   captive insurance products?

22            MS. DAVIS:  Objection, your Honor.

23            THE COURT:  Sustained.

24   Q.  Mr. Dicker, while you were at BDO and working on tax

25   solutions, is it fair to say that the tax opinion committee
```

Damndau1                    Dicker - cross

1   certainly discussed issues concerning economic substance?

2   A.  Yes.

3   Q.  Is it fair to say that the cases were not all in agreement

4   on issues concerning economic substance?

5   A.  Yes.

6   Q.  The tax opinion committee was staffed by people of

7   different expertise, correct?

8   A.  Correct.

9   Q.  There were some CPAs on there, right?

10  A.  Yes.

11  Q.  Then there were people like you and Mr. Bee who were

12  technical tax experts, correct?

13  A.  Mr. Bee was the technical tax expert.  I would not regard

14  myself at the same level of expertise.

15  Q.  The tax opinion committee followed developments in the law,

16  correct?

17  A.  Yes.

18  Q.  You followed events as they unfolded in Congressional

19  committees, correct?

20  A.  We tried to, yes.

21  Q.  And you posed questions to each other about the state of

22  the law, correct?

23  A.  We discussed the state of the law, yes.

24  Q.  It was important that the members of the tax opinion

25  committee follow the legal developments, correct?

Damndau1                          Dicker - cross

1   A.  Correct.

2   Q.  You participated in those discussions, did you not?

3   A.  Yes.

4   Q.  Do you remember in 1999 discussing a tax bill, a conference

5   committee that had come out concerning the Taxpayers' Refund

6   and Relief Act of 1999?

7   A.  I don't recall that specifically.

8   Q.  I'm going to show you what's marked as Government Exhibit

9   300-6.

10          MS. McCARTHY:  Is that in?

11          MR. DE CASTRO:  No.

12          MS. McCARTHY:  Can we put that on the screen for the

13  witness, please.

14  BY MS. McCARTHY:

15  Q.  Do you see that, sir?  Is it hard to read?

16  A.  It's hard to read.

17          MS. McCARTHY:  Can you make that top part a little

18  bigger for him.

19  Q.  Do you see that there's an e-mail from you on August 7 of

20  1999 to the opinion committee?

21  A.  Correct.

22  Q.  The subject is tax bill conference committee, assumption of

23  liabilities, right?

24  A.  Correct.

25          MS. McCARTHY:  Your Honor, we offer Government Exhibit

Damndau1                    Dicker - cross

```
 1    300-6.
 2              MS. DAVIS:  No objection.
 3              THE COURT:  Government Exhibit 300-6 is received in
 4    evidence.
 5              (Government's Exhibit 300-6 received in evidence)
 6              MS. McCARTHY:  May I publish, your Honor?
 7              THE COURT:  You may.
 8    BY MS. McCARTHY:
 9    Q.  You will see here, sir, that this is a discussion about
10    issues of potential concern to the short sale, right?
11    A.  I'm finding it difficult to read even at this scale.
12    Q.  If we can just highlight the first two paragraphs.
13              There is a house conference report on the Taxpayers'
14    Refund and Relief Act that contains a provision dealing with
15    anti-abuse where the liabilities are assumed.  Do you see that?
16    A.  Yes.
17    Q.  You talk in this e-mail about the developments in the
18    conference committee, correct?
19    A.  Yes.  It refers to the House conference report.
20    Q.  If we can go down to the paragraph that begins Lorin Luchs
21    is looking.  Who is Lorin Luchs?
22    A.  He was a partner in the Washington office, and his
23    responsibility was liaison with the IRS.
24    Q.  So he was not out selling the tax products then, right?
25    A.  Not to my knowledge.
```

Damndau1                    Dicker - cross

1   Q.   Do you know whether he previously had worked at the IRS?

2   A.   I don't recall.

3   Q.   But he in any event was BDO's liaison to the IRS, right?

4   A.   Correct.

5   Q.   So he was the person who would reach out to the IRS and ask

6   them questions periodically, correct?

7   A.   Correct.

8   Q.   That happened periodically in connection with the tax

9   products that BDO's tax opinion committee was reviewing,

10  correct?

11  A.   If we wanted that kind of information, Lorin Luchs would

12  try and get that information from the IRS.

13  Q.   In this e-mail you indicate that Lorin Luchs is looking to

14  see if there's any more information on this, right?

15  A.   Correct.

16  Q.   He would be doing that by contacting the IRS?

17              MS. DAVIS:  Objection.

18              THE COURT:  Sustained as to form.

19  Q.   Do you know how he would find out if there was any more

20  information?

21  A.   I would believe he would research whatever was available,

22  and if he could, he would contact the IRS and obtain

23  information if that was a possible method of getting the

24  information.

25  Q.   You go on to say, sir, If these regulations do only deal

Damndau1                    Dicker - cross

1    with liabilities as currently defined in the case law, then

2    this will have no effect on the SPREAD transaction, right?

3    A.   That's what it says, yes.

4    Q.   You are having a discussion about the current issue in this

5    committee report and how it will or will not impact your

6    shelters that are at issue, right?

7    A.   He must analyze the effect on the shelters that we were

8    doing, yes.

9    Q.   This was on August 7 of 1999, right?

10   A.   Correct.

11             MS. McCARTHY:  You can take that down.

12   Q.   Just four days later you wrote another e-mail to the tax

13   opinion committee, did you not?

14   A.   I didn't recall.

15             MS. McCARTHY:  I'm going to approach with Defense

16   Exhibit 88.

17             THE COURT:  You may.

18   BY MS. McCARTHY:

19   Q.   Does that appear to be an e-mail from you to both the tax

20   opinion committee and the tax sales executives?

21   A.   Yes.

22   Q.   In this e-mail you're saying, Further to my e-mail over the

23   weekend we have had many conversations -- withdrawn.

24             MS. McCARTHY:  Your Honor, we offer Defendants'

25   Exhibit 88.

Damndau1                          Dicker - cross

1                    MS. DAVIS:  No objection.

2                    THE COURT:  Defense Exhibit 88 is received in

3     evidence.

4                    (Defendants' Exhibit 88 received in evidence)

5                    MS. McCARTHY:  May we publish?

6                    THE COURT:  You may.

7     BY MS. McCARTHY:

8     Q.  So, again, this is from you.  This is four days after the

9     last e-mail we just looked at, right?  And it appears to be on

10    the same topic?

11    A.  It appears to be on the same topic yes.

12    Q.  You say, Further to my e-mail, I have had many

13    conversations with various parties about the language in the

14    conference committee report.  Right?

15    A.  That's what it says, yes.

16    Q.  And the general consensus is that the language as it stands

17    does not extend to the SPREAD transaction, right?

18    A.  That's what it says, yes.

19    Q.  You also said it shouldn't extend to the short sale either,

20    though potentially that is more exposed, right?

21    A.  That is what it says, yes.

22    Q.  If we go down to the next paragraph.  You say, Based on the

23    various conversations I have had, I believe our approach should

24    be to tell those interested in the transactions that we have

25    reviewed the act and bring the language to their attention.

Damndau1                           Dicker - cross

1           Right?

2     A.   Yes.

3     Q.   Then, if we go down to the last two portions of this

4     e-mail, you say, The overall message, the SPREAD transaction is

5     alive and well.  The short sale may potentially be more

6     exposed, but this development in itself does not change

7     anything.  Right?

8     A.   That's what it says, yes.

9     Q.   And you say, Contact me with any questions.  I am going to

10    be on vacation next week and Bob Greisman will be handling

11    SPREAD transaction issues next week while I am away.  Right?

12    A.   Correct.

13              MS. McCARTHY:  We can take that down.

14    Q.   Here you are you are discussing actively current issues in

15    the law, correct?

16    A.   Yes.

17    Q.   Current issues that may impact transactions that are going

18    on with Jenkens & Gilchrist, correct?

19    A.   Correct.

20    Q.   This debate actually went on a bit more, correct?

21    A.   I don't recall.

22    Q.   Well, this was a typical sort of conversation that you had

23    internally on the tax opinion committee, correct?

24    A.   Correct.

25    Q.   Is it fair to say that these two examples are not isolated

Damndau1                    Dicker – cross

1   examples of the type of analysis and discussion that the tax

2   opinion committee would have?

3   A.  These are typical discussions of the tax committee.

4   Q.  It is then clear, is it not, that the tax opinion committee

5   was not ignoring legal developments, right?

6   A.  Correct.

7   Q.  I would like to show you what's been marked as defendants'

8   Exhibit 523.  Actually I believe it's in evidence.

9          MS. McCARTHY:  If we could republish, your Honor.

10          THE COURT:  You may.

11          MS. McCARTHY:  If we could just make the whole thing,

12  all the tax --

13  BY MS. McCARTHY:

14  Q.  Do you need to see a hard copy of this, sir?

15  A.  It would help me.

16  Q.  All right.

17  A.  Thank you.

18  Q.  Does this appear to be an e-mail from you?

19  A.  Yes.

20  Q.  On October 25 of 1999, re urgent extender bill?

21  A.  Yes.

22  Q.  In this you are advising the tax solutions group about a

23  bill, some legislation, correct?

24  A.  Proposed legislation.

25  Q.  Right.  You indicate in this e-mail, This provision does

Damndau1                    Dicker - cross

1   not seem to affect the SPREAD transaction as the option is not

2   a liability, right?

3   A.   That's what it says, yes.

4   Q.   And you go on to tell the tax solutions group members

5   things to consider before going ahead with the SPREAD

6   transaction in particular states, right?

7   A.   Consider the rules in the relevant states, yes.

8   Q.   Mr. Dicker, is it fair to say at the time you sent this

9   e-mail in October 25 of 1999 you did not think that the

10  transactions you were doing with Jenkens were illegal, correct?

11  A.   At this time, in 1999, I was considering the concepts here.

12  The actual transactions it depended on how they were actually

13  executed.

14  Q.   Right.  But it's fair to say that were you not telling

15  anybody stop, right?

16  A.   I am not telling anyone to stop, correct.

17  Q.   But you did not believe that the transactions were illegal,

18  correct?

19  A.   I did not believe that the concept was an illegal concept

20  based on this review.

21  Q.   Sir, previously you've indicated that -- you previously

22  testified, is that right?

23  A.   Can you give me the context of that.

24  Q.   You testified in 2011 about your time at BDO and on the tax

25  opinion committee, right?

Damndau1                          Dicker - cross

1    A.  Yes.

2    Q.  I am going to direct counsel's attention to page 4443,

3    lines 18 to 24 and 4446, lines 2 to 23.  In 2011 you were shown

4    this very same document, sir, and it's Exhibit 523.

5           Do you remember being asked these questions and giving

6    these answers:

7    "Q.  Mr. Dicker, you got a paper tax and an electronic tax and

8    a mixture between the two of them you were able to see this is

9    an e-mail that you issued on October 25 of 1999?

10   "A.  Yes.

11   "Q.  You're referencing or discussing in here, and it says it

12   is urgent, what is called an extender bill, is that correct?

13   A.  That's what it says, yes."

14          On page 4446:

15   "Q.  Your e-mail then goes on and says this provision should be

16   brought to the attention of anyone doing the transaction now.

17          "And by anyone I assume you mean both BDO personnel

18   and clients of BDO personnel?

19   "A.  Yes."

20          THE COURT:  Just a little slower.

21          MS. McCARTHY:  Sorry.

22   "Q.  This should be done as soon as possible.

23          "That's consistent with your earlier comment that

24   this is an urgent message, right?

25   "A.  Yes.

Damndau1                    Dicker - cross

1  "Q.  Then you say Jenkens & Gilchrist are currently looking at

2  whether they can do a short sale with options to avoid this

3  provision.  The ultimate answer to that question proves to be

4  that they did develop a short sale -- excuse me -- a short

5  option transaction.  Isn't that what happened?

6  "A.  That's what happened, yes.

7  "Q.  At this point in time, did you think that that was

8  illegal?

9  "A.  I thought that the short sale was not caught by this.  I

10  did not think the short sale was caught by the extender bill

11  provisions.

12  "Q.  At this point in time, did you think that a short option

13  transaction would be illegal?

14  "A.  No."

15         Did you give that testimony, sir?  Did you give those

16  answers?

17  A.  I don't remember the exact answers I gave.

18         MS. McCARTHY:  Your Honor, I would like to offer that

19  portion of the testimony as a prior inconsistent statement of

20  the witness.

21         THE COURT:  Any objection?

22         MS. DAVIS:  No, your Honor.

23         MS. McCARTHY:  We will provide it in a presentable

24  form.

25         THE COURT:  Fine.

Damndau1                          Dicker - cross

1             MS. McCARTHY:   Thank you.

2       BY MS. McCARTHY:

3       Q.  Now, one of the other issues that were discussed in the tax

4       solutions group was the need for proper recordkeeping, correct?

5       A.  Correct.

6       Q.  And the need to document the client's business purpose,

7       right?

8       A.  Correct.

9       Q.  Because it was important that the client have at least some

10      business purpose, some nontax purpose in doing the transaction,

11      correct?

12      A.  Correct.

13      Q.  You were shown by Ms. Davis what's in evidence as

14      Government Exhibit 300-156.

15             MS. McCARTHY:   May we republish, your Honor.

16             THE COURT:   You may.

17             MS. McCARTHY:   If we could highlight everything on

18      there, if possible.

19      BY MS. McCARTHY:

20      Q.  You will recall, sir, that this is a document that

21      Mr. Kerekes sent around to the members of the tax solutions

22      group, correct?  And Mr. Field is on this e-mail.  And he's

23      attaching three memoranda that he has sent to clients in

24      product transactions, right?

25      A.  Correct.

Damndau1                          Dicker - cross

1   Q.   These are memoranda that reflect the client's business

2   purpose for entering into the transaction, right?

3   A.   These memoranda are meant to show business purpose.

4           MS. McCARTHY:   May we highlight the last two portions

5   of this, starting with, I believe, all the way to the end.

6   That is kind of hard to read.   Can you just make it pop out.

7   Thank you.

8   BY MS. McCARTHY:

9   Q.   You will see here that Mr. Kerekes said, I believe that we

10  should be providing our client with this type of analysis for

11  each of our transaction, right?

12  A.   That's what it says, yes.

13  Q.   And then he goes on and he says something about how to use

14  the documents that he has attached, right?   He says, Please

15  feel free to use the attached as guides, correct?

16  A.   Correct.

17  Q.   He also says, Although each memorandum obviously will have

18  to be customized to take into the account the progress of the

19  transaction, the nature of conversations held with the clients,

20  etc., right?

21  A.   Correct.

22  Q.   Mr. Kerekes is saying in this e-mail, is he not, that these

23  are simply things to give guidance to the members of the tax

24  solutions group on how to go about documenting their client's

25  business purpose, right?

Damndau1                         Dicker - cross

```
 1   A.  That's what it says, yes.
 2   Q.  Mr. Kerekes doesn't say in this e-mail everyone should use
 3   exactly the document that I have attached to my e-mail, does
 4   he?
 5   A.  He does not say that, no.
 6   Q.  In fact, he says, After I send each memorandum I make sure
 7   to discuss it with the client and make a note of that fact,
 8   right?
 9   A.  That's what it says, yes.
10   Q.  Is it your understanding that what Mr. Kerekes is saying in
11   this e-mail is that everyone should look at this as guides and
12   everyone should customize their documentation to their
13   particular circumstances?
14          MS. DAVIS:  Objection.
15          THE COURT:  Sustained.
16   Q.  Mr. Dicker, you just testified that Mr. Kerekes did not say
17   in this e-mail that everyone should use exactly the same
18   document, right?
19   A.  The e-mail does not say that.
20   Q.  In fact, it's quite clear that he's saying that everyone
21   needs to customize the documentation according to each client's
22   circumstances, correct?
23   A.  That's what the e-mail says.
24   Q.  That's what was sent to Mr. Field, correct?  He's copied on
25   this e-mail?
```

Damndau1                    Dicker - cross

1    A.  Yes.

2    Q.  Mr. Dicker, you testified yesterday that Notice 2000-44 was

3    issued by the IRS in August of 2000, correct?

4    A.  Yes.

5    Q.  Notices issued by the IRS are the IRS's positions on

6    certain issues, correct?

7    A.  Correct.

8    Q.  Notices from the IRS are not the law, isn't that right?

9    A.  Correct.

10   Q.  Nonetheless, the notices need to be paid attention to,

11   right, if you're in the business of dealing with the IRS,

12   right?

13   A.  Correct.

14   Q.  They are to be analyzed and considered, right?

15   A.  Yes.

16   Q.  Is it correct that White & Case, that law firm we talked

17   about yesterday, was advising BDO after the issuance of Notice

18   2000-44?

19   A.  I believe that was the case.

20   Q.  Do you remember that you personally had conversations with

21   Larry Hill at White & Case after Notice 2000-44 was issued?

22   A.  I don't recall those conversations.

23        MS. McCARTHY:  I'm going to approach with Defense

24   Exhibit 251.

25   Q.  Does that appear to be a bill to BDO Seidman from White &

Damndau1                          Dicker - cross

1    Case?

2    A.  Yes.

3             MS. McCARTHY:  We offer Defendants' Exhibit 251.

4             MS. DAVIS:  No objection.

5             THE COURT:  Defense Exhibit 251 is received in

6    evidence.

7             (Defendants' Exhibit 251 received in evidence)

8             MS. McCARTHY:  May we publish, your Honor?

9             THE COURT:  You may.

10            MS. McCARTHY:  If I can go to the second page please.

11   I'll go to the entry sort of in the middle, August 11, 2000.

12   BY MS. McCARTHY:

13   Q.  Do you see that entry, sir?  It is also up on your screen.

14   A.  I see it, yes.

15   Q.  It indicates that an attorney at White & Case is reviewing

16   the new notice on that date, right?  And also speaking with

17   Mike Kerekes and with Charlie Bee, correct?

18   A.  That's what it says, yes.

19            MS. McCARTHY:  If we can go down to an entry on August

20   25, the second one from the bottom.

21   Q.  Do you see there that there is a conference call with A.

22   Dicker and Charlie Bee, and the attorney is Larry Hill?

23   A.  Yes.

24   Q.  So is it fair to say, sir, that shortly after Notice

25   2000-44 issued, you were having conversations with Larry Hill

Damndau1                          Dicker - cross

1    at White & Case?

2    A.   That's what this indicates.

3    Q.   You do recall, do you not, that White & Case was involved

4    in assisting BDO in analyzing the notice, correct?

5    A.   I believe it was, yes.

6         MS. McCARTHY:  We can take that down.

7    Q.   It's correct, is it not, that after Notice 2000-44 issued

8    that BDO stopped offering the Jenkens & Gilchrist spread option

9    to its clients?

10   A.   I don't know what they decided finally to do.

11   Q.   Do you know that there was a discussion internally and with

12   the assistance of outside counsel that it was determined that

13   if the client entered into the transaction before August 11 of

14   2000 then the notice did not apply?

15   A.   I don't recall that analysis.

16   Q.   Do you remember that you sent out guidance to the tax

17   solutions group concerning Notice 2000-44?

18   A.   I don't recall what I sent out.

19   Q.   I would like to show you Government Exhibit 300-13.

20        MS. McCARTHY:  If you could put that on the screen for

21   the witness.

22        THE COURT:  You may.

23        MS. McCARTHY:  If you could just highlight for him the

24   body of that e-mail.

25   BY MS. McCARTHY:

Damndau1                         Dicker - cross

1    Q.  Do you recall this e-mail, sir?

2    A.  I don't recall this specific e-mail.

3    Q.  Is this an e-mail from you to the tax solutions group dated

4    September 7, 2000?

5    A.  Yes.

6             MS. McCARTHY:  We offer Government Exhibit 300-13.

7             MS. DAVIS:  No objection.

8             THE COURT:  Government Exhibit 300-13 is received in

9    evidence.

10            (Government's Exhibit 300-13 received in evidence)

11            MS. McCARTHY:  May we publish?

12            THE COURT:  You may.

13   BY MS. McCARTHY:

14   Q.  Sir, this is an e-mail from you within a few weeks after

15   Notice 2000-44 issued, right?

16   A.  Correct.

17   Q.  It's called list keeping letter, right?

18   A.  Correct.

19   Q.  One of the issues with Notice 2000-44 that you testified to

20   yesterday had to do with list keeping requirements, right?

21   A.  Notice 2000-44 referred to list keeping requirements.

22   Q.  Right.  So you say in your e-mail to the tax solutions

23   group, Attached is a letter which should be sent to all

24   potentially affected clients prior to taking any action which

25   might potentially cause a list keeping requirement, right?

Damndau1                    Dicker - cross

1   A.   That's what it says, yes.

2   Q.   It also says, This letter is meant to confirm the essential

3   points of the conversations which you have already had with

4   your clients on the subject, right?

5   A.   That is what it says, yes.

6   Q.   And Mr. Field is copied on this e-mail, right?

7   A.   Yes.

8   Q.   So your e-mail, your message here contemplates that

9   everyone who has a client involved in the Jenkens spread option

10  is going to talk to their client, correct, about Notice

11  2000-44, right?

12  A.   About listing requirements of 2000-44.

13  Q.   OK.   If we could go to the next page.

14          Do you see, sir, that you have attached a letter that

15  should be sent that's -- this is the letter that is referenced

16  in your e-mail, right?

17  A.   Yes.

18  Q.   It says in this e-mail, Notice is being provided to the

19  client about Notice 2000-44, right?   That there is, effective

20  after August 11, 2000, the IRS promulgated a new rule extending

21  certain list keeping requirements, right?

22  A.   That's the subject of this letter.

23  Q.   Sir, do you know whether this letter was actually sent out

24  to BDO's clients?

25  A.   I don't now recall whether or not it was.

Damndau1                        Dicker – cross

1            MS. McCARTHY:  I'm going to approach with what's

2    marked as Defense Exhibit 283.

3    Q.  Does this appear to be a message to Barbara Taylor from

4    Larry Cohen?

5    A.  It is to Barbara, but I don't know that it's Barbara

6    Taylor.

7    Q.  Who is Larry Cohen?

8    A.  Larry Cohen was a partner in the office of BDO Seidman.

9    Q.  Was he involved in tax solutions matters?

10   A.  Yes.

11   Q.  Do you see the attachment to this document?

12   A.  Yes.

13   Q.  Does it appear to be a letter to a client as you had

14   instructed concerning Notice 2000-44?

15   A.  Yes.

16            MS. McCARTHY:  We offer Defendants' Exhibit 283.

17            MS. DAVIS:  No objection.

18            THE COURT:  Defense Exhibit 283 is received in

19   evidence.

20            MS. McCARTHY:  May we publish?

21            THE COURT:  You may.

22            (Defendants' Exhibit 283 received in evidence)

23            MS. McCARTHY:  If we could just highlight the text of

24   that.  The cover is June 10, 2004.

25   BY MS. McCARTHY:

Damndau1                    Dicker - cross

1   Q.  You are no longer at BDO at this time, right?

2   A.  Correct.

3   Q.  It says, Barbara, I previously sent you electronically a

4   copy of the letter we sent to clients concerning Announcement

5   2002-2.  Attached is a copy of the letter we sent regarding

6   Notice 2000-44.  Right?

7   A.  That's what it says.

8           MS. McCARTHY:  If we could go to the next page.  Just

9   highlight the date all the way down to the end of first

10  paragraph.

11  Q.  The date on that is September 21, 2000, right?

12  A.  Correct.

13  Q.  That's just two weeks after your e-mail of September 7,

14  2000, right?

15  A.  It is just after the previous e-mail.

16  Q.  I'm going to give you 300-13, which is that e-mail.  That

17  was on September 7, 2000, right?

18  A.  Correct.

19  Q.  So two weeks later, 14 days later, on September 21, 2000,

20  this letter is sent to a client by Mr. Dudzinsky.  If you can

21  go to the last page, do you see the signature?

22  A.  I see that, yes.

23  Q.  Mr. Dudzinsky was a member of the tax solutions group,

24  right?

25  A.  Yes.

Damndau1                          Dicker - cross

 1   Q.  This letter -- you have it in your hand -- does appear to

 2   mirror what you sent out on September 7 and instructed members

 3   of the tax solutions group to send to their clients?

 4   A.  Yes.

 5            MS. McCARTHY:  Thank you.  You can take that down.

 6   BY MS. McCARTHY:

 7   Q.  Mr. Dicker, it is correct, is it not, that the portion of

 8   Notice 2000-44 that was so you said shocking to you was the

 9   last part that discussed certain acts of concealment in

10   reporting losses to the IRS, right?

11   A.  Correct.

12   Q.  The specific method of concealment identified in Notice

13   2000-44 was grantor trust netting, right?

14   A.  Correct.

15   Q.  It was in reference specifically to grantor trust netting

16   that the IRS stated that criminal penalties may apply, correct?

17   A.  Correct.

18   Q.  The rest of the notice had to do with potential civil

19   penalties, right?

20   A.  It would help me if I had a copy of the notice.

21            MS. McCARTHY:  Do you have it?  Thank you.

22            I am approaching with Government Exhibit 301-321.

23   Q.  Is that the notice?

24   A.  Yes.

25   Q.  You read the notice to the jury yesterday, do you remember

Damndau1                    Dicker - cross

1   that, large portions of it?

2   A.  I don't recall now.

3   Q.  You don't recall yesterday reading portions of this to the

4   jury, sir?

5   A.  Large portions.

6   Q.  I see.  Do you recall reading portions of it to the jury?

7   A.  I don't recall that I actually read it in my testimony.

8   Q.  We can put that question aside.  The question that is

9   really important at this moment is the only portion of this

10  notice that mentioned potential criminal penalties had to do

11  with grantor trust netting, is that true?

12  A.  Yes.

13  Q.  The reason that you were so personally shaken by that was

14  because you had been deeply involved in advising the tax

15  solution group about grantor trust netting, isn't that right?

16  A.  Correct.

17  Q.  In fact, you and other members of the tax solutions group

18  had advised clients that a grantor trust may be used to net off

19  capital gains and losses, right, so that only a net number is

20  reported on the individual's tax returns, isn't that right?

21  A.  Correct.

22  Q.  You did that in a number of e-mails that were sent out to

23  tax solutions group -- I withdraw that question.

24          You sent out e-mails to the tax solutions group giving

25  that advice, correct?

Damndau1                    Dicker - cross

1    A.   There were certainly e-mails within the group on this

2    subject.

3    Q.   I'm going to show you what's marked as Defense Exhibit 82.

4    Tell me if you recognize this.

5    A.   Yes.

6    Q.   Is that an e-mail from you dated September 8 of 1999 to the

7    opinion committee?

8    A.   Yes.

9              MS. McCARTHY:  We offer Defendant's Exhibit 82.

10             MS. DAVIS:  No objection.

11             THE COURT:  Defense Exhibit 82 is received in

12   evidence.

13             (Defendants' Exhibit 82 received in evidence)

14             MS. McCARTHY:  May we publish?

15             THE COURT:  You may, Ms. McCarthy.

16             MS. McCARTHY:  If you can highlight the entire e-mail.

17   BY MS. McCARTHY:

18   Q.   Mr. Dicker you say to the opinion committee, As you know,

19   we have been suggesting to individuals that a grantor trust may

20   be used to net off capital gains and losses so that only a net

21   number is reported on an individual's tax return.

22             Right?

23   A.   That's what it says, yes.

24   Q.   Then you go on to say, We know that KPMG had been taking

25   this approach, right?

Damndau1                    Dicker - cross

1    A.  Yes.

2    Q.  And KPMG was a major accounting firm, correct?

3    A.  Correct.

4    Q.  However, you go on, Doubts have been expressed as to

5    whether this is correct.

6    A.  That's what it says, yes.

7    Q.  You say, We need to come to our own analyzed view on this

8    point.

9    A.  Yes.

10   Q.  In fact, you attach a note from Dave DiMuzio in which he

11   concludes that the netting is not correct?

12   A.  That's what it says, yes.

13   Q.  Then you go on to say that Mr. DiMuzio's conclusion is not

14   based on any clear authority, right?

15   A.  That's what it says, yes.

16   Q.  So you are saying in this e-mail that there is a question

17   for the opinion committee to consider, whether or not netting

18   should be allowed, correct?

19   A.  Correct.

20   Q.  All right.  So this is you yourself sending out this e-mail

21   to the tax opinion committee, right?

22   A.  Yes.

23   Q.  This was not the end of the discussion, right?

24   A.  Correct.

25   Q.  Do you remember that about a week later you sent out

Damndau1                          Dicker - cross

```
 1   another e-mail to the tax opinion committee on grantor trust
 2   reporting?
 3   A.  I don't remember the timing, but I believe I did send out
 4   another e-mail.
 5   Q.  I'm going to show you what's been marked as Defense Exhibit
 6   83.  Is that the e-mail that you sent out on September 14?
 7   A.  I believe it is, yes.
 8           MS. McCARTHY:  We offer Defendants' Exhibit 83.
 9           MS. DAVIS:  No objection.
10           THE COURT:  Defense Exhibit 83 is received in evidence
11   and you may publish it.
12           MS. McCARTHY:  Thank you.
13           (Defendant's Exhibit 83 received in evidence)
14   BY MS. McCARTHY:
15   Q.  This is on September 14, just less than a week later after
16   your last e-mail, correct?
17   A.  Correct.
18   Q.  And you say, Having considered the responses, the position
19   seems to be clear.  And then you go on to say that the grantor
20   trust may file Form 1041 if it wishes to do so, right?
21   A.  Yes.
22   Q.  It seems to be cut off a little bit on the side there in
23   the text.  So you are giving advice to the tax opinion
24   committee that they may proceed with grantor trust netting,
25   correct?
```

Damndau1                         Dicker - cross

A.   I expressed the view again that we need to finalize this as

soon as possible.

Q.   But one of the things you also indicate in there is that

the trustee should attach a statement to the 1041 and give a

copy of that statement to the grantor, right?

A.   That's what it says, yes.

Q.   That on the individual's Form 1040 on their personal tax

return they would include the information from the K-1 on

Schedule D, right?

A.   That's what it says, yes.

Q.   So you are suggesting that the person on their 1040 include

information about the grantor trust on their personal return,

correct?

A.   Correct.

Q.   So is it fair to say that you were not suggesting to the

tax opinion committee that there should be that active

concealment that the IRS indicated in its notice where there

was absolutely no way for the IRS to tell that the grantor

trust was at issue?

A.   The concept was that the net amount would be put on the

return where it would be difficult for the IRS to identify what

was going on.

Q.   But you were also suggesting that information should be

attached to the personal 1040, correct, about the grantor

trust?

Damndau1                    Dicker - cross

A.  In this note I say they do not have to attach either the

K-1 or the statement of the 1040, but can do so if they wish.

Q.  In next paragraph do you see on the individual's 1040 they

would include the information on Schedule D, right?  They don't

have to attach the statement, right?

A.  They would need to include the net number, but they would

not necessarily have to attach the statement.

Q.  All right.  Mr. Dicker, you and Mr. and Larry Cohen, the

person we just saw a message from, actually continued talking

about grantor trust tax return filings later on, correct?

A.  I don't recall conversations with Larry Cohen.

          MS. McCARTHY:  I'm going to approach with defense

Exhibit 284.

Q.  Does that appear to be a memo to you from Larry Cohen dated

October 14, 1999?

A.  Yes.

Q.  Is this a continuation of the conversation about grantor

trust netting?

A.  Yes.

          MS. McCARTHY:  We offer Defendants' Exhibit 284.

          MS. DAVIS:  No objection.

          THE COURT:  Defense Exhibit 284 is received in

evidence.

          (Defendants' Exhibit 284 received in evidence)

          MS. McCARTHY:  May we publish?

1          THE COURT:  Yes, you may.

2     BY MS. McCARTHY:

3     Q.  Again, Mr. Dicker, this is a memo just to you from

4     Mr. Cohen, correct?

5     A.  Yes.

6     Q.  He appears to be reporting directly to you on the issue of

7     grantor trust netting, right?

8     A.  Correct.

9     Q.  So is it fair to say, Mr. Dicker, that you were the main

10    person who was advising the tax solutions group on the issue of

11    grantor trust netting?

12    A.  Yes.

13    Q.  And then Notice 2000-44 issued, right?

14    A.  Yes.

15    Q.  After that happened, BDO tax solutions group paid very

16    careful attention to that notice, correct?

17    A.  Yes.

18    Q.  You in fact sent an e-mail to the tax solutions group, not

19    just to the tax opinion committee, concerning grantor trust

20    reporting after the notice issued, right?

21    A.  I believe I did, yes.

22    Q.  I'm going to show you Defendants' Exhibit 69.  Is that your

23    e-mail of August 17, 2000 to the tax solutions group?

24    A.  Yes.

25          (Continued on next page)

Damedau2                          Dicker - cross

1   BY MS. MCCARTHY:

2   Q.  Concerning grantor trust netting reporting?

3   A.  Yes.

4           MS. MCCARTHY:  We offer Defendant's Exhibit 69.

5           MS. DAVIS:  No objection.

6           THE COURT:  Defense Exhibit 69 is received in

7   evidence.

8           (Defendant's Exhibit 69 received in evidence)

9           MS. MCCARTHY:  May we publish.

10          THE COURT:  You may.

11  BY MS. MCCARTHY:

12  Q.  So we see it's August 17, 2000, just six days after notice

13  2000-44, right?

14  A.  Correct.

15  Q.  And if we could go to the body of the e-mail.  So you

16  indicate in this e-mail that we have been considering reporting

17  the grantor trust transactions following the issue of notice

18  2000-44 by the IRS.  Right?

19  A.  Yes.

20  Q.  Then you go down the next paragraph, and you say, we have

21  previously reviewed how transactions carried out by grantor

22  trusts might be reported on individuals' tax returns.  Right?

23  A.  Yes.

24  Q.  Our general advice has been that if the grantor trust files

25  its own tax return, then the trust should prepare a statement

Damedau2                          Dicker - cross

1   of the transaction with the -- which the taxpayer should

2   include in their own tax return and attach the statement to the

3   return.

4           Do you see that?

5   A.  Yes.

6   Q.  So does that appear to be a reflection of the evolution of

7   the tax opinion committee's position on grantor trust

8   reporting?

9   A.  Yes.

10  Q.  So it evolved from the August 1999 e-mail we looked at just

11  a few moments ago, right?

12  A.  Yes.

13  Q.  And, in fact, you were saying that the advice has been that

14  the taxpayer should, in fact, attach documentation to the

15  return concerning the grantor trust, right?

16  A.  That's what it says, yes.

17  Q.  And you also then go on to say that this advice has been in

18  accordance with the approach taken in the regulations, right?

19  A.  That's what it says, yes.

20  Q.  And when you talk about regulations, you're talking about

21  IRS regulations, right?

22  A.  Correct.

23  Q.  And then you go on to say, whether or not the IRS position

24  on this is correct, we do not want to provide advice to any

25  client which in any way might remotely expose them or possibly

Damedau2                    Dicker - cross

1   our firm to criminal penalties, right?

2   A.   That's what it says, yes.

3   Q.   Nor do we want clients who have previously filed tax

4   returns, including grantor trust information, to unknowingly

5   have potentially exposed themselves to criminal penalties,

6   right?

7   A.   Correct.

8   Q.   Then there's an action plan, right?  You're telling

9   everybody to go take a look at what clients have done, correct?

10  A.   Yes.

11  Q.   So that we can address the situation appropriately, right?

12  A.   Yes.

13  Q.   Now, isn't it a fact that one of the clients you personally

14  advised engaged in grantor trust netting?

15  A.   I don't recall a specific client.

16  Q.   Do you remember the name Alfano?

17  A.   Yes.

18  Q.   That is a client that you personally dealt with, correct?

19  A.   Correct.

20  Q.   And that was on a nonJenkens transaction, right?

21  A.   Correct.

22  Q.   That was a Presidio deal, right?

23  A.   Correct.

24  Q.   And Brown & Wood was the law firm on the Presidio deals,

25  right?

Damedau2                          Dicker - cross

1   A.  I believe it was, yes.

2   Q.  And do you recall that you -- that that client, in fact,

3   engaged in grantor trust netting?

4   A.  That, I don't recall.

5   Q.  No memory of that?

6   A.  No.

7   Q.  Yet you had a particularly -- withdrawn.

8           You were particularly shocked by notice 2000-44,

9   correct?

10  A.  Yes.

11  Q.  Now, you testified yesterday that you were very distraught

12  after notice 2000-44 was issued, right?

13  A.  I was.

14  Q.  That you said you were just a physical and mental wreck, is

15  that right?

16  A.  I was.

17  Q.  But you were still able to conduct the business of the tax

18  solutions group, isn't that right?

19  A.  I tried.

20  Q.  Well, we just saw an e-mail from you on August 17th, just

21  six days after the notice.  It seemed that you were able to

22  communicate quite well with the tax solutions group, is that

23  right?

24  A.  Yes.

25  Q.  And, in fact, you were able to go on through the month of

Damedau2                      Dicker - cross

1    September in conducting tax solutions business concerning

2    nonJenkens transactions.  Do you recall that?

3    A.  I did do that.

4    Q.  And you sent out e-mails to the tax solutions group and to

5    tax solutions group members about deals involving Gramercy and

6    Bricolage and distressed debt transactions.  Do you remember

7    doing that?

8    A.  I don't recall what I sent out.

9            MS. MCCARTHY:  Your Honor, may I approach with Defense

10   Exhibit 270.

11           THE COURT:  You may.

12   Q.  Does that appear to be an e-mail from you dated

13   September 22, 2000, to Robert Dudzinsky?

14   A.  Yes.

15   Q.  And does that appear to be about a confidentiality

16   agreement concerning a deal with a company called Gramercy?

17   A.  It's to do with Gramercy.

18           MS. MCCARTHY:  We offer Defense Exhibit 270.

19           MS. DAVIS:  No objection.

20           THE COURT:  Defense Exhibit 270 is received.

21           (Defendant's Exhibit 270 received in evidence)

22           MS. MCCARTHY:  May we publish.

23           THE COURT:  You may.

24   BY MS. MCCARTHY:

25   Q.  So on September 22nd you're sending an e-mail to

Damedau2                          Dicker - cross

1   Mr. Dudzinsky, and this has to do with a different transaction.

2   Mr. Cohen has sent a confidentiality agreement to you, right,

3   in the e-mail below?

4   A.  That's what it seems to say, yes.

5   Q.  And you're working on this, and you say I've made some

6   amendments, right?

7   A.  Yes.

8   Q.  You also say you've talked to Scott Univer about this,

9   right?

10  A.  Correct.

11  Q.  And you sent a version to Laura O'Neill and Scott's group

12  for her blessing, right?

13  A.  That's what it says.

14  Q.  Was that a typical thing for you to do with something like

15  a confidentiality agreement, to send it to Scott Univer or

16  someone in Scott Univer's general counsel's office for them to

17  review?

18  A.  Yes.

19  Q.  And so this is over a month after notice 2000-44 issued,

20  right?

21  A.  Correct.

22  Q.  And then do you remember that BDO was involved in a

23  transaction called a distressed debt transaction?

24  A.  I don't recall that at the time.

25  Q.  Well, do you remember sending out something similar on a

Damedau2                         Dicker - cross

1     distressed debt transaction concerning a confidentiality

2     agreement?

3     A.  I don't recall doing that.

4     Q.  I'm going to approach with Defendant's Exhibit 272.  Is

5     that an e-mail from you to the tax solutions group on

6     September 28, 2000?

7     A.  Yes.

8     Q.  And, again, this is over a month or a month and a half

9     after notice 2000-44 issued, right?

10    A.  Correct.

11          MS. MCCARTHY:  We offer Defendant's Exhibit 272.

12          MS. DAVIS:  No objection.

13          THE COURT:  Defense Exhibit 272 is received in

14    evidence.

15          (Defendant's Exhibit 272 received in evidence)

16          MS. MCCARTHY:  May we publish.

17          THE COURT:  You may.

18    BY MS. MCCARTHY:

19    Q.  Mr. Dicker, in this e-mail you are telling the whole tax

20    solutions group that you've sent out a confidentiality

21    agreement to use by a client in respect of the distressed debt

22    deal, and you're attaching three additional versions, right?

23    A.  That's what it says, yes.

24    Q.  And you also indicate at the bottom that you drafted these

25    yourself.  So you copied Laura O'Neill, that attorney from

Damedau2                    Dicker - cross

1    Scott Univer's office, right?

2    A.   Correct.

3    Q.   And she's to -- for her review and approval, right?

4    A.   Correct.

5    Q.   So as of September 28th of 2000, Mr. Dicker, you were still

6    conducting the business of the tax solutions group, is that

7    right?

8    A.   Yes.

9    Q.   We can take that down.

10        Now, you indicated that you resigned from the

11   partnership of BDO, and I believe you said that it was as of

12   October 31st of 2000.  Is that right?

13   A.   That was the legal effective date.

14   Q.   May I have the Elmo, please.  Mr. Univer, I've put up on

15   the screen a calendar, the month of --

16        THE COURT:  Mr. Dicker.

17        MS. MCCARTHY:  I'm having trouble with that, your

18   Honor.  I apologize.

19   Q.   Mr. Dicker, I'm sorry.  I put up on the screen a calendar

20   for the month of October of 2000.  Do you see that?

21   A.   Yes.

22        MS. MCCARTHY:  And it's marked, your Honor, for the

23   record's purposes as Defendant's Exhibit 287.

24   Q.   Do you see -- so on October 31st you indicated you

25   resigned, right?

Damedau2                    Dicker - cross

1    A.  That was the effective date of my resignation.

2    Q.  And you resigned from BDO and the board, right?

3    A.  Yes.

4    Q.  Do you remember when you received your last tax solutions

5    group distribution?

6    A.  I don't recall the exact date.

7    Q.  Do you still have Government Exhibit 301-248 in front of

8    you?

9    A.  Yes.

10   Q.  Can you take a look at the second page, please.  And tell

11   us when you received your last tax solutions profit sharing.

12   A.  It says October 13, 2000.

13   Q.  So that's the last tax solutions group profit sharing.

14           Now, if you can just stay on that document, sir,

15   you'll see that you received profit sharing also on

16   September 5th of 2000, right?

17   A.  Yes.

18   Q.  And that amount was $460,000?

19   A.  That's what it says, yes.

20   Q.  And you received on October 13th of 2000 $325,000, right?

21   A.  That's what it says, yes.

22   Q.  So after notice 2000-44 you received almost $800,000 in

23   profit sharing from tax solutions, right?

24   A.  Correct.

25   Q.  And when is it that you were then appointed as a retired

Damedau2                          Dicker - cross

1    member of the board of directors?

2    A.  I believe in November.

3    Q.  Do you recall the date?

4    A.  I don't recall the exact date.

5    Q.  I'm going to approach with what's been marked Defendant's

6    Exhibit 75 -- well, actually, it's in evidence as Defendant's

7    Exhibit 75.  I'm just going to approach you with it, sir, so we

8    can keep the Elmo going.

9            Does that appear to be a board of directors minutes

10   from November 2nd of 2000?

11   A.  Yes.

12   Q.  And do you see the very first thing on the agenda?

13   A.  Yes.

14   Q.  What does it say about you?

15   A.  It welcomed me as the first retired partner to serve on the

16   board of directors.

17   Q.  And that was on November 2nd of 2000?

18   A.  Correct.

19   Q.  So the day after the 31st of October is November 1st,

20   right?

21   A.  Correct.

22   Q.  And then the next day, two days later, is November 2nd,

23   right?

24   A.  Correct.

25   Q.  So this is the date when you became a member of BDO's

Damedau2                          Dicker - cross

1    board, retired, right?

2    A.   That's correct.

3    Q.   Two days later?

4    A.   Correct.

5    Q.   What were you doing on November 1st?

6    A.   I don't recall.

7    Q.   Well, where was that meeting on November 2nd?

8    A.   Toronto.

9    Q.   Could you have been traveling to Toronto on the 1st?

10   A.   It's possible.

11   Q.   Now, so you were so upset about notice 2000-44, sir, that

12   you had to resign from the firm, isn't that right?

13   A.   Correct.

14   Q.   Yet two days later you rejoined the board of directors,

15   isn't that right?

16   A.   I did.

17   Q.   Now, you received some compensation for being a member of

18   the board of directors, did you not?

19   A.   Correct.

20   Q.   How much did you receive as a retired member of the board

21   of directors?

22   A.   My recollection is that it was $25,000 a year, plus a daily

23   amount for attending, physically attending, the meeting.

24   Q.   Do you recall that that was $2,500 for every meeting day?

25   A.   I don't recall the number.

Damedau2                    Dicker - cross

 1  Q.  Okay.  I'm going to show you what's been marked as

 2  Defendant's Exhibit 55.  Does this appear to be an e-mail

 3  concerning you, an internal BDO e-mail concerning you?

 4  A.  Yes.

 5          MS. MCCARTHY:  We offer Defendant's Exhibit 55.

 6          MS. DAVIS:  No objection.

 7          THE COURT:  Defendant's Exhibit 55 is received in

 8  evidence.

 9          (Defendant's Exhibit 55 received in evidence)

10          MS. MCCARTHY:  If we could switch to the other screen.

11  BY MS. MCCARTHY:

12  Q.  This is a message from Bob Gaida to Judy Geiselhart, right?

13  A.  Correct.

14  Q.  Do you know who Judy Geiselhart was?

15  A.  She was something to do with the administration in I think

16  Grand Rapids office.

17  Q.  And did she deal with human resources issues?

18  A.  I don't recall exactly what she did.

19  Q.  Well, in any event, Mr. Gaida is reporting to

20  Ms. Geiselhart that the board has approved a director

21  compensation for you, right?

22  A.  That's what it says, yes.

23  Q.  And that you will receive $2,500 per meeting, per meeting

24  day, right?

25  A.  Yes.

Damedau2                    Dicker - cross

1   Q.  And $25,000 honorarium for the year, right?

2   A.  Yes.

3   Q.  And how many meetings did you attend every year?

4   A.  There were typically four board meetings a year.  And my

5   recollection is I usually attended three of those meetings

6   physically.

7   Q.  And often those meetings were over two to three days,

8   correct?

9   A.  Several days, yes.

10  Q.  So you could receive $7,500 for just attending the meeting

11  in addition to your $25,000 honorarium, right?

12  A.  If it was a three-day meeting, yes.

13  Q.  And then if you multiply that by three different meetings,

14  you could earn close to 22, $23,000 in addition, right?

15  A.  Correct.

16  Q.  In addition, BDO was paying for your health benefits, isn't

17  that right?

18  A.  Correct.

19  Q.  And that was an important issue for you?

20  A.  Yes.

21  Q.  Now, you thought it was important to leave the partnership

22  and give up your rights to future profits of tax solutions

23  after notice 2000-44, right?

24  A.  I felt that's what I should do, and that's what I did.

25  Q.  And, in fact, it was important to you to get BDO to pay for

Damedau2                        Dicker - cross

1   your health benefits, right?

2   A.  Yes.

3   Q.  And you had earned over $6 million in your time at BDO

4   working on tax solutions, right?

5   A.  Correct.

6   Q.  Do you know how much it would have cost for you to get your

7   own health insurance?

8   A.  No.

9   Q.  Did you investigate that at all?

10  A.  No.

11  Q.  Now, you didn't feel concerned enough, though, to give back

12  all the money you'd earned on tax solutions, right?

13  A.  I did not give back any money in respect of tax solutions.

14  Q.  You didn't tell the board that you wanted to pay it back

15  because you didn't want to have any proceeds of a crime, right?

16  A.  I did not say that.

17  Q.  Not only that, but you continued to receive bonuses after

18  you retired, didn't you?

19  A.  Yes.

20  Q.  You received Gordon Foods bonuses after you retired, right?

21  A.  Correct.

22  Q.  And you did receive those through March of 2003, isn't that

23  right?

24  A.  I don't recall the exact date, but around then.

25  Q.  If you could look at Government Exhibit 301-248, which is

Damedau2                         Dicker - cross

1   still in front of you, and look at the final entry.

2   A.  I see that, yes.

3   Q.  The last time you received a bonus from Gordon Foods was on

4   March 4th of 2003, correct?

5   A.  That's what it says, yes.

6           MS. MCCARTHY:  Your Honor, I see the time.  If you'd

7   like to take a break?

8           THE COURT:  That's fine.  Members of the jury, we're

9   going to take a short recess.

10          Keep an open mind.  Don't discuss the case.

11          Please recess the jury.

12          (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

Damedau2                         Dicker - cross

```
 1              (In open court; jury not present)
 2              THE COURT:  Mr. Dicker, you may step down, sir, very
 3    briefly.
 4              We'll reconvene shortly.
 5              MR. OKULA:  Judge, I'm sorry.
 6              THE COURT:  Go ahead.  Have a seat.
 7              MR. OKULA:  Judge, two quick points.
 8              Counsel for Mr. Daugerdas had promised last night that
 9    they were going to let us know first thing this morning about
10    what his druthers are.  And we hadn't learned in that regard,
11    so I would ask that we find out the answer to that question.
12              THE COURT:  Fine.  What's the answer?
13              MR. LINDER:  The answer is it's Mr. Daugerdas'
14    intention to testify, your Honor.
15              THE COURT:  All right.  And what's the answer with
16    respect to Mr. Field?
17              MS. MCCARTHY:  Mr. Field does not intend to testify,
18    your Honor.
19              THE COURT:  All right.  Mr. Field, you understand,
20    sir, that you have the right to testify or not to testify.  Is
21    it your decision not to testify in this case?
22              DEFENDANT FIELD:  It is my decision, your Honor.
23              THE COURT:  Very well.  And you've taken that decision
24    after conferring with your counsel?
25              DEFENDANT FIELD:  I have conferred numerous times with
```

Damedau2                    Dicker - cross

counsel.

            THE COURT:  Fine.  Thank you, sir.

            MR. OKULA:  The second issue, your Honor, deals with

an issue related to Dr. DeRosa.

            We had notified defense counsel last night that there

had been a proceeding with respect to the Financial Futures

Association, which is a nongovernmental regulatory body

particular to the derivatives industry, where there had been a

complaint filed against Dr. DeRosa for failure timely to file

by a couple of weeks, and maybe a month on a couple of

occasions, of some quarterly reports.

            We didn't think that this issue rose to the level of

Giglio.  We turned it over nonetheless, and we'd ask counsel

for Mr. Daugerdas and Mr. Field whether they intend to cross on

it.  And I understand that Mr. Mazurek intends to try to cross

on it.

            We would suggest, your Honor, that this is not dealing

with any violation of the law.  It's a private industry or

regulation dealing with their timely filings.  And because the

courts have held even in the context of a tax return, where

there's an obligation to file a return, that the failure to

file a timely tax return does not go to truthfulness; that

here, where it's not even a violation of the law, that this

isn't something that falls within 608(b) and is an appropriate

matter of cross-examination, your Honor.

Damedau2                          Dicker - cross

1              MR. MAZUREK:  Judge, my response to that is I don't

2       know whether I'm going to use this or not.  I have the

3       information.  Clearly if the testimony by Mr. DeRosa is such

4       that he states something about the fact that he always files

5       things timely, then obviously I would be able to say that

6       that's not true.  So, I mean, I just reserve the right to use

7       this material that has been made available to me by the

8       government.

9              THE COURT:  Right.  We'll cross that bridge when we

10      come to it.  All right?

11             MR. MAZUREK:  Now, also, Judge, having reviewed again

12      last evening the limiting instructions relating to Mr. DeRosa,

13      there are just a couple of minor word changes that I would

14      request.  I'll share them with the government now so that they

15      can review them and then we can present them at the appropriate

16      time.

17             THE COURT:  That's fine.  All right.  And I remind the

18      government that it's not my practice to qualify an expert.  I

19      don't give a product endorsement to a jury.  But I will permit

20      the witness to offer opinions based upon their expertise that

21      it might be helpful to the jury under Rule 702, right?  So no

22      counsel should ask me to qualify their expert, all right?

23             MR. OKULA:  Very well.

24             THE COURT:  We'll take a short recess.

25             (Recess)

Damedau2                          Dicker - cross

            THE COURT:  Let's bring in the jury.

            (In open court; jury present)

            THE COURT:  Members of the jury, we will resume with
Ms. McCarthy's continued cross-examination of Mr. Dicker.

            You may proceed.

            MS. MCCARTHY:  Thank you.

BY MS. MCCARTHY:

Q.  So, sir, we've established that you, on November 2nd, were
appointed as a retired member of the board of directors of BDO,
correct?

A.  Correct.

Q.  And as a member of -- even as a retired member of the board
of directors, you had knowledge about all crucial aspects of
BDO's business, correct?

A.  I knew of those issues that were presented at the board.

Q.  Right.  We talked about this yesterday, about the sorts of
issues that were presented to the board of directors, right?

A.  Yes.

Q.  And the same sorts of issues of importance to the company
were presented to the board of directors, and you were a
retired member of the board, correct?

A.  Correct.

Q.  And you never raised any concerns with the board of
directors about the tax solutions group, did you?

A.  I did not.

Damedau2                          Dicker - cross

1    Q.  Now, in May of 2003 your appointment to the board of

2    directors was renewed, was it not?

3    A.  It was renewed.  I don't recall if that was the exact time.

4    Q.  All right.  I'm going to show you Defense Exhibit 96.  Are

5    those board minutes from May 13th to 15th, 2003?

6    A.  Yes.

7    Q.  And were you present at this meeting?

8    A.  Yes.

9              MS. MCCARTHY:  We offer Defense Exhibit 96.

10             MS. DAVIS:  No objection.

11             THE COURT:  Defense Exhibit 96 is received in

12   evidence.

13             (Defendant's Exhibit 96 received in evidence)

14             MS. MCCARTHY:  And if we could publish, your Honor.

15             THE COURT:  You may.

16   BY MS. MCCARTHY:

17   Q.  And you'll see, Mr. Dicker, that this is one of those

18   three-day meetings, right, the front page indicates?

19   A.  Yes.

20   Q.  And this took place in Chicago, right?

21   A.  Yes.

22   Q.  So you had to fly there from New Jersey, right?

23   A.  Yes.

24   Q.  And if we can go to the second page, the last entry, and

25   you'll see the heading, reappointment of director, right?

Damedau2                      Dicker - cross

1   A.  Yes.

2   Q.  It indicates that the board of directors approved the

3   reappointment of Adrian Dicker, retired partner, as a member of

4   the board of directors.

5   A.  Yes.

6   Q.  Is that right?  Now, you weren't required to accept your

7   reappointment to the board, were you?

8   A.  No.

9   Q.  You could have said I'm really not interested, I don't want

10  to be a member of the board, right?

11  A.  Correct.

12  Q.  But you were happy to continue as a board member, right?

13  A.  I continued, yes.

14  Q.  And is it fair to say that as a member of the board in your

15  retired capacity, you participated in the overall strategic

16  control of BDO?

17  A.  That was the role of the board of directors.

18  Q.  And that you as a retired member of the board, just as a

19  regular member, had a responsibility to all of the partners to

20  look after the best interests of BDO, isn't that right?

21  A.  Correct.

22  Q.  You can take that down.

23          Isn't it true that after notice 2000-44 was issued,

24  and after you resigned from the BDO partnership, that you filed

25  tax returns reporting losses from tax shelters on your own

Damedau2                          Dicker - cross

1    returns?

2    A.   I did.

3    Q.   And you did that in two separate tax years, correct?

4    A.   For the tax year 2000 and for the tax year 2001.

5    Q.   And the tax year 2000 return was filed in October of 2001,

6    correct?

7    A.   I believe it was, yes.

8    Q.   So that's a year after you resigned, right?

9    A.   Yes.

10   Q.   And the 2001 tax return was filed in the following October,

11   2002, correct?

12   A.   I believe it was, yes.

13   Q.   And those returns were filed jointly with your wife,

14   Suzanne, correct?

15   A.   Correct.

16   Q.   Now, in October of 2003, you resigned from the board of

17   directors, correct?

18   A.   Yes.

19   Q.   And that was the same day that Mr. Field was -- stepped

20   down as CEO, correct?

21   A.   I don't know if it's the same day, but around that time.

22   Q.   All right.  And that Mr. Field stepped down as CEO after a

23   partners meeting in Florida, correct?

24   A.   There was a partners meeting, but I don't recall whether it

25   was Florida.

Damedau2                        Dicker - cross

1   Q.  Okay.  Well, it was around the time you resigned from the

2   board, correct?

3   A.  Correct.

4   Q.  And under your resignation you actually had a written

5   agreement with BDO concerning your resignation, correct?

6   A.  Correct.

7   Q.  And Mr. Field assisted in negotiating that agreement for

8   you, didn't he?

9   A.  I believe he did, yes.

10  Q.  And under that agreement BDO agreed to pay you $25,000 per

11  year for the next three years, correct?

12  A.  Correct.

13  Q.  And they agreed to pay your attorneys fees for any actions

14  arising from your services as partner, right?

15  A.  It would help me to see the document.

16  Q.  All right.  I will show you Defense Exhibit 54.  Is there

17  an indemnification provision?  Does that refresh your

18  recollection?

19  A.  Yes.

20  Q.  And so BDO agreed to pay your attorneys fees, correct, out

21  of any issues arising from your employment at BDO, correct?

22  A.  I would expect that the indemnification would cover such

23  fees.

24  Q.  But that's what indemnification means, right, that it would

25  be repaid for expenses, correct?

Damedau2                    Dicker - cross

1    A.   That's the concept, yes.

2    Q.   Now, BDO, in fact, in your view, violated that agreement,

3    correct?

4    A.   Correct.

5    Q.   And they did not pay your attorneys fees; they stopped

6    paying any attorneys fees for you, correct?

7    A.   They stopped.

8    Q.   All right.  And that resulted in your teaming up with

9    Charlie Bee to bring an arbitration against BDO in 2008, is

10   that right?

11   A.   Correct.

12   Q.   Now, if we could have the Elmo, please.

13        Do you remember this?  This is Government

14   Exhibit 301-294, right?

15   A.   It looks familiar.

16   Q.   Do you remember seeing it yesterday, sir?

17   A.   Yes, I think I do.

18   Q.   And you remember testifying about it, right?

19   A.   I believe I did.

20   Q.   And this is a timeline that you testified about that shows

21   Denis Field's -- basically in gross terms, his tenure at BDO,

22   correct?

23   A.   It's a summary timeline, yes.

24   Q.   Now, you, we've established, starting in 1997 all the way

25   until you left in 2000, were handling tax products for BDO,

Damedau2                         Dicker - cross

1    correct?

2    A.   Correct.

3    Q.   So we can take the timeline here for you.  It goes almost

4    to the end of 2000, right?

5    A.   Correct.

6    Q.   That's tax products, right?  Right?

7    A.   Correct.

8    Q.   And you were appointed to the board of directors, you

9    testified, in late 1998, correct?

10   A.   Correct.

11   Q.   So if we can put something there, the board, right?

12   A.   Okay.

13   Q.   And then for -- we have a day in 2000 when you're not

14   related to BDO, right?  We have November 1, 2000; not on BDO

15   board, right?

16   A.   That's correct.

17   Q.   And then the very next day you're appointed retired member

18   of the board, right?

19   A.   Correct.

20   Q.   And then you continue on the board all the way until

21   October 2003, right?

22   A.   Correct.

23   Q.   And it's October 19, right, 2003?

24   A.   I don't remember the exact date.

25   Q.   Say October 2003.  And you receive your last bonus payment

Damedau2                        Dicker - cross

1    for Gordon Foods in March of 2003, right?

2    A.  Correct.

3    Q.  So you're still receiving bonus payments until March of

4    '03, correct?

5    A.  Correct.

6    Q.  And in addition, after you left in 2001, you also received

7    those Red Wagon bonuses, correct?

8    A.  May I review the --

9    Q.  301-248.  Your last bonus from Red Wagon was on January 12,

10   2001, correct?

11   A.  Correct.

12   Q.  So this is after you leave.  Does that fairly reflect your

13   time at BDO, starting in 1997?

14   A.  Yes.

15        MS. MCCARTHY:  We'll mark this, your Honor, as AB1.

16   Q.  Now, Mr. Dicker, your tax returns were audited in 2007, is

17   that correct?

18   A.  I don't recall if they were audited.

19   Q.  And, well, your lawyer was in communication with the IRS

20   concerning your tax returns, correct?  Laura Gavioli is your

21   attorney, correct?

22   A.  That's my recollection, yes.

23   Q.  And I believe you testified on direct examination that you

24   entered into a closing agreement with the IRS, isn't that

25   right?

Damedau2                          Dicker - cross

1    A.   Yes.

2    Q.   And usually a closing agreement is entered into to close an

3    audit, is it not?

4    A.   I'm not sure if that's the case, but I entered into a

5    closing agreement.

6    Q.   And do you remember when you entered into that closing

7    agreement?

8    A.   I don't remember the exact date.

9    Q.   If you were to see a copy of that, would that refresh your

10   memory?

11   A.   It may do.

12   Q.   Let's give it a try.  I'm going to show you Government

13   Exhibit 1002-47.  I just ask you to take a look at this and

14   tell me if this refreshes your recollection as to when you

15   entered into the closing agreement with the IRS.

16   A.   It shows the date as being in November 2007.

17   Q.   All right.  So you closed -- you settled with the IRS in

18   November of 2007, right?  That's what you just said?

19   A.   Yes.  Yes.

20   Q.   And isn't it true that Laura Gavioli, the same attorney who

21   represents you right now, sent a letter to the IRS with that

22   signed agreement in November of 2007?  Do you remember that?

23   A.   I believe she sent a letter.  I don't know whether it

24   included this agreement.

25   Q.   All right.  I'm going to show you Defendant's Exhibit 91.

Damedau2                        Dicker - cross

1   Does that appear to be a letter from Laura Gavioli to Agent Tim

2   Feldman regarding the Dicker closing agreement for Mercy Global

3   Recovery Fund?

4   A.  Yes.

5   Q.  And do you recognize this letter?

6   A.  It looks familiar to me.

7   Q.  Well, you're copied on it, correct, sir?

8   A.  Correct.

9   Q.  You and your wife, right?

10  A.  Correct.

11          MS. MCCARTHY:  We offer Defendant's Exhibit 91.

12          MS. DAVIS:  No objection.

13          THE COURT:  Defense Exhibit 91 is received in

14  evidence.

15          (Defendant's Exhibit 91 received in evidence)

16          MS. MCCARTHY:  May we publish?

17          THE COURT:  You may.

18  BY MS. MCCARTHY:

19  Q.  So we've established this is a letter sent on your behalf

20  by your attorney who presently represents you, right?

21  A.  Correct.

22  Q.  On November 20th of 2007.  And she indicates -- if you just

23  highlight the first and second paragraphs.  She says,

24  Ms. Gavioli writes she's enclosing the 906 closing agreement

25  for you and your wife, correct?

Damedau2                         Dicker - cross

1   A.  Yes.

2   Q.  And it goes on to say, Mr. and Mrs. Dicker's signatures on

3   the closing agreement should not be construed as an admission

4   of any kind about the merits of the transactions involved, the

5   actions at BDO Seidman, its partners or its employees or the

6   actions of Mr. and Mrs. Dicker themselves, right?

7   A.  That's what it says, yes.

8   Q.  And it also goes on to say you are entering into this

9   closing agreement solely to avoid the cost of litigating this

10  matter.  Is that right?

11  A.  That's what it says, yes.

12  Q.  And that was true, correct?

13  A.  We did not wish to incur costs in litigating the matter.

14  Q.  You also did not wish to concede that there was any problem

15  with the transactions you had entered into on your tax returns,

16  correct, the 2000 -- 2001 and 2002?

17  A.  We made no concession as to the merits of the transaction.

18  Q.  And another person copied on this letter is Jim Wing, isn't

19  that right?

20  A.  Yes.

21  Q.  And Jim Wing was representing you and Charlie Bee in that

22  joint arbitration against BDO, isn't that right?

23  A.  Correct.

24  Q.  Now, Mr. Dicker, you testified a bit about your

25  relationship with Charlie Bee.  I'd like to ask you a few

Damedau2                    Dicker - cross

1    questions about that.

2            Mr. Bee moved to Florida at some point, didn't he?

3    A.  He did.

4    Q.  Do you recall when that was?

5    A.  No.

6    Q.  And when he moved to Florida, you were living in

7    New Jersey, correct?

8    A.  Correct.

9    Q.  And you visited him in Florida, isn't that right?

10   A.  I did, yes.

11   Q.  How many times did you do that?

12   A.  Two or three times.  I don't know the exact number.

13   Q.  And did you go down there by yourself or with your family?

14   A.  By myself.

15   Q.  And did you go down there just to meet, just to spend time

16   with Mr. Bee?

17   A.  Yes, that's what -- to spend time with Charlie.

18   Q.  And how long were those visits with him?

19   A.  Not long.  A few days.

20   Q.  And would you stay at his home?

21   A.  Yes.

22   Q.  And was he married at that time?

23   A.  Yes.

24   Q.  To Nancy Medina?

25   A.  To Nancy, yes.

Damedau2                          Dicker - cross

1   Q.  And she had previously worked at BDO, correct?

2   A.  Correct.

3   Q.  And you also were golfing friends with Mr. Bee, right?  You

4   liked to golf?

5   A.  Yes.

6   Q.  And did you play golf with him fairly often?

7   A.  Not often, but we played golf.

8   Q.  And so would it often be when you played golf with him,

9   would it just be the two of you?

10  A.  Yes.

11  Q.  So is it fair to say that Mr. Bee was a very good friend of

12  yours?

13  A.  He was a good friend of mine, yes.

14  Q.  You used the term "was."  When did the friendship -- when

15  did you stop having a relationship with Mr. Bee?

16  A.  As soon as I found out that the government wanted to

17  interview me.  My attorney told me there was no --

18  Q.  Don't tell us what your attorney told you.

19          So after the government decided to interview you in

20  early '09, you stopped being friendly with Mr. Bee?

21  A.  I believe it was towards the end of 2008 that I was

22  informed the government wished to interview me.

23  Q.  Okay.  And so what did you do as a result of that?

24  A.  I no longer communicated with him.

25  Q.  So when is the last time that you spoke with Charlie Bee?

Damedau2                    Dicker - cross

1    A.  Probably the end of the arbitration in 2008.

2    Q.  Mr. Bee was a very trusted friend, isn't that right?

3    A.  He was a good friend.

4    Q.  And, in fact, in 2001 Mr. Bee was the trustee of both a

5    trust in your name and a trust in your wife's name, isn't that

6    right?

7    A.  That's right.

8    Q.  And he became that trustee, and that was after notice

9    2000-44 issued, correct?

10   A.  Correct.

11   Q.  And, Mr. Dicker, are you aware that Mr. Bee sent his

12   lawyers in to meet with the government the day after you

13   entered your guilty plea?

14   A.  No.

15   Q.  Now, Mr. Dicker, you entered into a cooperation agreement

16   with the government in March of 2009, correct?

17   A.  As part of a group plea agreement, correct.

18   Q.  You pled guilty pursuant to the terms of a cooperation

19   agreement, correct?

20   A.  I thought of it in terms of the plea agreement, but if you

21   call it a cooperation agreement, then it's further to that

22   agreement.

23   Q.  Well, we can call it a plea agreement.  Under the terms of

24   the plea agreement, you're required to cooperate with the

25   government, correct?

Damedau2                          Dicker - cross

1    A.   Correct.

2    Q.   And that agreement is a deal between you and the

3    government, isn't that right?

4    A.   It's an agreement between myself and the government.

5    Q.   And you've testified that you pled guilty to two counts,

6    correct?

7    A.   Correct.

8    Q.   And one count was a conspiracy count, correct?

9    A.   Correct.

10   Q.   And the second count was a tax evasion count with respect

11   to a particular BDO client, right?

12   A.   Correct.

13   Q.   And based upon your guilty plea, you face ten years in

14   jail, is that right?

15   A.   Correct.

16   Q.   And as we've established, the government has agreed not to

17   prosecute you with any crimes related to your personal tax

18   returns, correct?

19   A.   If I comply with the terms of the plea agreement.

20   Q.   As it stands right now, you face ten years in jail,

21   correct?

22   A.   Correct.

23   Q.   And the government has not required you to forfeit any of

24   the money that you earned at BDO, isn't that right?

25   A.   Correct.

Damedau2                          Dicker - cross

1    Q.  And it is correct, is it not, that you earned in the tax

2    solutions group, profit sharing alone, over 6, almost

3    $7 million; $6.7 million?

4    A.  An amount of that kind, yes.

5    Q.  And that in addition to that, you had partner compensation

6    that exceeded -- withdrawn.

7            You had an additional partner compensation, correct?

8    A.  Correct.

9    Q.  And do you know how much total you earned from BDO in the

10   time that you were working there?

11   A.  I think in the region of $9 million.

12   Q.  And you haven't had to give a penny of that money back as

13   you sit there, isn't that right?

14   A.  Not yet.

15   Q.  Well, your agreement does provide for restitution, right?

16   A.  Correct.

17   Q.  And restitution will be determined by your sentencing

18   judge, correct?

19   A.  Correct.

20   Q.  You have no idea as you sit there whether, in fact, you'll

21   be required to pay any restitution, isn't that right?

22   A.  I will have to wait for my sentencing to find out.

23   Q.  Right.  Now, is it fair to say that the most important

24   thing in the world for you right now is to avoid going to

25   prison?

Damedau2                    Dicker - cross

1  A.  I would say the most important thing for me is my family.

2  Q.  And to be able to see your family, correct?

3  A.  I would very much like to be able to see my family.

4  Q.  You would rather not spend ten years in prison, isn't that

5  right, Mr. Dicker?

6  A.  That's correct.

7  Q.  And your deal with the government gives you the chance to

8  avoid a jail sentence, doesn't it?

9  A.  In theory.  It's possible.

10 Q.  You could get as low as probation, isn't that right?

11 A.  I could hope for that.

12 Q.  And your best chance of not going to jail is if the

13 government writes a letter for you called a 5K letter, isn't

14 that right?

15 A.  I believe that's correct.

16 Q.  And 5K refers to a provision under the sentencing

17 guidelines, right?

18 A.  I think that's right.

19 Q.  Your attorney explained the sentencing guidelines to you,

20 didn't he?

21 A.  Yes.

22 Q.  And the government can write a letter to the Court advising

23 the Court of the extent of your cooperation in the

24 investigation and prosecution of other persons, correct?

25 A.  Correct.

Damedau2                         Dicker - cross

1   Q.   And, Mr. Dicker, you do understand that the government in

2   that letter will describe to the Court not only the extent of

3   your cooperation before trial, but also the fact that you

4   testified?

5   A.   I don't know what the government includes in such a letter.

6   Q.   Would you expect that the government would let your

7   sentencing judge know that you testified?

8   A.   I would hope so.

9   Q.   And is it true, Mr. Dicker, is it your understanding that

10  you will only get that 5K letter if you provide cooperation

11  against another person?

12  A.   I believe that letter is written if I provide substantial

13  assistance.  And I would imagine that it included cooperation

14  against another person.

15  Q.   And for you, that other person is Denis Field, isn't that

16  right?

17  A.   He is the defendant in this case in which I'm testifying.

18             MS. MCCARTHY:  I have nothing further, your Honor.

19             THE COURT:  Cross-examination, Mr. Linder?

20             MR. LINDER:  Yes.  Thank you, Judge.

21  CROSS EXAMINATION

22  BY MR. LINDER:

23  Q.   Mr. Dicker, good afternoon.  My name is Brian Linder.  I

24  represent Paul Daugerdas.

25             Sir, you and I have never met or spoken, correct?

Damedau2                          Dicker - cross

1    A.  Correct.

2    Q.  Now, there's been a lot of testimony both today and

3    yesterday about notice 2000-44, right?

4    A.  Yes.

5    Q.  And it was just a few issues I want to clarify with you.

6             First of all, you understand, sir, that the IRS

7    notices generally, and notice 2000-44 in particular, are

8    essentially state what the IRS' position is with respect of

9    certain aspects of the tax law, right?

10   A.  Yes.

11   Q.  And it's not the same thing as a statute or regulation or

12   even a revenue ruling, right?

13   A.  Correct.

14   Q.  And what we mean by that is it's not something that is

15   legal authority, correct?

16   A.  It's a statement of the IRS position.

17   Q.  Would you agree with me, sir, that it's not legal

18   authority, though?

19   A.  I agree.

20   Q.  Now, notice 2000-44 -- by the way, you may want to refer to

21   it during the course of your testimony.  I don't know if you

22   have it.  It's Government Exhibit 301-321.  Do you have that?

23            Let me make it easier for you.  Here you go.

24   A.  Thank you.

25   Q.  Now, the title of notice 2000-44 is tax avoidance using

Damedau2                          Dicker - cross

1   artificially high basis, right?

2   A.   Correct.

3   Q.   And you understand, sir, that tax avoidance is a term of

4   art in the tax world, so to speak; it's distinct from tax

5   evasion, right?

6   A.   I believe they're different concepts.

7   Q.   So in other words, tax avoidance is something which is

8   generally perceived to be legal, whereas tax evasion is

9   generally something that's perceived to be illegal, correct?

10  A.   That's the general conception.

11  Q.   Okay.  And am I correct, sir, that there are essentially,

12  with respect to this particular IRS notice, there are three

13  components to the notice, right?

14  A.   Correct.

15  Q.   And the first component is a description of transactions

16  that the IRS believes various individuals, entities are

17  engaging in that it believes the taxpayer would not be entitled

18  to the tax benefits, right?

19  A.   Correct.

20  Q.   And the description is there are several transactions that

21  are described, correct?

22  A.   Correct.

23  Q.   And one of the transactions that is described is generally

24  similar to the Jenkens & Gilchrist short option strategy,

25  right?

Damedau2                          Dicker - cross

1    A.  Correct.

2    Q.  And the Jenkens & Gilchrist short option strategy is not

3    mentioned specifically by name, correct?

4    A.  Correct.

5    Q.  In other words, what the IRS notice is relating to are

6    transactions of a general nature that are substantially similar

7    to those transactions, right?

8    A.  Correct.

9    Q.  And the IRS basically does a legal analysis of the

10   transaction, right?

11   A.  It sets out some legal analysis, yes.

12   Q.  And it sets out legal analysis, and ultimately the IRS

13   concludes that it believes that the taxpayer who engages in

14   these transactions is not entitled to the tax benefits, right?

15   A.  That's the IRS' view.

16   Q.  And it says that they will disallow the tax deductions,

17   right?

18   A.  Correct.

19   Q.  And it says that it may impose penalties for those

20   taxpayers who engage in those transactions, right?

21   A.  It says that, yes.

22   Q.  Well, and perhaps let me rephrase that.  What it says is

23   that it would seek to impose penalties, right?

24   A.  It says appropriate penalties may be imposed on

25   participants.

Damedau2                          Dicker – cross

1    Q.  Right.  And ultimately if a taxpayer decided, for example,

2    to challenge the IRS, it would be up to the Court to decide

3    whether or not penalties would be imposed, correct?

4    A.  The court is where the challenge is determined.

5    Q.  Now, the transaction -- would you agree with me, sir, that

6    the short option strategy or the spread transaction, which is

7    the way that you've sometimes referred to it, is described in

8    some detail in the notice?

9    A.  There's a paragraph on the transaction -- type of

10   transaction.

11   Q.  And the notice describes the transaction, it describes

12   essentially the flow, the steps of how the transaction works,

13   right?

14   A.  Yes.

15   Q.  Now, this notice was issued in approximately August of

16   2000, right?

17   A.  Correct.

18   Q.  And you're aware that Jenkens & Gilchrist implemented the

19   short option strategy in the latter part of 1999, right?

20   A.  I believe that's correct, yes.

21   Q.  You recall that, in fact, the BDO tax opinion committee was

22   reviewing model tax opinions for the short option strategy in

23   November of 1999, right?

24   A.  BDO reviewed model opinions around that time.

25   Q.  So is it fair to say that the 1999 tax year would be the

Damedau2                          Dicker - cross

1    first year that the Jenkens & Gilchrist tax shelters --

2    withdrawn.

3             1999 would be the first year that the Jenkens &

4    Gilchrist short option strategy was implemented, right?

5    A.   Correct.

6    Q.   And so those transactions would first be reported on tax

7    returns filed in the year 2000, right?

8    A.   Correct.

9    Q.   And am I correct, sir, that it's possible with extensions

10   that there may have been transactions or individuals who

11   engaged in Jenkens & Gilchrist short option transactions in the

12   year 1999 and hadn't even yet filed their tax returns by the

13   time notice 2000-44 was issued?

14   A.   That was possible, yes.

15   Q.   And so would you agree with me, sir, that notwithstanding

16   the fact that at least in some cases the tax returns hadn't

17   even been filed yet, the IRS is issuing a position paper which

18   essentially describes these transactions in some detail?

19             MS. DAVIS:  Objection.

20             THE COURT:  Overruled.

21   A.   Could you repeat the question for me, please.

22   Q.   Certainly.  Would you agree with me, sir, that

23   notwithstanding the fact that certain Jenkens & Gilchrist

24   taxpayers who engaged in transactions in 1999 may not have even

25   filed their tax returns in the year 2000, that IRS notice

Damedau2                        Dicker - cross

1    2000-44 describes the transaction in some detail?

2    A.   At the time it was issued, it described the transaction.

3    And it is possible that taxpayers had not filed their tax

4    returns in respect to such a transaction.

5    Q.   So would you agree with me, sir, that the IRS didn't seem

6    to have any problem understanding how the transaction worked?

7              MS. DAVIS:  Objection.

8              THE COURT:  Sustained.

9    Q.   Now, the penalties that are being discussed here with

10   respect to these transactions are civil penalties, right?

11   A.   The paragraph describes appropriate penalties may be

12   imposed on participants, deals with civil penalties that -- I

13   believe.

14   Q.   The second component of the notice is the listing

15   requirements, right?  That's the --

16   A.   Correct.

17   Q.   And specifically, what's referred to there is the fact that

18   the IRS is announcing in this notice that there are certain

19   temporary regulations which are going to require various

20   entities to maintain lists of individuals who engage in these

21   transactions, right?

22   A.   The IRS wanted lists kept of these kinds of transactions.

23   Q.   And the third aspect of this transaction, of this notice,

24   relates to what we've been referring to as the grantor trust

25   netting issue, right?

Damedau2                        Dicker - cross

1    A.  Correct.

2    Q.  And that's the only place in the notice in which the IRS

3    notice refers to potential criminal penalties, correct?

4    A.  Correct.

5    Q.  Now, the IRS isn't saying in this notice that grantor

6    trusts are illegal, right?

7    A.  It's not saying that grantor trusts themselves are illegal.

8    It's how they might be used might be illegal.

9    Q.  That's right.  So in other words, it's just a reporting

10   technique which, in fact, you were familiar with, that the IRS

11   is critical of in a very severe way, right?

12   A.  They were very critical of it, yes.

13   Q.  And so critical of it that they said that there could be

14   the possibility of imposition of criminal penalties, right?

15   A.  Correct.

16   Q.  Now, the grantor trust netting issue is an issue, as

17   Ms. McCarthy discussed with you, that you played a central role

18   in at BDO, right?

19   A.  Correct.

20   Q.  Do you recall, sir, that, in fact, you learned about the

21   grantor trust netting issue from John Larson of KPMG?

22   A.  That's my recollection.  That's the way I learned of the

23   concept.

24   Q.  And that was in approximately 1997 or 1998 when you first

25   learned of it?

Damedau2                    Dicker - cross

1   A.  Around that time.

2   Q.  Now, you also testified about the Jenkens & Gilchrist short

3   sale transaction, right?

4   A.  Yes.

5   Q.  And I think you said, by the way, that you met

6   Mr. Daugerdas one time, I think you said, for about three

7   minutes or so?

8   A.  That's my recollection.

9   Q.  Am I correct, sir, that you've had no involvement with

10  presentations to Jenkens & Gilchrist clients?

11  A.  I don't recall making any presentations to clients who were

12  Jenkens & Gilchrist clients at the time.

13  Q.  And, in fact, sir, you don't recall ever having a

14  conversation yourself with someone you knew to be a Jenkens &

15  Gilchrist client, right?

16  A.  I don't recall such a conversation.

17  Q.  Now, do you recall in 1998 a presentation by Mr. Daugerdas

18  to various people at BDO regarding the treasury short sale

19  transaction?

20  A.  I don't recall that presentation.

21  Q.  Do you recall how you first learned of the treasury short

22  sale transaction?

23  A.  It was through a contact that Bob Greisman had with

24  Mr. Daugerdas.

25  Q.  And, sir, do you recall being on a conference call at which

1    Mr. Daugerdas made a presentation to various people at BDO

2    regarding the treasury short sale transaction?

3    A.  I don't recall that conference call.

4    Q.  And this would have been around 1998, is that correct?

5    A.  I don't recall.

6    Q.  Well, do you recall first learning about the treasury short

7    sale in 1998?

8    A.  Yes, through Bob Greisman.

9    Q.  Do you recall reviewing any materials relating to the

10   treasury short sale in 1998 before the transaction was approved

11   by BDO?

12   A.  I can't recall what material I reviewed.

13   Q.  Do you recall reviewing a model opinion letter?

14   A.  I can't now recall what I reviewed.

15   Q.  Do you think you reviewed anything in 1998 regarding the

16   treasury short sale?

17   A.  I believe I did.  I just can't recall what.

18   Q.  Then you will agree with me, sir, that certainly other

19   people at BDO reviewed materials relating to the treasury short

20   sale, correct?

21   A.  I believe there would have been material we reviewed, but I

22   can't remember what it was.

23   Q.  And do you recall an article in Tax Notes by a woman by the

24   name of Alice Welt Cunningham?

25   A.  No.

Damedau2                     Dicker - cross

1   Q.  That's not something that you've ever been familiar with?

2   A.  It doesn't mean anything to me.

3   Q.  Do you know what Tax Notes is, sir?

4   A.  I believe it was some kind of literature issued setting out

5   current developments in taxation.

6   Q.  And you would keep abreast from time to time on certain

7   developments in taxation, right?

8   A.  Yes.

9   Q.  Do you recall when you learned about the treasury short

10  sale, having some familiarity with what a short sale was?

11  A.  I came to understand what a short sale was, yes.

12  Q.  You did understand what it was?  That's my question.

13  A.  I believe I understood what a short sale was, yes.

14  Q.  Okay.  And do you recall in 1998 having conversations with

15  anyone at BDO regarding BDO's review of the Jenkens treasury

16  short sale transaction?

17  A.  At what point?  What time do you have in mind?

18  Q.  I'm talking about 1998, before the -- before BDO

19  implemented the transaction.

20  A.  I don't recall the nature of those discussions.

21  Q.  Well, do you recall, sir, that you were a participant in

22  discussions that related to the approval by BDO of the treasury

23  short sale?

24  A.  I believe I would have been party to such discussions, yes.

25  Q.  You would have been an important party to those

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

Damedau2                          Dicker - cross

1   conversations, right?

2   A.   Yes.

3   Q.   Was Mr. Greisman involved in this process?

4   A.   I believe he would have been as the person who introduced

5   the transaction to BDO.

6   Q.   What about Mr. Bee?

7   A.   I believe he would be involved as well.

8   Q.   What about Mr. Kerekes?

9   A.   I believe he would have been involved, too.

10  Q.   And Lorin Luchs?

11  A.   I believe he would probably have been involved as well.

12  Q.   Were these individuals who were on a tax opinion committee

13  at that time?

14  A.   Yes.

15  Q.   Now, is it fair to say that at that point in time -- and

16  again, we're talking about the latter part of 1998 -- you were

17  familiar with the economic substance doctrine?

18  A.   Yes.

19  Q.   I mean, you had some experience in recommending tax

20  shelters previously to clients, correct?

21  A.   I'd been involved with reviewing transactions that we

22  offered to clients.

23  Q.   And one of them was Gordon Foods, right?

24  A.   I helped Charlie Bee with Gordon Foods.

25  Q.   So, again, it's fair to say that the economic substance

Damedau2                        Dicker - cross

1   doctrine, the requirement of profit potential and reasonable

2   possibility of a profit, were concepts that you were aware of

3   in 1998, right?

4   A.  Correct.

5   Q.  Now, the tax opinion committee reviewed materials in

6   connection with the approval process for the treasury short

7   sale, right?

8   A.  I believe that happened.

9   Q.  And the tax opinion committee approved the treasury short

10  sale transaction for recommendation to BDO clients, right?

11  A.  It was approved as something that could be recommended to

12  BDO clients.

13  Q.  And is it your understanding, sir, that in practice, the

14  approval required the approval of everyone on the tax opinion

15  committee?

16  A.  That's my recollection of how we operated.

17  Q.  And that would have included yourself, obviously, right?

18  A.  Correct.

19  Q.  And in 1998, BDO -- you're aware that BDO implemented the

20  treasury short sale for approximately eight clients, right?

21  A.  I don't recall the number.

22  Q.  But you're aware, sir, that BDO implemented the transaction

23  on behalf of some number of clients in 1998, right?

24  A.  It introduced clients to that transaction, yes.

25  Q.  And, well, when you say "introduced," are you aware that

Damedau2                          Dicker - cross

1    clients of BDO actually implemented the transaction?

2    A.   I believe the clients did implement the transaction.

3    Q.   Now, you testified that at some point, and I think you said

4    in early 1999, you had some concerns about the short sale

5    transaction, is that fair?

6    A.   Correct.

7            MR. LINDER:  Your Honor, could we republish Government

8    Exhibit 300-140, please.

9            THE COURT:  You may, Mr. Linder.

10   Q.   Mr. Dicker, if it's easier for you, I believe that there

11   may be a version of that somewhere?

12   A.   I'll try this.

13   Q.   You'll try it there, okay.  If we can just highlight the

14   body.

15           Now, this is an e-mail that you wrote, right?

16   A.   That I wrote, yes.

17   Q.   And you wrote to various individuals, Mr. Gaida and

18   Mr. Field, Mr. Bee, correct?

19   A.   Correct.

20   Q.   And you say, attached is a note that you prepared on the

21   subject which you hope is helpful.  These proposals will kill

22   some transactions but accelerate others.

23   A.   That's what it says, yes.

24   Q.   Now, if we could just go three pages in.  And the second

25   paragraph, just regarding other products.

Damedau2                    Dicker - cross

1        And this is the paragraph that you discussed on your

2   direct examination, right?

3   A.   Correct.

4   Q.   Now, you say here that regarding other products such as

5   Midco, PHC, FIRPTA, NOL refreshers, these seem to be untouched

6   at the moment.  Then you say, the short sale is also not

7   covered, presumably because the IRS feel that having already

8   ruled against it and with litigation pending, legislation is

9   unnecessary.

10       Do you see that?

11  A.   Yes.

12  Q.   Now, by saying that the IRS already ruled against it, this

13  is a reference to the IRS revenue ruling 95-26?

14  A.   I don't recall which revenue ruling.

15  Q.   But you were referring to a revenue ruling, right?

16  A.   Correct.

17  Q.   Now, what you say here is presumably, right?

18  A.   Yes.

19  Q.   And so you're really -- you're essentially guessing here as

20  to why the short sale isn't in this proposed legislation,

21  right?

22  A.   Correct.

23  Q.   Now, was it your understanding, sir, when you wrote this,

24  that the revenue ruling made the treasury short sale illegal?

25  A.   I'm not sure what the impact of the revenue ruling was at

Damedau2                              Dicker - cross

```
 1   this time.  I don't recall.
 2   Q.  Well, Ms. Davis asked you, for example, whether or not you
 3   had informed anyone about your position that's laid out here.
 4   Did you do any analysis that led you to this conclusion, sir?
 5   A.  To which conclusion?
 6   Q.  The conclusion that the IRS has already ruled against it,
 7   and, therefore, it's unnecessary to be included in this
 8   proposed legislation?
 9   A.  I must have known that it was a ruling in existence to make
10   this comment.
11   Q.  But there's no -- is there any detailed analysis in this
12   memo about the revenue ruling?
13   A.  I don't know.  I'd have to read the memo.
14   Q.  Well, do you recall ever doing any detailed analysis that
15   caused you to make this statement?
16   A.  I don't recall.
17            MR. LINDER:  Your Honor, could we republish Government
18   Exhibit 860-1A, which is in evidence.
19            THE COURT:  You may, Mr. Linder.
20   Q.  It may be a little easier for you, sir, if you look at the
21   hard copy.
22            Now, do you recognize this, sir, as a Tax Notes
23   article?
24   A.  It says Tax Notes at the bottom.
25   Q.  And again, you were generally familiar with the publication
```

Damedau2                    Dicker - cross

1    Tax Notes, right?

2    A.  I remember it was a form of literature like this, yes.

3    Q.  And you're aware, sir, that Tax Notes is a publication

4    which presents legal analyses from time to time on various

5    aspects of tax law, right?

6    A.  That's my recollection.

7    Q.  And do you see, sir, that this particular Tax Notes article

8    is by Alice Welt Cunningham?

9    A.  Yes.

10   Q.  And do you see that it is in the September 23rd, 1996,

11   issue of Tax Notes?  Do you see that in the lower left-hand

12   corner?

13   A.  Yes.

14   Q.  Now, obviously that's long before your e-mail, right, which

15   was in February of 1999, right?

16   A.  Correct.

17   Q.  And, sir, when you wrote your e-mail, were you aware of

18   this article?

19   A.  I don't recall this article.

20   Q.  And again, you've said that you were not aware that -- as

21   to whether Mr. Daugerdas had presented this article in his

22   presentation of the treasury short sale to BDO, is that

23   correct?

24   A.  I don't recall his presentation.

25   Q.  And you don't recall ever seeing this article before today,

Damedau2                    Dicker - cross

1    right?

2    A.   Correct.

3    Q.   Now, if we can just look at -- first go to the conclusion,

4    which is on the next to last page.  Mr. Dicker, it's the next

5    to last page.  Roman numeral V, conclusion.  And if we can just

6    highlight the first paragraph.

7          Now, this is an article which, you'll agree with me,

8    is 12 pages, right?

9    A.   Roughly that size.

10   Q.   And it has a very detailed legal analysis of various legal

11   precedents, including the revenue ruling 95-26, right?

12   A.   I see that, yes.

13   Q.   And the conclusion of Alice Welt Cunningham is stated here

14   as follows:  It is rare for this author to take a position

15   against the commissioner, particularly on facts as egregious as

16   those involved in the Fulcrum and FFPA cases.

17          Are you familiar with what those cases are, sir?

18   A.   No.

19   Q.   We'll get back to that in a moment.

20          Then it continues.  Nonetheless, as shown by the

21   conflicting positions propounded in revenue rulings 95-26,

22   95-45 and 95-8, the commissioner's analysis of a short sale

23   closure obligation as a Section 752 liability is analytically

24   flawed.

25          Do you see that?

Damedau2                         Dicker - cross

1    A.  Yes.

2    Q.  So would you agree with me, sir, that Ms. Cunningham

3    certainly is being critical of the IRS' analysis in the revenue

4    ruling 95-26?

5    A.  Yes.

6    Q.  And this is on the 752 issue, the Code Section 752 issue,

7    which is the issue upon which the short sale loophole is based,

8    right?

9    A.  I don't know if that was the section number.

10   Q.  Well, are you familiar with the fact that IRS Section 752

11   deals with partnership liabilities?

12   A.  I don't recall that now.

13   Q.  Do you think you knew that when you wrote the memo?

14   A.  It's likely that I did.

15   Q.  And you also say, make reference in your e-mail, sir,

16   that -- also, you see it says, and with litigation pending,

17   legislation is unnecessary, right?

18   A.  I see that, yes.

19   Q.  Do you recall that there were actually -- the litigation

20   that was pending were the cases that are mentioned in the Alice

21   Welt Cunningham article, the Fulcrum Financial Partners case,

22   and the Florida Power and Light case, right?

23   A.  I don't recall that now.

24   Q.  Did you recall how those cases wound up?

25   A.  No.

Damedau2                    Dicker - cross

1    Q.  Because they were pending at this point in time, right?

2    A.  That's what my note refers to, pending legislation.

3    Q.  So you were not --

4    A.  Pending litigation.  I don't know if I was referring to

5    these cases, but in any case, I don't know what happened in

6    those cases.

7    Q.  Okay.  And that's because you didn't do any detailed legal

8    analysis, right?

9    A.  As I sit here today, I don't have any recollection.

10   Q.  And, sir, when you wrote this, you had BDO -- the tax

11   opinion committee had already reviewed the Jenkens & Gilchrist

12   model tax opinion on the treasury short sale, right?

13   A.  They had reviewed whatever material had been provided for

14   them to review.

15   Q.  And do you have any question, sir, that the tax opinion

16   committee reviewed the tax opinion?

17   A.  Again, I don't recall exactly what material was reviewed or

18   when.

19   Q.  But, nevertheless, the tax opinion committee did approve

20   the transaction, correct?

21   A.  It approved it for recommendation to clients.

22   Q.  And you've said, sir, I believe, that the tax opinion

23   committee's function was to review tax opinions to determine

24   whether or not a transaction was suitable to be presented to

25   BDO clients, right?

Damedau2                    Dicker - cross

1   A.  The tax opinions and other relevant material.

2   Q.  Now, are you aware that the Jenkens & Gilchrist tax opinion

3   contained a detailed analysis of IRS revenue ruling 95-26?

4   A.  I don't recall exactly what was in the tax opinions that

5   were issued.

6   Q.  Do you accept my representation, sir, that there's a

7   detailed discussion in the 1999 treasury short sale opinion?

8           MS. DAVIS:  Objection.

9           THE COURT:  Sustained as to form.

10          MR. LINDER:  Your Honor, can we republish Defense

11  Exhibit 599-4.

12          THE COURT:  You may, Mr. Linder.

13  BY MR. LINDER:

14  Q.  You recognize the name Arthur Frigo, sir?

15  A.  No.

16  Q.  Are you aware that Mr. Frigo was a BDO client who

17  implemented a treasury short sale?

18  A.  I don't recall that.

19  Q.  And if we can go to Bates 041 to 044.

20          THE COURT:  Might this be a good time to take our

21  luncheon recess?

22          MR. LINDER:  Sure, Judge.

23          THE COURT:  All right.  Members of the jury, we're

24  going to take our luncheon recess.  Keep an open mind, and

25  don't discuss the case.

Damedau2                          Dicker – cross

1          We're going to resume promptly at 2:00.

2          Please recess the jury.

3          (Jury excused)

4          THE COURT:  You may step down, Mr. Dicker.

5          Everyone can be seated for a moment.  Are there any

6  issues that counsel want to raise?

7          MR. OKULA:  No, your Honor.

8          MR. LINDER:  No, your Honor.

9          MS. MCCARTHY:  No, your Honor.

10          THE COURT:  Have a good lunch.  See you at 2:00.

11          (Luncheon adjournment)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Damndau3                          Dicker – cross

1                      A F T E R N O O N    S E S S I O N

2                              (2:00 p.m.)

3           THE COURT:  You can have a seat, Mr. Dicker.

4           We're waiting for a juror.

5           MR. OKULA:  If I may hand up, your Honor, counsel for

6    Mr. Daugerdas and the government have agreed with respect to a

7    limited number of edits with respect to the Court's instruction

8    regarding Dr. DeRosa's testimony.  There is one that you will

9    see on the middle of page 5619 that we do not agree on.  As a

10   result, we are in agreement that it is not going to be

11   delivered.  So I have cancelled that out.  The other ones are

12   edited, and I think your Honor will note what the edits are.

13          MR. MAZUREK:  If you need help with my handwriting,

14   let me know.

15          THE COURT:  That is fine.

16          Is the jury here?

17          Are we ready to proceed?

18          MR. MAZUREK:  Yes.

19          THE COURT:  Let's bring in the jury.

20       (Continued on next page)

21

22

23

24

25

Damndau3                        Dicker - cross

1              (Jury present)

2              All right.  Everyone may be seated.

3              Members of the jury, thanks again for your

4      punctuality.  Good afternoon to you.

5              We are going to turn right around and continue with

6      Mr. Dicker, and Mr. Linder's continued cross-examination of

7      Mr. Dicker.

8              You may proceed.

9              MR. LINDER:  Thank you, Judge Pauley.

10     Q.  Mr. Dicker, good afternoon.

11             Before the lunch break, we were talking about Revenue

12     Ruling 95-26 and the discussion of Revenue Ruling 95-26 in the

13     Tax Notes article by Alice welt Cunningham.

14             Do you recall that, sir?

15     A.  I recall that.

16     Q.  If you could take out from, there is a Redweld to your

17     right, sir, exhibit 599-4, please.

18             MR. LINDER:  Your Honor, we may publish Defendants'

19     Exhibit 599-4, please.

20             THE COURT:  You may.

21     Q.  I believe right before the break I asked you whether or not

22     you knew Mr. Arthur Frigo, and I think you said that that was

23     not an e-mail that was familiar to you, correct?

24     A.  Correct.

25     Q.  And you recognize this, though, as a tax opinion letter by

1   Jenkens & Gilchrist to Mr. Frigo?

2   A.  That's what it looks like, yes.

3   Q.  The date on this opinion letter is March 12, 1999, correct?

4   A.  Correct.

5   Q.  This would have been in connection with a transaction that

6   was engaged in by Mr. Frigo in 1998, correct?

7   A.  Correct.

8           MR. LINDER:  If we can turn to Bates 0041, please,

9   Jesse.

10  Q.  You will see there at the bottom, Mr. Dicker, there's the

11  beginning of a discussion on Revenue Ruling 95-26, right?

12  A.  I see that, yes.

13  Q.  You will agree with me that that is on page E-16 of the

14  opinion letter.  Do you see the E-16 at the bottom?

15  A.  Yes.

16  Q.  It continues from E-16 through to E-17 to E-18 to E-19 and

17  concludes on E-20, right?

18  A.  Yes.

19          MR. LINDER:  Jesse, if we can turn to E-19, please.

20          At the bottom, just enlarge the conclusion, please.

21  BY MR. LINDER:

22  Q.  Do you see, sir, that the conclusion of this section on

23  Revenue Ruling 95-26 states, With one exception, that being the

24  March 1995 revenue ruling, the relevant authorities extending

25  from Revenue Ruling 57-29 to the IRS's litigating position in

Damndau3                          Dicker - cross

```
 1   the cases cited, other than the Fulcrum cases and the Salina
 2   case, consistently oppose treating the borrowing of securities
 3   in connection with a short sale as a partnership liability for
 4   purposes of Code section 752.
 5            Does that refresh your recollection, sir, that Code
 6   section 752 is the Code section that is involved with the
 7   anomaly in the treasury short sale?
 8   A.  I still don't remember which precise section.
 9   Q.  Then it says, The authority for this treatment is
10   substantial and more likely than not the partnership will
11   prevail on this issue if challenged by the IRS.
12            Do you recall you were asked questions about more
13   likely than not?  Is that a term that you were familiar with?
14   A.  That is a term I now understand more clearly.
15   Q.  You understood, sir, that a more-likely-than-not opinion
16   letter contemplates that there may be authorities going one way
17   or the other, correct?
18   A.  Yes.
19   Q.  What the tax opinion letter is saying in essence is that,
20   notwithstanding the fact that there may be some authority that
21   takes a contrary position, it is the author's position that it
22   is more likely than not that, if challenged in Court, the
23   taxpayer's position would be the prevailing position, correct?
24   A.  Yes.
25   Q.  So you would agree with me, sir, that at the time that you
```

Damndau3                        Dicker - cross

1    wrote the memo back in February of 1999, your e-mail about the

2    revenue ruling killing the short sale, that may have been an

3    overstatement?

4    A.   I don't know how that statement relates to the authorities,

5    so I can't gauge the quality of that statement.

6    Q.   That is because you don't remember whether or not you did

7    any analysis, correct?

8    A.   Correct.

9    Q.   That's because you don't know whether or not in fact that

10   what you were referring to is Revenue Ruling 95-26, correct?

11   A.   Correct.

12   Q.   Are you aware as you sit here today of any authority that

13   would have supported that position that you took in that

14   e-mail?

15   A.   No.

16   Q.   In the pages we were just looking at in fact there is a

17   reference to the Fulcrum cases and the Salina case.  Do you

18   recall whether or not those were the cases that you were

19   referring to as the litigation pending?

20   A.   I don't recall.

21   Q.   Ms. McCarthy asked you about some other e-mails that you

22   wrote from August into October of 1999 regarding proposed

23   legislation, the extender legislation, right?

24            Do you recall those?

25   A.   Yes.

Damndau3                     Dicker - cross

1   Q.  Your discussion in those e-mails related to both the short

2   sale transaction and the short option transaction, right?

3   A.  I believe that's right.

4   Q.  With respect to the short sale, what you were saying was

5   that the proposed legislation might catch the short sale

6   transaction, right?

7   A.  I would like to find the document to refresh myself.

8   Q.  Why don't we look at Defense Exhibit 523, which is in

9   evidence.  It should be in the Redweld you have right there,

10  the same Redweld you were just looking at?

11  A.  OK.  Yes.

12  Q.  Do you have that in front of you?

13            MR. LINDER:  Your Honor, may we republish Defense

14  Exhibit 523, please?

15            THE COURT:  You may.

16            MR. LINDER:  Thank you.

17  Q.  Do you see in the second paragraph, Mr. Dicker, the second

18  sentence you say, Bill Bricker had this view and is still

19  prepared to write a more-likely-than-not opinion.  And it

20  continues, However, for a short sale this provision is more

21  problematic as it could catch it, right?  Do you see that?

22  A.  I see that, yes.

23  Q.  Would you agree with me, sir, that what you were conveying

24  here was that as of this date, October 25, 1999, the loophole

25  or the anomaly upon which the short sale was based had not yet

Damndau3                        Dicker - cross

```
 1   been caught or closed?

 2   A.  Can you repeat that question for me.

 3   Q.  Sure.  Would you agree with me, sir, that what you were

 4   conveying here in your e-mail on October 25, 1999 was that as

 5   of this date, the anomaly or loophole upon which the short sale

 6   was based had not yet been caught or closed?

 7   A.  I am expressing the view that this extender bill as it

 8   relates to the short sale provision could catch it.

 9   Q.  Obviously this is proposed legislation, right?

10   A.  Correct.

11   Q.  So it's not yet law, correct?

12   A.  Correct.

13   Q.  This is more than six months after your February e-mail,

14   correct?

15   A.  Yes.

16   Q.  In which you said that the short sale had been killed,

17   right?

18   A.  Can you remind me which e-mail that was again?

19   Q.  We just looked at that, sir, February 1999.

20        Do you recall, sir, that you said in the e-mail, in

21   February 1999 that the short sale had been killed?

22   A.  Which document is that?

23   Q.  It is government Exhibit 300-140.  I think your words were

24   that the IRS had already ruled against it.

25   A.  I recall the words the IRS had already ruled against it.
```

Damndau3                    Dicker - cross

1    Q.  Again, six months afterwards you would agree with me that

2    there is legislation that is being contemplated that might

3    catch the treasury short sale, right?

4    A.  Correct.

5    Q.  You also testified on direct examination about a tax

6    opinion committee meeting which took place in approximately

7    March of 1999.  Do you recall that?

8    A.  Yes.

9    Q.  Do you have a clear recollection of that tax opinion

10   committee meeting?

11   A.  I don't have a clear recollection, but I read what was in

12   the note that was prepared by Bob Greisman of that meeting.

13   Q.  Right.  You're referring to Government Exhibit 301-216.

14           That's Mr. Greisman's memo.

15   A.  I'm referring to Mr. Greisman's memo.

16           MR. LINDER:  Your Honor, may we republish 301-216,

17   please.

18           THE COURT:  You may.

19   Q.  This is a memo, Mr. Dicker -- do you have that in front of

20   you?

21   A.  I do not.

22   Q.  You can see it on the screen.  This is a memo that

23   Mr. Greisman wrote in connection with or summarizing a tax

24   opinion committee meeting, right?

25   A.  Correct.

1  Q.  I think you said that prior to the meeting you had had some

2  conversations in which you had expressed concerns about the

3  Jenkens short sale transaction, right?

4  A.  Correct.

5  Q.  Just in terms of the timing, you would agree with me that

6  this is after BDO had implemented the transaction in 1998,

7  correct?

8  A.  Correct.

9  Q.  During the time period when BDO representatives are

10  presenting the transaction to potential clients in 1999, right?

11  A.  Can you repeat that again, the time.

12  Q.  Yes.  This tax opinion committee meeting and the

13  consideration of the short sale is taking place at the same

14  time that BDO representatives are presenting the transaction to

15  potential clients?

16  A.  This was still approved for presentation to clients at this

17  point.

18  Q.  Right.  Now, one of the issues that you identified, sir,

19  was the size of the Jenkens & Gilchrist fee, correct?

20  A.  Correct.

21  Q.  You see on page 1 of the memo in the second paragraph --

22          MR. LINDER:  Jesse, if you can just highlight, This

23  concern assumes.

24  Q.  Do you see that?  Do you see what Mr. Greisman says in the

25  middle of that paragraph is, This concern assumes that because

Damndau3                         Dicker - cross

1    of its size, the tax opinion fee can be recharacterized by the

2    IRS as a transaction cost, right?

3    A.   Yes.

4    Q.   Mr. Greisman very clearly says that this is an assumption

5    that he's making, right?

6    A.   It is an assumption that the concern makes, yes.

7    Q.   He also says that the concern is that the tax opinion fee

8    can be recharacterized, right?

9    A.   Correct.

10   Q.   Would you agree with me, sir, that that suggests that,

11   before it's recharacterized, initially it's characterized as

12   not a transaction cost?

13            MS. DAVIS:   Objection.

14            THE COURT:   Sustained as to form.

15   Q.   Mr. Dicker, did you have an understanding as to what

16   Mr. Greisman meant in that sentence when he says that the tax

17   opinion fee can be recharacterized by the IRS as a transaction

18   cost?

19   A.   I think it expressed my concern that these large fees could

20   be treated as transaction costs.

21   Q.   There was discussion, sir, that, absent recharacterization,

22   ordinarily the tax opinion fee is not a transaction cost,

23   correct?

24   A.   I don't recall discussions of that nature.

25   Q.   Is it fair to say that you don't recall discussions of any

Damndau3                    Dicker - cross

1    nature with respect to this tax opinion committee meeting other

2    than what is in this memo?

3    A.   The only other event related to these topics was the

4    information Charlie Bee provided to me.

5    Q.   Yes.  Why don't we go to the third page.

6              MR. LINDER:  The paragraph, Jesse, Finally.

7    Q.   Do you see there, Mr. Dicker, beginning in the second

8    sentence, it says, For example, it is not entirely clear

9    whether or not the IRS could or would recharacterize a portion

10   of a fee paid for a tax opinion as a transaction cost in a

11   transaction that essentially has no costs.

12             Do you see that?

13   A.   Yes.

14   Q.   Do you recall the discussion surrounding that sentence,

15   sir?

16   A.   I see the note, but I don't recall the discussions.

17   Q.   You would agree with me that that relates to the discussion

18   on the first page that we were just talking about?

19   A.   It's the same topic.

20   Q.   Yes.  I think you were aware, sir, that Mr. Greisman at the

21   request of the tax opinion committee had a conversation with

22   Mr. Daugerdas about some of these issues, correct?

23   A.   I don't recall that.

24   Q.   You don't recall the tax opinion committee requesting that

25   Mr. Greisman reach out to Mr. Daugerdas to respond to some of

Damndau3                          Dicker - cross

1   these concerns that you testified about?

2   A.  I don't recall that.

3   Q.  Can we go to page 3, As indicated.

4           Do you recall, sir, that Mr. Daugerdas addressed the

5   concerns of the tax opinion committee and that those concerns

6   are memorialized in the memo?

7   A.  I don't recall that.

8   Q.  Do you see where it says, As indicated above, in a brief

9   telephone conversation with Daugerdas, he indicated that he is

10  agreeable to reengineering the way his fee is billed?  However,

11  he firmly believes the better position is to have it all billed

12  as a tax opinion fee because there is no basis or support (in

13  his opinion) for the IRS to recharacterize the tax opinion fee

14  as something else, particularly where there are no other costs

15  associated with the transaction.  He made the point that where

16  there is much at stake, a tax opinion fee could be greater than

17  when there is less at stake.  As a fee for a tax opinion, his

18  entire fee "comes off the table" when determining profit

19  potential.  And then Mr. Greisman concludes, This is an

20  argument that may warrant further consideration.

21          Do you see that, sir?

22  A.  I see that in the note, yes.

23  Q.  That was Mr. Daugerdas' response to the concerns that were

24  discussed in the tax opinion committee meeting, correct?

25          MS. DAVIS:  Objection.

Damndau3                        Dicker - cross

```
1          THE COURT:  Overruled.
2    A.  This is what Greisman has written as Mr. Daugerdas'
3    response.
4    Q.  To the concerns that were raised in the tax opinion
5    committee meeting, correct?
6    A.  Dealing with the issue of tax opinion fees as transaction
7    costs.
8    Q.  You understood, sir, that it was Mr. Daugerdas' position
9    that tax legal advice was not a transaction cost, right?
10   A.  Can you repeat that.
11   Q.  You understood, sir, that Mr. Daugerdas' position was that
12   tax legal advice was not a transaction cost?
13   A.  I don't recall that.
14   Q.  Well, do you recall, sir, the paragraph that we just read
15   learning that that was Mr. Daugerdas' position?
16   A.  I can see that this is what Bob Greisman wrote saying this
17   was Mr. Daugerdas' position.
18   Q.  My question to you, sir, is, do you recall that that was
19   Mr. Daugerdas' position separate and apart from what you're
20   reading here now?
21   A.  No.
22   Q.  You also indicated that you had a concern about lack of
23   independence of the tax opinion writer?
24   A.  Correct.
25   Q.  You were aware, sir, that Jenkens & Gilchrist had no
```

Damndau3                        Dicker – cross

1   financial stake in the outcome of or an interest in the

2   underlying financial transactions, correct?

3   A.  I don't know what interest they had in the underlying

4   transactions.

5   Q.  You didn't know it then?

6   A.  I don't recall knowing it.

7   Q.  Yet you expressed an opinion about their lack of

8   independence?

9   A.  You are talking about the underlying financial interest in

10  the underlying transactions?

11  Q.  Yes.

12  A.  I believe that they were involved in the design, marketing,

13  and implementation, which are to me different issues.

14  Q.  Let me ask you this, sir:  Do you have any idea how much

15  time was spent researching and writing the tax opinion letter?

16  A.  I don't know how much time they spent dealing with those

17  issues.

18  Q.  Are you able to identify any problem with the technical

19  merits of the treasury short sale?

20  A.  As of today, I'm not competent to make any evaluation.

21  Q.  Were you competent in 1999?

22  A.  I don't think I was truly competent to make a determination

23  back then.

24  Q.  Now, you also made a statement I believe on direct

25  examination that the fee that Jenkens received was not just for

Damndau3                         Dicker - cross

1    the tax opinion?  Do you recall that?

2    A.   That was the concern I had.

3    Q.   Did you ever ask Mr. Daugerdas what his position was with

4    respect to that issue?

5    A.   I don't recall doing so.

6    Q.   Were you aware, sir, of a policy by Jenkens & Gilchrist to

7    not charge a client anything, even if they implemented the

8    transaction, if they decided not to take the tax opinion?

9    A.   I don't recall being aware of such a policy.

10   Q.   Because you never spoke to Mr. Daugerdas, right?

11   A.   Not in my recollection.

12   Q.   You testified that at some point in time you learned that

13   as a response to the proposed legislation, the extender

14   legislation, that Jenkens & Gilchrist was considering a

15   different tax shelter, the short option strategy, right?

16   A.   Correct.

17   Q.   This was in approximately the fall of 1999?

18   A.   Correct.

19   Q.   This was during a time period when BDO had been

20   implementing the Jenkens short sale transaction, right?

21   A.   Following that time period, yes.

22   Q.   There was a concern that for those clients who were in the

23   process of implementing the short sale that they might not be

24   able to get the contemplated tax benefits because the law might

25   change.  Do you recall that, sir?

Damndau3                      Dicker - cross

```
 1   A.  Yes.
 2            MR. LINDER:  Your Honor, can we republish Defense
 3   Exhibit 523, sir.
 4            THE COURT:  You may, Mr. Linder.
 5            MR. LINDER:  I know we've looked at this e-mail a
 6   number of times.  One moment, your Honor.
 7            If we can go to the middle, where it says, Likely
 8   question?
 9   Q.   Now, Mr. Dicker, first of all, this is an e-mail that you
10   wrote, correct?
11   A.  Correct.
12   Q.  It's to the tax solutions group, right?
13   A.  Correct.
14   Q.  What's the date on this e-mail?
15   A.  October 25, 1999.
16   Q.  Again, this is during a time period when there is concern
17   about this proposed legislation, the so-called extender bill,
18   right?
19   A.  Correct.
20   Q.  Again, this is during a time period when clients of BDO are
21   in the process of implementing the short sale, right?
22   A.  Yes.
23   Q.  So the question arose, What happens to those clients?  What
24   do we say to those clients if or in light of the fact that
25   there is the possibility that the law could change, right?
```

Damndau3                      Dicker - cross

1    A.   That's the question I raised in the memo.

2    Q.   Right.  Where it says, Likely question, this particular

3    part of the e-mail, you are essentially posing a hypothetical

4    question that a hypothetical client would ask BDO, right?

5    A.   I think that's what I intended, yes.

6    Q.   You say, pretending that you're the client, if I still go

7    ahead but the new provision still catches me, presumably the

8    opinion is irrelevant, so I don't have to pay for it.  Do you

9    see that, sir?

10   A.   Yes.

11   Q.   So would you agree with me, sir, that at that point in time

12   you knew that it was the Jenkens policy not to charge a client

13   for a tax opinion if they didn't need it or if they didn't take

14   it?

15   A.   Again, I did not know the Jenkens policy.

16   Q.   Yet you wrote that sentence in the e-mail, right?

17   A.   I wrote that sentence.

18   Q.   In writing that sentence, again, you intended to convey the

19   fact that the client would be aware of the fact that if the

20   opinion is irrelevant they don't have to pay for it, right?

21            MS. DAVIS:  Objection, your Honor.

22            THE COURT:  Sustained only as to form.

23   Q.   Would you agree with me, Mr. Dicker, that your intention

24   here was to convey to the tax solutions group that it was your

25   belief that a client would know that if it didn't take the tax

Damndau3                      Dicker - cross

1   opinion it wouldn't have to pay for it?

2   A.   That's what I anticipated a client would feel.

3   Q.   At some point around the same time the tax opinion

4   committee was reviewing the model tax opinion for the short

5   option strategy, right?

6   A.   At some point around that time.

7   Q.   Do you recall that it was in approximately November, early

8   November?

9   A.   I don't recall the time.  Around that time.

10  Q.   Do you recall, sir, that the legal underpinnings for the

11  short option strategy were similar to the legal underpinnings

12  for the short sale?

13  A.   Many of the legal issues were the same.

14  Q.   Notwithstanding the fact that the legal issues were the

15  same, the tax opinion committee reviewed at length the model

16  tax opinion, right?

17  A.   The tax opinion committee reviewed the model opinion.

18          MR. LINDER:  Your Honor, can we republish Defense

19  Exhibit 41, please.

20          THE COURT:  You may.

21  BY MR. LINDER:

22  Q.   Mr. Dicker, if it's easier for you, it might be, it should

23  be in the Redweld that you had to your right.

24  A.   Yes.

25  Q.   Mr. Dicker, do you have the e-mail in front of you?

Damndau3                    Dicker - cross

1    A.  Yes.

2    Q.  This is an e-mail that is -- you are on the distribution

3    list, right?  Do you see your name there?

4    A.  I am not sure whether it's an e-mail or a memo, but I'm on

5    the distribution list.

6    Q.  You're correct.  I misspoke.  You are absolutely right.

7    It's a memo, not an e-mail.

8            This is a memo that was drafted by Mr. Greisman on

9    November 2, 1999, correct?

10   A.  That's what it shows, yes.

11   Q.  He is distributing to the BDO tax opinion committee the

12   latest Jenkens & Gilchrist draft tax opinion, right?

13   A.  He distributed it to the people on the distribution list,

14   which included members of the tax opinion committee.

15   Q.  Is it your testimony that this distribution list does not

16   include the entire tax opinion committee, correct?

17   A.  Correct.

18   Q.  In the middle of the memo, Mr. Greisman says, As you know,

19   we have a number of clients ready to go.  In my view, we need

20   to look for and deal with any deal killers right away.  Do you

21   see that, sir?

22   A.  Yes.

23   Q.  Again, you received this memo, did you not, on November, 2,

24   1999?

25   A.  I am on the distribution list on it.

Damndau3                          Dicker - cross

```
 1   Q.  Sir, you did not respond to Mr. Greisman with any issues
 2   you perceived to be deal killers, correct?
 3   A.  I don't recall doing that.
 4   Q.  You are aware, sir, that there were others on the tax
 5   opinion committee who provided detailed comments to
 6   Mr. Greisman for him to then relay to Jenkens & Gilchrist,
 7   right?
 8   A.  I've seen that, yes.
 9   Q.  You were copied on some of those comments, right?
10   A.  Do you have material I could --
11   Q.  Sure.
12        MR. LINDER:  Your Honor, can we republish Government
13   Exhibit 300-32, please.
14        THE COURT:  You may.
15   BY MR. LINDER:
16   Q.  Do you see, sir, this is just one example, right?  This is
17   an e-mail from Mr. Greisman to Donna Guerin attaching comments
18   from Mr. Cohen, right?
19   A.  That's what it says, yes.
20        MR. LINDER:  Can you just highlight the top, please.
21   Q.  On the next page, sir, Mr. Cohen distributes his comments
22   to you and others, correct?
23   A.  That's what it says, yes.
24   Q.  These comments are comments relating to the substantive
25   aspects of the Jenkens & Gilchrist tax opinion, correct?
```

Damndau3                         Dicker - cross

```
1   A.  It deals with the Jenkens draft opinion.

2   Q.  Right.  If we can then look at Government Exhibit 301-180A.

3           MR. LINDER:  If we can republish that, your Honor.

4           THE COURT:  You may.

5   Q.  These are additional comments, correct?  This is a fax from

6   Mr. Greisman to Donna Guerin.  Do you see that, sir?

7   A.  Yes.

8   Q.  Based on the fax header, it looks like it was sent on March

9   14, 2000, right?

10  A.  Yes.

11  Q.  You recall that the model tax opinion was first being

12  reviewed by the tax opinion committee in early November of

13  1999, correct?

14  A.  Yes.

15  Q.  Here we are, some approximately four months later, and the

16  opinion is still being reviewed, correct?

17  A.  That seems to be the case, yes.

18  Q.  If we go to the last page of this exhibit, we'll see these

19  are your comments to Mr. Greisman about the opinion letter,

20  correct?

21  A.  Yes.  My comments about the opinion letter.

22  Q.  Sir, your intention in sending this e-mail to Mr. Greisman

23  was for him to relay these comments to Jenkens & Gilchrist,

24  correct?

25  A.  That would have been my expectation, yes.
```

Damndau3                    Dicker - cross

1   Q.  Because you knew that Mr. Greisman was serving as the
2   liaison with Jenkens & Gilchrist with respect to these
3   transactions, right?
4   A.  Correct.
5   Q.  Your intention was to make the Jenkens tax opinion letter a
6   stronger letter for the benefit of BDO clients, correct?
7   A.  I was trying to suggest improvements, yes.
8   Q.  Right.  I mean, you didn't intend to convey with this
9   e-mail that you believed that the conclusions in the opinion
10  letter were incorrect, did you?
11  A.  I did not convey that in this e-mail.
12  Q.  You didn't convey in this e-mail that the client wouldn't
13  be entitled to the tax benefits, did you?
14  A.  I did not convey that in this e-mail.
15  Q.  You certainly didn't convey or intend to convey to Jenkens
16  & Gilchrist by sending this e-mail that the transaction was
17  illegal?
18  A.  I did not intend to convey that in this e-mail.
19  Q.  So the tax opinion committee approved the short option
20  strategy, right?
21  A.  It was approved for recommendation to BDO clients.
22  Q.  Did the tax opinion committee approve the short option
23  strategy?
24  A.  It approved the concept of the transaction for sale to the
25  BDO clients.

Damndau3                     Dicker - cross

1    Q.  What do you mean by the concept?  This wasn't a concept.

2    This was an actual financial transaction that clients were

3    going to be engaging in, correct?

4    A.  What the clients actually do is based on the facts of what

5    they are actually doing.  This is the concept of what is

6    proposed for them to do.

7    Q.  So what you are saying is that the tax opinion committee

8    approved the fact that BDO representatives would be presenting

9    the transaction to clients?

10   A.  Correct.

11   Q.  Each of these opinions that were reviewed had

12   representations in them, correct?

13   A.  I believe the opinion had representations in it, yes.

14   Q.  You indicated that you made no statements to anyone at

15   Jenkens & Gilchrist about any concerns you may have had

16   relating to the representations, right?

17   A.  I don't believe I made any such statements to Jenkens &

18   Gilchrist.

19   Q.  Is it fair to say, sir, that you have no idea what people

20   like Mr. Shanbrom said to BDO clients about the representations

21   and the need to make representations, for example?

22   A.  Paul Shanbrom did not inform me what he was saying to

23   clients.

24   Q.  Obviously, sir, you don't know what Mr. Shanbrom may or may

25   not have said to anyone at Jenkens & Gilchrist about how he

Damndau3                         Dicker - cross

1    presented the transaction to clients?

2    A.  He did not inform me about that either.

3    Q.  Is it fair to say, sir, that as a member of the tax opinion

4    committee, you approved the short sale opinion in 1998?

5    A.  I approved the transaction for clients.

6    Q.  And in March of 1999, when the transaction was again being

7    discussed by the tax opinion committee, you approved that it

8    continue to be presented to BDO clients, correct?

9    A.  Correct.

10   Q.  And you approved of the short option transaction in the

11   fall of 1999, correct?

12   A.  I approved of it for presentation to BDO clients, yes.

13   Q.  Again, you never expressed to anyone at Jenkens &

14   Gilchrist, you yourself personally never expressed to anyone at

15   Jenkens & Gilchrist any concerns that you had with respect to

16   either the short sale or the short option transaction, is that

17   fair?

18   A.  Correct.

19          MR. LINDER:  One moment, your Honor.

20          THE COURT:  Take your time.

21          MR. LINDER:  Nothing further, your Honor.

22          THE COURT:  Redirect examination, Ms. Davis?

23          MS. DAVIS:  Yes, your Honor.  Thank you.

24   REDIRECT EXAMINATION

25   BY MS. DAVIS:

Damndau3                              Dicker - redirect

1   Q.  Mr. Dicker, on cross-examination, you were asked about

2   making a choice to cooperate rather than fight the charges.

3   Why did you make that choice?

4   A.  I was offered a plea agreement.  I knew I was guilty and I

5   accepted the plea agreement.

6   Q.  Why did you know you were guilty?

7   A.  Because at that stage I knew the wrongful actions I had

8   undertaken and I knew the law that applied to them.

9   Q.  And those wrongful actions were what?

10  A.  At the time I was a member of the tax solutions group and

11  prior to that, we had taken actions intended to mislead the

12  IRS.

13  Q.  In what way?

14  A.  By misrepresenting through documents what was really going

15  on.

16  Q.  What was really going on?

17  A.  What was really going on was the sale of tax shelters to

18  the clients who were paying large fees, and the consulting

19  agreements were designed to misrepresent that, and the

20  documentation put in regarding investment motives was designed

21  to misrepresent the investment motivation.

22  Q.  Did your wrongful actions include anything with respect to

23  economic substance of the tax shelters?

24              MR. LINDER:  Objection.  Leading.

25              THE COURT:  Sustained.

Damndau3                          Dicker - redirect

Q.   What, if anything, did you say at the entry of your plea
about the economic substance of the tax shelters?

          MR. LINDER:   Objection.

          THE COURT:   Sustained.

Q.   You were asked questions about Mr. Field's role in the tax
solutions group by Ms. McCarthy.   Based on your interactions
with Mr. Field, do you know what Denis Field's view was of the
revenues generated by the tax solutions group?

A.   It was very important to the profitability of BDO.

Q.   You were also asked about his responsibilities with regard
to, at the time that he was national tax director and chief
executive officer of BDO.   Was Denis Field, during that time
period when he was both national tax director and CEO,
attentive to the tax solutions group matters?

A.   In my experience, yes.

Q.   Were you able to discuss tax solution group matters with
him when you needed to?

A.   Yes.

Q.   Was he a participant in the telephone calls of the tax
solutions group?

A.   Yes.

Q.   And of the tax opinion committee?

A.   Yes.

Q.   At any point did it appear to you that he did not
understand the business of the tax solutions group?

Damndau3                         Dicker - redirect

1   A.   I believe he understood the business of the tax solutions

2   group.

3   Q.   You were asked a question by Ms. McCarthy to the effect

4   that it was no secret that BDO was involved in the tax shelter

5   business.  Do you recall a question like that?

6   A.   I recall a question like that.

7   Q.   To your knowledge, did anyone within the tax solutions

8   group tell the IRS the full extent of BDO's involvement with

9   the tax shelters that it was selling?

10  A.   Not to my knowledge.

11  Q.   Now, you were asked some questions about whether there was

12  a policy that if someone voted no in a tax opinion committee

13  the product would not have been approved.  Do you recall that?

14  A.   Yes.

15  Q.   How many times did you try to stop the sale of the Jenkens

16  & Gilchrist tax shelters by BDO?

17  A.   Two times.

18  Q.   Under the compensation agreement, do you recall who was

19  supposed to be making the decisions for the tax solutions

20  group?

21  A.   It was supposed to be a unanimous decision by the managers

22  of the tax solutions group.

23  Q.   Who was it that chose to go forward with the sales of the

24  Jenkens & Gilchrist tax shelters after you wanted to stop them?

25  A.   Denis Field made that decision.

Damndau3                    Dicker - redirect

1   Q.   Who had the approval authority over the tax shelter

2   products for the tax solutions group in 1997?

3   A.   Denis Field was the national tax director at that time.

4   Can you repeat the question?

5   Q.   Sure.  Who had the approval authority over the particular

6   tax shelter products to be sold by BDO in 1997?

7   A.   The national tax director, who was Denis Field.

8   Q.   What about 1998?

9   A.   The same.

10  Q.   What about in 1999 up until the formation of the tax

11  solutions group?

12  A.   The same.

13  Q.   Who had the ultimate responsibility in BDO for all tax

14  matters in 1997?

15  A.   The national tax director had the responsibility for the

16  national operations of BDO Seidman.

17  Q.   And Denis Field was national tax director up until what

18  date?

19  A.   Until he became the chairman and CEO in January 2000.

20  Q.   You were also asked questions about exploring a sale of BDO

21  or a merger with another company.  Do you recall that?

22  A.   Yes.

23  Q.   Was BDO ever sold to another company?

24  A.   No.

25  Q.   Was there ever a merger while you were involved with BDO?

1    A.   No.

2    Q.   You were asked questions about your recollections of your

3    dealings with the tax solutions group.

4            Do you recall each and every paper that crossed your

5    desk with respect to the tax solutions group?

6    A.   No.

7    Q.   Is there any haziness, though, of your recollection of what

8    Denis Field's involvement was with the tax solutions group?

9    A.   No.

10   Q.   You were also asked questions about your retirement from

11   BDO.  Do you recall that?

12   A.   Yes.

13   Q.   Why was it or who asked you to rejoin the board of

14   directors after your resignation from BDO?

15   A.   Denis Field.

16   Q.   What did he say to you about rejoining the board.

17   A.   He said that if I rejoined the board that I could have my

18   health expenses covered by BDO.

19   Q.   Had you made any suggestion to him prior to his approaching

20   you about rejoining the board that you wanted to be a retired

21   partner, board member?

22   A.   No.

23   Q.   What was the level of your involvement in the board of

24   directors as a retired partner?

25   A.   Whatever motions were put before the board I would vote on

Damndau3                        Dicker - redirect

1   them.

2   Q.   Do you recall being asked questions about and being shown

3   the picture of Paul Shanbrom?

4   A.   I think it was Paul Shanbrom, yes.

5   Q.   Do you recall observing interactions between Mr. Shanbrom

6   and Mr. Field?

7   A.   Yes.

8   Q.   What was the nature of their relationship?

9   A.   They seemed to be fairly close.

10  Q.   You were also shown a copy of a schedule of bonuses paid to

11  or payments made to Paul Shanbrom.  Do you recall that?

12  A.   Yes.

13  Q.   Who directly benefited from the profits of Paul Shanbrom's

14  sales after July 1, 1999?

15  A.   The tax solutions group managers, which was Denis, Charlie

16  and myself and also BDO.

17  Q.   You were also asked questions about the grantor trust

18  netting issue and the statements in Notice 2000-44 about

19  grantor trust netting.  Do you recall that?

20  A.   Yes.

21  Q.   What was the purpose of using a technique like the grantor

22  trust netting on a client's tax returns?

23  A.   To make it harder for the IRS to see what was going on.

24  Q.   Was that purpose discussed within the tax opinion

25  committee?

Damndau3                          Dicker - redirect

1    A.  Yes.

2    Q.  Was Denis Field part of those discussions?

3    A.  In my recollection, yes.

4    Q.  What did the IRS say in the notice that was wrong with that

5    grantor trust netting technique?

6    A.  That this attempt to hide what was going on was an act of

7    concealment that could be criminal.

8    Q.  Was BDO engaged in other acts of concealment with respect

9    to the Jenkens & Gilchrist tax shelters?

10   A.  Yes.

11   Q.  With respect to your resignation, Mr. Dicker, what did you

12   leave behind when you resigned?

13   A.  I gave up my financial interest in the tax solutions group.

14   I resigned as a partner, which meant I gave up my base

15   compensation, $750,000, plus whatever bonuses and I also gave

16   up any right to retirement payments by BDO.  I also thought I

17   was giving up my health insurance.

18   Q.  You were asked questions about your personal tax reporting,

19   the claiming of tax shelter losses.  Do you recall that?

20   A.  Yes.

21   Q.  For the year 2000, was that one of the years in which you

22   claimed tax shelter losses?

23   A.  Yes.

24   Q.  When would the taxes have been paid if you had not taken

25   the tax shelter losses?

Damndau3                              Dicker - redirect

1    A.  For the year 2000, you have to pay your taxes by April 15

2    of the following year, so that would be April 15, 2001.

3    Q.  For the 2001 year, when would those taxes have been paid?

4    A.  They should be paid by April 15, 2002.

5    Q.  How many years later did you actually pay the taxes,

6    approximately?

7    A.  I recall that I made some deposits in respect of the taxes

8    at some stage, maybe two or three years later, and then the

9    final payments were calculated under the closing agreement in

10   2007.

11   Q.  Now, with respect to the tax shelter losses, did you have a

12   substantial nontax business reason for entering into those tax

13   shelters?

14   A.  No.

15   Q.  You were also asked about your relationship with Charlie

16   Bee.  Did you ever play golf with Denis Field?

17   A.  At the board meetings we sometimes played golf, and he

18   would be part of the group playing golf.

19   Q.  You were asked a question by Mr. Linder on

20   cross-examination about, and I'm paraphrasing here, he asked

21   you something about the fact that grantor trusts are not

22   illegal, and I believe your response was something like it

23   depends on how they were used.  Do you recall that?

24            MR. LINDER:  Objection.

25            THE COURT:  Sustained.

Damndau3                    Dicker - redirect

1   Q.   Do you recall what your answer was with respect to

2   Mr. Linder's question about grantor trusts?

3   A.   I don't remember my exact words, but the essence was that

4   in themselves there is not a problem with grantor trusts.  It

5   depends how they're used.

6   Q.   What do you mean by that, it depends how they're used?

7   A.   If they're used to conceal things from the IRS, then that

8   is not a good use of grantor trusts.

9   Q.   You were asked about Notice 2000-44 and civil penalties by

10  Mr. Linder.  Do you recall that?

11  A.   Yes.

12  Q.   You pled guilty in this case, correct?

13  A.   In which case?

14  Q.   I'm sorry.  Withdrawn.  You've entered into a guilty plea,

15  correct?

16  A.   Correct.

17  Q.   Did some of the transactions at issue in your guilty plea

18  involve the short options transaction?

19  A.   Yes.

20  Q.   Your guilty plea did not depend on whether or not Notice

21  2000-44 referenced criminal penalties, correct?

22          MR. LINDER:  Objection.

23          THE COURT:  Sustained.

24  Q.   Just so we are clear, you were asked questions by

25  Mr. Linder and by Ms. McCarthy about the tax opinion committee

Damndau3                          Dicker – redirect

1   review of the Jenkens & Gilchrist tax shelter products.

2           At any point in time was Mr. Field not a member of the

3   tax opinion committee?

4   A.  At all times he was a member of the tax opinion committee.

5   Q.  You were also asked questions about an article by Alice

6   Welt Cunningham.  Do you have any idea who Alice Welt

7   Cunningham is or was?

8   A.  I have no idea.

9           (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Damedau4                    Dicker - redirect

1    BY MS. DAVIS:

2    Q.  In your opinion, Mr. Dicker, what is the more significant

3    source of authority, a Tax Notes article by Alice Welt

4    Cunningham or a revenue ruling by the Internal Revenue Service?

5    A.  I would pay more attention to a revenue ruling.

6    Q.  You were also asked questions about Government

7    Exhibit 301-216, which is the March 15, 1999, memorandum of the

8    tax opinion committee conference call.  Do you recall that?

9    A.  Yes.

10   Q.  In the 1998, 1999, 2000 time frame, did BDO provide legal

11   opinions for the Jenkens & Gilchrist tax shelters?

12   A.  Not in my recollection.

13   Q.  You were also asked questions about the independence issue

14   or what your view of the independence issue was.  What was your

15   concern with respect to what you termed the lack of

16   independence with regard to Jenkens & Gilchrist?

17   A.  My understanding was that generally tax opinions for

18   transactions were written by independent attorneys, but in this

19   situation Jenkens would not only write tax opinions, but it

20   also designed and marketed and were implementing the

21   transactions.

22   Q.  And why is that an independence problem?

23   A.  Because they were involved in -- directly in aspects of the

24   transactions.  So I can see -- my concern was, how could they

25   be independent?

Damedau4                         Dicker - redirect

1   Q.  Did you ever receive an answer to that question to your

2   satisfaction?

3              MR. LINDER:  Objection.

4              THE COURT:  Overruled.

5   A.  I don't recall receiving an answer that satisfied me.

6   Q.  You were also asked questions about a Defense Exhibit 41,

7   which has the phrase, the deal killing issues or deal killers.

8   Do you recall that?

9   A.  Yes.

10  Q.  With respect to commenting on the Jenkens & Gilchrist

11  opinion letter, why didn't you raise any of the concerns that

12  you had about profit potential or economic substance?

13  A.  I was just trying to suggest improvements to the trans --

14  to the opinion.  And I just didn't include items in that

15  because I didn't think those were going to be considered.

16  Q.  Were you making money on the sale of the Jenkens &

17  Gilchrist short options tax shelters?

18  A.  Yes.

19  Q.  Were you making money on the sale of the Jenkens &

20  Gilchrist short sale tax shelters?

21  A.  Yes.

22  Q.  Was Denis Field?

23  A.  Yes.

24  Q.  Was Charlie Bee?

25  A.  Yes.

Damedau4                    Dicker - redirect

1   Q.  Were the other members of the tax solutions group similarly

2   making money on those tax products?

3   A.  Yes.

4   Q.  Whose opinion letter was it?

5           MR. LINDER:  Objection.

6   Q.  With respect to Defense Exhibit 41.

7           THE COURT:  Overruled.

8   A.  I'm not sure which -- oh, here it is.  It was a draft tax

9   opinion from Jenkens & Gilchrist.

10  Q.  Was it in your personal interest to raise the deal killer

11  issues?

12  A.  No.

13  Q.  Why not?

14  A.  If the deals had stopped, then the transactions would not

15  have been done by the clients and BDO, and also myself would

16  have received less money.

17          MS. DAVIS:  Your Honor, might I republish Government

18  Exhibit 300-156.

19          THE COURT:  You may.

20  Q.  Do you recall, Mr. Dicker, that this was an e-mail from

21  Michael Kerekes to you and Mr. Field and others with three

22  memoranda attached that Mr. Kerekes was sending?

23  A.  Yes.

24  Q.  Now, if I could have enlarged the second paragraph, please.

25          Do you see what number three says, where it says, help

Damedau4                        Dicker - redirect

show the business reasons certain steps were taken, and then it

gives an example:  For example, showing that the reason the

client put on some trades as an individual before entering a

partnership was that the partnership documents were delayed and

he felt the market wouldn't wait.  Did you have an

understanding of what the role of the partnership was in the

Jenkens & Gilchrist tax shelter?

A.  It was an essential element in the transaction.

Q.  Could the client have achieved the tax benefits it had

wanted had there not been a contribution of the options to the

partnership?

A.  No.

Q.  And if we could have the last paragraph on the front of

that e-mail just enlarged, please.  Could you just read out

loud that last sentence, Mr. Dicker.

A.  After I send each memorandum, I make sure to discuss it

with the client and make a note of that fact.

Q.  So, according to what Mr. Kerekes is saying here, what came

first, the memorandum or the discussion with the client?

A.  This indicates he sent the memorandum first.

Q.  And if we could go to the next page of Government

Exhibit 300-156.

          MS. DAVIS:  And, your Honor, may I approach with two

exhibits?

          THE COURT:  You may.

Damedau4                    Dicker - redirect

1   Q.  I'm showing you what are marked as Government

2   Exhibit 301-34 and 301-162, both in evidence.  And if you

3   would, just take a look at 301-34.

4              MS. DAVIS:  May I republish 301-34, your Honor.

5              THE COURT:  You may, Ms. Davis.

6              MS. DAVIS:  Actually, we're going to have to go back

7   to 301-56, Ms. Levine.  I'm sorry.

8   Q.  Do you see that 301-34 is a memorandum to Melvin Gale from

9   Robert Greisman re your invest plans?

10  A.  Yes.

11  Q.  Is that the same subject matter line that we see in -- next

12  page, Ms. Levine, on the right hand.  If you enlarge that.

13  A.  Yes.

14  Q.  And do the paragraphs that you see in the Mel Gale memo

15  look virtually identical to the paragraphs on the right-hand

16  side?

17  A.  Yes.

18  Q.  And if you would take a look at Government Exhibit 301-162

19  in evidence.  Do you see that that's a memo from Michael

20  Kerekes to Brian Allen?

21  A.  Yes.

22  Q.  And it has the subject line of your investment plans?

23  A.  Yes.

24  Q.  And if you would just take a look at 301-162, and tell us

25  whether that looks to be virtually identical to the template

Damedau4                        Dicker - redirect

1  memorandum contained at 300-156.

2  A.  Yes.

3  Q.  Now, you were asked questions about Defendant's

4  Exhibit 266.

5           MS. DAVIS:  Might I republish that, your Honor?

6           And we'll need to go to the Elmo, Ms. Levine.

7           THE COURT:  You may, Ms. Davis.

8  Q.  Do you remember being asked some questions about this

9  posting on the intraweb of BDO?

10  A.  Yes.

11  Q.  And if we could go to the paragraph that starts out, we are

12  prepared.

13           Do you recall being asked questions about alternative

14  distribution channels?

15  A.  Yes.

16  Q.  And could you just read that paragraph out loud, please.

17  A.  We are prepared to enter into financial arrangements with

18  ADCs to encourage them to find transactions.  Typically this

19  involves paying them a fee based on 20 percent of the fee we

20  receive.  I'm not sure what the next word -- it's probably

21  this.  This would be dealt with on a transaction by transaction

22  basis.

23  Q.  To your knowledge did BDO pay third parties for referring

24  clients for Jenkens & Gilchrist tax shelters?

25  A.  Yes.

Damedau4                         Dicker - redirect

1   Q.  You were also asked questions about 301-24.

2              MS. DAVIS:  May I republish, your Honor.

3              THE COURT:  You may.

4              MS. DAVIS:  Ms. Levine, I think we have that.  If we

5   could get it up, please.  And if we could just enlarge the text

6   of this.

7   Q.  Now, do you see that this is a letter to Joseph Klausner

8   from a Michelle Srebalus?

9   A.  Yes.

10  Q.  Do you know who Michelle Srebalus is?

11  A.  I believe she was an administrative assistant at one of the

12  BDO offices.

13  Q.  Do you see whose address is listed at the top there?

14  A.  Right at the top is Chicago.

15  Q.  Chicago office.  And who's copied on this letter?

16  A.  Denis Field and Bob Greisman.

17  Q.  If we could go to the third page of this document and

18  enlarge the fees paragraph.  According to this document, what

19  was the fee for the spread transaction?  Just read it out loud.

20  Do you see where it says, the sentence that starts out the fee?

21  A.  The fee for the spread transaction would typically be

22  8 percent of the gain.

23  Q.  What about the fee for the short sale basis enhancement

24  transaction?

25  A.  The fee for the short sale basis enhancement transaction

Damedau4                        Dicker - redirect

1   typically will range from 4 percent to 6 percent of the gain,

2   and in some cases is as high as 8 percent.

3   Q.  Now, if we could just scroll down, Ms. Levine, to the

4   bottom.  Keep going.

5       Do you see where it says BDO Seidman, LLP,

6   confidential, for tax sales executives only?  Why was the tax

7   sales manual, quote, confidential, for tax sales executive

8   only?

9   A.  Because we did not want this to fall into other parties'

10  hands.

11  Q.  You were also asked questions about Government

12  Exhibit 301-167.

13          MS. DAVIS:  May I republish, your Honor.

14          THE COURT:  You may, Ms. Davis.

15          MS. DAVIS:  If we could have the second paragraph

16  underneath the listing of names enlarged.  Starts out, our tax

17  leader group.  Sorry.  Let's include both that and the

18  paragraph above it.

19  Q.  Now, who is listed as a member of the tax leader group?

20  A.  Charlie Bee, myself, Denis Field, Adam Griffith and Michael

21  Kerekes.

22  Q.  And what does the next paragraph say about the

23  responsibilities of the tax leader group?  If you could read

24  that, please.

25  A.  Our tax leader group has the responsibility to develop

Damedau4                    Dicker - redirect

```
1   and/or secure tax products and services to be sold by BDO

2   Seidman, LLP.  In addition, certain members of the tax leader

3   group are responsible for the quality and control over the

4   process and the products and services.

5          MS. DAVIS:  Now, Ms. Levine, if we could switch back

6   to the Elmo.

7          And, your Honor, might I republish Defense Exhibit 58.

8          THE COURT:  You may.

9   Q.  Do you recall being asked questions about this memorandum

10  that you wrote to Jack Weissbaum in July of 1999 entitled tax

11  products business line?  Do you recall that?

12  A.  Yes.

13  Q.  I think you were asked questions about the negotiation that

14  you did regarding the compensation agreement with

15  Mr. Weissbaum.  Do you recall that?

16  A.  Yes.

17  Q.  Now, I've taken the liberty of underlining every time on

18  that front page that the word we appears.  Do you see that?

19  A.  Yes.

20  Q.  Who does the we refer to in this memorandum?

21  A.  I think that that is Denis Field, Charlie Bee and myself.

22  Q.  Were those the people who ultimately benefited from the

23  compensation agreement regarding the tax solutions group?

24  A.  Yes.

25         MS. DAVIS:  Now, your Honor, might I republish
```

Damedau4                      Dicker - redirect

1   301-293.

2            THE COURT:  You may.

3            MS. DAVIS:  And, Ms. Levine, I can do it on the Elmo.

4   Q.  Do you recall being asked questions about this document

5   that had been prepared for BDO by WL Ross & Company?

6   A.  Yes.

7   Q.  And you were pointed to some paragraphs on the first

8   substantive page, and specifically, the paragraph which starts

9   out, during the last five years BDO has begun to develop new

10  markets and sales strategies.  Do you see that?

11  A.  Yes.

12  Q.  Could you point out where in that paragraph, Mr. Dicker,

13  there's any mention of tax shelters.

14  A.  I see no mention of tax shelters in that paragraph.

15  Q.  According to the last, second to last sentence, that says

16  the financial solutions practice.  Do you see that?  What

17  percentage of revenues is it listed as being responsible for?

18  A.  19 percent.

19  Q.  Now, you were also asked questions about Defense

20  Exhibit 74, which were board minutes of an August 21 through

21  23rd meeting in 2000, Colorado Springs.

22           MS. DAVIS:  Might I republish Defense Exhibit 74, your

23  Honor.

24           THE COURT:  You may.

25           MS. DAVIS:  I'm sorry.  I'm just going to have the

Damedau4                              Dicker - redirect

1    witness look at this.

2    Q.  And I would ask you to just identify first whether Denis

3    Field was at that board meeting, according to the attendees

4    list.

5    A.  He was.

6    Q.  And can you just read through that and let us know if

7    there's any mention of notice 2000-44 in that August 21st board

8    minutes.

9    A.  There is no mention of notice 2000-44 in these minutes.

10   Q.  Now, you were also asked questions about Defendant's

11   Exhibit 283.  Do you recall that?  This is a cover letter sent

12   from a Larry Cohen to a Barbara, correct?

13   A.  Correct.

14   Q.  And then there is a letter to someone named Dennis Owens.

15   And you were asked questions about the list keeping letter that

16   went out?

17   A.  Yes.

18   Q.  I'm going to have you take a look at this letter, if you

19   would.  And I would ask you whether there's any mention by name

20   of notice 2000-44 in that letter.

21   A.  I see no mention by name of notice 2000-44 in this letter.

22   Q.  Do you recall Mr. Linder asking you about the three

23   different components of notice 2000-44, one of which was the

24   list keeping?

25   A.  Yes.

Damedau4                        Dicker - redirect

Q.  And he also questioned you about the first part of the
memo, which talks about the IRS intending to disallow the
deductions from the type of transactions that are listed in
notice 2000-44.  Do you recall that?

A.  Yes.

Q.  I'd ask you to review that letter and see if in that letter
there's any mention of the IRS disallowing the deductions.

A.  I see no mention of that topic in this letter.

Q.  Now, you were asked questions by Mr. Linder about
Government Exhibit 301-216.

        MS. DAVIS:  Might I republish that, your Honor?

        THE COURT:  You may.

Q.  And do you see that this is the March 15, 1999, memo
regarding the March 11th conference call of the tax opinion
committee?

A.  I see that, yes.

Q.  Could we go to page three of the memorandum, Ms. Levine.
And could you enlarge the paragraph as indicated above.

        Do you recall Mr. Linder asking you questions about
this paragraph in which Mr. Greisman recounts a telephone
conversation with Mr. Daugerdas about his fee?  Do you see
that?

A.  Yes.

Q.  Now, in this paragraph, is there any mention of BDO's fee?

A.  No.

Damedau4                          Dicker - redirect

1   Q.  Was BDO's fee that it was receiving from Jenkens &

2   Gilchrist and billing separately the client, was it for a tax

3   opinion?

4   A.  BDO was not writing tax opinions.

5   Q.  So was the fee for a tax opinion?

6   A.  It could not be for a BDO tax opinion.

7         MS. DAVIS:  Nothing further.

8         THE COURT:  Recross, Ms. McCarthy?

9         MS. MCCARTHY:  Yes, your Honor.

10  RECROSS EXAMINATION

11  BY MS. MCCARTHY:

12  Q.  Mr. Dicker, good afternoon.

13        Ms. Davis just asked you a very broad question about

14  the tax solutions group meetings.  Do you recall her asking you

15  about tax solutions group meetings?

16  A.  Yes.

17  Q.  And she asked you whether Mr. Field attended tax solutions

18  group meetings, right?

19  A.  She asked me something along those lines, yes.

20  Q.  Okay.  And I believe you said he did, correct?

21  A.  That's my recollection.

22  Q.  And there were also tax solutions group phone calls,

23  correct?

24  A.  Correct.

25  Q.  And you generally led those phone calls, isn't that right?

Damedau4                       Dicker - recross

1   A.   I generally arranged those phone calls, yes.

2   Q.   And those were weekly phone calls, correct?

3   A.   We tried to make them weekly.

4   Q.   And can you tell us which specific meetings of the tax

5   solutions group that you recall Mr. Field being present at.

6   A.   I can't give you specific dates of meetings that he was

7   present at.

8   Q.   It would be very hard for you to do as you sit there,

9   correct?

10  A.   I can't recall specific dates.

11  Q.   Did you keep notes of attendance at tax solution group

12  meetings?

13  A.   I don't recall doing that.

14  Q.   How about the phone calls?  Do you recall any specific tax

15  solution group phone call that Mr. Field participated in?

16  A.   I want to -- do you mean tax solutions group, including the

17  tax opinion committee, or separately as the tax solutions

18  group?

19  Q.   Let's just start with the tax solutions group.

20  A.   I can't remember now the detailed calls back then.

21  Q.   And are you familiar with Mr. Field's travel schedule

22  during the time that the tax solutions group was in existence?

23  A.   I don't know what his travel schedule was then.

24  Q.   Because you were in the New York office and he was in

25  Chicago, right?

Damedau4                         Dicker - recross

1    A.  Correct.

2    Q.  And he was running the firm, wasn't he?

3    A.  He was the chairman and CEO of the firm after January 2000.

4    Q.  And you were focused entirely on tax products, isn't that

5    right?

6    A.  I spent most of my time on the tax solutions group and also

7    my board duties.

8    Q.  Putting the board aside, you spent your time entirely on

9    tax products, correct?

10   A.  That's how I spent my days.

11   Q.  Yes.  So you cannot, as you sit there, say with any

12   certainty at any particular meeting or call of the tax

13   solutions group that Mr. Field participated in, is that right?

14   A.  I can't tell you which particular meetings he participated

15   in.

16   Q.  Now, let's talk about the tax opinion committee.  Mr. Field

17   was a member of the tax opinion committee, correct?

18   A.  Correct.

19   Q.  And the tax opinion committee was formed in 1998, was it

20   not?

21   A.  I believe it was around then.

22   Q.  And the tax opinion committee's role was to analyze

23   specific tax products to determine whether they were viable for

24   offering to BDO's clients, correct?

25   A.  That was the purpose of the committee.

Damedau4                    Dicker - recross

1    Q.  And the tax opinion committee reviewed every single tax

2    product that was offered to BDO's clients, correct?

3    A.  I believe it did, yes.

4    Q.  And it made -- and there would be a vote.  We've talked

5    about this already.  There was a vote on the tax opinion

6    committee as to whether or not to approve a product for

7    offering to a client, correct?

8    A.  I don't remember a formal vote.  It was a consensus.

9    Q.  And it had to be unanimous, correct?

10   A.  My recollection, that was the practice.

11   Q.  And then the tax opinion committee's recommendation would

12   be given to Mr. Field when he was a national tax director,

13   correct?

14   A.  Yes.

15   Q.  And if the tax opinion committee passed on a product, they

16   would tell that to Mr. Field, correct?

17   A.  What do you mean by pass?

18   Q.  Agreed, approved a tax product.

19   A.  If -- well, he was a member of the tax opinion committee,

20   so he would know what the tax opinion committee had decided.

21   Q.  And there were many tax products that were reviewed by the

22   tax opinion committee and were rejected, were there not?

23   A.  There were a number of transactions rejected.

24   Q.  Mr. Field did not offer -- did not say, well, I'm going to

25   override that rejection, correct?

Damedau4                         Dicker - recross

1  A.  He -- a product that was approved -- rejected by the

2  opinion committee wouldn't -- I don't recall that being

3  overridden.

4  Q.  You don't recall that being overridden, correct?

5  A.  Not if it was approved by -- initially by the tax opinion

6  committee.

7  Q.  Now, you indicated that you retired from BDO on

8  October 31st of 2000 because you were so shaken up by notice

9  2000-44, correct?

10  A.  That's what happened, yes.

11  Q.  You were so upset about the criminal implications of the

12  things you had done at BDO, correct?

13  A.  In reference to criminal in notice 2000-44 was a great

14  shock to me.

15  Q.  And that was a reference to grantor trust netting, correct?

16  A.  Correct.

17  Q.  Yet there was only a single day that you were not

18  associated with BDO after your retirement, isn't that correct?

19  A.  The day of November 1st.

20  Q.  The day of November 1st, that's the only day you had no

21  association with BDO, is that right?

22  A.  Until I finally left in 2003.

23  Q.  Right.  November 2, 2000, two days after you retired from

24  BDO, you joined the board as a retired member, correct?

25  A.  Two days after my retirement was legally effective I

Damedau4                         Dicker - recross

1   rejoined the board.

2   Q.  You didn't run for the hills, correct?

3            MS. DAVIS:  Objection.

4            THE COURT:  Sustained.

5   Q.  You just testified that the reason you accepted an

6   appointment as a retired member to the BDO board of directors,

7   two days after your retirement, was because you were going to

8   be given health benefits; is that your testimony?

9   A.  That was very important to me.

10  Q.  You had just made over $6 million, sir, at BDO in

11  connection with the tax solutions, isn't that right?

12  A.  Around that number, yes.

13  Q.  And you have no idea how much your health benefits were

14  going to cost you, correct?

15  A.  I did not know.

16  Q.  Yet you agreed to rejoin what you believed was an

17  organization committing crimes so that you could have your

18  health benefits paid, is that your testimony?

19  A.  I agreed to rejoin the board because I wanted the health

20  insurance covered.

21  Q.  Mr. Dicker, after you retired from BDO in October 31st of

22  2000, you were no longer receiving the profits from the tax

23  solutions group, correct?

24  A.  My resignation terminated my rights under the compensation

25  agreement.

1   Q.  So you were free of any concerns, self concerns about

2   continuing to reap the profits from the tax solutions group

3   after you retired, correct?

4   A.  I no longer expected to receive amounts under the

5   compensation agreement.

6   Q.  Right.  So when you rejoined the board as a retired member

7   two days after your retirement, you could have called an

8   executive session of the board, could you not?

9   A.  I don't know whether I could do that or whether it was the

10  chairman of the board who could do that.  I don't recall.

11  Q.  Well, in an executive session the chairman, Mr. Field, the

12  CEO, would not be present, isn't that right?

13  A.  I don't recall the nature of the constitution.

14  Q.  Do you recall that there were times at board of directors

15  meetings where Mr. Field was asked to step out?

16  A.  I don't recall those occasions.

17  Q.  You don't recall a single occasion?

18  A.  I don't recall those occasions.

19  Q.  Do you recall that when people's compensation was being

20  discussed by the board of directors, those board members were

21  asked to step out of the room?

22  A.  I believe that was the practice.

23  Q.  And do you recall that there were also occasions when the

24  CEO was asked to step out so that issues concerning management

25  could be discussed?

Damedau4                              Dicker - recross

1   A.  I don't recall those occasions.

2   Q.  Mr. Dicker, you served on the board of directors from

3   November 2nd until October 19th of 2003, correct, as a retired

4   member?

5   A.  The dates sound right, yes.

6   Q.  In that time, sir, you never once raised an issue about the

7   tax solutions practice, isn't that right?

8   A.  That's correct.

9   Q.  And you were not receiving any profits from the tax

10  solutions group at that time, correct?

11  A.  I was no longer entitled to it, payments under the

12  compensation agreement.

13  Q.  So the concern you say you had about telling anybody about

14  your concerns while you were still receiving profits no longer

15  existed at that point, isn't that right?

16  A.  Can you repeat the question.

17  Q.  You testified, Mr. Dicker, that you never said anything to

18  stop the transactions; you never said anything else about the

19  transactions while you were working at BDO because you were

20  earning a lot of money, right?

21  A.  I was earning a lot of money when I was at BDO.

22  Q.  Right.  And you didn't want to upset that boat, correct?

23  A.  I didn't wish to.

24  Q.  But then you left and you weren't getting profits of the

25  group anymore.  You had no further financial interest in tax

1  solutions while you were a retired member of the board, right?

2  A.  Correct.

3  Q.  Yet you said nothing to the board of directors, isn't that

4  right, sir?

5  A.  Correct.

6          MS. MCCARTHY:  I have nothing else, your Honor.

7          THE COURT:  Recross, Mr. Linder?

8          MR. LINDER:  Yes, briefly, Judge.

9  RECROSS EXAMINATION

10  BY MR. LINDER:

11  Q.  Mr. Dicker, you testified that the Tax Notes article by

12  Alice Welt Cunningham is not authority like a revenue ruling,

13  right?

14  A.  An article is not authority.

15  Q.  And, sir, the Tax Notes article by Alice Welt Cunningham --

16  you didn't read it, right?

17  A.  I don't recollect the article.

18  Q.  And so you don't know as you sit here today whether or not,

19  in fact, the Alice Welt Cunningham article reviewed cases, for

20  example, right?

21  A.  I'm not familiar with the article, so I don't know

22  precisely what it included.

23  Q.  And the Jenkens & Gilchrist tax opinion letter cited cases,

24  did it not?

25  A.  There was an opinion letter that cited cases.

Damedau4                          Dicker - recross

1    Q.   And do you recall cases like *LaRue v. Commissioner* and

2    *Long v. Commissioner* and *Helmer v. Commissioner*, sir?

3    A.   I don't remember those names.

4    Q.   But tax court cases are more authoritative than revenue

5    rulings, aren't they, sir?

6    A.   I believe so.

7    Q.   Now, you were asked questions about the independence issue,

8    and I think you said -- you were asked whether you received an

9    answer to your question.  Do you recall that?

10   A.   Yes.

11   Q.   You never asked Paul Daugerdas about this independence

12   issue, did you?

13   A.   No.

14   Q.   You never asked anyone else to ask Paul Daugerdas for an

15   answer to this independence question, did you?

16   A.   I don't recall asking someone to do that.

17   Q.   You were asked about whether -- the issue about the BDO fee

18   in connection with the Greisman memo a few minutes ago, right?

19   A.   Yes.

20   Q.   Now, sir, a tax opinion, the Jenkens & Gilchrist tax

21   opinion, was an attorney-client communication, correct?

22   A.   Opinion is provided by an attorney to a client.

23   Q.   And it contains tax advice, does it not?

24   A.   That's the whole point of it.

25   Q.   Exactly.  And was it your understanding, sir, that

Damedau4                        Dicker - recross

1   Mr. Daugerdas' position was that tax advice was not a

2   transaction cost?

3            MS. DAVIS:  Objection.

4            THE COURT:  Sustained.

5   Q.  Was it your understanding, sir, that based on what you

6   learned at the tax opinion committee in the Greisman memo, that

7   Mr. Daugerdas' position was, and what he conveyed to

8   Mr. Greisman, was that tax advice was not a transaction cost?

9            MS. DAVIS:  Objection.

10           THE COURT:  Sustained as to form.

11  Q.  You recall the Greisman memo?

12  A.  Yes.

13  Q.  Do you recall, sir, that Mr. Daugerdas, Mr. Daugerdas'

14  position was conveyed to the tax opinion committee through

15  Mr. Greisman?

16  A.  Bob Greisman reported in that meeting what he said was

17  Mr. Daugerdas' position.

18  Q.  And my question to you, sir, is:  Was it your

19  understanding, based on what you learned from Mr. Greisman,

20  that Mr. Daugerdas' position was that tax advice was not a

21  transaction cost, yes or no?

22           MS. DAVIS:  Objection.

23           THE COURT:  Sustained.

24  Q.  Did you review the Greisman memo at or around the time that

25  it was written?

Damedau4                          Dicker - recross

```
 1   A.   It was issued to members of the tax opinion committee, of
 2   which I was a member, so I would have seen it.
 3   Q.   And it conveyed Mr. Daugerdas' position, did it not?
 4   A.   The position as reported by Bob Greisman.
 5   Q.   And did you have an understanding about Mr. Daugerdas'
 6   position, based on what was in the Greisman memo?
 7   A.   My source for that information was Mr. Greisman's memo.
 8   Q.   And was it your understanding that tax advice was not a
 9   transaction cost?
10   A.   I had no separate view on that issue.
11   Q.   You had no view one way or the other, sir?
12   A.   I did not know what the answer to that question was.
13           MR. LINDER:  Nothing further.
14           THE COURT:  Anything further, Ms. Davis?
15           MS. DAVIS:  Just one question.  A few questions.
16           Might I republish Government Exhibit 301-216?
17           THE COURT:  You may.
18           It's never just one.
19           MS. DAVIS:  I recognized that as soon as I said it,
20   your Honor.
21           Could I have page three, please.  And if we could go
22   back to the paragraph, as indicated above.
23   REDIRECT EXAMINATION
24   BY MS. DAVIS:
25   Q.   What is referenced in line three, where it says,
```

Damedau4                     Dicker - redirect

1   Mr. Daugerdas believes the better position is to have it all

2   billed as what?  What does that say?

3   A.  As to have it all billed as tax opinion fee.

4              MS. DAVIS:  No further questions.

5              THE COURT:  Anything further, Ms. McCarthy?

6              MS. MCCARTHY:  Nothing, your Honor.

7              THE COURT:  Mr. Linder?

8              MR. LINDER:  Nothing, Judge.

9              THE COURT:  Mr. Dicker, you're excused as a witness,

10  sir.  You may step down.

11             THE WITNESS:  Thank you, your Honor.

12             THE COURT:  Members of the jury, we're going to take a

13  very short recess and move on to another witness.

14             So keep an open mind.  Come to no conclusions.  Don't

15  discuss the case.

16             Please recess the jury.

17             (Continued on next page)

18

19

20

21

22

23

24

25

Damedau4                          Dicker - redirect

1          (In open court; jury not present)

2          THE COURT:  Everyone may be seated for a moment.

3          Last evening the parties raised a further issue with

4     the Court regarding Elowe and Knoedler Archivum.  So that we

5     can proceed with a minimum of objections, in my in limine

6     rulings, I held that the government could introduce a

7     demonstrative, including summaries of HOMER transactions as to

8     which no fact witness had testified, subject to a limiting

9     instruction that the demonstratives were used to show only the

10    economic effect of the transactions, not that any defendants or

11    their taxpayer clients knew the specific profit potential.

12          The government seeks to introduce separate slides of

13    two HOMER transactions, one involving Jeffrey Elowe and the

14    other involving Knoedler Archivum.  Elowe did not testify at

15    trial but Ruth Yates' testimony provides a sufficient factual

16    context about this transaction for the jury to permit the

17    demonstrative.  Specifically, Yates testified about a meeting

18    she attended with Daugerdas at which the transaction was

19    described.

20          As for the Knoedler Archivum HOMER transaction, the

21    parties stipulated to the admission of certain evidence with

22    respect to the transaction which will be read to the jury.

23    That stipulation also provides sufficient context for the

24    government to make an abbreviated presentation regarding this

25    transaction.  Of course, I'll issue the limiting instruction I

Damedau4                         Dicker – redirect

1    previewed in my in limine ruling and that the parties have

2    modified on consent, and endeavor to prevent DeRosa from

3    crossing over into impermissible fact testimony regarding these

4    transactions.  And I'm also relying on the government's

5    representation that neither of these matters are going to be

6    major aspects of Mr. DeRosa's testimony.

7               All right.  We'll take a few minutes.

8               MR. OKULA:  Just to give the Court some context on

9    what we're doing next.  There are two stipulations that, with

10   the Court's permission, we'd like to read when the jury

11   reconvenes.  And then we'll call Dr. DeRosa.

12              THE COURT:  Okay.

13              (Recess)

14              (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

Damedau4                      Dicker - redirect

1                 (In open court; jury present)

2                 THE COURT:  Members of the jury, I'm informed at this

3       time that the government wishes to read a stipulation to you

4       before the next witness comes in.

5                 Let me say that a stipulation is an agreement between

6       the parties that, if called, a witness would give certain

7       testimony or a document is received into evidence.  And so to

8       the extent that a stipulation contains facts that were agreed

9       to be true, you as the jury may accept those facts as true.

10                So now let's see what kind of stipulation we have

11      here.

12                Mr. Okula?

13                MR. OKULA:  Thank you, Judge Pauley.

14                There are, in fact, two stipulations.  The second one

15      will be accompanied by a document we'd like to display to the

16      jury.

17                But starting first with Government Exhibit 800 --

18                THE COURT:  Take the podium.

19                MR. OKULA:  Thank you, your Honor.

20                Government Exhibit 800-14 provides as follows:  It is

21      hereby stipulated and agreed by and between the United States

22      of America, by Preet Bharara, United States Attorney for the

23      Southern District of New York, Stanley J. Okula, Nanette Davis

24      and Niketh Velamoor, US attorneys, and Paul Daugerdas and his

25      counsel, Henry Mazurek and Brian Linder, and Denis Field and

1    his counsel, Sharon McCarthy and Cesar de Castro, that if

2    called as a witness at trial, Peter Sansone would testify as

3    follows:  One, he was employed by Knoedler Archivum, Inc.

4    during the period 2001 through 2005, serving in the position of

5    controller.  During that period Knoedler was owned by an

6    individual named Michael Hammer.

7            Paragraph two, for each of the tax years 2001, 2003

8    and 2004, Sansone did the initial preparation of the corporate

9    tax return for Knoedler, IRS form 1120, which Sansone

10   thereafter sent to Hammer for signature.  These tax returns

11   reported losses or carry-forward losses stemming from

12   Knoedler's participation in a HOMER tax shelter during the 2001

13   tax year.

14           Next paragraph is:  Following Knoedler's execution of

15   the HOMER tax shelter in 2001, Sansone received in Knoedler's

16   New York office an opinion letter from Jenkens & Gilchrist.

17   The opinion letter is marked Government Exhibit 43-1.

18           It is further stipulated and agreed that Government

19   Exhibits 1001-51, which is the draft tax return, and 43-1, the

20   opinion letter, and this stipulation may be received in

21   evidence at trial.  It's dated October 21, 2013, and signed by

22   all the parties.

23           Government Exhibit 800-16 provides as follows:  It is

24   hereby stipulated and agreed by and between the United States

25   of America, by all the attorneys for the United States and

Damedau4                        Dicker - redirect

1    defendant Paul Daugerdas and his counsel Henry Mazurek and

2    Brian Linder, that, one, Government Exhibit 500-3 is a series

3    of e-mails between various individuals at Ernst & Young between

4    May 5, 2001, and June 7, 2001; and two, this stipulation may be

5    received in evidence at trial.  And it's dated October 21,

6    2013, and signed by representatives of the government and

7    representatives on behalf of Paul Daugerdas.

8            With the Court's permission, we'd like to publish and

9    read for the jury, your Honor, Government Exhibit 500-3.

10           MS. MCCARTHY:  Your Honor, Mr. Field objects.

11           THE COURT:  Very well.  Once again, members of the

12   jury, this concerns HOMER transactions.  And you may not

13   consider this against Mr. Field in considering the substantive

14   charges against him.

15           MR. OKULA:  If I may, your Honor, first, I'd like to

16   formally offer the two exhibits, which are Government

17   Exhibits 800-14 and 800-16 respectively.

18           THE COURT:  Any objection?

19           MR. MAZUREK:  No objection pursuant to the

20   stipulation.

21           THE COURT:  Any objection?

22           MS. MCCARTHY:  We have a continuing objection.

23           THE COURT:  Overruled.  Government Exhibits 800-14 and

24   800-16 are received.

25           (Government's Exhibits 800-14 and 800-16 received in

Damedau4                              Dicker - redirect

1    evidence)

2              MR. OKULA:  May we publish, your Honor, Government

3    Exhibit 500-3, which was received in evidence but we're

4    offering in evidence pursuant to Exhibit 800-16, the second

5    stipulation.

6              THE COURT:  Government Exhibit 500-3 is received and

7    you may publish it.

8              MR. OKULA:  Thank you, your Honor.

9              (Government's Exhibit 500-3 received in evidence)

10             MR. OKULA:  Starting at the bottom in the

11   chronological order, Ms. Levine -- hold on.  It's a couple

12   pages back.  If you could blow that up, please.

13             That's an e-mail dated May 5, 2001, from Richard

14   Joyner to Robert Coplan and Jill Starr of Ernst & Young and

15   provides, Bob, we have a client whose return we prepared last

16   year that did a new COBRA transaction in 2000.  We were not

17   involved in the transaction in any way.  In fact, we didn't

18   know they did the deal until we got the tax return information.

19   Can we sign the return with the transaction in it, with a

20   standard engagement letter limiting our liability?  Richard.

21             If we go to the next page.  Responsive e-mails from

22   Robert Coplan, May 7, 2001, 8:10 a.m. to Richard Joyner and

23   copying Jill Starr.  Subject, COBRA.  If we can go over to the

24   preceding page, Ms. Levine.  Blow up the top.  I'm sorry.

25   Could you go to the top of the preceding page.  Thank you.

1          This would present the same situation we dealt with in

2    one or two cases last year.  It is still possible for us to

3    sign a return with a notice 2000-44 transaction on it, provided

4    that it was implemented in a manner that we believe gives it a

5    reasonable basis of succeeding.  What that means is that the

6    client has to give us information on the economics of the

7    transaction.  Was there a reasonable expectation of making a

8    profit after fees?  And after fees, in all caps, question mark.

9    As you probably know, this was true in our structure, but

10   several others who sold this transaction, open quote, notable

11   the Jenkens & Gilchrist approach, closed quote, allowed the

12   client to invest as little as 1 percent of the loss amount in

13   the digital options.  This made the probability of winning the

14   bet quite small, and in the case of J & G, the profit from

15   winning the bet could not -- I'm sorry, profit from winning the

16   bet would not even have overcome the fees.  We would not be

17   able to sign a return with this structure.  But there are

18   others we could sign.  In other words, we are being consistent

19   in that we still believe the transaction can work, and nothing

20   in the way of court cases has undermined that belief.  However,

21   the way in which the economics fail to support or not support

22   business purpose is the key issue.  You probably need to advise

23   the client of this with regard to the return prep fee, since it

24   will take you some time in any event to determine the economics

25   of the transaction.  And you can't do his return without such

1    an examination.  Robert B. Coplan.

2              And this is from Richard Joyner to Jill Starr in

3    response to the preceding e-mail.  It says, can you get someone

4    to help me do a quick and dirty assessment?  It may be that we

5    go back to Will and ask him to request this analysis from the

6    law firm.  What do you think?

7              And from Jill Starr to Richard Joyner, June 1, 2001.

8    Subject, COBRA.  And if you go over please, Ms. Levine.

9              Richard, I just spoke to Erwin Mayer at Jenkens.  He

10   said he would be happy to draft a letter on the economics of

11   the transaction, but had one question.  Are the fees Bob Coplan

12   referred to the attorneys fees for setting up the partnership,

13   S corp., etc., and transaction fees, or will they include the

14   fees for drafting the tax opinion?  According to Erwin, the,

15   quote, COBRA transaction, unquote, clearly could have made a

16   profit if we just are referring to the attorneys fees for

17   setting up the entities and the fees for the opinion -- I'm

18   sorry, the fees for the option transactions.  However, he said

19   the, quote, transaction, unquote, could not have been

20   profitable if you have to include the attorneys fees for the

21   tax opinion, which are by far the substantial portion of the

22   attorneys fees.

23             He also commented that notice 2000-44 did not have any

24   new requirements regarding the, quote, economics, unquote, of

25   the transaction, so he didn't understand why EY was willing to

Damedau4                        Dicker – redirect

1    sign off last year and why EY has these new, quote,

2    requirements, unquote, this year.  I have a feeling we may need

3    to forward this to Bob Coplan but wanted to run it by you

4    first.

5             Signed, Jill Starr.

6             (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Damndau5

```
 1              The responsive e-mail from Richard Joyner to Robert
 2     Coplan, copying Jill Starr on June 1, 2001:
 3              Bob, can you guide us a bit here.  My sense is that we
 4     have to include all of the fees related to the transaction, but
 5     wanted to get your input.  Also, if you have any comments on
 6     the 2000-44 issue, those would be appreciated.
 7              Finally, the response from Robert Coplan to Richard
 8     joiner, copying Jill Starr on June 7, 2001, 8:13 p.m.:
 9              I have not changed my position on this.  In fact, the
10     e-mail below is illuminating, but not surprising to me, now
11     that I see it is Jenkens that is involved.  From the day we
12     discussed doing COBRA with J & G, we made our position to them
13     quite clear -- the transaction had to be potentially profitable
14     after all fees.  We did not for a moment accept their argument
15     that the opinion letter fee "several percentage points of the
16     loss amount and sometimes millions" could be ignored in this
17     analysis.  This was one of the key reasons we had to
18     restructure the transaction for us to consider selling it.
19     I'll bet the client in your case only invested 1 percent of the
20     loss amount -- that's all they had at risk.  And they probably
21     had maybe at best a 15 percent probability of winning their
22     digital options bet.  This transaction is not one we would
23     think had a "reasonable" expectation of making a profit and
24     this would especially be true with a several percent "opinion
25     letter fee."  Whoever you are dealing with can check with Paul
```

Damndau5

1    Daugerdas at J & G, and he will verify that E & Y would not go

2    for the transactions without modifying the approach they took.

3            They are correct about the IRS Notice.  That should

4    not and did not change our opinion of the transaction.  I said

5    so before.  They are implying that I was willing to "sign off"

6    last year, but am changing my mind this year.  This is not

7    true. I would sign off on the right transaction last year and

8    this year, and my standard for signing has not changed since

9    1999.  We would not have signed off on the "ignored opinion

10   letter fee deal" with a 1 percent investment in 1999.  The same

11   holds true today.  Notice 2000-44 has nothing to do with it.

12   Robert Coplan.

13           MR. LINDER:  Your Honor, can we have the limiting

14   instruction, please.

15           THE COURT:  Two things:

16           First, members of the jury, when I overruled

17   Mr. Field's objection and gave you the limiting instruction, I

18   mistakenly referred to this as a HOMER transaction.  It's a

19   COBRA transaction.

20           As with HOMER transactions, Mr. Field's objection and

21   my limiting instruction is that you cannot consider the COBRA

22   transactions on the substantive counts against Mr. Field.

23           Second, once again, the expression of some opinion

24   about deductibility or about the lawfulness of the transaction

25   by a party is just an expression by that party.  At the end of

Damndau5

1    this trial, you are going to receive express instructions from

2    me concerning the law with respect to this matter.

3            MR. OKULA:  Your Honor, before I formally call on our

4    next witness, I would like to formally offer Government

5    Exhibits 1001-51A and 43-1, which were part of the initial

6    stipulation.  1001-51A and 43-1.

7            THE COURT:  Any objection?

8            MR. LINDER:  No, your Honor.

9            THE COURT:  Government Exhibits 1001-51A and 43-1 are

10   received.

11           (Government's Exhibits 1001-51A and 43-1 received in

12   evidence)

13           MR. LINDER:  I should have been more specific.  I was

14   requesting a nonhearsay limiting instruction.

15           THE COURT:  These are out-of-court statements.  They

16   are not offered for the truth.  You shouldn't consider them for

17   the truth, just for the fact that they were made, that

18   Mr. Coplan was exchanging comments with others involved in a

19   transaction.  That is all.  They are simply offered to show

20   state of mind, not for the truth of the statements.

21           All right.

22           MR. OKULA:  Thank you, your Honor.  The United States

23   calls Dr. David DeRosa.

24    DAVID F. DeROSA,

25        called as a witness by the Government,

Damndau5

1              having been duly sworn, testified as follows:

2                   THE COURT:  Mr. Okula, you may inquire.

3                   MR. OKULA:  Thank you, Judge Pauley.

4    DIRECT EXAMINATION

5    BY MR. OKULA:

6    Q.  Good afternoon, Mr. DeRosa.

7    A.  Good afternoon, Mr. Okula.

8    Q.  How old are you, sir?

9    A.  I am 63 years old.

10   Q.  Where do you currently reside?

11   A.  I reside in New Canaan, Connecticut.

12   Q.  Do you have a family, sir?

13   A.  Yes, I do.

14   Q.  Consisting of?

15   A.  My wife and our two daughters, ages 22 and 19.

16   Q.  How are you currently employed?

17   A.  I am employed by a company that I own called DeRosa

18   Research & Trading, and I am also employed part-time by

19   Columbia University.

20   Q.  We'll get back to DeRosa Research & Trading in a moment,

21   but can you tell us a little about your educational background

22   Dr. DeRosa?

23   A.  I did all of my studies at the University of Chicago.  I

24   received a bachelor of arts in economics in 1968 -- excuse me,

25   in 1972.  I started in '68.  And I stayed for another six years

Damndau5                        DeRosa - direct

1    and got a Ph.D. from the business school.  It is now called the

2    Booth School, but it then was called the Graduate School of

3    Business of the University of Chicago.  I got that in '78.

4    Q.  Did you, while you were getting your Ph.D., do some

5    teaching?

6    A.  Yes.

7    Q.  Where?

8    A.  Well, I supported myself by teaching first at University of

9    Illinois, and then at Loyola University of Chicago.

10   Q.  Did you go on to other teaching positions after that?

11   A.  Yes.  The first teaching position I had was as an assistant

12   professor at the University of Southern California.  And after

13   that I left teaching for a prolonged period of time while I did

14   other things, but I came back to it later.

15   Q.  Where?

16   A.  The first place I did teaching when I returned to the

17   academic world was my old school, the University of Chicago, in

18   the graduate school of business.

19   Q.  You taught what subjects there?

20   A.  Well, I was teaching in the finance department.  I taught

21   two courses.  One was a course entitled, that I had made up

22   called foreign exchange and its related derivative instruments.

23   I also taught a course on design of new financial and

24   derivative products.

25   Q.  You used the phrase foreign exchange.  We are going to talk

1    a little bit about that later.  Can you give us a brief

2    definition of what that is?

3    A.   It's the same thing as the currency market.  It means where

4    people change one currency for another, for instance, changing

5    your dollars to yen or changing your dollars to euros or Swiss

6    francs or British pounds.

7    Q.   You also used the phrase derivative, too.  Can you give us

8    a brief explanation of what a derivative is.

9    A.   A derivative, as the name implies, is something that's

10   derived from something else.  An example would be an option

11   contract in which the value of that contract depends critically

12   on the price of another instrument, such as an exchange rate or

13   a stock.  So options, forwards, swaps, futures, exotic options,

14   all of those are called derivative instruments.

15   Q.   Can you describe a little bit your tenure at USC, and then

16   teaching at University of Chicago.

17   A.   Right.

18   Q.   Did you teach any other places after that?

19   A.   Yes.  I taught for 14 years at the Yale school of

20   Management.  That was my next stop.

21   Q.   You taught what there?

22   A.   For a while I taught courses on international financial

23   markets, and I taught my trademark foreign exchange and related

24   derivative instruments and some other courses as well.

25   Q.   Where did you teach after Yale?

Damndau5                        DeRosa - direct

1    A.   Columbia.

2    Q.   What courses did you teach there?

3    A.   The courses -- I always, I seem to always like to teach my

4    foreign exchange and related derivative instruments, but the

5    main course that I teach at Columbia is called pricing models,

6    and those are about option pricing, option and derivative

7    pricing.

8    Q.   You referred earlier in your testimony to taking some time

9    off between your teaching where you spent some time working a

10   regular job, right?

11   A.   A regular job.

12   Q.   Can you tell us your work history a little bit, Dr. DeRosa?

13   A.   When I first came out of the University of Chicago, I got a

14   very unusual job offer, and it was to go live and advise the

15   minister of finance of Saudi Arabia on selecting investment

16   projects.

17           I did that, and then I returned to Saudi Arabia to

18   work on developing their stock market.  They didn't have a

19   stock market, but we created a stock market for them.  I then

20   worked in Kuwait at an investment bank that was owned by some

21   members of the royal family of Kuwait.

22           Following that, in 1985 I came back to the United

23   States and I started a stock brokerage company called DeRosa &

24   Company, which I had for three years, and clients were mostly

25   institutions that were hiring me for my knowledge of academic

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

Damndau5                           DeRosa - direct

1    finance and particular options.

2             Following that I went to work for a big money manager

3    called Alliance Capital, which is in New York.  It is now

4    called Alliance Bernstein.  And I was a portfolio manager in

5    the area of derivatives, using options.

6             I then went to work for a short period of time at

7    another firm that's part of Credit Suisse Asset Management.

8    Then I went to work for Swiss Bank, which is now UBS, as a

9    foreign exchange trader.

10   Q.  What does a foreign exchange trader do?

11   A.  Well, there are many types of traders, Mr. Okula.  Many of

12   them are just buying and selling at customers' requests, a

13   customer calls up and wants foreign exchange.  What I did was I

14   was part of the proprietary trading team.  So we had an

15   allocation of the bank's capital, and we put money at risk

16   hoping that our view of exchange rate would work out.

17   Q.  How long did you stay at Swiss Bank?

18   A.  I was there for three years.

19   Q.  And you left to do what?

20   A.  I left to set up a small hedge fund investment company

21   called Quadrangle Investment.

22   Q.  What did you do there?

23   A.  I was the head trader.

24   Q.  And how long did you stay at Quadrangle?

25   A.  We stayed for a year and a half.

Damndau5                         DeRosa - direct

1    Q.  Until you did what?

2    A.  In 1997 I started my own firm where I am right now, DeRosa

3    Research & Trading.

4    Q.  At the outset, what were the principal activities or

5    affairs of DeRosa Research & Trading?

6    A.  It was meant to do research and consulting and also to

7    start managing money for outside investors.

8    Q.  Have you always developed or branched out into other areas?

9    A.  Yes.  I am on the board of a number of major hedge fund

10   companies.  Some of them are very large.  One of them alone is

11   more than $30 billion.  I have also done corporate teaching,

12   but my two main activities now are doing right what you see me

13   doing now, expert witness work, and research associated with

14   that, and also being on boards of directors and I teach and I

15   write books.

16   Q.  You mentioned books that you have written.  Could you just

17   describe a couple of the books that you have authored.

18   A.  The most recent one is coming out on October 28, and I just

19   saw the first copy of it just the other day.  It's called

20   Foreign Exchange Operations.  It is an unusual book because I

21   don't think anyone has written on this topic before, but it is

22   all about what happens after a foreign exchange trade is made,

23   of how money clears, of how contracts between brokers and their

24   clients work, of how money settles in the international

25   markets, of how central banks are involved in wiring money.

1           The book before that was the third edition of Options

2    On Foreign Exchange.  That is now in its third edition.

3           Then I have another book called In Defense of Free

4    Capital Markets which talks about financial crises.

5           I have a book about central banking in smaller

6    countries, emerging market countries.

7           And I have yet another book on managing foreign

8    exchange risk.

9           All of these, most of these are in multiple editions

10   Q.  Dr. DeRosa, you mentioned that you do a significant of part

11   of your work as expert witness testifying, is that correct?

12   A.  Yes.

13   Q.  Have you worked in significant regard as an expert on

14   behalf of the United States government?

15   A.  Yes.

16   Q.  Have you worked with, for instance, people from the

17   Internal Revenue Service?

18   A.  Yes, I have.

19   Q.  And from the civil branch of the Department of Justice?

20   A.  Yes, sir.

21   Q.  As well as the criminal branch of the Department of

22   Justice?

23   A.  Just like today.

24   Q.  Is your practice limited to testifying only for the United

25   States government?

Damndau5                          DeRosa - direct

1   A.  No.

2   Q.  Have you in fact been consulted on occasion by, for

3   instance, in the tax shelter area, by representatives of tax

4   shelter clients?

5   A.  I have received phone calls from attorneys inquiring as to

6   whether or not I was available to be an expert witness on the

7   taxpayers' side.

8   Q.  Did that ultimately end up in you testifying on behalf of

9   the taxpayers?

10  A.  Well, usually what they do is they give you a brief picture

11  of what --

12          MR. MAZUREK:  Objection.

13  Q.  Just yes or no.

14          THE COURT:  Sustained.

15  A.  Yes.

16  Q.  As a result of that conversation --

17  A.  I'm sorry.  I didn't hear the question.

18  Q.  I'll start again.

19          As a result of being contacted and having any

20  discussions with representatives of taxpayers, have you

21  ultimately testified on behalf of taxpayers?

22  A.  No.

23  Q.  What is your hourly bailing rate, Dr. DeRosa?

24  A.  For the government, $450 an hour.

25  Q.  Do you have staff at DeRosa Research & Trading?

Damndau5                    DeRosa - direct

1   A.   I do.

2   Q.   Consisting of what?

3   A.   I have four professional people that support my activities,

4   and I have a bookkeeper and I also have an office manager.

5   Q.   In connection with your testimony in this particular

6   matter, Dr. DeRosa, how much have you billed to date?

7   A.   I believe it's $75,000.

8   Q.   Based on approximately how many hours that were put in by

9   you and your staff?

10   A.   300.

11   Q.   What in particular did you look at or were you asked to

12   examine in connection with your testimony here today,

13   Dr. DeRosa?

14   A.   Mostly it is -- what I looked at were documents that are

15   legal opinions about investment products, and I looked at a lot

16   of documents that came from Deutsche Bank, confirmations and

17   other internal records.

18   Q.   Just broadly speaking, your analysis with respect to the

19   documents and the transactions you looked at was aimed at

20   achieving what?

21   A.   One, to understand the transactions.  I wanted to

22   understand their inherent ability to make money or not make

23   money.  I wanted to know something about their risk.  I wanted

24   to know about their potential for profit.

25   Q.   I'm going to ask you to take a look at and you'll see on

Damndau5                          DeRosa - direct

1   the screen in front of you what's been marked for

2   identification as Government Exhibit 101-21A.

3           Before I get to that, Dr. DeRosa, have you been asked

4   to look at a series of different transactions that went by

5   different names?

6   A.  Yes, I have.

7   Q.  Have you looked at, for instance, a series of transactions

8   involving digital currency options?

9   A.  Yes, sir.

10  Q.  Digital currency swaps?

11  A.  Yes, sir.

12  Q.  How about treasury shorts?

13          Have you looked at treasury shorts?

14  A.  Yes.

15  Q.  Finally, have you looked at some options in connection with

16  what is known as the HOMER tax shelter?

17  A.  Yes, sir.

18  Q.  Let's start with Government Exhibit --

19          MR. OKULA:  I think I misidentified it, your Honor,

20  it's 108-21A.

21  Q.  Do you recognize that cover sheet?

22  A.  OK.  It's back.  My screen was blank for a few moments.

23  Q.  Yes.  Do you recognize that?

24  A.  Yes.

25  Q.  What is that?

Damndau5                    DeRosa – direct

1    A.   These are slides that I prepared concerning Mr. Daugerdas'

2    investment in the year 2000 in digital option transactions.

3              MR. OKULA:  With the Court's permission, your Honor, I

4    would like to utilize Government Exhibit 108-21A as a

5    demonstrative for the jury.

6              MR. MAZUREK:  No objection.

7              MR. DE CASTRO:  No objection, but ask for an

8    instruction, your Honor.

9              THE COURT:  All right.  Government Exhibit 108-21A is

10   received in evidence.

11             (Government's Exhibit 108-21A received in evidence)

12             THE COURT:  Once again, this is a presentation

13   relating to transactions in which Mr. Field is not charged

14   substantively, so you can't consider it in that regard.

15             MR. OKULA:  Thank you, your Honor.

16   BY MR. OKULA:

17   Q.   In my questioning, I referred to and the slide reflects the

18   title digital options.  Do you see that, Dr. DeRosa?

19   A.   Yes, sir.

20   Q.   Could you give us a quick description of what a digital

21   currency option is.

22   A.   Yes.  A digital currency option was originally called a bet

23   option.  It's sometimes called a binary option, and it is a

24   very simple transaction in the following sense:

25             The option is structured on a specific exchange rate,

Damndau5                         DeRosa - direct

1    like the exchange rate of dollars for yen.  And there is an

2    element in the transaction called the strike price.  That's

3    like the triggering level.

4          On expiration date at 10 a.m., New York time, the

5    dealer that sold the option looks to see where the exchange

6    rate is.  If it is trading better than the strike, then the

7    owner of the digital option gets a fixed prize, gets a fixed

8    sum of money.

9          But even if it goes beyond that strike, keeps going,

10   the money prize is just the same.  That's why it was once

11   called a bet option, right?  Because it's saying, I'm betting

12   that dollar/yen is going to be at 115 yen to the dollar, at 10

13   a.m. on November 3.  And if I'm right, the dealer has to pay me

14   $100,000; and if I'm wrong I get nothing.  That's why it's

15   digital.

16   Q.  So digital is a reference to the fact that it is a either

17   you win or you lose?  All or nothing?

18   A.  It's an all or nothing.  It's you either get that payoff or

19   nothing.

20   Q.  Have you ever heard the phrase or the word European style

21   to describe a digital options?

22   A.  Yes.

23   Q.  What does that mean?

24   A.  Well, early in the development of option pricing theory, it

25   was learned that it's important to distinguish whether an

Damndau5                    DeRosa - direct

1   option can be triggered at any time in its life, ever -- for an

2   old historic reason, that's called American exercise -- or just

3   at the end, and that's called European.  These options are

4   European.  It doesn't matter what happens to dollar/yen before

5   the expiration.  It's only at 10 a.m. on the last day.  That is

6   all that matters.

7           If it's better than the strike, the owner of the

8   option gets paid.  If it's not better than the strike, nobody

9   gets money.

10  Q.  You've referred to something called the strike price.  What

11  is the strike?

12  A.  The strike price is like the critical test level.  And the

13  underlying exchange rate, like dollar/yen, has to breach that

14  or be better than that in order for the option to get

15  triggered.  So that's the criterion.  That's the marker.

16          If the marker is here, the strike is here, and if this

17  is a bullish bet, if you're over that marker, bang, you get

18  paid at the end.  But if you are not over that marker, the

19  strike, you get nothing.

20  Q.  You referred a moment ago, Dr. DeRosa, to something called

21  American exercise.  Have you ever heard the phrase

22  plain-vanilla option?

23  A.  Yes.

24  Q.  Is that the same as the American exercise?

25  A.  No, it is not.

Damndau5                    DeRosa - direct

Q.  What is the plain-vanilla option?

A.  A plain-vanilla option would be like this:  Let's say that
somebody wants to buy a house, right?  And the seller of the
house, often you see this in rent-to-buy kind of situations.
So the seller of the house says to the buyer, I'll give you an
option to buy the house for three years at this fixed price.

        Now, no matter what happens, as long as the market
price of the house is above that strike price, the owner of the
option gets to buy, and the more the house goes up in value,
the more that option is worth.

        So it's not digital.  It's not digital because it's
not this fixed pot of money that you get.  It's more valuable
the more it exceeds the strike.  That is what a plain vanilla
is.  That's the term that they use.

Q.  How are these strike prices and the terms of the options
set at the outset?

A.  Well, usually what happens is most options are created by
investment banking firms.  They don't have to be, but most of
them are created by them at the request of a customer.

        So a customer might say, I would like to have a
digital option on dollar/yen that pays $100,000 in one month's
time, and I would like the strike of 115.

        But it often goes another way, that the investment
bank consults and says, Well, wouldn't you really rather have
it at a different strike, or we can improve it by doing this,

Damndau5                     DeRosa - direct

1    that, or the other thing.  But ultimately the customer accepts

2    the terms.

3    Q.   Is there typically a written piece of paper that

4    memorializes what the agreed-to terms of the option contract

5    are?

6    A.   Yes.

7    Q.   That's called what?

8    A.   A confirmation.  So whenever a trade is done, a

9    confirmation is produced with all of the terms.

10   Q.   By all of the terms you mean what?

11   A.   Well, the size, what exchange rate it's on, when it

12   expires, things like that.

13   Q.   In connection with your analysis of the digital options in

14   this case, what specific documents did you look at in trying to

15   assess the profitability of certain digital options contracts?

16   A.   First, we had the tax opinions, which gave us sort of a

17   roadmap to the transactions.

18              Then we had documents that -- all of the transactions

19   that I examined were done with Deutsche Bank, a big German

20   bank, right.  And Deutsche Bank, we have the confirmations, and

21   then we also have internal trading records, but not always, but

22   for some of them.  And one is a screen shot of their option

23   program, called ODET.

24   Q.   And ODET, O-D-E-T, is an acronym for what?

25   A.   It stands for option deal entry tool, right.  That's what

Damndau5                          DeRosa - direct

1    it means.  And a tool is a program.

2    Q.  What type of information was reflected on the ODET that

3    aided you in doing your analysis?

4    A.  We don't have ODETs for everything, but when we have the

5    ODETs, the ODET shows all of the terms of the option, plus it

6    shows internal information that we can use in understanding the

7    option price.

8    Q.  What type of internal information is reflected on the ODETs

9    and the other Deutsche Bank documents that would aid you in

10   after the fact assessing the probabilities?

11   A.  Well, the size of the option, the strike price, which

12   exchange rate it is, when the option expires, and then sort of

13   what I would call like the inner guts of the option pricing.

14   And those are what was the level of the exchange rate when the

15   transaction was executed.  It will have in one of two ways the

16   interest rate in the two currencies, right?  It may have that

17   in another form, but that's what's it's giving you.

18          Then it has one of the key elements of option pricing,

19   an estimate -- not an estimate but a statement of the

20   volatility of the market.  Sometimes that's called standard

21   deviation, sometimes it is called volatility, but you need

22   that.

23   Q.  Why is an understanding of volatility either in the

24   documents of the financial institution that's putting on the

25   trade or learned through some other manner, why is that

Damndau5                          DeRosa – direct

1    critical to your pricing or understanding of the probabilities?

2    A.  Because the models that I used, the ones that I have

3    written about all those years and taught at all these schools

4    and used on Wall Street are in a family of pricing models

5    called the Black Scholes family, after Fisher Black and Myron

6    Scholes.

7    Q.  Who were they?

8    A.  Well, Fisher Black sadly died.  He was an academic and

9    later a partner of Goldman Sachs.  And Myron Scholes was also

10   an academic.  They alternated between the University of Chicago

11   and MIT.  And Scholes later went on to Wall Street work as

12   well.

13          There was a third person named Robert Merton who was

14   critical in developing these models.

15   Q.  What is the Black Scholes model?

16   A.  Again, it's the family of Black Scholes that I am talking

17   about.  But it basically is our workhorse model for pricing

18   options of various kinds and also for extracting hedging and

19   risk analysis and also for obtaining probabilities.

20   Q.  Black Scholes was developed by the three individuals, or

21   the two aided by the third approximately when?

22   A.  In the very early '70s.  I first saw it was a working paper

23   in 1972.

24   Q.  Is the Black Scholes model or some variant of it the

25   standard model that's employed in options pricing on Wall

Damndau5                          DeRosa - direct

1   Street?

2   A.   It certainly starts with that.  And for the purposes here,

3   this is as far as you need to go.  It's literally been taught

4   to hundreds of thousands of people, some taught by me.  It's

5   ubiquitous.  It's a all over the place in the options world.

6   Q.   Just to try to get a sense of what this Black Scholes model

7   is, it's not some machine, is it?

8   A.   I'm sorry.  It's not what?

9   Q.   It's not some machine, right?

10  A.   No.

11  Q.   Is it, for lack of a better phrase, a formula?

12  A.   Yes.  That's correct, exactly what it is.

13  Q.   Tell us how you would employ the formula in a general sense

14  in trying to figure out the possibilities of a given set of

15  options.

16  A.   Well, it starts out like this.

17       You start out with these equations, which you could

18  put into -- if you're familiar with Excel, it can go right into

19  a group of Excel cells, and it wouldn't even take much space.

20  But at the time that they invented it, nobody was thinking

21  about this.  Imagine that you got a place where you put the

22  entry fields, right?  And the entry fields would be the size of

23  the option, the exchange rate, because we are talking about

24  currency options, where the currency is trading, what the level

25  is, what the strike is.  You would put in the interest rate for

Damndau5                          DeRosa - direct

1    each of the currencies, and then you would put in the

2    volatility, which is a standard deviation.

3              You can then use Excel, or you could use even, you

4    could even do it with this, with an HP 12C calculator, not

5    automatically, but you could calculate the value of the option.

6    That would be the first step.

7    Q.   You described earlier or began to describe the universe of

8    documents from Deutsche Bank that you use, I think you

9    described the confirming and some of the ODETs which were the

10   particular documents from Deutsche Bank as well as the opinion

11   letters, correct?

12   A.   We looked at those, yes, and others.

13   Q.   Were there some additional records from Deutsche Bank that

14   you looked at as well?

15   A.   Yes.  We also had some printouts of something called RMS,

16   which is their risk management system of the bank, which shows

17   what options were alive in their risk management book, and one

18   other.

19   Q.   Why is analysis of a bank's risk management book important

20   to assessing the probability of options?

21   A.   Because it told us -- first of all, it confirmed the terms,

22   right, that we got the right option.  And, secondly, it's

23   important to know how the bank was hedging this.  Because

24   banks, when they do derivatives they don't take risk.  They

25   want to lay off the risk as much as possible.  They are just

Damndau5                      DeRosa – direct

1    trying to buy low and sell high, but they don't keep live risk

2    on the desk.

3            So the way they hedge it is like -- it is sort of like

4    a microscope, that you are looking into the risk manager's

5    process and seeing how does he or she regard the risk of the

6    transaction.

7    Q.  You referred to something called hedging.  What is that and

8    how does that play into risk management?

9    A.  Hedging means that somebody does transactions that

10   neutralize or nearly neutralize the risk of a trade that the

11   bank has done with a customer.

12   Q.  Did you have that complete universe of documents, the RMS

13   and the ODETs on each of the either swaps or options that you

14   looked at?

15   A.  We did but -- some of it we did.

16   Q.  Was there something called an Ethos E-T-H-O-S, Ethos

17   reports that you had as well?

18   A.  Yes.

19   Q.  What were they?

20   A.  That is the most recent version of RMS.  That's showing you

21   what the last version of it is, in case they changed something.

22   Q.  Did you have this complete universe of documents for each

23   of the options that you looked at and analyzed in connection

24   with your work here?

25   A.  No.

Damndau5                        DeRosa - direct

1    Q.  So what did you do to try to find some alternative source
2    of information that could help you in your analysis?
3    A.  Well, we have a subscription -- at I might add great
4    cost -- to Bloomberg, the Bloomberg terminal, Bloomberg as in
5    Michael Bloomberg the mayor of our great city.  That was the
6    source of his business fortune, considerable business fortune.
7    For a large amount of money you can get a terminal that gives
8    you news and current stock prices and exchange rates, plus it
9    has the industry standard database of historical prices and
10   volatilities and interest rates.  So it's a research tool as
11   well as a trader's tool.
12           So if we didn't have information from Deutsche Bank,
13   we checked Bloomberg.  But even if we had the Deutsche Bank
14   information, we also check that with Bloomberg just to make
15   sure that everything was square.
16   Q.  If you had the internal Deutsche Bank documents, you could
17   tell at what particular point in a day some aspect of the trade
18   was effectuated, correct?
19   A.  Yes.
20   Q.  If you did not have that point in time as reflected in the
21   Deutsche Bank documents, how would you know what price in
22   Bloomberg to look for for that particular day?
23   A.  Well, you don't know.  What you know, though, is the range
24   of prices that day.  So what we would do is we would do the
25   calculations based on the high and the low, and then we took

Damndau5                          DeRosa - direct

1  either the high or the low depending on which one looked more

2  favorable for the taxpayer's transaction.

3  Q.  Directing your attention now to 108-21A --

4          MR. OKULA:  If you could go to the next page, please,

5  Ms. Levine.

6  Q.  Could you tell us what you endeavored to set out here, what

7  you tried to show us, Dr. DeRosa?

8  A.  Well, this is sort of the first page.  This is showing the

9  first transaction that we are going to look at.

10          This is Mr. Daugerdas in November of the year 2000 did

11 offsetting digital options that were triggered off of -- it

12 says USD/JPY.  That's currency trader talk for dollar against

13 yen, the dollar/yen exchange rate.  JPY means Japanese yen, and

14 USD means our U.S. dollar.

15 Q.  The phrase that's used there in the caption, Offsetting

16 Digital Options, what does the word offsetting mean?

17 A.  Mr. Okula, these transactions in the offsetting digital

18 options work like this:  On one hand, Mr. Daugerdas bought a

19 digital option on dollar/yen.  But simultaneously, he sold back

20 to the bank a near perfect, but not exact, replica of the

21 option that he bought.  So he bought an option and he sold an

22 option, and they're extremely similar to each other.  They have

23 the same expiration, the same currency, and nearly the same

24 price.

25 Q.  It says on the slide that Mr. Daugerdas contracted to pay

1    $25 million net for the component digital option he purchased

2    through Deutsche Bank.  Is $25 million actually exchanged?

3    A.  No, because of the second option.

4    Q.  The second option being?

5    A.  The one that he told for $24,750,000.

6    Q.  So how much money is actually put up to essentially

7    purchase this bet on the option pair?

8    A.  Mr. Daugerdas paid net $250,000 for this.

9         MR. OKULA:  If we could go to the next slide, please,

10   Ms. Levine.

11   Q.  Do you see the second point there.  It says, Would receive

12   either all or nothing.  Is that the way it's stating the

13   digital aspect of the option?

14   A.  Well, he's got one option that is going to pay him if it

15   hits and another option that he has to pay on.  And since they

16   are nearly identical, either they are both to hit and make

17   payments or neither will hit and make payments, so it's zero,

18   which means it is, his $250,000 is gone, or he'll get the net

19   payment of the two.

20        MR. OKULA:  If we can go to the next slide,

21   Ms. Levine.

22   Q.  Are these the two outcomes that you just spoke about?

23   A.  Well, the important thing to understand is that this is a

24   double-or-nothing bet.  You can think of it just like a bet,

25   right.  Both options will either expire worthless, which in

Damndau5                           DeRosa – direct

options world is called out of the money.  It means they are

dead at expiration, in which case, the $250,000 premium is

water under the dam, right?  It's gone.  Or they'll both hit,

meaning that they're both in the money.

          And the net of those payments is that he'll get

$500,000 from Deutsche.  That's the net amount.  But he spent

$250,000, so he'll be up $250,000.  So I think of this as a

double-or-nothing bet.  That's what all this comes down to is a

double-or-nothing bet.

Q.  Before we go to the next slide and the probabilities, let

me ask you this, Dr. DeRosa.  You have described the exercise

essentially at the last day of the term of the option, correct?

A.  Yes, sir.

Q.  Even though it is fashioned that way in practice with these

types of options, is there an ability to essentially do an

early termination of the option?

A.  Well, Mr. Okula, in the world of trading options from

professional banks, the bank usually stands ready to buy it

back from you if you want to get rid of it.  So that's how you

would terminate it.  You would sell the option you own and buy

the option that you had sold them back.  And that's a

termination.

Q.  And the thinking on why a bank would seek to make an early

payment on the bank is what?

          MR. MAZUREK:  Objection.  Calls for speculation.

Damndau5                        DeRosa – direct

1          MR. OKULA:  As a matter of general practice.

2          THE COURT:  Yes.  Overruled.

3    A.  I'm sorry.  Now I've lost the question.

4    Q.  I'll ask it again.  As a matter of general practice, what

5    would be the thinking on why the bank would seek to essentially

6    end the term of the option early, in other words, make a

7    payment before it goes to expiration?

8    A.  Well, Mr. Okula, there are two reasons for that.  The first

9    is that, generally speaking, whenever a bank does a transaction

10   they make money.

11         Secondly, they stand behind the product and say, Well,

12   if we sold it to you, we'll buy it back at a price.  But,

13   generally speaking, they like to do transactions, whether it's

14   undoing them or redoing them.  They like to trade.

15   Q.  Is the movement of the currency in a particular direction a

16   factor in that regard?

17   A.  Absolutely.

18   Q.  Now, turning to the next slide, if you would, tell us how

19   you assess the probabilities of Mr. Daugerdas' particular

20   option pair, the U.S. dollar/Japanese yen.

21   A.  I referred earlier to this family of models called Black

22   Scholes.  We are looking at now the member of the family that

23   does digital currency options, right?

24         Basically, once you have got the price, you can go

25   back in and assess the probability, you can pull out the

Damndau5                         DeRosa - direct

1   probability implied by the inputs of the option being

2   successful for the investor.

3   Q.   The probability of Mr. Daugerdas getting the double payout

4   on the Japanese yen/U.S. dollar bet was what?

5   A.   38.5 percent.

6   Q.   And then conversely, the chance of losing it all were?

7   A.   61.5.

8           MR. OKULA:   If you could go to the next slide,

9   Ms. Levine.

10  Q.   So this just a summary of what your methodology was and

11  what the outcome --

12  A.   Yes, sir.

13  Q.   Can you just run through that.

14  A.   Well, he paid $250,000 to get into the trade, which was the

15  net of buying and selling.   I used the standard option pricing

16  formulas to extract the probabilities of the option finishing

17  successfully for him at expiration.   In my opinion from the

18  calculations, he had about a -- he had not about, he had a 38.5

19  percent probability of being successful in the

20  double-or-nothing bet.

21          MR. OKULA:   Ms. Levine, could you please go to the

22  next slide.

23  Q.   You talked earlier about sometimes the full universe of

24  documents from Deutsche Bank being available and sometimes not.

25          How about in this instance?

Damndau5                          DeRosa – direct

1   A.  We had the full universe of documents, so I simply used the

2   numbers that were on the ODET, but I did my own calculations

3   and confirmed that the prices were correct.

4   Q.  Did you also have Deutsche Bank account statements for

5   Mr. Daugerdas that you reviewed as part of the analysis?

6   A.  No, I didn't have account statements.

7   Q.  Well, you had a universe of Deutsche Bank documents,

8   correct?

9   A.  Yes.

10  Q.  Is one of the things that you learned or came to see at the

11  end of the day is whether the option that you just analyzed the

12  probabilities of, whether there was a payout?  In other

13  words --

14  A.  I'm sorry, I misunderstood you.  Yes, indeed, I have that

15  information.  In other words, what he did with the option

16  subsequently.

17  Q.  Yes.

18  A.  Yes.  I have that.  I'm sorry.  I misunderstood you.

19  Q.  As you sit there now, do you recall what the outcome of

20  U.S. dollar/Japanese yen bet was.  You have a document that you

21  prepared, correct?

22  A.  I do.  But I don't have it in front of me, and I don't want

23  to guess.

24  Q.  All right.

25  A.  OK.  This is the November 2000 dollar/yen.  He paid

Damndau5                          DeRosa - direct

1  $250,000.

2             THE COURT:  What document is this?

3             MR. OKULA:  If I may, your Honor.

4  Q.  Mr. DeRosa, don't read from the document unless I ask you a

5  question.  OK.

6             You prepared, is that right, an analysis, basically a

7  short analysis of what the outcomes of the options were?

8  A.  Yes.

9  Q.  I have placed in front of you what's been marked for

10 identification as Government Exhibit 3500-108WWW.  I'm going

11 ask you to do this, Dr. DeRosa.  Just look at the document,

12 don't read from it, and then tell us whether that refreshes

13 your recollection --

14 A.  Yes.

15 Q.  -- about what the outcome of this particular options bet

16 was?

17 A.  He sold it back to the bank, sold the pair back for

18 $210,000.

19 Q.  So the end result was what?

20 A.  He lost $40,000.

21 Q.  Was there a second pair of options that you looked at in

22 connection with Mr. Daugerdas for the November 2000 period?

23 A.  Yes, sir.

24             MR. OKULA:  If you can go to the next slide, please,

25 Ms. Levine.

Damndau5                    DeRosa - direct

1   Q.  How do they differ from the U.S. dollar/Japanese yen?

2   A.  Well, they are both done in November of 2000.  This is also

3   a pair of digital options, only this time it's on the euro

4   against the U.S. dollar.  That's the exchange rate.

5   Q.  Is the structure basically of this set of slides similar to

6   the one that just described for the U.S. dollar/Japanese yen,

7   the difference being just the currency?

8   A.  Well, there are differences in strikes and things like

9   that, but it's basically the same two-to-one bet,

10  double-or-nothing bet.

11          MR. OKULA:  If we could go forward, please,

12  Ms. Levine, one.  And one more.

13  BY MR. OKULA:

14  Q.  What were the probabilities on this transaction that you

15  determined?

16  A.  45.1 percent chance of being successful.

17  Q.  And, conversely, the chances of losing on the bet were

18  what?

19  A.  54.9.

20          MR. OKULA:  If we could go forward two pages, please,

21  Ms. Levine.

22  Q.  Did you have all of the internal Deutsche Bank documents

23  with respect to this particular trade?

24  A.  No.

25  Q.  So what did you use?

Damndau5                        DeRosa – direct

1  A.  Well, this is, as I said earlier, my subscription to the

2  Bloomberg machine.  We went in and we got, for that day we got

3  the critical information that we needed to price and evaluate

4  the probabilities.  And we did it again at the highest rate for

5  the day for euro/dollar, the exchange rate for the euro against

6  the dollar, and the lowest exchange rate for the day.

7  Q.  If you had used the lowest rate for the day, would the

8  probabilities have changed?

9  A.  Yes.

10  Q.  How so?

11  A.  It would have dropped to 38.3.

12  Q.  Now, going forward, was there a third pair of digital

13  options that you looked at for Mr. Daugerdas for the December

14  2000 period?

15  A.  Yes.

16  Q.  Can you describe a little bit what the contours of this

17  option pair were.

18  A.  I think I need another slide.  Right.  OK.

19         MR. OKULA:  Keep going forward, please, Ms. Levine.

20         THE WITNESS:  No.  No.  Back one.

21         MR. OKULA:  Back one more.

22         THE WITNESS:  That's the slide I need.

23         MR. OKULA:  OK.

24         THE WITNESS:  OK.

25  A.  So this is a smaller option, it's a euro/dollar.  Again,

Damndau5                          DeRosa – direct

1   the euro is the common currency of many European countries, and

2   it's traded against the dollar.

3          This time he agreed to pay 3.6 million to buy the

4   component digital, and he contracted to receive 3,564,000 for

5   the option that he was selling to the bank, which means that he

6   was out $36,000.

7          MR. OKULA:  Can you go forward, please, Ms. Levine.

8   A.  It is an all or nothing.

9   Q.  Was this similar digital, that is, all or nothing on the

10  bet?

11  A.  Yes, sir.

12         MR. OKULA:  If you could go forward one more.

13  Q.  The probabilities of the outcome here were what?

14  A.  The probabilities of losing the $36,000 were 65.8 percent,

15  and the probability of being successful was 34.2 percent.

16  Q.  On this particular set of options that he paid the $36,000

17  premium, do you know whether all of the Deutsche Bank inputs

18  were available?

19         MR. OKULA:  If you can go forward a couple of pages,

20  Ms. Levine.

21         THE WITNESS:  No, you're going too fast.

22         MR. OKULA:  There you go.

23  A.  Again, this was another one where I had to go to Bloomberg

24  and look up the historical change rates and volatility and

25  interest rates.

Damndau5                          DeRosa - direct

1   Q.   So you used the high rate for the day to calculate the

2   probabilities he did?

3   A.   I also did on the low.

4   Q.   Which would have resulted in what potential outcomes?

5   A.   The probability of being successful drops to 14.9 percent.

6   Q.   Now these last two options, the one for $3,600,000 and the

7   second one for $25 million, looking at the exhibit that you

8   have in front of you, does that refresh your recollection about

9   what the outcomes were for Mr. Daugerdas on those, the second

10  and third option pairs for 2000?

11  A.   Well, he had a little more luck with the previous euro one,

12  the one for $250,000.  He closed that at out at $270,000.  So

13  he made $20,000 on that one.

14  Q.   And the $36,000, where he paid the $36,000 premium?

15  A.   He sold it for 30,000, so he lost 6,000.

16           MR. OKULA:   If we could go forward to the next slide.

17  Q.   Were there two additional options paired that you look at

18  for Mr. Daugerdas that he did in different tax years?

19  A.   Right, correct.

20  Q.   And could you describe the first one, first for 1999?

21  A.   The one that he did on December 3 of '99, when he did the

22  trade had a long, this was on the euro -- EUR is the euro --

23  against the dollar, and it had a long premium of 5 million.  So

24  he had to pay 5 million, but he got to offset that by the

25  option he sold for $4,962,500, so he was out a net premium of

Damndau5                          DeRosa - direct

1   $37,500.

2   Q.  Now, if you could stop there, Dr. DeRosa.  On the previous

3   options, the three previous options pairs that we looked at,

4   the premium that was put up was 1 percent of the long option,

5   that is, the $25 million option had a $250,000 put up.  Is it

6   the same 1 percent here?

7   A.  No.

8   Q.  What percentage is it?

9   A.  Well, what percentage is it?  Fortunately I brought my

10  calculator.  It's .75 percent.

11  Q.  So three-quarters of a percent?

12  A.  Yes.  Three-quarters of a percent, right.

13  Q.  What were the potential outcomes that you calculated here?

14  A.  He either loses the $37,500 with a large probability of

15  82.7 percent, or he gets his double or nothing, he gets his

16  double -- that would be the nothing.  The double is that he

17  would get $37,500 with a probability of 17.3 percent.

18  Q.  What was the actual outcome of that trade for

19  Mr. Daugerdas?

20  A.  He lost it all.  It expired worthless.

21  Q.  Now for the final one for the 2000 year, could you describe

22  briefly the contours of that options pair?

23  A.  You mean 2001?

24  Q.  Yes, 2001.

25  A.  Dollar/yen.  So that is on the other big exchange rate,

Damndau5                        DeRosa – direct

1     dollar/yen.

2              This was a substantially larger option.  It was a

3     premium of $25 million that he contracted to pay, and on the

4     short side $24,750,000.  So on this one he got a quarter of a

5     million dollars in the trade.

6     Q.  What were the probabilities with respect to this final one

7     for 2001?

8     A.  The probabilities of both expiring out of the money of 50.8

9     percent, and the probability of winning the double or nothing

10    bet is 49.2 percent.

11    Q.  I think you note in the line above those calculations that

12    you have the Deutsche Bank inputs to make the calculation, that

13    is, you didn't have to rely on the Bloomberg high and low for

14    that second calculation?

15    A.  For the 2001 option I'm just using it.  But I compared it

16    to Bloomberg.  But I used the Deutsche Bank inputs.

17    Q.  Why would you compare it to Bloomberg even though you had

18    the Deutsche Bank inputs, all of the relevant documents?

19    A.  I wanted to be careful.

20    Q.  What was the outcome of that final options bet for

21    Mr. Daugerdas?

22    A.  They are very close.

23    Q.  I mean, what was the ultimate return?

24    A.  Oh, sorry.  I thought you wanted a comparison.  He sold the

25    option for $200,000, so he lost $50,000 on the trade.

Damndau5                         DeRosa – direct

Q.  In addition to the options for Mr. Daugerdas, did you also

look at the digital options transactions for a small universe

of other clients of Jenkens & Gilchrist?

            MR. MAZUREK:  Judge, might this be a good time to

issue the limiting instruction?

            THE COURT:  Fine.

            Members of the jury, what you are hearing and what you

are about to hear I'm permitting Dr. DeRosa to testify

regarding his calculations about the objective profit potential

of the tax shelter transactions.

            This evidence is being allowed, though, solely for the

purpose of providing evidence about the possible economic

effect of the transactions.  I will explain this to you in

greater detail at the conclusion of the case.  But the

important thing now is for each of you to recognize that you

cannot rely on this evidence to conclude that either of the

defendants or their taxpayer clients knew the specific profit

potential calculations of these transactions as testified to by

Dr. DeRosa.  Dr. DeRosa has no personal knowledge of what the

defendants knew about the profit potential of the tax shelter

transactions.

            MR. OKULA:  Thank you, your Honor.

            Your Honor, we just completed one slide and we're

about to go into a wholly separate one.  I'm happy to plow on,

but if your Honor thinks this is an appropriate breaking point,

Damndau5                              DeRosa - direct

1    I will do whatever your Honor wants.

2              THE COURT:  It sounds like a great time to suspend for

3    the evening.  Doesn't it, Doctor?

4              THE WITNESS:  Yes, sir.

5              THE COURT:  All right.

6              Members of the jury, that is exactly what we are going

7    to do.

8              Keep an open mind.  Come to no conclusion, don't

9    discuss the case among yourselves or with anyone else.  And

10   don't go home tonight thinking, you know, I'm going to try some

11   digital options with my 401(k).  OK.  It doesn't work that way.

12   Don't do it.

13             The sun's back out.  I understand it might rain

14   tomorrow morning.  You know what happens in New York when it

15   rains.  Everything gets crazy.  So leave a little early, get

16   here.

17             If you're all here early, we can start early.

18   Dr. DeRosa will be here early and he'll be ready to go.  We

19   will all be ready.

20             All right.  So have a great evening and a safe trip

21   home.  Please recess the jury.

22             THE LAW CLERK:  All rise.

23             Jury exiting.

24        (Continued on next page)

25

Damndau5                         DeRosa – direct

1           (Jury not present)

2           THE COURT:  And, Doctor, you may step down.

3           THE WITNESS:  Thank you.

4           THE COURT:  You're excused until tomorrow morning.

5           THE WITNESS:  Right.  Thank you.

6           THE COURT:  Everyone may be seated.

7           Are there any issues that counsel wish to raise?

8           MR. MAZUREK:  Yes.

9           THE COURT:  Do you wish to raise anything regarding

10   Dr. DeRosa?

11          MR. MAZUREK:  Yes.

12          THE COURT:  Dr. DeRosa, I am going to ask you to step

13   outside of the courtroom, please.

14          THE WITNESS:  Yes, sir.

15          (Witness not present)

16          MR. MAZUREK:  Your Honor, a couple of points.

17          One is just a housekeeping matter.  I understand that

18   the exhibits that are being introduced through Dr. DeRosa are

19   demonstratives only.

20          THE COURT:  Yes.  Certainly all these slides are

21   demonstratives, right.  They are never going to be sent into

22   the jury room under any circumstance.

23          MR. MAZUREK:  OK.  Secondly, I guess I am a little

24   concerned relating to an issue that was raised in limine.  If

25   your Honor recalls, one of the issues that the government

sought to use DeRosa's testimony is to introduce evidence that

Mr. Daugerdas and his own transactions obtained some kind of

favorable treatment from Deutsche Bank during the course of his

trades.

         As the first demonstrative indicated, the government

introduced the probabilities of profit on those particular

trades.  Then through one of the 3500 material, which is marked

3500-108-WWW, they refreshed Dr. DeRosa's recollection

regarding the outcomes of each of these trades.

         My concern here is that they seem to be setting up and

they also elicited testimony about early termination and what

the general practice was at banks for early termination.

         As your Honor recalls, in your order right before the

trial, your order indicated that this was an area that

Dr. DeRosa was not to go into.  I suspect that the government

is aware of that and is going up to the limit but is not going

to ask further questions regarding that.

         My concern, though, in addition to that, is that the

government, despite the fact that there's no evidence on the

record and they've indicated there is no evidence that they

intend to introduce at this trial that any such favorable

treatment on the unwinding of contracts that Mr. Daugerdas

personally traded at Deutsche Bank is part of the record, that

they are setting up the facts to be able to argue it in

summation.

Damndau5                         DeRosa - direct

1            I would submit that that is an improper argument,

2    given the lack of the factual basis for such an argument.  I

3    raise it now because it just seems they have gone through this

4    exercise with Dr. DeRosa and they wouldn't have I don't think

5    otherwise.

6            The actual outcome of the options has no relevance

7    with respect to the objective prong of the economic substance

8    test for the first element, and this is the limitation that the

9    Court has entered here in terms of what the relevance of

10   Dr. DeRosa's testimony is, that is, he's only testifying as to

11   whether a tax was due and owing if you take out the

12   transactions in the tax shelters.

13           So my concern again is that it would be an improper

14   argument to make that argument without a proper factual basis.

15   I want the record to be clear that that is my position now lest

16   that we forget about it and it appears suddenly in the

17   summation.

18           MR. OKULA:  Just to be clear, your Honor, we have no

19   intent of arguing that there was preferential treatment or some

20   special deal being given to Mr. Daugerdas.  I think your Honor

21   recalls in denying the defendants' posttrial from the first

22   trial Rule 29 motion, your Honor looked at what the outcomes of

23   the transactions were with respect to Mr. Daugerdas and said

24   that it supported the inference or it could support an

25   inference that by terminating early or having constantly loser

Damndau5                          DeRosa - direct

1      options, it supports an argument and an inference that there

2      was no genuine investment intent by Mr. Daugerdas.

3              That's the only reason why the outcomes was elicited.

4      So, just to be perfectly clear, again, we are not arguing

5      preferential treatment or special deals that he was given in

6      any manner or form through Dr. DeRosa, nor do we intend to

7      argue that in summation.

8              THE COURT:  All right.  Anything else that counsel

9      would like to raise?

10             MR. OKULA:  Just real briefly, your Honor.  I think I

11     probably have maybe an hour, 90 minutes to go with Dr. DeRosa,

12     and then Agent Catanzaro will be our final witness tomorrow.

13             Perhaps -- hope springs eternal -- it could start

14     tomorrow morning, if not tomorrow afternoon.  But I imagine

15     that we would be done at some point tomorrow.

16             So I just wanted to ask the Court, if that comes

17     about, how does the Court wish or what does the Court plan on

18     how we are going to proceed with respect to any of the defense

19     case?

20             Obviously, Mr. Daugerdas' indication is that there is

21     going to be testimony from Mr. Daugerdas, and there is also a

22     summary witness.  We just want to get a sense about how things

23     are going to play out in the way of us closing.

24             THE COURT:  You mean resting?

25             MR. OKULA:  Resting.  That's what I meant.

Damndau5                          DeRosa - direct

1          Thank you, your Honor.

2          THE COURT:  My own view is this:

3          First, I don't want to waste a minute of the jury's

4     time.  If the government rests, and it happens to be 3:30, I

5     will deem motions reserved until 5 o'clock when we send the

6     jury home.  And, without prejudice to anyone's position in

7     making an argument, I will explain to the jury, first of all,

8     that neither defendant has any obligation to put on any case.

9     In fact, they don't have to examine witnesses.

10          Then, together with the jury, we'll find out whether,

11     first, the defendant Daugerdas has any case that he wishes to

12     present.  And I would expect that the defendant will announce

13     that he does, and you will call your first witness, whoever

14     that may be, and we will proceed until 5 o'clock.

15          MR. OKULA:  Can we get an indication of who the first

16     witness will be.  In other words, they've indicated --

17          THE COURT:  I understand.

18          MR. MAZUREK:  It will be Jesse Storbeck, right here in

19     the courtroom, as a summary fact witness.

20          THE COURT:  All right.

21          MR. MAZUREK:  Followed by Mr. Daugerdas.

22          THE COURT:  Now, I have a largely complete draft

23     charge.  Obviously, I am tweaking it as we are proceeding.  I

24     need to know whether there is any further submission first from

25     the defendants in connection with the government's renewed

Damndau5                          DeRosa – direct

1    application on the Pinkerton charge.  I presume that you wish

2    to give me something.

3              When can you get that to me?

4              MR. LINDER:  Judge, I believe we can get you something

5    probably by tomorrow morning.

6              THE COURT:  OK.

7              So theoretically, then, no matter where we are in the

8    case, we can possibly take it up at 5 o'clock.  Because I mean

9    my inclination would be to tell the jury that, if we can finish

10   the taking of evidence on Thursday, I would like to proceed to

11   closing arguments on Friday.

12             What?

13             MR. MAZUREK:  I am going to have a heart attack.

14             I don't know how long the cross-examination of

15   Mr. Daugerdas will be, but I suspect that the direct might be

16   about a day.

17             THE COURT:  All right.  I am not going to have you all

18   rest breathless at 5 o'clock on Thursday and tell you you have

19   to close on Friday morning.

20             All right.

21             MS. McCARTHY:  Your Honor, we also have some witnesses

22   that we will be putting on.

23             THE COURT:  You will have them in the queue.

24             MS. McCARTHY:  Yes, your Honor.

25             THE COURT:  Ready to go after Mr. Daugerdas' case.

Damndau5                         DeRosa - direct

1           MR. OKULA:  Does Ms. McCarthy and Mr. DeCastro have a

2     sense about what the formation of the queue is?

3           MR. DE CASTRO:  Right now we can believe maybe Tony

4     Walkowicz and then Michelle Srebalus.  That may flip-flop.  I

5     am just not sure.

6           THE COURT:  Are these witnesses coming in from out of

7     town.

8           MR. DE CASTRO:  One, Ms. Walkowicz would be coming in

9     from out of town.  Ms. Srebalus is local -- not local, she is

10    coming in from Pennsylvania.  Depending on the timing I can

11    make sure she's first.

12          THE COURT:  Get them here so they're ready to go.

13          MR. MAZUREK:  Judge, can we speak about summations in

14    terms of -- I know that your Honor usually sets time limits.

15          THE COURT:  I do.

16          MR. MAZUREK:  They are very strict, I understand.

17          THE COURT:  Not usually, but always, because I think

18    it promotes a fair trial.  The other thing is I'll tell you

19    that there is absolutely no reason that all closings in this

20    case cannot be completed in one day.

21          MR. MAZUREK:  Right.

22          THE COURT:  And they will be completed in one day,

23    even if I have to ask the jury to stay a little bit longer.

24          MR. MAZUREK:  I figure that since there are three of

25    us, that the government goes twice, about two hours per party,

Damndau5                        DeRosa - direct

1    that would get us six hours.  And if we can stay a little bit

2    longer, then the government can have the rebuttal time.

3              THE COURT:  I may arrange for the jury to have lunch

4    in the jury room so we can take an abbreviated lunch.  It looks

5    like I am causing pain to Mr. Okula.

6              MR. OKULA:  No pain at all.  I just didn't want to let

7    my acquiescence that Mr. Mazurek essentially postulating what

8    the division of time is going to be is our agreement with

9    respect to it.

10             THE COURT:  No.  It's good that you should all be

11   thinking about it.  We can talk about it more at the end of the

12   day tomorrow, as I now start to see that the conclusion of this

13   case is --

14             MR. MAZUREK:  Is nigh.

15             THE COURT:  -- is drawing near.

16             Anything else?

17             MR. OKULA:  Nothing.

18             Thank you, your Honor.

19             THE COURT:  All right.  Have a good evening.  I have

20   one other matter on, so if you can clear out, I will see you

21   tomorrow morning.

22             (Adjourned to Wednesday, October 23, 2013, at 10 a.m.)

23

24

25

```
 1                    INDEX OF EXAMINATION

 2  Examination of:                        Page

 3  ADRIAN DICKER

 4  Cross By Ms. McCarthy  . . . . . . . . . .6340

 5  Cross By Mr. Linder  . . . . . . . . . . .6434

 6  Redirect By Ms. Davis  . . . . . . . . . .6479

 7  Recross By Ms. Mccarthy  . . . . . . . . .6502

 8  Recross By Mr. Linder  . . . . . . . . . .6510

 9  Redirect By Ms. Davis  . . . . . . . . . .6513

10  DAVID F. DeROSA

11  Direct By Mr. Okula  . . . . . . . . . . .6527

12  BY MR. OKULA

13                    GOVERNMENT EXHIBITS

14  Exhibit No.                         Received

15   301-248   . . . . . . . . . . . . . . . .6342

16   301-260   . . . . . . . . . . . . . . . .6367

17   300-6   . . . . . . . . . . . . . . . . .6372

18   300-13   . . . . . . . . . . . . . . . . .6387

19   800-14 and 800-16  . . . . . . . . . . .6519

20   500-3   . . . . . . . . . . . . . . . . .6520

21   1001-51A and 43-1  . . . . . . . . . . .6526

22   108-21A   . . . . . . . . . . . . . . . .6537

23                    DEFENDANT EXHIBITS

24  Exhibit No.                         Received

25   79   . . . . . . . . . . . . . . . . . .6346
```

1    74    . . . . . . . . . . . . . . . . . . . .6353

2    70    . . . . . . . . . . . . . . . . . . . .6358

3    331   . . . . . . . . . . . . . . . . . . . .6362

4    88    . . . . . . . . . . . . . . . . . . . .6375

5    251   . . . . . . . . . . . . . . . . . . . .6385

6    283   . . . . . . . . . . . . . . . . . . . .6389

7    82    . . . . . . . . . . . . . . . . . . . .6393

8    83    . . . . . . . . . . . . . . . . . . . .6395

9    284   . . . . . . . . . . . . . . . . . . . .6397

10   69    . . . . . . . . . . . . . . . . . . . .6399

11   270   . . . . . . . . . . . . . . . . . . . .6403

12   272   . . . . . . . . . . . . . . . . . . . .6405

13   55    . . . . . . . . . . . . . . . . . . . .6410

14   96    . . . . . . . . . . . . . . . . . . . .6418

15   91    . . . . . . . . . . . . . . . . . . . .6426

16

17

18

19

20

21

22

23

24

25