


305 Madison Avenue
New York, NY 10165
T: 212-922-1080
F: 212-949-8255

Henry E. Mazurek
Partner
mazurek@clayro.com

May 5, 2014

BY ECF AND FEDERAL EXPRESS

Hon. William H. Pauley III
United States District Court
Southern District of New York
United States Courthouse
500 Pearl Street
New York, New York 10007-1312

Re: *United States v. Paul M. Daugerdas*
S6 09 Cr. 581 (WHP)

Dear Judge Pauley:

We write to set forth the defendant's position with respect to the *Fatico* hearing scheduled for May 15, 2014. The government seeks to have the Court consider, pursuant to 18 U.S.C. §3553(a), uncharged conduct dating from the early 1990's that is unrelated to the offenses of conviction and irrelevant to the advisory guidelines calculation. Therefore, the only theoretical relevance of such evidence for sentencing purposes is that it relates to "the history and characteristics of the defendant." 18 U.S.C. § 3553(a)(1). Bearing in mind that the ultimate objective of the sentencing process is to arrive at a "reasonable" sentence that is "sufficient but not greater than necessary" to achieve the objectives of § 3553(a), this detour is unwarranted given the plethora of information about the defendant that is in the record from two trials and given the minimal theoretical weight the court should attach to this factor in determining a reasonable sentence. Set forth below in Part II, we elaborate on the argument that the *Fatico* hearing is unwarranted.

We have previously provided to the Probation Department the defendant's objections to the initial disclosure of the probation report, including the issues we anticipate the government would seek to highlight at a *Fatico* hearing.[1] *See attached*. Obviously the government does not

[1] The paragraphs from the letter that discuss the factual issues that we believe would be the subject of the *Fatico* hearing are ¶¶ 33-42.

propose that a *Fatico* hearing is necessary to resolve each of the defendant's objections. For example, the government would no doubt prefer to gloss over the most significant of the defendant's objections: that the scope of the conspiracy of which the jury convicted Mr. Daugerdas was far narrower than the conspiracy alleged in the indictment, and that the jury found that Mr. Daugerdas acted in good faith with respect to his belief that the tax strategies complied with the economic substance doctrine. Nevertheless, for the Court's convenience, in Part I below we summarize the defendant's position with respect to the evidence relating to civil fee disputes between Mr. Daugerdas and the law/accounting firms with which he was associated and which the government seeks to present at the *Fatico* hearing.

I.

Paragraphs 56 through 60 of the probation report contain allegations by the government that Mr. Daugerdas diverted funds from Arthur Andersen ("AA"), Altheimer & Gray ("A&G"), and Jenkens & Gilchrist ("J&G"). The diversion allegations concern payments received by Mr. Daugerdas during the 1990's in connection with tax shelter transactions. The government proposes to call witnesses to establish how and when the payments were made, yet these are facts that are not in dispute. The probation report characterizes these payments as payments to which the firms were entitled. The defendant disagrees.

*Receipt of $560,000 from Jackson Tufts law firm* (PSR paragraph 56)

In late March 1994, the Jackson Tufts law firm sent two wire transfers to EBC Financial & Annuity Corporation ("EBC") totaling $560,000. EBC was a company owned by Frank Smith, a friend of Mr. Daugerdas. EBC subsequently wired funds to another entity controlled by Mr. Daugerdas. The wire transfers occurred as a result of an arrangement between Mr. Daugerdas and Emil Pesiri, the attorney at Jackson Tufts who authored the tax opinion for Donald Flynn. After AA learned of the payments to EBC, it sought information from Mr. Daugerdas concerning EBC and the basis for the payments. Mr. Daugerdas refused to provide Andersen with the requested information. When Mr. Daugerdas persisted in his refusal to provide the requested information, AA ultimately requested that he voluntarily resign from the firm. Mr. Daugerdas agreed to do so.

There is no dispute that Mr. Daugerdas was the beneficiary of the funds, that he was asked to voluntarily resign, and that he did so following this request. The allegation that Mr. Daugerdas diverted these funds from AA presupposes that AA was entitled to the fees in the first place. Yet, AA never formally alleged that they were entitled to any fees beyond what they had received in connection with the Flynn transaction, and, indeed, Mr. Flynn expressed the view that AA was overpaid for the work it performed.

*Receipt of $450,000 from Frank Trznadel* (PSR paragraph 57)

In November 1994, following his resignation from AA in April 1994, Mr. Daugerdas received a wire transfer from Comdisco Investment Group in the approximate amount of $492,000. The Presentence Report notes that Mr. Daugerdas received this referral fee in connection with a transaction he initially brought to Comdisco following his resignation but prior to August 31, 1994, the resignation's formal effective date. It was understood, though, that during this time period Mr. Daugerdas would be free to pursue new ventures on a full-time basis. The following year, AA learned that Comdisco had paid Mr. Daugerdas a referral fee in connection with a transaction that did not involve AA. AA personnel contacted A&G, with whom it had a long-standing relationship, and threatened to sue for a portion of the fees. Ultimately, a settlement was reached. There is no dispute concerning the fact that Mr. Daugerdas received the fee. This too was a civil fee dispute that was ultimately settled.

*Receipt of "secret" fees from James Haber* (paragraph 58)

James Haber was a tax shelter promoter to whom Mr. Daugerdas referred business opportunities and with whom he structured deals as both a lawyer and as a non-legal adviser. In instances in which A&G issued tax opinions in connection with the transactions, A&G was paid a fee for the tax opinion. Mr. Daugerdas was also paid a fee in connection with services rendered other than as a lawyer or as a referral. These fees were not disclosed to A&G. Mr. Daugerdas was not precluded from engaging in business activities outside the practice of law by the A&G partnership agreement and thus he believed he had no legal obligation to disclose his receipt of these fees to A&G. The fees were not A&G fees and were not "diverted" from A&G.

*Receipt of a "secret" fee for the Besicorp transaction* (paragraph 59)

Similar to the fees paid by Mr. Haber to Mr. Daugerdas referenced above, Mr. Haber's firm, the Diversified Group (DGI), paid Mr. Daugerdas a fee for services rendered by Mr. Daugerdas other than as a lawyer. These fees were not disclosed to either A&G or J&G. The transaction occurred during the period when Mr. Daugerdas was moving from A&G to J&G. Both firms rendered legal services in connection with this transaction, for which they were paid. A&G's services involved corporate transactional work, and J&G issued a tax opinion. As Mr. Daugerdas was not precluded from engaging in business activities outside the practice of law by his partnership agreements, he understood he had no legal obligation to disclose his receipt of the fees from DGI.

The government does not contend that any of these issues implicate the computation of the advisory Sentencing Guidelines. The government presented these allegations to the Probation Department as aggravating factors regarding the "history and characteristics of the defendant." 18 U.S.C. § 3553(a)(1).

II.

The government has requested the Court to conduct a hearing pursuant to *United States v. Fatico*, 603 F.2d 1053 (2d Cir. 1979), for the purpose of introducing additional evidence against Mr. Daugerdas relating to uncharged conduct involving fee disputes between him and his business or law partners. *See United States v. Lohan*, 945 F.2d 1214, 1216 (2d Cir. 1991) ("A *Fatico* hearing is a sentencing hearing at which the prosecution and the defense may introduce evidence relating to the appropriate sentence."). This Court should use its considerable discretion at sentencing to decline the government's request to hold an evidentiary hearing on matters far peripheral and largely irrelevant to the central contested matters at sentencing. *United States v. Cavera*, 550 F.3d 180, 191 (2d Cir. 2008) (*en banc*) (an aggravating or mitigating factor only "can bear the weight assigned it under the totality of circumstances in the case"). Judicial resources are better spent on determining the reasonableness of any sentence to be imposed on Mr. Daugerdas based on the charged and tried offense conduct, which now has been the subject of two jury trials and a combined twenty weeks of testimony. As the Second Circuit recently said in affirming a sentencing court's decision not to hold protracted proceedings on peripheral sentencing issues: "The District Court was free to prioritize efficiency over an exercise in futility." *United States v. Corsey*, 723 F.3d 366, 375 (2d Cir. 2013).

The current state of what is now an evolving body of law related to federal sentencing directs a District Court to frame its sentencing decision around an ill-defined but, what Judge Calabresi called, a "beguilingly simple" standard of "reasonableness." *United States v. Cavera*, 550 F.3d at 188. The District Court is given broad discretion in defining the contours of reasonableness and sentences are reviewed under a standard "'akin to review for abuse of discretion, under which [the Second Circuit] consider[s] whether the sentencing judge exceeded the bounds of allowable discretion, committed an error of law in the course of exercising discretion, or made a clearly erroneous finding of fact.'" *United States v. Leslie*, 658 F.3d 140, 142 (2d Cir. 2011) (*per curiam*) (quoting *United States v. Williams*, 475 F.3d 468, 474 (2d Cir. 2007)). The Second Circuit instructs that this broad discretion is granted to District Courts because they are better positioned institutionally to determine the appropriate sentence in a particular case. *United States v. Fernandez*, 443 F.3d 19, 27 (2d Cir. 2006).

Under this "reasonableness" touchstone, a District Court is instructed to "begin all sentencing proceedings by correctly calculating the applicable Guidelines range," *Gall v. United States*, 552 U.S. 38, 49 (2007), and then to consider the factors listed in 18 U.S.C. § 3553(a) before imposing a final sentence. *United States v. Preacely*, 628 F.3d 72, 79 (2d Cir. 2010).

Here, the government seeks to put the cart before the horse. Before the parties have even submitted to the Court their sentencing memoranda and briefed the considerable disputes that exist in the Probation Department's calculation of the advisory Sentencing Guidelines (which merely mimicked the government's proffered calculations without addressing Mr. Daugerdas's

arguments), the government wants to introduce testimony from several witnesses regarding issues ***that have nothing to do with Guidelines calculations.*** The government must concede that the evidence it seeks to introduce is not relevant conduct under the Guidelines, *see* U.S.S.G. § 1B1.3(a)(2), as it is not the "same course of conduct" for which Mr. Daugerdas has been tried and convicted. The subject matter of the government's proposed *Fatico* hearing involves issues which were the subject of pretrial Rule 404(b) motions by the government.

Specifically, the government seeks to hold a mini-trial this month to litigate claims by Mr. Daugerdas's prior accounting partners at Arthur Andersen and law partners at Altheimer & Gray and Jenkens & Gilchrist regarding disputes over fees, and whether Mr. Daugerdas took fees that should have gone to the firms collectively rather than to him personally. Some of these disputes are over 20 years old and have nothing to do with the claims of tax shelter fraud against the government, which was the subject of Mr. Daugerdas's indictment and two trials. These disputes are more commonly presented to the Court in civil commercial litigation (and are usually mired in technical provisions of partnership or contract law) and serve no useful purpose in determining the reasonableness of Mr. Daugerdas's criminal sentencing. In any event, even the government concedes these do not impact the Court's required calculation of the Guidelines. *Cavera*, 550 F.3d at 190 (a district court commits procedural error only where it fails to calculate the Guidelines range, makes a mistake in its Guidelines calculation, or treats the Guidelines as mandatory).

Because these issues do not invoke Guidelines calculations, they can only be relevant to sentencing under the remaining Section 3553(a) factors. The factor invoked by the government as relevant to the disputed fee issues is the first in the listed series in Section 3553(a), namely "the history and characteristics of the defendant." 18 U.S.C. § 3553(a)(1); *see also* 18 U.S.C. § 3661 ("No limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence.").

The use of an evidentiary hearing to add to the Court's calculus regarding Mr. Daugerdas's "history and characteristics" is hardly needed given the extraordinarily extensive set of facts that already have come before this Court about Mr. Daugerdas during the last ***five years*** of litigation in this matter. Not only would such a hearing be a colossal waste of limited judicial resources, it also would present evidence that – given the enormous amount of evidence already before the Court on more relevant sentencing issues about the crimes charged – could be afforded little weight in determining a reasonable sentence as required under federal sentencing law. *See Cavera*, 550 F.3d at 191 (an aggravating or mitigating factor only "can bear the weight assigned it under the totality of circumstances in the case"); *see also McMillan v. Pennsylvania*, 477 U.S. 79, 88 (1986) (while generally endorsing rules that permit sentencing enhancements based on conduct not proved to the same degree required to support a conviction, cautioned that those

rules are not free from constitutional restraints, and rejecting such enhancements when they become the "tail which wags the dog of the substantive offense.").

In this case, because the government already advocates for a Guidelines sentence in the range of 20 years, based on the calculations it submitted to the Probation Department (which we vigorously dispute), these additional facts which are not relevant to the Guidelines calculations, would only be an ***additional*** aggravating factor that the government seeks to introduce on top of the Guidelines recommended sentence.[2] How much weight could such a factor be given in the course of this Court's determination of reasonableness? Is it the government's position that 20 years is not sufficient under Section 3553(a)?[3] How much is too much? Could these uncharged fee disputes be given any more weight than any aggravating Guidelines factor that the government recommends based on conduct that was actually the subject of trial? If the Sentencing Commission did not consider unrelated and uncharged allegations of "bad" conduct as relevant in determining an appropriate and reasonable Guidelines range, should this Court give consideration to the government's contention now that these issues be given some significant weight at Mr. Daugerdas's sentencing? Each of these questions leads to an answer of a resounding "no." The government only invites error into an already quite complicated set of sentencing issues before the Court.

Moreover, the case law is exceptionally clear that sentencing courts are not required to hold evidentiary hearings on every ancillary issue that a party wishes to present before the Court. The principle behind the need for *Fatico* hearings was to ensure due process to defendants whose

---

[2] The government has argued that this testimony should be presented to rebut evidence of Mr. Daugerdas's good character, such as his extraordinary care of his family, including a special needs child, his acts of charitable good works, his volunteering of free accounting services to non-profit organizations, or his contributions to the Catholic Church. But the government is misguided in this regard. Since the Guidelines were deemed advisory only, sentencing is no longer measured on a scorecard where one point cancels the other. The Court is just as able to consider the good marks of the man, as it is those acts that reflect human failings. What the government seeks to do by emphasizing fee disputes at an extended hearing is to emphasize these incidents over the charitable and generous acts of kindness that Mr. Daugerdas will present in his own sentencing memorandum. The Court is able to discern these differences without expending unnecessary resources, especially after hearing from dozens of government witnesses at trial. *See Cruz v. Miller*, 255 F.3d 77, 86 (2d Cir. 2001) ("[W]e are determining the reasonableness of the state courts' 'decision' . . . not grading their papers.")

[3] In evaluating the arithmetic computations of the Guidelines, which produced a sentencing range of 30 years, Judge Jacobs in his dissenting opinion in *Cavera* concluded: "something needs to be re-thought when in a case like this [involving counts of child pornography], the Guidelines calculation yields a life sentence. That is the sentence imposed on Jeffery Dahmer, who killed people, and ate them." *Cavera*, 699 F.3d at 303 (Jacobs, J., dissenting).

sentences might be enhanced based on facts being presented by the government for the first time at sentencing and which are disputed. However, we inform the Court here that Mr. Daugerdas is willing to rely on the facts reported in his response to the draft Presentence Report and as further amplified herein. Mr. Daugerdas does not seek an evidentiary hearing to protect his interests on these peripheral subjects and respectfully submits that such a hearing has the possible effect of attaching too much weight to factors outside of those most relevant to Mr. Daugerdas and the crimes contested in this Court. *See United States v. Broxmeyer*, 699 F.3d 265, 280 (2d Cir. 2012) ("it is well established that a district court need not hold an evidentiary hearing to resolve sentencing disputes, as long as the defendant is afforded some opportunity to rebut the government's allegations") (internal quotation marks omitted); *see also United States v. Phillips*, 431 F.3d 86, 93 (2d Cir. 2005) (same).

The Supreme Court made clear in its decision in *United States v. Watts,* 519 U.S. 148, 155 (1997) (*per curiam*), that "consideration of information about the defendant's character and conduct at sentencing does not result in punishment for any offense other than the one of which the defendant was convicted." (internal quotation marks omitted). In other words, the District Court is not free from constitutional tethers that prohibit it from sentencing Mr. Daugerdas from alleged crimes that were not related to the conduct tried before the jury. It can consider this conduct only to the extent the other alleged conduct puts in context the relevant convicted conduct. *See e.g. Broxmeyer*, 699 F.3d at 289-90 (finding that the sentencing court appropriately used its discretion in enhancing defendant's sentence based on aggravating factors considered by the Sentencing Commission to be based on a pattern of conduct of sexual exploitation of girls made possible by the defendant's position as school athletic coach). Here, the alleged acts by Mr. Daugerdas of allegedly "diverting" firm fees to personal accounts does not contextualize his intent to defraud the government and IRS by defending illegal tax shelters. Indeed, the allegations surrounding who deserved to retain fees does not enlighten the Court at all regarding Mr. Daugerdas's intent in advancing the tax shelters at issue in the case. In fact, the very notion that the management of these several other industry firms – AA, A&G, and J&G – believed the fees derived for these tax shelters should have been shared by the partnerships or shareholders collectively reflect an acknowledgement, at least by these firms, that the fees were legitimate (and certainly not criminal). To this extent, the alleged "diversion" of such fees does not reconcile with an enhanced punishment for the crimes Mr. Daugerdas was actually convicted of. In this way, the government's request for the Court to consider this conduct would result in punishment for an offense other than the one of which he was convicted. *Watts*, 519 U.S. at 155.

After two jury trials, lasting an aggregate of almost half a year, the government seeks to distract the Court's attention from substantial issues regarding the extent of Mr. Daugerdas's culpability on the actual counts of conviction. Mr. Daugerdas was acquitted of nine felony counts and convicted of seven counts after trial. The Court is confronted with the considerable challenge of weighing how to calculate a reasonable sentence based on these considerably mixed results. This should be the focus of Mr. Daugerdas's sentencing proceedings. However,

apparently because of the mixed verdicts and substantial number of acquitted counts, the government seeks to try Mr. Daugerdas yet a third time – but now on unrelated, uncharged conduct. This Court should not succumb to the government's machinations, especially given the profound seriousness and respect that should be afforded the lengthy jury trial process that has preceded sentencing in this case. *See United States v. Concepcion*, 983 F.2d 369, 396 (2d Cir. 1992) (Newman, J., concurring) ("A just system of criminal sentencing cannot fail to distinguish between an allegation of conduct resulting in a conviction and an allegation of conduct resulting in an acquittal.").

Judge Chin, now from the appellate bench but a veteran of many sentencing hearings in the District Court, recently wrote: "[S]entencing is one of the most difficult – and important – responsibilities of a trial judge." *United States v. Thavaraja*, 740 F.3d 253, 259 (2d Cir. 2014). In support of this proposition, as if any support were needed, Judge Chin cited the following thoughtful authorities: "Mark W. Bennett, *Hard Time: Reflections on Visiting Federal Inmates*, 94 Judicature 304 (2011) ("It is an awesome responsibility to take one's liberty away."); Gerald E. Rosen, *The Hard Part of Judging*, 34 Suffolk U.L.Rev. 1, 6 (2000) ("Virtually every week, I receive letters from the families of defendants who are facing sentence, . . . relating heart-rending stories of serious illness in the family, or financial hardship and deep emotional loss for the children, parents, spouses, and other family members of the defendant."); Jack B. Weinstein, *Does Religion Have a Role in Criminal Sentencing?*, 23 Touro L. Rev. 539, 539 (2007) ("Sentencing, that is to say punishment, is perhaps the most difficult task of a trial court judge.")." *Id.* at 260, n. 5. Clearly, many competing considerations come into play in determining a fair and just sentence.

This case presents a particular complexity of factors for this sentencing Court. The Court has presided over two jury trials – with two very different sets of results. It has heard months of testimony about criminal charges that ranged a full decade of conduct. It is hard to conceive what purpose the government has in now adding to this tremendous record with testimony unrelated to the tax shelter fraud conspiracies that it elevated to such substantial levels of criminality that it could possibly recommend a 20-year Guidelines range as reasonable – a veritable life sentence for Mr. Daugerdas who is 63 years of age.

We respectfully submit that this Court should not require six or seven additional witnesses to travel to New York and spend our scant judicial resources to talk about whether Mr. Daugerdas took fees that should have been put into a collective firm or partnership's pot. *See* William Shakespeare, *Macbeth*: "Life's but a walking shadow, a poor player that struts and frets his hour upon the stage and then is heard no more. It is a tale told by an idiot, full of sound and fury, signifying nothing." (V.v.24-28). Undoubtedly, such testimony will dissolve into arcane issues surrounding provisions in partnership and shareholder agreements that have little to do with the tax charges that were the subject of both acquittals and convictions in this courtroom. Such evidence is far afield from what this Court needs to consider in fashioning a just and

reasonable sentence for crimes involving sophisticated application of complicated levels of federal tax common law.

We respectfully focus the Court on the months of trial testimony that sought to uncover the intent of Mr. Daugerdas in advocating for the tax shelters he employed on behalf of himself and his clients for over a decade. We also focus the Court on the results of the jury who responsibly sat through nearly ten weeks of testimony before rendering its thoughtful – and presumptively meaningful – verdicts. *See United States v. Watts*, 519 U.S. at 158 (cautioning sentencing courts and the Sentencing Commission about the perception of justice and the important "role that juries and acquittals play in our system" to lend an imprimatur of legitimacy to our criminal justice system) (Breyer, J., concurring). These are the factors that will help this Court craft a conscientious and principled sentence based on factors relevant to the crimes actually adjudicated in this courtroom.

Finally, we also present for the record a constitutional reason for this Court to deny an evidentiary hearing on the uncharged fee disputes and not to consider these in determining Mr. Daugerdas's sentence. Despite existing law countenancing otherwise, we reserve for the record our objection to this evidence being considered by a judge (and not a jury) under a preponderance of the evidence standard, thereby violating Mr. Daugerdas's rights under the Fifth and Sixth Amendments. We submit that due process and the right to a fair and public trial should require findings by a jury on a standard of beyond a reasonable doubt before a sentencing court punishes a defendant based on uncharged conduct. We agree with the reasoning of Justice Scalia in *Rita* and *Gall* that the current post-*Booker* sentencing regime must one day reckon with its inconsistencies in authorizing sentencing judges to enhance punishment based on factors not found by a jury beyond a reasonable doubt. *Gall v. United States*, 552 U.S. 38, 60 (2007) (Scalia, J., concurring); *United States v. Rita*, 551 U.S. 338, 371-75 (2007) (Scalia, J., concurring); *see also Cavera*, 699 F.3d at 302 (Jacobs, J., dissenting) ("The majority is cautious enough to avoid relying on those [untried] incidents [in affirming an enhanced Guidelines sentence] because of the vexing constitutional questions such reliance would raise.") (citing *Gall,* 552 U.S. at 60, and *Rita*, 551 U.S. at 371-75). The government here asks the Court to enhance Mr. Daugerdas's sentence based on untried conduct involving fee disputes with his prior partners and shareholders. To increase a sentence being imposed on unrelated crimes, based on uncharged conduct not the subject of any prior conviction, and determined only by judge-made findings under a preponderance of evidence standard would result in an unconstitutional sentence. *See e.g., Alleyne v. United States,* 133 S.Ct. 2151, 2155 (2013) (because mandatory minimum sentences increase the penalty for a crime, any fact that increases the mandatory minimum is an "element" of that crime that must be submitted to the jury and found beyond a reasonable doubt; overturning *Harris v. United States*, 536 U.S. 545 (2002)). The Supreme Court's slow but steady progress is to require courts to sentence only on the crimes for which a defendant has been convicted.

**CONCLUSION**

For all of the foregoing reasons, this Court should exercise its considerable discretion at sentencing and deny the government's request for a *Fatico* hearing. The Court's discretion at sentencing allows it to consider the hearsay statements and other reliable information submitted by Mr. Daugerdas in response to the government's claims on these ancillary, non-Guidelines related matters. Moreover, the government has failed to show how these issues could be afforded any meaningful weight under the considerable totality of circumstances at issue in this case. *Cavera*, 550 F.3d at 191 (an aggravating or mitigating factor only "can bear the weight assigned it under the totality of circumstances in the case"); *see also McMillan v. Pennsylvania*, 477 U.S. 79, 88 (1986) (rejecting sentence enhancements when they become the "tail which wags the dog of the substantive offense."). Lastly, the government invites constitutional error by asking this Court to enhance Mr. Daugerdas's sentence based on conduct not previously litigated before a jury. *See Alleyne*, 133 S.Ct. at 2167 ("jury-based factfinding would act as a check: in the first instance, against a sentencing judge wrongly imposing the higher sentence that the judge believes is appropriate, and in the second instance, against a sentencing judge wrongly being required to impose the higher sentence that the judge believes is inappropriate").

Respectfully submitted,

/s/

Henry E. Mazurek
Brian D. Linder

cc: AUSA Stanley J. Okula, Jr. (via email)
AUSA Nanette L. Davis (via email)