# Clayman & Rosenberg LLP

305 Madison Avenue
New York, NY 10165
T: 212-922-1080
F: 212-949-8255
www.clayro.com

Brian D. Linder
Partner
linder@clayro.com

March 14, 2014

Colleen Tyler
Senior U.S. Probation Officer
Southern District of New York
500 Pearl Street
New York, New York 10007-1312

                                 Re: <u>U.S. v. Paul Daugerdas, 09-CR-581 (WHP)</u>

Dear Ms. Tyler:

      Please accept this letter as the defendant Paul Daugerdas's objections to the probation report dated February 14, 2014. We reserve the right to supplement these objections upon receipt of additional information from the government.

      The fundamental objection that the defendant has to the probation report as initially disclosed is that it includes as offense conduct the full panoply of conduct alleged in the indictment and ignores the jury's conclusion that Mr. Daugerdas was not guilty of the broad scheme alleged in the indictment. The government's view of the scope of the criminal conduct of the offense of conviction is much broader than is supported by the jury's verdict. The government is of the view that the jury concluded that Mr. Daugerdas was a participant in a conspiracy that encompassed each and every tax shelter client of Jenkens & Gilchrist. In fact, the jury's verdict demonstrated that they rejected the sweeping conspiracy posited in the indictment. Rather, it is readily apparent that the criminal conduct for which the jury deemed Mr. Daugerdas responsible were the two tax shelter transactions engaged in by three clients that were the subject of the convictions on counts 5, 6, 7 and 11.

      The jury convicted Mr. Daugerdas of counts 5, 6, 7, and 11. These were tax evasion counts related to two sets of transactions: the Blair/Coleman transaction and the Toporek transaction. The government alleged that, with respect to these counts, sales of stocks or currency that resulted in the desired tax losses actually occurred in the year following the year that the tax deductions were sought and that "as of" statements were issued by Deutsche Bank to make it appear that the transactions occurred in the prior year. These were the only substantive counts as to which the government alleged these types of irregularities.

From the jury's verdict, it is apparent that the jury rejected the government's argument that Mr. Daugerdas knew that the transactions lacked economic substance. That is the only rational explanation for the jury's conclusion that Mr. Daugerdas was not guilty of tax evasion with respect to his own tax returns (counts 14-16) or with respect to the other client tax evasion counts (Moore: count 2; Shackleton: count 3; Harter: count 4; DuCote: count 8; Olmsted: count 9; Saunders: count 10). Therefore, it is also apparent that the scope of the conspiracy alleged in count 1, the obstruction alleged in count 13, and the mail fraud alleged in count 17, all relied upon the allegedly tainted Blair/Coleman and Toporek transactions.

The central allegation in the indictment, repeated numerous times as "fact" by the probation report, was that all of the tax shelters were "fraudulent." The basis for this allegation was the government's claim that the transactions lacked economic substance and that Mr. Daugerdas knew that the transaction lacked economic substance. Yet, it was this central allegation that the jury rejected in acquitting Mr. Daugerdas of each count of tax evasion, including the counts alleging tax evasion with respect to his personal tax obligations for 1999-2001, except for the two sets of transaction that involved allegations of so-called backdating: Coleman/Blair and Toporek. Therefore, the "offense conduct" section of the Presentence Report should reflect the conduct underlying the counts of conviction and not the much broader in scope allegations of the indictment.

For example, the defendant objects to the statements in the Presentence Report indicating that the tax shelters were "fraudulent," *e.g.* ¶¶ 21, 52; that the defendant as a general proposition created false documents to hide from the IRS the true nature of the tax shelters, *e.g.* ¶ 36; that the defendant caused hundreds of clients to claim fraudulent tax losses, *e.g.* ¶ 41; that the defendant evaded his own tax obligations, *e.g.* ¶ 55; that the amount of the tax loss is in excess of $1.6 billion, *e.g.* ¶ 63; and that the amount of restitution is in excess of $368 million, *e.g.* ¶ 65, all as more fully indicated in the specific objections set forth below.

Finally, the defendant objects to the characterization of Mr. Daugerdas's conduct as discussed in paragraphs 57-61 as detailed below. The defendant also maintains that the events described, which are unrelated to the offense conduct and which occurred 15 to 20 years ago, should not by themselves necessitate a *Fatico* hearing since resolution of these matters need not affect the sentencing. *Rule 32 (i)(3)(B), Fed.R.Crim.P.*

Specific Objections to Pre-Sentence Report

1. Object to the statement on page 1 and on page 39, paragraph 132, that twice the gross loss for Count 1 is $3,260,332,686. The defendant maintains that the amount of income allegedly improperly sheltered is $8,056,590, which is the cumulative sheltered income for the tax evasion counts deemed proven by the jury. The gross tax loss, utilizing the tax rate of 28% employed by the sentencing guidelines, yields a cumulative tax loss of $2,255,844. Thus, twice the gross loss is $4,511,688.

2. Object to the statement on page 2 and on page 39, paragraph 132, that twice the gross loss for Count 5 is $13,430,352. The defendant maintains that the amount of income allegedly improperly sheltered is $6,715,176. The gross tax loss, utilizing the tax rate of 28% employed by the sentencing guidelines, yields a tax loss of $ 1,880,249. Thus, twice the gross loss is $3,760,498.

3. Object to the statement on page 2 and on page 39, paragraph 132, that twice the gross loss for Count 6 is $2,370,062. The defendant maintains that the amount of income allegedly improperly sheltered is $1,185,031. The gross tax loss, utilizing the tax rate of 28% employed by the sentencing guidelines, yields a tax loss of $331,808. Thus, twice the gross loss is $663,616.

4. Object to the statement on page 2 and on page 39, paragraph 132, that twice the loss for Count 7 is $2,196,800. The defendant maintains that the evidence at trial was that, prior to the change in the Deutsche Bank statements, a draft tax return for 2001 was prepared which showed that Mr. Toporek was entitled to a capital loss of $759,877 and an ordinary loss of $182,140. As a result of the allegedly improper conduct in altering the Toporek transaction, the final tax return for 2001 showed the same capital loss but a larger ordinary loss of $338,523. Thus, the amount of income allegedly improperly sheltered is $156,383. The gross tax loss, utilizing the tax rate of 28% employed by the sentencing guidelines, yields a tax loss of $43,787. Thus, twice the gross loss is $87,574.

5. Object to the statement on page 2 and on page 39, paragraph 132, that twice the gross loss for Count 11 is $1,903,064. The defendant maintains that there is actually no tax loss. The reason for this is that the Toporek transaction for 2002 was the result of a carryforward loss from the prior year. Since the allegation was that the transaction which generated the tax loss actually occurred in 2002 and not in 2001, the loss was appropriately taken in 2002.

6. For the reasons set forth above, the defendant objects to the statement on page 16, paragraph 21, that characterizes the actions of Donna Guerin in connection with the implementation of transactions as creating "fraudulent paperwork."

7. For the reasons set forth above, the defendant objects to the statement on page 16, paragraph 21, that characterizes the actions of Erwin Mayer as "implementing the fraudulent tax shelters of which DAUGERDAS was the principal architect" and "creating fraudulent paperwork."

8. The defendant objects to the statement on page 18, paragraph 30, in that it states that Jenkens & Gilchrist ("J&G") paid BDO a portion of the fees it collected from clients as "a result of the

sale of the tax shelters." The statement should indicate in addition that the fees were paid to BDO in exchange for work performed by BDO.

9. The defendant objects to the statement on page 18, paragraph 33, in that it characterizes Craig Brubaker as participating with "co-conspirators" working at J&G and others. Mr. Brubaker was acquitted of all charges, including the conspiracy charge.

10. For the reasons set forth above, the defendant objects to the Heading preceding page 19, paragraph 36, in that it characterizes DAUGERDAS as selling "fraudulent tax shelters" with "co-conspirators."

11. For the reasons set forth above, the defendant objects to the statement on page 19, paragraph 36, in that it indicates that DAUGERDAS and his co-conspirators designed, marketed, and implemented four fraudulent tax shelter transactions and created "various false documents and lies."

12. For the reasons set forth above, the defendant objects to the statement on page 19, paragraph 37, as to the characterization of defendant's activity as constituting the creation, or assistance in the creation of, false and fraudulent documentation to make it appear that transactions had occurred in a manner that did not reflect reality. For the reasons set forth above, the defendant objects to the statement on page 19, paragraph 37, that the tax shelters were fraudulent and had no reasonable opportunity to earn an economic profit. The jury rejected the view that the defendant believed that the transactions lacked economic substance. The defendant objects to the statement on page 19, paragraph 37, as to the characterization of the J&G tax opinion letters as fraudulent and an attempt to deceive the I.R.S. about the bona fides of the tax shelters and the clients' intent. The opinion letters were not directed to the IRS and, indeed, were privileged communications which should only have been presented to the IRS or a court to mitigate penalties after the issue of tax liability had already been established.

13. The defendant objects to the statement on page 20, paragraph 38, as to the characterization of the opinion letters as containing significantly false representations concerning client intentions and motivations. As indicated by the jury's verdict, the defendant believed that the clients also wanted to earn a profit on the investments, in addition to achieving tax benefits. Further, J&G communicated directly with clients by having them execute various documents by which the clients verified their business purpose in establishing various investment entities that executed the investments.

14. For the reasons set forth above, the defendant objects to the statement on page 21, paragraph 39, indicating that false representations and false statements were also included in Short Sales, Swaps, and HOMER opinion letters with respect to client intent and profit probability. Moreover, the allegedly small profit potential of the HOMER options indicated was based on the opinion testimony of the government's expert, David DeRosa, that they were all substantially less than 1%, yet client testimony (Lonsdale) indicated an anticipated 80-90% probability of profit on the HOMER transaction. Furthermore, there was no testimony that the defendant or J&G were ever told by anyone that the profit potential was as described by Dr. DeRosa.

15. The defendant objects to the statement on page 21, paragraph 40, that J&G charged clients a percentage of the tax loss. Rather, the fee was calculated based upon the amount of income sought to be sheltered, which in turn determined the size of the transaction. GX 201-298.

16. For the reasons set forth above, the defendant objects to the statement on page 21, paragraph 41, that Daugerdas and his co-conspirators caused hundreds of clients to claim fraudulent tax losses.

17. For the reasons set forth above, the defendant objects to the statement on page 21, paragraph 42 that the defendant spearheaded a fraudulent scheme with regard to transactions that lacked economic substance. The defendant also objects to the statement that the defendant participated "directly" in the fraudulent backdating of tax shelter transactions as contrary to the evidence.

18. Although arguably consistent with the jury verdict, the defendant objects to the statements on page 21, paragraph 42, that the defendant engaged in the corrupt and fraudulent "correction" of tax shelter transactions.

19. The defendant objects to the statement on page 21, paragraph 42, that the conduct described violated basic accounting principles known to DAUGERDAS.

20. The defendant objects to the statement on page 22, paragraph 43, referring to "DAUGERDAS's backdating" when none of the activity described was attributed to Daugerdas.

21. The defendant objects to the statement on page 22, paragraph 45, that the opinion letter "falsely stated" that foreign currency had been sold on December 28, 2001, when such statement was clearly based on Deutsche Bank's journal entries and brokerage statements which provided that such transactions had occurred "as of" December 28, 2001.

22. Although arguably consistent with the jury verdict, the defendant objects to the statement on page 22, paragraph 46, which describes the tax returns prepared by AMEX as being "fraudulently 'revised,'" and the tax losses claimed as being based on "backdated transactions."

23. Although arguably consistent with the jury verdict, the defendant objects to the statement on page 22, paragraph 47, which inaccurately refers to the Coleman, Blair, and Aronoff transactions as being "backdated." Errors in the implementation of the transaction were corrected as indicated openly on the Deutsche Bank statements and Deutsche Bank indicated that the corrected transaction had a trade date "as of" the original trade date. This "as of" dating is common on brokerage statements.

24. The defendant objects to the statement on page 23, paragraph 49, which refers to conduct not attributable to Mr. Daugerdas. The defendant also objects to the statement on page 24, paragraph 49, that the opinion letter "falsely stated" that foreign currency had been sold in December 2001, when such statement was clearly based on Deutsche Bank's journal entries and brokerage statements which provided that such transactions had occurred "as of" December 2001.

25. The defendant objects to the statement on page 23, footnote 2, which mischaracterizes the tax

cost of the foreign currency after partnership liquidation as "artificial" basis, as opposed to tax basis properly determined under the tax rules of Internal Revenue Code Section 732.

26. For the reasons set forth above, the defendant objects to the statement on page 24, paragraph 50, which incorrectly refers to "backdating" and "fraudulent tax reporting" in connection with the Coleman and Blair transactions.

27. For the reasons set forth above in paragraph 23, the defendant objects to the references to the "backdating" of transactions for the Aronoff family in paragraph 51.

28. For the reasons set forth above in paragraph 23, the defendant objects to references on page 24, paragraph 51, that Yackee effectuated transactions that were "backdated," that Yackee faxed brokerage statements with "fraudulent" as of dates to BDO Seidman, and that tax returns reported "fraudulent backdated transactions."

29. For the reasons set forth above, the defendant objects to the statement on page 25, paragraph 52, that the defendant earned income from the sale of "fraudulent tax shelters."

30. The defendant objects to the statements on page 25 and 26, paragraphs 53 and 54, that the defendant assisted Donna Guerin in employing fraudulent means to receive a portion of her tax shelter compensation and that he had a side deal with Guerin regarding her compensation. While the defendant did pay bonuses to Guerin and others who worked with the defendant at Altheimer and Gray ("A&G") and J&G, he had no agreement or understanding with Guerin or anyone (except Erwin Mayer with respect to one payment) about these payments. Moreover, these payments were not hidden from J&G.

31. For the reasons set forth above, the defendant objects to the statement on page 26, paragraph 55, that he fraudulently evaded his tax obligations and impeded and obstructed the IRS from ascertaining his tax liabilities. Defendant was acquitted of all personal tax evasion counts by the jury.

32. The defendant objects to the statements on page 26, paragraph 56, that he defendant intended to hide losses and that he failed to report properly the income and losses on the Subchapter S Corporation U.S. Income Tax Returns of Paul M. Daugerdas, Chartered, and Treasurex Financial, Ltd. All income was reported on the relevant tax returns, and the defendant complied with instructions for the IRS Form 1120S in reporting the fee income.

33. The defendant objects to the characterization of his receipt of $560,000 as embezzlement from Arthur Andersen as set forth on page 27, paragraph 57. The money was paid at the request of Emil Pesiri from the law firm Jackson Tufts and was in recognition of Mr. Daugerdas's assistance to Pesiri in connection with the Flynn and other transactions. In this transaction, Flynn paid Jackson Tufts a total fee and Jackson Tufts in turn paid Arthur Andersen. Jackson Tufts also paid a portion of its fee to Mr. Daugerdas. The Anderson fee was not diminished by the payment to Mr. Daugerdas. Indeed, the mutual client, Don Flynn, objected to the amount of the fee that Arthur Andersen received. Subsequently, Arthur Andersen agreed to provide additional services to Flynn at no charge. Treasurex's client was the law firm, not Don Flynn,

and there was no legal obligation to make any disclosures to Arthur Andersen. Defendant had no exclusive or non-compete agreement with Andersen except with respect to professional (CPA) accounting services. The fees to Treasurex were properly reported on the Treasurex tax return. As the jury concluded, Mr. Daugerdas did not evade his personal tax obligations.

34. The defendant objects to the references on page 27, paragraph 58, to secret negotiations between the defendant and Frank Trznadel because it implies that the defendant had an obligation to inform Arthur Andersen about his business opportunities at that point in time. Mr. Daugerdas was advised by Arthur Andersen by letter dated "as of April 25, 1994" that following an initial 3 week transition period, he would be free to spend "virtually full-time" focusing on future opportunities.

35. The defendant objects to the statement on page 27, Paragraph 58, that he caused the referral check to be issued to him in September, 1994, after he formally left Arthur Andersen. The fee was in fact billed as a legal fee from Paul M. Daugerdas & Associates in October, 1994, and paid by wire transfer in November, 1994.

36. The defendant objects to the statements on page 27, paragraph 58, describing the events leading to the resolution of this dispute. Following Arthur Andersen's threats in an attempt to collect the fee paid to Mr. Daugerdas, Mr. Daugerdas provided counsel for Arthur Andersen with a legal opinion from Seymour Simon of Rudnick & Wolf, a former justice of the Illinois Supreme Court, noting *inter alia*, that Mr. Daugerdas could not share his legal fee with Arthur Andersen. To resolve this matter, A&G purchased Arthur Andersen's alleged claim against Mr. Daugerdas for less than half of the fee and then Mr. Daugerdas made a capital contribution to A&G in the amount of the settlement sum.

37. For the reasons set forth above, the defendant objects to the statement on page 27, paragraph 58, that he "evaded paying any taxes on the fee."

38. The defendant objects to the statement on page 27, paragraph 59, that he received "secret" fees while at A&G, or that he had any legal obligation to make disclosures of these fees to A&G.

39. The defendant objects to the statement on page 28, paragraph 59, that he had the fees for the A&G legal opinions paid to Treasurex rather than A&G. A&G was fully and fairly paid for its opinion work. For this reason, the defendant objects to the statements that these fees were "secret" or "diverted," or that he had a legal obligation to disclose his receipt of these fees.

40. The defendant objects to the statement on page 28, paragraph 60, that the Besicorp transaction was organized by James Haber. The transaction was originated and organized by Treasurex, which brought in Haber to act as the manager of the acquisition company.

41. The defendant objects to the statement on page 28, paragraph 60, that defendant was "enlisted" to write a tax opinion.

42. The defendant objects to the statements on page 28, paragraph 60, that he arranged to be paid a "secret side fee" and paid no taxes on "secret side fees." The defendant further objects to the

statement that he failed to disclose to J&G the receipt of fees by Treasurex since he had no legal obligation or agreement to do so.

43. The defendant objects to the statement on page 28, paragraph 62 that he committed perjury when he testified at a deposition that he voluntarily resigned from Arthur Andersen. The defendant was requested to resign and he did so following a difference of opinion over his receipt of a fee from Emil Pesiri's law firm. However, the resignation was voluntary in the sense that the defendant declined to contest the resignation request as was his right under the partnership agreement. Mr. Daugerdas's separation from the firm was amicable, although there were additional disputes following his separation. Lastly, Mr. Daugerdas has always maintained that the services he provided were legal services, issuing tax opinion letters for clients who agreed to enter into a tax shelter transaction, and not the promotion or sale of the tax shelters themselves. Moreover, the term "tax shelter" as understood by Mr. Daugerdas was a defined term under the tax law, and the transactions for which he wrote tax opinions were not technically "tax shelters."

44. For the reasons set forth above, the defendant objects to the statement on page 28, paragraph 63, that the amount of the tax loss is $1,630,166,343. The proper calculation based on the jury's verdict is $2,255,844.

45. For the reasons set forth above, the defendant objects to the statement on page 29, paragraph 65, that restitution will be in excess of $231,000,000. The Restitution Calculation provided by the government (with interest calculated through March 21, 2014) shows a restitution total of $368,090,638 for the clients listed – but not one of the clients listed engaged in a swap transaction or had allegations of improper document changes like the Coleman/Blair and Toporek transactions. Indeed, every single client engaged in a short sale or short option transaction – exactly like the transactions on which the jury acquitted the defendant on nine counts. For example, the list of clients for which restitution is sought by the government includes Don Flynn and related entities and his adviser, Keith Skibicki. Yet, Mr. Skibicki testified at the trial that they had a business purpose for entering into the short sales of treasuries. Since the clients identified are outside the scope of the offense conduct as found by the jury, the restitution should be zero.

46. For the reasons set forth above, the defendant objects to the statements on page 29, paragraphs 65 and 66, that the tax loss is $1,630,166,343. The amount should be $2,255,844. The defendant further objects to the statement that the total claimed tax benefits were $7,077,812,881. The tax benefit generated to the taxpayers as a result of the offense of conviction was $2,255,844.

47. For the reasons set forth above, the defendant objects to the guidelines calculation set forth on page 30, paragraph 70. Based upon a tax loss of $2,255,844 , the base offense level should be 22. The defendant objects to the enhancement of two levels for use of sophisticated means as the basis for the enhancement is conduct for which the defendant was acquitted. The alleged backdating of transactions, and the use of "as of" statements to prepare tax returns and tax opinion letters, did not involve sophisticated means.

48. The defendant objects to the statement on page 30, paragraph 71, that he encouraged any others to violate the law. There is no evidence in the record that the defendant encouraged anyone to engage in the alleged improper backdating of transactions.

49. The defendant objects to the application of the organizer or leader enhancement pursuant to 3B1.1(a) as set forth on page 30, paragraph 73. There were not five or more criminal actors involved in the alleged backdating of the Coleman/Blair and Toporek transactions, nor was the activity "otherwise extensive."

50. The defendant objects to the guidelines calculation that the adjusted offense level and total offense level is 44 as set forth on page 30, paragraphs 75, 77, and 78. The correct total offense level, as set forth above, is level 22.

51. Page 34, paragraph 104 should indicate that ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓.

52. Page 35, paragraph 118, should be corrected to reflect that the amount involved in the disagreement that led to the defendant's separation from Arthur Andersen was $560,000 as referenced in Paragraph 57. Subsequent to his separation from Arthur Andersen, the defendant received an additional fee of approximately $492,000 in connection with the transaction discussed in paragraph 58. The total fees that Arthur Andersen claimed belonged to them was just over $1 million.

53. The following corrections should be made to page 36, paragraph 119 relating to the defendant's assets:



54. The following correction should be made to page 36, paragraph 120: Net Worth of ▓▓▓▓▓▓▓▓ should be ▓▓▓▓▓▓▓▓

55. The following correction should be made to page 36, paragraph 121: assets subject to restriction, freeze, or seizure of $5,248,201 should be $27,156,733.

56. For the reasons set forth above, the defendant objects to the statement on page 37, paragraph 124, that the total offense level is 44. The total offense level should be 22.

9

57. For the reasons set forth above, page 39, paragraph 134 should be corrected to reflect that the range for the fine is from $7,500 to $4,511,688.

58. For the reasons set forth above, the defendant objects to the statement on page 39, paragraph 136, that restitution should be ordered in the amount of $4,000,000,000. Based on the government spreadsheet and the discussion in paragraph 45 above, the restitution should be zero.

59. For the reasons set forth above, the defendant objects to the statement on page 40, paragraph 137 that the defendant is subject to forfeiture of at least $180,000,000, in addition to the assets specified in the forfeiture allegation, since the amount indicated is predicated on the assumption that the defendant was convicted of all conduct alleged in the indictment. This ignores the fact that the defendant was acquitted of nine counts of client and individual tax evasion for the short sale, short option, and HOMER option transactions, clearly evidencing that the vast majority of the proceeds received by defendant were not the result of fraudulent activity and not proceeds subject to forfeiture.

Very truly yours,

Henry E. Mazurek
Brian D. Linder

*Attorneys for Paul Daugerdas*

cc: (via email)

Stanley J. Okula, Jr.

Nanette L. Davis

57. For the reasons set forth above, page 39, paragraph 134 should be corrected to reflect that the range for the fine is from $7,500 to $4,511,688.

58. For the reasons set forth above, the defendant objects to the statement on page 39, paragraph 136, that restitution should be ordered in the amount of $4,000,000,000. Based on the government spreadsheet and the discussion in paragraph 45 above, the restitution should be zero.

59. For the reasons set forth above, the defendant objects to the statement on page 40, paragraph 137 that the defendant is subject to forfeiture of at least $180,000,000, in addition to the assets specified in the forfeiture allegation, since the amount indicated is predicated on the assumption that the defendant was convicted of all conduct alleged in the indictment. This ignores the fact that the defendant was acquitted of nine counts of client and individual tax evasion for the short sale, short option, and HOMER option transactions, clearly evidencing that the vast majority of the proceeds received by defendant were not the result of fraudulent activity and not proceeds subject to forfeiture.

Very truly yours,

Henry E. Mazurek
Brian D. Linder

*Attorneys for Paul Daugerdas*

cc: (via email)

Stanley J. Okula, Jr.

Nanette L. Davis