**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

:

**UNITED STATES OF AMERICA,**                    :

    - v. -                                    :          **S6 09 Cr. 581 (WHP)**

**PAUL DAUGERDAS,**                              :

                              :

        **Defendant.**                      :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


### GOVERNMENT'S SENTENCING MEMORANDUM
### REGARDING DEFENDANT PAUL DAUGERDAS




**PREET BHARARA**
**United States Attorney for the Southern**
**District of New York**


**STANLEY J. OKULA, JR.,**
**NANETTE L. DAVIS,**
**Assistant United States Attorneys**

    **- Of Counsel -**

# TABLE OF CONTENTS

Preliminary Statement ..................................................................................................................1

I.  Relevant Facts .......................................................................................................................2

    A.  The Defendant's Educational Background, Work History, and Compensation ........2

    B.  The Offense Conduct ................................................................................................6

        1.  The Proof at Trial ..........................................................................................7

        2.  The Indictment and Jury Verdict ................................................................10

        3.  Daugerdas's Role as an Organizer and Leader of the Criminal Activity
           and Architect of the Fraudulent Son-of-BOSS Shelters ................................12

        4.  Daugerdas's Participation in Fraudulent Backdating .......................................15

        5.  Daugerdas's Secret Fee Agreement with Guerin ................................................16

        6.  Daugerdas's Fee Diversions and Perjury ................................................17

    C.  The PSR and the Guidelines Determinations ..........................................................20

    D.  The Objections to the PSR and the Court's Guidelines Rulings ............................21

    E.  Restitution ................................................................................................................24

II.  Sentencing Legal Principles ................................................................................................25

III.  Section 3553(a) Analysis ....................................................................................................27

        1.  The Nature and Circumstances of the Offense ............................................28

        2.  History and Characteristics of the Defendant ................................................30

## TABLE OF CONTENTS (cont'd)

3.   The Need to Afford Adequate Deterrence ........................................................34

4.   The Need To Avoid Unwarranted Sentence Disparities.................................39

5.    The Appropriate Sentence............................................................................43

Conclusion ...........................................................................................................................44

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

                                   :

UNITED STATES OF AMERICA,            :

    - v. -                    :       S6 09 Cr. 581 (WHP)

PAUL DAUGERDAS,               :

                                     :

             Defendant.         :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## GOVERNMENT'S SENTENCING MEMORANDUM
## <u>REGARDING DEFENDANT PAUL DAUGERDAS</u>

The United States respectfully submits this memorandum for the Court's consideration in connection with the sentencing of defendant Paul Daugerdas ("Daugerdas" or "the defendant"), which is scheduled for June 25, 2014.   Through this memo, we (1) respond to certain arguments and facts set forth by Daugerdas in his sentencing memo, and (2) explain the Government's position regarding the offense conduct, the applicable Sentencing Guidelines, and the appropriate sentence.

### <u>Preliminary Statement</u>

The facts in this case have resoundingly demonstrated that defendant Paul Daugerdas — an attorney and certified public accountant — devised, supervised, and reaped unprecedented unlawful proceeds from the largest criminal tax fraud in history.  That fraud, which featured Daugerdas's creation and implementation of four fraudulent tax shelters that spanned almost two decades, resulted in the production of over $7 billion of fraudulent tax deductions or benefits, $1.63 billion in Sentencing Guidelines tax loss, and well in excess of $371 million in current extant

losses to the United States Treasury.  Daugerdas's involvement in the fraud, principally as progenitor, marketer, implementer, and defender of the fraudulent tax shelters, also resulted in his receipt of the largest personal share of the proceeds of scheme, by far — over $95 million.

For the reasons spelled out below, in our <u>Fatico</u> hearing submissions, and in the Probation Department's Presentence Investigation Report ("PSR"), we submit that Daugerdas's decades-long role as the architect and principal financial beneficiary of the tax fraud scheme, and his related fraudulent diversion of millions of dollars from his partners at Arthur Andersen ("AA"), Altheimer & Gray ("A&G"), and Jenkens & Gilchrist ("J&G"), call for a prison sentence no less than the 20-year term recommended by Probation.   Indeed, we submit that a sentence below the range recommended by Probation for Daugerdas — the most prolific, pernicious, and utterly unrepentant tax cheat in United States history — would fail to serve the essential sentencing goals of general deterrence, specific deterrence, and the promotion of respect for the rule of law.

## I.   **RELEVANT FACTS**[1]

### A.   **Defendant's Educational Background, Work History, and Compensation**

Daugerdas obtained an undergraduate degree from DePaul University in 1972, after which he became a certified public accountant. (PSR ¶117).  Daugerdas thereafter attended DePaul University Law School and obtained his law degree in 1974.   (PSR ¶116).  From in or about 1975 through August 31, 1994, Daugerdas worked in the Chicago office of the accounting firm Arthur Andersen, where he served for many years as a tax partner and where his partnership draw topped $590,000 in his last year.   (GX 1993-25).

But being paid over a half million dollars was not enough for Daugerdas, who decided to

---

[1]  The facts described in this section are based on the Probation Department's Presentence Report ("PSR"), the trial record, the record of the <u>Fatico</u> hearing, documents that the Government has produced to the defendant in discovery, and Government interviews of various witnesses.

divert to himself fees earned as a result of his work at AA.   Thus, in the wake of Daugerdas's participation as an AA partner in the 1991 Turner Broadcasting tax shelter transaction orchestrated by, among others, the tax shelter boutique ICA and the San Francisco law firm Jackson, Tufts, Cole & Black ("JTC&B"), Daugerdas arranged to be surreptitiously paid in excess of $100,000, which Daugerdas caused to be routed to him via the Chicago bank account of a college friend, Frank Smith, in order to disguise Daugerdas's receipt of the funds.   See Fatico Hearing Transcript of 05/16/14.

Similarly, in the immediate wake of the 1993-94 Short Sale tax shelter transaction orchestrated by Daugerdas and others at AA for AA client Donald Flynn, in March 1994 Daugerdas caused a secret payment of $560,000 to be made to him through Smith's bank account. In order to justify the payments, Smith sent fee invoices to JTC&B that falsely sought payment for "economic consulting" work that was never performed.   As the Fatico testimony established, those fees were sent via wire transfer to Smith's account by JTC&B attorney Emil Pesiri — whom Daugerdas had arranged to serve as the opinion-letter writer in the Flynn tax shelter for a fee, also dictated by Daugerdas, that was significantly greater than any fee previously paid to Pesiri for a tax opinion.

AA found out, however, that Daugerdas had directed the $560,000 fee to Smith's company, and asked Daugerdas to explain why that fee had been sent to Smith, about whom everyone else involved in the Flynn transaction knew nothing.   In response, Daugerdas repeatedly lied to AA, claiming that Smith and his company had performed an economic analysis of the Flynn tax shelter transaction.   When AA requested Daugerdas to produce the written analysis purportedly conducted by Smith, Daugerdas told the firm that none existed.   When AA thereafter

insisted that Daugerdas produce Smith in person, Daugerdas (who never disclosed that Smith was his college friend, much less that Smith had surreptitiously forwarded all but $10,000 of the $560,000 fee to a secret Daugerdas corporate entity),[2] refused AA's demand, which ultimately led to his termination from the AA partnership.

Like many corporate-sector terminations that are effectuated in a manner designed not to draw attention to tawdry facts or illegal acts, Daugerdas's termination from AA was effectuated through AA's demand in April 1994 that Daugerdas tender his resignation.   Daugerdas acceded to this demand, announcing in late April 1994 that he had resigned, effective August 31, 1994. Before formally walking out AA's doors, however, Daugerdas set in motion his plan to divert another AA fee to himself.   Thus, in or about July and August 1994, Daugerdas arranged for AA client Amoco to meet with Chicago-based tax shelter promoter Comdisco in connection with Amoco's interest in entering into a lease-strip tax shelter.   Following this meeting, which Daugerdas attended as an AA partner, Amoco decided to go forward with the tax shelter, the paperwork for which was put in place in September 1994.

After learning that Amoco had decided to proceed with the Comdisco tax shelter, Daugerdas sent a fee invoice to Comdisco in late September 1994, requesting that $491,000 be paid to Daugerdas in his individual capacity as an attorney.   Daugerdas falsely styled the invoice as a request for attorney's fees and post-dated it with a late October 1994 date.   Comdisco initially balked at paying the fee but ultimately agreed to send it to Daugerdas, after he agreed to provide a written indemnification to Comdisco, to protect it in the event that AA should make a claim with

---

[2]  As Smith's testimony at the <u>Fatico</u> hearing made clear, Daugerdas paid Smith $10,000 for laundering the fee through Smith's corporate bank account.   Smith also made clear that he performed no services in connection with the receipt of the fee, and had drafted and sent the bogus invoices to JTC&B at the direction of Daugerdas.

4

respect to the Amoco referral fee.   Daugerdas provided the indemnification, resulting in his personal receipt of the $491,000 fee — about which AA knew nothing.

In late 1994, Daugerdas joined the Altheimer & Gray law firm in Chicago as head of its tax department, where he stayed until late December 1998.   Largely as a result of his dissatisfaction with his compensation[3] and concomitant desire to get a larger portion of the skyrocketing tax shelter fees he was bringing in, Daugerdas resigned from A&G in late 1998 and joined, together with Erwin Mayer and Donna Guerin, the newly-formed Chicago office of J&G.   (PSR ¶20). Just prior to leaving A&G, however, Daugerdas arranged in December 1998 to finalize two tax opinions for a California-based client of two tax shelter boutiques, one in New York (The Diversified Group ("DGI"), owned by James "Jimmy" Haber) and the other in San Francisco (Presidio Advisors, owned by John Larson and Robert Pfaff).   Daugerdas also arranged that a secret payment for those tax opinions, issued on the letterhead of A&G, would be routed to him personally by Haber.   Thus, in February 1999, after Presidio Advisors routed payment for the two opinions to DGI in New York, Haber caused $400,000 to be sent to Daugerdas's corporate entity, Treasurex.   Daugerdas never informed A&G that he had received the secret fee for tax opinions on A&G letterhead.

Daugerdas struck a compensation agreement with J&G providing that, once Daugerdas successfully brought in $1 million in fees to the firm for a particular year, he would receive 50% of any additional fees up to $5 million.   Once the $5 million level was reached, Daugerdas received 70% of all additional fees. (GX 201-34).   It was pursuant to that compensation agreement that J&G paid Daugerdas over $89 million in fees for the tax years 1999-2001 alone. The breakdown of

---

[3] A&G paid Daugerdas $542,358 and $998,765 in partnership compensation for the 1997 and 1998 years, respectively.   (GX 1993-25).

Daugerdas's J&G fees for those years was as follows: 1999—$19,316,188; 2000—$50,297,507; and 2001—$19,980,552.   (GX 1993-25).   During those same years, Daugerdas's charitable gifts, as reflected on his IRS Forms 1040 for the years 1999-2001, totaled just $42,648, broken down as follows: 1999—$7,400; 2000—$7,426; and 2001—$27,822.   As a percentage of gross income (and not counting the additional millions of fraudulently diverted fee income routed by Daugerdas through Treasurex), Daugerdas's charitable giving was .047%.[4]

In or about 2003, J&G effectively shut down Daugerdas's tax shelter practice, largely as a result of Government enforcement actions and civil litigation by former clients that began in 2002. Together with Mayer, Daugerdas stayed at J&G between 2004 and 2005 in an "Of Counsel" capacity, principally assisting with J&G's responses to the various litigations.   (Guerin performed the same role during that time period, although she remained a "shareholder" of the firm.)   All three left J&G between December 2005 and February 2006.

J&G, which, at its peak, was a 600-lawyer firm with a long and proud history in Texas and elsewhere, shut its doors in or about March 2007, after entering into a non-prosecution agreement with the Government.   The tax shelter practice that Daugerdas brought to J&G was widely understood to have been the cause of the firm's demise.   See CEMCO Investors LLC v. United States, 515 F.3d 749, 750 (7th Cir. 2008) (Easterbrook, C.J.) ("Paul M. Daugerdas, a tax lawyer whose opinion letters while at Jenkins & Gilchrist led to the firm's demise . . . .").

B.   **The Offense Conduct**

Undeterred by this Court's post-trial rulings rejecting his contention that the jury's verdict

---

[4] According to the Statistical Abstract of the United States, the average American household contributed 2.2% of its income to charity in 1995. For 1998, the figure was 2.1%, United States v. Serafini, 233 F.3d 758, 780-81 (3d Cir. 2000) (Rosenn, J., dissenting) (citing Statistical Abstract of the United States, and Independent Sector), a figure that has remained fairly constant.

can and should be read as one based exclusively on fraudulent backdating, Daugerdas continues to

base his discussion of the facts and the Sentencing Guidelines calculations on that demonstrably

incorrect premise.   Given Daugerdas's tack in this regard, it is important to review briefly the

proof at trial, the specific allegations in the Indictment, and the jury's verdict as to the conspiracy

and other counts.   We then discuss several discrete aspects of the offense and related conduct

that bear special emphasis, as they speak volumes about Daugerdas's involvement in the tax

fraud and the unbounded nature of his fraud schemes and greed.

### 1.   The Proof at Trial

The proof at trial ─ which this Court appropriately labeled "overwhelming" with respect to

Daugerdas's culpability ─ compellingly demonstrated that Daugerdas oversaw the design,

marketing, implementation, and defense of four separate fraudulent tax shelters ─ Short Sale,

Short Options, Swaps, and HOMER.   In particular, the proof showed that, beginning in or about

1993, Daugerdas was one of the principal progenitors of the "tax play" behind the first three of

those shelters (that is, all except HOMER), which utilized the partnership basis rules to produce

non-economic losses.[5]   Each of the shelters consisted of an elaborate, choreographed series of

---

[5]  This partnership "tax play" was at the heart of what the Courts and commentators have referred
to as "Son-of-BOSS" tax shelters.   As the Tax Court has noted in the context of adjudicating the
Short Sale tax shelter of J&G client Marnin Kligfeld:

> Son–of–BOSS is a variation of a slightly older alleged tax shelter known as BOSS,
> an acronym for "bond and options sales strategy."   There are a number of different
> types of Son–of–BOSS transactions, but what they all have in common is the
> transfer of assets encumbered by significant liabilities to a partnership, with the
> goal of increasing basis in that partnership.   The liabilities are usually obligations
> to buy securities, and typically are not completely fixed at the time of transfer.
> This may let the partnership treat the liabilities as uncertain, which may let the
> partnership ignore them in computing basis.   If so, the result is that the partners
> will have a basis in the partnership so great as to provide for large—but not

steps that would generate fraudulent losses for J&G clients, thereby allowing those wealthy clients to significantly reduce — or, in most cases, completely eliminate — the taxes owed on millions of dollars in income.

Daugerdas and his co-conspirators recognized early on that the extraordinary tax benefits purportedly obtained through the use of these shelters would be obviated or vigorously challenged if the IRS were to learn the true facts and circumstances surrounding these shelters.   Rather than assume that risk, Daugerdas and his many co-conspirators engaged in an elaborate scheme to obstruct, mislead, and, in many instances, flat-out lie to the IRS, all as part of a corrupt endeavor to make it appear as though these transactions had occurred as a byproduct of the client's thoughtful investment strategy.   Thus, for example, Daugerdas and others at J&G: devised and authored client opinion letters for each of the tax shelters that falsely and fraudulently described the clients' intent and reasons for engaging in various aspects of the tax shelters and whether the tax shelters had a reasonable opportunity to make a profit;[6] assisted tax return preparers in preparing false and fraudulent tax returns for clients that claimed the fraudulent losses from the tax shelters sold and implemented by J&G; prepared false documents and tax shelter narratives that were sent to the IRS

---

out-of-pocket—losses on their individual tax returns.   Enormous losses are attractive to a select group of taxpayers—those with enormous gains.

Kligfeld Holdings v. Comm'r, 128 T.C. 192, 194, 2007 WL 1556083 (2007)).

[6]   The proof at trial showed that Daugerdas was specifically confronted with the issue of whether signed client representation letters should be used in connection with the J&G opinion letters, which would have created a written record of each clients' acknowledgment of the factual representations underlying the client opinion letters.   Daugerdas, however, rejected this "best practices" concept, allowing him and others to fabricate the representations without fear that that the clients would be asked to focus on those representations prior to the issuance of the opinions. (Trial II Tr. 2769-70.)

with the intent to deceive the IRS about the clients' reasons for entering into the tax shelters, as well as the legal support for those transactions; and participated in the fraudulent backdating of tax shelter transactions that were implemented incorrectly during the tax year.

The motivation for creating and mass-marketing the tax shelters was plain:  it allowed Daugerdas and his co-conspirators to collect gargantuan fees ─ usually 3-6% of the tax benefit created for the clients ─ and thereby allow those clients to evade their tax obligations.   In essence, the scheme involved a corrupt invitation by Daugerdas to his clients to pay to him and his co-conspirators in the form of fees only a small portion of what the clients otherwise owed in taxes, and to pay nothing to the Internal Revenue Service.   As a result of the success of the scheme, the conspirators collected outlandish fee income, as follows:

| DEFENDANT | APPROXIMATE INCOME FROM TAX SHELTERS |
|---|---|
| PAUL DAUGERDAS | $95,700,000 |
| ERWIN MAYER | $28,700,000 |
| DONNA GUERIN | $17,500,000 |
| DAVID PARSE | $3,000,000 |
| CHARLES BEE | $23,620,000 |
| ADRIAN DICKER | $6,000,000 |
| ROBERT GREISMAN | $4,500,000 |

(PSR ¶51).   The proof at trial and otherwise adduced during the investigation of this case has also demonstrated the aggregate harm wrought by Daugerdas and his co-conspirators as a result of the successful sale of the four tax shelters:

| SHELTER NAME | TOTAL TAX EVADED | TOTAL TAX BENEFITS CREATED |
|---|---|---|
| Short Sale | $487,271,364 | $2,381,974,494 |

| Short Options | $953,619,206 | $3,864,609,323 |
|---|---|---|
| SWAPS | $   88,371,363 | $   402,155,704 |
| HOMER | $   92,751,810 | $   429,073,360 |
| **TOTALS** | **$1,630,166,343** | **$7,077,812,881** |

(PSR ¶65).

### 2.   The Indictment and Jury Verdict

Count One of the Indictment alleged an elaborate, two-decades-long conspiracy centered on Daugerdas's involvement in the design, marketing, implementation, and defense of the J&G tax shelters. In particular, the massive conspiracy specifically alleged several independent aspects of the tax shelter fraud: the drafting and issuance of fraudulent opinion letters designed to undermine the ability of the IRS to determine the J&G clients' correct tax liabilities and whether penalties should be imposed, see Ind. ¶¶ 42-46; the backdating of transactions used to achieve fraudulent tax losses, and the false tax return reporting that occurred as a consequence of the fraudulent backdating, see Ind. ¶ 47; the creation of false and fraudulent transactional documents for the J&G shelters, which were used to minimize the appearance that each tax shelter was an investment undertaken to generate profits rather than devices simply to generate tax losses, see Ind. ¶¶ 48-49; the preparation of tax returns that reported the massive fraudulent losses stemming from the J&G tax shelter transactions, see Ind. ¶ 50; and fraud during the audits and litigation related to the tax shelters, including providing the IRS with false statements, fraudulent documents, and bogus legal and factual arguments, see Ind. ¶ 51.

The conspiracy count listed three separate and discrete objects: (i) to defraud the IRS through the design, marketing, and sale of the J&G tax shelters (the "Klein" object); (ii) to commit

tax evasion with respect to the tax liabilities of tax shelter clients, using various means and methods; and (iii) to commit wire fraud through the design, marketing, and implementation of fraudulent tax shelters.  See Ind. ¶¶ 59-62.  In a special interrogatory, the full jury found Daugerdas guilty with respect to all three of the conspiracy count's objects.  (Tr. 7807).

The jury also found Daugerdas guilty of Counts 5, 6, 7, and 11, which were a subset of the ten client tax evasion charges alleging that Daugerdas attempted to evade the taxes of certain clients through the following acts, among others:

> (a)    designing and implementing tax shelters that Daugerdas knew lacked economic substance and genuine business purpose, and were not genuinely engaged in for profit;

> (b)    using those tax shelters to generate millions in tax losses that Daugerdas knew could not properly be deducted on the returns of the tax shelter clients;

> (c)    creating and utilizing entities that served no legitimate business purpose;

> (d)    providing and causing to be issued false and fraudulent "more likely than not" legal opinion letters from J&G;

> (e)    causing to be prepared, and causing to be signed and filed with the IRS, false and fraudulent U.S. Individual Income Tax Returns, Forms 1040, which understated the tax shelter clients' taxable income and the tax due and owing thereon; and

> (f)    taking various steps to conceal from the IRS the existence of the tax shelters, their true nature, and certain conspirators' role in designing, marketing, and implementing the tax shelters.  See Ind. ¶ 65.

Count Thirteen of the Indictment, which charged Daugerdas with corruptly endeavoring to obstruct and impair the lawful functions of the IRS, specifically incorporated all of the substantive

allegations contained in Count One, the conspiracy count.   See Ind. ¶ 105.   Thus, in addition to the other allegations in Count Thirteen — relating to Daugerdas's corrupt use of personal tax shelter transactions between 1993 and 2002, resulting in the payment of almost no income taxes while receiving over $99 million in income during that period — the jury's guilty verdict on Count Thirteen was grounded in all of the same means, methods, and acts contained in Count One.

Finally, Count Seventeen, which charged Daugerdas with scheming to defraud the IRS through the use of the mails (that is, mail fraud), likewise incorporated all of the substantive allegations contained in the conspiracy count.   See Ind. ¶ 105.   Thus, like Count Thirteen, the jury's guilty verdict on Count Seventeen was grounded in all of the same means, methods, and acts contained in Count One.

### 3.   Daugerdas's Role as Organizer and Leader of the Criminal Activity and as an Architect of the Fraudulent Son-of-BOSS Tax Shelters

Daugerdas's central role as an organizer and leader of the tax shelter fraud scheme is deserving of special consideration — and rigorous condemnation — by the Court.   That is so for several reasons.   First, Daugerdas's organizational and supervisory activities were doubtlessly the impetus for the criminal involvement of Guerin and Meyer, who, together with Daugerdas, supervised and tutored J&G partners and associates regarding the fraudulent aspects of the transactions in order to facilitate their participation in the assembly line production of deal documents and opinion letters.[7].

---

[7] One vivid episode of the corrupt leadership fomented by Daugerdas involved the tax shelter tutorial given by mentee Donna Guerin to J&G associates from Texas and elsewhere in or about early 1999, when Guerin described how the use of an LLC in the Short Sale transaction was part of a "hide the ball" strategy — that is, designed to reduce audit risk by having any tax reporting document sent to an LLC (which had its own taxpayer ID number) rather than the individual taxpayer involved in the transaction.   (Trial II Tr. 2394-95).   Daugerdas provided Mayer with

Aside from his recruitment of central participants such as Guerin and Meyer, Daugerdas was involved in other significant aspects of organization and leadership of the fraud scheme, including: serving as principal crafter of the false representations placed in the template opinion letters; point person in establishing the relationship, in the early 1990's, with the corrupt brokers and others at Alex Brown (and, later, Deutsche Bank), which financial institution played a central role in helping to craft and implement the financial products inserted into the shelters as purported "investment" vehicles; serving as relationship person with corrupt partners of Ernst & Young, who worked with Daugerdas in devising and selling the COBRA version of the short option tax shelter; serving as key decision-maker in rejecting, on behalf of J&G, the legal flaws in COBRA identified by Jared Blanchard of E&Y with respect to the short options shelter; serving as point person in establishing the relationships with numerous other tax shelter promoters and hucksters, including John Ohle and Jeff Conrad of Bank One, Robert Greisman of BDO Seidman,[8] Emil Pesiri of JTC&B, and Jimmy Haber of DGI.   (The incestuous relationships between Daugerdas at J&G and others in the tax shelter universe between 1993 and 2001 are noted in the chart attached hereto as Exhibit A, which also notes the shelters involved and those convicted as a result of their involvement.)

Finally, as the proof at the <u>Fatico</u> hearing and trial made plain, Daugerdas was one of the principal architects of the whole wave of Son-of-BOSS tax shelters that began in or about 1993

---

essentially the same description of the purpose of the LLC.   (Trial II Tr. 2255-56).   Some of the J&G associates who attended the Guerin tutorial meeting were later involved in the sale of the fraudulent tax shelters or the fraudulent tax reporting that occurred.   Clearly, supervisory activities that essentially guided junior attorneys in the fraud should be considered an especially aggravating factor.

8   BDO resolved its own criminal and civil penalty liabilities with a $50 million Deferred Prosecution Agreement with the Department of Justice.

and proliferated throughout that decade and afterward.   In particular, Daugerdas worked closely with Pesiri and ICA on the tax idea underlying the Turner Broadcasting tax shelter, which involved use of the partnership tax play, predicated on Section 752 of the Internal Revenue Code, that disregarded so-called contingent liabilities when calculating outside basis for partners in a partnership. Using as a template the Turner transaction — which involved a corporate taxpayer seeking to refresh expiring capital losses — Daugerdas imported the Section 752 idea into an individual taxpayer transaction and began, while at AA, the marketing of those transactions to wealthy taxpayers. Thus, Daugerdas played a critical role in 1993 in the sale of what became the Short Sale shelter to the Don Flynn group of taxpayers, which resulted in the creation of $150 million of fraudulent basis and huge fees to Pesiri's firm and AA, as well as Daugerdas personally. Thereafter, Daugerdas's marketing of the tax shelters, aided by his mentoring of Mayer and Guerin, resulted in the explosion of those transactions at A&G and J&G and throughout the tax shelter industry.

Given the foregoing, this Court should give appropriate consideration to the instrumental and influential role played by Daugerdas — viz., central tax alchemist of a generation of fraudulent tax shelters.[9]

---

[9]   The proof at trial showed the central role of Daugerdas in (i) developing the digital currency option when the IRS began enforcement initiatives with respect to the Short Sale shelter; (ii) developing, with John Beery, the notional principal contract, or "swap," that was used as a replacement for the options in the J&G tax shelter structure following the issuance by the IRS of Notice 2000-44; and (iii) developing, with John Beery, the knock-out options utilized in the HOMER tax shelter.   The proof also showed that, even after being told that the HOMER options had been implemented improperly, resulting in an inability of the options, standing alone, to return any profit, Daugerdas nonetheless oversaw the issuance of opinion letters for the HOMER transactions.

### 4.    Daugerdas's Participation in Fraudulent Backdating

As detailed in paragraphs 41-50 of the PSR, Daugerdas's conduct involved not only the design, marketing, and implementation of the fraudulent J&G tax shelters, but also fraudulent backdating of certain of those transactions when he and others at J&G realized that the shelter had been implemented incorrectly, or not consistent with the clients' wishes with respect to the amount or nature of the tax loss.

The facts concerning all of the backdating will not be repeated at length herein.   It is useful to note, however, the following aggravating facts: (i) Daugerdas participated in the backdating together with others at J&G, including Guerin and John Beery, as well as David Parse of Deutsche Bank; (ii) beyond the instances of backdating in the PSR, the trial record reflects that Erwin Mayer discussed with Daugerdas certain backdating done by Mayer in one of his own client transactions as part of the overall conspiracy (Trial II Tr. 2339), as well as alterations made by Mayer of Deutsche Bank account statements that referred to fees paid by the clients to J&G; and (iii) all of the incidents of backdating that are detailed in the PSR resulted in the fraudulent tax reporting of the tax shelter results by the clients.

Whatever can be said about the pervasive nature of the tax shelter industry in the late 1990's and early 2000's and the purported unsettled state of the economic substance doctrine and the attendant effects on Daugerdas's conduct (which Daugerdas uses as a quasi-excuse for his conduct), [10] the fraudulent backdating of transactions was garden variety fraud.    Basic

---

[10]    Daugerdas has attached to his sentencing memo a letter drafted by tax lawyer Jasper "Jack" Cummings, who purports to describe how the economic substance doctrine was too vague to apply in both the criminal and civil settings during the period 1994-2001.  We need not devote much time to the obvious and numerous shortcomings of the Cummings letter except to note that his so-called "analysis" would come as a surprise to the Second Circuit Court of Appeals, which has

principles of tax reporting, embodied in the Code-based annual accounting rule, have long prohibited the changing of tax results through transactions carried out after the close of the tax year.   Given this clear legal imperative, Daugerdas's willingness to participate in such conduct can only be viewed as brazen misconduct.

### 5.    Daugerdas's Secret Fee Arrangement with Guerin

As noted in paragraph 53 of the PSR, Daugerdas and Guerin deceived the J&G board by reaching a secret compensation pact that allowed Guerin to be compensated based on the number of tax shelter deals she originated, even though she had no "origination credit" provision in her employment agreement with J&G.   In order to understand the untoward aspects of Daugerdas's secret compensation deal with Guerin, it is important to remember certain aspects of Daugerdas's written compensation agreement with J&G.   Through that agreement, Daugerdas secured the right to receive (i) 70% of the tax shelter fees that J&G collected on tax shelter transactions in

---

applied the economic substance doctrine and upheld criminal tax convictions based on that doctrine since at least 1989. See United States v. Atkins, 869 F.2d 135, 140 (2d Cir. 1989) (defendants' "contention that the district court's charge on lack of economic substance has no place in a criminal prosecution is without merit."). Cummings's "analysis" should also come as a surprise to Daugerdas, whose very own tax opinions noted as settled law the core requirement of the economic substance doctrine that tax motivated transactions have a reasonable possibility of profit. Daugerdas should hardly be heard to complain, therefore, that he is being held to account, for Sentencing Guidelines and other purposes, for hatching transactions that had no possibility of profit. Finally, it is telling that Cummings, who refused to speak to the Government about the circumstances surrounding his providing of the letter, did not see fit to examine any of the facts of the case, much less Daugerdas's purported belief that you can disregard fees and other costs when conducting a profitability analysis — the so-called heart of Daugerdas's legal defense. At best, then, Cummings's "analysis" — with its disregard of the facts of the case, such as Daugerdas's lie-laden opinion letters, and the decades of circuit-bound case law firmly recognizing economic substance as a predicate for civil and criminal liability — is hardly worthy of a second year law student in an introductory Tax Law class. At worst, it is an apologia for fraud by opinion letter writers who would seek to justify losses from any tax-motivated transaction by arguing that the "judge made" economic substance doctrine is, by gosh, just too difficult and vague to figure out, even for civil liability.

which Daugerdas was the originator or "finder";[11] and (ii) 50% of the tax shelter fees that J&G collected from tax shelter transactions that were originated by Erwin Mayer and Donna Guerin. Thus, because Guerin had no separate compensation formula with J&G, her origination of transactions resulted in 50% of the fee going to the firm, which had the unfettered discretion to decide at the end of the year how much it wished to pay Guerin based on her originations.   On the other hand, if a transaction were originated by Daugerdas, J&G received only 30% of the fee, because Daugerdas had a contractual right to 70%.   <u>See</u> GX 201-34 (Daugerdas Compensation Agreement).

Daugerdas and Guerin deceived J&G through their mutual agreement that, rather than having Guerin take "origination credit" for certain transactions where Guerin was, in fact, the originator (such as those transactions relating to KPMG and referral source Ralph Lovejoy), she would allow Daugerdas to claim full origination credit.   (Trial I Tr. 3804-05; 3826-27).   This allowed Guerin and Daugerdas to give Daugerdas 70% of the fee rather than 50% (and thus leaving J&G 30% of the fee rather than 50%), and thereafter leave it to Daugerdas — rather than the J&G compensation committee — to determine how much Guerin would be paid as a result of her fee origination.

Stated simply, J&G was deprived of the information concerning the secret Guerin/Daugerdas agreement, pursuant to which Guerin gave Daugerdas full credit and that, as a result, Daugerdas computed the amount he paid Guerin based on her originations.

### 6.   Daugerdas's Fee Diversions and Perjury

The facts adduced at the <u>Fatico</u> hearing made plain that, far from being simply an

---

[11]   As noted above, the 70% apportionment kicked in after Daugerdas brought in $5 million of fees.

"aggressive" tax lawyer who was attempting to use the IRS's own arguments against it (as he has portrayed himself at trial and elsewhere), Daugerdas was a common thief who devised schemes to steal from his partners at AA, A&G, and J&G.   Although Daugerdas attempts to justify his receipt of over $1 million of fees while at AA as simply "moonlighting," such a characterization does not explain why Daugerdas used Frank Smith as a nominee to receive Daugerdas's secret fees, why Daugerdas lied to AA personnel when they asked them about the diversion of the fee to Frank Smith, and why Daugerdas never disclosed his receipt of the Comdisco fee at the time he received it.   Stated another way, if Daugerdas believed he was entitled to the Flynn fee, why didn't he tell AA that he, rather than Smith, had received the fee?   Moreover, why did he try to convince AA that Smith had performed bona fide services in connection with the Flynn transaction?   Finally, why didn't Daugerdas make AA aware of his receipt of the Comdisco fee at the time?   The answers to these questions are obvious: Daugerdas lied and failed to disclose because he knew he was not entitled to the fees himself.   These lies and subterfuges, we submit, should be given significant consideration by the Court.

So, too, should Daugerdas's perjury at the DGI deposition.   The transcript of Daugerdas's testimony makes clear that he flat-out lied when asked about the circumstances surrounding his departure from AA, which he now (after the <u>Fatico</u> hearing) acknowledges resulted from a dispute with AA over his diversion of the Flynn fee.   Here are the pertinent portions of the questions and answers from the Daugerdas deposition:

Q;      Tell me the circumstances of your departure from Arthur Andersen.

A:      I voluntarily resigned from the firm.

Q:      What prompted you to voluntarily resign from the firm?
A:      A recognition of my likely unit levels of compensation for the next

ten years, opportunities in the marketplace.

Q;      Was it a completely amicable separation from the firm?

A:      Yes.

                    *       *       *       *       *

Q:      Had Treasurex Financial received remuneration in respect of
        business activities that you engaged in prior to your leaving Arthur
        Andersen?

A:      No.

                    *       *       *       *       *

Q:      Was there anything in any way related to business dealings you had
        with Mr. Pesiri that entered into your decision to voluntarily resign
        from Arthur Andersen?

A:      No.

(GX 58-12B, at 175-77).   The Daugerdas testimony was patently false in a number of ways.

First, the answer regarding why Daugerdas left AA — "likely unit levels of compensation" and

"opportunities in the marketplace" — was demonstrably untrue because the departure was based

on Daugerdas's refusal to be truthful about the Flynn fee diversion.   Second, Daugerdas's

denial that Treasurex had received any remuneration prior to his separation from AA was also

untrue, because the bank records of Treasurex show that it received the diverted Flynn fee on

August 4, 1994, which was prior to Daugerdas's departure.   See GX 1994-18 (worksheets

showing receipt of fee by Treasurex on 08/04/94).   Moreover, the facts adduced at the hearing

made plain that Smith transferred to a Daugerdas entity (Orchard West Plaza) the diverted fee in

April and then again in early August.   If Daugerdas is maintaining — as he apparently is — that

it was a Treasurex fee, then certainly Treasurex had dominion and control over the fee through

19

Daugerdas's Orchard West bank account.   Finally, Daugerdas's denial that his dealings with Pesiri were not part of the decision to resign was untrue, as Pesiri's transfer of the Flynn fee to Smith, and AA's subsequent discovery of that fact, is what prompted Daugerdas's forced resignation.   In sum, it is plain that Daugerdas shamelessly perjured himself at his deposition.[12] The Government submits that the false testimony by Daugerdas, as part of his effort to hide his unlawful conduct surrounding the fee diversions, should be given significant consideration by the Court.

### C.      The PSR and the Guidelines Determination

In connection with the sentencing of Daugerdas, the Probation Office prepared a PSR that, among other things, calculated the defendant's Sentencing Guidelines offense levels.   As calculated by Probation, the final offense level for Daugerdas is 44, broken down as follows:

- A base offense level of 36 pursuant to §§ 2T1.9, 2T1.1, and 2T4.1 (tax table). PSR ¶ 69.

- An increase of 2 levels pursuant to U.S.S.G. § 2T1.1(b)(2) because the offense involved sophisticated means.   PSR ¶ 69.

- An increase of 2 levels pursuant to U.S.S.G. § 2T1.9(b)(2) because the defendant was involved in conduct intended to encourage persons other than or in addition to co-conspirators to violate the internal revenue laws.   This conduct involved encouraging hundreds of tax shelter clients to violate the tax laws.   PSR ¶ 70.

- An increase of 4 levels pursuant to U.S.S.G. § 3B1.1(a) because the defendant was an organizer or leader of criminal activity that involved five or more persons and was otherwise extensive.   Daugerdas directly led Mayer, Guerin, and Beery in the offense conduct, which also involved the following criminal actors, among others: David Parse; Michael Cook; Patrick O'Daniel; Bryan Lee; Paul Shanbrom; Robert Greisman; Charles Bee; Denis Field; Adrian Dicker; and Michael Kerekes.

---

[12] As the Government noted in its pre Fatico-hearing memo, Daugerdas also perjured himself when he professed a complete lack of recollection, and a complete inability to have his recollection refreshed, about the circumstances surrounding his receipt through Treasurex in February 1999 of the $400,000 fee routed to him by Haber for the Presidio-related opinions.   (GX 58-12b, at 306).

PSR ¶ 72.

Daugerdas has no criminal history points.  Thus, with a final offense level of 44, Daugerdas's Guidelines analysis, according to the PSR, with which the Government concurs, yields a final advisory Guidelines range of life imprisonment. (PSR ¶ 133).  The statutory maximum, however, is 58 years' imprisonment.   Id.

### D.    The Objections to the PSR and the Court's Guidelines Rulings

Daugerdas advanced numerous objections to the PSR, including the following Sentencing Guidelines-based contentions: (i) that the total Guidelines loss amount was $2.2 million (based simply on the backdated tax shelter transactions) rather than the full amount of loss stemming from the hundreds of tax shelter transaction from which Daugerdas profited; (ii) that the conspiracy and scheme of which he was convicted was not "sophisticated" within the meaning and definitions of the tax Guideline; (iii) that he was not a leader or organizer and the offenses of conviction did not involve five or more people; and (iv) that he did not encourage others to violate the tax laws.   Daugerdas also raised dozens of other objections to the facts, including those relating to his fraudulent diversion of fees from AA, A&G, and J&G and the secret fee agreement he struck with Donna Guerin.

On June 6, 2014, this Court overruled all of Daugerdas's objections to the PSR.   As a result, the final Guidelines offense level is 44, with the attendant imprisonment range of life.

Notwithstanding this Court's Guidelines and other determinations, Daugerdas has advanced a host of additional challenges to the Sentencing Guidelines computations, only two of which are worthy of response.

First, Daugerdas maintains that post-verdict conversations between his counsel and the

jury mandate that he be held responsible only for the tax losses stemming from the backdated tax shelter transactions and not the overarching conspiracy.   Not surprisingly, Daugerdas fails to cite to any case holding that the post-verdict views of one or more jurors should be given weight in determining the scope of a conspiracy or scheme for Sentencing Guidelines purposes.   In fact, no such authority exists.   More to the point, the only jury specification that is legally deserving of respect is the special interrogatory with respect to the conspiracy charge, where the jury found that the Government had established all three objects of the conspiracy — that is, the Klein, tax evasion, and mail/wire fraud objects.   Given that finding, and the relevant conduct provisions of the Tax Guideline[13] — which command that the Court count the losses from "all conduct violating the tax laws" — the proper loss amount is that stemming from the full range of fraudulent shelter transactions.   Contrary to Daugerdas's claim, there simply is no viable argument that the tax shelter transactions are unrelated to the backdating conduct, as the backdating occurred as part of the implementation of the fraudulent tax shelters.

---

[13]  While Daugerdas cites to the general "relevant conduct provisions contained in U.S.S.G § 1B1.3 (Memo, at 51-52), Daugerdas ignores the separate relevant conduct provisions of the Tax Guidelines, which provide in pertinent part that,

> [i]n determining the total tax loss attributable to the offense ( see §1B1.3(a)(2)), all conduct violating the tax laws should be considered as part of the same course of conduct or common scheme or plan unless the evidence demonstrates that the conduct is clearly unrelated. The following examples are illustrative of conduct that is part of the same course of conduct or common scheme or plan: (a) there is a continuing pattern of violations of the tax laws by the defendant . . . and (e) the violation in each instance involves a failure to report or an understatement of a specific source of income, e.g., interest from savings accounts or income from a particular business activity.

U.S.S.G § 2T1.1.

Daugerdas contends next that his Sixth Amendment rights were violated because the jury did not find the facts underlying the tax loss enhancements beyond a reasonable doubt.   Relatedly, Daugerdas maintains that because the jury convicted him simply of fraudulent backdating, it would be constitutionally impermissible to increase his Guidelines based on hundreds of millions of dollars of additional tax loss.   These arguments lack merit for two reasons.   First, as this Court found in denying Daugerdas's post-trial motions, the premise of the argument is wrong, in that the jury's verdict on the conspiracy and mail fraud counts simply cannot be read as limited to backdating alone — irrespective of what two unnamed jurors may have said following the verdict. Second, Daugerdas's argument fails to take account of the language and holdings in Apprendi v. New Jersey, 530 U.S. 466 (2000), and United States v. Booker, 543 U.S. 220 (2005), neither of which requires a jury or district court to find facts, beyond a reasonable doubt, in every instance where a sentence might be enhanced.   On the contrary, Apprendi holds that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." 530 U.S. at 490. Here, Daugerdas is not being subjected to enhanced penalties beyond the prescribed statutory maxima. Thus, Apprendi and Booker do not apply (except to the extent that Booker makes the Guidelines advisory on the sentencing court).   See United States v. Visinaiz, 428 F.3d 1300, 1316 (10th Cir.2005) ("Booker quite clearly, does not prohibit the district court from making findings and applying the enhancements and adjustments to [a defendant's] sentence as long as it did not view or apply the Guidelines as mandatory.").

In sum, the defendant's eleventh-hour Guidelines challenges should be rejected.

E.      <u>Restitution</u>

Daugerdas's continuing objection to a restitution order in the full amount of the harm stemming from the conspiracy and mail fraud counts should also be rejected.

There is no viable "complexity" argument, for the reasons articulated by Judge Baer in the case of Daugerdas's co-conspirator, Michael Kerekes, and implicitly adopted by this Court with respect to co-conspirators David Parse, Donna Guerin, Charles Bee, Adrian Dicker, and Robert Greisman.  <u>See</u> <u>United States v. Kerekes</u>, No. 09 Cr. 137 (HB), 2012 WL 3526608 (S.D.N.Y. Aug. 15, 2012) (rejecting complexity argument in determining that BDO/J&G tax shelter transactions for clients who escaped audit resulted in actual tax loss to IRS of approximately $61 million), <u>aff'd</u>, 531 Fed. Appx. 182 (2d Cir. 2013); <u>see also</u> <u>United States v. Bengis</u>, 631 F.3d 33, 41 (2d Cir. 2011) (vacating district court's finding that determination of restitution amount was unduly complicated and time-consuming).   The number of taxpayers comprising the IRS's loss is limited to sixty-four individuals (or taxpayer groups), and the tax loss figures have been calculated by the IRS at $371,006,397, as reflected on the restitution chart provided to Probation and Daugerdas.[14]

In addition, the fact that Daugerdas is subject to a separate forfeiture does not mean that the Court should not order restitution.   The Mandatory Victim Restitution Act of 1996 ("MVRA"), Pub. L. No. 104-132, § 204(a), 110 Stat. 1227 (1996) (codified as amended at 18 U.S.C. § 3663A), makes restitution for certain crimes, including certain tax crimes under Title 18, mandatory.   <u>See</u> <u>United States v. Walker</u>, 353 F.3d 130, 133-34 (2d Cir. 2003) (discussing significantly reduced

---

[14]     A disk with the Revenue Agent Reports for each of the individuals listed on the restitution chart will be provided to the Court, the Probation Office, and to defense counsel under separate cover.

discretion afforded courts in imposing restitution under the MVRA).   A defendant found guilty of a conspiracy charge, of course, is liable for restitution to victims harmed by the conspiracy ─ in this case, the IRS.   As the Second Circuit has held:

> The MVRA requires restitution where (a) the offense was "committed by fraud or deceit" and (b) "an identifiable victim or victims has suffered a physical injury or pecuniary loss." 18 U.S.C. § 3663A(a)(1), (c)(1)(A)(ii), (c)(1)(B). . . .   A 'victim' means a person directly and proximately harmed as a result of the commission of an offense . . . including, in the case of an offense that involves as an element a scheme, conspiracy, or pattern of criminal activity, any person directly harmed by the defendant's criminal conduct in the course of the scheme, conspiracy, or pattern." § 3663A(a)(2).

United States v. Archer, No. 10─4683─CR, 2011 WL 4360013, *16 (2d Cir. 2011).

In addition, interest due is properly includible in a restitution order.   United States v. Qurashi, 634 F.3d 699, 704 (2d Cir. 2011).   The Internal Revenue Code provides that interest must be paid on any tax that is not properly remitted to the IRS on or before the due date of the tax.   See 26 U.S.C. § 6601.   The rate of interest, prescribed in Section 6621 of the Code, was utilized to calculate Daugerdas's restitution amount.

Thus, Daugerdas is liable for the full amount of taxes and interest owed to the IRS as a result of the conspiracy and mail fraud charge, for which the Government submits he should be liable jointly and severally with his co-conspirators.

## II.   SENTENCING LEGAL PRINCIPLES

We are thoroughly aware of the Court's familiarity and facility with the Sentencing Guidelines and the law of sentencing, particularly in this post-Booker age.   We nonetheless think it helpful to review briefly the governing legal principles in this area.

While the Sentencing Guidelines are no longer mandatory, they nevertheless continue to play a critical role in trying to achieve the "basic aim" that Congress tried to meet in enacting the

Sentencing Reform Act, namely, "ensuring similar sentences for those who have committed similar crimes in similar ways." United States v. Booker, 543 U.S. 220, 252 (2005); see United States v. Crosby, 397 F.3d 103, 113 (2d Cir. 2005) ("[I]t is important to bear in mind that Booker/Fanfan and section 3553(a) do more than render the Guidelines a body of casual advice, to be consulted or overlooked at the whim of a sentencing judge.").   The applicable Sentencing Guidelines range "will be a benchmark or a point of reference or departure" when considering a particular sentence to impose. United States v. Rubenstein, 403 F.3d 93, 98-99 (2d Cir. 2005). In furtherance of that goal, a sentencing court is required to "consider the Guidelines 'sentencing range established for . . . the applicable category of offense committed by the applicable category of defendant,' the pertinent Sentencing Commission policy statements, the need to avoid unwarranted sentencing disparities, and the need to provide restitution to victims." Booker, id. at 260 (citations omitted); see also id. at 264 ("The district courts, while not bound to apply the Guidelines, must consult those Guidelines and take them into account when sentencing.").

Apart from the Sentencing Guidelines, as the Court is well aware, the other factors set forth in Title 18, Section 3553(a), must be considered.   Section 3553(a) directs the Court to impose a sentence "sufficient, but not greater than necessary" to comply with the purposes set forth in paragraph two.    That sub-paragraph sets forth the purposes as:

> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
> (B) to afford adequate deterrence to criminal conduct;
> (C) to protect the public from further crimes of the defendant; and
> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner . . . .

Section 3553(a) further directs the Court – in determining the particular sentence to impose – to consider:   (1) the nature and circumstances of the offense and the history and characteristics of

the defendant; (2) the statutory purposes noted above; (3) the kinds of sentences available; (4) the kinds of sentence and the sentencing range as set forth in the Sentencing Guidelines; (5) the Sentencing Guidelines policy statements; (6) the need to avoid unwarranted sentencing disparities; and (7) the need to provide restitution to any victims of the offense.   See 18 U.S.C. § 3553(a).

In light of Booker, the Second Circuit has instructed that district courts should engage in a three-step sentencing procedure.   See Crosby, 397 F.3d at 103.   First, the Court must determine the applicable Sentencing Guidelines range, and in so doing, "the sentencing judge will be entitled to find all of the facts that the Guidelines make relevant to the determination of a Guidelines sentence and all of the facts relevant to the determination of a non-Guidelines sentence."   Id. at 112.   Second, the Court must consider whether a departure from that Guidelines range is appropriate.   Id.   Third, the Court must consider the Guidelines range, "along with all of the factors listed in section 3553(a)," and determine the sentence to impose. Id. at 113.   In so doing, it is entirely proper for a judge to take into consideration his or her own sense of what is a fair and just sentence under all the circumstances.   United States v. Jones, 460 F.3d 191, 195 (2d Cir. 2006).

## III.   Section 3553(a) Analysis

Although the Guidelines, as set forth above, are no longer binding, they reflect the seriousness of the offenses of conviction and the particular aggravating factors relating to Daugerdas's conduct. We respectfully submit that a term of incarceration no less than that recommended by Probation is imperative in order to emphatically promote general deterrence and respect for the law.

1.      **The Nature and Circumstances of the Offenses**

The crimes Daugerdas committed were literally off-the-charts in terms of the tax harm caused to the United States Treasury and in other regards as well.   In particular, Daugerdas's crimes, of which he was an organizer and leader, spanned two decades and were unprecedented in the history of tax fraud prosecutions in the amount of fraudulent tax benefits created ($7,077,812,881), amount of Guidelines tax loss caused ($1,630,166,343), and amount of proceeds unlawfully obtained by the principal actors (over $150,000,000).

It goes without saying that tax offenses are serious, costly, and damaging to our nation's system of taxation.   See United States v. Ture, 450 F.3d 352, 357 (8th Cir. 2006) ("The criminal tax laws are designed to protect the public interest in preserving the integrity of the nation's tax system.").   The Internal Revenue Code, § 6151(a), sets forth the general rule of our voluntary federal tax system: "Except as otherwise provided, when a return of tax is required under this title or regulation, the person required to make such return, shall, without assessment or notice and demand from the Secretary, pay such tax to the internal revenue officer with whom the return is filed, and shall pay such tax at the time and place fixed for filing the return."   The tax offenses at issue in this case have cost the United States Treasury, and the nation's honest taxpayers, not only the taxes that should have been paid, but an unprecedented amount in resources in investigating and prosecuting the criminal cases, and investigating, resolving and, in some instances, litigating the myriad civil cases of Daugerdas's clients.

The defendant is an attorney and CPA who should be held to the same, if not higher, degree of compliance with the law.   As a result of his acumen as an attorney and the role he played in devising the overarching scheme and advising clients in connection with tax matters,

Daugerdas had the ability to counsel his clients appropriately so that they could and would comply with the tax laws.   Instead, in order to obtain the unprecedented fees that he and his co-conspirators collected, he willingly participated as an attorney and tax advisor in hundreds of fraudulent tax shelter transactions.

The seriousness of the defendant's conduct, his organizational and leadership role with respect to junior (co-conspirator) attorneys at J&G, the amount of taxes he personally evaded and caused clients to evade, and the exorbitant amount of fees he collected from A&G and J&G in doing so, all support the prison sentence recommended by Probation. The defendant acted without regard to his responsibilities as a citizen, lawyer, and CPA to adhere to the tax laws of this country, and for that he must be held to account.

Daugerdas's suggestion that he is somehow less blameworthy for selling fraudulent tax shelters because "everyone was doing it" should be summarily rejected for a number of reasons. First, just as a crack dealer selling crack on a corner with several others cannot find refuge in the argument that "everyone else" on that corner was selling crack, so, too, a corrupt tax professional who knowingly engages in massive tax fraud scheme cannot escape blame because other tax professionals at law firms and accounting firms had lost their legal bearings as well.   White collar defendants deserve no special treatment.

Second, Daugerdas is plainly wrong in suggesting that "everyone was doing it."   To be sure, tax professionals at AA, KPMG, BDO Seidman, Ernst & Young, Presidio Advisors, Brown & Wood, Arnold & Porter, Bank One, Shumaker Loop & Kendrick, and JTC&B were engaged in tax shelter fraud, but those individuals — a significant number of whom now have the name "convict" — represented a small percentage of the otherwise law-abiding tax professionals in the

United States.  Finally, there is absolutely no proof that "everyone" was engaged in the type of shameless and brazenly illegal backdating of transactions in which Daugerdas and others engaged, as well as Daugerdas's perjury and fraudulent fee diversions.

### 2.    History and Characteristics of the Defendant

While it is certainly appropriate for the Court to consider the defendant's good works,[15] the Government respectfully submits that any credit given them must be balanced against the fact that his ability to perform such good works resulted directly from the position he achieved and the wealth that he accumulated as a result of the breathtaking fraud of which he was the principal architect. In particular, with respect to Daugerdas's contributions to certain charities, such as Make-A-Wish, the law is clear that a defendant's acts of charity cannot "trump" a defendant's criminal conduct, absent truly exceptional circumstances — which are simply not present here. As the Seventh Circuit has succinctly observed: "Wealthy people commonly make gifts to charity. They are to be commended for doing so but should not be allowed to treat charity as a get-out-of-jail card."   United States v. Vrdolyak, 593 F.3d 676, 682 (7th Cir. 2010).

In Vrdolyak, the court reversed a probation-only sentence for a white-collar criminal who defrauded his large institutional victim of $1.5 million.[16]  The court of appeals found it error for

---

[15]   Defense counsel accuses the Government of trying to prevent the Court from learning of Daugerdas's good works (Br. 43 ("The government seeks to deny the Court this view of Mr. Daugerdas."), but we have done no such thing.  The only party who has sought to prevent the Court from learning facts about "Paul Daugerdas—the man" is Daugerdas himself — who took the unprecedented step of making a motion to preclude the Court from conducting the Fatico hearing.

the district court to give "enormous weight" to the charitable acts of the defendant "while virtually ignoring the evidence that tugged the other way." 593 F.3d at 682.   The court explained that charitable contributions "must be exceptional before they will support a more-lenient sentence" because "it is usual and ordinary, in the prosecution of similar white-collar crimes involving high-ranking corporate executives, to find that a defendant was involved as a leader in community charities, civic organizations, and church efforts."  Id. (quoting United States v. Repking, 467 F.3d 1091, 1095 (7th Cir. 2006)).   The court continued:

> To allow any affluent offender to point to the good his money has performed and to receive a downward departure from the calculated offense level on that basis is to make a mockery of the Guidelines. Such accommodation suggests that a successful criminal defendant need only write out a few checks to charities and then indignantly demand that his sentence be reduced. The very idea of such purchases of lower sentences is unsavory, and suggests that society can always be bought off, even by those whose criminal misconduct has shown contempt for its well-being.

Id. (quoting United States v. McHan, 920 F.2d 244, 248 (4th Cir. 1990)).

Likewise, in Repking, the Seventh Circuit rejected an (effectively) probationary sentence for a white-collar criminal, vacating as substantively unreasonable a one-day sentence of imprisonment in a million-dollar bank-fraud case — notwithstanding the defendant's restitution to his victim, his negligible chance of recidivism, his charitable works in the community, and even his cooperation with the government's criminal investigation.   See 467 F.3d at 1094-95. Noting the Guidelines' policy statement that a defendant's charitable contributions are "not

---

[16]  The issue before the court in Vrdolyak was procedural unreasonableness, since the government appealed only on that ground.   See 593 F.3d at 684.   See also Brief of the United States, United States v. Vrdolyak, No. 09-1891 (7th Cir. filed July 17, 2009), available at 2009 WL 2251149.   But the court's reasoning applies equally to an analysis of substantive unreasonableness, and in particular to whether a sentence gives unreasonable weight to a defendant's charitable contributions and letters from the recipients of his patronage.

ordinarily relevant," see U.S.S.G. § 5H1.11, the court held that consideration of a defendant's charitable works "is not specifically prohibited, especially in a post-Booker world."   Id. at 1095. The court found substantively unreasonable the district court's ultimate conclusion that the defendant's "charitable works were so extraordinary that they should be given weight despite the contrary view of the Sentencing Commission," stating:

> [W]e leave open the possibility that a one-day sentence of imprisonment might be justifiable for a defendant who rivals Robin Hood; but Repking, a millionaire who stole for himself and his friends, is not that defendant.

Id. at 1096.   See also United States v. Crouse, 145 F.3d 786, 792 (6th Cir. 1998) (defendant's civic contributions, not atypical for prominent businessman, did not support nine-level downward departure); United States v. Morken, 133 F.3d 628, 630 (8th Cir. 1998) (defendant's charitable and other good works did not justify departure from Guidelines); United States v. Haversat, 22 F.3d 790, 796 (8th Cir. 1994) (defendant's charitable and volunteer activities did not make him atypical).

Here, a close examination of Daugerdas's financial contributions shows them to be anything but extraordinary. In fact, as noted above, for the period 1999-2001, Daugerdas's financial and other gifts to charity, as reflected on his income tax returns, show that they represented just .047% of the gross fee income he received from J&G.   To the extent that sum may be called "extraordinary," such a label is appropriate only as an indicator of how extraordinarily insignificant the contributions were, as compared to Daugerdas's gross income.[17]

---

[17] At the same time he was making those paltry financial contributions to Make-A-Wish, Daugerdas — who proclaims in his sentencing memo that he "never surrounded himself with flashy, material things" (Memo. at 43) — was using over $3.3 million of fraud proceeds to buy a seven bedroom lakefront house in Wisconsin, with an indoor pool, indoor theater, boathouse, and

Moreover, it is hardly a coincidence that more significant contributions, totaling approximately $100,000 per year from 2004-07, occurred when Daugerdas came under investigation by the IRS.   See Make-A-Wish Contribution Summary, attached hereto as Exhibit D.[18]

Likewise, the Government submits that any testimonials to the defendant's character and honesty by his family and friends ought to be given little weight.   See United States v. McClatchey, 316 F.3d 1122, 1135 (10th Cir. 2003) ("excellent character references are not out of the ordinary for an executive who commits white-collar crime; one would be surprised to see a person rise to an elevated position in business if people did not think highly of him or her"). While there are certainly cases where it can be said that a defendant's offense conduct was in some way wildly aberrant or representative of so brief and isolated a lapse in judgment that it is appropriate to give significant weight to an otherwise blameless life, this demonstrably is not such a case.   For years of his professional life, the defendant participated in what amounted to one of the most audacious tax fraud in history, resulting in a tax loss for Guidelines purposes of over $1.63 billion and over $95 million in income to him.   What is more, the counts of conviction do not represent tell the full range of the defendant's criminal activities, as the facts at the Fatico

---

speedboat.   See Fraud Proceeds Tracing re: Williams Bay Home, attached hereto as Exhibit B. In addition, although Daugerdas's bling may have been limited to the lakefront home (and his million dollar home in Wilmette), he was quietly opening and funding financial and securities accounts at dozens of financial institutions in order stash millions of his fraud proceeds for future use.   See Master Fraud Proceeds Tracing Chart, attached hereto as Exhibit C

[18]  The related testimonials of Daugerdas's non-monetary contributions to Make-A-Wish and other charities lack any specifics necessary to make them truly meaningful, much less "extraordinary." To be sure, the fact that Daugerdas contributed some assistance to charities is commendable and worthy of mention.   But truly exceptional contributions of time and energy have to be supported by some explanation and description greater than "He was a Board Member" or "He was Chairman for a year" or "He invited me to sit at his table."

hearing and a review of Daugerdas's DGI deposition make plain that he took millions by fraud and lied repeatedly under oath to cover it up.

Accordingly, even crediting any testimonials he has submitted in connection with sentencing — and we do not in any way question the sincerity of those testimonials[19] — the defendant, through his prolonged and greed-driven criminal conduct at AA, A&G, and J&G, has shown that he is not someone who deserves any benefit of the doubt with respect to this Court's judgment of his character.

In short, Daugerdas's good works and devotion to friends and family are simply overwhelmed by the unprecedented enormity of his criminal conduct.

### 3.    The Need to Afford Adequate Deterrence

One of the paramount factors the Court must consider in imposing sentence under Section 3553(a) is the need for the sentence to "afford adequate deterrence to criminal conduct."  18 U.S.C. § 3553(a)(2)(B).   We respectfully submit that a substantial term of imprisonment is vitally necessary to achieve the goals of general and specific deterrence, especially given nature and history of this defendant and this type of case.

---

[19]    While we do not call into question the sincerity of the letters sent on Daugerdas's behalf, we feel compelled to comment on the letter sent by one individual — Chicago businessman Frank Smith, who testified at the <u>Fatico</u> hearing. Smith sums up his letter by noting, "He [Daugerdas] was never too busy to help a friend." It should be recalled that Daugerdas's friendship and "help" to Smith consisted of, among other things: enlisting Smith to employ the bank accounts of Smith's company, EBC Financial, to receive the $560,000 diverted by Daugerdas from AA, as well as $100,000 diverted years earlier from the Turner Broadcasting transaction; enlisting Smith to prepare fraudulent invoices in order to obtain those fees; causing Smith to transfer the diverted funds from EBC to Daugerdas's shell company, Orchard West Plaza; having Smith take custody of the fees when Daugerdas sent them back to EBC from Orchard West at a time when AA was investigating Daugerdas and the fee diversion; and paying Smith over $10,000 for his money laundering services.

The convictions of Daugerdas and his co-conspirators occurred as the result of a prolonged investigation that literally took years and vast government resources to complete. Experience has shown that cases of this kind are very difficult to prosecute, for a host of reasons. First, because the transactions are structured to appear complex on paper, it is often difficult to determine exactly what is going on, let alone to explain it to a jury.

A more fundamental problem in cases like this is that the documents themselves tell only part of the story. Those documents, by design, were intended to deceive — to give the appearance of legitimate, profit-motivated investment transactions that provided tax benefits. Moreover, the documents, particularly the tax opinions crafted, reviewed, tweaked, and sold by Daugerdas and his minions, recited factual representations ostensibly made by the J&G clients and purported to confirm those clients' investment motivations in pursuing the transactions. The reality of the fraud scheme lies in the utter falsity of those opinion-letter representations and the secret understandings and agreements among the participants that the transactions were being pursued solely for tax reasons. It is inherent that those falsities and secret understandings can be uncovered only through the testimony of witnesses.

Many witnesses, however, have not readily volunteered to cooperate and testify in cases of this kind, in part due to their own legal exposure. (The Court will recall the constant drum of Fifth Amendment invocations by the witnesses who were called.) Moreover, there was a remarkable abundance of arrogance in the legal, tax, and financial community that advanced the belief that the creation of an almost impenetrable wall of financial jargon, combined with the surface complexity of the transactions and purported ambiguity of the governing tax doctrines, would make a successful prosecution impossible or exceedingly problematic. Other

commentary advanced the belief that the conduct of Daugerdas and other tax shelter lawyers and purveyors amounted to nothing more than "aggressive" representation of the taxpayer clients, or that the law in the tax shelter area was somehow unconstitutionally vague or ill-defined.   The Government respectfully submits that an essential function of the sentencing in this case is to send a very clear message that those beliefs are profoundly mistaken.   Lying about the nature, purpose, and results of tax transactions is ─ and has always been ─ a crime, and one deserving of significant punishment when carried out by corrupt tax professionals.  And engaging in tax-driven transactions when there is <u>no</u> possibility that the transaction can produce a profit has always been a violation of settled tax principles.

Given the foregoing, meaningful criminal sanctions are essential to stop frauds like those perpetrated by Daugerdas and his misguided supporters, which amounted to nothing less than an assault upon the orderly fiscal operation of this country that depends on every taxpayer paying his or her appropriate share ─ no more and no less.   Put simply, only the real fear of a substantial prison sentence will deter fraudulent shelter progenitors, promoters, salesmen, and facilitators like Daugerdas from carrying on their activities and causing their harm.   Otherwise, such promoters will, like their clients, be inclined to roll the dice and bet that the enormous financial benefits of the tax shelters outweigh the likelihood and costs of getting caught.

Such an approach would be entirely consistent with the Sentencing Guidelines, which specifically recognize that general deterrence is a vitally important goal in sentencing for criminal tax offenses, due to the relatively few criminal tax prosecutions that are brought.   As the Sentencing Commission explained:

The criminal tax laws are designed to protect the public interest in preserving the

36

integrity of the nation's tax system.   Criminal tax prosecutions serve to punish the violator and promote respect for the tax laws.   Because of the limited number of criminal tax prosecutions relative to the estimated incidence of such violations, deterring others from violating the tax laws is a primary consideration underlying these guidelines.   Recognition that the sentence for a criminal tax case will be commensurate with the gravity of the offense should act as a deterrent to would-be violators.

U.S.S.G. ch 2, pt. T, introductory cmt.   See also United States v. Engle, 592 F.3d 495, 502 (4th Cir. 2010) ("Given the nature and number of tax evasion offenses as compared to the relatively infrequent prosecution of those offenses, we believe that the Commission's focus on incarceration as a means of third-party deterrence is wise.   The vast majority of such crimes go unpunished, if not undetected. Without a real possibility of imprisonment, there would be little incentive for a wavering would-be evader to choose the straight-and-narrow over the wayward path"); United States v. Burgos, 276 F.3d 1284, 1289 n.6 (11th Cir. 2001) (observing "[f]or a judge sentencing a defendant convicted of tax evasion, the chief concern may be general deterrence").

Moreover, in tax prosecutions there is good reason to impose Guidelines sentences as opposed to the more lenient probationary sentences sought by tax evaders.   As the Guidelines commentary further explains:

Under pre-guidelines practice, roughly half of all tax evaders were sentenced to probation without imprisonment, while the other half received sentences that required them to serve an average prison term of twelve months.   This guideline is intended to reduce disparity in sentencing for tax offenses and to somewhat increase average sentence length.   As a result, the number of purely probationary sentences will be reduced.

Guideline Commentary, Section 2T1.1.

Our Circuit has echoed the Commission's observations, noting that, "[o]nly a limited number of criminal tax prosecutions are brought relative to the number of alleged violations.

*See* U.S. Sentencing Guidelines Manual ch. 2, pt. 2, introductory cmt." <u>United States v. Trupin</u>, 475 F.3d 71, 76 n.6 (2d Cir. 2007) (seven-month prison sentence for multi-year tax evasion scheme with a tax loss of $1.2 million failed to reflect seriousness of offense).   As the <u>Trupin</u> court aptly observed, a tax evader, is "in effect [stealing] from his fellow taxpayers through his deceptions." <u>Id.</u> at 76; <u>see also</u> <u>United States v. Taylor</u>, 499 F.3d 94, 102 (1st Cir. 2007) (vacating sentencing of probation with one year in a halfway house for tax fraud offense where tax loss was $129,879 finding that "[w]hile tax fraud is not violent in nature, at its heart, it is theft, specifically theft of money to which the public is entitled").

Judge Weinfeld aptly articulated, in a pre-Guidelines setting, the need for incarceration as a result of the tax evader's violation of the basic compact under which all American income-earners live:

> This court has long had the view that income tax evasion cases where defendants are found guilty, whether upon their pleas of guilty or after jury verdict, require a term of imprisonment.  The income tax laws of our country in effect reflect an honor system under which the citizens are required to cooperate with the government, to file true and accurate returns.   I have been of the view that unless a citizen lives up to his responsibility there must follow, barring an extraordinary situation, a term of imprisonment as an example to other people in the community.

<u>United States v. Tana</u>, 85 Cr. 1119 (EJW) (June 17, 1986; Tr. at 12-13).   In a recent case involving a defendant who utilized an undeclared Swiss bank containing millions of dollars and which resulted in hundreds of thousands of dollars of tax loss and a Sentencing Guidelines range of 24 to 30 months (facts that are different from those present here), Judge Gardephe echoed Judge Weinfeld's sentiments in a manner applicable to this case:

> Our tax system is, at bottom, a voluntary one.   Those who use sophisticated means of tax evasion, the sorts of sophisticated means seen here, when their activities come to light they must be punished in a manner that will discourage others from

> engaging in similar conduct.   I believe in the views of Judge Weinfeld, for whom I
> have the greatest respect, and specifically his views as expressed in the case of
> United States versus Tana, that absent extraordinary circumstances, cases of
> significant tax evasion often call for a sentence of imprisonment.   There's nothing
> about the facts here that suggest to me that a different outcome is appropriate.

United States v. Werdiger, 10 Cr. 325 (PGG) (November 9, 2011; Tr. at 49-50).   And this Court, too, has specifically recognized the important role of general deterrence given the relative scarcity of criminal tax prosecutions.   See United States v. Mullahy, 10 Cr. 554 (WHP) (November 23, 2010; Tr. 10) ("Looking at the 3553(a) factors in this case, the Court agrees with the Government that tax crimes are not prosecuted frequently and, therefore, there is a need for deterrence.").

In sum, general deterrence in cases like this can be accomplished *only* through a meaningful term of incarceration.

### 4.      The Need to Avoid Unwarranted Sentence Disparities

The Sentencing Guidelines were promulgated, in part, to minimize disparities in federal sentences.   Although those Guidelines are no longer mandatory, the importance of eliminating sentencing disparities remains an important factor which the Court must separately consider pursuant to 18 U.S.C. § 3553(a)(7).   We attach for the Court's consideration a chart of sentences in other tax cases, including ones with comparable loss amounts.   See Exhibit E (the "Sentencing Chart").   The Sentencing Chart breaks out the sentences imposed and various other sentencing data in a broad variety or criminal tax contexts, including, most pertinently, tax shelter prosecutions.

Although we believe that there is significant utility in the Court considering what has happened in other cases, we hasten to note our acute awareness that, at best, such guidance can get the Court only so far.   Every case is unique; every individual defendant is unique.   We do not

mean to suggest otherwise.   The reasons for referencing the other sentences are straightforward: first, while we fully recognize that the recommendations made by Probation and the Government herein call for a very substantial sentence, similar sentences have been meted out in cases involving comparable overall conduct and tax losses; and second, it is not uncommon for defendants who are less criminally culpable than Daugerdas to receive and serve lengthy sentences of incarceration.

The universe of tax shelter sentences that the Court should consider when fashioning Daugerdas's sentence should not be limited to those stemming from the KPMG (United States v. Stein, 05 Cr. 888 (LAK)) and Ernst & Young (United States v. Coplan, 09 Cr. 555 (SS)) tax shelter cases.   Daugerdas has set forth no persuasive argument why the tax shelter sentences imposed in the Stein and Coplan cases are the only ones the Court should consider when weighing the appropriate sentence in a case involving, among other things, conduct designed to encourage hundreds of others to violate the tax laws.   See Daugerdas PSR ¶ 70 (citing to upward adjustment of Guidelines calculation because Daugerdas was involved in conduct intended to encourage persons other than or in addition to co-conspirators to violate the Internal Revenue Laws).   In fact, no persuasive argument exists, as the proper prism through which the Court should view its statutory mandate to avoid unwarranted sentencing disparities is one that considers tax shelter fraud sentences on a nationwide basis, not simply within a single district.   See United States v. Snyder, 136 F.3d 65, 68-70 (1st Cir.1998) (explaining that the phrase regarding the need to avoid "unwarranted sentencing disparities" in the Sentencing Guidelines reflects a "concern with variations among federal courts across the nation, without reference to their state counterparts," and that the "[G]uidelines seek to perform uniform sentencing among federal courts in respect to

40

federal crimes").

That is not to say, of course, that the <u>Stein</u> and <u>Coplan</u> cases do not provide some indications of what certain Southern District Judges determined to be the appropriate sentences, based on the unique facts of those cases.  In that regard, it is important to note certain critical distinctions between the facts of this case and those involved in <u>Stein</u> and <u>Coplan</u>.  First, <u>Stein</u> involved $111 million in Guidelines tax losses, while this case involves almost fifteen times that amount — over $1.6 billion.  Second, the defendants in <u>Stein</u> were convicted of participating in one fraudulent tax shelter — BLIPS [20] — while Daugerdas's conviction here is predicated principally on a conspiracy charging four separate tax shelters sold for almost two decades by Daugerdas and others.  It is also useful to note that, despite those distinctions, the critical actors in the <u>Stein</u> case — Larson, Pfaff, and Ruble — received sentences of 120, 97, and 78 months, respectively.

---

[20] BLIPS was an acronym for the Bond Linked Issue Premium Structure, a Son-of-BOSS tax shelter that was predicated on the same "contingent liability" tax play as the short sale, short option, and SWAPS tax shelters.

With respect to the Coplan case, there are certain similarities in the underlying conduct: four tax shelters were involved in each case, and the conduct occurred roughly at the same time Daugerdas and his co-conspirators were engaged in the Short Options Strategy and HOMER.    In fact, there was an overlap with Coplan with respect to the COBRA tax shelter, which Daugerdas and Guerin participated in (largely as opinion letter writers) with Ernst & Young at the same time they were involved in the charged conspiracy.   There were also critical distinctions, however, including the fact that the Coplan indictment charged tax evasion offenses only with respect to one of the tax shelters involved (CDS Add-On).   Thus, the case was tried not principally on a lack-of-economic-substance theory but on the theory that the defendants engaged in a conspiracy to lie to the IRS and others about the operation of the Ernst & Young tax shelter transactions and the reasons why the clients entered into them.   Finally, the Ernst & Young partners who were convicted in the case did not engage in the backdating of tax shelter transactions and did not receive anywhere near the gargantuan fees collected by Daugerdas, Guerin, Mayer, and the BDO defendants.   Indeed, the Ernst & Young defendants basically collected their partnership compensation, which did not include a percentage of the fees charged to the clients.

In addition to the Stein and Coplan sentences, we respectfully suggest that the sentences imposed in the Bank One, Aegis, Security Trust, American Rights Litigators, and Anderson Ark tax shelter cases are worthy of consideration, since those cases, like this one, involved the sale of tax shelters or tax evasion packages to numerous taxpayers.   As the Sentencing Chart makes clear, those cases involved sentences of between 96-240 months for many of the defendants, based on Guidelines tax losses that ranged from $7.5 million to $120 million — fractions of the tax loss here.

### 5.       The Appropriate Sentence

The Government submits that a sentence of at least 20 years is appropriate for Daugerdas. Such a sentence, consistent with the recommendation of the Probation Department, will best serve the ends of justice pursuant to 18 U.S.C. § 3553(a).   Such a sentence is also commensurate with others charged with the most serious and sustained tax and complex financial crimes.[21]

Any argument or suggestion that the defendant has been punished enough by the loss of his law license and reputation should be rejected.   According to this logic, one who is professionally licensed should not be sent to jail for committing the same crime that would justify a sentence of imprisonment for a less well-heeled and well-educated defendant or one who enjoys a smaller standing in the community.   We respectfully suggest that the Court should reject the notion that the professionally educated should be sentenced more lightly than the poor or powerless or less-effectively-represented because, for the former, the humiliation and shame of conviction alone is more devastating than it would be for those who have enjoyed fewer advantages in life.

We respectfully submit that a substantial term of imprisonment is warranted for both general and specific deterrence reasons, would reflect the seriousness of Daugerdas's fraudulent conduct, and would promote respect for the law.   An attorney or professional contemplating the potential fruits of massive fraudulent conduct should see and know that a significant jail term is its likely consequence.   A term of imprisonment as brief as that recommended by Daugerdas (24-30 months), on the other hand, would rightly be perceived as a slap on the wrist and would serve to

---

[21] One comparable defendant who comes to mind is Mark Dreier, who was sentenced by Judge Rakoff to 20 years based on $400 million of actual losses experienced by victims of Dreier's investment fraud scheme.

deter no one.

We further submit that specific deterrence and incapacitation are vital components of any sentence here, as the tone advanced by Daugerdas in his sentencing memo is one of defiance. Indeed, Daugerdas ignores the myriad lies in his opinion letters and the other fraudulent aspects of his scheme and suggests that his view of the law was correct, that his conduct was completely licit, and that any issues he had with AA, A&G, and J&G regarding fees were "civil contract disputes." It is hardly a stretch to imagine Daugerdas continuing his criminal conduct, including his orchestration of and participation in illegal tax schemes, absent an incarceratory sentence that will prevent him from doing so.

## **CONCLUSION**

The orderly financial functioning of this country depends largely upon voluntary compliance with the internal revenue laws by all citizens, regardless of wealth or status or who their tax lawyers or accountants might be.   That system of voluntary compliance would crumble if lawyers and other professionals who engage in sustained tax fraud schemes believed they could cheat with impunity or that the most severe sanctions that they would face when caught were merely the payment of financial penalties and the loss of a law license, together with the 24-30 month sentence that Daugerdas asks for here — the relative equivalent of a slap on the wrist given the conduct at issue.

Substantial imprisonment is indispensable in a case like this, lest the fraud perpetrated by the defendant breed skepticism and bitterness among hard-working American taxpayers who fulfill their tax obligations by paying their taxes honestly and who do not have the financial wherewithal or sophistication to utilize tax shelters to evade and otherwise flout their tax

44

obligations.

On the unique facts of this case — involving a defiant defendant who arguably has caused more tax harm than any criminal defendant who has come before him, and who collected more criminal proceeds than anyone else as a result — a sentence no less than the 20-year term recommended by Probation is entirely appropriate and eminently just.

Dated:    New York, New York
          June 16, 2014

                                   Respectfully submitted,

                                   PREET BHARARA
                                   United States Attorney
                                   Southern District of New York


                         By:       __s/Stanley J. Okula, Jr._____
                                   STANLEY J. OKULA, JR.
                                   Assistant United States Attorney
                                   (212) 637-1585
                                   stan.okula@usdoj.gov
                                   NANETTE L. DAVIS
                                   Special Assistant United States Attorney
                                   (212) 637-1117
                                   nanette.l.davis@usdoj.gov

## <u>CERTIFICATE OF SERVICE</u>

   I hereby certify that this document, filed through ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing and that paper copies will be sent to those indicated as non-registered participants on the above date.


      By:     s/Stanley J. Okula, Jr.
          STANLEY J. OKULA, JR.
          Assistant United States Attorney
          (212) 637-1585
          stan.okula@usdoj.gov