

MSF

Meister Seelig & Fein LLP

*Henry E. Mazurek*
*Partner*
Direct (212) 655-3594
Fax (212) 655-3535
hem@msf-law.com

April 21, 2020

**VIA ECF**

Hon. William H. Pauley III
United States District Court Judge
United States Courthouse
500 Pearl St.
Courtroom 20B
New York, NY 10007

      **Re:**     ***United States v. Paul M. Daugerdas*, 09-cr-581 (WHP)**

Dear Judge Pauley:

We represent defendant Paul M. Daugerdas. We respectfully submit this reply letter in further support of Mr. Daugerdas' motion pursuant to 18 U.S.C. § 3582(c)(1)(A) for compassionate release. (ECF Doc. Nos.1018, 1019.)

**1.**      **The Court has Authority to Reach the Merits of Mr. Daugerdas' Motion**

Mr. Daugerdas filed his administrative petition on March 24, 2020.[1] The 30-day waiting period delineated in 18 U.S.C. § 3582(c)(1)(A) is set to expire on April 23, 2020—in just two days. Still, the government urges the Court to dismiss Mr. Daugerdas' motion for failure to exhaust, ignoring both the Court's legal authority to waive this non-jurisdictional claim processing rule, and the fact that a dismissal on that basis will only invite Mr. Daugerdas to re-file precisely the same request in two days. The Court should reject the government's impractical and legally incorrect position.

As an initial matter, the government's argument that "Section 3582(c)(1)(A) has mandatory exhaustion language with no exceptions," (Gov. Opp. at 4), conflates claim processing rules that may be waived, like the exhaustion requirement in § 3582(c)(1)(A), with jurisdictional requirements that cannot. *See, e.g., Henderson ex rel. Henderson v. Shinseki*, 562 U.S. 428, 435, (2011); *Coleman v. Newburgh Enlarged City Sch. Dist.*, 503 F.3d 198, 203 (2d Cir. 2007) ("the Supreme Court has admonished lower courts to more carefully distinguish between jurisdictional rules and mandatory claims-processing rules, the latter being subject to waiver and forfeiture"); *United States v. Haney*, No. 19-CR-541 (JSR), 2020 WL 1821988, at *2 (S.D.N.Y. Apr. 13, 2020) ("because claim-processing rules do not govern a court's adjudicatory capacity, they may, in certain cases, be waivable by the parties or by the courts.") (quotation marks, citations and

---

[1] A copy of Mr. Daugerdas' petition to the USP Marion warden is attached as Exhibit 1.

modifications omitted).[2]  As explained in Mr. Daugerdas' moving brief, because § 3582(c)(1)(A) is not expressly jurisdictional, it is a non-jurisdictional claim processing rule that the Court may waive under the extraordinary circumstances presented by the COVID-19 pandemic.  *See* Moving Br., ECF Doc. 1019, at 9-10; *accord Haney*, 2020 WL 1821988, at *2 ("the exhaustion requirement in § 3582(c)(1)(A) . . . simply delineates the process for a party to obtain judicial review, not referring to the adjudicatory capacity of courts. That is, § 3582(c)(1)(A) 'does not speak in jurisdictional terms or refer in any way to the jurisdiction of the [federal] courts.'") (quoting *Zipes v. Trans World Airlines, Inc.*, 455 U.S. 385, 394 (1982)).

The structure of § 3582, permitting the court to address Mr. Daugerdas' compassionate release petitions without prior review by the BOP, also undermines the government's argument that the Court should strictly enforce the exhaustion requirement to await the BOP's input "about the merits of compassionate release requests."  (Gov. Opp. at 8.)  Section 3582 plainly envisions judicial determinations in the absence of an administrative record.  And, waiving the exhaustion requirement under these exigent circumstances is consistent with the statute's objective: to ensure that defendants "have the right to a meaningful and prompt <u>judicial</u> determination of whether he should be released."  *Haney*, 2020 WL 1821988, at *3; *accord United States v. Russo*, No. 16-CR-441 (LJL), 2020 WL 1862294, at *6 (S.D.N.Y. Apr. 14, 2020) (rejecting the government's argument that administrative exhaustion is not waivable, as § 3582(c)(1)(A) "does not reflect unqualified commitment to administrative exhaustion and it does reflect acknowledgement that the judiciary has an independent interest in, and responsibility for, the criminal judgments it is charged with imposing.").

Judge Nathan's lucid and comprehensive opinion in *United States v. Scparta*, similarly explained that waiving the 30-day waiting period during this rapidly developing national emergency is also broadly consistent with "congressional intent for the defendant to have the right to a meaningful and prompt judicial determination of whether he should be released.  Because the 30-day rule was meant as an accelerant to judicial review it would pervert congressional intent to treat it as a substantial obstacle to effective judicial review."  *United States v. Scparta*, No. 18-cr-578 (AJN), [Dkt. 69] at 15 (S.D.N.Y. Apr. 20, 2020) (quotation marks, citations and modifications omitted).[3]  The very "[t]he title of the First Step Act's provision that enacted this exhaustion regime," which is "Increasing the Use and Transparency of Compassionate Release," reflects the efficiency that the statute sought to achieve.  *Id.* at 13.  "[C]onstruing the exhaustion requirement strictly" would only undermine the law's clear aims: "Without the application of equitable exceptions, prisoners bringing compassionate-release motions due to COVID-19 may *never* obtain timely judicial review before the virus takes its toll."  *Id.* at 13.

The court in *Scparta* also observed that the statute was also designed "to 'enhance public safety' and 'make[] . . . changes to Bureau of Prisons' policies and procedures to ensure prisoner and guard safety and security.'"  *Id.* at 14 (quoting H.R. Rep. 115-699 at 22).  "Yet strictly

---

[2] *See also* Mr. Daugerdas' Moving Br. ECF Doc. 1019, at 9-11.

[3] Judge Nathan's decision in *United States v. Scparta*, which the government raised in its April 21, 2020 supplemental letter, (ECF. Doc. 1025), is attached as Exhibit 2.

Hon. William H. Pauley III
April 21, 2020
Page 3 of 14

construing the exhaustion requirement and not admitting equitable exceptions in these
circumstances achieves precisely the opposite result," *id.*, endangering both Mr. Daugerdas, and
the community more broadly:

> The risk to incarcerated individuals [posed by COVID-19] . . . is acute; . . .
> individuals in carceral settings are at particularly high risk for contracting the
> disease because of the inability to individuals to socially distance, shared communal
> spaces, and limited access to hygiene products. This risk, however, is not just to
> prisoners—it extends to prison guards and staff . . . . And the public is also at risk.
> Inmates who are released from prison and prison staff become additional vectors of
> transmission, increasing COVID-19's community spread.

*Id.*

Because every additional day that Mr. Daugerdas must wait for a judicial determination
brings renewed risk of deadly infection—precisely the risk this motion seeks to avoid—the
statutory purpose is best served by waiving the 30-day waiting period. *See id.* at 13 ("True enough,
the statute's 30-day lapse provision provides a judicial backstop—but even thirty days may be far
too long for individuals at high risk for COVID-19. The statute's plain text—both its distinctive
structure and its title—therefore supports application of equitable exceptions."); *Haney*, 2020 WL
1821988,  at *4 ("in the extraordinary circumstances now faced by prisoners as a result of the
COVID-19 virus and its capacity to spread in swift and deadly fashion, the objective of meaningful
and prompt judicial resolution is clearly best served by permitting Haney to seek relief before the
30-day period has elapsed.").

Numerous decisions in this Circuit have thus waived defendants' failure to exhaust their
administrative remedies during this pandemic for precisely these reasons.  *See United States v.
Livington*, No. 18-CR-416 (ENV), 2020 WL 1905202, at *1 (E.D.N.Y. Apr. 17, 2020) ("In ordinary
times and circumstances, this statutorily imposed exhaustion requirement is not waivable . . . .In
the context of such extraordinary life-threatening circumstances, the crafting of judge-made
exceptions to a statutory exhaustion requirement is not only appropriate, but compelled . . . as the
statute would otherwise permit, to save human life."); *United States v. Gileno*, No. 3:19-CR-161-
(VAB)-1, 2020 WL 1904666, at *5 (D. Conn. Apr. 17, 2020) ("the Court joins these other district
courts and waives the exhaustion requirement for Mr. Gileno, as undue delay in his release could
result in catastrophic health consequences for him in light of his underlying health conditions and
the COVID-19 pandemic."); *Russo*, 2020 WL 1862294, at *6 (waiving administrative exhaustion
requirement "given the extraordinary circumstances here, and because doing so would not be
inconsistent with congressional intent"); *Haney*, 2020 WL 1821988, at *4 ("in the extraordinary
circumstances now faced by prisoners as a result of the COVID-19 virus and its capacity to spread
in swift and deadly fashion, the objective of meaningful and prompt judicial resolution is clearly
best served by permitting [defendants] to seek relief before the 30-day period has elapsed.");
*United States v. Smith*, No. 12 CR. 133 (JFK), 2020 WL 1849748, at *4 (S.D.N.Y. Apr. 13, 2020)
("judicial waiver is permissible in light of the extraordinary threat certain inmates face from
COVID-19"); *United States v. Pinto-Thomaz*, 18-CR-579 (JSR), 2020 WL 1845875, at *1
(S.D.N.Y. Apr. 13, 2020) (finding that the § 3582 exhaustion requirement "is waivable in the

Hon. William H. Pauley III
April 21, 2020
Page 4 of 14

circumstances presented by the COVID-19 crisis"); *United States v. Sawicz*, No. 08-CR-287 (ARR), 2020 WL 1815851, at *2 (E.D.N.Y. Apr. 10, 2020) (holding that the status of the COVID-19 outbreak "combined with the fact that the defendant is at risk of suffering severe complications if he were to contract COVID-19 because of his hypertension, justifies waiver here," emphasizing that "any delay at all puts the defendant at an increased risk."); *United States v. McCarthy*, No. 3:17-CR-0230 (JCH), 2020 WL 1698732, at *4 (D. Conn. Apr. 8, 2020) (waiving the administrative exhaustion requirement due to futility and prejudice); *United States v. Zukerman*, No. 16 CR. 194 (AT), 2020 WL 1659880, at *2 (S.D.N.Y. Apr. 3, 2020) ("the Court holds that Zukerman's exhaustion of the administrative process can be waived in light of the extraordinary threat posed—in his unique circumstances—by the COVID-19 pandemic."); *United States v. Colvin*, No. 3:19CR179 (JBA), 2020 WL 1613943 (D. Conn. Apr. 2, 2020) (waiving the exhaustion requirement as, given the circumstances of the COVID-19 pandemic, it "likely renders BOP incapable of granting adequate relief"); *United States v. Perez*, No. 17 CR. 513-3 (AT), 2020 WL 1546422 (S.D.N.Y. Apr. 1, 2020) (same).

As a practical matter, dismissing Mr. Daugerdas' petition for failure to exhaust also makes little sense. The government acknowledges that the 30-day administrative waiting period elapses in just two days, on April 23. (*See* Gov. Opp. at 3.) Still, the government promotes dismissing the motion on procedural grounds, all but inviting Mr. Daugerdas to promptly re-file the same request. This absurd position runs directly contrary to the "objective of judicial efficiency," a primary purpose of statutory exhaustion. *Haney*, 2020 WL 1821988, at *4 ("Because of the pandemic, prisoners have inundated the BOP with requests for release. . . courts determined to enforce the waiting period are essentially forced to consider each such motion twice, first to conclude that the exhaustion provision is not satisfied, and then again, days or at most a few weeks later, to reach the merits once the requisite time has elapsed.). At a minimum, the Court should wait to decide Mr. Daugerdas' motion until April 23, once the 30-day exhaustion period has passed.

## 2.    COVID-19 Presents a Mortal Danger to Mr. Daugerdas, and an Extraordinary and Compelling Reason Warranting his Release

As the government acknowledges, "suffering from a serious physical or medical condition," "that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility," constitutes "extraordinary and compelling reasons," under 18 U.S.C. 3582(c)(1)(A)(i). (Gov. Opp. at 21 (quoting U.S.S.G. § 1B1.13, Application Note 1(A).) Mr. Daugerdas plainly meets that standard. His numerous underlying health conditions and age place him at serious medical risk if he becomes infected with COVID-19, and in the prison environment he is powerless to practice "self-care" necessary to minimize that risk. This mortal danger is simply not "just punishment" for Mr. Daugerdas' crimes, warranting his release for the "extraordinary and compelling reasons" that COVID-19 presents.

### A.    The Government Concedes that Mr. Daugerdas is at Risk of Experiencing Serious Health Complications if he is Infected with COVID-19

Although the government dismisses Mr. Daugerdas' very real risk of death from COVID-19 as "hyperbole," it does not contest the facts underlying Mr. Daugerdas' motion: the existence,

Hon. William H. Pauley III
April 21, 2020
Page 5 of 14

severity, or risks posed by his numerous health conditions and advanced age. (Gov. Opp. at 20
("There is no dispute that the defendant has heart disease, diabetes, and certain other conditions.
There is also no dispute that at least heart disease and diabetes, along with the defendant's age, are
COVID-19 risk factors.").) Mr. Daugerdas' specific combination of comorbidities, including
diabetes, hypertension, high cholesterol and coronary artery disease, as well as his advanced age,
place him at a particularly high risk of death if he contracts COVID-19. *See* "Information for
Healthcare Professionals: COVID-19 and Underlying Conditions," Centers for Disease Control
and Prevention (listing "those at high-risk for severe illness from COVID-19," including: (1)
people 65 years and older, (2) people who have serious heart conditions, (3) people with diabetes,
and (4) People who are immunocompromised," including smokers).[4] A study of COVID-19
victims in New York found that "just over 86% of reported COVID-19 deaths involved at least
one comorbidity." *See* "Comorbidities rule in New York's COVID-19 deaths," *The
Hospitalist*, (Apr. 8, 2020).[5] And, Mr. Daugerdas is under medical care for three of the top four
co-morbidities identified in COVID-19 deaths: (1) hypertension, diabetes, and coronary artery
disease, found in 55.4%, 37.3%, and 12.4% of all COVID-19 deaths, respectively. *Id.*

The relative prevalence of his health conditions diseases does not diminish the
extraordinary risk of death that Mr. Daugerdas would face should he become infected. Thus,
courts in this Circuit have released inmates with precisely these, and other similarly prevalent but
nonetheless deadly, health risks under § 3582. *See United States v. Wen*, No. 6:17-CR-06173
EAW, 2020 WL 1845104, at *2 (W.D.N.Y. Apr. 13, 2020) (granting compassionate release motion
to defendant suffering from asthma as "People with moderate to severe asthma may be at higher
risk of getting very sick from COVID-19. COVID-19"); *United States v. Sawicz*, 08-CR-287
(ARR), 2020 WL 1815851, at *2 (E.D.N.Y. Apr. 10, 2020) (granting compassionate release based
on defendant's hypertension); *United States v. McCarthy*, Nos. 3:17-CR-0230 (JCH), 3:92-CR-
0070 (JCH), 2020 WL 1698732, at *1, *5 (D. Conn. Apr. 8, 2020) (finding extraordinary and
compelling reasons for release of inmate convicted of armed bank robbery because he was 65 years
old and had health conditions that increased COVID-19 risk, including asthma and COPD); *United
States v. Harris*, No. 18 Cr. 364 (PGG), [Dkt. 414] at 1, 3  (S.D.N.Y. Apr. 8, 2020) (finding
extraordinary and compelling reasons for release of inmate with asthma and Crohn's disease,
which made him particularly vulnerable to COVID-19); *United States v. Zukerman*, No. 16 Cr.
194 (AT), 2020 WL 1659880, at *1, *5 (S.D.N.Y. Apr. 3, 2020) (finding extraordinary and
compelling reasons for release of 75-year-old inmate with diabetes, hypertension, and obesity
"because of the great risk that COVID-19 poses to an elderly person with underlying health
problems"); *United States v. Hernandez*, No. 18 Cr. 834-04 (PAE), 2020 WL 1684062, at *3
(S.D.N.Y. Apr. 2, 2020) (finding extraordinary and compelling reasons for release of inmate at
high risk of serious illness from COVID-19 because of his asthma and acknowledging difficulties
that high-risk inmate would face in caring for self if contracted COVID-19 in detention); *United
States v. Colvin*, No. 3:19CR179 (JBA), 2020 WL 1613943, at *1 (D. Conn. Apr. 2, 2020)
(granting compassionate release motion to defendant with diabetes); *United States v. Jepsen*, No.

---

[4] Available at: https://www.cdc.gov/coronavirus/2019-ncov/hcp/underlying-conditions.html.

[5] Available at: https://www.the-hospitalist.org/hospitalist/article/220457/coronavirus-
updates/comorbidities-rule-new-yorks-covid-19-deaths.

Hon. William H. Pauley III
April 21, 2020
Page 6 of 14

3:19-CV-00073(VLB), 2020 WL 1640232, at *4 (D. Conn. Apr. 1, 2020) (granting compassionate release as "Mr. Fellela was in the highest risk group of death given his age (62), his weight (300 pounds), diabetes, and other ailments").

The government suggests that the absence of confirmed COVID-19 cases at USP Marion undermines the urgency of Mr. Daugerdas' motion. (*See* Gov. Opp. at 19, 24 (characterizing the "basis" of the motion as "speculative").). But, because of shortages of test kits, the country is plagued by under-diagnosis. *See* Ezekiel J. Emanuel and Paul Romer, "Without More Tests, America Can't Reopen," *The Atlantic* (Apr. 18, 2020) ("The United States remains very much in the dark about who has the coronavirus and who does not. We have a shortage of COVID-19 tests, and we simultaneously have the highest number of confirmed cases in the world.").[6] The BOP is no exception, and the absence of positive COVID-19 tests in an institution is not conclusive evidence of the virus' absence. *See United States v. Asaro*, No. 17-CR-127 (ARR), 2020 WL 1899221, at *6 (E.D.N.Y. Apr. 17, 2020) (granting compassionate release motion based on COVID-19 risks to the defendant, although "as of this writing, no confirmed cases of COVID-19 are present at Springfield [prison where defendant was housed], I cannot conclude that no cases are, in fact, present, without assurances that the BOP is routinely testing everyone within the facility."). The virus has spread to all 50 states, and recently has infected its first victims in Williamson County, Illinois where USP Marion is located. *See* "Illinois Coronavirus Map and Case Count," *New York Times* (Apr. 20, 2020).[7] We further learned from our client that the prison officials within USP Marion have taken some inmates out of the general population unit where Mr. Daugerdas is housed, and into segregated housing units ("SHU"). It is unclear the reason for this move, but it is likely a result of COVID-19 fears and not because of a sudden rash of disciplinary sanctions inside this minimum-security facility.

Indeed, the COVID-19 pandemic is accelerating within the BOP at a much faster rate than in the general U.S. population, which is expected given the fact that the general population can self-quarantine while prisoners cannot. Once COVID-19 appears inside a jail, there is little that can be done to prevent the virus from infecting many of the other inmates, and then it is often the case of too little, too late. The available COVID-19 data reported by the BOP reveals the havoc and death this pandemic already has wrought within our correctional institutions. On the day that Mr. Daugerdas filed his motion, there were 318 reported COVID-19 cases among inmates, 163 cases among BOP staff, and 9 inmate deaths.[8] On the day the prosecutor filed his response, there were 465 cases among inmates, 296 among staff, and 18 inmate deaths.[9] As of today, there are

---

[6] Available at: https://www.theatlantic.com/ideas/archive/2020/04/were-testing-the-wrong-people/610234/.

[7] Available at: https://www.nytimes.com/interactive/2020/us/illinois-coronavirus-cases.html#cases.

[8] Available at: https://www.bop.gov/coronavirus/#.

[9] *Id.*

Hon. William H. Pauley III
April 21, 2020
Page 7 of 14

540 cases among inmates, 323 among staff, and 23 reported inmate deaths.[10]  The below graph shows that the three-day moving average of infections leaves the BOP on the upward part of the curve for COVID-19 inmate infections.  There is no "flattening" happening here:



The government also contends that the BOP has successfully implemented pandemic preparedness plans in the event of a COVID-19 outbreak at USP Marion, which are sufficient to protect Mr. Daugerdas.[11]  The data above belie this assertion.  First, the modified operations do

---

[10] *Id.*

[11] BOP, *Implementing Modified Operations,* available at
https://www.bop.gov/coronavirus/covid19/status.jsp (last visited on 4/21/2020).

Hon. William H. Pauley III
April 21, 2020
Page 8 of 14

_____

not sufficiently address pre-symptomatic or asymptomatic spread of COVID-19 among staffers, contractors and inmates.  For example, only BOP staff at medical referral centers or in areas of the country with "sustained community transmission" are subject to "[e]nhanced screening."[12]  And this "enhanced screening" only requires temperature checks and self-reporting of symptoms—it does not require testing (and could not since tests are in short supply), or for staff to disclose whether they have been in high risk areas or venues or exposed to other symptomatic people.  Since most COVID-19 transmission occurs pre-symptomatically, and some people show no symptoms at all, these "enhanced screenings" are simply inadequate.  The screening tool used for prison contractors is similarly deficient.[13]  Moreover, there is still inmate, staff, and contractor movement: staff do not live at the prisons; essential contractor services allowed into and out of prisons are "for example, medical services, mental health services, religious services and critical infrastructure repairs"; and "the BOP may need to move inmates to better manage the detention bedspace as well as assure that administrative facilities do not become overcrowded beyond available resources."[14]

Moreover, the BOP provides conflicting information about inmate screening.  It claims to require all newly admitted asymptomatic inmates to be quarantined for at least 14 days.[15]  But the inmate screening tool does not reflect this process, instead directing staff to conduct "normal intake" so long as an inmate has not traveled to a CDC-determined risk location or had close contact with anyone *diagnosed* with COVID-19 in the last 14 days.[16]  Phase 5 of BOP's COVID-19 Action Plan purports to significantly decrease inmate movement by requiring that incarcerated

_____

[12] *Id.*

[13] BOP, *Visitor/Volunteer/Contractor Covid-19 Screening Tool*, available at: https://www.bop.gov/coronavirus/docs/covid19_screening_tool.pdf.  For example, the contractor screening tool asks contractors whether they have traveled to China, Iran, South Korea, Italy, and Japan in the last 14 days, but does not screed those who have traveled to, for instance, Spain (184,948 cases), France (147,113 cases), Germany (138,273 cases), or elsewhere in the United States (793,361 cases).  *See COVID-19 Map—Johns Hopkins Coronavirus Resources Center,* Johns Hopkins University & Medicine, available at: https://coronavirus.jhu.edu/map.html (last visited Apr. 21, 2020).  This tool also fails to screen for pre-symptomatic spread or whether contractors are practicing CDC-recommended guidelines of social distancing.

[14] BOP, *Implementing Modified Operations,* available at: https://www.bop.gov/coronavirus/covid19_status.jsp.

[15] *See* BOP, COVID-19 Action Plan:  Phase 5, available at: https://www.bop.gov/resources/news/20200331_covid19_action_plan_5.jsp (last visited Apr. 21, 2020) (Background on Phases 1-4).

[16] *See* BOP, *Coronavirus Disease 2019 (COVID-19) Inmate Screening Tool*, available at: https://www.bop.gov/coronavirus/docs/covid19_inmate_screening_tool_20200202.pdf (last visited Apr. 21, 2020).

Hon. William H. Pauley III
April 21, 2020
Page 9 of 14

individuals at every institution be "secured in their assigned cells/quarters."[17]   However, in a minimum security, like the USP Marion facility where Mr. Daugerdas resides, he remains in his "quad" with three other inmates sharing the area with only a thin partition separating them, and still sharing bathrooms, showers, laundry, recreation and computer and phone access.

The BOP's own staff reports that the agency is failing to respond to COVID-19 in its facilities.  *The New York Times* "spoke[ ] with more than a dozen workers in the Bureau of Prisons," who reported that "federal prisons are ill-prepared for a coronavirus outbreak.  Many lack basic supplies like masks, hand sanitizer, and soap."[18]  For example, staff at FCI Tallahassee, a low-security facility, described a potential outbreak as "mass chaos," and confirmed that BOP is "just not prepared to handle something of that nature."[19]   And a union representative at FCI Oakdale recounted the BOP was slow to shut down a prison labor program in the facility, the program was not shut down until after an inmate tested positive for COVID-19.  Now, "people [keep] getting sick back to back to back to back."[20]

While the above stories are anecdotes in a much broader system, they are prognosticators of what Mr. Daugerdas is likely to face if an outbreak occurs in the cramped dormitories of the minimum-security facility at rural USP Marion.  The "rural" southern Illinois setting that is touted by the government as providing some sort of comfort to Mr. Daugerdas,  because he is somehow insulated from COVID-19 there, is actually perversely the opposite. Most BOP facilities are located in rural outposts (that is where most prisons are built in this country) and the overwhelming BOP data show that these "outposts" have resulted in the greatest amount of inmate deaths.  For example, the facility in Oakdale, Louisiana is located in a "parish" of fewer than 8,000 inhabitants in remote, central Louisiana, but FCI Oakdale has reported COVID-19 positive tests for *23 inmates and 22 corrections staff, resulting in 7 inmate deaths.*  The tiny town of Lisbon, Ohio—population of under 3,000—nestled in a sparsely populated area of central Ohio, hosts the BOP facility of FCI Elkton.  The data reported by the BOP out of that facility is truly harrowing.  As of the date of this letter, the BOP reported positive COVID-19 tests in *52 inmates and 46 correctional staff, resulting*

---

[17] *See COVID-19 Action Plan:  Phase Five,* available at: https://www.bop.gov/resources/news/20200331_covid19_action_plan_5.jsp. (last visited Apr. 21, 2020).

[18] "Coronavirus in the U.S.:  Latest Map and Case Count" (last updated Apr. 21, 2020), *The New York Times*, available at: https://nytimes.com/interactive/2020/us/coronavirus-us-cases.html.

[19] Keegan Hamilton, "Sick Staff, Inmate Transfers, and No Tests:  How the U.S. is Failing Federal Inmates as Coronavirus Hits," *Vice* (March 24, 2020), available at: https://www.vice.com/en_us/article/ige4vg/sick-staff-inmate-transfers-and-no-tests-how-the-us-is-failing-federa-inmates-as-coronavirus-hits. ("Sick Staff").

[20] Kimberly Kindy, "An Explosion of Coronavirus Cases Cripple Federal Prison in Louisiana," *Washington Post,* (March 29, 2020), available at: https://www.washingtonpost.com/national/an-explosion-of-coronavirus-cases-cripple-federal-prison-in-louisiana/2020/03/29/75a465c0-71d5-11ea85cb-8670579b863d_story.html.

Hon. William H. Pauley III
April 21, 2020
Page 10 of 14

*in 6 inmate deaths.*  Before the COVID-19 virus infected FCI Oakdale and FCI Elkton, these facilities seemed similarly nestled in sparsely populated, remote and rural communities—just like USP Marion.  But the carnage that has resulted in those two rural towns occurred only in the prison, not to the general population of those communities.  The fact that Mr. Daugerdas is imprisoned in rural southern Illinois provides no protection for him *because he is a federal inmate who cannot self-quarantine and he is in the highest risk category under CDC guidelines.*

Because of the accelerated march of COVID-19 through BOP facilities, the lack of preparedness of these facilities to prevent such an infectious disease outbreak, and the recent data of serious illness and death that have overtaken elderly BOP inmates who contracted COVID-19 in-custody, all lead to the urgency of this motion for Mr. Daugerdas.  Now is the time to effectively protect Mr. Daugerdas, BOP staff and the general public—before the virus exposes itself inside the Marion, Illinois institution.

### B.      Mr. Daugerdas' Release Plan Would Diminish his Risk and the Public's Risk of Contracting COVID-19

The government perplexingly contends that Mr. Daugerdas would be "in greater peril of COVID-19 infection" if released to home incarceration "given his wife's potential exposure to infected patients at the Chicago hospital at which she works" as a nurse.  (Gov. Opp. at 20.)  That galling assertion is exactly backwards.  As a nurse, Mr. Daugerdas' wife knows the precautionary measures necessary to protect herself and her husband from infection.  She is also qualified to assist Mr. Daugerdas should he exhibit COVID-19 symptoms in home incarceration.

Perhaps more importantly, however, the suburban house where Mr. Daugerdas' wife lives has separate bedrooms and baths, permitting Mr. Daugerdas to effectively self-isolate.  If released, he will also have ample access to personal protective equipment ("PPE"), including face masks, gloves, soap, hand-sanitizer (with alcohol, the effective ingredient against the virus), and disinfectant cleaning products.  These social distancing and hygiene measures are the most effective tools to prevent the spread of COVID-19.  *See* Moving Br. at 14-17.

The personal space and hygiene products that will be available to Mr. Daugerdas upon release to home incarceration contrast starkly with his current conditions at USP Marion.  Although the government touts the BOP's ability to manage the COVID-19 crisis, (*see* Gov. Opp. at 16-19), the basic steps of frequent disinfecting and social distancing remain impossible.  Mr. Daugerdas continues to have access to communal telephones, computers, bathrooms and showers, without the ability to disinfect these frequently touched objects prior to using them himself.  Dormitory living is simply antithetical to stemming the spread of COVID-19, precluding Mr. Daugerdas from practicing the necessary self-care to protect himself from the virus.  *See, e.g., Perez*, 2020 WL 1546422, at *4 (granting § 3582 motion, explaining that "[c]onfined to a small cell where social distancing is impossible, Perez cannot provide self-care because he cannot protect himself from the spread of a dangerous and highly contagious virus."); U.S.S.G. § 1B1.13 (listing among the "extraordinary and compelling reasons" justifying compassionate release that the defendant's

Hon. William H. Pauley III
April 21, 2020
Page 11 of 14

circumstances "substantially diminishe[] the ability of the defendant to provide self-care within the environment of a correctional facility").[21]

### C.      The § 3553(a) Factors Warrant Mr. Daugerdas' Release

Although the government asserts that "the same Section 3553(a) factors that warranted the defendant's sentence counsel against release," (Gov. Opp. at 22), circumstances have changed substantially since, tipping the balance in favor of his release.

The government makes much of the fact that Mr. Daugerdas has only served about one-third of this Court's originally imposed sentence in prison (5½ years on a 15-year sentence). Notably, based on years of data reported by the federal Sentencing Commission, the Court's sentence of 15 years was clearly in the upper 5 percent of longest sentences imposed on non-violent, first-time offenders, especially one who was 63 years old at the time of his sentence. The sentence was long and potentially life-threatening: one in which based on actuarial life expectancies of men with pre-existing health conditions such as Mr. Daugerdas' might not be survivable. The Court intended to send a severe general deterrence message and inflict serious punishment on Mr. Daugerdas. It did that.

Today, however, Mr. Daugerdas confronts a mortal threat that he cannot adequately defend against. He faces the real possibility of serious illness and even death if infected by the coronavirus before he turns 70. Even the government does not – and cannot – dispute that. This danger is not one that we, as a society, should reasonably condone as just punishment.

The Suffolk County District Attorney recently testified before the New York State legislature and eloquently spoke about the COVID-19 threat to our inmates and what it should mean to us collectively as a nation:

> People do not stop being human the day they are sentenced. Although some have made terrible choices or engaged in reprehensible behavior, the sentence they received for their crime did not include contracting COVID-19 and death.[22]

This is not hyperbole—just as the shuddering of the world's economies and the closing of international borders and the loss of more than 20 million American jobs do not represent hyperbole. The risks to Mr. Daugerdas in prison represent "compelling and extraordinary reasons" to reduce Mr. Daugerdas' sentence and, by doing so, this Court will not do damage to the purposes of federal sentencing as enumerated in 18 U.S.C. § 3553(a).

---

[21] *See also* Mr. Daugerdas' Moving Br., ECF Doc. 1019, at 17-22 (describing Mr. Daugerdas' difficulties protecting against COVID-19 within the prison).

[22] Rachel Rollins, District Attorney, *Statement of Suffolk County District Attorney Rachel Rollins at Hearing before the Supreme Judicial Court* (Mar. 31, 2020), available at: https://www.suffolkdistrictattorney.com/press-releases/items/2020/3/31/statement-of-suffolk-county-district-attorney-rachael-rollins-on-todays-hearing-before-the-supreme-judicial-court.

Hon. William H. Pauley III
April 21, 2020
Page 12 of 14

Let us catch our breath as a nation. Is it really too slight a sentence—in a just and compassionate society—for us to say that a man who spent most of his seventh decade of life in prison, from ages 63 to 69, is insufficient to reflect seriousness of the crime, convey respect for the law, and provide just punishment? Are 5½ years in federal prison not a substantial deprivation of liberty to be a "sufficient but not greater than necessary" punishment in our land? 18 U.S.C. § 3553. These just punishment and general deterrence factors are the ones that the government largely rely upon to urge the Court to deny Mr. Daugerdas' motion despite the "compelling and extraordinary reasons" presented by the coronavirus pandemic.

Maybe it is a bit audacious to argue that 5½ years in prison represent a substantial and long prison sentence in this case, but we embrace that argument here. Nearly 70 months in prison for a first-time offender in a non-violent case, for a defendant who is elderly (approaching 70) with serious health conditions, who outside his offense conduct lived an admirable life as a husband, father, charitable provider, and who has never posed a public threat outside of providing bad tax advice, is a long and serious sentence in any society—including ours.

Because Mr. Daugerdas already has served a substantial prison term, the unthinkable risks to his health simply outweigh the societal benefits of general deterrence or just punishment that his continued incarceration at USP Marion might somehow convey. *See, e.g., Perez*, 2020 WL 1546422, at *4 (balancing the "the benefits of keeping [the defendant] in prison for the remainder of his sentence," with the "the potential consequences of doing so," which "are extraordinarily grave," in granting the defendant's compassionate release motion).

As explained in his opening motion papers, the other Section 3553(a) factors also weigh in Mr. Daugerdas' favor for early release. Because this Court sentenced Mr. Daugerdas, it is intimately familiar with how these factors apply to him. At Mr. Daugerdas' sentencing hearing, undersigned counsel spoke at length about the dignity and grace that this man exhibited in life outside of the offense conduct. (*See* Sentencing Tr., ECF Doc. 839 (7/1/14), at 41-47.)

Mr. Daugerdas raised his son, Paul Jr., by himself, starting at the tender age of 25. (*Id.* at 42-43.) He did so only because his first wife left him and their son after the family suffered an unimaginable tragedy. Paul and his ex-wife, Anna, lost a baby girl, Carrie, at six months to congenital heart problems. Anna did not handle this tragic loss well and left the family in desperation. Paul "was even then, as he is today, the bedrock of his family. He raised Paul Jr. on his own. He comforted [his 5-year-old son] from the loss of his mother and baby sister." (*Id.* at 43.) As related at Mr. Daugerdas' sentencing hearing, "Paul Jr. is [now] a successful commercial airline pilot" and informed the Court he owes all of his success in life to his father. (*Id.* at 45.)

Mr. Daugerdas went on to father an additional five children with his current wife, Eleanor: three children born to the couple, and two children, whom Paul adopted from Eleanor's prior marriage. (*Id.*) He was a proud and dutiful parent to each of them, as they represented in letters to the Court at sentencing. (*Id.*) Indeed, Paul showered the most love and affection and time to his youngest son, Michael, who suffered from a seizure disorder that left him developmentally challenged. (*Id.* at 45-47.) Paul was the lead figure in young Michael's life, "[a]t every step of the way, he made sure Michael was getting the care, medical and educational, that he needed." (*Id.* at 45.)

Hon. William H. Pauley III
April 21, 2020
Page 13 of 14

Now, Michael Daugerdas has returned home to live with his mother during this pandemic. If the Court were to release Mr. Daugerdas to home confinement, he could again resume his role as Michael's champion. Michael continues to need careful supervision to avoid serious injury or complications during the violent seizures he still occasionally experiences. (*Id.* at 46-47.) His father and registered nurse mother are the perfect parents for Michael to survive and thrive under, even in these dangerous times of pandemic.

Before the government complains that Michael's presence in the residence might be a further health risk during the threat of COVID-19 infection, the house at which Eleanor and Michael now reside includes an additional bedroom to allow Mr. Daugerdas to self-quarantine and practice responsible social distancing if released to home confinement.

Finally, the personal history and characteristics of Mr. Daugerdas showed that he generously gave his time to charity. While the government fussed at length about his perceived paucity in financial giving, it ignored the letters and commendations given to Mr. Daugerdas by charities in which he gave something even more precious: his time away from family and work. Because of Mr. Daugerdas' personal and sometimes tragic experiences with sick children, he donated considerable time to children who had life-threatening diseases at the Make-a-Wish Foundation and those who had profound developmental disabilities at the Misericordia charities. (*Id.* at 47.) Mr. Daugerdas has shown tremendous grace in dealing with the most vulnerable of our society's children.

While the Court's 180-month sentence in June 2014 reflected the seriousness of Mr. Daugerdas' offense and was indicative of the Court's thinking of what a "sufficient, but not greater than necessary" punishment was at that time, the current circumstances have shifted the very axis on which we view societal life.[23] Specifically, due to the COVID-19 pandemic, the "history and characteristics of the defendant" and the "need . . .  to provide the defendant with needed  . . .

---

[23] The government states in its opposition brief that Mr. Daugerdas has shown no remorse for his crime, but that harkens back to the time of sentencing. The government presents no evidence that Mr. Daugerdas remains the man he was almost six years ago. Nearly 70 months in prison changes a man completely. Mr. Daugerdas has adjusted well to institutional life and has been a model prisoner. He wishes every day that he did not do things that caused him to be separated from his family, whom he cherishes more than anything else in life. He regrets a lot of his life conduct that made him lose the one thing that meant the most to him: time with family. He experiences these feelings each night he puts himself to sleep in prison, which he has now done for over 2,000 nights.

The government also complains about Mr. Daugerdas' wife's claims against the government to retain property that she earned through her marriage with Paul. That is her right to assert, and Mr. Daugerdas should not be penalized for his wife's legal claims. Indeed, this Court has yet to rule on the merits of Eleanor Daugerdas' motions. There have been no rulings that Mrs. Daugerdas stood as a "nominee" to her husband in earning a stake in marital property. Her life's work as a registered nurse and her current devotion to being present on the front lines of our country's battle with COVID-19 and her courageous efforts to save lives, bely her status as a mere "nominee" to her husband.

Hon. William H. Pauley III
April 21, 2020
Page 14 of 14

medical care," including preventative care, 18 U.S.C. § 3553(a), now weigh heavily in favor of
Mr. Daugerdas' release, given the risks that continued incarceration pose to him.

Resentencing Mr. Daugerdas to time served and an additional lengthy period of home
incarceration as a condition of supervised release would strike a reasonable and merciful balance:
placing a very real restriction on Mr. Daugerdas' liberty that would save him from gratuitous
exposure to COVID-19.   Such a penalty would justly factor the current circumstances of life
during a pandemic while still providing "sufficient, but not greater than necessary" punishment to
satisfy federal sentencing mandates. 18 U.S.C. § 3553.

## CONCLUSION

Even under the strictest evaluation of the sentencing factors under 18 U.S.C. § 3553(a),
fairness and reflection of Mr. Daugerdas' individual history and characteristics should outweigh
the need to continue to incarcerate a man who approaches 70 with serious health conditions during
this pandemic.

We respectfully urge this Court to decide that a just society should insulate our elderly
inmates from the suffering and even death that COVID-19 brings to Mr. Daugerdas' high-risk
health profile.  Mr. Daugerdas already served nearly six years in prison.  He is old and weak, and
society does not need him incarcerated to feel protected or convey some sense of stern
punishment.  He should be detained at home without the undue risk to his health: the cost to
American society would be less in dollars and we would collectively profit by proving ourselves
to be decent and merciful even to those who committed crimes.

Because Mr. Daugerdas has demonstrated "extraordinary and compelling reasons," this
Court should grant his motion for early release and convert his remaining period of incarceration
to a term of supervised release with a condition of home confinement.  In the alternative, the Court
should recommend that the BOP itself find Mr. Daugerdas to be a suitable candidate for pre-release
custody in home confinement for the remainder of his unserved prison term.[24]

Respectfully submitted,

_____/s/ HEM_____
Henry E. Mazurek
Ilana Haramati
Meister Seelig & Fein LLP
125 Park Avenue, Suite 700
New York, New York 10017

*Counsel for Defendant Paul M. Daugerdas*

cc:     Counsel of Record (*via ECF*)

---

[24] Courts in this district have recommended that the BOP seriously consider defendants "as
candidates for release under their administrative criteria," where the Court found that "release may
well be warranted under guidelines that are more lenient than the 'extraordinary and compelling'
standard that binds the Court."  *Pinto-Thomaz*, 2020 WL 1845875, at *4.