

*Henry E. Mazurek*
*Partner*
Direct (212) 655-3594
Fax (212) 655-3535
hem@msf-law.com

August 10, 2020

**VIA ECF**

Hon. William H. Pauley III
United States District Court Judge
United States Courthouse
500 Pearl St.
Courtroom 20B
New York, NY 10007

      **Re:**    ***United States v. Paul M. Daugerdas*, 09-cr-581 (WHP)**

Dear Judge Pauley:

      We urgently write the Court to report the dangerous health conditions facing our client Paul M. Daugerdas, who is an inmate at USP Marion (BOP No. 62444-054), and ask for his immediate release. Specifically, we respectfully request the Court to reconsider its May 1, 2020 Order ("May 1 Order") denying Mr. Daugerdas' motion for compassionate released under 18 U.S.C. § 3582(c)(1)(A). At that time, the Court concluded that the Section 3553(a) factors did not warrant Mr. Daugerdas' early release despite the threat of COVID-19 at USP Marion. *United States v. Daugerdas*, No. 09-CR-581, ECF Doc. 1030, 2020 WL 2097653 (S.D.N.Y. May 1, 2020). Now, we ask the Court to reconsider its findings because the risk of COVID-19 is no longer just a threat—Mr. Daugerdas has tested positive for the virus.

      Our earlier prediction of dire events at USP Marion has sadly come true. The virus is rampaging inside the Marion, Illinois facilities. ***More than 145 inmates and staff have tested positive for COVID-19 in the last two weeks***—and the numbers show no sign of plateauing. ***Two inmates already have died from complications caused by the virus.*** 1.3 percent of the Marion inmates who contracted the disease are now dead and, based on statistical extrapolations, that number will also likely rise in the coming days.

      During the initial litigation of Mr. Daugerdas' compassionate release motion only three months ago, there was not a single USP Marion inmate or prison staff member infected with COVID-19. Now, in alarming contrast, the specific data is terrifying: a total of at least 137 inmates

Hon. William H. Pauley III
August 10, 2020
Page 2 of 12

and 8 staff members at USP Marion have tested positive for COVID-19,[1] and two inmates (ages 39 and 65) have died of complications from the virus.[2]

Today, the virus presents an actual and present danger to Mr. Daugerdas' health. Because of pre-existing co-morbidities—which this Court found to be "extraordinary and compelling reasons supporting his release"—Mr. Daugerdas is now in the fight of his life. *See* ECF Doc. 1030, 2020 WL 2097653, at *3 (citing Mr. Daugerdas' numerous health conditions, explaining "[a]fter reviewing the parties' briefs and Daugerdas's BOP medical records, this Court finds that Daugerdas has shown 'extraordinary and compelling reasons'" for compassionate release).

We seek the Court's immediate intervention and implore the Court to order his release so that he can be treated at home by his registered nurse wife, Eleanor Daugerdas, who has spent the last four months assisting doctors and other medical personnel in their efforts to support the recovery of COVID-19 patients.

---

[1]     USP Marion consists of two facilities: (1) a medium security facility, and (2) a minimum-security prison "camp." reporting 84 "active" cases of COVID-19 at USP Marion showing, as of Friday, August 7, 2020: 70 active inmate cases and 5 staff. In the last two weeks, another 57 inmates and 4 staff have reportedly "recovered" from the virus, according to BOP statistics. In total, at least 145 individuals at USP Marion, or greater than 10% of the two facilities' approximately 1,200 inmates have tested positive for COVID-19. *See* "COVID-19 roundup," *CapitolFax.com* (Aug. 7, 2020), available at: https://capitolfax.com/2020/08/07/covid-19-roundup-51/; *see also* www.bop.gov/coronavirus. Of course, because the BOP does not separate the reported positive COVID-19 cases between facilities, it is possible—even likely—that the percentage of infected inmates at the satellite "camp," where Mr. Daugerdas resides, is much higher. Mr. Daugerdas has informed his children that he has been told that of the approximately 120 current camp residents, approximately 60, **or about 50 percent of the total residents, have tested positive.** *See also* Nausheen Husain, "2 dead at Marion federal prison during COVID-19 surge despite restrictive conditions, say inmates and family members," *Chicago Tribune* (Aug. 7, 2020) (The Bureau of Prisons, which was reporting 72 positive cases July 31 at Marion in southern Illinois, reported 133 positive cases Monday. On Tuesday, the number went down to 88, with 49 inmates reported recovered, and then to 84, including four prison employees, on Friday."), available at: https://www.chicagotribune.com/coronavirus/ct-marion-federal-prison-covid-deaths-numbers-20200807-swoge2zwxfeu3nitbndvpdjhm4-story.html.

[2]     *See* "Second inmate dies after testing positive for COVID-19 at USP Marion," *Metropolis Planet* (Aug. 7, 2020), available at: https://www.metropolisplanet.com/coronavirus_news/second-inmate-dies-after-testing-positive-for-covid-19-at-usp-marion/article_1d1491eb-c5f6-5ca6-9f39-ddb5034d74dd.html. Inmate Taiwan Davis, age 39, died five days ago after his COVID-19 symptoms suddenly worsened. He was serving a seven-year prison sentence for a federal narcotics offense. The previous Sunday, Earl James, a 65-year-old inmate also died of complications from COVID-19. These inmates remained at the prison until their symptoms became life-threatening, at which time they were transferred to a hospital to die.

Hon. William H. Pauley III
August 10, 2020
Page 3 of 12

There is another urgent reason for this Court to order Mr. Daugerdas' immediate release. Prison management at USP Marion have only exacerbated the risks to Mr. Daugerdas and other sick inmates by grouping them in the same general area at the satellite camp, forcing dozens of virus-infected inmates to share crowded, communal facilities, including the same toilets and showers. Instead of getting individualized care to treat symptoms of the virus, Marion minimum-security inmates are left to take care of themselves unless and until the time their symptoms become life-threatening. This is both inhumane and a violation of fundamental human rights.

Nicole Daugerdas, Paul's youngest daughter, sent this chilling email about the conditions experienced by her father, which he reported in a telephone call at the end of last week:

> Even for those [inmates] exhibiting mild symptoms - leaving [my Dad] with 124 other inmates is putting [him] at significantly higher risk for escalating the disease process and developing complications. Furthermore, the types and severity of the viral strains of COVID at this time are unknown, and it is clear the prison staff is not taking action when inmates are reporting not feeling well. Taiwan Davis - the 39-year-old inmate who died on August 5th was complaining of symptoms *for days* prior to being evaluated by prison medical personnel. When he finally was examined, he was immediately sent to the local hospital - and shortly after began coughing up blood and was dead within 24 hours.

(Ex. A, Email from Nicole Daugerdas, 8/7/2020.)[3]

Compassionate release to home confinement is the ***only*** way to protect Mr. Daugerdas from the mortal danger he faces under these prison conditions. Indeed, it is not hyperbolic to state that Mr. Daugerdas now risks the possible death penalty for his non-violent tax-related crimes.

## I.     Mr. Daugerdas' COVD-19 Infection Warrants Reconsideration

Reconsideration of a motion is warranted due to a change in circumstance "or previously unavailable facts that might reasonably be expected to alter the conclusion reached by the [C]ourt." *United States v. Alvarez-Estevez*, No. 13-CR-380 (JFK), 2014 WL 12681364, at *2 (S.D.N.Y. Nov. 6, 2014); *accord United States v. Morvillo-Vidal*, No. 10-CR-222 (RWS), 2011 WL 4072173, at *2 (S.D.N.Y. September 13,20 II) ("the major grounds justifying reconsideration," include "the availability of new evidence, or the need to correct a clear error or prevent manifest injustice").

---

[3] The *Chicago Tribune* confirms these, and similar conditions at USP Marion: "Three inmates the Tribune communicated with complained this week about other decisions the prison administration has made in recent weeks, such as banning the use of phones and email, using isolation rooms for inmates needing to quarantine, and, for several days, keeping those who tested positive all together in a recreation room." Husain, "2 dead at Marion federal prison during COVID-19 surge despite restrictive conditions, say inmates and family members," *Chicago Tribune*.

Hon. William H. Pauley III
August 10, 2020
Page 4 of 12

_____

In denying Mr. Daugerdas' compassionate release, this Court emphasized that as of the May 1 Order, there were "no reported cases of COVID-19 at the Marion Camp," which the Court found could "indicate that the BOP's current protocols have been sufficient to prevent an outbreak." ECF Doc. 1030, 2020 WL 2097653, at *3. Plainly, that is no longer the case. As is clear from the severe COVID-19 outbreak at USP Marion, the BOP's protocols have, at this stage, failed to keep Mr. Daugerdas safe. His recent infection warrants the Court's reconsideration—to give him the greatest chance of surviving and recuperating from his COVID-19 illness. *See, e.g., United States v. Millul*, No. 18-cr-579 (JSR), Compassionate Release Order on Reconsideration, ECF. Doc. 199, at 1 (May 18, 2020 S.D.N.Y.) (granting defendant's motion for reconsideration of his compassionate release petition based on new evidence of the defendant's health conditions and vulnerabilities to COVID-19).

II.   **Mr. Daugerdas has Tested Positive for COVID-19 and his Continued Incarceration at USP Marion Severely Inhibits his Recovery**

On August 2, 2020, Mr. Daugerdas tested positive for COVID-19. He has lost his sense of taste and smell and is experiencing body aches and respiratory symptoms, including a chronic dry cough, which is a foreboding symptom of COVID-19. *See* Tara Parker-Pope and Mika Gröndahl, "Could My Symptoms Be Covid-19?," *New York Times* (Aug. 5, 2020).[4]

As discussed extensively in Mr. Daugerdas' initial motion papers, he suffers from numerous pre-existing medical conditions, including Type-2 diabetes, obesity, hypertension, and high cholesterol, and he was also a prolific smoker prior to his incarceration. *See* Paul Daugerdas' Mem. of Law in Support of Compassionate Release Mot., ECF Doc. 1019 at 2, 16 (Apr. 10, 2020). The combination of these co-morbidities substantially increases Mr. Daugerdas' vulnerability to COVID-19. *See* Lisa Winter, "Nearly All NYC-Area COVID-19 Hospitalizations Had Comorbidities," *The Scientist*, (Apr. 24, 2020) (study of 5,700 patients hospitalized in the New York Area because of COVID-19 found that 94 percent of the patients had a chronic health problem, and 88 percent had two or more, with the three most prevalent being hypertension (56.6 percent), obesity (41.7 percent), and diabetes (33.8 percent).);[5] *see also* Coronavirus Disease 2019, "People of Any Age with Underlying Medical Conditions," *Centers for Disease Control and Prevention* (updated June 25, 2020) (obesity, Type 2 diabetes, and hypertension are all COVID-19 risk factors);[6] Katherine J. Wu, "Study of 17 Million Identifies Crucial Risk Factors for

_____

[4]      Available at: https://www.nytimes.com/interactive/2020/08/05/well/covid-19-symptoms.html.

[5]      Available at: https://www.the-scientist.com/news-opinion/nearly-all-nyc-area-covid-19-hospitalizations-had-comorbidities-67476.

[6]      Available at: https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html.

Hon. William H. Pauley III
August 10, 2020
Page 5 of 12

_____

Coronavirus Deaths," *The New York Times*, (Updated July 13, 2020) ("Medical conditions such as obesity, diabetes . . . linked to poor outcomes" in COVID-19 patients).[7]

Mr. Daugerdas' COVID-19 infection puts him in mortal danger, which as the Court recognized in its May 1 Order, presents "extraordinary and compelling reasons" for his release under § 3582. ECF Doc. 1030, 2020 WL 2097653, at *3 ("After reviewing the parties' briefs and Daugerdas's BOP medical records, this Court finds that Daugerdas has shown 'extraordinary and compelling reasons' under the Policy Statement. Daugerdas contends—and the Government does not dispute—that he suffers from Type 2 diabetes, obesity, hypertension, and high cholesterol, which expose individuals to a higher risk of serious illness from COVID-19.") (citations omitted). Indeed, numerous courts in this circuit have similarly held that defendants' COVID-19 co-morbidities present extraordinary and compelling reasons for compassionate release. *See, e.g., United States v. Ramirez*, No. 19-cr-105 (LGS), Compassionate Release Order, ECF. Doc. 52, at 5 (S.D.N.Y. Aug. 6, 2020) (where defendant had diabetes, obesity, and hypertension the court found that "Defendant's compromised health conditions, taken in concert with the COVID-19 public health crisis, constitute an extraordinary and compelling reason to modify to Defendant's sentence on the grounds that he is suffering from a serious medical condition that substantially diminishes his ability to provide self-care within the environment of the facility."); *United States v. Kissi*, No. 13-CR-51 (MKB), 2020 WL 3723055, at *8-9 (E.D.N.Y. June 26, 2020) (granting compassionate release based in part on defendant's hypertension); *United States v. Foreman*, No. 3:19-CR-62 (VAB), 2020 WL 2315908, at *4 (D. Conn. May 11, 2020) (granting compassionate release, noting that "hypertension is still a risk factor" for COVID-19); *United States v. Lewis*, No. 16-CR-302, 2020 WL 2081374, at *1 (S.D.N.Y. Apr. 30, 2020) (extraordinary and compelling reasons warranted release  of defendant with diabetes and high blood pressure.); *United States v. Lucas*, No. 15-CR-143, 2020 WL 2059735, at *3 (W.D.N.Y. Apr. 29, 2020) (extraordinary and compelling reasons warranted release where defendant suffered from diabetes); *United States v. Zukerman*, No. 16-CR-194 (AT), 2020 WL 1659880, at *1, *5 (S.D.N.Y. Apr. 3, 2020) (extraordinary and compelling reasons warranted release of inmate with diabetes, hypertension, and obesity).

Now that Mr. Daugerdas has contracted the virus, his precarious health presents an even stronger reason for his release: he is in actual danger of severe and protracted illness due to the COVID-19 pandemic.  The pre-existing health conditions that made Mr. Daugerdas particularly susceptible to severe complications of COVID-19 are equally likely to impact the trajectory of his recovery.  According to Dr. Mike Ryan, executive director of the World Health Organization's Health Emergencies Program, "People who suffer very severe illness can take months to recover from the illness."  *See* Morgan McFall-Johnsen, "More than 1.3 million people have recovered from the coronavirus — and are likely now immune. But painful symptoms may last far longer

_____

[7]      Available at: https://www.nytimes.com/2020/07/08/health/coronavirus-risk-factors.html?surface=home-discovery-vi-prg&fellback=false&req_id=975265703&algo=identity&imp_id=189955000&action=click&module=Science%20%20Technology&pgtype=Homepage.

Hon. William H. Pauley III
August 10, 2020
Page 6 of 12

than people realize," *Business Insider*, (May 8, 2020).[8]   Indeed, for COVID-19 patients, "[r]ecovery . . . tends to look different, with much depending on a patient's health status prior to hospital admission."  *See* Yale University, "What does recovery from COVID-19 look like?," *MedicalXpress* (May 20, 2020).[9]  "Those least likely to recover seem to be frail older patients with other preexisting illnesses," like Mr. Daugerdas.  *See* Judith Graham, "What Does Recovery From COVID-19 Look Like? It Depends. A Pulmonologist Explains," *Kaiser Health News*, (Apr. 9, 2020).[10]  And, even among recovered patients, "[a]n estimated 30 to 40% of patients continue to face health challenges."  Yale University, "What does recovery from COVID-19 look like?" *MedicalXpress*.  Long-lasting effects of COVID-19 can include "decreased lung capacity," and "lungs [with] signs of organ damage."  Morgan McFall-Johnsen, *supra*.  Even if Mr. Daugerdas overcomes his bout with COVID-19, because of his serious pre-existing health conditions, he likely faces a halting and tenuous recovery.

Mr. Daugerdas' chances of surviving COVID-19 could also depend on the quality of the facility where he receives care—his recovery prospects may significantly increase if he is treated in a top-tier hospital near his home rather than in a BOP facility.  *See, e.g.,* Brian M. Rosenthal, Joseph Goldstein, Sharon Otterman and Sheri Fink, "Why Surviving the Virus May Come Down to Which Hospital Admits You, *New York Times* (July 1, 2020) ("mortality data from three dozen hospitals obtained by The New York Times indicates that the likelihood of survival may depend in part on where a patient is treated. At the peak of the pandemic in April, the data suggests, patients at some community hospitals were three times more likely to die as patients at medical centers in the wealthiest parts of the city.").[11]   Releasing Mr. Daugerdas now may appreciably impact his recuperation prospects.

We really hoped that we would never have the need to write this request for reconsideration of the Court's earlier denial.  It pains us to remind the Court of the government's words in its opposition to Mr. Daugerdas' earlier request, but we feel compelled to do so now.  Two months ago, the government urged the Court to reject Mr. Daugerdas' plea for mercy, by arguing, in part:

> [T]he defendant has also not cogently explained why both he and those with whom he lives and interacts at Marion Camp (which is in rural, southern Illinois and where authorities are enforcing screening and quarantine as warranted) allegedly would be safer if he were out of prison, and instead living in suburban Chicago (which has a high rate of COVID-19 infection) with a nurse who has exposure to COVID-19 patients. Put simply, while the work of Daugerdas's wife on the front lines of this

---

[8] Available at: https://www.businessinsider.com/covid-19-recovery-survivors-immunity-2020-4.

[9] Available at: https://medicalxpress.com/news/2020-05-recovery-covid-.html.

[10] Available at: https://khn.org/news/what-does-recovery-from-covid-19-look-like-it-depends-a-pulmonologist-explains/.

[11] Available at: https://www.nytimes.com/2020/07/01/nyregion/Coronavirus-hospitals.html.

Hon. William H. Pauley III
August 10, 2020
Page 7 of 12

_____

public health crisis is laudable, the fact remains that she (and, therefore, the defendant) faces a greater risk of Coronavirus infection as a result.

Gov. Opp. Mem., ECF Doc. 1024, 4/17/20, at 22.

Eleanor Daugerdas, who had the benefit of ample personal protection equipment and careful hospital protocols, still has not contracted COVID-19. Her husband, Paul, at the mercy of prison officials, has.

III.    **USP Marion Officials Have Failed to Adequately Manage the Facility's Predictable COVID-19 Outbreak, Leaving Compassionate Release as Mr. Daugerdas' Only Real Remedy**

The USP Marion prison administration's efforts to protect inmates from COVID-19 have abjectly failed. The conditions at the prison are near chaos in the wake of the rampant outbreak at the facilities. Inmates are grouped in two categories COVID-19 positive and COVID-19 negative, with the earlier group growing by the day. Consolidating the infected inmates in one area at the satellite camp only accomplishes one thing: making it harder for any one inmate to stand out among the sick, thereby increasing the odds of another Taiwan Davis and Earl Davis (*i.e.,* inmate fatalities) will result.

Based on information reported by Mr. Daugerdas, he and many other camp inmates received word on or about August 2 that they tested positive for the virus. As a result, the Warden tightened the lockdown already imposed at the minimum-security camp. This forced the infected inmates to remain in their cramped, shared quarters of quad-based units. Rather than isolating the inmates who were infected, or transferring them to medical units for observation and treatment, the BOP did the opposite—they grouped the sick inmates together within their original living quarters. Mr. Daugerdas still shares communal facilities, including toilets, sinks, and showers with many other COVID-19-positive inmates, some of whom are obviously symptomatic. And, because they are on "lockdown," inmates are restricted from using laundry facilities, requiring even sick inmates to attempt to clean their undergarments in the communal sinks and showers.[12]

The COVID-19 infected inmates also do not receive adequate meals. Corrections officers are now providing them with "dinner" at 1 p.m., consisting of nothing but a frozen peanut butter and jelly sandwich. *See* Ex. A, Nicole Daugerdas email dated 8/7/2020. The BOP's mishandling of the COVID-19 crisis at USP Marion, has led to predictably disastrous results. At least 145

_____

[12]    Mr. Daugerdas' telephone use also has been substantially restricted during the COVID-19 outbreak, curtailing his ability to communicate with his family and counsel regarding his health and the prison's conditions. Moreover, undersigned counsel has written several emails and left voice messages with Mr. Daugerdas' unit counselor, and not one of these messages has been returned.

Hon. William H. Pauley III
August 10, 2020
Page 8 of 12

_____

inmates and staff have contracted the virus and two inmates are dead, while the number of hospitalized inmates remains unknown.[13]

Most concerning for Mr. Daugerdas' bout with the virus, USP Marion staff have been slow to respond to sick inmates, allowing their COVID-19 symptoms to progress unabated. For example, Taiwan Davis, a 39-year-old USP Marion inmate who died on August 5, reportedly complained of increased shortness of breath, coughing and hypoxia for several days. Only five days after his COVID-19 diagnosis did Davis receive medical attention, resulting in his immediate admission to the hospital. He died shortly after. *See* Molly Parker, "2nd inmate with COVID-19 dies at Marion federal prison," *The Southern Illinoisan* (Aug. 7, 2020).[14]

The BOP has the solemn responsibility of protecting the health and safety of Mr. Daugerdas and his fellow inmates. This responsibility is only accentuated during this unprecedented public health crisis. Prison officials are not up to the task. The BOP's neglect has cost at least two USP Marion inmates their lives, and is jeopardizing many more, including Mr. Daugerdas.

We recognized, as did the Court, that Mr. Daugerdas' temporary furlough for the duration of the COVID-19 public health crisis would have been the least drastic, and arguably ideal, preventive remedy for this crisis. *See* ECF Doc. 1030, 2020 WL 2097653, at *5 ("this Court believes that Daugerdas is fit for temporary release from prison—but only until the COVID-19 pandemic abates . . . this Court strongly urges the BOP to consider Daugerdas for furlough under § 3622 in light of the COVID-19 crisis, his age, and underlying medical conditions until such time as the crisis abates."). But the BOP simply ignored the Court's firm recommendation for Mr. Daugerdas' temporary release.

More chilling perhaps, the Warden at USP Marion has barely reduced the minimum-security prison's population, thereby keeping it dangerously dense during the pandemic. As the Court is aware, "the best—perhaps the only—way to mitigate the damage and reduce the death toll [of inmates from COVID-19] is to decrease the jail and prison population by releasing as many people as possible." *Id.* (quoting *United States v. Nkanga*, No. 18-CR-713 (JMF) , 2020 WL 1529535, at *1 (S.D.N.Y. Mar. 31, 2020)). The Marion Warden did nothing of the sort. Apparently, a majority of the inmates who resided at the facility prior to the pandemic outbreak still reside there,[15] and over 1,000 inmates continue to be housed at the medium-security facility. Hundreds of men have thus continued to share communal facilities throughout the COVID-19 lockdown. Although over the last five months society has learned a great deal about the social distancing measures necessary to prevent COVID-19's unmitigated spread, the inmates at USP

_____

[13]     The BOP does not publish inmate hospitalization data.

[14]     Available at: https://thesouthern.com/news/local/2nd-inmate-with-covid-19-dies-at-marion-federal-prison/article_10097895-9e80-5275-b87a-79e8722becdd.html.

[15]     *See* https://www.bop.gov/locations/institutions/mar/.

Hon. William H. Pauley III
August 10, 2020
Page 9 of 12

Marion were prevented from taking these basic precautions.[16] USP Marion's crowded, communal conditions proved ideal for the virus' transmission.

The BOP's malfeasance in the face of Mr. Daugerdas' substantial COVID-19 risks now leaves compassionate release to home confinement as his only available remedy.

## IV.    Mr. Daugerdas' COVID-19 Infection and the Continuing Unsafe Conditions at USP Marion Favor his Release Under the Section 3553(a) Factors

Since the Court initially denied Mr. Daugerdas compassionate release, the deadly pandemic has swept through USP Marion, infecting Mr. Daugerdas, and potentially endangering his life. These markedly different circumstance change the balance of § 3553(a) factors significantly. *See United States v. Pena*, No. 15-CR-551 (AJN), 2020 WL 2301199, at *4 (S.D.N.Y. May 8, 2020) ("the Court's analysis" of § 3553 factors "is different in current circumstances."); *United States v. Park*, No. 16-CR-473 (RA), 2020 WL 1970603, at *4 (S.D.N.Y. Apr. 24, 2020) ("If not for the unprecedented pandemic facing the nation, Ms. Park would have been required to serve the entirety" her sentence.).

The state of Mr. Daugerdas' health certainly has become more dire since the Court's May 1 Order.  Because he is now infected with COVID-19, all of his chronic health conditions—Type 2 diabetes, obesity, hypertension, and elevated cholesterol—that previously could be medically managed, have become potentially lethal in the face of COVID-19.  *See, e.g.,* Wu, "Study of 17 Million Identifies Crucial Risk Factors for Coronavirus Deaths," *The New York Times*, ("Medical conditions such as obesity, diabetes . . . linked to poor outcomes" in COVID-19 patients).  The fact of Mr. Daugerdas' health conditions may not have changed in the years since his 2014 sentencing, but their present effect is drastically different.  Thus, although the Court may have "accounted for Daugerdas's age and his then-existing medical conditions," in his sentencing six years ago, ECF Doc. 1030, 2020 WL 2097653, at *4, the Court could not have considered the deadly risk that those conditions now pose to Mr. Daugerdas following his COVID-19 infection.[17]

---

[16]    *See, e.g.,* "Coronavirus Disease 2019 (COVID-19): How to Protect Yourself & Others," *CDC* (July 31, 2020) (Recommending that individuals "Avoid close contact . . . Stay at least 6 feet (about 2 arms' length) from other people," and that "Keeping distance from others is especially important for people who are at higher risk of getting very sick."), available at: https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/prevention.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fprepare%2Fprevention.html.

[17]    It remains unclear whether a patient can contract COVID-19 more than once, and to what extent relapse is possible.  Accordingly, even should he recover from his present COVID-19 illness, Mr. Daugerdas may remain vulnerable to further infection should he remain in USP Marion, where he is unable to practice self-care to protect himself from further infection.  *See, e.g., Se Eun Gong*, "In South Korea, A Growing Number Of COVID-19 Patients Test Positive After

Hon. William H. Pauley III
August 10, 2020
Page 10 of 12

_____

In initially denying Mr. Daugerdas' motion, the Court placed substantial weight on his offense conduct, explaining that "[g]ranting Daugerdas's motion would do little to 'promote respect for the law' or 'provide just punishment for the offense.'" *Id.* (quoting 18 U.S.C. § 3553(a)(2)(A)). There is no dispute regarding the severity of Mr. Daugerdas' conduct. Respectfully, however, requiring Mr. Daugerdas—who is an unfit, elderly man—to battle a potentially lethal COVID-19 infection from within an unprepared BOP facility is far more punitive than necessary under § 3553(a)'s statutory mandate.[18]   18 U.S.C. § 3553(a) (requiring a punishment "sufficient, but not greater than necessary" to effectuate federal sentencing goals); *see also Ramirez*, No. 19-cr-105 (LGS), Compassionate Release Order, at 6 (granting compassionate release to defendant wo had served only approximately 18 months of his 72-month sentence as "although he has not served the majority of his sentence and certain sentencing factors may weigh against release, the sentencing factors do not override the high risk of severe illness or death posed by COVID-19"); *United States v. Valencia*, No. 15-CR-163 (AT), 2020 WL 2319323, at *7 (S.D.N.Y. May 11, 2020) ("The Court did not intend that Valencia's sentence 'include incurring a great and unforeseen risk of severe illness or death' brought on by a global pandemic.") (quotation marks and citations omitted); *United States v. Bess*, No. 16-CR-156, 2020 WL 1940809, at *10 (W.D.N.Y. Apr. 22, 2020) (granting compassionate release to defendant sentenced to 84 months less than a year earlier, explaining "[t]his Court is now even more convinced that unless it lowers Bess's sentence, there is a substantial risk that he will become seriously ill and, with an unsettlingly high degree of probability, serve a life sentence.").

In its May 1 Opinion, the Court found that granting Mr. Daugerdas compassionate release "would create an 'unwarranted sentence disparit[y] among defendants,'" as the "Court sentenced a less culpable co-defendant, Donna Guerin, to a term of 96 months of imprisonment." ECF Doc. 1030, 2020 WL 2097653, at*4 (quoting  18 U.S.C. § 3553(a)(6)). Notably, Ms. Guerin is no longer in prison.  While BOP reports she is in a halfway house facility, given the pandemic's impact, she is likely serving the remainder of her sentencing in home confinement.  The 59-year-old co-defendant served approximately 6-plus years of her 8-year sentence, or approximately 75 percent of the total term.  Thankfully for Ms. Guerin, she was eligible for home detention at the initial outbreak of COVID-19 in March 2020.

Mr. Daugerdas has now served approximately 6 years of his 15-year-sentence, or about 40 percent of his full-term sentence.  This does not represent a slap-on-the-wrist or some meaningless punishment.  It represents serious prison time in any decent society.  But more importantly, Mr.

_____

Recovery," *NPR* (Apr. 17, 2020), available at: https://www.npr.org/sections/coronavirus-live-updates/2020/04/17/836747242/in-south-korea-a-growing-number-of-covid-19-patients-test-positive-after-recover.

[18]     Nor would Mr. Daugerdas' compassionate release pose any danger to the community.  As the Court found in its May 1 Opinion, "Daugerdas' convictions resulted in his disbarment and the revocation of his accounting license.  In short, he no longer has the tools to perpetuate his tax shelter scheme.  Accordingly, this Court finds that Daugerdas is no longer a danger to the community." ECF Doc. 1030, 2020 WL 2097653, at *3 n.5.

Hon. William H. Pauley III
August 10, 2020
Page 11 of 12

Daugerdas now faces the potential death penalty for a non-violent crime in which no one died or was injured. Mr. Daugerdas' COVID-19 infection inside an unprepared BOP facility itself represents a level of punishment that cannot be measured by looking at a number of months on a sentencing grid. This Court cannot logically compare the length of Mr. Daugerdas' sentence with any other co-defendant who has not contracted, or is not markedly vulnerable to contracting, this deadly virus. Ordering Mr. Daugerdas' compassionate release now would not create an "unwarranted" sentencing disparity. Indeed, it would represent a just and fair execution of the law and enhance our society's respect for the merciful flexibility of our criminal rules.

Lastly, Mr. Daugerdas has endured harsher prison conditions these last few months than other similarly situated defendants who qualify to service their prison time in a minimum-security facility. Mr. Daugerdas has been living in strict lockdown over the last two-plus months. Practically, he has had no mobility at all during this time, unable to leave his quad unit. This period of incarceration therefore has been meaningfully more difficult and punitive than most who came before him. *See, e.g., United States v. Gezer*, No. 16-cr-282 (CM), Sentencing Tr., ECF. Doc. 65, at 12:9-16 (S.D.N.Y. May 8, 2019) (describing the conditions at the MDC during the 2019 blackout as "hellish and unworthy of this country," and relying on those conditions in imposing a below-Guidelines sentence); *United States v. Ozols*, No. 16-CR-692 (JMF), Sentencing Tr., ECF. Doc. 234, at 30:20-31:16 (S.D.N.Y. Feb. 12, 2019) (crediting defendant "for what he endured at the MDC in the last few weeks" and stating that "the conditions [are those] that one associates with a third world country and not a country like this, and nobody in detention, whether convicted, not convicted, awaiting sentencing, should have to endure that as the detainees did at the MDC").

## V.    Conclusion

Even under the strictest evaluation of the sentencing factors under 18 U.S.C. § 3553(a), fairness and reasoned consideration of Mr. Daugerdas' individual history and characteristics should outweigh the need to continue to incarcerate a sickly, 69-year-old man who is fighting a COVID-19 infection.

We desperately urge this Court to act now and release Mr. Daugerdas to self-quarantine at his family residence outside of Chicago, Illinois, where he will receive around-the-clock treatment from medical personnel, or more specifically from his registered nurse wife, Eleanor. Mrs. Daugerdas can safely transport Mr. Daugerdas from the Marion facility by car and drive him home in a socially distant and protective way. He would have no contact with anyone else during the trip home and would remain in isolation there, or be brought to a hospital if necessary. This would be an example of the compassionate operation of just law.

 Mr. Daugerdas already has served six years in prison. He is old and weak and should not die in prison. Before he contracted coronavirus, this Court found that Mr. Daugerdas demonstrated "extraordinary and compelling reasons," to grant his motion for early release and convert his remaining period of incarceration to a term of supervised release with a condition of home confinement. Now, the need for such an order is even more compelling and urgent.

Hon. William H. Pauley III
August 10, 2020
Page 12 of 12

_____

     For all the foregoing reasons, we implore the Court to reconsider its May 1 Order, and grant Mr. Daugerdas compassionate release with a condition of home confinement for the duration of his sentence pursuant to 18 U.S.C. § 3582(c)(1)(A).

                    Respectfully submitted,

                        /s/ HEM
                    Henry E. Mazurek
                    Ilana Haramati
                    Meister Seelig & Fein LLP
                    125 Park Avenue, Suite 700
                    New York, New York 10017

                    *Counsel for Paul M. Daugerdas*

cc:      Counsel of Record (*via ECF*)