UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

--------------------------------------------------------------- x

                                                :

UNITED STATES OF AMERICA             :

                                                :

                  -v.-                       :          09 Cr. 581 (WHP)

                                                  :

PAUL M. DAUGERDAS               :

                                                :

                          Defendant.        :

--------------------------------------------------------------- x

                                                  :

ELEANOR DAUGERDAS,           :
PMD INVESTMENTS LLC, and     :
WBLG WALWORTH LLC,         :

                                                  :

                          Petitioners       :

--------------------------------------------------------------- x

# MEMORANDUM OF LAW IN OPPOSITION TO PETITIONERS' MOTION FOR SANCTIONS AGAINST THE GOVERNMENT

AUDREY STRAUSS
United States Attorney for the
Southern District of New York

Kiersten A. Fletcher
Assistant United States Attorney
- Of Counsel -

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ................................................................................................ ii

BACKGROUND ............................................................................................................... 1

    I.     The Criminal Case ................................................................................... 1

    II.    Ancillary Proceeding .............................................................................. 5

    III.   Petitioners' Motion for Sanctions ........................................................... 9

ARGUMENT .................................................................................................................. 10

A.    Applicable Law ....................................................................................... 10

B.    The Government Did Not Have a Duty to Obtain Unredacted J&G Bank Records.......... 11

C.    The Government Lacks the Culpable State of Mind to Impose Sanctions ....................... 14

D.    Sanctions are Inappropriate Because Petitioners Have Suffered No Prejudice ................ 19

CONCLUSION ................................................................................................................ 20

## **TABLE OF AUTHORITIES**

**Federal Cases**                                                                     **Page(s)**

*Chin v. Port Auth. of N.Y. & N.J.*,
  685 F.3d 135 (2d Cir.2012) ................................................................ 10, 11, 14, 15

*GenOn Mid–Atlantic, LLC v. Stone & Webster, Inc.*,
  282 F.R.D. 346 (S.D.N.Y.2012) .............................................................................. 11

*Harkabi v. SanDisk Corp.*,
  275 F.R.D. 414 (S.D.N.Y.2010) .............................................................................. 14

*In re Pfizer Inc. Sec. Litig.*,
  288 F.R.D. 297 (S.D.N.Y. 2013) ........................................................ 10, 11, 14, 15

*Pure Power Boot Camp v. Warrior Fitness Boot Camp*,
  587 F.Supp.2d 548 (S.D.N.Y.2008) ........................................................................ 10

*United States v. Bermudez*,
  526 F.2d 89 (2d Cir. 1975) ...................................................................................... 11

*United States v. Brennerman*,
  816 F. App'x 583 (2d Cir. 2020), *cert. denied*,141 S. Ct. 1442 (2021) .................... 12

*United States v. Daugerdas*,
  837 F.3d 212 (2d Cir. 2016) ........................................................................... 5, 6, 8, 9

*United States v. Daugerdas*,
  892 F.3d 545 (2d Cir. 2018) ................................................................................. 3, 5

*United States v. Porcelli*,
  865 F.2d 1352 (2d Cir. 1989) .................................................................................. 16

*United States v. Yousef*,
  327 F.3d 56 (2d Cir. 2003) ...................................................................................... 12

*In re Various Grand Jury Subpoenas*,
  235 F.Supp. 3d 472 (S.D.N.Y. 2017) ............................................................... 12, 17

*In re WRT Energy Sec. Litig.*,
  246 F.R.D. 185 (S.D.N.Y.2007) .............................................................................. 15

*Zubulake v. UBS Warburg, LLC*,
  229 F.R.D. 422 (S.D.N.Y.2004) .............................................................................. 10

**Federal Statutes**

Title 18, United States Code, Section 2 ........................................................................ 3

Title 18, United States Code, Section 371 .................................................................... 3

Title 18, United States Code, Section 1341 .................................................................. 3

Title 26, United States Code, Section 7201 .................................................................. 3

Title 26, United States Code, Section 7212 .................................................................. 3

**Rules**

Rule 17 ................................................................................................................... 12, 17

The United States of America (the "Government"), by and through its attorney Audrey Strauss, United States Attorney for the Southern District of New York, and Kiersten A. Fletcher, Assistant United States Attorney, Of Counsel, respectfully submits this memorandum of law in opposition to the motion for sanctions filed by third-party petitioners Eleanor Daugerdas, PMD Investments LLC, and WBLG Walworth LLC (the "Petitioners") for the Government's alleged failure to preserve and timely produce certain bank records during discovery (the "Motion") (D.E. 1064).

For the reasons set forth in detail below, the Motion should be denied because the Government has produced the relevant bank records within its control and was never under any obligation to obtain additional records from third parties for Petitioners' use in these proceedings.  Moreover, even if the Court were to find that the Government should have collected the relevant bank records from third parties, the Government's decision not to was entirely made in good faith under the circumstances, and cannot form the basis for a finding of gross negligence sufficient to justify sanctions.

## BACKGROUND

### I.     The Criminal Case

On or about June 9, 2009, a Grand Jury sitting in this District returned an Indictment charging Paul M. Daugerdas (the "Defendant") with orchestrating a long-running and extremely successful decades long tax-shelter scheme through his employer, Jenkens & Gilchrist ("J&G") (the "Initial Indictment") (D.E.1).

On or about June 16, 2009, the Court issued a Post-Indictment Restraining Order (the "Restraining Order") restraining numerous financial institution accounts following a

1

determination by the Court that there was probable cause that those accounts contained proceeds of Defendant's tax fraud scheme (the "Restrained Accounts").

On or about May 24, 2011, following a jury trial, the Defendant was found guilty of the tax fraud scheme alleged in a third superseding indictment (the "S3 Indictment"). On or about June 4, 2012, following a successful motion for a new trial based on juror bias, a new trial was granted. Thereafter, the Defendant moved to vacate the Restraining Order and the Government opposed the application submitting, *inter alia*, the Declaration of Stanley J. Okula, Jr. (the "Okula Restraining Order Declaration") which provided support that the Restrained Accounts contained proceeds of the Defendant's tax fraud.  (*See* D.E. 558). The Okula Restraining Order Declaration attached as an exhibit, *inter alia*, an Administrative Services Agreement between Jenkens and Gilchrist (Texas) ("J&G Texas") and Jenkens and Gilchrist (An Illinois Corporation) ("J&G Illinois") which required the deposit of J&G Illinois gross revenues into a separate bank account maintained by a representative of J&G Texas on behalf of J&G Illinois. *Id*. at Ex. 6.  The Okula Restraining Order Declaration also attached two pages of bank records from a J&G Illinois bank account (the "J&G Illinois Account") which reflected two wire distributions from J&G Illinois to the Defendant's PMD Chartered Chase Bank Account totaling approximately $60 million (the "Wire Records").[1]  *Id.* at Ex. 7.

On November 7, 2012, the Court denied the Defendant's motion, finding the fees received from J&G constituted proceeds of the Defendant's crime (the "November 7 Order"). (D.E. 574.)

---

[1] The two pages reflect one wire transfer in the amount of $15,473,001 to Daugerdas on Dec. 31, 1999 and one wire transfer in the amount of $46,357,902 to Daugerdas on Dec. 29, 2000, both paid by J&G Illinois.

On July 1, 2013, a Grand Jury sitting in this District returned a sixth Superseding Indictment charging the Defendant with the same tax fraud scheme as alleged in the S3 Indictment (the "S6 Indictment") (D.E. 644).

On October 31, 2013, following the second jury trial, the Defendant was found guilty of conspiracy to defraud the United States, commit tax evasion, and engage in a mail and wire fraud scheme, in violation of Title 18, United States Code, Section 371 (Count One); tax evasion, in violation of Title 18, United States Code, Section 2, and Title 26, United States Code, Section 7201 (Counts Five through Seven and Eleven); a corrupt endeavor to obstruct the due administration of the internal revenue laws, in violation of 26 U.S.C. § 7212(a) (Count Thirteen); and mail fraud, in violation of Title 18, United States Code, Sections 1341 and 2 (Count Seventeen).

On June 19, 2014, the Government moved for the entry of preliminary order of forfeiture of various assets of the Defendant, including the Restrained Accounts, as proceeds of the Defendant's tax shelter scheme and the imposition of a forfeiture money judgment in the amount of $180,000,000 (the "Government's Motion") (D.E. 825).  In support of the Government's Preliminary Order of Forfeiture, the Government submitted a Declaration from Special Agent Christine Mazzella, which traced approximately $91 million of distributions from J&G to Paul Daugerdas-controlled entities through Paul Daugerdas's PMD Chartered account at JP Morgan Chase.  (D.E. 826 ¶ 16).  In support of the Preliminary Order of Forfeiture, the Government took the position (with which the Court later agreed) that any fees Paul Daugerdas received from J&G would not have been paid to him *but for* his commission of the underlying criminal offenses, and therefore the fees were forfeitable as crime proceeds. *See United States v. Daugerdas*, 892 F.3d 545, 550 (2d Cir. 2018). The Government did not undertake to ascertain which J&G bank

accounts sent Paul Daugerdas the proceeds, because the funds were crime proceeds regardless of the account from which the funds were received.

On June 23, 2014, the Defendant filed an opposition contesting the Government's assertion that the assets of the Defendant were proceeds of his offenses. The Defendant argued, among other things, that the J&G fees paid to the Defendant were first commingled with legitimate funds, but failed to offer any proof of such commingling, including any records related to the J&G Illinois Account. (D.E. 828.)

On June 25, 2014, the Court included in its judgment of conviction a forfeiture money judgment in the amount of $164,737,500.  (D.E. 838.)  In imposing that amount of forfeiture, the Court ruled that the evidence presented at Paul Daugerdas's second trial was substantially the same as the overwhelming evidence presented at his first trial, which underpinned the Court's November 7 finding that the J&G fees paid to Paul Daugerdas were criminal proceeds.  *See* June 25, 2014 Tr. at 12:8-9 (D.E. 839) (citing the Nov. 7, 2012 Order Denying *Pro-Se* Motion to Vacate at 5 (D.E. 574).

On June 26, 2014, the Court entered a Preliminary Order of Forfeiture (the "June 26 POF") forfeiting to the Government the Defendant's interest in the certain properties (the "Specific Properties").

Paul Daugerdas appealed his conviction and the entry of the June 26 POF. In denying his appeal, the Second Circuit found, in relevant part, "the J&G account from which Daugerdas was paid held only the funds received by the Chicago office. The trial evidence established that the entirety of the tax-shelter fee income received by J&G's Chicago office—the pool of money from which Daugerdas was paid—was generated by Daugerdas's criminal acts.  Based on this evidence, the district court did not clearly err in concluding that the funds located in Daugerdas's

4

various accounts were the proceeds of his frauds." *United States v. Daugerdas*, 837 F.3d 212, 231 (2d Cir. 2016).

## II.     **The Ancillary Proceeding**

On August 29, 2014, the Petitioners filed a Petition asserting her interest in some of the Specific Properties because, *inter alia*, the Specific Properties were forfeitable only as "substitute assets" of the Defendant's offenses, rather than as offense property (the "Original Petition").  (D.E. 853.)

On October 31, 2014, the Government moved to dismiss the Original Petition asserting that the Specific Properties were proceeds of the Defendant's tax shelter fraud as the Court had determined in the June 26 POF and November 7 Order (the "Motion to Dismiss"). (D.E. 866.)

On March 20, 2017, the Court granted the Government's Motion to Dismiss and rejected the arguments set forth in the Original Petition, holding that, as previously determined by the Court, the Specific Properties were proceeds of the Defendant's crime and were not substitute assets and that Petitioners lacked standing to challenge that finding (the "March 20 Order"). (D.E. 900.)

On June 13, 2018, the Second Circuit reversed the March 20 Order and remanded for further proceedings.  In so doing, the Second Circuit reiterated its earlier finding that that because all of the tax shelter fees paid to J&G "were generated through the criminal acts of Daugerdas and his coconspirators," "none of [the funds at issue] would have been obtained but for the fraudulent scheme, . . . and they are subject to seizure as 'proceeds' of the fraudulent scheme" , but held that Due Process afforded Petitioners standing to challenge that finding. *United States v. Daugerdas*, 892 F.3d 545, 550 (2d Cir. 2018) (citing *Daugerdas* 837 F.3d at 218).  In remanding the matter to allow Petitioners to challenge the June 26 POF on the merits,

the Second Circuit noted in a footnote that "the district court did not consider whether any such commingling by the firm would, as a matter of law, actually defeat a finding that Paul's law firm income constituted the proceeds of his crimes (although, in Paul's case, it found as a factual matter that such commingling had not occurred, and we affirmed)" and noted that it was "not self-evident why, if Paul's partnership compensation was entirely derived from such fees, his income could not itself be considered the proceeds of fraud" but left it to this Court to decide the issue. *Id.* at 554 n.6.

On July 25, 2018, the parties appeared before Your Honor for a status conference, at which Petitioner's counsel requested the Government produce records from the J&G Illinois Account (the "J&G Illinois Records") for use in support of her claim. On that date the Court entered an Order requiring, *inter alia*, the Government to produce the J&G Illinois Records (the "July 25 Order"). Following the conference, the Government, working with agents at the IRS endeavored to search through the J&G shared drive containing electronic versions of the case files, the IRS searched through hundreds of boxes of documents maintained in the hard copy case file, and former AUSA Stanley Okula ran searches through the case database, which was then maintained on a now-legacy platform called Concordance. In addition, AUSA Okula informed the Government counsel handling the ancillary proceeding that he did not seek the J&G Illinois Records, via subpoena or other request, as part of the criminal case. *See* Declaration of Stanley Okula in Opposition to Petitioners' Motion for Sanctions (the "Okula Sanctions Declaration") at ¶¶ 7-8. A search of the IRS's hard copy files, the case shared drive at the U.S. Attorney's Office, and Concordance did not uncover the records or how the two pages from the J&G Illinois Records came to be attached to the Okula Restraining Order Declaration. *Id.* at ¶ 11.

On August 6, 2018, an Amended Preliminary Order of Forfeiture as to Certain Specific Properties was entered by the Court correcting the description of certain assets included in the Preliminary Order. Additionally, on October 24, 2018, the Court entered a Second Amended Preliminary Order as to Certain Specific Properties, correcting the description of additional assets of the Defendant.

On December 6, 2018, Petitioners filed an amended petition asserting, *inter alia*, that the proceeds of Paul Daugerdas' tax shelter scheme were "inextricably commingled" in J&G's bank accounts with untainted client fees prior to J&G making distributions to the Defendant-controlled PMD 3307 Account (the "Amended Petition").  (D.E. 970, ¶ 21, 22).  As such, the Petitioners claimed the Government could not forfeit those distributions as proceeds of Paul Daugerdas's tax shelter scheme.

 On or about January 22, 2020, the Court denied the Government's motion to dismiss the Amended Petition finding Petitioners sufficiently pled commingling in the Amended Petition to allow discovery to commence in the ancillary proceeding. (D.E. 1011).

Consistent with the Court's March 23, 2020 scheduling order, the parties exchanged discovery demands and interrogatories on April 30, 2020.  However, as a result of the COVID-19 pandemic, the parties both encountered difficulties in reviewing and producing the requested documents.  As the Government informed the Court in September of last year, while attempting to collect the relevant documents to produce to the Petitioners in response to discovery requests, the Government learned that Concordance, the legacy database  on which the J&G case files were maintained, was not accessible from outside the U.S. Attorney's Office. *See* Declaration of Kiersten A. Fletcher at ¶ 5 (the "Fletcher Declaration").  In light of the COVID-19 pandemic, and in an effort to ensure the Government could effectively search

7

through the entire case file, the Government decided to migrate the case data over to Relativity, a web-based document management platform now used by the Government in most cases, and accessible from our remote offices.  The process of migrating the data unexpectedly took many months due to the size of the database and the need to convert the Concordance data into a format readable by Relativity.

While the case Relativity database was being processed, Government counsel undertook anew to learn how the Government had been in possession of the excerpts of the J&G Illinois Records at the time it filed the Okula Restraining Order Declaration.  On or about November 5, 2020, Government counsel handling this forfeiture proceeding learned, for the first time, that in approximately April 2007, a separate prosecution team had received a production of documents from J&G, which was then represented by Davis Polk & Wardwell ("DPW"), in response to a grand jury subpoena issued in a separate grand jury investigation related to Ernst & Young (the "2007 DPW Production").  *See* Okula Sanctions Declaration at ¶ 7; Fletcher Declaration at ¶ 7. In other words, the Government was able to confirm AUSA Okula's recollection (as conveyed to the Court in 2019) that the J&G Illinois Records were not sought in connection with the U.S. Attorney's Office investigation of J&G or Paul Daugerdas.  *Id*.  Instead, they were sought in a separate grand jury investigation conducted by another Assistant United States Attorney. Following this revelation, the Government reached out to DPW to see if DPW still had a copy of the 2007 DPW Production or the underlying J&G Illinois Records, but has been unsuccessful.  Fletcher Declaration at ¶ 7.

After the full J&G case file was loaded into the newly-created Relativity database, Government counsel ultimately performed a manual review of that database, and identified and resolved an apparent technical issue with the relevant files that rendered them unsearchable.

Only at that point did the prosecution team responsible for this case finally located the 2007
DPW Production. *Id.* at ¶ 8.  In other words, the Government had finally located the 2007
DPW Production, which contained the portions of the J&G Illinois Records that had previously
been attached to the Okula Restraining Order Declaration.  The Government promptly produced
the full 2007 DPW Production to the Petitioners on November 30, 2020.  It appears from
Petitioners' motion that to date Petitioners have not made contact with DPW regarding the J&G
Illinois Records or made any effort to obtain them apart from sending a subpoena to the
custodian bank.

The Government's initial review of the 2007 DPW Production revealed that more than
$80 million of the $91 million initially traced from J&G to the Defendant's accounts was
received from the J&G Illinois Account that was created to receive payments from Paul
Daugerdas's tax shelter clients as contemplated by the J&G Administrative Services
Agreement.  In other words, the 2007 DPW Production supported the Government's earlier
position that the vast majority of funds wired to the Defendant came from the J&G Illinois
Account referred to in the Administrative Services Agreement, and were not "commingled"
with clean client receipts as the Petitioners' Amended Petition had alleged would be shown.[2]

### III.        The Petitioners' Motion for Sanctions

Unable to demonstrate from the 2007 DPW Production that Paul Daugerdas's tax shelter
client fees were commingled with receipts from J&G's legitimate clients (much less
"inextricably" so), Petitioners now seek to salvage their claim by moving for sanctions on the

---

[2]        While the Petitioner's motion suggests that most of the transfers were received by PMD
Chartered from J&G Texas accounts, those transfers, while numerous, primarily consisted of
$20,000 biweekly salary payments to the Defendant, while the multimillion dollar year-end
payments tied to tax shelter clients came directly from the J&G Illinois Account.

basis of (i) the Government's alleged "failure to preserve evidence" of certain bank records by not seeking them from third parties years prior to any indication that they were relevant to forfeiture, and (ii) the Government's belated production of the 2007 DPW Production.  For the reasons set forth below, the Court should deny the motion.

## ARGUMENT

### A.  Applicable Law

A party who seeks sanctions based on the spoliation of evidence must show: "(1) that the party having control over the evidence had an obligation to preserve it at the time it was destroyed; (2) that the records were destroyed with a 'culpable state of mind' and (3) that the destroyed evidence was 'relevant' to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense." *In re Pfizer Inc. Sec. Litig.,* 288 F.R.D. 297, 313 (S.D.N.Y. 2013) (quoting *Zubulake v. UBS Warburg, LLC,* 229 F.R.D. 422, 430 (S.D.N.Y.2004)).  "When the nature of the breach [of discovery obligations] is non-production of evidence, as opposed to actual destruction or significant alteration, a district court 'has broad discretion in fashioning an appropriate sanction.'" *Id.* at 325 (citing *Pure Power Boot Camp v. Warrior Fitness Boot Camp,* 587 F.Supp.2d 548, 567 (S.D.N.Y.2008).  "The test courts apply tracks the spoliation analysis." *Id.*

"If the moving party satisfies these elements, the 'court may, in its discretion, grant an adverse inference jury instruction or other sanctions insofar as such a sanction would 'serve the threefold purpose of (1) deterring parties from destroying evidence; (2) placing the risk of an erroneous evaluation of the content of the destroyed evidence on the party responsible for its destruction; and (3) restoring the party harmed by the loss of evidence helpful to its case to where the party would have been in the absence of spoliation.'" *Id.* (quoting *Chin v. Port Auth.*

10

*of N.Y. & N.J.*, 685 F.3d 135 (2d Cir.2012)).  In addition, "a court should never impose

spoliation sanctions of any sort unless there has been a showing—inferential or otherwise—that

the movant has suffered prejudice."  *In re Pfizer* at 316 (quoting *GenOn Mid–Atlantic, LLC v.*

*Stone & Webster, Inc.,* 282 F.R.D. 346, 353 (S.D.N.Y.2012)).

### B.  <u>The Government Did Not Have a Duty to Obtain Unredacted J&G Bank Records</u>

Petitioners cannot make the requisite showing for spoliation, because the Government has

not failed to preserve any evidence within its control.  Rather, the relevant bank records actually

obtained by the Government have been produced to the Petitioners.  Despite the Petitioners'

assertion that the Government had an obligation to "preserve" unredacted J&G Illinois bank

records in the possession of Bank of America, there is no allegation that the Government was

ever in possession of complete unredacted versions of the J&G Illinois Records and failed to

preserve them for this ancillary proceeding.  Instead, the Petitioners argue that the Government

was obligated to preserve and seek the bank records upon which Petitioners would now like to

rely because another Assistant United States Attorney, in a separate investigation, happened to

obtain excerpts of the records from J&G's counsel pursuant to a grand jury subpoena several

years prior.  Despite this Court's explicit request at the pre-motion conference that Petitioners do

so, Petitioners do not cite any legal authority in support of the proposition that the Government

(as opposed to a private litigant) is obligated to seek and obtain documents from a non-agent

third party for purposes of preserving those documents for some later possible claim.

It is a basic principle of federal criminal law in the Second Circuit that the Government's

disclosure obligations do not extend to third parties outside of the prosecution team. *See United*

*States v. Bermudez*, 526 F.2d 89, 100 n.9 (2d Cir. 1975) ("As with *Brady* and *Giglio*, the Jencks

11

Act does not require production of witness statements or documents from a file that was 'never in the possession of the prosecution or the federal investigators.'")  The Second Circuit has repeatedly rejected claims by criminal defendants who sought to impose on the Government an obligation to seek records in the possession of third parties.  In *United States v. Brennerman*, a criminal defendant sought to compel compliance with his Rule 17 subpoena for production of bank records from ICBC, a third party, and to compel the Government to obtain the records for him.  816 F. App'x 583, 586 (2d Cir. 2020), *cert. denied*, 141 S. Ct. 1442 (2021).  In dismissing Brennerman's appeal, the Second Circuit noted that ICBC was "not an agent of the government, and therefore the prosecution was under no obligation to make efforts to obtain information beyond what it previously collected and turned over to Brennerman." *Id*. at 586; *see also, United States v. Yousef*, 327 F.3d 56, 112 (2d Cir. 2003) (finding the Government was under no obligation to produce prior statements of foreign law enforcement officials that it does not possess).  Applying this case law and taking Petitioners' argument to its logical conclusion, the Government would have no obligation to seek the J&G Illinois Account Bank Records in the criminal case against the Defendant, but would be required to preserve the same records in anticipation of a potential future claim by a third party petitioner in an ancillary proceeding or face sanctions for failing to do so.  The law does not compel this absurd result.

Petitioners' reliance on *In re Various Grand Jury Subpoenas*, 235 F. Supp. 3d 472 (S.D.N.Y. 2017) (Pauley, J.) for the proposition that the Government has control over a document because it has the "practical ability to obtain from a non-party" is inapposite.  *See* Motion at 8.  *In re Various Grand Jury Subpoenas* involved a claim by the *recipient* of a grand jury subpoena that she was not required to produce bank records in the name of her husband and foundation notwithstanding her practical ability to obtain those records.  Nothing in *In re*

*Various Grand Jury Subpoenas* – or any other case law cited by the Petitioners' would impose such an obligation on the Government.  And for good reason:  by virtue of its grand jury subpoena power, the Government has the "practical ability" to obtain virtually any business records of any third party having any relationship to the grand jury investigation.  Requiring the Government to identify and preserve any such evidence if there was any prospect of a third party litigant in an ancillary proceeding wanting that evidence a decade later would impose a novel, burdensome obligation on the Government that is wholly unsupported by the law.

Against this backdrop, Petitioners seek to sidestep these implications by arguing that the Government must have subpoenaed the full J&G Illinois Records, which put those records within the Government's control even if the Government did not actually receive them.   This argument proves too much.  While the Government has not been able to locate the subpoena served on J&G to which the 2007 DPW Production responded, it appears from the Index of Productions provided by J&G in response to that subpoena that the Government did *not* request J&G bank records, and instead sought proof of payments made by J&G to Defendant.  *See* Declaration of James R. DeVita, Exhibit E, p. 8 (D.E. 1065).  Indeed, the J&G Illinois Records were produced with the description "List of checks from J&G to Paul M. Daugerdas, Chartered for each year from 1999-2003, followed by hard copies of those checks" and "List of wire transfers from J&G to Paul M. Daugerdas, Chartered for each year from 1999-2003, followed by documentation of those wire transfers."  *Id.* In other words, the index for the 2007 DPW Production appears to respond to requests for information about payments to the Defendant, not the J&G Illinois Records more broadly.  As such, the J&G Illinois Records were likely not within the scope of the subpoena served in the E&Y investigation, and cannot form the basis for a finding that the Government controlled these records so as to trigger an obligation to preserve them.

13

Regardless of whether the J&G Illinois records were subject to the 2007 grand jury subpoena issued in the E&Y investigation, the Government was under no duty to preserve those records it never obtained, and the Petitioners motion for sanctions should be denied on this basis alone.

### C.  The Government Lacks the Culpable State of Mind to Impose Sanctions

Assuming *arguendo*, that the Government had "control" of the unredacted J&G Illinois Account Records due to the 2007 grand jury subpoena issued by the Ernst and Young prosecution team, which it did not, the Court should decline to impose sanctions, because the Government's decision was entirely reasonable under the circumstances, strongly rebutting any inference that the Government had the requisite culpable state of mind to justify sanctions.

For the reasons discussed above, the Government was under no obligation to obtain the J&G Illinois Account Records during its investigation and prosecution of the Defendant. Petitioners do not suggest that the Government acted with any sort of affirmative bad faith in failing to seek the records or causing them to be deleted, nor could they in light of the fact that the Government would have had no reason to doubt that Petitioners or the defendant could have obtained the records themselves had they chosen to do so.  In the absence of any allegations or proof of bad faith, Petitioners instead contend that the Government acted with "gross negligence" when it determined not to seek the bank records at issue.

"In the discovery context, negligence is a 'failure to conform to the standard' of 'what a party must do to meet its obligation to participate meaningfully and fairly in the discovery phase of a judicial proceeding." *Harkabi v. SanDisk Corp.,* 275 F.R.D. 414, at 418-19 (S.D.N.Y.2010) (Pauley, D.J.).  Gross negligence is the "failure to exercise even that care which a careless person

would use." *Id.* at 419 (quotations omitted).  In *In re Pfizer Inc. Sec. Litig.,* held "[t]he failure of

a party to institute a litigation hold does not constitute gross negligence *per se.*" *Id.* at 315 (citing

*Chin v. Port Auth. of New York & New Jersey*, 685 F.3d 135, 162 (2d Cir. 2012). The *Pfizer*

Court, endorsing a case-by-case approach for the failure to produce relevant evidence, noted that

"the Court of Appeals for the Second Circuit has recently held that 'the better approach is to

consider [the failure to adopt good preservation practices] as one factor' in the determination of

whether discovery sanctions should issue." *In re Pfizer*, at 315 (quoting *Chin v. Port Auth. of*

*N.Y. & N.J.*).  Moreover, "[e]ven where the preservation obligation has been breached, sanctions

will only be warranted if the party responsible for the loss had a sufficiently culpable state of

mind." *In re WRT Energy Sec. Litig.,* 246 F.R.D. 185, 195 (S.D.N.Y. 2007).

     As set forth above, the Government did not seek the full J&G Illinois Bank Account

records in 2007 and, no court has ever held that the Government was under any obligation to do

so.  Given that the position taken by Petitioners here is entirely novel, and no court has ever

imposed on the Government an obligation to seek the records of third parties under these

circumstances, the Government could not possibly have understood itself to have such an

obligation at the time.  It cannot be negligence, let alone gross negligence, to violate a supposed

standard that did not exist at the time of the relevant conduct.

     The Government's 2009 effort to restrain Paul Daugerdas's assets or its 2012 reliance on

redacted portions of the 2007 DPW Production did not change this result, because the

Government still saw no reason to obtain the full bank account history for bank accounts it

neither needed to support its claim or anticipated another party might need.  *See* Okula Sanctions

Declaration at ¶¶ 8-10.

While the Petitioners assert that it "strains credibility" that the Government did not seek the entire J&G Illinois Records and that AUSA Okula's representations are "dubious," the Okula Sanctions Declaration makes clear precisely why the Government did not seek the records at issue here.  Specifically, throughout the criminal case against the Defendant, the Government has asserted – and continues to assert – that but for the Defendant's tax shelter scheme, he would not have received any funds from J&G. Therefore, any monies paid by J&G to Daugerdas were necessarily crime proceeds.  Okula Sanctions Declaration at ¶¶ 8-10; *see also United States v. Porcelli*, 865 F.2d 1352, 1365 (2d Cir. 1989) (otherwise legitimate or untainted assets may nonetheless be seized by the government if a criminal defendant "would not have acquired or maintained [them] but for his fraudulent scheme").   In light of that theory, and the fact that two pages of the Wire Records showed more than $60 million transferred to the Defendant from the J&G Illinois Account created for the purpose of receiving J&G Illinois tax shelter client funds, there was no need for the prosecution team to investigate the full activity of the J&G Illinois Account any further.  *Id.* ¶ 8.  Instead, AUSA Okula acted entirely reasonably by obtaining the evidence needed to support his claim, without burdening a third party with additional, overbroad requests for documents beyond those needed to prove the relevant facts.  And the subsequent criminal case supported this conclusion:  as demonstrated through two trials, the evidence showed that the Defendant would not have obtained any distributions from J&G but for his creation of the illegal tax shelters. Accordingly, nothing about the Government's conduct constitutes gross negligence.

Indeed, to the extent Petitioners argue that the Government was negligent in failing to try to locate the records, the same would be equally true of the Petitioners.  Both Petitioners and the Defendant (Petitioner Eleanor Daugerdas's spouse) have been aware that the Government had

restrained and intended to forfeit these funds since 2009, and they, not the Government, have asserted the commingling theory for which the records are purportedly essential.  Yet at no point during the course of the Defendant's case, including challenging the restraint order and litigating forfeiture, did the Defendant ever seek to get these records either from J&G or by requesting a Rule 17 subpoena to the bank.  Nor did Petitioners apparently ever seek the "critical records" through the Defendant or otherwise between 2009 and the filing of their initial petition in 2014, and in fact never even requested them from the Government before 2018.  Yet despite neither the Petitioners nor the Defendant seeking these records for the first 9 years of this controversy, Petitioners now say it was "grossly negligent" for the Government not to do so.

If the J&G Illinois Records were relevant to the Defendant's or the Petitioners' claims related to the June 26 POF, either could have sought the Court's permission to issue a subpoena for the records or sought them through other means, including through Daugerdas's former employer, J&G, or through J&G's counsel.  *See In re Various Grand Jury Subpoenas*, 235 F.Supp. 3d 472 (S.D.N.Y. 2017) (noting records maintained by an individual's spouse and employer were within that individual's control).  If it was negligent for the Government to fail to seek these records, it was equally negligent for Petitioners not to get them.

Petitioners further argue that it was incumbent upon the Government to demand that J&G or DPW "preserve" the records indefinitely.  Petitioners offer no legal basis for the Government to have done this, and the Government is aware of none.  In light of the lack of authority for the Government to demand preservation, the Government's failure to issue a preservation notice for the J&G Illinois Bank Account records does not constitute ordinary negligence, let alone gross negligence.

17

With respect to the Court's July 2018 Order, the Government conducted a good faith search for the records, including conducting a search of the J&G case shared drive for any requests for the relevant documents, which revealed none had been sent, searching through boxes of hard copy documents maintained at IRS, and searching through the legacy Concordance database.   Okula Sanctions Declaration at ¶ 11.  The Government's inability to find the requested records was, as it turns out, because the files were located in a separate case file that AUSA Okula did not work on (focusing on another accounting firm whose partners were separately charged), and on a legacy database that was not properly searchable until 2020. Fletcher Declaration at ¶ 8.  In March 2020, before its receipt of the Petitioners' document requests, the Government undertook to rebuild that legacy database to enable the Government to find any documents responsive to the Petitioners' anticipated document requests without having to review documents in hard copy.  Only after that database was completed and damaged files in the database repaired did the database become adequately searchable.  In November 2020, the Government located the 2007 DPW Production at which point it was promptly produced to the Petitioners.  *Id.*  The Government's efforts to locate the 2007 DPW Production were undertaken in good faith, and while the delay in production was unfortunate, it certainly did not rise to the level of gross negligence.

D.  **Sanctions for the Delay are Inappropriate Because Petitioners Have Suffered No Prejudice**

The Court should reject Petitioner's claim that the delay that occurred in producing the 2007 DPW Production prejudiced them. Petitioners filed the Amended Petition without the benefit of the requested records and were successful in defeating the Government's motion to dismiss the Petition without the records they sought.  Petitioners received the records in the

Government's possession in the ordinary course of discovery, months before any depositions have been taken.  Thus, the Government's delay in producing the 2007 DPW Production caused the Petitioners no harm.  Petitioners are now free to rely on the documents therein in pursuing its claim and are in no better (or worse) a position than had they received the records in 2018.  Accordingly, the Petitioners has suffered no prejudice from any delay that would justify sanctions.

Notwithstanding the absence of any prejudice, Petitioners now argue the June 26 POF should be "vacated" as to Petitioners and Petitioners should receive $10 million of the Specific Properties.  As a threshold matter, there is no such remedy as vacating the June 26 POF with respect to Petitioners; the June 26 POF forfeited the Defendant's interest in the Specific Properties and the Petitioners are being afforded in this ancillary proceeding the opportunity to demonstrate an interest in the Specific Properties superior to the Government's.  But more importantly, Petitioner's claim of entitlement to $10 million rests on its flawed theory that the Defendant received $10 million of untainted funds and that there is $10 million somewhere that the Government will be unable to forfeit.  Though this is a merits issue, and not an issue for the Court to resolve on the Petitioners' motion for sanctions, the amount of money paid to Daugerdas-controlled entities directly from the J&G Illinois Account (and therefore not even arguably commingled with J&G Texas funds) is vastly in excess of the funds currently restrained by the Government as Daugerdas's proceeds, and so the Specific Properties remain traceable to the tainted funds from the J&G Illinois Account.  Thus, recognizing their argument to obtain $10 million will be unavailing on the merits, Petitioners now effectively argue that the Court should forego any hearing or summary judgment briefing and simply return $10 million of criminal proceeds to the Defendant's spouse as a sanction.  Such a sanction is unsupported by the record

19

and should be rejected as a lawless attempt to avoid this Court resolving the Petitioners' claim on the merits.

## **<u>CONCLUSION</u>**

For the foregoing reasons, the Petitioners' motions for sanctions should be denied, and Petitioners should be required to complete discovery and move towards a resolution of its claim on the merits, either at a hearing or on a motion for summary judgment.

Dated: May 14, 2021
      New York, New York

                          Respectfully submitted,

                          AUDREY STRAUSS
                          United States Attorney
                          Southern District of New York

By:      _____/s/_____
                          Kiersten A. Fletcher
                          Assistant United States Attorney
                          (212) 637-2238